**MUEHLBAUER LAW OFFICE, LTD.**
ANDREW R. MUEHLBAUER
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
Jonathan D. Park (*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
jpark@pomlaw.com

*Attorneys for Co-Lead Plaintiffs Todd Langer, Mary Barida, and Jacks Way LLC*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| TODD LANGER, MARY BARIDA, AND JACKS WAY LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARATHON DIGITAL HOLDINGS, INC., MERRICK OKAMOTO, FREDERICK G. THIEL, SIMEON SALZMAN, and HUGH J. GALLAGHER,<br><br>Defendants. | Case No. 2:23-cv-00470-RFB-DJA<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


**I. NATURE OF THE ACTION** ..... 1

**II. JURISDICTION AND VENUE** ..... 4

**III. PARTIES** ..... 4

A. Plaintiffs ..... 4

B. Defendants ..... 5

**IV. SUBSTANTIVE ALLEGATIONS** ..... 7

A. Background of Marathon ..... 7

B. Bitcoin and Bitcoin Mining ..... 8

C. Bitcoin Trading ..... 10

D. Management is Responsible for Compliance with Accounting Standards. ..... 10

E. Accounting Standards for Reporting Impairment of Bitcoin Assets. ..... 12

F. Marathon's Valuation of Its Bitcoin Assets. ..... 14

G. The Company's Bitcoin Mining Pool: MaraPool ..... 16

H. The Company Reveals Certain Material Weaknesses In Its Financial Reporting While Concealing Others ..... 19

I. The Company Reveals That It Received an SEC Comment Letter Concerning the Company's Accounting Policies, That It Could Not Timely File its 10-K, and Cancels Its Scheduled Earnings Call ..... 20

J. The Company Issues the Restatement ..... 22

**V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD** ..... 24

A. Materially False and Misleading Assurances Regarding the Company's Internal Controls over Financial Reporting ..... 24

B. Materially False and Misleading Reports Regarding Impairment of Bitcoin Assets Accounted for in Violation of GAAP. ..... 26

C. Materially False and Misleading Reports of Cost of Revenues Accounted for in Violation of GAAP ..... 34

**VI. LOSS CAUSATION** ..... 34

**VII. THE RESTATEMENT** ..... 37

**VIII. DEFENDANT GALLAGHER ABRUPTLY LEAVES THE COMPANY** ..... 39

**IX. ADDITIONAL ALLEGATIONS CONCERNING SCIENTER** .... 40

A. The 2021 10-K Explicitly Acknowledged A Requirement that Defendants Violated. .... 40

B. Defendants Violated Clear and Long-Standing Accounting Rules. .... 40

C. Defendants Have Never Fully Disclosed the Comment Letter or Previously Hidden SEC Comments Received During 2022. .... 42

D. Defendant Gallagher's Abrupt Departure. .... 43

E. Insider Stock Sales. .... 44

**X. CLASS ACTION ALLEGATIONS** .... 44

**XI. PRESUMPTION OF RELIANCE** .... 46

**XII. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE** .... 47

**XIII. COUNTS** .... 48

COUNT I .... 48

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the 10(b) Defendants) .... 48

COUNT II .... 51

(Violations of Section 20(a) of the Exchange Act Against the 20(a) Defendants) .... 51

PRAYER FOR RELIEF .... 52

DEMAND FOR TRIAL BY JURY .... 53

Court-appointed Co-Lead Plaintiffs Todd Langer, Mary Barida, and Jacks Way LLC ("Plaintiffs"),[1] individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marathon Digital Holdings, Inc. ("Marathon" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet, as well as the investigation directed by Plaintiffs' counsel. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Marathon's publicly traded common stock between May 10, 2021 and February 28, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its current and former executive officers.

[1] Mary Barida pursues these claims both on her own behalf (and on behalf of the Class) as well as on behalf of her husband, Peter J. Wuebbolt, from whom she has received a valid assignment of claims. *See* ECF No. 16-2.

2. Marathon is a digital asset technology company that is principally engaged in producing or "mining" digital assets with a focus on the Bitcoin ecosystem. Bitcoin (or "BTC") is a cryptocurrency that was introduced in 2009 and is designed to act as money and a form of payment outside the control of any one person, group, or entity. Unlike fiat currency, bitcoin is created, distributed, traded, and stored using a decentralized ledger system known as a blockchain.[2] "Mining" bitcoin involves devoting significant computing power to "solving" the next block in the Bitcoin blockchain and thus obtaining the resulting new bitcoin. The Company also operated a mining pool where the Company's computing power and that of unrelated third parties were combined in this effort, with any mined bitcoins allocated to participating miners according to their contribution of mining power.

3. During the Class Period, the Company's strategic initiatives primarily focused on mining and holding bitcoin as a long-term investment. Each quarter, the Company reported its bitcoin holdings as well as its revenue from its bitcoin mining pool, while assuring investors that it had appropriate internal controls over financial reporting. Nevertheless, the Company repeatedly violated accounting rules concerning its bitcoin assets and its Bitcoin mining pool, leading it to restate nearly ***two years*** of financial results after receiving an unspecified number of comment letters, including one on February 22, 2013, from the SEC. The SEC raised questions about a number of the Company's accounting practices, including one rule that the Company's own auditor publicly acknowledged required a different method several months before the Company conceded that it had violated accounting rules.

[2] In this Amended Complaint, "Bitcoin" – with a capitalized first letter – is used to refer to the protocol, software, and community, and "bitcoin" – with a lower-case first letter – is used to refer to units of the currency.

4. On February 28, 2023, Marathon cancelled its webcast and earnings call concerning its fiscal year 2022 results with only four hours notice. That same day, the Company disclosed receipt of a letter from the SEC relating to accounting errors in the Company's previously issued financial statements, as well as prior comments from the SEC relating to the Company's accounting practices. The Company did not publicly file any of those comments from the SEC. The Company told investors that the "statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 . . . should no longer be relied upon" and would be restated.[3]

5. On this news, Marathon's stock price fell $0.59 per share, or ***8.31%***, to close at $6.51 per share on March 1, 2023.

6. Two weeks later, the Company issued a restatement, revealing that its financial condition—and internal controls—were materially different than it had told investors during the Class Period, including with respect to the value of its bitcoin holdings and the cost of its revenues.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

[3] The Company referred to these periodic reports as the "Impacted Financial Statements," and that term is used herein at times.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Marathon is incorporated in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

12. Co-Lead Plaintiff Todd Langer, as set forth in the previously-filed Certification (ECF No. 16-5), acquired Marathon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Co-Lead Plaintiff Mary Barida and her assignee, as set forth in the previously-filed Certification (ECF No. 16-5), acquired Marathon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14. Co-Lead Plaintiff Jacks Way LLC, as set forth in the previously-filed Certification (ECF No. 16-5), acquired Marathon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**B. Defendants**

15. Defendant Marathon is a Nevada corporation with principal executive offices located at 101 NE Third Avenue, Suite 1200, Fort Lauderdale, Florida 33301. The Company's headquarters were formerly located at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada 89144. The Company has stated that it moved its headquarters to Fort Lauderdale in 2022. During the Class Period, Marathon's common stock and redeemable warrants traded on The Nasdaq Capital Market ("Nasdaq") under the ticker symbol "MARA".

16. Defendant Merrick Okamoto ("Okamoto") served as the Company's Chief Executive Officer ("CEO") and Executive Chairman of the Board from prior to the start of the Class Period until April 2021. Defendant Okamoto joined the Company's Board in April 2017, was appointed the interim CEO effective January 1, 2018, and was hired as the Company's permanent CEO and Executive Chairman in October 2018. After stepping down as CEO in April 2021, Defendant Okamoto remained as Executive Chairman until the end of 2021.

17. Defendant Frederick G. Thiel ("Thiel") has served as the Company's CEO since April 2021 and as its Executive Chairman since January 2022, replacing Defendant Okamoto in both roles. Prior to joining the Company, from June 2017 through 2020, Defendant Thiel was the Chairman of SPROCKET, INC., a Blockchain/Cryptocurrency technology and financial services company.

18. Defendant Simeon Salzman ("Salzman") served as the Company's Chief Financial Officer ("CFO") from October 2020 until March 2022, when he became the Company's Chief

Accounting Officer ("CAO"). Defendant Salzman served as CAO until Defendant Salzman is a Certified Public Accountant and served as the CFO of several other companies prior to joining Marathon.

19. Defendant Hugh J. Gallagher ("Gallagher") has served as the Company's CFO since March 31, 2022, when he replaced Defendant Salzman in that position. Prior to joining the Company, Defendant Gallagher had over thirty years of experience in treasury, accounting, financial reporting, and financial planning roles, including serving as vice president finance and CFO of AmeriGas Propane from 2013 to 2018, treasurer (2011-2014) and director of investor relations and treasury (2007-2011) at UGI Corporation; and director of financial planning (2000-2004) at AmeriGas Propane. Defendant Gallagher is a Certified Public Accountant.

20. Defendants Marathon, Thiel, Salzman, and Gallagher are sometimes referred to herein as the "10(b) Defendants." Defendants Okamoto, Thiel, Salzman, and Gallagher are sometimes referred to herein as the "20(a) Defendants."

21. The 20(a) Defendants possessed the power and authority to control the contents of Marathon's SEC filings, press releases, and other market communications. The 20(a) Defendants were provided with copies of Marathon's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Marathon, and their access to material information available to them but not to the public, the 20(a) Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The 20(a) Defendants are liable for the false statements and omissions pleaded herein.

22. The 10(b) Defendants and the 20(a) Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of Marathon

23. Marathon is a digital asset technology company that is principally engaged in producing or "mining" digital assets with a focus on the Bitcoin ecosystem. Marathon was first incorporated in the State of Nevada in 2010 under the name Verve Ventures, Inc. The following year, it changed its name to American Strategic Minerals Corporation. At that time, the Company was engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, the Company discontinued its minerals business and began to invest in real estate properties in Southern California. Only four months later, in October 2012, the Company discontinued its real estate business and began focusing on IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc.

24. Then, on November 1, 2017—after Defendant Okamoto joined the Company's Board—the Company entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), a company that was focused on mining digital assets. The Company later began purchasing its own cryptocurrency mining machines and established a data center in Canada to mine digital assets. The Company told investors that it intended to add GBV's existing technical capabilities and digital asset miners and expand its activities in the mining of new digital assets, while at the same time harvesting the value of its remaining IP assets. In June 2018, however, the Company disclosed that its board of directors ("Board") had decided not to pursue the merger agreement with GBV. The Company paid GBV a termination fee of 750,000 shares of common stock valued at $2.85

million. Since that time, the Company has focused on mining and holding cryptocurrency, in particular Bitcoin.

**B. Bitcoin and Bitcoin Mining**

25. Bitcoin is a cryptocurrency that was introduced in 2009 and is designed to act as money and a form of payment outside the control of any one person, group, or entity. Unlike fiat currency, bitcoin is created, distributed, traded, and stored using a decentralized ledger system known as a blockchain. A distributed ledger is a shared database of information, stored on many computers rather than on a centralized server, that is chained together via cryptographic techniques.

26. Bitcoin mining is the process by which transactions are officially entered on the blockchain. It is also the way new bitcoins are launched into circulation. Bitcoin mining is the computational work that network nodes undertake to validate the information contained in blocks. Mining is conducted by miners using hardware and software to generate a cryptographic number that is equal to or less than a number set by the Bitcoin network's difficulty algorithm.

27. The first miner to find the solution to the problem receives bitcoins as a reward, and the process begins again. This reward is an incentive that motivates miners to assist in the primary purpose of mining: to earn the right to record transactions on the blockchain for the network to verify and confirm. In essence, Bitcoin miners are paid for their work as auditors: they conduct the first verification of Bitcoin transactions.

28. The rewards for mining bitcoin are cut in half every four years. When first mined in 2009, one block would earn you 50 BTC. In 2012, this was halved to 25 BTC. By 2016, this was halved again to 12.5 BTC. On May 11, 2020, the reward was halved again to 6.25 BTC. The reward was halved again in April 2024 to 3.125 BTC.

29. Due to the halving process and increasing (if volatile) prices of Bitcoin, miners want to receive as many bitcoins as possible because the supply of new coins is slowly dwindling. Sometime around 2140, there will be no more new bitcoins created.

30. When the Bitcoin blockchain was first released, it was possible to mine it competitively on a personal computer. However, as it became more popular, more miners joined the network, which lowered the chances of being the one to solve the hash.[4] As a cryptocurrency like Bitcoin becomes more popular, the number of computers participating in this peer-to-peer validation network increases. With more participants and more computing power, the so-called "hashpower" of the entire network increases accordingly. This is also referred to as the mining difficulty or difficulty.

31. Mining difficulty in the Bitcoin network is adjusted automatically after 2,016 blocks have been mined in the network. An adjustment of difficulty upwards or downwards depends on the number of participants in the mining network and their combined hashpower. Thus, over time, greater processing (or "hashing") power has become necessary for one to have a reasonable chance of receiving a reward for mining.

32. For that reason, Bitcoin mining has moved on from using personal computers and is now done largely on specialized application-specific integrated circuits ("ASICs") that are usually optimized for a specific digital currency, such as Bitcoin or another cryptocurrency. The majority of the Bitcoin network mining capacity is now owned by large mining firms, such as

[4] In computer science, a hash is a function that converts one value to another. Hashes are used to secure information. In the case of cryptocurrency, they are used to ensure data contained in the blocks on a blockchain are not altered. The information encrypted by a hashing function is validated by network participants when they attempt to generate a hash less than the network target. Once the target hash is reached, the network closes the block—consensus is reached after the block closes because the network continues to validate transactions and block information after the hash solution is found.

Marathon, as well as mining pools, where miners combine their hashing power in order to secure new Bitcoin. For instance, Marathon reported at the beginning of the Class Period that its "active mining fleet" comprised approximately 12,084 miners, all of which were ASIC machines. At that time, Marathon reported that this mining fleet generated approximately 1.29 EH/s, or exahashes per second. (One exahash is equal to one quintillion hashes.)

**C. Bitcoin Trading**

33. Bitcoin is generally traded on a Bitcoin exchange, which is a digital marketplace that serves as an intermediary between buyers and sellers of bitcoin, similar to a stock exchange. Some Bitcoin exchanges are decentralized, meaning they are operated without a central authority. These exchanges allow peer-to-peer trading of bitcoin without an exchange authority to facilitate the transactions.

34. Unlike a stock exchange, Bitcoin trading is not limited to market hours. Bitcoin trades twenty-four hours a day. As a result, the value of bitcoin can change constantly, not just during regular stock exchange hours. There is no "closing" price or "opening" price.

**D. Management is Responsible for Compliance with Accounting Standards.**

35. As a publicly traded U.S. company, Marathon must comply with U.S. Generally Accepted Accounting Principles ("GAAP" or "US GAAP"). GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").

36. In 2009, FASB issued the FASB Accounting Standards Codification ("ASC") which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. ASC is a systematic framework used in the United States to organize and present accounting standards and principles, and the SEC has designated FASB as the organization responsible for setting accounting standards for public companies in the United States. ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC, Topic 105, Sub-topic 10, § 5, ¶ 1.)

37. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

38. Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by AICPA states in pertinent part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).

39. Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls:

> Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . .

(15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

**E. Accounting Standards for Reporting Impairment of Bitcoin Assets.**

40. The FASB ASC Master Glossary defines intangible assets as assets (not including financial assets) that lack physical substance. Accordingly, cryptocurrency assets such as Bitcoin meet the definition of intangible assets and are accounted for under FASB ASC 350, *Intangibles — Goodwill and Other*.

41. ASC 350-30-35-4 states that if no legal, regulatory, contractual, competitive, economic, or other factors limit the useful life of an intangible asset to the reporting entity, the useful life of the asset should be considered indefinite. Because there is no inherent limit imposed on the useful life of the crypto asset to the entity, then the crypto asset would be classified as an indefinite-lived intangible asset.

42. Therefore, accounting and reporting that applies to crypto assets is much more closely aligned to that of a brand or trademark than to that of cash (including foreign currency), a cash equivalent or a financial asset or instrument. This is because without the endorsement of a government, crypto currencies do not qualify as legal tender. Through comment letters, in 2018, the SEC made its position clear that bitcoin (or ether) should not be treated as cash equivalents or equity, which companies account for based on fair market value.[5]

---

[5] *See, e.g.*, July 23, 2018 SEC comment letter to Blockchain Industries, Inc. (https://www.sec.gov/Archives/edgar/data/1084370/000000000018022481/filename1.pdf); August 21, 2018 SEC comment letter to BTCS Inc. (https://www.sec.gov/Archives/edgar/data/1436229/000000000018026066/filename1.pdf).

43. ASC 350-30 requires that indefinite-lived intangible assets not be amortized but assessed for impairment at least annually, and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired. An impairment is recorded when the carrying value of an intangible asset exceeds its fair value and the impairment loss is equal to the excess amount.

44. ASC 820 addresses measurement of fair value. Under ASC 810-10-20, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

45. Under ASC 820-10-35-6, if there is a principal market for the asset or liability, the fair value measurement shall represent the price in that market (whether that price is directly observable or estimated using another valuation technique), even if the price in a different market is potentially more advantageous at the measurement date. Per ASC 820-10-35-41, a quoted price in an active market provides the most reliable evidence of fair value and shall be used without adjustment to measure fair value whenever available. Because bitcoins are fungible, the trading price of bitcoin provides the most reliable evidence of fair value.

46. As a result, GAAP requires that if the trading price of bitcoin *at any time* declines below the price at which a company bought it, that is a circumstance indicating that the bitcoin asset is impaired and the Company is required to record an impairment reflecting the difference between the bitcoin's preexisting carrying value and the lowest trading price since acquisition.

47. Per ASC 350-30-35-20, impairments, once taken, are never reversed, even if the fair value of the crypto asset recovers during the same reporting period.

48. Other reporting companies acknowledged this rule. For instance, Tesla—publicly known as a large purchaser of bitcoin—stated the following in its annual report on Form 10-K for its fiscal year ended December 31, 2020, filed on February 2, 2021:

> We will account for digital assets as indefinite-lived intangible assets in accordance with ASC 350, Intangibles–Goodwill and Other. The digital assets are initially recorded at cost and are subsequently remeasured on the consolidated balance sheet at cost, net of any impairment losses incurred since acquisition. We will perform an analysis each quarter to identify impairment. *If the carrying value of the digital asset exceeds the fair value* ***based on the lowest price quoted in the active exchanges during the period****, we will recognize an impairment loss equal to the difference in the consolidated statement of operations.*[6]

49. MicroStrategy, a major Bitcoin development company, also acknowledged the proper GAAP requirements for valuing its Bitcoin assets. MicroStrategy's annual report on Form 10-K for its fiscal year ended December 31, 2020, filed on February 12, 2021, stated:

> The Company determines the fair value of its bitcoin on a nonrecurring basis in accordance with ASC 820, Fair Value Measurement, based on quoted (unadjusted) prices on the active exchange that the Company has determined is its principal market for bitcoin (Level 1 inputs). The Company performs an analysis each quarter to identify whether events or changes in circumstances, principally decreases in the quoted (unadjusted) prices on the active exchange, indicate that it is more likely than not that any of the assets are impaired. *In determining if an impairment has occurred, the Company considers the* ***lowest price of one bitcoin quoted on the active exchange at any time*** *since acquiring the specific bitcoin held by the Company*. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.

**F. Marathon's Valuation of Its Bitcoin Assets.**

50. Prior to and during the Class Period, Marathon stated that it accounted for its digital assets as indefinite-lived intangible assets. In the Q2 2021 10-Q, the Company stated that:

> Digital currencies are included in current assets in the consolidated balance sheets. *Digital currencies are recorded at cost less impairment.*

[6] Unless otherwise noted, all emphases are added.

> *An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that **it is more likely than not that the indefinite-lived asset is impaired.*** Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

51. This misled investors because the Company did not, as required by ASC 350, assess its bitcoin holdings for impairment "when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired" and did not record impairment reflecting the different between the carrying value and the fair value as revealed by those "events or changes in circumstances." Specifically, even if the trading price of bitcoin declined below the carrying value of the Company's bitcoin holdings, it did *not* record impairment unless the trading price of bitcoin was lower at a specified cut-off time that the Company selected. The Company made this choice even though Bitcoin trading is not restricted to "market hours." Further, when the Company did record impairment, it did not use the lowest trading price of bitcoin during the reporting period, as required by ASC 820. Rather, it used the trading price at the Company's selected cut-off time.

52. Indeed, Defendants assured investors that the Company had robust internal controls and that its financial statements were prepared in compliance with GAAP.

53. The Company's annual report on Form 10-K for the fiscal year ended December 31, 2022 (the "2021 10-K"), filed on March 10, 2022, further misled investors. The 2021 10-K reported that the Company "account[ed] for [its] bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value

***at any time*** since their acquisition" and that "*the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange* ***at any time*** *since its acquisition*."

54. This was false. When the Company restated its financial statements in 2023, it restated the values for impairment of its bitcoin holdings for all four quarters of 2021 and the first three quarters of 2022 to "correct[] its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day." Thus, the Company did not, as it stated in the 2021 10-K, use the lowest prices of bitcoin "at any time" to determine whether and to what extent the Company's bitcoin holdings were impaired, in violation of GAAP.

55. Investors did not know until the end of the Class Period that the Company's impairment analysis for its bitcoin holdings improperly used trading prices at an arbitrary cut-off time in violation of ASC 350 and thus of GAAP. Investors were thus misled by the Company's Class Period Reports (defined herein) that reported impairment of the Company's bitcoin holdings in violation of GAAP.

**G. The Company's Bitcoin Mining Pool: MaraPool**

56. On March 25, 2021, Marathon entered into an agreement to obtain an exclusive and irrevocable license to use another company's proprietary Bitcoin mining pool technology for use in the Company's new Bitcoin mining pool called "MaraPool." Marathon claimed that MaraPool "functions as a strategic differentiator for Marathon, as it provides us with improved insight into the performance of our mining operations, the potential to further optimize our performance, and the ability to vote on proposed upgrades and changes to the Bitcoin network."

57. MaraPool is now a self-operated *private* pool. However, it was open to third-party pool participants from September 2021 until May 2022. During that time, the third-party pool participants paid a pool fee to Marathon for its services as the pool operator pursuant to pool service contracts. As the private pool operator, the Company facilitated the contribution of hash rate by third-party pool participants by providing access to the pool's software license and tracking the hash rate generated by each pool participant to enable calculation of the pro rata block reward and transaction fee payment to each pool participant. As the operator of MaraPool, the Company delegated mining work to the pool participants utilizing software that algorithmically assigned work to each individual miner. By virtue of its selection and operation of the software, the Company as operator controlled delegation of work to the pool participants, and thus directed the mining pool participants to contribute their hash rate to solve in areas that the Company designates. MaraPool was associated with its own bitcoin wallet (owned by the Company as Operator), which was recorded on the distributed Bitcoin ledger as the winner of proof of work block rewards and assignee of all validations and, therefore, the transaction verifier of record. Therefore, the Company determined that it controlled the service of providing transaction verification services to the network and requester. Fees associated with the licensed software used in the operation of the private pool were originally recorded by Marathon as cost of revenues.

58. The Company also acted as a participant in the pool: it contributed mining power and thus was entitled to consideration equal to a fractional share of the Bitcoin reward (non-cash consideration, less any pool fees paid to the mining pool operator which are recorded as contra-revenues), for successfully adding a block to the blockchain. The Company's fractional share of the block reward was based on the proportion of the Company's contributed hash rate to the total computing power contributed by all mining pool participants in solving the then-current algorithm

as calculated and determined by the pool operator (that is, the Company itself), net of any pool fees.

59. Under ASC 606-10-55-37, generally, an entity is a principal if it controls the specified good or service before that good or service is transferred to a customer. Here, Marathon exercised control over the operations of the mining pool.

60. Under ASC 606-10-55-37B, the entity that is determined to be a principal follows the "gross" approach and recognizes revenue when (or as) it satisfies its performance obligation in the amount equal to the price paid by the end consumer for the good or service ("gross" revenue). The amounts remitted to the other party are presented as an expense. Conversely, under ASC 606-10-55-38, a reporting entity that is determined to be an agent, follows the "net" approach and recognizes revenue when (or as) it satisfies its performance obligation equal to the net amount retained after remitting amounts to the other parties for providing the good or service ("net" revenue).

61. The Company's annual reports on Form 10-K for 2020 and 2021 did not disclose whether Marathon accounted for revenues derived from MaraPool on a gross basis (as principal) or on a net basis (as an agent). The Company's quarterly report for the second quarter of 2022, filed on August 9, 2022, disclosed that:

> The Company is a pool operator and acts as an agent, and not as a principal. The Company did not have control over any third party contributing hashrate to its pool. It merely facilitated the contribution of hash rate by third party pool participants who could choose to join or leave a pool as they wish. As the pool operator, the Company recognized 100% of all pool fees generated by such pool as fee revenue and not mining revenue. The Company therefore concluded that in its capacity as the pool operator it was an agent, and not a principal.

62. That report assured investors that the Company complied with GAAP and had robust internal controls over its financial reporting.

**H. The Company Reveals Certain Material Weaknesses In Its Financial Reporting While Concealing Others**

63. During the Class Period, Defendants made a series of statements to investors about the Company's internal controls over financial reporting. Beginning on May 10, 2021—the first day of the Class Period—Defendants reassuringly reported that the Company had a robust system of internal controls and disclosure controls to assure that the Company's financial statements were accurate.

64. On March 10, 2022, the Company disclosed one discrete "material weakness" in its internal controls over financial reporting. On that day, the Company filed the 2021 10-K, which Defendants Thiel and Gallagher signed. The 2021 10-K disclosed that "management identified a weakness in internal control over financial reporting related to Information Technology General Controls" as of December 31, 2022. Specifically, Defendants disclosed that:

> the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

65. Defendants nevertheless assured investors that there were no other material weaknesses in the Company's internal controls over financial reporting, and that this particular material weakness "did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K."

66. The Q1 2022 10-Q, Q2 2022 10-Q, and Q3 2022 10-Q similarly represented that there were no other material weaknesses in the Company's internal controls over financial reporting.

**I. The Company Reveals That It Received an SEC Comment Letter Concerning the Company's Accounting Policies, That It Could Not Timely File its 10-K, and Cancels Its Scheduled Earnings Call**

67. On February 28, 2023, during the trading day, the Company issues a series of announcements that sent its stock price into a decline.

68. The Company issued a press release at 12:21 pm Eastern time "announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for ***today***, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

69. The Company also filed a Form 8-K with the SEC stating that it had "received a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below." The Company disclosed that "after consultation with Marcum LLP, the Company's independent auditor," the Board had concluded that:

> due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements.

70. The Company stated that "[a]s a result of receiving the SEC comments on February 22, 2023 and the Audit Committee's determination to restate the Impacted Financial Statements," the Company was unable its Form 10-K for 2022 by the filing deadline of March 1, 2023.

71. The Company disclosed that "[a]mong the restatement issues" were impairment of digital assets, and operation of a bitcoin mining pool that included third party participants. The Company acknowledged that:

> its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance with the ASC 350-30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value, which effectively calls for the intraday low price to be utilized in calculating impairment whenever events or changes in circumstances indicate it is more likely than not that the asset is impaired.

72. The Company also disclosed that its revenue recognition with respect to MaraPool included the determination that "in its capacity as the operator of a mining pool that included third parties, it acted as an agent. As a result, the Company recorded revenues on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool." However, this "assessment that it acted as an Agent in operating the third-party mining pool was incorrect and . . . it should have concluded that it was acting as a principal in its capacity as the pool operator." The Company acknowledged that it "should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants," and estimated that "its revenues and its cost of revenues for the year ended December 31, 2021 were understated due to the 'net' vs. 'gross' presentation of revenues in its financial statements."

73. As the market digested this news, the Company's stock price fell 0.14% on February 28, 2023, while the Nasdaq Blockchain Economy Index *rose*, generating a negative abnormal company-specific return. The following trading day, March 1, 2023, as the market

continued to digest the Company's announcements, the Company's stock price fell 8.31% to close at $6.51, even as the Nasdaq Blockchain Economy Index rose again.

**J. The Company Issues the Restatement**

74. Two weeks later, on March 16, 2023, the Company finally filed its annual report on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K, which was signed and certified by Defendants Thiel and Gallagher, disclosed that "[t]he Company received Staff comments *during 2022* which are *material* and *still under review* as set forth below." The report continued: "[w]e *additionally* have described below certain comments *more recently received* which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved."

75. The 2022 10-K disclosed that, at some point either in 2022 or on February 22, 2023 (or both), the SEC "objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin." The Company acknowledged that its prior practice of using a daily "closing" price for bitcoin did not comply with GAAP.

76. The 2022 10-K also revealed that the SEC had, at an unspecified time, "commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool." The Company disclosed that in its restated financial results provided in the 2022 10-K, it had "revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue."

77. The Company acknowledged that its previous accounting practice violated ASC Topic 606, "Revenue from Contracts with Customers," and thus violated Generally Accepted

Accounting Principles that it is required to follow. In the 2022 10-K, Defendants conceded that Marathon's

> assessment that it acted as an Agent in operating the third-party mining pool was incorrect and that it should have concluded that it was acting as a principal in its capacity as the pool operator. The effect of this change from Agent to Principal is that the Company should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants.

78. The Company further acknowledged that it "concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls the transaction verification services as an Operator," and thus that it acted a principal rather than an agent. The Company did not identify any new facts that led it to correct its prior violation of ASC 606.

79. The proper application of ASC 606 to the Company's MaraPool operations led to material changes in the Company's cost of revenues. For instance, the Company originally reported that its cost of revenues for 2021 was $33.7 million. As a result of the Company's violation of ASC 606 with respect to MaraPool, this was understated by approximately $8.7 million, or ***25.8%***.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Materially False and Misleading Assurances Regarding the Company's Internal Controls over Financial Reporting

80. Each of the Company's periodic reports on Form 10-K or Form 10-Q filed during the Class Period assured investors concerning the Company's internal controls over financial reporting.[7] Specifically, each of the Company's Class Period Reports stated that:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, ***management concluded that our disclosure controls and procedures were effective***.

81. With respect to each Class Period Report that they signed, each such Defendant certified that, inter alia: (a) based on their knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

[7] These are the quarterly reports on Form 10-Q filed on May 10, 2021 (the "Q1 2021 10-Q"), August 13, 2021 (the "Q2 2021 10-Q"), November 15, 2021 (the "Q3 2021 10-Q"), May 6, 2022 (the "Q1 2022 10-Q"), August 9, 2022 (the "Q2 2022 10-Q"), and November 14, 2022 (the "Q3 2022 10-Q"), as well as the 2021 10-K filed on March 10, 2022. These are referred to collectively herein as the "Class Period Reports." Defendants Thiel and Salzman signed the Q1 2021 10-Q, the Q2 2021 10-Q, the Q3 2021 10-Q, and the 2021 10-K. Defendants Thiel and Gallagher signed the Q1 2022 10-Q, the Q2 2022 10-Q, and the Q3 2022 10-Q.

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report; (b) the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report; (c) they, with the other signatory, designed and maintained disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company, evaluated those controls and procedures, and disclosed their conclusions about the effectiveness of the disclosure controls and procedures; and (d) they disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which were reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information.

82. The statements referenced in the two above paragraphs above were materially false and misleading because (i) the Company misrepresented the robustness of its disclosure controls and procedures and internal control over financial reporting; (ii) the Company was violating GAAP with respect to its MaraPool revenues and cost of revenues and assessing impairment of its bitcoin holdings; (iii) as a result, the Company's cost of revenue were materially misstated during the Class Period; (iv) also as a result, the value of the Company's bitcoin holdings was materially misstated during the Class Period, and (v) the foregoing, once revealed, was reasonably likely to have a material negative impact on the Company's financial condition.

### B. Materially False and Misleading Reports Regarding Impairment of Bitcoin Assets Accounted for in Violation of GAAP.

83. Each of the Class Period Reports reported impairment of the Company's bitcoin holdings that, unbeknownst to investors, was calculated in violation of GAAP, and falsely and misleadingly described the Company's method for assessing impairment of bitcoin without disclosing the Company's GAAP violations.

84. The Q1 2021 10-Q stated that:

> Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired*. *Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

85. The Q2 2021 10-Q stated that:

> Digital currencies, Digital currencies, restricted and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

86. The Q3 2021 10-Q stated that:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired***. ***Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

87. The 2021 10-K stated that:

The Company intends to account for its digital currency assets as indefinite life intangible assets. ***An intangible asset with an indefinite useful life is not amortized, but rather is assessed for impairment annually, or more frequently, when events or changes in circumstances occur which indicate that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company will have the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted. Realized gain or loss on the sale of digital currencies is included in other income or expenses in the Company's statements of operations.

88. The 2021 10-K further stated that:

Digital currencies are included in current assets in the consolidated balance sheets as intangible assets with indefinite useful lives. Digital currencies are recorded at cost less impairment.

***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the***

> ***time its fair value is being measured***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

89. The Q1 2022 10-Q stated that:

> Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

90. The Q2 2022 10-Q stated that:

> Digital currencies, Digital currencies, restricted and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

91. The Q3 2022 10-Q further stated that:

> Digital currencies are included in current and other assets in the consolidated balance sheets as intangible assets with indefinite useful life and are recorded at cost less impairment. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, ***or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired***. ***Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured***. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. ***If it is determined that the price of Bitcoin declines to lower than the carrying value, the Company has determined that it is more likely than not that an impairment exists. The Company determines the amount of impairment to record based on the fair value of bitcoin following the fair value measurement framework in ASC 820 – Fair Value Measurement. If the fair value of bitcoin is lower than the carrying amount the Company will record an impairment*** and subsequent reversal of impairment losses is not permitted.

92. The Q3 2022 10-Q stated that:

> Digital currencies, and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded as indefinite lived intangibles at cost less impairment in accordance with FASB ASC 350 – Intangibles-Goodwill and Other. Digital currencies, restricted represent collateral for long-term loans and as such are classified as a non-current asset.
>
> ***An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. When the exchange-traded price of digital currencies declines below its carrying value, the Company has determined that it is more likely than not that an impairment exists***. When this occurs, the amount of impairment to record is determined based on the fair value of digital currencies in accordance with the fair value measurement framework in FASB ASC 820 – Fair Value Measurement "(ASC 820"). ***If the fair value of digital currency is lower than its carrying amount, the Company will record an impairment in an amount by which the carrying value exceeds the fair value of the digital currency***. Subsequent reversal of impairment losses is not permitted.

93. The statements in the eleven above paragraphs were materially false and misleading because (i) the Company did not recognize impairment losses on its bitcoin holdings when events or changes in circumstances occurred indicating that it is more likely than not that the indefinite-lived asset is impaired, (ii) nor did it record impairment of its bitcoin holdings in the amount by

which the carrying value exceeded the fair value of bitcoin, as required by ASC 350 and 820. These accounting rules required that the Company assess whether and to what extent its bitcoin holdings were impaired by reference to the lowest trading price of bitcoin *at any time* during the period, which the Company did not do. Instead, the Company used the U.S. Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings.

94. The Q2 2021 10-Q also stated that:

> ***The Company accounts for its digital currencies as indefinite-lived intangible assets in accordance with Accounting Standards Codification ("ASC") 350, Intangibles – Goodwill and Other***. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, ***net of any impairment losses incurred since receipt***. ***Pursuant to guidance from ASC 820, Fair Value Measurement, the Company is required to determine the non-recurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value falls below the carrying value of the digital currencies***. The digital currencies can only be marked down when impaired and not marked up when their value increases. ***The resulting carrying value represents the fair value of the asset***.

95. Similarly, the Q3 2021 10-Q stated that:

> ***The Company accounts for its digital currencies as indefinite-lived intangible assets in accordance with Accounting Standards Codification ("ASC") 350, Intangibles – Goodwill and Other***. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, ***net of any impairment losses incurred since receipt***. ***Pursuant to guidance from ASC 820, Fair Value Measurement, the Company is required to determine the non-recurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value falls below the carrying value of the digital currencies***. The digital currencies can only be marked down when impaired and not marked up when their value increases. ***The resulting carrying value represents the fair value of the asset***.

96. The statements in the two above paragraphs were materially false and misleading because (i) the Company did not account for its bitcoin holdings in accordance with ASC 350 or ASC 820, (ii) did not measure the carrying value of its bitcoin holdings net of any impairment losses incurred since receipt, and (iii) did not record impairment losses as the fair value of bitcoin fell below the Company's carrying value of its bitcoin holdings. These accounting rules required that the Company assess whether and to what extent its bitcoin holdings were impaired by reference to the lowest trading price of bitcoin *at any time* during the period, which the Company did not do. Instead, the Company used the U.S. Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings.

97. The 2021 10-K further stated that:

> ***Market Price Risk of Bitcoin.*** We have invested a significant portion of our cash in bitcoin and, as of December 31, 2021, we held approximately 8,115 bitcoins. The carrying value of our bitcoins as of December 31, 2021 was $42,667, which reflects cumulative impairments of $29.6 million, on our Consolidated Balance Sheet. As discussed in Note 2, Summary of Significant Accounting Policies, to the Consolidated Financial Statements, ***we account for our bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition***. Impairment losses cannot be recovered for any subsequent increase in fair value. For example, the market price of one bitcoin in our principal market ranged from $46,178 - $67,634 during the three months ended December 31, 2021, ***but the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition***. Therefore, negative swings in the market price of bitcoin could have a material impact on our earnings and on the carrying value of our digital assets. Positive swings in the market price of bitcoin are not reflected in the carrying value of our digital assets and impact earnings only when the bitcoin is sold at a gain. For the year ended December 31, 2021, we incurred impairment losses of $29.6 million on our bitcoin. As of March 9, 2022, at 4:00 p.m. EST, the market price of one bitcoin in our principal market was $38,900.

98. The statements in the above paragraph were materially false and misleading because the Company did not report the carrying value of each bitcoin it held at the end of the reporting period in a manner that reflected the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition. Instead, the Company used the U.S. Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings.

99. In addition, the Company's Class Period Reports contained materially false and misleading reports of impairment of the Company's bitcoin holdings that violated GAAP.

100. The Q1 2021 10-Q reported that the Company's bitcoin holdings were impaired by $662,119 in that quarter and, as a result, the Company's total operating expenses were $56,208,229.

101. The Q2 2021 10-Q reported that the Company's mined bitcoin holdings were impaired by $11,078,660 in that quarter and that, as a result, the Company's total operating expenses were $24,700,251.

102. The Q3 2021 10-Q reported that the Company's bitcoin holdings were impaired by $6,731,890 in that quarter and that, as a result, the Company's total operating expenses were $115,991,238.

103. The 2021 10-K reported that the Company's bitcoin holdings were impaired by $29,552,991 in that year and that, as a result, the Company's total operating expenses were $201,855,397.

104. The Q1 2022 10-Q reported that the Company's bitcoin holdings were impaired by $19,551,254 in that quarter and that, as a result, the Company's total operating and administrative expenses were $34,450,350.

105. The Q2 2022 10-Q reported that the Company's bitcoin holdings were impaired by $127,590,231 in that quarter.

106. The Q3 2022 10-Q reported that the Company's bitcoin holdings were impaired by $5,903,891 in that quarter.

107. These reports of impairment of the Company's bitcoin holdings in the seven above paragraphs were materially false and misleading by virtue of the Company's violation of ASC 350 as well as of the Company's own statements in the 2021 10-K that the value of the Company's bitcoin holdings reflected the lowest price of one bitcoin quoted at any time since its acquisition. ASC 350 and 820 required that the Company assess whether and to what extent its bitcoin holdings were impaired by reference to the lowest trading price of bitcoin *at any time* during the period, which the Company did not do despite explicitly stating it did so in the 2021 10-K. Instead, the Company used the U.S. Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings. The Company's violations of GAAP were revealed on February 28, 2023, and the true impairment of the Company's bitcoin holdings, and its effect on the Company's financial condition, was revealed by the Restatement as set forth in Section VII, below.

**C. Materially False and Misleading Reports of Cost of Revenues Accounted for in Violation of GAAP**

108. The Company's periodic reports for the third quarter of 2021 through the second quarter of 2022 were false and misleading by reporting cost of revenues that were accounted for in violation of GAAP as a result of the Company's improper accounting with respect to MaraPool, as revealed by the Restatement.

109. The Q3 2021 10-Q reported that cost of revenue for the third quarter of 2021 was $10,263,009.

110. The 2021 10-K reported that cost of revenue for the fiscal year ended December 31, 2021 was $33,696,103.

111. The Q1 2022 10-Q reported that cost of revenue for the first quarter of 2022 was $26,393,636.

112. The Q2 2022 10-Q reported that cost of revenue for second first quarter of 2022 was $41,394,556.

113. These reports of the Company's cost of revenue were materially false and misleading because they were understated as a result of the Company's improper accounting with respect to MaraPool. The Company's violations of GAAP were revealed on February 28, 2023, and the Company's true cost of revenue for these reporting periods was revealed by the Restatement as set forth in Section VII, below.

## VI. <u>LOSS CAUSATION</u>

114. On February 28, 2023, during the trading day, Marathon issued a press release "announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and

fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

115. That same day, also during the trading day, in a Form 8-K filed with the SEC, Marathon disclosed receipt of a letter from the SEC relating to accounting errors in the Company's previously issued financial statements. Specifically, the Company disclosed:

> On February 22, 2023, Marathon Digital Holdings, Inc. [] received a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below.
>
> On February 27, 2023, the Company's Audit Committee of the Board of Directors, after consultation with Marcum LLP, the Company's independent auditor, concluded that due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements.
>
> Management and the Audit Committee have discussed these matters with Marcum LLP.
>
> As a result of receiving the SEC comments on February 22, 2023 and the Audit Committee's determination to restate the Impacted Financial Statements, the Company is unable to complete and file its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 ("2022 Form 10-K") and to make the required corrections to its financials and accompanying disclosures for the Impacted Financial Statements by the filing deadline for the Company's 2022 Form 10-K of March 1, 2023. The Company expects to file a Form 12b-25 with the SEC indicating that the Company intends to file its 2022 Form 10-K on or before the fifteenth calendar day following the prescribed due date.
>
> Among the restatement issues are:
>
> **Impairment of digital assets:** The Company's digital assets (bitcoin) are indefinite lived intangible assets within the scope of FASB ASC 350 – *Intangible Assets*

*Goodwill and Other* ("ASC 350") and as such, are subject to impairment testing on an annual basis or more frequently if events or changes in circumstances indicate it is more likely than not that the asset is impaired in accordance with ASC 350-30-35-18.

The Company recently determined that its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance with the ASC 350-30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value, which effectively calls for the intraday low price to be utilized in calculating impairment whenever events or changes in circumstances indicate it is more likely than not that the asset is impaired.

**Operation of a bitcoin mining pool that included third party participants**: In late 2021 and early 2022, the Company operated a bitcoin mining pool that included a small number of unrelated third-party participants. The Company accounts for revenues based on ASC Topic 606, *Revenue from Contracts with Customers* (ASC "606") and had determined that in its capacity as the operator of a mining pool that included third parties, it acted as an agent. As a result, the Company recorded revenues on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool.

The Company recently determined that its assessment that it acted as an Agent in operating the third-party mining pool was incorrect and that it should have concluded that it was acting as a principal in its capacity as the pool operator. The effect of this change from Agent to Principal is that the Company should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants.

The Company estimates that both its revenues and its cost of revenues for the year ended December 31, 2021 were understated due to the "net" vs. "gross" presentation of revenues in its financial statements. As a result, both revenues and cost of revenues, energy, hosting and other are expected to increase upon completion of this restatement for 2021. There will also be minor increases to revenues and cost of revenues, energy, hosting and other in previously issued interim financial statements in both 2021 and 2022. The restatement of the Impacted Financial Statements is not expected to have any impact on total margin, operating income or net income in 2021 or in any of the interim periods in 2021 or 2022. The Company no longer operates a pool that includes third parties.

116. As the market digested this news, which revealed that Defendants' prior statements were materially false and misleading, and constituted the materialization of risks concealed by those statements, Marathon's stock price fell $0.60 from its closing price on February 27, 2023 to close at $6.51 on March 1, 2023, a decline of ***8.31%***.

117. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII. THE RESTATEMENT

118. On March 16, 2023, the Company filed its late annual report on Form 10-K for the fiscal year ended December 31, 2022, correcting the accounting violations discussed above and restating its financial results for the periods covered by the Impacted Financial Statements (the "Restatement"). The 2022 10-K disclosed, inter alia, that:

> *The Company received Staff comments* ***during 2022*** *which* ***are material and still under review*** *as set forth below. We* ***additionally*** *have described below* ***certain comments more recently received*** which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved.
>
> ● Revenue recognition. The Staff commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool. The Company has, in the restated financial results, revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. . . .
> ● Impairment of bitcoin. The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.

119. The 2022 10-K disclosed:

> The Company corrected its previous conclusion that as the operator of Marapool ("Operator"), third-party mining pool participants ("pool participants") are its customer. The Company previously viewed such pool participants as principal to the delivery of transaction verification services to the network and requester and therefore recognized revenue net of amount remitted to pool participants' pro rata entitlement to block rewards and transaction fees. *The Company has since corrected its revenue recognition policy and concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls the transaction verification services as an Operator. This results in recognition of all transaction fees and block rewards earned from transaction verification services performed by the Company in its role as an Operator of*

> *MaraPool as revenue from contracts with customers under Topic 606, with the portion of the transaction fees and block rewards remitted to MaraPool participants as cost of revenues.*

120. The Company disclosed restated cost of revenues for 2021 and reported cost of revenues for 2022 that corrected the improper accounting for cost of revenues related to MaraPool originally reported for the first two quarters of 2022. The Restatement revealed that the Company's prior reports of cost of revenue were understated by the following amounts as a result of the Company's improper accounting with respect to MaraPool:

| ***Period*** | ***Amount of Understatement In Original Report*** |
|---|---|
| Q3 2021 | $624,000, or 6% |
| Full year 2021 | $8.699 million, or 25.8% |
| Q1 2022 | $5,000, or 0.19% |
| Q2 2022 | $1,000, or 0.02% |

121. The 2022 10-K further disclosed:

> Impairment of bitcoin. *The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.*

122. The 2022 10-K further explained:

> *The Company corrected its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day.* The Company's correction of this calculation results in it recognizing impairment in an amount by which the carrying value exceeds the fair value of the digital assets at any point in time during the day.

123. The 2022 10-K reported restated amounts of impairment for the Company's bitcoin holdings. The Restatement showed that the Company had materially understated the impairment of its bitcoin holdings, as follows:

| ***Period*** | ***Amount of Understatement In Original Report*** |
|---|---|
| Q1 2021 | $204,000, or 30.8% |
| Q2 2021 | $1,944,000, or 17.6% |
| Full year 2021 | $2.448 million, or 8.3% |
| Q1 2022 | $3,756,000, or 19.2% |
| Q2 2022 | $6,797,000, or 5.3% |

124. The table below further illustrates the impact of the Restatement, with respect to the Company's improper impairment of its bitcoin assets, on the Company's financial statements:

| Impairment of Digital Assets | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ($000s, except per share amts.) | Q1 2021 3/31/2021 | Q2 2021 6/30/2021 | Q3 2021 9/30/2021 | Q4 2021 12/31/2021 | 2021 12/31/2021 | Q1 2022 3/31/2022 | Q2 2022 6/30/2022 | Q3 2022 9/30/2022 |
| | | | | (Over)/understated by | | | | |
| Total Revenues | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cost of revenues | - | - | - | - | - | - | - | - |
| Operating income (loss) | (204) | (1,944) | 551 | (851) | (2,448) | (3,756) | (6,797) | 4,529 |
| Income (loss) before income taxes | (204) | (1,944) | 551 | (851) | (2,448) | (3,756) | (6,797) | 4,529 |
| Net income (loss) | $ (204) | $ (1,944) | $ 551 | $ (265) | $ (1,748) | $ (3,756) | $ (7,155) | $ 4,739 |
| Earnings (loss) per share - diluted | $ (0.01) | $ (0.02) | $ - | $ - | $ (0.02) | $ (0.04) | $ (0.06) | $ 0.04 |

125. As the above table shows, the Company's GAAP violations resulted in it reporting operating income/loss, income/loss before income taxes, net income/loss, and earnings per share (diluted) that were materially more positive than they, in reality, were for the first two quarters of 2021, the fiscal year of 2021, and the first two quarters of 2022.

## VIII. DEFENDANT GALLAGHER ABRUPTLY LEAVES THE COMPANY

126. The Restatement was the last SEC filing that Defendant Gallagher signed on behalf of the Company. On March 31, 2023—only *two weeks* after the Restatement—the Company announced that Defendant Gallagher, who had become the Company's CFO just one year earlier, would leave his job effective May 12, 2023. According to the Company, Defendant Gallagher

was leaving for unspecified "personal reasons." The Company did not announce Gallagher's successor at that time. In fact, the CFO position was not filled until June 14, 2023, meaning the Company had no CFO for an entire month, even as it consummated a private placement offering of over $14 million of its Series A redeemable convertible preferred stock, which is a transaction in which a CFO would normally be centrally involved.

## IX. ADDITIONAL ALLEGATIONS CONCERNING SCIENTER

127. In addition to the allegations above, a strong inference of Defendants' scienter is further established by the following allegations.

### A. The 2021 10-K Explicitly Acknowledged A Requirement That Defendants Violated.

128. In the 2021 10-K, Defendants provided greater specificity concerning its assessment of impairment of its bitcoin holdings under GAAP. The 2021 10-K specifically stated that "the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition." Thus, Defendants explicitly acknowledged that GAAP required the Company to assess the impairment of its bitcoin holdings using the lowest bitcoin trading price ***at any time*** since the Company acquired the bitcoin. Though Defendants' statement that the Company complied with this rule was false, it contributes to the strong inference of their scienter.

### B. Defendants Violated Clear and Long-Standing Accounting Rules.

129. A strong inference of Defendants' scienter is further established by the fact that they violated clear and long-standing accounting rules under GAAP. The Company did not identify any new facts or circumstances previously unknown to it that led it to correct its prior improper accounting.

130. Indeed, the Company's own auditor, Marcum, explicitly acknowledged *during the Class Period* that GAAP's impairment requirement requires companies to record the value of Bitcoin at its lowest value—***not*** its lowest value at an arbitrary "closing" time. The article was attributed to Robert Graham's Marcum's National Leader – Digital Assets & Blockchain. Published on Marcum's website on October 20, 2022—*months before the Company issued the Restatement*—the article addressed the FASB's tentative recommendation to modify accounting rules for reporting cryptocurrency assets, stating that:

> This recommendation may prove a boon to the cryptocurrency industry as advocates for the change have long suggested that adopting the fair-value accounting method will enable crypto holdings to be accurately valued on corporate balance sheets. The existing impairment requirement will be phased out so an asset won't have to be recorded at its lowest ever post-purchase value.[8]

131. The prominent accounting firm Deloitte also recognized that GAAP, during the Class Period, "require[d] entities to use a crypto asset's ***lowest observable fair value*** within a reporting period."[9]

132. Furthermore, other major companies including Tesla and MicroStrategy, as discussed above, acknowledged that GAAP required them to use the lowest recorded price of bitcoin when assessing whether and to what extent their bitcoin holdings were impaired. This is particularly significant given the prominence of Tesla's announcement in February 2021 that it was buying $1.5 *billion* in bitcoin, which was credited for pushing the price of bitcoin up by 20%. Furthermore, Defendant Okamoto specifically acknowledged MicroStrategy in his January 25, 2021 announcement that the Company had purchased $150 million in bitcoin, stating:

> By purchasing $150 million worth of Bitcoin, we have accelerated the process of

---

8 https://www.marcumllp.com/insights/fasb-recommends-new-cryptocurrency-accounting-method-with-significant-impact-on-corporate-reporting

9 https://dart.deloitte.com/USDART/home/publications/deloitte/heads-up/2023/fasb-issues-asu-crypto-assets

> building Marathon into what we believe to be the de facto investment choice for individuals and institutions who are seeking exposure to this new asset class. We also believe that holding part of our Treasury reserves in Bitcoin will be a better long-term strategy than holding US Dollars, similar to other *forward-thinking companies like MicroStrategy*.

133. Thus, Defendants' decision to violate this rule when reporting its Bitcoin assets to investors was *at least* reckless.

134. Further, the Company's violation of ASC Topic 606 and the resulting understatement of cost of revenues arising from the Company's operation of MaraPool involved clear and long-standing accounting rules. The Company's recognition that ASC Topic 606 required it to record its cost of revenues on a gross basis did not result from any new facts that were not available to Defendants at the time of their misleading statements. Thus, Defendants misstatements concerning revenues from MaraPool were made at least with recklessness.

135. The fact that the Company committed multiple accounting violations regarding the core of its business is strong evidence that Defendants acted at least recklessly in reporting the Company's Bitcoin assets and cost of revenues, and in assuring investors about the Company's internal controls over financial reporting.

### C. Defendants Have Never Fully Disclosed the Comment Letter or Previously Hidden SEC Comments Received During 2022.

136. The strong inference of Defendants' scienter is further bolstered by the fact that they withheld the Comment Letter rather than filing it publicly for investors to read, as is common. Indeed, the Company has itself previously filed ***thirty-three*** letters it received from the SEC. Nevertheless, the Company did not file the Comment Letter it received on February 22, 2023.

137. Rather, the Company's first disclosure of the Comment Letter, on February 28, 2023, obliquely described the letter as "relating to, among other things, certain accounting matters

as described further below. The February 28, 2023 announcement did not clearly disclose the contents of the Comment Letter, stating instead that as a result of the Comment Letter *and* the determination of the Company's Audit Committee, the Company would restate the Impacted Financial Statements, and that "among the restatement issues" were impairment of bitcoin in compliance with the ASC 350-30-35-19 and accounting for MaraPool revenues under ASC Topic 606.

138. Then, in the late-filed 2022 10-K, the Company disclosed that it "received [SEC] Staff comments during *2022* which are material and still under review," *as well as* "certain comments more recently received which relate to certain restatement items in this Form 10-K." All of these comments were listed under the heading "Unresolved Staff Comments." The Company did not file the Comment Letter received in February 2023 or the comments it received during 2022, leaving investors to guess exactly what the SEC said and when. Defendants' decision to keep investors in the dark about the details of the SEC's correspondence contributes to a strong inference of Defendants' scienter.

**D. Defendant Gallagher's Abrupt Departure.**

139. The announcement of Defendant Gallagher's abrupt departure from the Company a mere two weeks after the Restatement provides strong additional support for scienter. Not only did his departure come virtually immediately on the heels of the Restatement, Gallagher had served as the Company's CFO for just one year when his resignation was announced, though he had been hired on a three-year contract subject to automatic renewal. Further, by leaving at that time, Defendant Gallagher surrendered 100,000 restricted stock units (RSUs) that would have vested over the next two years at a schedule of 12,500 RSUs every three months. Had Gallagher remained in the CFO position for one more year—which would still be an unusually short tenure of merely

two years as CFO—another 50,000 RSUs, worth over $400,000 at the time his departure was announced, would vest. Defendant Gallagher's

**E. Insider Stock Sales.**

140. During the Class Period, before Defendants' fraud was revealed, Defendant Okamoto sold millions of dollars worth of Company stock. Specifically, on December 28, 2021, Defendant Okamoto sold 83,333 shares of Marathon stock at an average price of $37.02 per share, reaping proceeds of over ***$3 million***.

141. Furthermore, during the Class Period, the Company entered into an unusual agreement concerning equity compensation for Defendants Okamoto and Thiel. Specifically, in connection with a dispute concerning the settlement of certain restricted stock unit awards previously granted to Defendant Okamoto, on October 12, 2022, the Company entered into a settlement agreement with Okamoto, pursuant to which it agreed to pay him ***$24 million***. The Company entered into related settlement agreements with respect to certain restricted stock unit awards previously granted to five other individuals, including Defendant Thiel, which totaled approximately $1 million in the aggregate.

142. These facts establish that Defendants had a motive to defraud investors.

## X. CLASS ACTION ALLEGATIONS

143. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

> All persons and entities that purchased or otherwise acquired the Marathon's publicly traded common stock during the Class Period and were damaged thereby.

144. Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of the Company and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions

(1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; and (v) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories

145. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Marathon common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Marathon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

148. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Marathon;
- whether the 20(a) Defendants caused Marathon to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the price of Marathon common stock was artificially inflated during the Class Period because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

149. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. PRESUMPTION OF RELIANCE

150. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Marathon common stock are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company's common stock traded on the Nasdaq;
- the Company was covered by multiple analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiff and members of the Class purchased, acquired and/or sold Marathon common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

151. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

152. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

153. The protections applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

154. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures the Company or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement

knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of the Company who knew that the statement was untrue or misleading when made.

## XIII. COUNTS

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the 10(b) Defendants)**

155. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

156. This Count is asserted against the 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

157. During the Class Period, the 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Marathon securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Marathon common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the 10(b) Defendants, and each of them, took the actions set forth herein.

158. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Marathon common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Marathon's financial condition, prospects, and internal controls.

159. By virtue of their positions at Marathon, the 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

160. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Marathon, the 10(b) Defendants (other than Marathon itself) had knowledge of the details of Marathon's internal affairs.

161. The 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the 10(b) Defendants

(other than Marathon itself) were able to and did, directly or indirectly, control the content of the statements of Marathon. As officers and/or directors of a publicly-held company, the 10(b) Defendants (other than Marathon itself) had a duty to disseminate timely, accurate, and truthful information with respect to Marathon's business, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Marathon common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Marathon's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Marathon common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the 10(b) Defendants, and were damaged thereby.

162. During the Class Period, Marathon common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the 10(b) Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Marathon common stock at prices artificially inflated by 10(b) Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Marathon stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Marathon stock declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

163. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164. As a direct and proximate result of the 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the 20(a) Defendants)**

165. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

166. During the Class Period, the 20(a) Defendants participated in the operation and management of Marathon, and conducted and participated, directly and indirectly, in the conduct of Marathon's business affairs. Because of their senior positions, they knew the adverse non-public information about Marathon's misstatement of income and expenses and false financial statements.

167. As officers and/or directors of a publicly owned company, the 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Marathon's financial condition and results of operations, and to correct promptly any public statements issued by Marathon which had become materially false or misleading.

168. Because of their positions of control and authority as senior officers, the 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Marathon disseminated in the marketplace during the Class Period concerning Marathon's results of operations. Throughout the Class Period, the 20(a) Defendants exercised their power and authority to cause Marathon to engage in the wrongful acts complained of herein. The 20(a) Defendants, therefore, were "controlling persons" of Marathon within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Marathon common stock.

169. Each of the 20(a) Defendants, therefore, acted as a controlling person of Marathon. By reason of their senior management positions and/or being directors of Marathon, each of the 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Marathon to engage in the unlawful acts and conduct complained of herein. Each of the 20(a) Defendants exercised control over the general operations of Marathon and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

170. By reason of the above conduct, the 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Marathon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: June 4, 2024

Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**

*/s/ Andrew R. Muehlbauer*
Andrew R. Muehlbauer
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@mlolegal.com

*Counsel for Co-Lead Plaintiffs and Liaison Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
Jonathan D. Park (*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
jpark@pomlaw.com

**THE SCHALL FIRM**
Brian Schall (*pro hac vice* application forthcoming)
Brian England (*pro hac vice* application forthcoming)
Rina Restaino (*pro hac vice* application forthcoming)
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067

Telephone: 310-301-3335
Email: brian@schallfirm.com
briane@schallfirm.com
rina@schallfirm.com

*Counsel for Co-Lead Plaintiffs and Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2024, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the email addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Andrew R. Muehlbauer*
Andrew R. Muehlbauer