# EXHIBIT A

# Mar. 10, 2022 Marathon Form 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
# FORM 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2021

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the transition period from _____ to_____

# MARATHON DIGITAL HOLDINGS, INC.

(Exact Name of Registrant as Specified in Charter)

| Nevada | 001-36555 | 01-0949984 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1180 North Town Center Drive, Suite 100, Las Vegas, NV — 89144

(Address of principal executive offices) — (Zip Code)

Registrant's telephone number, including area code: 702-945-2773

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | MARA | The Nasdaq Capital Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. Yes ☒ No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. ☒

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

The aggregate market value of the common stock, no par value, held by non-affiliates of the registrant, based on the closing sale price of registrant's common stock as quoted on the Nasdaq Capital Market on June 30, 2021 (the last business day of the registrant's most recently completed second fiscal quarter), was approximately $3.1 billion. Accordingly, the registrant qualifies under the SEC's revised rules as a "large accelerated filer."

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date. 103,052,069 shares of common stock are issued and outstanding as of March 9, 2022.



2

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I.** |  |  |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 22 |
| Item 1B. | Unresolved Staff Comments | 38 |
| Item 2. | Properties | 39 |
| Item 3. | Legal Proceedings | 39 |
| Item 4. | Mine Safety Disclosures | 39 |
| **PART II.** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| Item 6. | Selected Financial Data | 41 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 49 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 50 |
| Item 9A. | Controls and Procedures | 50 |
| Item 9B. | Other Information | 51 |

**PART III.**

| Item 10. | Directors, Executive Officers and Corporate Governance | 52 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 52 |
| Item 13. | Certain Relationships and Related Transactions, Director Independence | 52 |
| Item 14. | Principal Accounting Fees and Services | 52 |

**PART IV.**

| Item 15. | Exhibits, Financial Statement Schedules | 53 |
| Item 16. | Form 10-K Summary | 56 |

3

## MARATHON DIGITAL HOLDINGS, INC.

### FORWARD LOOKING STATEMENTS

This Annual Report on Form 10-K and other written and oral statements made from time to time by us may contain so-called "forward-looking statements," all of which are subject to risks and uncertainties. Forward-looking statements can be identified by the use of words such as "expects," "plans," "will," "forecasts," "projects," "intends," "estimates," and other words of similar meaning. One can identify them by the fact that they do not relate strictly to historical or current facts. These statements are likely to address our growth strategy, financial results and product and development programs. One must carefully consider any such statement and should understand that many factors could cause actual results to differ from our forward-looking statements. These factors may include inaccurate assumptions and a broad variety of other risks and uncertainties, including some that are known and some that are not. No forward-looking statement can be guaranteed, and actual future results may vary materially.

These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks in the section entitled "Risk Factors" and the risks set out below, any of which may cause our or our industry's actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. These risks include, by way of example and not in limitation:

- The uncertainty of profitability;
- Risks related to failure to obtain adequate financing on a timely basis and on acceptable terms; and
- The potential economic fallout resulting from the COVID-19 outbreak and related circumstances.
- Other risks and uncertainties related to our business plan and business strategy.

This list is not an exhaustive list of the factors that may affect any of our forward-looking statements. These and other factors should be considered carefully, and readers should not place undue reliance on our forward-looking statements. Forward looking statements are made based on management's beliefs, estimates and opinions on the date the statements are made, and we undertake no obligation to update forward-looking statements if these beliefs, estimates and opinions or other circumstances should change. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable law, including the securities laws of the United States we do not intend to update any of the forward-looking statements to conform these statements to actual results.

Information regarding market and industry statistics contained in this Annual Report on Form 10-K is included based on information available to us that we believe is accurate. It is generally based on industry and other publications that are not produced for purposes of securities offerings or economic analysis. We have not reviewed or included data from all sources. Forecasts and other forward-looking information obtained from these sources are subject to the same qualifications and the additional uncertainties accompanying any estimates of future market size, revenue and market acceptance of products and services. As a result, investors should not place undue reliance on these forward-looking statements.

As used in this annual report, the terms "we", "us", "our", the "Company", "Marathon Digital Holdings, Inc.", "Marathon") and "MARA" mean Marathon Digital Holdings, Inc. and its subsidiaries, unless otherwise indicated.

4

## PART I

### ITEM 1. BUSINESS

Marathon is a digital asset technology company that mines cryptocurrencies with a focus on the blockchain ecosystem and the generation of digital assets. Marathon also acquires bitcoin when our cash, cash equivalents and short-term investments exceed current working capital requirements, and we may from time to time, subject to favorable market conditions, issue debt or equity securities to raise capital to use the proceeds to purchase bitcoin. To Marathon, the strategy is to hold bitcoin as a long term investment rather than engaging in regular trading of bitcoin or to hedge or otherwise enter into derivative contracts with respect to our bitcoin holdings, though we may sell bitcoin in future periods as needed to generate cash for treasury management and other general corporate purposes. Holding bitcoin is a strategy to act as a store of value, supported by a robust and public open source architecture, that is not linked to any country's monetary policy and can therefore serve as a hedge against inflation. We are of the firm belief that bitcoin offers additional opportunity for appreciation in value with increasing adoption due to its limited supply. We may also explore opportunities to become involved in businesses ancillary to our bitcoin mining business as favorable market conditions and opportunities arise.

We were incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc. On December 7, 2011, we changed our name to American Strategic Minerals Corporation and were engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, we discontinued our minerals business and began to invest in real estate properties in Southern California. In October 2012, we commenced our IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc. On November 1, 2017, we entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), which is focused on mining digital assets. We purchased cryptocurrency mining machines and established a data center in Canada to mine digital assets. We are expanding our activities in the mining of new digital assets, while at the same time harvesting the value of our remaining IP assets.

On June 28, 2018, our Board has determined that it is in the best interests of the Company and our shareholders to allow the Amended Merger Agreement with GBV to expire on its current termination date of June 28, 2018 without further negotiation or extension. The Board approved to issue 3,000,000 shares of our common stock to GBV as a termination fee for us cancelling the proposed merger between the two companies.

All share and per share values for all periods presented in the accompanying consolidated financial statements have been retroactively adjusted to reflect the 1:4 Reverse Split which occurred on April 8, 2019.

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd. (the "Seller"), a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of

4

shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share on December 27, 2019. On March 30, 2020, the Seller agreed to amend the total of number of shares to be issued was reduced to 2,101,500 shares and the rest of 350,250 shares was issued at $0.49 per share. There was no mining payable outstanding as of September 30, 2020.

On May 11, 2020, the Company announced the purchase of 700 M30S+ (80 TH) miners. On May 12, 2020, the Company announced the purchase 660 Bitmain S19 Pro Miners. On June 11, 2020, the Company announced the purchase of an additional 500 of the latest generation Bitmain S19 Pro Miners, bringing the Company's total Hashrate to approximately 240 PH/s when fully deployed.

On May 20, 2020, the Company amended its note, originally dated August 31, 2017, with Bi-Coastal Consulting Defined Benefit Plan to reduce the conversion price to $0.60 per share. The current principal balance of the Note was $999,105.60 and accrued the interest was $215,411.30. The Company agreed to the reduction in the conversion price from $0.80 to $0.60 to incentivize the Note holder to convert the Note to common stock. As the Note has been fully converted to common stock, the Company has no Long-Term debt.

On July 28, 2020, the Company closed a public offering of 7,666,666 shares of common stock, including the exercise in full by the underwriter of the option to purchase an additional 999,999 shares of common stock, at a public offering price of $0.90 per share. The gross proceeds of this offering, before deducting underwriting discounts and commissions and other offering expenses payable by Marathon, were approximately $6.9 million.

On July 29, 2020, the Company announced the purchase of 700 next generation M31S+ ASIC Miners from MicroBT. in the miners arrived mid-August.

On August 13, 2020, the Company entered into a Long Term Purchase Contract with Bitmaintech PTE., LTD ("Bitmain") for the purchase of 10,500 next generation Antminer S-19 Pro ASIC Miners. The purchase price per unit is $2,362 ($2,206 with a 6.62% discount) for a total gross purchase price of $24,801,000 (with a 6.62% discount for a discounted price of $23,159,174). The parties confirm that the total hashrate of the Antminers under this agreement shall not be less than 1,155,000 TH/s.

5

Subject to the timely payment of the purchase price, Bitmain delivered products according to the following schedule: 1,500 units on or before January 31, 2021; and 1,800 units on or before each of February 28, 2021; March 31, 2021; April 30, 2021, May 31, 2021 and June 30, 2021. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and has received 10,500 units from Bitmain.

On October 23, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19 Pro ASIC Miners. The 2021 delivery schedule was for 2,500 units to be delivered in January, 4,500 units delivered in February and the final 3,000 units delivered in March 2021. The gross purchase price was $23,620,000.00 with 30% due upon the execution of the contract and the balance paid over the next 4 months. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,581,594.00. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and has received 10,000 units from Bitmain.

On December 8, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19j Pro ASIC Miners, with 6,000 units delivered in August 2021, and the remaining 4,000 units delivered in September 2021. The gross purchase price is $23,770,000 with 10% of the purchase price due within 48 hours of execution of the contract, 30% due on January 14, 2021, 10% due on February 15, 2021, 30% due on June 15, 2021 and 20% due on July 15, 2021. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,718,649. As of December 31, 2021, the Company paid the entire purchase price under this agreement and has received 10,000 units from Bitmain.

On December 23, 2020, the Company executed a contract with Bitmain to purchase an additional 70,000 next generation Antminer S-19 ASIC Miners, with 7,000 units to be delivered by August 2021, 2,100 units to be delivered by September 2021, 6,500 units to be delivered by October 31, 2021, 14,700 units to be delivered by November 30, 2021, 24,500 units to be delivered by December 31, 2021 and 15,200 units to be delivered by January 31, 2022. The purchase price is $167,763,451. The purchase price for the miners shall be paid as follows: 20% within 48 hours of signing of contract; 30% on or before March 1, 2021; 4.75% on June 15, 2021; 1.76% on July 15, 2021; 4.58% on August 15, 2021; 10.19% on September 15, 2021; 17.63% on October 15, 2021 and 11.55% on November 15, 2021. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and received over 40,000 units from Bitmain.

Effective December 31, 2020, The Board of Directors of Marathon Digital Holdings, Inc. (the "Company") ratified the following arrangements approved by its Compensation Committee:

Merrick Okamoto, CEO was awarded a cash bonus of $2,000,000 which was paid before year end 2020. He was also awarded a special bonus of 1,000,000 RSUs with immediate vesting. He was given a new three-year employment agreement effective January 1, 2021 with the same salary and bonus as the prior agreement. He was also granted the following: award of 1,000,000 RSUs when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $500,000,000; award of 1,000,000 RSUs priced when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $750,000,000; award of 2,000,000 RSUs priced at lowest closing stock price in past 30 trading days when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $1,000,000,000; and award of 2,000,000 RSUs when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $2,000,000,000.

Sim Salzman, CFO, was granted a bonus payment of $40,000 in cash; and a bonus of 91,324 RSUs with immediate vesting. James Crawford, COO, was granted a bonus payment of $127,308 in cash and a stock bonus of 57,990 RSUs with immediate vesting. Furthermore, per his employment agreement, his base salary for the 2021 was increased by 3%.

Compensation for directors of the board for 2021 as follows: (i) cash compensation of $60,000 per year for each director, plus an additional $15,000 per year for each committee chair, paid 25% at the end of each calendar quarter; (ii) for existing directors, the equivalent of 54,795 RSUs; and (iii) for newly elected directors, a one-time grant of 91,324 RSUs, vesting 25% each calendar quarter during 2021. For clarification, new directors will also receive the same annual compensation as existing directors in addition to their one time grant.

On January 12, 2021, the Company also announced that it had successfully completed its previously announced $200 million shelf offering by utilizing its at-the-market (ATM) facility. As a result, the Company ended the 2020 fiscal year with $217.6 million in cash and 74,656,549 shares outstanding.

6

On January 15, 2021, Marathon Digital Holdings, Inc., a Nevada corporation (the "Company"), held an annual meeting of stockholders (the "Meeting"). As of the record date for the Meeting, 51,403,280 shares of common stock were issued and outstanding. A total of 33,981,556 shares of common stock, constituting a quorum, were present and accounted for at the Meeting. At the Meeting, the Company's stockholders approved the following proposals:

**VOTES CAST**

| PROPOSAL #1 | PROPOSAL | PROPOSAL #4 |
|---|---|---|

| Common shares | Increase in Shares under 2018 Incentive Plan by 5 million | #2a Election of Merrick Okamoto | PROPOSAL #2b Election of Peter Benz | PROPOSAL #3 Ratification of Auditor | Nonbinding Advisory Vote on Executive Compensation |
|---|---|---|---|---|---|
| Yes | 10,112,531 | 12,184,952 | 12,216,945 | 32,948,526 | 11,146,174 |
| No | 2,278,676 | | | 464,134 | 1,093,170 |
| Abstain | 163,325 | 369,187 | 337,194 | 567,470 | 315,663 |
| Broker Non-Vote | 21,427,024 | 21,427,417 | 21,427,417 | 1,426 | 21,426,549 |

Effective January 19, 2021, David Lieberman resigned as a director of Marathon Digital Holdings, Inc. (the "Company"). On the same date, the Company's Board appointed Kevin DeNuccio as a director to fill the vacancy created by Mr. Lieberman's resignation.

Mr. DeNuccio is the Founder and General Partner of Wild West Capital LLC since 2012 where he focused on angel investments, primarily in SAAS software start-ups. He brings to Marathon more than 25 years of experience as a chief executive, global sales leader, public and private board member, and more than a dozen angel investments, managing and growing leading technology businesses. He served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories and Unisys Corporation.

On January 25, 2021, the Company announced that it has purchased 4,812.66 BTC in an aggregate purchase price of $150 million.

Effective March 1, 2021, the Company changed its name to Marathon Digital Holdings, Inc.

On April 26, 2021, the Company appointed Fred Thiel as its new chief executive officer. Mr. Thiel has succeeded Merrick Okamoto, who has served as the Company's chief executive officer since 2018, and who served as executive chairman of the board of directors following the transition until his retirement at the end of 2021.

On March 25, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a licensing agreement with DMG Blockchain Solutions, Inc. to license DMG's proprietary Blockseer pool technology for use in its new Marathon OFAC Pool . Pursuant to the terms and conditions of the Agreement, the Company will be granted an exclusive and irrevocable license to use the technology in the U.S., and DMG will receive: $500,000 in restricted common stock of the Company (stock to be issued in a transaction exempt from registration under Section 4(a)(2) under the Securities Act of 1933, as amended); a monthly license fee with a sliding scale based on the MARAPool's block rewards and transaction fees received by the pool; and technical support services to be provided on an as-needed basis with payment in US dollars. As of December 31, 2021, DMG has received shares equivalent to $500,000 in restricted common stock of the Company.

On May 20, 2021, the Company appointed Georges Antoun and Jay Leupp to its board of directors, effective immediately, as Peter Benz transitions to become the company's vice president of corporate development and Michael Berg stepped down from his position of director to pursue other projects. As a result, Marathon's board of directors now consists of five directors, including three independent directors and two inside directors.

On May 21, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a binding letter of intent with Compute North, LLC to host 73,000 Bitcoin Miners over a staged in implementation between October 2021 and March 2022. The hosting cost is $0.50 per machine per month and the hosting rate will be $0.044 per kWh. In order to build out the infrastructure without paying for the capital expenditure, the Company will provide an 18 month bridge loan to Compute North of up to $67 million dollars, in tranches, based upon specified requirements being met. The terms of the contract are limited to three years with increases thereafter capped at three percent per year thereafter. The Company has also agreed to pay up to $14 million in expedite fees for construction/electrical and supply chain expediting activities. As of December 31, 2021, the Company paid $8 million of the $14 million in expedite fees recorded as a deposit on the balance sheet . On September 3, 2021, the Company entered into a master agreement with Compute North, LLC whereas the Company will pay an initial deposit of $14.6 million in aggregate over five instalments. As of December 31, 2021, the Company paid the full $14.6 million initial deposit recorded as a deposit on the balance sheet.

On July 30, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a fully executed contract with Bitmain to purchase an additional 30,000 S-19j Pro ASIC Miners, with 5,000 units scheduled to be delivered in each of January 2022, February 2022, March 2022, April 2022, May 2022, and June 2022. The purchase price is $126,000,000 with (i) 25% of the purchase price due paid within one day of execution of the contract, (ii) 35% of the purchase price of each batch due in consecutive months with 35% of the January 2022 batch due immediately, and then 35% of each of the remaining five batches due on the 15th of each consecutive month starting August 15, 2021, through December 15, 2021 and (iii) the remaining 40% of the purchase price of each batch due on the 15th of each consecutive month starting November 15, 2021 and then 40% of each of the remaining five batches due on the 15th of each consecutive month through April 2022.

7

On August 9, 2021, the Company appointed Sarita James and Said Ouissal to its board of directors, effective immediately as independent directors.

On August 23, 2021 , the Company issued 2,722,435 shares of common stock pursuant to the 2018 Equity Incentive Plan.

On August 27, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a Master Securities Loan Agreement (the "Agreement") with NYDIG Funding, LLC ("NYDIG"). Pursuant to the Agreement, the Company will loan its bitcoin ("BTC") to NYDIG with an interest rate of three percent (3%) per annum. Interest accrues daily and is payable on a monthly basis. The Agreement provides that the Company may recall its BTC at any time. NYDIG shall, prior to or concurrently with the transfer of the BTC to NYDIG, but in no case later than the close of business on the day of such transfer, transfer to the Company collateral with a market value at least equal to 100% of the market value of the loaned BTC, and the Company is granted a first priority lien on such collateral. As of August 27, 2021, the Company loaned 300 BTC to NYDIG.

As previously disclosed in the Company's monthly production updates, there have been multiple instances of the power generating station in Hardin, MT operating below peak capacity and thus limiting the Company's ability to mine bitcoin during 2021. To mitigate these issues in the future, system upgrades will be performed on the power generating station beginning in November 2021 and continuing into 2022. Each phase of this maintenance will require the plant, and therefore the Company's mining operations in Hardin, MT, to be offline for approximately three to five days. The upgrades are intended to improve the power generating station's efficacy and efficiency, increase safety, mitigate the potential for unexpected downtime in the future, and ultimately improve the Company's ability to effectively mine bitcoin. The Company believes that the impact of these upgrades on its mining operations will minimize future downtime and thus counterbalance any maintenance downtime experienced as a result of these repairs.

On October 1, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a Revolving Credit and Security Agreement (the "Agreement") with Silvergate Bank (the "Bank") pursuant to which Silvergate has agreed to loan the Company up to $100,000,000 on a revolving basis pursuant to the terms of the Agreement and the $100,000,000 principal amount revolving credit note issued by the Company in favor of the Bank under the Agreement ("Note"). The terms of the facility ("RLOC") set forth in the Agreement and Note are as follows:

| | |
|---|---|
| Initial Term: | One (1) Year |
| Availability: | The RLOC shall be made available from time to time to the Company for periodic draws (provided no event of default then exists) from its closing date up to and including the one- year anniversary of the loan date. |
| Origination Fee: | 0.25% of the Loan Commitment to the Bank (or $250,000); due at RLOC closing. |
| Unused Commitment | |

**Fee:** 0.25% per annum of the portion of the unused Loan Commitment, payable monthly in arrears.

**Renewal:** The RLOC may be renewed annually by agreement between the Bank and the Company, subject to (without limitation): (i) Company makes a request for renewal, in writing, no less than sixty (60) days prior to the then current maturity date, (ii) no event of default then exists, (iii) Company provides all necessary documentation to extend the RLOC, (iv) Company has paid all applicable fees related to the loan renewal, and (v) the Bank has approved such extension request according to its internal credit policies as determined by the Bank in its sole and absolute discretion.

If the Bank approves a request by Company to renew the RLOC upon any maturity, then a Renewal Fee of 0.25% of the Loan Commitment (or $250,000) shall be due and payable upon extension of the Loan Commitment.

8

**Payments:** Interest only to be paid monthly, with principal all due at maturity.

**Collateral:** The RLOC will be secured by a pledge of a sufficient amount of Company's right, title and interest in and to bitcoin and/or U.S. Dollar ("USD") stored in a custody account for the benefit of the Bank (the "Collateral Account"). the Bank will establish a Collateral Account with a regulated custodial entity (the "Custodian") that has been approved by the Bank. the Bank and Custodian will have a custodial agreement to perfect the security interest in the pledged Collateral Account which, among other things, allows for 1) the Bank to monitor the balance of the Collateral Account and 2) allows the Bank to have exclusive control over the Collateral Account including liquidation of the collateral in the event of Company's default under the terms of the RLOC. the Bank may also file a UCC financing statement on the pledged collateral.

**Minimum Advance Rate:** At origination, the Company must ensure the Collateral Account balance has sufficient bitcoin (and/or US$) to cause a Loan to Value (the "LTV") ratio of 65% (or less) ("Minimum Advance Rate") on the unpaid principal balance of the RLOC.

**Covenants:** The Company must maintain a minimum debt to equity ratio of 0.5:1. The Company must maintain a minimum liquidity of $25,000,000.

On November 9, 2021, the Company received a waiver letter from Silvergate Bank whereas Silvergate Bank has waived its default rights with respect to noncompliance of Section VII. Negative Covenants 7.3 Indebtedness and Section VI. Affirmative Covenants 6.5. Financial Covenants. Silvergate Bank accepts and acknowledges convertible notes in the aggregate principal amount up to $650,000,000, plus an option to purchase an additional $97,500,000 principal amount of Convertible Notes shall not constitute "Indebtedness" for purpose of Section 7.3 of the Revolving Credit and Security Agreement. Further the maximum debt-to-equity ratio in Section 6.5 shall be revised to be 1.50:1.00.

During the quarter ended September 30, 2021, the Company and certain of its executives received a subpoena from the SEC to produce documents and communications concerning the Hardin, Montana data center facility described in our Form 8-K dated October 13, 2020. On October 6, 2020, the Company entered into a series of agreements with multiple parties to design and build a data center for up to 100-megawatts in Hardin, MT. In conjunction therewith, the Company filed a Current Report on Form 8-K on October 13, 2020. The 8-K discloses that, pursuant to a Data Facility Services Agreement, the Company issued 6,000,000 shares of restricted Common Stock, in transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933, as amended. We understand that the SEC may be investigating whether or not there may have been any violations of the federal securities law. We are cooperating with the SEC.

On November 18, 2021, Marathon Digital Holdings, Inc. (the "Company") issued $650,000,000 principal amount of its 1.00% Convertible Senior Notes due 2026 (the "Notes"). The Notes were issued pursuant to, and are governed by, an indenture (the "Indenture"), dated as of November 18, 2021, between the Company and U.S. Bank National Association, as trustee (the "Trustee"). Pursuant to the purchase agreement between the Company and the initial purchasers of the Notes, the Company also granted the initial purchasers an option, for settlement within a period of 13 days from, and including, November 18, 2021 to purchase up to an additional $97,500,000 principal amount of Notes. As noted below, this option was exercised and an additional $97,500,000 principal amount of Notes was issued on November 23, 2021.

The Notes will be the Company's senior, unsecured obligations and will be (i) equal in right of payment with the Company's existing and future senior, unsecured indebtedness; (ii) senior in right of payment to the Company's existing and future indebtedness that is expressly subordinated to the Notes; (iii) effectively subordinated to the Company's existing and future secured indebtedness, to the extent of the value of the collateral securing that indebtedness; and (iv) structurally subordinated to all existing and future indebtedness and other liabilities, including trade payables, and (to the extent the Company is not a holder thereof) preferred equity, if any, of the Company's subsidiaries.

9

The Notes will accrue interest at a rate of 1.00% per annum, payable semi-annually in arrears on June 1 and December 1 of each year, beginning on June 1, 2022. The Notes will mature on December 1, 2026, unless earlier repurchased, redeemed or converted. Before the close of business on the business day immediately before June 1, 2026, noteholders will have the right to convert their Notes only upon the occurrence of certain events. From and after June 1, 2026, noteholders may convert their Notes at any time at their election until the close of business on the second scheduled trading day immediately before the maturity date. The Company will settle conversions by paying or delivering, as applicable, cash, shares of its common stock or a combination of cash and shares of its common stock, at the Company's election. The initial conversion rate is 13.1277 shares of common stock per $1,000 principal amount of Notes, which represents an initial conversion price of approximately $76.17 per share of common stock. The conversion rate and conversion price will be subject to customary adjustments upon the occurrence of certain events. In addition, if certain corporate events that constitute a "Make-Whole Fundamental Change" (as defined in the Indenture) occur, then the conversion rate will, in certain circumstances, be increased for a specified period of time.

The Notes will be redeemable, in whole or in part (subject to certain limitations described below), at the Company's option at any time, and from time to time, on or after December 6, 2024 and on or before the 21st scheduled trading day immediately before the maturity date, at a cash redemption price equal to the principal amount of the Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date, but only if the last reported sale price per share of the Company's common stock exceeds 130% of the conversion price on (1) each of at least 20 trading days, whether or not consecutive, during the 30 consecutive trading days ending on, and including, the trading day immediately before the date the Company sends the related redemption notice; and (2) the trading day immediately before the date the Company sends such notice. However, the Company may not redeem less than all of the outstanding Notes unless at least $100.0 million aggregate principal amount of Notes are outstanding and not called for redemption as of the time the Company sends the related redemption notice. In addition, calling any Note for redemption will constitute a Make-Whole Fundamental Change with respect to that Note, in which case the conversion rate applicable to the conversion of that Note will be increased in certain circumstances if it is converted during the related redemption conversion period.

If certain corporate events that constitute a "Fundamental Change" (as defined in the Indenture) occur, then, subject to a limited exception for certain cash mergers, noteholders may require the Company to repurchase their Notes at a cash repurchase price equal to the principal amount of the Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. The definition of Fundamental Change includes certain business combination transactions involving the Company and certain de-listing events with respect to the Company's common stock.

The Notes will have customary provisions relating to the occurrence of "Events of Default" (as defined in the Indenture), which include the following: (i) certain payment defaults on the Notes (which, in the case of a default in the payment of interest on the Notes, will be subject to a 30-

day cure period); (ii) the Company's failure to send certain notices under the Indenture within specified periods of time; (iii) the Company's failure to comply with certain covenants in the Indenture relating to the Company's ability to consolidate with or merge with or into, or sell, lease or otherwise transfer, in one transaction or a series of transactions, all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, to another person; (iv) a default by the Company in its other obligations or agreements under the Indenture or the Notes if such default is not cured or waived within 60 days after notice is given in accordance with the Indenture; (v) certain defaults by the Company or any of its subsidiaries with respect to indebtedness for borrowed money of at least $50,000,000; and (vi) certain events of bankruptcy, insolvency and reorganization involving the Company or any of its significant subsidiaries.

If an Event of Default involving bankruptcy, insolvency or reorganization events with respect to the Company (and not solely with respect to a significant subsidiary of the Company) occurs, then the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding will immediately become due and payable without any further action or notice by any person. If any other Event of Default occurs and is continuing, then, the Trustee, by notice to the Company, or noteholders of at least 25% of the aggregate principal amount of Notes then outstanding, by notice to the Company and the Trustee, may declare the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding to become due and payable immediately. However, notwithstanding the foregoing, the Company may elect, at its option, that the sole remedy for an Event of Default relating to certain failures by the Company to comply with certain reporting covenants in the Indenture consists exclusively of the right of the noteholders to receive special interest on the Notes for up to 270 days at a specified rate per annum not exceeding 0.50% on the principal amount of the Notes.

10

On November 23, 2021, Marathon Digital Holdings, Inc. (the "Company") issued $97,500,000 aggregate principal amount of the Company's 1.00% Convertible Senior Notes due 2026 (the "Option Notes") to Jefferies LLC, as representative of the several initial purchasers (collectively, the "Initial Purchasers") in connection with the exercise of the Initial Purchasers' option to purchase additional notes. The Option Notes, together with the $650,0000,000 aggregate principal amount of the Company's 1.00% Convertible Senior Notes due 2026 that were previously issued, were issued in connection with a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended, and were issued pursuant to the Indenture dated as of November 18, 2021 by and between the Company and U.S. Bank National Association, as trustee.

Effective November 30, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into an amended five year hosting agreement with Compute North, LLC ("Compute North") to host 73,000 S19 miners to be deployed during the first two quarters of 2022 at a hosting fee of $0.044 per kilowatt hour with substantially the same terms as the Company's prior hosting agreements with Compute North. On that same date, the Company also entered into a joint venture with Compute North to form Marathon Compute North 1 LLC (the "LLC") of which the equity is owned 82% by Marathon and 18% by Compute North, the business purpose of which is to jointly host bitcoin miners. The LLC entered into a hosting agreement with Compute North to host an additional 30,000 S19 miners along substantially similar terms to the hosting agreement between the Company and Compute North also at $0.044 per kilowatt hour.

On December 15, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a Severance and Release Agreement ("Agreement") with Merrick Okamoto, its Executive Chairman ("Okamoto"). Pursuant to the Agreement, Okamoto is retiring effective December 31, 2021. He is providing a standard release to the Company in exchange for payment of 83,333 restricted stock units of the Company, which shall vest immediately upon grant. The shares underlying the RSUs are being issued pursuant to the Company's registration statement on Form S-8 (file no. 333-258928), filed with the SEC on August 19, 2021. Additionally on December 31, 2021, the Company shall pay Okamoto the following: (i) accrued wages of $30,942.92, his annual 2021 bonus in the amount of $371,315 and any remaining approved and unpaid Company expenses incurred by him, if any. He is also entitled to medical insurance reimbursement as currently maintained through December 31, 2022, and thereafter is entitled to COBRA at his own expense, to the extent available by law.

On December 17, 2021, a putative class action complaint was filed in the United States District Court for the District Court of Nevada, against the company and present and former senior management. The Complaint alleges securities fraud related to the disclosures of an SEC investigation previously made by the Company on November 15, 2021. Plaintiff Tad Schaltre served the Complaint on the Company on March 1, 2022.

On December 21, 2021, Marathon Digital Holdings, Inc. (the "Company") executed a contract with Bitmain to purchase an additional 78,000 next generation Antminer S-19 XP Miners, with 13,000 units being delivered in each of July 2022, August 2022, September 2022, October 2022, November 2022 and December 2022. The purchase price is $879,060,000. The purchase price for the miners shall be paid as follows: 35% of the total amount within two days of execution of the purchase contract, 35% of each single shipment price at least six months prior to each such shipment, and the remaining 30% of each single shipment price at least one month prior to each such shipment.

Effective December 27, 2021, Marathon Digital Holdings, Inc. (the "Company") appointed Ashu Swami as its Chief Technology Officer and entered into an Executive Employment Agreement ("Agreement") with Mr. Swami.

Mr. Swami joins Marathon Digital Holdings from Core Scientific where he served as the CPO since Feb 2021, leading the company's foray into DeFi and heading the mining hardware and software optimization tech. Prior to that, from Jan 2019 to Feb 2021, he was the CTO of Apifiny, a hybrid CEX and DEX crypto exchange. Previously, from Jan 2016 to Dec 2018, Mr. Swami headed a SPV of Quadeye Securities which pioneered and traded Mining Swaps, operated cloud mining data centers, and served as the Chief Advisor to Fortune 50 companies including Intel Corp on Blockchain initiatives. From May 2013 to Dec 2015, he founded LocalPad, a p2p marketplace and payments plugin that provided ebay-in-a-box like functionality to large blogs to monetize their user base. Prior to that, from May 2007 to Apr 2013, Mr. Swami was a Portfolio Manager and led the high frequency market-making business at Morgan Stanley Program Trading to become a top 5 market maker in US ETFs. Previously, since May 2002, Mr. Swami spent over 4 years as a Sr Component Designer and then Tech Lead in Intel's Enterprise Platforms Group. Mr. Swami holds a BTech in CSE from IIT Bombay, and M.B.A. from Duke University.

11

Pursuant to the terms of the Agreement, Mr. Swami is employed as CTO for a one year term which shall automatically renew unless either he or the Company notifies the other at least 90 days before the end of the initial or any renewal term of the intent to terminate the Agreement. Mr. Swami's base salary is $275,000 per year with a cash bonus of up to $137,500 per year. Mr. Swami shall also be granted 80,000 restricted stock units, of which 20,000 shall vest on the one year anniversary of the effective date of the Agreement, and then 5000 RSUs shall vest on each subsequent three month anniversary with the last 5000 RSUs vesting on the four year anniversary of the effective date of the Agreement. Upon certain not for cause termination events under the Agreement, Mr. Swami would be entitled to vesting of all unvested RSUs and a severance payment of six months of salary in addition to all accrued and unpaid salary and vacation and the like. The Agreement contains other commercially standard terms for events of termination and the like.

On December 21, 2021, the Company executed a contract with Bitmain to purchase an additional 78,000 next generation Antminer S-19 XP Miners, with 13,000 units being delivered in each of July 2022, August 2022, September 2022, October 2022, November 2022 and December 2022. The purchase price is $879,060,000. The purchase price for the miners shall be paid as follows: 35% of the total amount within two days of execution of the purchase contract, 35% of each single shipment price at least six months prior to each such shipment, and the remaining 30% of each single shipment price at least one month prior to each such shipment. As of December 31, 2021, the Company has paid $307,671,000 of the purchase price.

On February 11, 2022, we entered into an At The Market Offering Agreement, or sales agreement, with H.C. Wainwright & Co., LLC, or Wainwright,

relating to shares of our common stock offered by this prospectus supplement. In accordance with the terms of the sales agreement, we may offer and sell shares of our common stock having an aggregate offering price of up to $750,000,000 from time to time through Wainwright acting as our sales agent.

On February 18, 2022, a shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of the Company's board of directors and senior management. The complaint is based on allegations substantially similar to the allegations in the December 2021 putative securities class action complaint, related to the Company's disclosure of an SEC investigation previously made by the Company on November 15, 2021. On March 4, 2022, the Complaint was served on the Company.

*Blockchain and Cryptocurrencies Generally*

Bitcoin is a digital asset that is issued by and transmitted through an open source protocol collectively maintained by a peer-to-peer network of decentralized user nodes. This network hosts a public transaction ledger, known as the bitcoin blockchain, on which bitcoin holdings and transactions in bitcoin are recorded. Balances of bitcoin are stored in individual "wallet" functions, which associate network public addresses with a "private key" that controls the transfer of bitcoin. The bitcoin blockchain can be updated without any single entity owning or operating the network. New bitcoin is created and allocated by the protocol that governs bitcoin through a "mining" process that rewards users that verify transactions in the bitcoin blockchain. The bitcoin protocol limits the total issuance of bitcoin over time to 21 million.

Bitcoin can be used to pay for goods and services, or it can be converted to fiat currencies, such as the U.S. dollar, at rates of exchange determined by market forces on bitcoin trading platforms, which operate 24-hours-a-day, 7-days-a-week and are not regulated in as comprehensive a manner as traditional securities exchanges. As a result, trading on these markets is likely more subject to manipulation than on securities markets regulated by the SEC, and pricing on these markets is likely affected by such manipulative activity. In addition to these platforms, over-the-counter markets and derivatives markets for bitcoin also exist; however, these markets are still maturing and many are unregulated.

Bitcoin exists entirely in electronic form, as virtually irreversible public transaction ledger entries on the blockchain, and transactions in bitcoin are recorded and authenticated not by a central repository, but by a decentralized peer-to-peer network. This decentralization avoids certain threats common to centralized computer networks, such as denial of service attacks, and reduces the dependency of the bitcoin network on any single system. While the bitcoin network as a whole is decentralized, the private keys used to access bitcoin balances are not widely distributed and are held on hardware (which can be physically controlled by the holder or by a third party such as a custodian) or via software programs on third-party servers and loss of such private keys results in an inability to access, and effective loss of, the corresponding bitcoin. Consequently, bitcoin holdings are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure, and user error, among others. These risks, in turn, make bitcoin subject to theft, destruction, or loss of value from hackers, corruption, or technology-specific factors such as viruses that do not affect conventional fiat currency. In addition, the bitcoin network relies on open source developers to maintain and improve the bitcoin protocol. Accordingly, bitcoin may be subject to protocol design changes, governance disputes such as "forked" protocols, competing protocols, and other open source-specific risks that do not affect conventional proprietary software.

12

Distributed blockchain technology is a decentralized and encrypted ledger that is designed to offer a secure, efficient, verifiable, and permanent way of storing records and other information without the need for intermediaries. Cryptocurrencies serve multiple purposes. They can serve as a medium of exchange, store of value or unit of account. Examples of cryptocurrencies include: bitcoin, bitcoin cash, and litecoin. Blockchain technologies are being evaluated for a multitude of industries due to the belief in their ability to have a significant impact in many areas of business, finance, information management, and governance.

Cryptocurrencies are decentralized currencies that enable near instantaneous transfers. Transactions occur via an open source, cryptographic protocol platform which uses peer-to-peer technology to operate with no central authority. The online network hosts the public transaction ledger, known as the blockchain, and each cryptocurrency is associated with a source code that comprises the basis for the cryptographic and algorithmic protocols governing the blockchain. In a cryptocurrency network, every peer has its own copy of the blockchain, which contains records of every historical transaction - effectively containing records of all account balances. Each account is identified solely by its unique public key (making it effectively anonymous) and is secured with its associated private key (kept secret, like a password). The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.

No single entity owns or operates the network. The infrastructure is collectively maintained by a decentralized public user base. As the network is decentralized, it does not rely on either governmental authorities or financial institutions to create, transmit or determine the value of the currency units. Rather, the value is determined by market factors, supply and demand for the units, the prices being set in transfers by mutual agreement or barter among transacting parties, as well as the number of merchants that may accept the cryptocurrency. Since transfers do not require involvement of intermediaries or third parties, there are currently little to no transaction costs in direct peer-to-peer transactions. Units of cryptocurrency can be converted to fiat currencies, such as the US dollar, at rates determined on various exchanges, such as Cumberland, Coinsquare (in Canada), Coinbase, Bitsquare, Bitstamp, and others. Cryptocurrency prices are quoted on various exchanges and fluctuate with extreme volatility.

We believe cryptocurrencies offer many advantages over traditional, fiat currencies, although many of these factors also present potential disadvantages and may introduce additional risks, including:

- acting as a fraud deterrent, as cryptocurrencies are digital and cannot be counterfeited or reversed arbitrarily by a sender;
- immediate settlement;
- elimination of counterparty risk;
- no trusted intermediary required;
- lower fees;
- identity theft prevention;
- accessible by everyone;
- transactions are verified and protected through a confirmation process, which prevents the problem of double spending;
- decentralized - no central authority (government or financial institution); and
- recognized universally and not bound by government imposed or market exchange rates.

However, cryptocurrencies may not provide all of the benefits they purport to offer at all or at any time.

13

Bitcoin was first introduced in 2008 and was first introduced as a means of exchange in 2009. Bitcoin is a consensus network that enables a new payment system and a completely new form of digital money. It is the first decentralized peer-to-peer payment network that is powered by its users with no central authority or middlemen. From a user perspective, we believe bitcoin can be viewed as cash for the Internet. The bitcoin network shares a public ledger called the "blockchain." This ledger contains every transaction ever processed, allowing a user's computer to verify the validity of each transaction. The authenticity of each transaction is protected by digital signatures corresponding to the sending addresses, allowing all users to have full control over sending bitcoins currency rewards from their own bitcoin addresses. In addition, anyone can process

transactions using the computing power of specialized hardware and earn a reward in bitcoins for this service. This process is often called "mining."

As with many new and emerging technologies, there are potentially significant risks. Businesses (including the Company) which are seeking to develop, promote, adopt, transact or rely upon blockchain technologies and cryptocurrencies have a limited track record and operate within an untested new environment. These risks are not only related to the businesses the Company pursues, but the sector and industry as a whole, as well as the entirety of the concept behind blockchain and cryptocurrency as value. Factors such as access to computer processing capacity, interconnectivity, electricity cost, environmental factors (such as cooling capacity) and location play an important role in "mining," which is the term for using the specialized computers in connection with the blockchain for the creation of new units of cryptocurrency.

**Mathematically Controlled Supply**

The method for creating new bitcoins is mathematically controlled in a manner so that the supply of bitcoins grows at a limited rate pursuant to a pre-set schedule. The number of bitcoins awarded for solving a new block is automatically halved every 210,000 blocks. Thus, the current fixed reward for solving a new block is 12.5 bitcoins per block and the reward decreased by half to become 6.25 bitcoins around May 10, 2020, which is the current reward (based on estimates of the rate of block solution calculated by BitcoinClock.com). This deliberately controlled rate of bitcoin creation means that the number of bitcoins in existence will never exceed 21 million and that bitcoins cannot be devalued through excessive production unless the Bitcoin Network's source code (and the underlying protocol for bitcoin issuance) is altered. The Company monitors the Blockchain network and, as of December 9, 2020, based on the information we collected from our network access, more than 18.45 million bitcoins have been mined.

**Digital Asset Mining**

We intend to power and secure blockchains by verifying blockchain transactions using custom hardware and software. We are currently using our hardware to mine bitcoin ("BTC") and expect to mine BTC, and potentially other cryptocurrencies. Bitcoin relies on different technologies based on the blockchain. Wherein bitcoin is a digital currency, we will be compensated in BTC based on the mining transactions we perform, which is how we will earn revenue.

Blockchains are decentralized digital ledgers that record and enable secure peer-to-peer transactions without third party intermediaries. Blockchains enable the existence of digital assets by allowing participants to confirm transactions without the need for a central certifying authority. When a participant requests a transaction, a peer-to-peer network consisting of computers, known as nodes, validate the transaction and the user's status using known algorithms. After the transaction is verified, it is combined with other transactions to create a new block of data for the ledger. The new block is added to the existing blockchain in a way that is permanent and unalterable, and the transaction is complete.

Digital assets (also known as cryptocurrency) are a medium of exchange that uses encryption techniques to control the creation of monetary units and to verify the transfer of funds. Many consumers use digital assets because it offers cheaper and faster peer-to-peer payment options without the need to provide personal details. Every single transaction and the ownership of every single digital asset in circulation is recorded in the blockchain. Miners use powerful computers that tally the transactions to run the blockchain. These miners update each time a transaction is made and ensure the authenticity of information. The miners receive a transaction fee for their service in the form of a portion of the new digital "coins" that are issued.

14

*Performance Metrics - Hashing*

We operate mining hardware which performs computational operations in support of the blockchain measured in "hash rate" or "hashes per second." A "hash" is the computation run by mining hardware in support of the blockchain; therefore, a miner's "hash rate" refers to the rate at which it is capable of solving such computations. The original equipment used for mining bitcoin utilized the Central Processing Unit (CPU) of a computer to mine various forms of cryptocurrency. Due to performance limitations, CPU mining was rapidly replaced by the Graphics Processing Unit (GPU), which offers significant performance advantages over CPUs. General purpose chipsets like CPUs and GPUs have since been replaced in the mining industry by Application Specific Integrated Circuits (ASIC) chips. These ASIC chips are designed specifically to maximize the rate of hashing operations.

We measure our mining performance and competitive position based on overall hash rate being produced in our mining sites. The latest equipment utilized in our mining operation performs in the range of approximately 86 - 110 terahash per second (TH/s) per unit. This mining hardware is on the cutting edge of available mining equipment and we believe our acquisition of our units places us among leaders of publicly-traded cryptocurrency miners; however, advances and improvements to the technology are ongoing and may be available in quantities to the market in the near future which may affect our perceived position. We believe that our current inventory of miners establishes us among the top public companies in the United States mining cryptocurrency.

**Our Strategy:** Marathon Digital Holdings' primary focus is to support the adoption, security, and evolution of Bitcoin by building one of the largest, most agile, and most sustainably operated Bitcoin mining operations in the world. Our strategy is to purchase hardware ("miners") that are specially designed to solve complex cryptographic problems set forth by the Bitcoin protocol and to partner with third-party hosting providers to deploy this hardware, predominantly at renewable power sources, with the ultimate aim of adding blocks to the Bitcoin blockchain and earning bitcoin.

In the second quarter of 2021, we determined that the most effective strategy for expanding and improving the efficiency of our mining operations is to invest in mining hardware rather than the construction and maintenance of the infrastructure that supports Bitcoin mining, including but not limited to hosting centers and power facilities. As a result, we now employ an "asset light" business model, opting to outsource the deployment and hosting of our machines to third party hosting providers, including Compute North, who deploy our miners at locations with low costs of electricity and access to clean and/or renewable energy sources. We believe this strategy provides a superior return on assets, increases our optionality, and reduces risks to our business.

Along with our hosting partners, we focus on deploying our miners predominantly "behind the meter" at renewable power stations to reduce our costs, to optimize for sustainably generated power, to incentivize the construction of new renewable power stations in the United States, and to help improve the stability of power grids by operating as a flexible, base load customer.

**Our Mining Operations:** In 2020, we began rapidly expanding our Bitcoin mining operations by purchasing large numbers of state-of-the-art Bitcoin miners from Bitmain, one of the leading Bitcoin mining hardware manufacturers. By expanding our mining operations and increasing our "hash rate" (computing power) relative to the rest of the network, we can improve the probability of successfully adding a block to Bitcoin's blockchain and therefore earning bitcoin.

- **Our Bitcoin Miners:** In the second half of 2020, we began purchasing large quantities of new Bitcoin miners from Bitmain to expand and upgrade our Bitcoin mining operations. Our major orders to date are as follows:
    - August 2020: 10,500 Antminer S19 Pros (110 TH/s)
    - October 2020: 10,000 Antminer S19 Pros (110 TH/s)
    - December 2020: 10,000 Antminer S19j Pros (100 TH/s)
    - December 2020: 70,000 Antminer S19s (90-110 TH/s)
    - July 2021: 30,000 Antminer S19j Pros (110 TH/s)

○ December 2021: 78,000 Antminer S19 XPs (140 TH/s)

15

We have paid an average price of $6,054 per machine, or $52 per Terahash, for these miners, which we believe are among the most powerful and most efficient currently available. Shipment schedules by month are as follows:



As of January 2021, we had 2,060 miners deployed, generating approximately 0.2 Exahash per second ("EH/s"). Once deployments and upgrades are complete, we expect our total fleet to consist of approximately 199,000 state of the art Bitcoin miners, capable of producing 23.3 EH/s. Based on current construction and deployment schedules, we currently believe all machines may be deployed by early 2023.



16

- **Our Mining Facilities:** We deploy miners in various locations across the United States, including South Dakota, Nebraska, Montana, and Texas. Our blended costs for electricity and hosting across our entire fleet is $0.0426 per kilowatt hour ("kWh"). Our objective is for our mining operations to be 100% carbon neutral and predominantly powered by renewable power sources (solar, wind, etc.) by the end of fiscal year 2022.
    ○ **Hardin, MT Data Center:** In October 2020, we entered into a series of agreements to construct a Bitcoin mining facility adjacent to a stranded power station in Hardin, MT. We house approximately 30,000 Bitcoin miners at this facility, half of which reside in air cooled containers, while the other half reside in an air cooled building. Our miners at this location derive all of their power from the previously dormant power station, which is owned by Beowulf Energy and can produce up to 100 megawatt (MW) of power. Both the power station and our mining facility reside on land owned by the Crow Nation. The construction of our mining facility in Hardin, MT was completed in December 2021.
    ○ **Compute North Hosting Arrangements:** Since 2017, we have been hosting Bitcoin miners with Compute North at their mining facilities in North Dakota and Nebraska. In May 2021, we announced that we had entered into a binding letter of intent with Compute North to host 73,000 of our Bitcoin miners at a new 300 MW data center in Texas. In December 2021, we announced that we were expanding our agreement to include up to 100,000 of our Bitcoin miners.

      Our arrangements with Compute North provide us with reliable hosting, access to renewable power, and low costs of operations. We pay a fixed rate for electricity and hosting to Compute North, who develops and operates the facilities while managing the deployment of our miners. Through these arrangements, we are deploying miners at multiple locations in Texas and elsewhere, the majority of which are behind the meter at wind and solar farms operated by one of the largest renewable energy power providers in North America.

      Construction of new facilities is currently underway and continuing throughout 2022. Once completed, we expect our mining operations to be 100% carbon neutral.

**Our Bitcoin Holdings:** While we may sell bitcoin in future periods as needed to generate cash for treasury management and other general corporate purposes, Marathon Digital Holdings views its bitcoin holdings as long-term holdings. We last sold bitcoin on October 21, 2020 and have since been accumulating and holding ("hodling") all the bitcoin we produce. As of December 31, 2021, we held approximately 8,115 bitcoin, including the 4,794 bitcoin held in the investment fund. A total of 4,812.66 bitcoin was purchased and placed into an investment fund in January 2021 for an average price of $31,168 per bitcoin. During 2021, 18 bitcoin were liquidated as needed by the investment manager in order to pay the management fee and other operating expenses of the fund pursuant to the management agreement.

We believe that bitcoin is attractive because it can serve as a store of value and a hedge against inflation as it is supported by a robust and public open source architecture that is untethered to sovereign monetary policy. We also believe that bitcoin, due to its limited supply, has the potential to further appreciate in value as adoption increases.

**Halving/Halvening Events:** Bitcoin miners receive a reward in the form of bitcoin for each block they successfully process and add to Bitcoin's blockchain. This reward, frequently referred to as a "block reward", is the foundation of Bitcoin's supply algorithm. It is the process by which new bitcoin enter the marketplace.

Bitcoin's supply is finite, and the rate at which new bitcoin enter the marketplace is designed to decrease over time, reducing the rate of inflation. Every 210,000 blocks, the block reward is cut in half (i.e., decreased by 50%). This event is commonly referred to as a "halving" or "halvening." On average, blocks are added to Bitcoin's blockchain every 10 minutes. As a result, a halving/halvening event occurs approximately every four years.

17



(Source)

For the first four years of Bitcoin's life, the block reward was 50 bitcoin per block. In 2012, the block reward decreased to 25 bitcoin per block. In 2016, the block reward was reduced to 12.5 bitcoin per block. The last halving occurred on May 12, 2020 when the block reward was cut to 6.25 bitcoin per block. The next halving is expected to occur in 2024, at which time, the block reward will be reduced to 3.125 bitcoin per block. Halving events will continue until all 21,000,000 bitcoin have been mined, which is expected to occur in approximately 2140.

While not guaranteed, historically, halving events have been correlated with increases Bitcoin's price. (Source)



**MaraPool**: Marathon Digital Holdings operates its own bitcoin mining pool, MaraPool. The pool functions as a strategic differentiator for Marathon, as it provides us with improved insight into the performance of our mining operations, the potential to further optimize our performance, and the ability to vote on proposed upgrades and changes to the Bitcoin network.

18

**Cybersecurity**. To the Company's knowledge there has been no security breach or incident, unauthorized access or disclosure, or other compromise of or relating to the Company or its subsidiaries information technology and computer systems, networks, hardware, software, data and databases, equipment or technology. The Company has not been notified of, and has no knowledge of any event or condition that could result in, any security breach or incident, unauthorized access or disclosure or other compromise to their IT Systems and Data, and the Company has implemented appropriate controls, policies, procedures, and technological safeguards to maintain and protect the integrity, continuous operation, redundancy and security of their IT Systems and Data reasonably consistent with industry standards and practices, or as required by applicable regulatory standards. The Company is presently in material compliance with all applicable laws or statutes and all judgments, orders, rules and regulations of any court or arbitrator or governmental or regulatory authority, internal policies and contractual obligations relating to the privacy and security of IT Systems and Data and to the protection of such IT Systems and Data from unauthorized use, access, misappropriation or modification.

**Research & Development:**

We have recently made several R&D forays.

Marathon's Research Lab

Marathon operates a proof-of-work research initiative focused on accelerating the development and deployment of the best new mining practices. This initiative focuses on the proprietary testing and experimentation of proof-of-work related matters such as miners, firmware, immersion technologies, power supply units, miner software, and pools. The initiative is also focused on researching and publishing thought pieces related to the future of mining, impact on the electrical grid, impact on local economies, security, performance issues, as well as general education. Research is performed both within Marathon, as well as via partnerships with complimentary corporations, startups, non-profits, and universities. This initiative's purview extends beyond just Bitcoin to include investigation and experimentation of all proof-of-work cryptocurrencies, as well as examining optimal participation with proof-of-stake cryptocurrencies at the infrastructure layer.

Marathon's Incubator

Marathon operates an incubator/accelerator for the Bitcoin ecosystem. The purpose of the incubator is to support the development of new technologies and businesses that seek to expand and enrich Bitcoin as a decentralized global monetary, settlement, and digital information network. These technologies may include, but are not limited to, infrastructure building blocks, and "layer 2" protocols.

**Human Capital:** We believe our ongoing success depends on our employees. Development and investment in our people are central to who we are and will continue to be so. We take a comprehensive approach to sourcing, hiring, onboarding, integrating, developing, engaging and rewarding employees. As of December 31, 2021, our workforce consisted of nine full time employees.

Marathon Digital Holdings, Inc. is committed to the principles of equal employment. We are committed to complying with all federal, state, and local laws providing equal employment opportunities, and all other employment laws and regulations. It is our intent to maintain a work environment that is free of harassment, discrimination, or retaliation because of age (40 and older), race, color, national origin, ancestry, religion, sex, sexual orientation (including transgender status, gender identity or expression), pregnancy (including childbirth, lactation, and related medical conditions), physical or mental disability, genetic information (including testing and characteristics), veteran status, uniformed servicemember status, or any other status protected by federal, state, or local laws. The Company is dedicated to the fulfilment of this policy in regard to all aspects of employment, including but not limited to recruiting, hiring, placement, transfer, training, promotion, rates of pay, and other compensation, termination, and all other terms, conditions, and privileges of employment.

19

## Competition

In cryptocurrency mining, companies, individuals and groups generate units of cryptocurrency through mining. Miners can range from individual enthusiasts to professional mining operations with dedicated data centers. Miners may organize themselves in mining pools. The Company competes or may in the future compete with other companies that focus all or a portion of their activities on owning or operating cryptocurrency exchanges, developing programming for the blockchain, and mining activities. At present, the information concerning the activities of these enterprises is not readily available as the vast majority of the participants in this sector do not publish information publicly or the information may be unreliable. Published sources of information include "bitcoin.org" and "blockchain.info"; however, the reliability of that information and its continued availability cannot be assured.

Several public companies (traded in the U.S. and Internationally), such as the following, may be considered to compete with us, although we believe there is no company, including the following, which engages in the same scope of activities as we do.

- Overstock.com Inc.
- Bitcoin Investment Trust
- Blockchain Industries, Inc. (formerly Omni Global Technologies, Inc.)
- Bitfarms Technologies Ltd. (formerly Blockchain Mining Ltd)
- DMG Blockchain Solutions Inc.
- Digihost International, Inc.
- Hive Blockchain Technologies Inc.
- Hut 8 Mining Corp.
- HashChain Technology, Inc.
- MGT Capital Investments, Inc.
- DPW Holdings, Inc.
- Layer1 Technologies, LLC
- Northern Data AG
- Riot Blockchain
  Core Scientific
  Terawulf Mining
  Genesis Mining

While there is limited available information regarding our non-public competitors, we believe that our recent acquisition and deployment of miners (as discussed further above) positions us well among the publicly traded companies involved in the cryptocurrency mining industry. The cryptocurrency industry is a highly competitive and evolving industry and new competitors and/or emerging technologies could enter the market and affect our competitiveness in the future.

20

## Government Regulation

Government regulation of blockchain and cryptocurrency is being actively considered by the United States federal government via a number of agencies and regulatory bodies, as well as similar entities in other countries. State government regulations also may apply to our activities and other activities in which we participate or may participate in the future. Other regulatory bodies are governmental or semi-governmental and have shown an interest in regulating or investigating companies engaged in the blockchain or cryptocurrency business.

Businesses that are engaged in the transmission and custody of bitcoin and other digital assets, including brokers and custodians, can be subject to U.S. Treasury Department regulations as money services businesses as well as state money transmitter licensing requirements. Bitcoin and other digital assets are subject to anti-fraud regulations under federal and state commodity laws, and digital asset derivative instruments are substantively regulated by the U.S. Commodity Futures Trading Commission. Certain jurisdictions, including, among others, New York and a number of countries outside the United States, have developed regulatory requirements specifically for digital assets and companies that transact in them.

Regulations may substantially change in the future and it is presently not possible to know how regulations will apply to our businesses, or when they will be effective. As the regulatory and legal environment evolves, we may become subject to new laws, further regulation by the SEC and other agencies, which may affect our mining and other activities. For instance, various bills have also been proposed in Congress related to our business, which may be adopted and have an impact on us. For additional discussion regarding our belief about the potential risks existing and

future regulation pose to our business, see the Section entitled "Risk Factors" herein.

In addition, since transactions in bitcoin provide a reasonable degree of pseudo anonymity, they are susceptible to misuse for criminal activities, such as money laundering. This misuse, or the perception of such misuse (even if untrue), could lead to greater regulatory oversight of bitcoin platforms, and there is the possibility that law enforcement agencies could close bitcoin platforms or other bitcoin-related infrastructure with little or no notice and prevent users from accessing or retrieving bitcoin held via such platforms or infrastructure. For example, in her January 2021 nomination hearing before the Senate Finance Committee, Treasury Secretary Janet Yellen noted that cryptocurrencies have the potential to improve the efficiency of the financial system but that they can be used to finance terrorism, facilitate money laundering, and support malign activities that threaten U.S. national security interests and the integrity of the U.S. and international financial systems. Accordingly, Secretary Yellen expressed her view that federal regulators needed to look closely at how to encourage the use of cryptocurrencies for legitimate activities while curtailing their use for malign and illegal activities. Furthermore, in December 2020, the Financial Crimes Enforcement Network ("FinCEN"), a unit of the Treasury Department focused on money laundering, proposed a new set of rules for cryptocurrency-based exchanges aimed at reducing the use of cryptocurrencies for money laundering. These proposed rules would require filing reports with FinCEN regarding cryptocurrency transactions in excess of $10,000 and also impose record-keeping requirements for cryptocurrency transactions in excess of $3,000 involving users who manage their own private keys. In January 2021, the Biden Administration issued a memorandum freezing federal rulemaking, including these proposed FinCEN rules, to provide additional time for the Biden Administration to review the rulemaking that had been proposed by the Trump Administration. As a result, it remains unclear whether these proposed rules will take effect.

## Intellectual Property

We actively use specific hardware and software for our cryptocurrency mining operation. In certain cases, source code and other software assets may be subject to an open source license, as much technology development underway in this sector is open source. For these works, we intend to adhere to the terms of any license agreements that may be in place.

We do not currently own, and do not have any current plans to seek, any patents in connection with our existing and planned blockchain and cryptocurrency related operations. We do expect to rely upon trade secrets, trademarks, service marks, trade names, copyrights and other intellectual property rights and expect to license the use of intellectual property rights owned and controlled by others. In addition, we have developed and may further develop certain proprietary software applications for purposes of our cryptocurrency mining operation.

21

## Employees

As of February 28, 2022, we had ten full-time employees. We believe our employee relations to be good.

## Accounting for Digital Currencies

The lack of U.S. Generally Accepted Accounting Principles (U.S. GAAP) instruction regarding the proper accounting treatment of digital currency assets has created uncertainty regarding the reporting and proper asset classification of digital currency holdings. Management intends to exercise its business judgment in determining appropriate accounting treatment for the recognition of revenue from mining of digital currencies. Management, in conjunction with its outside public accountants and its auditors, has examined various factors surrounding the substance of the Company's operations and the available guidance published for public company accounting practices in Accounting Standards Codification.

The Company intends to account for its digital currency assets as indefinite life intangible assets. An intangible asset with an indefinite useful life is not amortized, but rather is assessed for impairment annually, or more frequently, when events or changes in circumstances occur which indicate that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company will have the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted. Realized gain or loss on the sale of digital currencies is included in other income or expenses in the Company's statements of operations.

## ITEM 1A. RISK FACTORS

*The combined organization will be faced with a market environment that cannot be predicted and that involves significant risks, many of which will be beyond its control. In addition to the other information contained in this Annual Report on Form 10-K, you should carefully consider the material risks described below before investing in our securities. If any of the following risks actually occur, our business, results of operations and financial condition would likely suffer. In these circumstances, the market price of our common stock could decline, and you may lose all or part of your investment.*

22

## *We may be classified as an inadvertent investment company.*

We are not engaged in the business of investing, reinvesting, or trading in securities, and we do not hold ourselves out as being engaged in those activities. Under the Investment Company Act of 1940, as amended (the "1940 Act"), however, a company may be deemed an investment company under Section 3(a)(1)(C) of the 1940 Act if the value of its investment securities is more than 40% of its total assets (exclusive of government securities and cash items) on a consolidated basis.

We have commenced digital asset mining, the outputs of which are cryptocurrencies, which may be deemed a security in the future, although the SEC states that bitcoin, which is the only cryptocurrency we currently mine, is not a security (https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_fundstrading). In the event that the digital assets other than bitcoin held by us exceed 40% of our total assets, exclusive of cash, we inadvertently become an investment company. An inadvertent investment company can avoid being classified as an investment company if it can rely on one of the exclusions under the 1940 Act. One such exclusion, Rule 3a-2 under the 1940 Act, allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which an issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis and (b) the date on which an issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of government securities and cash items) on an unconsolidated basis. We are putting in place policies that we expect will work to keep the investment securities held by us at less than 40% of our total assets, which may include acquiring assets with our cash, liquidating our investment securities or seeking a no-action letter from the SEC if we are unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner.

As Rule 3a-2 is available to a company no more than once every three years, and assuming no other exclusion were available to us, we would have to keep within the 40% limit for at least three years after we cease being an inadvertent investment company. This may limit our ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on our earnings. In any event, we do not intend to become an investment company engaged in the business of investing and trading securities.

Classification as an investment company under the 1940 Act requires registration with the SEC. If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable. Registration is time consuming and restrictive and would require a restructuring of our operations, and we would be very constrained in the kind of business we could do as a registered investment company. Further, we would become subject to substantial regulation concerning management, operations, transactions with affiliated persons and portfolio

composition, and would need to file reports under the 1940 Act regime. The cost of such compliance would result in the Company incurring substantial additional expenses, and the failure to register if required would have a materially adverse impact to conduct our operations. If we determine to mine cryptocurrencies, other than bitcoin in the future, we will establish and disclose the process and framework we use to determine if such digital assets are securities under Section 2(a)(1) of the Securities Act and will address any specific risks in our policy and framework in making such a determination. This description would also include any policy/framework limitations and state these are risk-based judgments by us and not a legal standard or determination binding on any regulator.

***Failure to effectively manage our growth could place strains on our managerial, operational and financial resources and could adversely affect our business and operating results.***

Our growth has placed, and is expected to continue to place, a strain on our limited managerial, operational and financial resources and systems. Further, as our subsidiary companies' businesses grow, we will be required to continue to manage multiple relationships. Any further growth by us or our subsidiary companies, or an increase in the number of our strategic relationships, may place additional strain on our managerial, operational and financial resources and systems. Although we may not grow as we expect, if we fail to manage our growth effectively or to develop and expand our managerial, operational and financial resources and systems, our business and financial results would be materially harmed.

23

***The further development and acceptance of digital asset networks and other digital assets, which represent a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of digital asset systems may adversely affect an investment in us.***

Digital assets such as bitcoins, that may be used, among other things, to buy and sell goods and services are a new and rapidly evolving industry of which the digital asset networks are prominent, but not unique, parts. The growth of the digital asset industry in general, and the digital asset networks of bitcoin in particular, are subject to a high degree of uncertainty. The factors affecting the further development of the digital asset industry, as well as the digital asset networks, include:

- continued worldwide growth in the adoption and use of bitcoins and other digital assets;
- government and quasi-government regulation of bitcoins and other digital assets and their use, or restrictions on or regulation of access to and operation of the digital asset network or similar digital assets systems;
- the maintenance and development of the open-source software protocol of the bitcoin network;
- changes in consumer demographics and public tastes and preferences;
- the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;
- general economic conditions and the regulatory environment relating to digital assets; and
- the impact of regulators focusing on digital assets and digital securities and the costs associated with such regulatory oversight.
- A decline in the popularity or acceptance of the digital asset networks of bitcoin, or similar digital asset systems, could adversely affect an investment in us.

***If we acquire digital securities, even unintentionally, we may violate the Investment Company Act of 1940 and incur potential third-party liabilities.***

The Company intends to comply with the 1940 Act in all respects. To that end, if holdings of cryptocurrencies are determined to constitute investment securities of a kind that subject the Company to registration and reporting under the 1940 Act, the Company will limit its holdings to less than 40% of its assets. Section 3(a)(1)(C) of the 1940 Act defines "investment company" to mean any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. Section 3(a)(2) of the 1940 Act defines "investment securities" to include all securities except (A) Government securities, (B) securities issued by employees' securities companies, and (C) securities issued by majority-owned subsidiaries which (i) are not investment companies and (ii) are not relying on the exception from the definition of investment company in section 3(c)(1) or 3(c)(7) of the 1940 Act. As noted above, the SEC has not stated whether bitcoin and cryptocurrency is an investment security, as defined in the 1940 Act.

24

***COVID-19 or any pandemic, epidemic or outbreak of an infectious disease in the United States or elsewhere may adversely affect our business.***

The COVID-19 virus has had unpredictable and unprecedented impacts in the United States and around the world. The World Health Organization has declared the outbreak of COVID-19 as a "pandemic," or a worldwide spread of a new disease. Many countries around the world have imposed quarantines and restrictions on travel and mass gatherings to slow the spread of the virus. In the United States, federal, state and local governments have enacted restrictions on travel, gatherings, and workplaces, with exceptions made for essential workers and businesses. As of the date of this prospectus, we have not been declared an essential business. As a result, we may be required to substantially reduce or cease operations in response to governmental action or decree as a result of COVID-19. We are still assessing the effect on our business from COVID-19 and any actions implemented by the federal, state and local governments. We have implemented safety protocols to protect our staff, but we cannot offer any assurance that COVID-19 or any other pandemic, epidemic or outbreak of an infectious disease in the United States or elsewhere, will not materially and adversely affect our business.

***Significant contributors to all or any digital asset network could propose amendments to the respective network's protocols and software that, if accepted and authorized by such network, could adversely affect an investment in us.***

For example, with respect to bitcoins network, a small group of individuals contribute to the Bitcoin Core project on GitHub.com. This group of contributors is currently headed by Wladimir J. van der Laan, the current lead maintainer. These individuals can propose refinements or improvements to the bitcoin network's source code through one or more software upgrades that alter the protocols and software that govern the bitcoin network and the properties of bitcoin, including the irreversibility of transactions and limitations on the mining of new bitcoin. Proposals for upgrades and discussions relating thereto take place on online forums. For example, there is an ongoing debate regarding altering the blockchain by increasing the size of blocks to accommodate a larger volume of transactions. Although some proponents support an increase, other market participants oppose an increase to the block size as it may deter miners from confirming transactions and concentrate power into a smaller group of miners. To the extent that a significant majority of the users and miners on the bitcoin network install such software upgrade(s), the bitcoin network would be subject to new protocols and software that may adversely affect an investment in the Shares. In the event a developer or group of developers proposes a modification to the bitcoin network that is not accepted by a majority of miners and users, but that is nonetheless accepted by a substantial plurality of miners and users, two or more competing and incompatible blockchain implementations could result. This is known as a "hard fork." In such a case, the "hard fork" in the blockchain could materially and adversely affect the perceived value of digital assets as reflected on one or both incompatible blockchains, which may adversely affect an investment in us.

***The open-source structure of the bitcoin network protocol means that the contributors to the protocol are generally not directly compensated for their contributions in maintaining and developing the protocol. A failure to properly monitor and upgrade the protocol could damage the bitcoin network and an investment in us.***

The bitcoin network for example operates based on an open-source protocol maintained by contributors, largely on the Bitcoin Core project on GitHub. As an open source project, bitcoin is not represented by an official organization or authority. As the bitcoin network protocol is not sold and its use does not generate revenues for contributors, contributors are generally not compensated for maintaining and updating the bitcoin network protocol. Although the MIT Media Lab's Digital Currency Initiative funds the current maintainer Wladimir J. van der Laan, among others, this type of financial incentive is not typical. The lack of guaranteed financial incentive for contributors to maintain or develop the bitcoin network and the lack of guaranteed resources to adequately address emerging issues with the bitcoin network may reduce incentives to address the issues adequately or in a timely manner. Changes to a digital asset network which we are mining on may adversely affect an investment in us.

25

***If a malicious actor or botnet obtains control in excess of 50% of the processing power active on any digital asset network, including the bitcoin network, it is possible that such actor or botnet could manipulate the blockchain in a manner that adversely affects an investment in us.***
If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on any digital asset network, including the bitcoin network, it may be able to alter the blockchain by constructing alternate blocks if it is able to solve for such blocks faster than the remainder of the miners on the blockchain can add valid blocks. In such alternate blocks, the malicious actor or botnet could control, exclude or modify the ordering of transactions, though it could not generate new digital assets or transactions using such control. Using alternate blocks, the malicious actor could "double-spend" its own digital assets (i.e., spend the same digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintains control. To the extent that such malicious actor or botnet does not yield its majority control of the processing power or the digital asset community does not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible. Such changes could adversely affect an investment in us.

The approach towards and possible crossing of the 50% threshold indicate a greater risk that a single mining pool could exert authority over the validation of digital asset transactions. To the extent that the digital assets ecosystems do not act to ensure greater decentralization of digital asset mining processing power, the feasibility of a malicious actor obtaining in excess of 50% of the processing power on any digital asset network (e.g., through control of a large mining pool or through hacking such a mining pool) will increase, which may adversely impact an investment in us.

***If the award of digital assets for solving blocks and transaction fees for recording transactions are not sufficiently high to incentivize miners, miners may cease expending hashrate to solve blocks and confirmations of transactions on the blockchain could be slowed temporarily. A reduction in the hashrate expended by miners on any digital asset network could increase the likelihood of a malicious actor obtaining control in excess of fifty percent (50%) of the aggregate hashrate active on such network or the blockchain, potentially permitting such actor to manipulate the blockchain in a manner that adversely affects an investment in us.***
Bitcoin miners record transactions when they solve for and add blocks of information to the blockchain. When a miner solves for a block, it creates that block, which includes data relating to (i) the solution to the block, (ii) a reference to the prior block in the blockchain to which the new block is being added and (iii) all transactions that have occurred but have not yet been added to the blockchain. The miner becomes aware of outstanding, unrecorded transactions through the data packet transmission and propagation discussed above. Typically, bitcoin transactions will be recorded in the next chronological block if the spending party has an internet connection and at least one minute has passed between the transaction's data packet transmission and the solution of the next block. If a transaction is not recorded in the next chronological block, it is usually recorded in the next block thereafter.

As the award of new digital assets for solving blocks declines, and if transaction fees are not sufficiently high, miners may not have an adequate incentive to continue mining and may cease their mining operations. For example, the current fixed reward on the bitcoin network for solving a new block is twelve and a half (12.5) bitcoins per block; the reward decreased from twenty-five (25) bitcoin in July 2016. It is estimated that it will halve again in about four (4) years. This reduction may result in a reduction in the aggregate hashrate of the bitcoin network as the incentive for miners will decrease. Moreover, miners ceasing operations would reduce the aggregate hashrate on the bitcoin network, which would adversely affect the confirmation process for transactions (i.e., temporarily decreasing the speed at which blocks are added to the blockchain until the next scheduled adjustment in difficulty for block solutions) and make the bitcoin network more vulnerable to a malicious actor obtaining control in excess of fifty percent (50%) of the aggregate hashrate on the bitcoin network. Periodically, the bitcoin network has adjusted the difficulty for block solutions so that solution speeds remain in the vicinity of the expected ten (10) minute confirmation time targeted by the bitcoin network protocol.

Marathon believes that from time to time there will be further considerations and adjustments to the bitcoin network, and others regarding the difficulty for block solutions. More significant reductions in aggregate hashrate on digital asset networks could result in material, though temporary, delays in block solution confirmation time. Any reduction in confidence in the confirmation process or aggregate hashrate of any digital asset network may negatively impact the value of digital assets, which will adversely impact an investment in us.

26

***To the extent that the profit margins of digital asset mining operations are not high, operators of digital asset mining operations are more likely to immediately sell their digital assets earned by mining in the digital asset exchange market, resulting in a reduction in the price of digital assets that could adversely impact an investment in us.***
Over the past two years, digital asset mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation servers. Currently, new processing power brought onto the digital asset networks is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated machines. They require the investment of significant capital for the acquisition of this hardware, the leasing of operating space (often in data centers or warehousing facilities), incurring of electricity costs and the employment of technicians to operate the mining farms. As a result, professionalized mining operations are of a greater scale than prior miners and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to more immediately sell digital assets earned from mining operations on the digital asset exchange market, whereas it is believed that individual miners in past years were more likely to hold newly mined digital assets for more extended periods. The immediate selling of newly mined digital assets greatly increases the supply of digital assets on the digital asset exchange market, creating downward pressure on the price of each digital asset.

The extent to which the value of digital assets mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined digital assets rapidly if it is operating at a low profit margin-and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold into the digital asset exchange market more rapidly, thereby potentially reducing digital asset prices. Lower digital asset prices could result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a network effect that may further reduce the price of digital assets until mining operations with higher operating costs become unprofitable and remove mining power from the respective digital asset network. The network effect of reduced profit margins resulting in greater sales of newly mined digital assets could result in a reduction in the price of digital assets that could adversely impact an investment in us.

***To the extent that any miners cease to record transactions in solved blocks, transactions that do not include the payment of a transaction fee***

16

*will not be recorded on the blockchain until a block is solved by a miner who does not require the payment of transaction fees. Any widespread delays in the recording of transactions could result in a loss of confidence in that digital asset network, which could adversely impact an investment in us.*

To the extent that any miners cease to record transaction in solved blocks, such transactions will not be recorded on the blockchain. Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (e.g., a collective movement among miners or one or more mining pools forcing bitcoin users to pay transaction fees as a substitute for or in addition to the award of new bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the blockchain. Any systemic delays in the recording and confirmation of transactions on the blockchain could result in greater exposure to double-spending transactions and a loss of confidence in certain or all digital asset networks, which could adversely impact an investment in us.

27

*The acceptance of digital asset network software patches or upgrades by a significant, but not overwhelming, percentage of the users and miners in any digital asset network could result in a "fork" in the respective blockchain, resulting in the operation of two separate networks until such time as the forked blockchains are merged. The temporary or permanent existence of forked blockchains could adversely impact an investment in us.*

Digital asset networks are open source projects and, although there is an influential group of leaders in, for example, the bitcoin network community known as the "Core Developers," there is no official developer or group of developers that formally controls the bitcoin network. Any individual can download the bitcoin network software and make any desired modifications, which are proposed to users and miners on the bitcoin network through software downloads and upgrades, typically posted to the bitcoin development forum on GitHub.com. A substantial majority of miners and bitcoin users must consent to those software modifications by downloading the altered software or upgrade that implements the changes; otherwise, the changes do not become a part of the bitcoin network. Since the bitcoin network's inception, changes to the bitcoin network have been accepted by the vast majority of users and miners, ensuring that the bitcoin network remains a coherent economic system; however, a developer or group of developers could potentially propose a modification to the bitcoin network that is not accepted by a vast majority of miners and users, but that is nonetheless accepted by a substantial population of participants in the bitcoin network. In such a case, and if the modification is material and/or not backwards compatible with the prior version of bitcoin network software, a fork in the blockchain could develop and two separate bitcoin networks could result, one running the pre-modification software program and the other running the modified version (i.e., a second "bitcoin" network). Such a fork in the blockchain typically would be addressed by community-led efforts to merge the forked blockchains, and several prior forks have been so merged. This kind of split in the bitcoin network could materially and adversely impact an investment in us and, in the worst-case scenario, harm the sustainability of the bitcoin network's economy.

*Intellectual property rights claims may adversely affect the operation of some or all digital asset networks.*

Third parties may assert intellectual property claims relating to the holding and transfer of digital assets and their source code. Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in some or all digital asset networks' long-term viability or the ability of end-users to hold and transfer digital assets may adversely affect an investment in us. Additionally, a meritorious intellectual property claim could prevent us and other end-users from accessing some or all digital asset networks or holding or transferring their digital assets. As a result, an intellectual property claim against us or other large digital asset network participants could adversely affect an investment in us.

*The digital asset exchanges on which digital assets trade are relatively new and, in most cases, largely unregulated and may therefore be more exposed to fraud and failure than established, regulated exchanges for other products. To the extent that the digital asset exchanges representing a substantial portion of the volume in digital asset trading are involved in fraud or experience security failures or other operational issues, such digital asset exchanges' failures may result in a reduction in the price of some or all digital assets and can adversely affect an investment in us.*

The digital asset exchanges on which the digital assets trade are new and, in most cases, largely unregulated. Furthermore, many digital asset exchanges (including several of the most prominent USD denominated digital asset exchanges) do not provide the public with significant information regarding their ownership structure, management teams, corporate practices or regulatory compliance. As a result, the marketplace may lose confidence in, or may experience problems relating to, digital asset exchanges, including prominent exchanges handling a significant portion of the volume of digital asset trading.

A lack of stability in the digital asset exchange market and the closure or temporary shutdown of digital asset exchanges due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in the digital asset networks and result in greater volatility in digital asset values. These potential consequences of a digital asset exchange's failure could adversely affect an investment in us.

*Political or economic crises may motivate large-scale sales of digital assets, which could result in a reduction in some or all digital assets' values and adversely affect an investment in us.*

As an alternative to fiat currencies that are backed by central governments, digital assets such as bitcoins, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of digital assets either globally or locally. Large-scale sales of digital assets would result in a reduction in their value and could adversely affect an investment in us.

*Our ability to adopt technology in response to changing security needs or trends poses a challenge to the safekeeping of our digital assets.*

The history of digital asset exchanges has shown that exchanges and large holders of digital assets must adapt to technological change in order to secure and safeguard their digital assets. We rely on NYDig's 100% cold storage custody solution held in a purpose-built physically-secure environment based on established, industry best practices to safeguard our digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. We believe that it may become a more appealing target of security threats as the size of our bitcoin holdings grow. To the extent that either NYDig or we are unable to identify and mitigate or stop new security threats, our digital assets may be subject to theft, loss, destruction or other attack, which could adversely affect an investment in us.

28

*Security threats to us could result in, a loss of our digital assets, or damage to the reputation and our brand, each of which could adversely affect an investment in us.*

Security breaches, computer malware and computer hacking attacks have been a prevalent concern in the digital asset exchange markets, for example since the launch of the bitcoin network. Any security breach caused by hacking, which involves efforts to gain unauthorized access to information or systems, or to cause intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, and the inadvertent transmission of computer viruses, could harm our business operations or result in loss of our digital assets. Any breach of our infrastructure could result in damage to our reputation which could adversely affect an investment in us. Furthermore, we believe that, as our assets

grow, it may become a more appealing target for security threats such as hackers and malware.

We rely on NYDig's 100% cold storage custody solution held in a purpose-built physically-secure environment based on established, industry best practices to safeguard our digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. Nevertheless, NYDig's security system may not be impenetrable and may not be free from defect or immune to acts of God, and any loss due to a security breach, software defect or act of God will be borne by the Company.

The security system and operational infrastructure may be breached due to the actions of outside parties, error or malfeasance of an employee of ours, or otherwise, and, as a result, an unauthorized party may obtain access to our, private keys, data or bitcoins. Additionally, outside parties may attempt to fraudulently induce employees of ours to disclose sensitive information in order to gain access to our infrastructure. As the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently, or may be designed to remain dormant until a predetermined event and often are not recognized until launched against a target, we may be unable to anticipate these techniques or implement adequate preventative measures. If an actual or perceived breach of our security system occurs, the market perception of the effectiveness of our security system could be harmed, which could adversely affect an investment in us.

In the event of a security breach, we may be forced to cease operations, or suffer a reduction in assets, the occurrence of each of which could adversely affect an investment in us.

***A loss of confidence in our security system, or a breach of our security system, may adversely affect us and the value of an investment in us.***

We will take measures to protect us and our digital assets from unauthorized access, damage or theft; however, it is possible that the security system may not prevent the improper access to, or damage or theft of our digital assets. A security breach could harm our reputation or result in the loss of some or all of our digital assets. A resulting perception that our measures do not adequately protect our digital assets could result in a loss of current or potential shareholders, reducing demand for our Common Stock and causing our shares to decrease in value.

29

***Digital Asset transactions are irrevocable and stolen or incorrectly transferred digital assets may be irretrievable. As a result, any incorrectly executed digital asset transactions could adversely affect an investment in us.***

Digital asset transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction or, in theory, control or consent of a majority of the processing power on the respective digital asset network. Once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer of digital assets or a theft of digital assets generally will not be reversible, and we may not be capable of seeking compensation for any such transfer or theft. Although our transfers of digital assets will regularly be made to or from vendors, consultants, services providers, etc. it is possible that, through computer or human error, or through theft or criminal action, our digital assets could be transferred from us in incorrect amounts or to unauthorized third parties. To the extent that we are unable to seek a corrective transaction with such third party or are incapable of identifying the third party which has received our digital assets through error or theft, we will be unable to revert or otherwise recover incorrectly transferred Company digital assets. To the extent that we are unable to seek redress for such error or theft, such loss could adversely affect an investment in us.

***The limited rights of legal recourse against us, and our lack of insurance protection expose us and our shareholders to the risk of loss of our digital assets for which no person is liable.***

The digital assets held by us are not insured. Therefore, a loss may be suffered with respect to our digital assets which is not covered by insurance and for which no person is liable in damages which could adversely affect our operations and, consequently, an investment in us.

***Digital assets held by us are not subject to FDIC or SIPC protections.***

We do not hold our digital assets with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC") and, therefore, our digital assets are not subject to the protections enjoyed by depositors with FDIC or SIPC member institutions.

***We may not have adequate sources of recovery if our digital assets are lost, stolen or destroyed.***

If our digital assets are lost, stolen or destroyed under circumstances rendering a party liable to us, the responsible party may not have the financial resources sufficient to satisfy our claim. For example, as to a particular event of loss, the only source of recovery for us might be limited, to the extent identifiable, other responsible third parties (e.g., a thief or terrorist), any of which may not have the financial resources (including liability insurance coverage) to satisfy a valid claim of ours.

***The sale of our digital assets to pay expenses at a time of low digital asset prices could adversely affect an investment in us.***

We may sell our digital assets to pay expenses on an as-needed basis, irrespective of then-current prices. Consequently, our digital assets may be sold at a time when the prices on the respective digital asset exchange market are low, which could adversely affect an investment in us.

30

***Regulatory changes or actions may restrict the use of bitcoins or the operation of the bitcoin network in a manner that adversely affects an investment in us.***

Until recently, little or no regulatory attention has been directed toward bitcoin and the bitcoin network by U.S. federal and state governments, foreign governments and self-regulatory agencies. As bitcoin has grown in popularity and in market size, the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., the CFTC, the Commission, FinCEN and the Federal Bureau of Investigation) have begun to examine the operations of the bitcoin network, bitcoin users and the bitcoin exchange market.

Digital assets currently face an uncertain regulatory landscape in not only the United States but also in many foreign jurisdictions such as the European Union, China and Russia. While certain governments such as Germany, where the Ministry of Finance has declared bitcoin to be "*Rechnungseinheiten*" (a form of private money that is recognized as a unit of account, but not recognized in the same manner as fiat currency), have issued guidance as to how to treat bitcoin, most regulatory bodies have not yet issued official statements regarding intention to regulate or determinations on regulation of bitcoin, the bitcoin network and bitcoin users.

The effect of any future regulatory change on us, bitcoins, or other digital assets is impossible to predict, but such change could be substantial and adverse to us and could adversely affect an investment in us.

***It may be illegal now, or in the future, to acquire, own, hold, sell or use digital assets in one or more countries, and ownership of, holding or trading in our securities may also be considered illegal and subject to sanction.***

Although currently digital assets are not regulated or are lightly regulated in most countries, including the United States, one or more countries such as China and Russia may take regulatory actions in the future that severely restricts the right to acquire, own, hold, sell or use digital assets or to exchange digital assets for fiat currency. Such an action may also result in the restriction of ownership, holding or trading in our securities. Such restrictions may adversely affect an investment in us.

***If regulatory changes or interpretations of our activities require our registration as a money services business ("MSB") under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, we may be required to register and comply with such regulations. If regulatory changes or interpretations of our activities require the licensing or other registration of us as a money transmitter (or equivalent designation) under state law in any state in which we operate, we may be required to seek licensure or otherwise register and comply with such***

*state law. In the event of any such requirement, to the extent Marathon decides to continue, the required registrations, licensure and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease Marathon's operations. Any termination of certain Company operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.*

To the extent that the activities of Marathon cause it to be deemed an MSB under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, Marathon may be required to comply with FinCEN regulations, including those that would mandate Marathon to implement anti-money laundering programs, make certain reports to FinCEN and maintain certain records.

To the extent that the activities of Marathon cause it to be deemed a "money transmitter" ("MT") or equivalent designation, under state law in any state in which Marathon operates, Marathon may be required to seek a license or otherwise register with a state regulator and comply with state regulations that may include the implementation of anti-money laundering programs, maintenance of certain records and other operational requirements. Currently, the NYSDFS has finalized its "BitLicense" framework for businesses that conduct "virtual currency business activity," the Conference of State Bank Supervisors has proposed a model form of state level "virtual currency" regulation and additional state regulators including those from California, Idaho, Virginia, Kansas, Texas, South Dakota and Washington have made public statements indicating that virtual currency businesses may be required to seek licenses as money transmitters. In July 2016, North Carolina updated the law to define "virtual currency" and the activities that trigger licensure in a business-friendly approach that encourages companies to use virtual currency and blockchain technology. Specifically, the North Carolina law does not require miners or software providers to obtain a license for multi-signature software, smart contract platforms, smart property, colored coins and non-hosted, non-custodial wallets. Starting January 1, 2016, New Hampshire requires anyone who exchanges a digital currency for another currency must become a licensed and bonded money transmitter. In numerous other states, including Connecticut and New Jersey, legislation is being proposed or has been introduced regarding the treatment of bitcoin and other digital assets. Marathon will continue to monitor for developments in such legislation, guidance or regulations.

31

Such additional federal or state regulatory obligations may cause Marathon to incur extraordinary expenses, possibly affecting an investment in the Shares in a material and adverse manner. Furthermore, Marathon and its service providers may not be capable of complying with certain federal or state regulatory obligations applicable to MSBs and MTs. If Marathon is deemed to be subject to and determines not to comply with such additional regulatory and registration requirements, we may act to dissolve and liquidate Marathon. Any such action may adversely affect an investment in us.

*Current interpretations require the regulation of bitcoins under the CEA by the CFTC, we may be required to register and comply with such regulations. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.*

Current and future legislation, CFTC and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins are treated for classification and clearing purposes. In particular, bitcoin derivatives are not excluded from the definition of "commodity future" by the CFTC. We cannot be certain as to how future regulatory developments will impact the treatment of bitcoins under the law.

Bitcoins have been deemed to fall within the definition of a commodity and, we may be required to register and comply with additional regulation under the CEA, including additional periodic report and disclosure standards and requirements. Moreover, we may be required to register as a commodity pool operator and to register us as a commodity pool with the CFTC through the National Futures Association. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in us. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain of our operations. Any such action may adversely affect an investment in us. No CFTC orders or rulings are applicable to our business.

*If regulatory changes or interpretations require the regulation of bitcoins under the Securities Act and Investment Company Act by the Commission, we may be required to register and comply with such regulations. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors. This would likely have a material adverse effect on us and investors may lose their investment.*

Current and future legislation and the Commission rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins are treated for classification and clearing purposes. The Commission's July 25, 2017 Report expressed its view that digital assets may be securities depending on the facts and circumstances. As of the date of this prospectus, we are not aware of any rules that have been proposed to regulate bitcoins as securities. We cannot be certain as to how future regulatory developments will impact the treatment of bitcoins under the law. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in us. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain of our operations. Any such action may adversely affect an investment in us.

To the extent that digital assets including bitcoins and other digital assets we may own are deemed by the Commission to fall within the definition of a security, we may be required to register and comply with additional regulation under the 1940 Act, including additional periodic reporting and disclosure standards and requirements and the registration of our Company as an investment company. Additionally, one or more states may conclude bitcoins and other digital assets we may own are a security under state securities laws which would require registration under state laws including merit review laws which would adversely impact us since we would likely not comply. As stated earlier in this prospectus, some states including California define the term "investment contract" more strictly than the Commission. Such additional registrations may result in extraordinary, non-recurring expenses of our Company, thereby materially and adversely impacting an investment in our Company. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease all or certain parts of our operations. Any such action would likely adversely affect an investment in us and investors may suffer a complete loss of their investment.

32

*If federal or state legislatures or agencies initiate or release tax determinations that change the classification of bitcoins as property for tax purposes (in the context of when such bitcoins are held as an investment), such determination could have a negative tax consequence on our Company or our shareholders.*

Current IRS guidance indicates that digital assets such as bitcoin should be treated and taxed as property, and that transactions involving the payment of bitcoin for goods and services should be treated as barter transactions. While this treatment creates a potential tax reporting requirement for any circumstance where the ownership of a bitcoin passes from one person to another, usually by means of bitcoin transactions (including off-blockchain transactions), it preserves the right to apply capital gains treatment to those transactions which may adversely affect an investment in our Company.

*The loss or destruction of a private key required to access a digital asset may be irreversible. Our loss of access to our private keys or our*

19

*experience of a data loss relating to our Company's digital assets could adversely affect an investment in our Company.*

Digital assets are controllable only by the possessor of both the unique public key and private key relating to the local or online digital wallet in which the digital assets are held. We are required by the operation of digital asset networks to publish the public key relating to a digital wallet in use by us when it first verifies a spending transaction from that digital wallet and disseminates such information into the respective network. We safeguard and keep private the private keys relating to our digital assets by relying on NYDig's 100% cold storage custody solution held in a purpose-built physically-secure environment based on established, industry best practices to safeguard our digital assets from theft, loss, destruction or other issues relating to hackers and technological attack; to the extent a private key is lost, destroyed or otherwise compromised and no backup of the private key is accessible, we will be unable to access the digital assets held by it and the private key will not be capable of being restored by the respective digital asset network. Any loss of private keys relating to digital wallets used to store our digital assets could adversely affect an investment in us.

*Because many of our digital assets are held by digital asset exchanges, we face heightened risks from cybersecurity attacks and financial stability of digital asset exchanges.*

Marathon may transfer their digital asset from its wallet to digital asset exchanges prior to selling them. Digital assets not held in Marathon's wallet are subject to the risks encountered by digital asset exchanges including a DDoS Attack or other malicious hacking, a sale of the digital asset exchange, loss of the digital assets by the digital asset exchange and other risks similar to those described herein. Marathon does not maintain a custodian agreement with any of the digital asset exchanges that hold the Marathon's digital assets. These digital asset exchanges do not provide insurance and may lack the resources to protect against hacking and theft. If this were to occur, Marathon may be materially and adversely affected.

*If the award of digital assets for solving blocks and transaction fees for recording transactions are not sufficiently high to cover expenses related to running data center operations, it may have adverse effects on an investment in us.*

If the award of new digital assets for solving blocks declines and transaction fees are not sufficiently high, we may not have an adequate incentive to continue our mining operations, which may adversely impact an investment in us.

33

*As the number of digital assets awarded for solving a block in the blockchain decreases, the incentive for miners to continue to contribute processing power to the respective digital asset network will transition from a set reward to transaction fees. Either the requirement from miners of higher transaction fees in exchange for recording transactions in the blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for digital assets and prevent the expansion of the digital asset networks to retail merchants and commercial businesses, resulting in a reduction in the price of digital assets that could adversely impact an investment in us.*

In order to incentivize miners to continue to contribute processing power to any digital asset network, such network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. This transition could be accomplished either by miners independently electing to record in the blocks they solve only those transactions that include payment of a transaction fee or by the digital asset network adopting software upgrades that require the payment of a minimum transaction fee for all transactions. If transaction fees paid for digital asset transactions become too high, the marketplace may be reluctant to accept digital assets as a means of payment and existing users may be motivated to switch from one digital asset to another digital asset or back to fiat currency. Decreased use and demand for bitcoins that we have accumulated may adversely affect their value and may adversely impact an investment in us.

*Fluctuations in the price of bitcoin may significantly influence the market price of our class A common stock*

To the extent investors view the value of our class A common stock as linked to the value or change in the value of our bitcoin, fluctuations in the price of bitcoin may significantly influence the market price of our class A common stock.

*Our bitcoin holdings could subject us to regulatory scrutiny*

As noted above, several bitcoin investment vehicles have attempted to list their shares on a U.S. national securities exchange to permit them to function in the manner of an ETF with continuous share creation and redemption at NAV. To date the SEC has declined to approve any such listing, citing concerns over the surveillance of trading in markets for the underlying bitcoin as well as concerns about fraud and manipulation in bitcoin trading markets. Even though we do not function in the manner of an ETF and do not offer continuous share creation and redemption at NAV, it is possible that we nevertheless could face regulatory scrutiny from the SEC, as a company with securities traded on The Nasdaq Capital Market.

In addition, as digital assets, including bitcoin, have grown in popularity and market size, there has been increasing focus on the extent to which digital assets can be used to launder the proceeds of illegal activities or fund criminal or terrorist activities, or entities subject to sanctions regimes. While we have implemented and maintain policies and procedures reasonably designed to promote compliance with applicable anti-money laundering and sanctions laws and regulations and take care to only acquire our bitcoin through entities subject to anti money laundering regulation and related compliance rules in the United States, if we are found to have purchased any of our bitcoin from bad actors that have used bitcoin to launder money or persons subject to sanctions, we may be subject to regulatory proceedings and further transactions or dealings in bitcoin may be restricted or prohibited.

*Due to the unregulated nature and lack of transparency surrounding the operations of many bitcoin trading venues, they may experience fraud, security failures or operational problems, which may adversely affect the value of our bitcoin*

Bitcoin trading venues are relatively new and, in some cases, unregulated. Furthermore, there are many bitcoin trading venues which do not provide the public with significant information regarding their ownership structure, management teams, corporate practices and regulatory compliance. As a result, the marketplace may lose confidence in bitcoin trading venues, including prominent exchanges that handle a significant volume of bitcoin trading.

Negative perception, a lack of stability in the broader bitcoin markets and the closure or temporary shutdown of bitcoin trading venues due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in bitcoin and result in greater volatility in the prices of bitcoin. To the extent investors view our common stock as linked to the value of our bitcoin holdings, these potential consequences of a bitcoin trading venue's failure could have a material adverse effect on the market value of our common stock.

34

*The price of bitcoin may be influenced by regulatory, commercial, and technical factors that are highly uncertain*

Bitcoin and other digital assets are relatively novel and are subject to various risks and uncertainties that may adversely impact their price. For example, the application of securities laws and other regulations to such assets is unclear in certain respects, and it is possible that regulators in the United States or foreign countries may create new regulations or interpret laws in a manner that adversely affects the price of bitcoin. The growth of the digital assets industry in general, and the use and acceptance of bitcoin in particular, may also impact the price of bitcoin and is subject to a high degree of uncertainty. The pace of worldwide growth in the adoption and use of bitcoin may depend, for instance, on public familiarity with digital assets, ease of buying and accessing bitcoin, institutional demand for bitcoin as an investment asset, consumer demand for bitcoin as a means of payment, and the availability and popularity of alternatives to bitcoin. Even if growth in bitcoin adoption occurs in the near or medium-term, there is no assurance that bitcoin usage will continue to grow over the long-term. Because bitcoin has no physical existence beyond the record of transactions on the Bitcoin blockchain, a variety of technical factors related to the Bitcoin blockchain could also impact the price of

bitcoin. For example, malicious attacks by "miners" who validate bitcoin transactions, inadequate mining fees to incentivize validating of bitcoin transactions, hard "forks" of the Bitcoin blockchain into multiple blockchains, and advances in quantum computing could undercut the integrity of the Bitcoin blockchain and negatively affect the price of bitcoin. The liquidity of bitcoin may also be reduced and damage to the public perception of bitcoin may occur, if financial institutions were to deny banking services to businesses that hold bitcoin, provide bitcoin-related services or accept bitcoin as payment, which could also decrease the price of bitcoin.

***If we or our third-party service providers experience a security breach or cyberattack and unauthorized parties obtain access to our bitcoin, we may lose some or all of our bitcoin and our financial condition and results of operations could be materially adversely affected***

Security breaches and cyberattacks are of particular concern with respect to our bitcoin. Bitcoin and other blockchain-based cryptocurrencies have been, and may in the future be, subject to security breaches, cyberattacks, or other malicious activities. A successful security breach or cyberattack could result in a partial or total loss of our bitcoin in a manner that may not be covered by insurance or indemnity provisions of the custody agreement with a custodian who holds our bitcoin. Such a loss could have a material adverse effect on our financial condition and results of operations.

***Regulatory change reclassifying bitcoin as a security could lead to our classification as an "investment company" under the Investment Company Act of 1940 and could adversely affect the market price of bitcoin and the market price of our class A common stock.***

While senior SEC officials have stated their view that bitcoin is not a "security" for purposes of the federal securities laws, the SEC has so far refused to permit the listing of any bitcoin-based exchange traded funds, citing, among other things, concerns regarding bitcoin market integrity and custodial protections. It is possible that the SEC could take a contrary position to the one taken by its senior officials or a federal court could conclude that bitcoin is a security. Such a determination could lead to our classification as an "investment company" under the Investment Company Act of 1940, which would subject us to significant additional regulatory controls that could have a material adverse effect on our business and operations and also may require us to substantially change the manner in which we conduct our business.

In addition, if bitcoin is determined to constitute a security for purposes of the federal securities laws, the additional regulatory restrictions imposed by those laws could adversely affect the market price of bitcoin and in turn adversely affect the market price of our class A common stock.

***Variability in intellectual property laws may adversely affect our intellectual property position.***

Intellectual property laws, and patent laws and regulations in particular, have been subject to significant variability either through administrative or legislative changes to such laws or regulations or changes or differences in judicial interpretation, and it is expected that such variability will continue to occur. Additionally, intellectual property laws and regulations differ among states, and countries. Variations in the patent laws and regulations or in interpretations of patent laws and regulations in the United States and other countries may diminish the value of our intellectual property and may change the impact of third-party intellectual property on us. Accordingly, we cannot predict the scope of patents that may be granted to us, the extent to which we will be able to enforce our patents against third parties, or the extent to which third parties may be able to enforce their patents against us.

35

***We may seek to internally develop additional new inventions and intellectual property, which would take time and be costly. Moreover, the failure to obtain or maintain intellectual property rights for such inventions would lead to the loss of our investments in such activities.***

We may in the future seek to engage in commercial business ventures or seek internal development of new inventions or intellectual property. These activities would require significant amounts of financial, managerial and other resources and would take time to achieve. Such activities could also distract our management team from its present business initiatives, which could have a material and adverse effect on our business. There is also the risk that such initiatives may not yield any viable new business or revenue, inventions or technology, which would lead to a loss of our investment in such activities.

In addition, even if we are able to internally develop new inventions, in order for those inventions to be viable and to compete effectively, we would need to develop and maintain, and we would be heavily reliant upon, a proprietary position with respect to such inventions and intellectual property. However, there are significant risks associated with any such intellectual property we may develop principally including the following:

- patent applications we may file may not result in issued patents or may take longer than we expect to result in issued patents;
- we may be subject to interference proceedings;
- we may be subject to opposition proceedings in the U.S. or foreign countries;
- any patents that are issued to us may not provide meaningful protection;
- we may not be able to develop additional proprietary technologies that are patentable;
- other companies may challenge patents issued to us;
- other companies may have independently developed and/or patented (or may in the future independently develop and patent) similar or alternative technologies, or duplicate our technologies;
- other companies may design around technologies we have developed; and
- enforcement of our patents would be complex, uncertain and very expensive.

We cannot be certain that patents will be issued as a result of any future patent applications, or that any of our patents, once issued, will provide us with adequate protection from competing products. For example, issued patents may be circumvented or challenged, declared invalid or unenforceable or narrowed in scope. In addition, since publication of discoveries in scientific or patent literature often lags behind actual discoveries, we cannot be certain that we will be the first to make our additional new inventions or to file patent applications covering those inventions. It is also possible that others may have or may obtain issued patents that could prevent us from commercializing our products or require us to obtain licenses requiring the payment of significant fees or royalties in order to enable us to conduct our business. As to those patents that we may acquire, our continued rights will depend on meeting any obligations to the seller and we may be unable to do so. Our failure to obtain or maintain intellectual property rights for our inventions would lead to the loss of our investments in such activities, which would have a material adverse effect on us.

Moreover, patent application delays could cause delays in recognizing revenue from our internally generated patents and could cause us to miss opportunities to license patents before other competing technologies are developed or introduced into the market. We are not actively pursuing any commercialization opportunities or internally generated patents.

36

***We are highly dependent on the continued services of our small team of executives.***

We are dependent upon the efforts and services of our small executive team. While we have a preliminary plan for succession of certain key executive, the loss of any one of our key executives could have an adverse effect on our operations.

***We have identified a material weakness in our internal control over financial reporting which, if not timely remediated, may adversely affect the accuracy and reliability of our future financial statements, and our reputation, business and the price of our common stock, as well as may lead to a loss of investor confidence in us.***

As described under Item 9A. "Controls and Procedures" below, management has concluded that a material weakness in our internal control over financial reporting existed as of December 31, 2021. This material weakness is more fully described in Item 9A. Accordingly, internal control over

financial reporting and our disclosure controls and procedures were not effective as of such date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

We will take immediate action to remediate this material weakness. While we believe the steps described under Item 9A below will improve the effectiveness of our internal control over financial reporting and remediate the identified deficiencies, if our remediation efforts are insufficient to address the material weakness or we identify additional material weaknesses in our internal control over financial reporting in the future, our ability to analyze, record and report financial information accurately, to prepare our financial statements within the time periods specified by the rules and forms of the SEC and to otherwise comply with our reporting obligations under the federal securities laws and could be adversely affected. The occurrence of, or failure to remediate, this material weakness and any future material weaknesses in our internal control over financial reporting may adversely affect the accuracy and reliability of our financial statements and have other consequences that could materially and adversely affect our business, including an adverse impact on the market price of our common stock, potential actions or investigations by the SEC or other regulatory authorities, shareholder lawsuits, a loss of investor confidence and damage to our reputation.

***Our future success depends on our ability to expand our organization to match the growth of our activities.***

As our operations grow, the administrative demands upon us will grow, and our success will depend upon our ability to meet those demands. We are organized as a holding company, with numerous subsidiaries. Both the parent company and each of our subsidiaries require certain financial, managerial and other resources, which could create challenges to our ability to successfully manage our subsidiaries and operations and impact our ability to assure compliance with our policies, practices and procedures. These demands include, but are not limited to, increased executive, accounting, management, legal services, staff support and general office services. We may need to hire additional qualified personnel to meet these demands, the cost and quality of which is dependent in part upon market factors outside of our control. Further, we will need to effectively manage the training and growth of our staff to maintain an efficient and effective workforce, and our failure to do so could adversely affect our business and operating results. Currently, we have limited personnel in our organization to meet our organizational and administrative demands.

**Risks Relating to Marathon's Stock**

***Exercise or conversion of warrants and other convertible securities will dilute shareholder's percentage of ownership.***

We have issued convertible securities, options and warrants to purchase shares of our Common Stock to our officers, directors, consultants and certain shareholders. In the future, we may grant additional options, warrants and convertible securities. The exercise, conversion or exchange of options, warrants or convertible securities, including for other securities, will dilute the percentage ownership of our shareholders. The dilutive effect of the exercise or conversion of these securities may adversely affect our ability to obtain additional capital. The holders of these securities may be expected to exercise or convert such options, warrants and convertible securities at a time when we would be able to obtain additional equity capital on terms more favorable than such securities or when our Common Stock is trading at a price higher than the exercise or conversion price of the securities. The exercise or conversion of outstanding warrants, options and convertible securities will have a dilutive effect on the securities held by our shareholders. We have in the past, and may in the future, exchange outstanding securities for other securities on terms that are dilutive to the securities held by other shareholders not participating in such exchange.

***Our Common Stock may be delisted from The Nasdaq Capital Market ("Nasdaq") if we fail to comply with continued listing standards.***

Our Common Stock is currently traded on Nasdaq under the symbol "MARA". If we fail to meet any of the continued listing standards of Nasdaq, our Common Stock could be delisted from Nasdaq. The continued listing standards include specifically enumerated criteria, such as:

- a $1.00 minimum closing bid price;
- stockholders' equity of $2.5 million;
- 500,000 shares of publicly-held Common Stock with a market value of at least $1 million;
- 300 round-lot stockholders; and
- compliance with Nasdaq's corporate governance requirements, as well as additional or more stringent criteria that may be applied in the exercise of Nasdaq's discretionary authority.

***Our stock price may be volatile.***

The market price of our Common Stock is likely to be highly volatile and could fluctuate widely in price in response to various factors, many of which are beyond our control, including the following:

- changes in our industry including changes which adversely affect bitcoin and other digital assets;
- competitive pricing pressures;
- our ability to obtain working capital financing;
- additions or departures of key personnel;
- sales of our Common Stock;
- our ability to execute our business plan;
- operating results that fall below expectations;
- loss of any strategic relationship;
- regulatory developments; and
- economic and other external factors.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are unrelated to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of our Common Stock.

***We have never paid nor do we expect in the near future to pay cash dividends.***

We have never paid cash dividends on our capital stock and do not anticipate paying any cash dividends on our Common Stock for the foreseeable future. While it is possible that we may declare a dividend after a large settlement, investors should not rely on such a possibility, nor should they rely on an investment in us if they require income generated from dividends paid on our capital stock. Any income derived from our Common Stock would only come from rise in the market price of our Common Stock, which is uncertain and unpredictable.

***Offers or availability for sale of a substantial number of shares of our Common Stock may cause the price of our Common Stock to decline.***

If our stockholders sell substantial amounts of our Common Stock in the public market upon the expiration of any statutory holding period or lockup agreements, under Rule 144, or issued upon the exercise of outstanding warrants or other convertible securities, it could create a circumstance commonly referred to as an "overhang" and in anticipation of which the market price of our Common Stock could fall. The existence of an overhang, whether or not sales have occurred or are occurring, also could make more difficult our ability to raise additional financing through the sale of equity or equity-related securities in the future at a time and price that we deem reasonable or appropriate. The shares of our restricted Common Stock will be freely tradable upon the earlier of: (i) effectiveness of a registration statement covering such shares and (ii) the date on which such shares may be sold without registration pursuant to Rule 144 (or other applicable exemption) under the Securities Act of 1933, as amended ("Securities Act").

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

Not Applicable

38

## ITEM 2. PROPERTIES

We lease an executive office space on a month-to-month basis at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada 89144.

Subsequent to year end, on February 14, 2022, the Company leased office space with a sixty-three month term at 101 NE Third Avenue, Suite 1200, Fort Lauderdale, Florida for a total rent of $18,765 per month. We have also leased office space in Irvine CA at a total rent of $7,747 per month.

## ITEM 3. LEGAL PROCEEDINGS

On January 14, 2021, Plaintiff Michael Ho ("Plaintiff" or "Ho") filed a Civil Complaint for Damages and Restitution ("Complaint") against Marathon Patent Group, Inc., now known as Marathon Digital Holdings, Inc. (the "Company") in the Superior Court of the State of California for the County of Riverside. The Complaint alleges six causes of action against the Company, (1) Breach of Written Contract; (2) Breach of Implied Contract; (3) Quasi-Contract; (4) Services Rendered; (5) Intentional Interference with Prospective Economic Relations; and (6) Negligent Interference with Prospective Economic Relations. The Complaint seeks damages, restitution, punitive damages, and costs of suit. The claims arise from the same set of facts. Ho alleges that the Company profited from commercially-sensitive information he shared with the Company, purportedly under a mutual non-disclosure agreement, and that the Company failed to compensate him for his role in securing the acquisition of a supplier of energy for the Company. On February 22, 2021, the Company responded to Mr. Ho's Complaint with a general denial and the assertion of applicable affirmative defenses. Then, on February 25, 2021, the Company removed the action to the United States District Court in the Central District of California, where the action remains pending. Marathon filed a motion for summary judgment/adjudication of all causes of action. On February 11, 2022, the Court granted the motion and dismissed Ho's 2nd, 5th and 6th causes of action. Discovery is closed. The Court held a pre-trial conference on February 24, 2022, where it vacated the March 3, 2022 trial date and ordered the parties to meet and confer on a new trial date, which will likely be after June 2022, given the Court's current backlog as a result of Covid. The Court discussed the various theories of damages maintained by the parties. In its ruling on the summary judgment motion and at the pre-trial conference on February 24, 2022, the Court noted that a jury is more likely to accept $150,000 as an appropriate damages amount if liability is found, as opposed to the various theories espoused by Ho that result in multi-million dollar recoveries. Due to outstanding issues of fact and law, it is impossible to predict the outcome at this time; however, after consulting legal counsel, the Company is confident that it will prevail in this litigation, since it did not have a contract with Mr. Ho and he did not disclose any commercially-sensitive information under any mutual nondisclosure agreement that was used to structure any joint venture with energy providers. Trial is set to begin on May 26, 2022.

During the quarter ended September 30, 2021, the Company and certain of its executives received a subpoena to produce documents and communications concerning the Hardin, Montana data center facility described in our Form 8-K dated October 13, 2020. On October 6, 2020, the Company entered into a series of agreements with multiple parties to design and build a data center for up to 100-megawatts in Hardin, MT. In conjunction therewith, the Company filed a Current Report on Form 8-K on October 13, 2020. The 8-K discloses that, pursuant to a Data Facility Services Agreement, the Company issued 6,000,000 shares of restricted Common Stock, in transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933, as amended. We understand that the SEC may be investigating whether or not there may have been any violations of the federal securities law. We are cooperating with the SEC.

On December 17, 2021, a putative class action complaint was filed in the United States District Court for the District Court of Nevada, against the company and present and former senior management. The Complaint alleges securities fraud related to the disclosures of an SEC investigation previously made by the Company on November 15, 2021. Plaintiff Tad Schaltre served the Complaint on the Company on March 1, 2022.

On February 18, 2022, a shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of the Company's board of directors and senior management. The complaint is based on allegations substantially similar to the allegations in the December 17, 2021 putative securities class action complaint, related to the Company's disclosure of an SEC investigation previously made by the Company on November 15, 2021. On March 4, 2022, the Complaint was served on the Company.

## ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

39

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

### Market Information

Our common stock is currently quoted on The NASDAQ Capital Market under the symbol "MARA".

### Holders

As of March 9, 2022, there were 249 holders of record of 103,052,069 shares of the Company's Common Stock.

### Securities Authorized for Issuance under Equity Compensation Plans

### 2012, 2014, 2017 and 2018 Equity Incentive Plans

The following table gives information about the Company's common stock that may be issued upon the exercise of options granted to employees, directors and consultants under its 2012, 2014, 2017 and 2018 Equity Incentive Plans as of December 31, 2021. On August 1, 2012, our board of directors and stockholders adopted the 2012 Equity Incentive Plan, pursuant to which 96,154 shares of our common stock are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On September 16, 2014, our board of directors adopted the 2014 Equity Incentive Plan, subsequently approved by the shareholders on July 31, 2015, pursuant to which up to 125,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On September 6, 2017, our board of directors adopted the 2017 Equity Incentive Plan, subsequently approved by the shareholders on September 29, 2017, pursuant to which up to 625,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On January 1, 2018, our board of directors adopted the 2018 Equity Incentive Plan, subsequently approved by the shareholders on March 7, 2018, pursuant to which up to 2,500,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On January 15, 2021, the Company's shareholders approved an increase in the number of shares authorized for issuance under the 2018 Equity Incentive Plan by 5,000,000 shares, which increase took effect automatically. As of March 12, 2021, the 2012, 2014, 2017 and 2018 Equity Incentive Plans had outstanding grants and remaining unissued shares, taking into account issuance of restricted stock to officers and directors, as follows:

**Equity Compensation Plan Information**

| Number of securities to be issued upon exercise of outstanding | Weighted-average exercise price of | Number of securities remaining available for future issuance under equity |
| --- | --- | --- |

23

| Plan category | options, warrants and rights | | outstanding options, warrants and rights | compensation plans |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 393,777 | $ | 21.18 | 880,804 |
| Equity compensation plans not approved by security holders | - | $ | - | - |
| Total | 393,777 | $ | 21.18 | 880,804 |

**Recent issuances of unregistered securities**

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued and additional 474,808 at $0.90 per share. On March 30, 2020, the Company has issued an additional 350,250 shares at $1.75 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2020. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2021 and 2019, respectively. As of December 31, 2021, there is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2021.

On June 1, 2020, the Company issued 2,023,739 shares at $0.60 per share pursuant to the conversion of $999,106 of principal and $215,137 of interest related to the extinguishment of the Convertible Note.

On October 6, 2020, the Company issued 6,000,000 shares at $1.87 per share pursuant to the Long Term Prepaid Service Contract with Liefern LLC and Lucky Liefern LLC each receiving 3,000,000 shares for the operation and servicing of the Hardin, Montana facility through September 2025.

**Recent Repurchases of Securities**

None.

40

**ITEM 6. RESERVED**

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis is intended as a review of significant factors affecting our financial condition and results of operations for the periods indicated. The discussion should be read in conjunction with our consolidated financial statements and the notes presented herein. In addition to historical information, the following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that involve risks and uncertainties. Our actual results could differ significantly from those expressed, implied or anticipated in these forward-looking statements as a result of certain factors discussed herein and any other periodic reports filed and to be filed with the Securities and Exchange Commission.*

***Cautionary Note Regarding Forward-Looking Statements***

*This report and other documents that we file with the Securities and Exchange Commission contain forward-looking statements that are based on current expectations, estimates, forecasts and projections about our future performance, our business, our beliefs and our management's assumptions. Statements that are not historical facts are forward-looking statements. Words such as "expect," "outlook," "forecast," "would," "could," "should," "project," "intend," "plan," "continue," "sustain", "on track", "believe," "seek," "estimate," "anticipate," "may," "assume," and variations of such words and similar expressions are often used to identify such forward-looking statements, which are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward- looking statements are not guarantees of future performance and involve risks, assumptions and uncertainties, including, but not limited to, those described in our reports that we file or furnish with the Securities and Exchange Commission. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statements after the date they are made, whether as a result of new information, future events, changes in assumptions or otherwise.*

**Business of the Company**

We were incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc. As of the date of this filing, our name has been changed to Marathon Digital Holdings, Inc. On December 7, 2011, we changed our name to American Strategic Minerals Corporation and were engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, we discontinued our minerals business and began to invest in real estate properties in Southern California. In October 2012, we discontinued our real estate business and we commenced our IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc. On November 1, 2017, we entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), which is focused on mining digital assets. We have since purchased our cryptocurrency mining machines and established a data center in Canada to mine digital assets. Following the merger, we intended to add GBV's existing technical capabilities and digital asset miners and expand our activities in the mining of new digital assets, while at the same time harvesting the value of our remaining IP assets. On June 28, 2018, the board has determined that it is in the best interests of the Company and its shareholders to allow the Amended Merger Agreement to expire on its current termination date of June 28, 2018 without further negotiation or extension. The Board approved to issue 750,000 shares of our common stock to GBV as a termination fee for cancelling the proposed merger between the two companies. The fair value of the common stocks was $2,850,000.

41

**Recent Developments**

**See "Business - Recent Developments"**

Critical Accounting Policies and Estimates

We believe that the following accounting policies are the most critical to aid you in fully understanding and evaluating this management discussion and analysis:

Digital Currencies

Digital currencies are included in current assets in the consolidated balance sheets as intangible assets with indefinite useful lives. Digital currencies are recorded at cost less impairment.

An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying

amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

At December 31, 2021, we carried $123.2 million of digital assets on our balance sheet, consisting of the approximately 3,321 bitcoins, and held $268.5 million in cash and cash equivalents, compared to $2.3 million of digital assets and $141.3 million in cash and cash equivalents at December 31, 2020, reflecting the shift in our liquid assets. As of March 9, 2022, we held approximately 9,007 bitcoins, of which, 4,794 bitcoins were acquired at an aggregate purchase price of $150 million at an average purchase price of approximately $31,168 per bitcoin, inclusive of fees and expenses. We expect to purchase additional bitcoin in future periods, though we may also sell bitcoin in future periods as needed to generate Cash Assets for treasury management purposes.

Impairment of Long-lived Assets

Management reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to undiscounted future cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. On January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020. During the year ended December 31, 2019 we moved certain of our bitcoin miners to a new location in the United States and recorded an impairment of $447,776 in our leasehold improvements in Canada.

Non-GAAP Financial Measures

We are providing supplemental financial measures for (i) non-GAAP income from operations that excludes the impact of depreciation and amortization of fixed assets, impairment losses on mined cryptocurrency, server maintenance contract amortization and stock compensation expense and (ii) non-GAAP net income and non-GAAP diluted earnings per share that exclude the impact of depreciation and amortization of fixed assets, impairment losses on mined cryptocurrency, change in fair value of warrant liability, server maintenance contract amortization and stock compensation expense, net of withholding taxes. These supplemental financial measures are not measurements of financial performance under generally accepted accounting principles in the United States ("GAAP") and, as a result, these supplemental financial measures may not be comparable to similarly titled measures of other companies. Management uses these non-GAAP financial measures internally to help understand, manage, and evaluate our business performance and to help make operating decisions.

We believe that these non-GAAP financial measures are also useful to investors and analysts in comparing our performance across reporting periods on a consistent basis. The first supplemental financial measure excludes non-cash operational expenses that we believe are not reflective of our general business performance such as (i) depreciation and amortization of fixed assets, (ii) significant impairment losses on mined cryptocurrency, (iii) server maintenance contract amortization and (iv) stock compensation expense, net of withholding taxes that could vary significantly in comparison to other companies.

42

The second set of supplemental financial measures excludes the impact of (i) depreciation and amortization of fixed assets, (ii) significant impairment losses on mined cryptocurrency, (iii) change in fair value of warrant liability (iv) server maintenance contract amortization and (v) stock compensation expense, net of withholding taxes. We believe the use of these non-GAAP financial measures can also facilitate comparison of our operating results to those of our competitors.

Non-GAAP financial measures are subject to material limitations as they are not in accordance with, or a substitute for, measurements prepared in accordance with GAAP. For example, we expect that share-based compensation expense, which is excluded from the first two non-GAAP financial measures, will continue to be a significant recurring expense over the coming years and is an important part of the compensation provided to certain employees, officers, and directors. Similarly, we expect that depreciation and amortization of fixed assets will continue to be a recurring expense over the term of the useful life of the assets. We have also excluded impairment losses on mined cryptocurrency from the first two non-GAAP financial measures, which may occur in future periods as a result of our continued holdings of significant amounts of bitcoin. Our non-GAAP financial measures are not meant to be considered in isolation and should be read only in conjunction with our Consolidated Condensed Financial Statements, which have been prepared in accordance with GAAP. We rely primarily on such Consolidated Condensed Financial Statements to understand, manage, and evaluate our business performance and use the non-GAAP financial measures only supplementally.

The following is a reconciliation of our non-GAAP income from operations for the three months and year ending December 31, 2021, respectively, which excludes the impact of (i) depreciation and amortization of fixed assets (ii) impairment losses on mined cryptocurrency (iii) server maintenance contract amortization and (iv) stock compensation expense, net of withholding taxes, to its most directly comparable GAAP measures for the periods indicated:

| | For the Three Months Ended December 31, | | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 | 2019 |
| **Reconciliation of non-GAAP income from operations:** | | | | | | |
| Income (loss) from Operations | $21,632,772 | $(4,953,470) | $(1,257,172) | $ (85,087,730) | $(9,833,104) | $ (4,239,111) |
| Depreciation and Amortization of Fixed Assets | 6,888,201 | 1,212,871 | 529,015 | 14,904,002 | 3,064,212 | 994,481 |
| Impairment of mined cryptocurrency | 11,080,241 | - | - | 29,552,991 | - | - |
| Server maintenance contract amortization | 1,207,647 | 968,712 | - | 3,278,927 | 976,842 | - |
| Stock Compensation Expense, net of withholding taxes | 8,425,074 | 180,532 | 270,885 | 156,071,895 | 1,129,300 | 330,749 |
| Non-GAAP income (loss) from operations | $49,233,935 | $(2,591,355) | $ (457,272) | $118,720,085 | $(4,662,750) | $(2,913,881) |

43

The following are reconciliations of our non-GAAP net income and non-GAAP diluted earnings per share for the three months and year ending December 31, 2021, respectively, in each case excluding the impact of (i) depreciation and amortization of fixed assets (ii) impairment losses on mined cryptocurrency (iii) change in fair value of warrant liability (iv) server maintenance contract amortization and (v) stock compensation expense, net of withholding taxes, to its most directly comparable GAAP measures for the periods indicated:

| | For the Three Months Ended December 31, | | | For the Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 | 2019 |
| **Reconciliation of non-GAAP net income:** | | | | | | |

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| Net (loss) income | $ 11,525,939 | $(5,234,227) | $(1,151,843) | $ (36,174,506) | $(10,447,771) | $(3,699,060) |
| Non-cash adjustments to Net Income (loss) | | | | | | |
| Depreciation and Amortization of Fixed Assets | 6,888,201 | 1,212,871 | 529,015 | 14,904,002 | 3,064,212 | 994,481 |
| Impairment of mined cryptocurrency | 11,080,241 | - | - | 29,552,991 | - | - |
| Change in fair value of warrant liability | 821,061 | 290,938 | (33,987) | 1,048,286 | 309,588 | (26,234) |
| Server maintenance contract amortization | 1,207,647 | 968,712 | - | 3,278,927 | 976,842 | - |
| Stock Compensation Expense, net of withholding taxes | 8,425,074 | 180,532 | 270,885 | 156,071,895 | 1,129,300 | 330,749 |
| Total Non-cash adjustments to Net Income (Loss) | $28,422,224 | $ 2,653,053 | $ 765,913 | $204,856,101 | $ 5,479,942 | $ 1,298,996 |
| Non-GAAP net (loss) income | $39,948,163 | $(2,581,174) | $ (385,930) | $168,681,595 | $ (4,967,829) | $(2,400,064) |
| **Reconciliation of non-GAAP diluted earnings (loss) per share:** | | | | | | |
| Diluted (loss) earnings per share | $ 0.11 | $ (0.10) | $ (0.17) | $ (0.36) | $ (0.13) | $ (0.53) |
| Depreciation and Amortization of Fixed Assets (per diluted share) | 0.06 | 0.02 | 0.08 | 0.15 | 0.04 | 0.15 |
| Impairment of mined cryptocurrency (per diluted share) | 0.10 | - | - | 0.30 | - | - |
| Change in fair value of warrant liability (per diluted share) | 0.01 | 0.01 | (0.01) | 0.01 | - | - |
| Server maintenance contract amortization (per diluted share) | 0.01 | 0.02 | - | 0.03 | 0.01 | - |
| Stock Compensation Expense, net of withholding taxes (per diluted share) | 0.07 | - | 0.04 | 1.57 | 0.01 | 0.05 |
| Non-GAAP diluted earnings (loss) per share | $ 0.36 | $ (0.05) | $ (0.06) | $ 1.70 | $ (0.07) | $ (0.33) |

44

Recent Issued Accounting Standards

See Note 2 to our consolidated financial statements for a discussion of recent accounting standards and pronouncements.

**Results of Operations for the Years Ended December 31, 2021, December 31, 2020 and December 31, 2019**

We generated revenues of $150.5 million during the year ended December 31, 2021 as compared to $4.4 million during the year ended December 31, 2020. For the year ended December 31, 2021, this represented an increase of $146.1 million or 3,353%. Revenue for the years ended December 31, 2021 and 2020 were derived primarily from cryptocurrency mining. During 2021, the Company placed into service over 30,000 bitcoin mining machines while increasing the Company's hash rate by approximately 1800%. This increase resulted in the Company generating an average of 1.6 bitcoin per day in January 2021 to generating approximately 15.6 bitcoin per day in December 2021.

We generated revenues of $4.4 million during the year ended December 31, 2020 as compared to $1.2 million during the year ended December 31, 2019. For the year ended December 31, 2020, this represented an increase of $3.2 million or 268%. Revenue for the years ended December 31, 2020 and 2019 were derived primarily from cryptocurrency mining.

Direct cost of revenues during the year ended December 31, 2021 and 2020 amounted to approximately $33.7 million and $7.0 million, respectively. For the year ended December 31, 2021, this represented an increase of $26.7 million or 381%. Direct costs of revenue include cohosting fees, electricity, depreciation and amortization expenses of the cryptocurrency mining machines and patents, contingent payments to patent enforcement legal costs, patent enforcement advisors and inventors as well as various non-contingent costs associated with enforcing the Company's patent rights and otherwise in developing and entering into settlement and licensing agreements that generate the Company's revenue.

Direct cost of revenues during the year ended December 31, 2020 and 2019 amounted to approximately $7.0 million and $2.5 million, respectively. For the year ended December 31, 2020, this represented an increase of $4.5 million or 182%. Direct costs of revenue include cohosting fees, electricity, depreciation and amortization expenses of the cryptocurrency mining machines and patents, contingent payments to patent enforcement legal costs, patent enforcement advisors and inventors as well as various non-contingent costs associated with enforcing the Company's patent rights and otherwise in developing and entering into settlement and licensing agreements that generate the Company's revenue.

We incurred other operating expenses of $201.8 million for the year ended December 31, 2021 and $7.2 million for the year ended December 31, 2020. For the year ended December 31, 2021, this represented an increase of $194.6 million or 2,702%. These expenses primarily consisted of the impairment of mining equipment, compensation to our officers, directors and employees, professional fees and consulting incurred in connection with the day-to-day operation of our business.

We incurred other operating expenses of $7.2 million for the year ended December 31, 2020 and $2.9 million for the year ended December 31, 2019. For the year ended December 31, 2020, this represented an increase of $4.3 million or 144%. These expenses primarily consisted of the impairment of mining equipment, compensation to our officers, directors and employees, professional fees and consulting incurred in connection with the day-to-day operation of our business and break-up fee to GBV.

45

The operating expenses consisted of the following:

| | Total Other Operating Expenses | | |
|---|---|---|---|
| | **For the Year Ended** | | |
| | **December 31, 2021** | **December 31, 2020** | **December 31, 2019** |
| Compensation and related taxes (1) | $ 164,285,755 | $ 4,730,143 | $ 1,475,450 |
| Consulting fees (2) | 531,677 | 302,561 | 130,813 |
| Professional fees (3) | 5,268,485 | 733,741 | 422,335 |
| Other general and administrative (4) | 2,216,489 | 551,672 | 465,783 |
| Impairment of cryptocurrencies (5) | 29,552,991 | - | - |
| Impairment of equipment and leasehold improvements (6) | - | 871,302 | 447,776 |
| Total | $ 201,855,397 | $ 7,189,419 | $ 2,942,157 |

(1) Compensation expense and related taxes: Compensation expense includes cash compensation and related payroll taxes and benefits, and non-cash equity compensation expenses. For the year ended December 31, 2021 and 2020, compensation expense and related payroll taxes were $164.3 million and $4.7 million, an increase of $159.6 million or 3,373%. During the years ended December 31, 2021 and 2020, we recognized non-cash employee and board equity-based compensation of $160.8 million and $1.2 million, respectively. For the year ended December 31, 2020 and 2019, compensation expense and related payroll taxes were $4.7 million and $1.5 million, an increase of $3.3 million or 221%. During the years

ended December 31, 2020 and 2019, we recognized non-cash employee and board equity-based compensation of $1.2 million and $0.9 million, respectively.

(2) Consulting fees: For the year ended December 31, 2021 and 2020, we incurred consulting fees of $0.5 million and $0.3 million, respectively, an increase of $0.2 million or 76%. For the year ended December 31, 2020 and 2019, we incurred consulting fees of $0.3 million and $0.1 million, respectively, an increase of $0.2 million or 131%. Consulting fees include consulting fees primarily for investor relations and public relations services as well as other consulting services. The increase in consulting fees for the year ended December 31, 2020 compared to the same period in the prior year was primarily due to the write-off of prepaid consulting fees from a prior period.

(3) Professional fees: For the year ended December 31, 2021 and 2020, professional fees were $5.3 million and $0.7 million, respectively, an increase of $4.5 million or 618%. For the year ended December 31, 2020 and 2019, professional fees were $0.7 million and $0.4 million, respectively, an increase of $0.3 million or 74%. Professional fees primarily reflect the costs of professional outside accounting fees, legal fees and audit fees. The increase in professional fees was mainly the result of legal fees related to the Convertible Debt and ATM financing offerings.

(4) Other general and administrative expenses: For the year ended December 31, 2021 and 2020, other general and administrative expenses were $2.2 million and $0.6 million, respectively, an increase of $1.7 million or 302%. For the year ended December 31, 2020 and 2019, other general and administrative expenses were $0.6 million and $0.5 million, respectively, an increase of $0.1 million or 18%. General and administrative expenses reflect the other non-categorized operating costs of the Company and include expenses related to being a public company, rent, insurance, technology and other expenses incurred to support the operations of the Company.

(5) Impairment of cryptocurrencies: For the year ended December 31, 2021 and 2020, impairment of cryptocurrencies were $29.6 million and $0, an increase of $29.6 million or 100%. Impairment of cryptocurrencies reflect the impairment of the bitcoin earned by the Company subject to FASB ASC 350 *Intangibles - Goodwill and Other*.

(6) Impairment of equipment and leasehold improvements: For the years ended December 31, 2020 and 2019, the Company recorded a loss on the impairment of equipment and leasehold improvements in the amounts of $0.9 million and $0.4 million.

46

**Operating Loss**

We reported operating loss from continuing operations of $85.1 million and $9.8 million for the years ended December 31, 2021 and 2020, respectively. We reported operating loss from continuing operations of $9.8 million and $4.2 million for the years ended December 31, 2020 and 2019, respectively.

**Other Income (Expenses)**

Total other income was $71.9 million for the year ended December 31, 2021 compared to total other expenses of $0.6 million for the year ended December 31, 2020. Total other expenses were $0.6 million for the year ended December 31, 2020 compared to total other income of $0.7 million for the year ended December 31, 2019. The changes are related to the unrealized gains associated with the purchase of 4,812.66 bitcoin held in an investment fund of one.

**Net Loss Available to Common Shareholders**

We reported net loss of $36.2 million, $10.4 million and $3.5 million for the year ended December 31, 2021, 2020 and 2019, respectively.

*Liquidity and Capital Resources*

The Company's consolidated financial statements have been prepared assuming that it will continue as a going concern, which contemplates continuity of operations, realization of assets, and liquidation of liabilities in the normal course of business.

As reflected in the consolidated financial statements, the Company had and accumulated deficit of approximately $152.2 million, $116.1 million and $105.6 million at December 31, 2021, December 31, 2020 and December 31, 2019, respectively, a net loss of approximately $36.2 million, $10.4 million and $3.5 million, respectively, and approximately $18.2 million, $7.8 million and $3.3 million net cash used in operating activities for the year ended December 31, 2021, December 31, 2020 and December 31, 2019, respectively.

Liquidity is the ability of a company to generate funds to support its current and future operations, satisfy its obligations, and otherwise operate on an ongoing basis. At December 31, 2021, the Company's cash and cash equivalents balances totaled $268.5 million compared to $141.3 million at December 31, 2020. The increase in liquidity is due to the issuance of $747.5 million in convertible notes during 2021.

Net working capital increased by $389.4 million, to working capital of $674.4 million at December 31, 2021 from working capital of $285.0 million at December 31, 2020.

Cash used in operating activities was $18.2 million, $7.8 million and $3.3 million during the year ended December 31, 2021, December 31, 2020 and December 31, 2019, respectively.

Cash used in investing activities was $891.9 million, $81.3 million and cash provided of $1.2 million for the year ended December 31, 2021, December 31, 2020 and December 31, 2019, respectively.

Cash provided by financing activities was $1.037 billion, $229.7 million and $0.2 million during the year ended December 31, 2021, December 31, 2020 and December 31, 2019, respectively.

47

During 2019, the Company issued 172,126 shares of common stock under the At The Market Offering for the total proceeds of $255,893, net of offering cost of $10,442.

During 2020, the Company issued 54,301,698 shares of common stock under the At The Market Offering for the total proceeds of $307,064,401, net of offering cost of $9,405,129.

On March 30, 2020, the Company issued 350,250 shares of common stock in exchange for S9 miners with a fair market value of $612,938.

On June 1, 2020, the Company issued 2,023,739 shares of common stock in exchange for the conversion and extinguishment of the note payable outstanding in an amount of $999,106.

On October 6, 2020, the Company issued 6,000,000 shares of common stock in exchange for five years of services pursuant to the Power Purchase Agreement and Data Facility Services Agreement for the total proceeds of $0, net of offering cost of $0 valued at the time of execution at $1.87 per share or $11,220,000 in aggregate.

*Selected short-term and long-term contractual obligations and commitments.*

**December 31,2021**

| | Less than 1 year | 1-3 years | 3-5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| **Contractual obligations** | | | | | |
| Purchase agreements | $ 632,635,125 | $ - | $ - | $ - | $ 632,635,125 |
| Long-term debt | 7,475,000 | 22,425,000 | 754,975,000 | - | 784,875,000 |
| Total (estimated) | $ 640,110,125 | $ 22,425,000 | $ 754,975,000 | $ - | $1,417,510,125 |

We believe that existing cash and cash equivalents held by us and cash and cash equivalents anticipated to be generated by us are sufficient to meet working capital requirements, anticipated capital expenditures, and contractual obligations for at least the next 12 months. As of December 31,

2021, we held approximately 8,115 bitcoin, including the 4,794 bitcoin held in the investment fund. A total of 4,812.66 bitcoin was purchased and placed into an investment fund in January 2021 for an average price of $31,168 per bitcoin. During 2021, 18 bitcoin were liquidated as needed by the investment manager in order to pay the management fee and other operating expenses of the fund pursuant to the management agreement.

We do not believe we will need to sell any of our bitcoins within the next twelve months to meet our working capital requirements, although we may from time to time sell bitcoins as part of treasury management operations, including to increase our cash balances. The Bitcoin market historically has been characterized by significant volatility in its price, limited liquidity and trading volumes compared to sovereign currencies markets, relative anonymity, a developing regulatory landscape, susceptibility to market abuse and manipulation, and various other risks inherent in its entirely electronic, virtual form and decentralized network. During times of instability in the Bitcoin market, we may not be able to sell our bitcoins at reasonable prices or at all. As a result, our bitcoins are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. In addition, upon sale of our bitcoin, we may incur additional taxes related to any realized gains or we may incur capital losses as to which the tax deduction may be limited.

**Off-Balance Sheet Arrangements**

None.

48

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The following discussion about our market risk exposures involves forward-looking statements. Actual results could differ materially from those projected in the forward-looking statements.

We are exposed to the impact of market price changes in bitcoin.

*Market Price Risk of Bitcoin.* We have invested a significant portion of our cash in bitcoin and, as of December 31, 2021, we held approximately 8,115 bitcoins. The carrying value of our bitcoins as of December 31, 2021 was $42,667, which reflects cumulative impairments of $29.6 million, on our Consolidated Balance Sheet. As discussed in Note 2, Summary of Significant Accounting Policies, to the Consolidated Financial Statements, we account for our bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition. Impairment losses cannot be recovered for any subsequent increase in fair value. For example, the market price of one bitcoin in our principal market ranged from $46,178 - $67,634 during the three months ended December 31, 2021, but the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition. Therefore, negative swings in the market price of bitcoin could have a material impact on our earnings and on the carrying value of our digital assets. Positive swings in the market price of bitcoin are not reflected in the carrying value of our digital assets and impact earnings only when the bitcoin is sold at a gain. For the year ended December 31, 2021, we incurred impairment losses of $29.6 million on our bitcoin. As of March 9, 2022, at 4:00 p.m. EST, the market price of one bitcoin in our principal market was $38,900.

49

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**MARATHON DIGITAL HOLDINGS, INC.**

**CONSOLIDATED FINANCIAL STATEMENTS**

**DECEMBER 31, 2021**

**Index to Consolidated Financial Statements**

| | |
|---|---|
| REPORTS OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRMS (PCAOB ID No. 688) | F-2 |
| CONSOLIDATED BALANCE SHEETS | F-4 |
| CONSOLIDATED STATEMENTS OF OPERATIONS | F-5 |
| CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY | F-6 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS | F-7 |
| NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS | F-8 to F-31 |

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRMS**

To the Board of Directors and Stockholders of
Marathon Digital Holdings, Inc. & Subsidiaries

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Marathon Digital Holdings, Inc. & Subsidiaries (the Company) as of December 31, 2020, and the related consolidated statements of operations, stockholders' equity, and cash flows for the period in the two years ended December 31, 2020, and the related notes (collectively referred to as the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the consolidated results of its operations and its cash flows for the period in the two years ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

**Critical Audit Matters:**

Critical audit matters are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements, and (2) involved our especially challenging, subjective, or complex judgments.

We determined that there are no critical audit matters.



RBSM LLP

We have served as the Company's auditor since 2017.

Las Vegas, NV

March 16, 2021

F-2

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors of

Marathon Digital Holdings, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Marathon Digital Holdings, Inc. (the "Company") as of December 31, 2021, the related consolidated statements of operations, stockholders' equity and cash flows for the year then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2021, based on the criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013 and our report dated March 9, 2022, expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting because of the existence of a material weakness.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of a critical audit matter does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Revenue Recognition*

As disclosed in Note 2 of the financial statements, the Company recognizes revenue in accordance with ASC 606, *Revenue from Contracts with Customers*. The Company provides computing power in crypto asset transaction verification services to the blockchain network. The transaction consideration received by the Company, if any, is a non-cash consideration, which the Company measures at fair value on the date received.

The principal consideration for our determination that performing procedures related to revenue recognition is a critical audit matter is due to the complexities involved in auditing completeness and occurrence of the revenue recognized by the Company particularly in light of material weakness identified in the design and effectiveness of certain internal controls over the IT environment for certain financially relevant systems.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the financial statements. These procedures included, among others, (i) performing site visitations of the Company's facility where the mining hardware is located, which included an observation of the physical and environmental controls and mining equipment inventory, (ii) on a sample basis testing the hashing power contributed by the Company's mining hardware, (iii) independently confirming certain financial and performance data directly with the blockchain network, (iv) performing certain substantive analytical procedures using hashing power data and electricity consumption data to determine the completeness and occurrence of digital assets rewarded to the Company as consideration for services rendered, and (v) confirming the digital asset balances directly with the custodian of the Company's wallets.

/s/ Marcum LLP

Marcum LLP

We have served as the Company's auditor since 2021.

Costa Mesa, CA

March 9, 2022

F-3

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
## CONSOLIDATED CONDENSED BALANCE SHEETS

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 268,522,019 | $ 141,322,776 |
| Digital currencies | 102,805,980 | 2,271,656 |
| Digital currencies, restricted | 20,437,284 | - |
| Other receivable | - | 74,767,226 |
| Deposit | 34,458,347 | 65,647,592 |
| Investment fund | 223,778,545 | - |
| Loan receivable | 30,000,000 | - |
| Prepaid expenses and other current assets | 8,148,016 | 2,399,965 |

| | | |
|---|---|---|
| Total current assets | 688,150,191 | 286,409,215 |
| Other assets: | | |
| Property and equipment, net of accumulated depreciation and impairment charges of $21,311,461 and $6,480,359 for December 31, 2021 and 2020, respectively | 276,242,794 | 17,224,321 |
| Prepaid service contract | 13,665,589 | 8,415,000 |
| Right-of-use assets | - | 200,301 |
| Deposit, non-current | 466,254,623 | - |
| Investment in SAFE Agreements | 3,000,000 | - |
| Intangible assets, net of accumulated amortization of $280,497 and $207,598 for December 31, 2021 and 2020, respectively | 931,226 | 1,002,402 |
| Total other assets | 760,094,232 | 26,842,024 |
| **TOTAL ASSETS** | $ 1,448,244,423 | $ 313,251,239 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 12,927,139 | $ 999,742 |
| Current portion of accrued bond interest | 867,260 | - |
| Current portion of lease liability | - | 121,596 |
| Warrant liability | - | 322,437 |
| Total current liabilities | 13,794,399 | 1,443,775 |
| Long-term liabilities | | |
| Convertible notes payable | 728,405,922 | - |
| SBA PPP loan payable | - | 62,500 |
| Deferred tax liabilities | 23,020,721 | - |
| Total long-term liabilities | 751,426,643 | 62,500 |
| Total liabilities | 765,221,042 | 1,506,275 |
| **Commitments and Contingencies** | | |
| Stockholders' Equity: | | |
| Preferred stock, 0.0001 par value, 50,000,000 shares authorized, no shares issued and outstanding at December 31, 2021 and 2020, respectively | - | - |
| Common stock, 0.0001 par value; 200,000,000 shares authorized; 102,733,273 and 81,974,619 issued and outstanding at December 31, 2021 and 2020, respectively | 10,273 | 8,197 |
| Additional paid-in capital | 835,693,610 | 428,242,763 |
| Accumulated other comprehensive loss | (450,719) | (450,719) |
| Accumulated deficit | (152,229,783) | (116,055,277) |
| Total stockholders' equity | 683,023,381 | 311,744,964 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 1,448,244,423 | $ 313,251,239 |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-4

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| **Revenues** | | | |
| Cryptocurrency mining revenue | $ 150,463,770 | $ 4,357,443 | $ 1,185,227 |
| **Total revenues** | 150,463,770 | 4,357,443 | 1,185,227 |
| **Operating costs and expenses** | | | |
| Cost of revenue | 33,696,103 | 7,001,128 | 2,482,181 |
| Impairment of mining equipment | - | 871,302 | - |
| Impairment of leasehold improvements | - | - | 447,776 |
| Compensation and related taxes | 164,285,755 | 4,730,143 | 1,475,450 |
| Consulting fees | 531,677 | 302,561 | 130,813 |
| Professional fees | 5,268,485 | 733,741 | 422,335 |
| General and administrative | 2,216,489 | 551,672 | 465,783 |
| Impairment of mined cryptocurrency | 29,552,991 | - | - |
| Total operating expenses | 235,551,500 | 14,190,547 | 5,424,338 |
| **Income (loss) from operations** | (85,087,730) | (9,833,104) | (4,239,111) |
| **Other income (expenses)** | | | |
| Gain from extinguishment of debt | - | - | 181,995 |
| Other income (expenses) | 81,827 | 115,876 | - |
| Foreign exchange loss | - | - | (11,873) |
| Loss on conversion of note | - | (364,833) | - |
| Change in fair value of investment in NYDIG fund | 73,778,545 | - | - |
| Realized gain (loss) on sale of digital currencies | 14,175 | 15,466 | 36,092 |
| Change in fair value of warrant liability | (1,048,286) | (309,588) | 26,234 |
| Change in fair value of mining payable | - | (66,547) | 507,862 |
| Interest income | 677,415 | 18,343 | 33,651 |
| Interest expense | (1,569,731) | (20,984) | (51,915) |
| Total other (expenses) income | 71,933,945 | (612,267) | 722,046 |
| **Loss before income taxes** | $ (13,153,785) | $ (10,445,371) | $ (3,517,065) |
| Provision for income taxes | (23,020,721) | (2,400) | - |

| | | | | |
|---|---|---|---|---|
| Net loss | $ | (36,174,506) | $ | (10,447,771) | $ | (3,517,065) |
| Net income (loss) per share, basic and diluted: | $ | (0.36) | $ | (0.13) | $ | (0.53) |
| Weighted average shares outstanding, basic and diluted: | | 99,337,587 | | 81,408,340 | | 6,664,238 |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-5

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS EQUITY**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | |
| Balance as of December 31, 2018 | - | $ - | 6,379,992 | $ 638 | $105,461,396 | $(102,090,441) | $ (450,719) | $ 2,920,874 |
| Stock based compensation | - | - | 150,000 | 15 | 933,667 | - | - | 933,682 |
| Par value adjustment and additional shares issued due to reverse split | - | - | 5,413 | 1 | (1) | - | - | - |
| Issuance of common stock, net of offering costs/At-the-market offering | - | - | 172,126 | 17 | 245,477 | - | - | 245,494 |
| Common stock issued for purchase of mining servers | - | - | 1,751,250 | 175 | 3,064,512 | - | - | 3,064,687 |
| Net loss | - | - | - | - | - | (3,517,065) | - | (3,517,065) |
| Balance as of December 31, 2019 | - | $ - | 8,458,781 | $ 846 | $109,705,051 | $(105,607,506) | $ (450,719) | $ 3,647,672 |
| Stock based compensation | - | - | 2,745,639 | 275 | 1,178,334 | - | - | 1,178,609 |
| Issuance of common stock, net of offering costs/At-the-market offering | - | - | 54,301,698 | 5,430 | 297,653,840 | - | - | 297,659,270 |
| Common stock issued for purchase of mining servers | - | - | 350,250 | 35 | 171,587 | - | - | 171,622 |
| Common stock issued for note conversion | - | - | 2,023,739 | 202 | 1,578,873 | - | - | 1,579,075 |
| Common stock issued for long term service contract | - | - | 6,000,000 | 600 | 11,219,400 | - | - | 11,220,000 |
| Issue common stock and warrant for cash | - | - | 7,666,666 | 767 | 6,270,833 | 0 | - | 6,271,600 |
| Warrant exercised for cash | - | - | 413,233 | 41 | 464,846 | - | - | 464,887 |
| Options exercised for cash | - | - | 14,613 | 1 | (1) | - | - | - |
| Net loss | - | - | - | - | - | (10,447,771) | - | (10,447,771) |
| Balance as of December 31, 2020 | - | $ - | 81,974,619 | $ 8,197 | $428,242,763 | $(116,055,277) | $ (450,719) | $ 311,744,964 |
| Stock based compensation, net of tax withholding | - | - | 7,671,317 | 767 | 156,071,609 | - | - | 156,072,376 |
| Issuance of common stock, net of offering costs/At-the-market offering | - | - | 12,500,000 | 1,250 | 237,428,370 | - | - | 237,429,620 |
| Options exercised on cashless basis | - | - | 23,500 | 3 | (3) | - | - | - |
| Warrant exercised for cash | - | - | 221,946 | 22 | 1,445,358 | - | - | 1,445,380 |
| Common stock issued for cashless exercise of warrants | - | - | 29,797 | 3 | 1,370,705 | - | - | 1,370,708 |
| Common stock issued for service and license agreements | - | - | 312,094 | 31 | 11,134,808 | - | - | 11,134,839 |
| Net loss | - | - | - | - | - | (36,174,506) | - | (36,174,506) |
| Balance as of December 31, 2021 | - | $ - | 102,733,273 | $10,273 | $835,693,610 | $(152,229,783) | $ (450,719) | $ 683,023,381 |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-6

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ (36,174,506) | $ (10,447,771) | $ (3,517,065) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation | 14,831,102 | 2,993,036 | 923,304 |
| Amortization of patents and website | 71,176 | 71,176 | 71,177 |

| | | | |
|---|---:|---:|---:|
| Amortization of leasehold improvements | 1,723 | - | - |
| Deferred tax liability | 23,020,721 | - | - |
| Loss on conversion of debt | - | 364,833 | - |
| Impairment of mining equipment | - | 871,302 | - |
| Impairment of leasehold improvements | - | - | 447,776 |
| Realized gain (loss) on sale of digital currencies | (11,659) | (15,466) | (36,092) |
| Change in fair value of warrant liability | 1,048,286 | 309,588 | (26,234) |
| Change in fair value of mining payable | - | 66,547 | (507,862) |
| Change in fair value of investment securities | (73,778,545) | - | - |
| Gain on PPP loan forgiveness | (62,500) | - | - |
| Impairment of cryptocurrencies | 29,552,991 | - | - |
| Stock based compensation | 160,786,028 | 1,178,609 | 933,682 |
| Amortization of right-of-use assets | 200,301 | 96,986 | 82,840 |
| Bad debt allowance | - | - | - |
| Change in prepaid service contract | - | 561,000 | - |
| Changes in operating assets and liabilities: | | | |
| Digital currencies | (150,512,940) | (4,357,443) | (1,185,227) |
| Lease liability | (121,596) | (86,842) | (72,548) |
| Prepaid expenses and other assets | 136,200 | 644,059 | (435,159) |
| Accounts payable and accrued expenses | 11,927,398 | (23,318) | 2,753 |
| Accrued interest on bond payable | 867,260 | - | - |
| Net cash used in operating activities | (18,218,560) | (7,773,704) | (3,318,655) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Sale of digital currencies | - | 2,102,394 | 1,220,178 |
| Interest received from digital currencies, restricted | - | - | - |
| Loan receivable | (30,000,000) | - | - |
| Purchase of investment securities | (150,000,000) | - | - |
| Purchase of SAFE investments | (3,000,000) | - | - |
| Purchase of property and equipment | (273,851,299) | (17,742,315) | (5,225) |
| Deposits for the purchase of mining servers | (435,065,378) | (65,647,592) | - |
| Net cash provided by (used in) investing activities | (891,916,677) | (81,287,513) | 1,214,953 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds received on issuance of notes payable | - | 62,500 | - |
| Proceeds from issuance of common stock/At-the-market offering | 324,768,476 | 229,961,998 | 255,893 |
| Offering costs for the issuance of common stock/At-the-market offering | (12,571,668) | (7,069,955) | (10,399) |
| Proceeds from issuance of convertible debt, net of agent's discount | 728,812,500 | - | - |
| Other offering costs | (406,578) | - | - |
| Proceeds from line of credit | 77,500,000 | - | - |
| Repayment from line of credit | (77,500,000) | - | - |
| Value of shares withheld for taxes | (4,713,652) | - | - |
| Proceeds from issuance of common stock and warrant, net | - | 6,271,600 | - |
| Proceeds received on exercise of options and warrants | 1,445,402 | 464,887 | - |
| Net cash provided by financing activities | 1,037,334,480 | 229,691,030 | 245,494 |
| Net (decrease) increase in cash and cash equivalents | 127,199,243 | 140,629,813 | (1,858,208) |
| Cash and cash equivalents - beginning of period | 141,322,776 | 692,963 | 2,551,171 |
| Cash and cash equivalents - end of period | 268,522,019 | $ 141,322,776 | $ 692,963 |

| | | | | | | |
|---|---|---:|---|---:|---|---:|
| **Supplemental schedule of non-cash investing and financing activities:** | | | | | | |
| Par value adjustment due to reverse split | $ | - | $ | - | $ | 1 |
| Receivable due to share issuance | $ | - | $ | 74,767,226 | $ | - |
| Common stock issued for purchase of mining servers | $ | - | $ | 171,622 | $ | 3,064,687 |
| Reduction of share commitment for purchase of mining servers | $ | - | $ | 408,625 | $ | 1,021,562 |
| Options exercised into common stock | $ | 3 | $ | - | $ | - |
| Warrants exercised into common shares | $ | 1,370,723 | $ | - | $ | - |
| Restricted stock issuance | $ | - | $ | - | $ | 15 |
| Common stock issued for note conversion | $ | - | $ | 1,579,074 | $ | - |
| Common stock issued for service and license agreements | $ | 11,134,839 | $ | 11,220,000 | $ | - |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-7

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**
**NOTE 1 - ORGANIZATION AND DESCRIPTION OF BUSINESS**
**Organization**

Marathon Digital Holdings, Inc. (the "Company") was incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc. On December 7, 2011, the Company changed its name to American Strategic Minerals Corporation and were engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, the Company discontinued the minerals business and began to invest in real estate properties in Southern California. In October 2012, the Company discontinued its real estate business and the Company commenced IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc. On November 1, 2017, the Company entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), which is focused on mining digital assets. The Company purchased cryptocurrency

mining machines and established a data center in Canada to mine digital assets. The Company expanded its activities in the mining of new digital assets, while at the same time harvesting the value of its remaining IP assets. As of October 2020, the financial operations were brought in house and are completed by the Company's accounting team that consists of a Chief Financial Officer, Chief Operating Officer and bookkeeper. Subsequent to December 31, 2020, the Company hired a full-time Controller. We have also moved all of our data mining operations that were operating in Canada prior to 2021 to our new facility in Hardin, Montana.

The Company's Board of Directors adopted the reverse stock split approved by its shareholders at its December 2018 Board Meeting. Upon the effectiveness of the reverse stock split, every four shares of issued and outstanding common stock before the open of business on April 8, 2019 was combined into one issued and outstanding share of common stock, with no change in par value per share. All share and per share values for all periods presented in the accompanying consolidated financial statements have been retroactively adjusted to reflect the 1:4 Reverse Split.

On January 1, 2018, our Board adopted the 2018 Equity Incentive Plan, subsequently approved by the stockholders on March 7, 2018, pursuant to which up to 625,000 shares of common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers.

On May 21, 2019, the Company received notice from the Nasdaq Capital Market (the "Capital Market") that the Company has failed to maintain a minimum of $2,500,000 in stockholders' equity for continued listing as required under Listing Rule 5550(b)(1) as its Form 10-Q for the period ended March 31, 2019 reported stockholders' equity of $2,158,192. On July 23, 2019, we announced Nasdaq approved the Company's plan to regain compliance, and the Company was required to file its Form 10-Q for the period ending September 30, 2019 with the SEC on or before November 13, 2019, which it did, evidencing compliance with the stockholders' equity requirement.

F-8

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2020. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2020 and 2019, respectively. There is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020.

On May 11, 2020, the Company purchased 700 new generation M305+ASIC Miners from MicroBT for approximately $1.3 million. The 700 miners produce 80/Th and will generate 56 PH/s (petahash) of hashing power, compared to the Company's current S-9 production of 46 PH/s. These next generation MicroBT ASIC miners are markedly more energy efficient than our existing Bitmain models. These miners were delivered to the Company's Hosting Facility in June 2020 and are producing Bitcoins.

The Company purchased 660 latest generation Bitmain S19 Pro Miners on May 12, 2020, 500 units on May 18, 2020 and an additional 500 units on June 11, 2020. These miners produce 110 TH/s and will generate 73 PH/s (petahash) of hashing power, compared to the Company's S-9 production of 46 PH/s. The Company made the payments of approximately $4.2 million in the second quarter of 2020 and received 660 of the 1,660 units at its Hosting Facility in August 2020, and its hosting partner, Compute North, had installed them upon their arrival. Of the 1,000 remaining S-19 Pro Miners due to arrive in the 4th quarter of 2020, 500 were received in November of 2020 and installed in the Company's Hosting Facility in Montana, while another 60 miners were received and placed into service in January 2021. The remaining 440 miners that were anticipated to arrive in the 4th quarter of 2020 were cancelled and the Company received a refund of the original purchase price of $1.1 million in January 2021.

On July 29, 2020, the Company announced the purchase of 700 next generation M31S+ASIC Miners from MicroBT. The miners arrived mid-August of 2020.

On August 13, 2020, the Company entered into a Long Term Purchase Contract with Bitmaintech PTE., LTD ("Bitmain") for the purchase of 10,500 next generation Antminer S-19 Pro ASIC Miners. The purchase price per unit is $2,362 ($2,206 with a 6.62% discount) for a total gross purchase price of $24,801,000. The parties confirm that the total hashrate of the Antminers under this agreement shall not be less than 1,155,000 TH/s. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a total net discount of 8.63% to the purchase price adjusting the amount due to $22,660,673.

F-9

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

As of December 31, 2021, the Company has paid the entire purchase price under this agreement and received all 10,500 units from Bitmain.

On October 6, 2020, the Company entered into a series of agreements with affiliates of Beowulf Energy LLC, a Delaware limited liability company (collectively and as applicable, "Beowulf") and Two Point One, LLC, a Delaware limited liability company ("2Pl"; Marathon, Beowulf and 2Pl each a "Party" and, collectively, the "Parties"). Beowulf and 2Pl have designed and developed a data center facility of up to 100-megawatts (the "Facility") that is located next to, and supplied energy directly from, Beowulf's power generating station in Hardin, MT (the "Hardin Station"). The Facility was developed in two phases to reach its 100 MW capacity, and the Hardin Station will supply the Facility exclusively with energy to operate Bitcoin mining servers.

The projected build out cost for Phase I is approximately $23 million, which is front loaded as the infrastructure is being built for the full 100 MW project. Phase I accounts for 70 MW of the 100 MW project. It entails high voltage equipment to break down the full 100 MW load from the generating station, and thereafter, the infrastructure cost per MW is a matter of distributing power at a container level. Assuming market conditions similar to current, the build out cost for Phase II works out to approximately $200,000 - $250,000 per MW. These are all in costs covering all equipment and labor needed starting from the power coming off the Generating Station distributed down to running the actual miners: including breakers, transformers, switches, containers, PDUs, fans, network cables, and the like.

Marathon and Beowulf entered into an exclusive Power Purchase Agreement for the initial supply of 30 MW (Phase I), and up to 100 MW in the aggregate (Phase II), of energy load to the Facility at a cost of $0.028/kWh. The initial term of the Power Purchase Agreement is five years, with up to five additional three-year extensions, as mutually agreed, assuming 75% energy utilization of the initial 30 MW of energy supplied to the Facility.

33

Marathon purchased certain mining infrastructure and equipment for the Facility from Beowulf for a purchase price of $750,000, and Marathon has the right, at no additional cost, to construct and access the Facility on land adjacent to the Hardin Station pursuant to a lease agreement with Beowulf. After the execution of the contract, the Company entered into additional miner purchase agreements. Due to the increased size of the Company's fleet of miners, Phase I was increased from the initial 30 MW to 70 MW, while Phase II will encompass the completion of the remaining 30 MW for the project.

Beowulf and 2P1 will provide operation and maintenance services for the Facility pursuant to a Data Facility Services Agreement, in exchange for an initial issuance of 3,000,000 shares of Marathon's common stock to each of Beowulf and 2Pl valued at the time of execution at $1.87 per share or $11,220,000 in aggregate. Upon completion of Phase I, Marathon will issue to Beowulf an additional 150,000 shares of its common stock. During Phase II, Marathon will issue to Beowulf an additional 350,000 shares of its common stock - 150,000 shares upon reaching 60 MW of Facility load and 200,000 at completion of the full 100 MW of Facility load. The cost to maintain and run the Facility will be $0.006/kWh. All shares issued under the Data Facility Services Agreement are issued pursuant to transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933.

On October 23, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19 Pro ASIC Miners. The 2021 delivery schedule will be 2,500 Units in January, 4,500 Units in February and the final 3,000 Units in March 2021. The gross purchase price is $23,620,000 with 30% due upon the execution of the contract and the balance paid over the next 4 months. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,581,594. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and received all 10,000 units from Bitmain.

As of the November 12, 2020, the Company sold all shares of our common stock available thereunder for an aggregate purchase price of $100,000,000 under our 2020 At the Market Offering pursuant to our registration statement on Form S-3 declared effective by the SEC on August 6, 2020, which was the total amount available for sale thereunder.

On December 8, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19j Pro ASIC Miners, with 6,000 units to be delivered in August 2021, and the remaining 4,000 units to be delivered in September 2021. The gross purchase price is $23,770,000 with 10% of the purchase price due within 48 hours of execution of the contract, 30% due on January 14, 2021, 10% due on February 15, 2021, 30% due on June 15, 2021 and 20% due on July 15, 2021. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,718,649. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and received all 10,000 units from Bitmain.

F-10

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On December 11, 2020, the Company entered into an At The Market Agreement with HC Wainwright for up to $200,000,000. On January 12, 2021, the Company also announced that it had successfully completed its previously announced $200 million shelf offering by utilizing its at-the-market (ATM) facility. The Company ended the 2020 fiscal year with $141.3 million in cash and 81,974,619 shares outstanding.

On December 23, 2020, the Company executed a contract with Bitmain to purchase an additional 70,000 next generation Antminer S-19 ASIC Miners, with 7,000 units to be delivered in July 2021, and the remaining 63,000 units to be delivered in December 2021. The purchase price is $167,763,451. The purchase price for the miners shall be paid as follows: 20% within 48 hours of signing of contract; 30% on or before March 1, 2021; 4.75% on June 15, 2021; 1.76% on July 15, 2021; 4.58% on August 15, 2021; 10.19% on September 15, 2021; 17.63% on October 15, 2021 and 11.55% on November 15, 2021. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and received approximately 40,000 units from Bitmain.

On December 31, 2020, the Company sold 6,632,712 shares of common stock pursuant to the At The Market offering. Proceeds of $77.1 million net of offering costs of $2.3 million were received on January 4, 2021. Due to the timing of the proceeds received, another current receivable was recorded in an amount of $74.8 million as of December 31, 2020.

Effective December 31, 2020, the Board of Directors of the Company ratified the following arrangements approved by its Compensation Committee:

Merrick Okamoto, CEO was awarded a cash bonus of $2,000,000 which was paid before year end 2020. He was also awarded a special bonus of 1,000,000 RSUs with immediate vesting. He was given a new three-year employment agreement effective January 1, 2021 with the same salary and bonus as the prior agreement. He was also granted the following: award of 1,000,000 RSUs when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $500,000,000; award of 1,000,000 RSUs priced when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $750,000,000; award of 2,000,000 RSUs priced at lowest closing stock price in past 30 trading days when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $1,000,000,000; and award of 2,000,000 RSUs when the Company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $2,000,000,000. As of December 31, 2021, Mr. Okamoto had earned all bonuses set forth.

Sim Salzman, CFO, was granted a bonus payment of $40,000 in cash; and a bonus of 91,324 RSUs with immediate vesting. James Crawford, COO, was granted a bonus payment of $127,308 in cash and a stock bonus of 57,990 RSUs with immediate vesting. Furthermore, per his employment agreement, his base salary for the 2021 was increased by 3%.

Compensation for directors of the board for 2021 was as follows: (i) cash compensation of $60,000 per year for each director, plus an additional $15,000 per year for each committee chair, paid 25% at the end of each calendar quarter; (ii) for existing directors, the equivalent of 54,795 RSUs; and (iii) for newly elected directors, a one-time grant of 91,324 RSUs, vesting 25% each calendar quarter during 2021. For clarification, new directors will also receive the same annual compensation as existing directors in addition to their one time grant.

On January 12, 2021, the Company, entered into a Securities Purchase Agreement (the "Purchase Agreement") with certain purchasers named therein (the "Purchasers"), pursuant to which the Company agreed to issue and sell, in a registered direct offering (the "Offering"), 12,500,000 shares of its common stock (the "Securities") at an offering price of $20.00 per share.

The Purchase Agreement contains customary representations and warranties and agreements of the Company and the Purchasers and customary indemnification rights and obligations of the parties. The closing of the Offering occurred on January 15, 2021. The Company received gross proceeds of $250,000,000 in connection with the Offering, before deducting placement agent fees and related offering expenses.

On January 25, 2021, the Company announced that it has purchased 4,812.66 BTC in an aggregate purchase price of $150 million through an investment fund of one managed by NYDIG as the general partner, while the Company retains 100% of the limited partner interests. We expect to purchase additional bitcoin held by NYDIG Digital Assets Fund III, LP, the investment fund in future periods, though we may also sell bitcoin in future periods as needed to generate Cash Assets for treasury management purposes.

F-11

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On February 11, 2021, the Company issued 4,701,442 shares of common stock pursuant to the 2018 Equity Incentive Plan.

Effective March 1, 2021, the Company changed its name to Marathon Digital Holdings, Inc.

On March 7, 2021, the Company entered into a termination agreement with the 9349-0001 Quebec Inc., to agree to terminate the outstanding lease. As of that date, the Company was fully released and discharged from any and all obligations under the Lease Agreement. In November 2017, the Company assumed a lease in connection with the mining operations in Quebec, Canada.

On May 21, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a binding letter of intent with Compute North, LLC to host 73,000 Bitcoin Miners over a staged in implementation between October 2021 and March 2022. The hosting cost is $0.50 per machine per month and the hosting rate will be $0.044 per kWh. In order to build out the infrastructure without paying for the capital expenditure, the Company will provide an 18 month bridge loan to Compute North of up to $67 million dollars, in tranches, based upon specified requirements being met. The terms of the contract are limited to three years with increases thereafter capped at three percent per year thereafter. The Company has also agreed to pay up to $14 million in expedite fees for construction/electrical and supply chain expediting activities. As of December 31, 2021, the Company paid $8 million of the $14 million in expedite fees recorded as a deposit on the balance sheet and loaned Compute North $30 million. On September 3, 2021, the Company entered into a master agreement with Compute North, LLC whereas the Company will pay an initial deposit of $14.6 million in aggregate over five instalments. As of December 31, 2021, the Company paid the full $14.6 million initial deposit recorded as advances to vendor on the balance sheet.

On July 30, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a fully executed contract with Bitmain to purchase an additional 30,000 S-19j Pro ASIC Miners, with 5,000 units scheduled to be delivered in each of January 2022, February 2022, March 2022, April 2022, May 2022, and June 2022. The purchase price is $126,000,000 with (i) 25% of the purchase price due paid within one day of execution of the contract, (ii) 35% of the purchase price of each batch due in consecutive months with 35% of the January 2022 batch due immediately, and then 35% of each of the remaining five batches due on the 15th of each consecutive month starting August 15, 2021, through December 15, 2021 and (iii) the remaining 40% of the purchase price of each batch due on the 15th of each consecutive month starting November 15, 2021 and then 40% of each of the remaining five batches due on the 15th of each consecutive month through April 2022. As of December 31, 2021, the Company has paid $92,015,375 of the total balance of $120,711,500. The amounts paid are classified as advances to vendor on the balance sheet.

On August 27, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a Master Securities Loan Agreement (the "Agreement") with NYDIG Funding, LLC ("NYDIG"). Pursuant to the Agreement, the Company will loan its bitcoin ("BTC") to NYDIG with an interest rate of three percent (3%) per annum. Interest accrues daily and is payable on a monthly basis. The Agreement provides that the Company may recall its BTC at any time. NYDIG shall, prior to or concurrently with the transfer of the of the BTC to NYDIG, but in no case later than the close of business on the day of such transfer, transfer to the Company collateral with a market value at least equal to 100% of the market value of the loaned BTC, and the Company is granted a first priority lien on such collateral. As of December 31, 2021, the Company loaned 300 BTC to NYDIG. This balance is classified as digital currencies, restricted on the balance sheet.

On December 21, 2021 and December 30, 2021, the Company entered into two separate Simple Agreement for Future Equity ("SAFE") agreements classified on the balance sheet as non-current assets. Pursuant to ASC 323, *Equity Method of Accounting for Investments*, an investment in another company is recorded as an asset on the balance sheet at cost. An equity method investment is valued as of a specific reporting date with any activity related to the investment recorded through the income statement. Investments are typically current assets if the Company intends to sell them within a year, however as SAFEs have no expiration date, the Company intends to classify these types of investments as a noncurrent asset due to the indefinite life of the conversion. This balance is classified as investment in SAFE agreements on the balance sheet.

On December 22, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into another Master Securities Loan Agreement (the "Agreement") with NYDIG Funding, LLC ("NYDIG"). Pursuant to the Agreement, the Company will loan its bitcoin ("BTC") to0 NYDIG with an interest rate of two and a quarter percent (2.25%) per annum. Interest accrues daily and is payable on a monthly basis. The Agreement provides that the Company may recall its BTC at any time. NYDIG shall, prior to or concurrently with the transfer of the of the BTC to NYDIG, but in no case later than the close of business on the day of such transfer, transfer to the Company collateral with a market value at least equal to 100% of the market value of the loaned BTC, and the Company is granted a first priority lien on such collateral. As of December 31, 2021, the Company loaned an additional 300 BTC for a total amount of 600 BTC to NYDIG. This balance is classified as digital currencies, restricted on the balance sheet.

### Risks and Uncertainties

The impact of the worldwide spread of a novel strain of coronavirus ("COVID 19") has been and continues to be unprecedented and unpredictable, but based on the Company's current assessment, the Company does not expect any material impact on its long-term strategic plans, operations and its liquidity due to the worldwide spread of COVID-19. However, the Company is continuing to assess the effect on its operations by monitoring the spread of COVID-19 and the actions implemented to combat the virus throughout the world and its assessment of the impact of COVID-19 may change.

F-12

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

### NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation and Principles of Consolidation**

The accompanying consolidated financial statements include the accounts of the Company's subsidiaries, Marathon Crypto Mining, Inc., MARA Pool, LLC, Crypto Currency Patent Holding Company and Soems Acquisition Corp, all of which are dormant as of December 31, 2021. For consolidated entities where
the Company owns less than 100% of the subsidiary, the Company records net loss attributable to non-controlling interests in its consolidated statements of operations equal to the percentage of the economic or ownership interest retained in such entities by the respective non-controlling parties.

The Company's consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

**Use of Estimates and Assumptions**

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant estimates made by management include, but are not limited to, realization of long-lived assets, deferred income taxes, unrealized tax positions, the realization of digital currencies and stock-based compensation expense.

**Cash and Cash Equivalents**

The Company considers all highly liquid debt instruments and other short-term investments with maturity of three months or less, when purchased, to be cash equivalents. The Company maintains cash and cash equivalent balances at one financial institution that is insured by the Federal Deposit Insurance Corporation. The Company's accounts at this institution are insured, up to $250,000, by the Federal Deposit Insurance

Corporation ("FDIC"). For the years ended December 31, 2021 and 2020, the Company's bank balances exceeded the FDIC insurance limit in an amount of $267.8 million and $140.3 million, respectively. To reduce its risk associated with the failure of such financial institution, the Company evaluates at least annually the rating of the financial institution in which it holds deposits. As of December 31, 2021 and 2020, the Company had cash equivalents of $266.6 million and $129.8 million, respectively.

**Segment Reporting**

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision-making group in deciding how to allocate resources and in assessing performance. Our chief operating decision-making group ("CODM") is composed of the chief executive officer and chief financial officer. The Company currently operates in the Digital Currency Blockchain segment. The Company's Crypto-currency Machines are located in the United States, and the Company has employees only in the United States and views its operations as one operating segment as the CODM reviews financial information on a consolidated basis in making decisions regarding resource allocations and assessing performance.

**Digital Currencies**

Digital currencies are included in current assets in the consolidated balance sheets as an indefinite lived intangible asset. Digital currencies are recorded at cost less impairment. In performing the quantitative impairment test of the mined BTC balances as well as recordation of daily revenues,as described in ASC 350-30-35-19, the Company utilizes the pricing of BTC on a nightly basis from Coindesk.com (https://www.coindesk.com/price/bitcoin/). The CoinDesk Bitcoin Price Index (XBX) is the world's leading reference for the price of bitcoin, used by the largest institutions active in crypto assets. It is the crypto market standard, benchmarking billions of dollars in registered financial products and pricing hundreds of millions in daily over-the-counter transactions. Built for replicability and reliability, in continuous operation since 2014, the "XBX" is relied upon by asset allocators, asset managers, market participants and exchanges Bitcoin, ether and gold prices are taken at **approximately 4pm New York time**[1]. Bitcoin is the CoinDesk Bitcoin Price Index (XBX); Ether is the CoinDesk Ether Price Index (ETX); Gold is the COMEX spot price. Information about CoinDesk Indices can be found at coindesk.com/indices.

[1] https://www.coindesk.com/indices/xbx/

F-13

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

**Halving**

The reward for a bitcoin miner changes roughly every four years, or after every 210,000 blocks are mined and gets reduced by half each time, this whole process is called bitcoin halving. The last halving occurred on May 11, 2020 and reduced the reward per block to 6.25 BTC.

The following table presents the activities of the digital currencies for the years ended December 31, 2021 and 2020:

| | | |
|---|---|---:|
| **Digital currencies at December 31, 2019** | $ | 1,141 |
| Additions of digital currencies | | 4,357,443 |
| Realized gain on sale of digital currencies | | 15,466 |
| Sale of digital currencies | | (2,102,394) |
| **Digital currencies at December 31, 2020** | $ | 2,271,656 |
| Additions of digital currencies | | 150,463,770 |
| Realized gain on sale of digital currencies | | 11,659 |
| Impairment of cryptocurrencies | | (29,552,991) |
| Interest received on cryptocurrencies, restricted | | 129,170 |
| Disposition of digital currencies | | (80,000) |
| **Digital currencies at December 31, 2021** | $ | 123,243,264 |

**Loan Receivable**

On May 21, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a binding letter of intent with Compute North, LLC to host 73,000 Bitcoin Miners over a staged in implementation between October 2021 and March 2022. The hosting cost is $0.50 per machine per month and the hosting rate will be $0.044 per kWh. In order to build out the infrastructure without paying for the capital expenditure, the Company will provide an eighteen-month bridge loan to Compute North of up to $67 million dollars, in tranches, based upon specified requirements being met. The loan receivable is structured as an interest-only loan with no pre-payment penalty. The interest rate shall be 0% for the initial twelve-month period and 12% for the last six months. As of December 31, 2021, the Company paid $30 million dollars and is classified as a loan receivable on the balance sheet. The Company expects the loan receivable to be repaid during 2022.

**Property and Equipment**

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The Company operates in an emerging industry for which limited data is available to make estimates of the useful economic lives of specialized equipment. Subsequent to December 31, 2020, management has determined that the expected useful life of transaction verification servers would be five years. Prior to December 31, 2020, management depreciated these servers over two years. This assessment takes into consideration the availability of historical data and management's expectations regarding the direction of the industry including potential changes in technology. Management reviews this estimate annually and will revise such estimates as and when data comes available.

To the extent that any of the assumptions underlying management's estimate of useful life of its transaction verification servers are subject to revision in a future reporting period either as a result of changes in circumstances or through the availability of greater quantities of data then the estimated useful life could change and have a prospective impact on depreciation expense and the carrying amounts of these assets.

**Intangible Assets**

Intangible assets include the Crypto Currency Patent with original estimated useful life of 17 years. The Company amortizes the cost of the intangible assets over their estimated useful lives on a straight-line basis. Costs incurred to acquire patents, including legal costs, are also capitalized as long-lived assets and amortized on a straight-line basis with the associated patent.

The Company monitors the carrying value of long-lived assets for potential impairment and tests the recoverability of such assets whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If a change in circumstance occurs, the Company will perform a test of recoverability by comparing the carrying value of the asset or asset group to its undiscounted expected future cash flows. If cash

flows cannot be separately and independently identified for a single asset, the Company will determine whether impairment has occurred for the group of assets for which we can identify the projected cash flows. If the carrying values are in excess of undiscounted expected future cash flows, the Company will measure any impairment by comparing the fair value of the asset or asset group to its carrying value. During the year ended December 31, 2021 and 2020, there was no impairment to the intangible assets.

**Impairment of Long-lived Assets**

Management reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to undiscounted future cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. On January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners for $616,236. As of December 31, 2020, these assets had a net book value of $1,487,538. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020. During the year ended December 31, 2021 and 2020, the Company's leasehold improvements were impaired by $0 and $0, respectively.

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**Investment Fund**

In 2016, the FASB issued Accounting Standards Update (ASU) 2016-01, *Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities,* that requires entities to generally measure investments in equity securities at fair value and recognize changes in fair value in net income.

On January 25, 2021, the Company entered into a limited partnership agreement with NYDIG Digital Assets Fund III, LP ("Fund") whereas the Fund purchased 4,812.66 BTC in an aggregate purchase price of $150 million. The Company owns 100% of the limited partnership interest. The investment fund is included in current assets in the consolidated balance sheets.

The Fund qualifies and operates as an investment company for accounting purposes pursuant to the accounting and reporting guidance under ASC 946, Financial Services - Investment Companies, which requires fair value measurement of the Fund's investments in digital assets. The digital assets held by the Fund are traded on a number of active markets globally, including the over-the-counter ("OTC") market and digital asset exchanges. A fair value measurement under ASC 820 for an asset assumes that the asset is exchanged in an orderly transaction between market participants either in the principal market for the asset or, in the absence of a principal market, the most advantageous market for the asset (ASC 820-10-35-5). An entity must have access to the principal (or most advantageous) market at the measurement date (ASC 820-10-35-6A).

Pursuant to a management agreement, the Fund paid the Investment Manager a management fee (the "Management Fee"), payable monthly, computed at a rate of 0.50% per annum of the net asset value of such limited partner's capital account, according to the opening NAV of the first day of each calendar month with such opening NAV being equal to the NAV as of 4pm ET on the last day of each preceding calendar month (taking into account expenses of the Fund charged to the Fund but without taking into account any withdrawal occurring on such date). Effective March 25, 2021, the rate was reduced to 0.30% per annum. In the event of an additional capital contribution, a withdrawal of a limited partner's capital account or the termination of the Fund as of a date other that the first day of a calendar month, the Management Fee payable will be prorated based on the number of days elapsed in that calendar month. Payment of the Management Fee may be deferred in the General Partner's discretion. The Fund's bitcoin may be liquidated by the Investment Manager as needed in order to pay the Management Fee or other operating expenses of the Fund.

**Revenue Recognition**

The Company recognizes revenue under ASC 606, Revenue from Contracts with Customers. The core principle of the new revenue standard is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The following five steps are applied to achieve that core principle:

- Step 1: Identify the contract with the customer
- Step 2: Identify the performance obligations in the contract
- Step 3: Determine the transaction price
- Step 4: Allocate the transaction price to the performance obligations in the contract
- Step 5: Recognize revenue when the Company satisfies a performance obligation

In order to identify the performance obligations in a contract with a customer, a company must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met: The customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct), and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

If a good or service is not distinct, the good or service is combined with other promised goods or services until a bundle of goods or services is identified that is distinct.

The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both. When determining the transaction price, an entity must consider the effects of all of the following:

- Variable consideration
- Constraining estimates of variable consideration
- The existence of a significant financing component in the contract
- Noncash consideration
- Consideration payable to a customer

Variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

The transaction price is allocated to each performance obligation on a relative standalone selling price basis.

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The transaction price allocated to each performance obligation is recognized when that performance obligation is satisfied, at a point in time or over time as appropriate.

Providing computing power in crypto asset transaction verification services to the network is the only performance obligation under our arrangements with the network. The transaction consideration the Company receives, if any, is noncash consideration, which the Company measures at fair value on the date received, which is not materially different than the fair value at the time the Company has earned the award. The consideration is all variable. Because it is not probable that a significant reversal of cumulative revenue will not occur, the consideration is constrained until the Company successfully places a block (by being the first to solve an algorithm) and the Company receives confirmation of the consideration it will receive, at which time revenue is recognized. There is no significant financing component in these transactions.

Fair value of the digital asset award received is determined using the average U.S. dollar spot rate of the related digital currency at the time of receipt.

Expenses associated with running the digital currency mining business, such as rent and electricity cost are also recorded as cost of revenues. Depreciation on digital currency mining equipment is recorded as a component of cost of revenues.

**Related Party Transactions**

Parties are considered related to the Company if the parties, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with the Company. Related parties also include principal owners of the Company, its management, members of the immediate families of principal owners of the Company and its management and other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests. The Company discloses all related party transactions.

On October 11, 2018, the Company entered into a 2-year Employment Agreement, subject to successive 1 year extension, with Merrick Okamoto, pursuant to which Mr. Okamoto will serve as the Executive Chairman and Chief Executive Officer of the Company. Pursuant to the terms of the Agreement, Mr. Okamoto shall receive a base salary at an annual base salary of $350,000 (subject to annual 3% cost of living increase) and an annual bonus up to 100% of base salary as determined by the Compensation Committee or the Board. As further consideration for Mr. Okamoto's services, the Company agreed to issue Mr. Okamoto 10-year stock options to purchase 1,250,000 shares of Common Stock, with a strike price of $2.32 per share, vesting 50% on the date of grant and 25% on each 6 months anniversary of the date of grant. On December 31, 2021 Mr. Okamoto retired from the Company and as such as of December 31, 2021 no bonus has been accrued.

On July 22, 2019, the Company granted David Lieberman, James Crawford and other three board directors 5-year stock options to purchase total of 200,000 shares of common stock, with an exercise price of $2.04 per share, vesting 50% on the date of grant and 25% on each 6 months anniversary of the date of grant. On October 19, 2020, David Lieberman retired and at that time, his shares of common stock fully vested.

See Note 1 for a description of bonuses and restricted stock unit awards to related parties ratified by the Board of Directors as of December 31, 2020.

**Fair Value of Financial Instruments**

The Company measures at fair value certain of its financial and non-financial assets and liabilities by using a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, essentially an exit price, based on the highest and best use of the asset or liability. The levels of the fair value hierarchy are:

Level 1: Observable inputs such as quoted market prices in active markets for identical assets or liabilities

Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data

Level 3: Unobservable inputs for which there is little or no market data, which require the use of the reporting entity's own assumptions.

F-16

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The carrying amounts reported in the consolidated balance sheet for cash, accounts receivable, accounts payable, and accrued expenses, approximate their estimated fair market value based on the short-term maturity of these instruments. The carrying value of notes payable and other long-term liabilities approximate fair value as the related interest rates approximate rates currently available to the Company.

Financial assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level of input that is significant to their fair value measurement. The Company measures the fair value of its marketable securities by taking into consideration valuations obtained from third-party pricing sources. The pricing services utilize industry standard valuation models, including both income and market-based approaches, for which all significant inputs are observable, either directly or indirectly, to estimate fair value. These inputs included reported trades of and broker-dealer quotes on the same or similar securities, issuer credit spreads, benchmark securities and other observable inputs.

The following tables present information about the Company's assets and liabilities measured at fair value on a recurring basis and the Company's estimated level within the fair value hierarchy of those assets and liabilities as of December 31, 2021 and 2020, respectively:

| | Fair value measured at December 31, 2021 | | | |
|---|---|---|---|---|
| | Total carrying value at December 31, 2021 | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| Assets | | | | |
| Money Market Accounts | $ 266,635,158 | $ 266,635,158 | $ - | $ - |
| Investment Fund | $ 223,778,545 | $ - | $ 223,778,545 | $ - |
| Liabilities | | | | |
| Warrant liability | $ - | $ - | $ - | $ - |

| | Fair value measured at December 31, 2020 | | | |
|---|---|---|---|---|
| | Total carrying value at December 31, 2020 | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| Liabilities | | | | |
| Warrant liability | $ 322,437 | $ - | $ - | $ 322,437 |

There were no transfers between Level 1, 2 or 3 during the years ended December 31, 2021 and 2020.

At December 31, 2021, the Company had an outstanding warrant liability in the amount of $0 associated with warrants that were issued in January 2017 and warrants issued related to the Convertible Notes issued in August and September of 2017. The following table rolls forward the fair value of the Company's warrant liability, the fair value of which is determined by Level 3 inputs for the year ended December 31, 2021.

F-17

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**FV of warrant liabilities**

| | Fair value |
|---|---|
| Outstanding as of December 31, 2019 | $ 12,849 |
| Change in fair value of warrants | 309,588 |
| Outstanding as of December 31, 2020 | $ 322,437 |
| Cashless exercise of warrants | (1,370,723) |
| Change in fair value of warrants | 1,048,286 |
| Outstanding as of December 31, 2021 | $ - |

The fair value of the warrant liabilities are marked-to-market each reporting period and changes in fair value are recorded as a non-operating gain or loss in our statement of operations, until they are completely exercised. The fair value is determined each reporting period using the Black-Scholes option pricing model and is affected by changes in inputs to that model including our stock price, expected stock price volatility, dividends, interest rates and expected term.

**Non-recurring measurement of Fair Value**

The Company accounts for its digital currencies as indefinite-lived intangible assets in accordance with Accounting Standards Codification ("ASC") 350, *Intangibles - Goodwill and Other*. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, net of any impairment losses incurred since receipt. Pursuant to guidance from ASC 820, *Fair Value Measurement,* the Company is required to determine the nonrecurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value falls below the carrying value of the digital currencies. The digital currencies can only be marked down when impaired and not marked up when their value increases. The resulting carrying value represents the fair value of the asset. The last impairment date for the digital currencies was December 31, 2021. The Company had an outstanding carrying balance of digital assets of approximately $123.2 million, net of impairment losses incurred of $29.6 million for the year ended December 31, 2021. As of December 31, 2021, the fair value of the approximate 3,321 bitcoin held as digital currencies is approximately $152.8 million.

**Income Taxes**

The Company accounts for income taxes pursuant to the provision of Accounting Standards Codification ("ASC") 740-10, "Accounting for Income Taxes" which requires, among other things, an asset and liability approach to calculating deferred income taxes. The asset and liability approach requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the carrying amounts and the tax bases of assets and liabilities. A valuation allowance is provided to offset any net deferred tax assets for which management believes it is more likely than not that the net deferred asset will not be realized.

The Company follows the provision of the ASC 740-10 related to Accounting for Uncertain Income Tax Position. When tax returns are filed, it is more likely than not that some positions taken would be sustained upon examination by the taxing authorities, while others are subject to uncertainty about the merits of the position taken or the amount of the position that would be ultimately sustained. In accordance with the guidance of ASC 740-10, the benefit of a tax position is recognized in the financial statements in the period during which, based on all available evidence, management believes it is most likely that not that the position will be sustained upon examination, including the resolution of appeals or litigation processes, if any. Tax positions taken are not offset or aggregated with other positions.

The Company recognizes the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the consolidated financial statements from such positions are then measured based on the largest benefit that has a greater than 50% likelihood of being realized upon settlement with the applicable taxing authority. The portion of the benefits associated with the tax positions taken that exceeds the amount measured as described above should be reflected as a liability for uncertain tax benefits in the accompanying balance sheet along with any associated interest and penalties that would be payable to the taxing authorities upon examination.

F-18

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**Basic and Diluted Net Loss per Share**

Net loss per common share is calculated in accordance with ASC Topic 260: Earnings Per Share ("ASC 260"). Basic loss per share is computed by dividing net loss by the weighted average number of shares of common stock outstanding during the period. The computation of diluted net loss per share does not include dilutive common stock equivalents in the weighted average shares outstanding, as they would be anti-dilutive.

Securities that could potentially dilute loss per share in the future that were not included in the computation of diluted loss per share at December 31, 2021 and 2020 are as follows:

| | As of December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Warrants to purchase common stock | 326,779 | 287,656 |
| Restricted stock | 642,094 | - |
| Conversion of convertible notes | 9,812,955 | - |
| Options to purchase common stock | - | 106,120 |
| **Total** | **10,781,828** | **393,776** |

The following table sets forth the computation of basic and diluted loss per share:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Net loss attributable to common shareholders | $ (36,174,506) | $ (10,447,771) | $ (3,517,065) |
| Denominator: | | | |
| Weighted average common shares - basic | 99,337,587 | 81,408,340 | 6,664,238 |
| Weighted average common shares - diluted | 99,337,587 | 81,408,340 | 6,664,238 |
| Loss per common share - basic | $ (0.36) | $ (0.13) | $ (0.53) |
| Loss per common share - diluted | $ (0.36) | $ (0.13) | $ (0.53) |

**Stock-Based Compensation**

The Company expenses stock-based compensation to employees and non-employees over the requisite service period based on the estimated

grant-date fair value of the awards and forfeiture rates. The Company estimates the fair value of stock option grants using the Black-Scholes option pricing model and the assumptions used in calculating the fair value of stock-based awards represent management's best estimates and involve inherent uncertainties and the application of management's judgment. These assumptions are the expected stock volatility, the risk-free interest rate, the expected life of the option, the dividend yield on the underlying stock and the expected forfeiture rate. Expected volatility is calculated based on the historical volatility of the Company's common stock over the expected term of the option. Risk-free interest rates are calculated based on continuously compounded risk-free rates for the appropriate term.

F-19

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

**Leases**

The Company accounts for its leases under ASC 842, Leases. Under this guidance, arrangements meeting the definition of a lease are classified as operating or financing leases and are recorded on the consolidated balance sheet as both a right of use asset and lease liability, calculated by discounting fixed lease payments over the lease term at the rate implicit in the lease or the Company's incremental borrowing rate. Lease liabilities are increased by interest and reduced by payments each period, and the right of use asset is amortized over the lease term. For operating leases, interest on the lease liability and the amortization of the right of use asset result in straight-line rent expense over the lease term. Variable lease expenses, if any, are recorded when incurred.

In calculating the right of use asset and lease liability, the Company elected to combine lease and non-lease components. The Company excluded short-term leases having initial terms of 12 months or less from the new guidance as an accounting policy election and recognizes rent expense on a straight-line basis over the lease term.

**Recent Accounting Pronouncements**

In December 2019, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2019-12, "*Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes ("ASU 2019-12")*", which is intended to simplify various aspects related to accounting for income taxes. ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. This guidance is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, with early adoption permitted. The Company has adopted this pronouncement and has determined there has been no material impact of this standard on its consolidated financial statements and related disclosures.

In 2020, the Financial Accounting Standards Board issued Accounting Standards Update (ASU) 2020-06, *Debt-Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging-Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity*, to address the complexity in accounting for certain financial instruments with characteristics of liabilities and equity. Amongst other provisions, the amendments in this ASU significantly change the guidance on the issuer's accounting for convertible instruments and the guidance on the derivative scope exception for contracts in an entity's own equity such that fewer conversion features will require separate recognition, and fewer freestanding instruments, like warrants, will require liability treatment. This guidance is effective for fiscal years beginning after December 15, 2021, with early adoption permitted. The Company adopted ASU 2020-06 early as of January 1, 2021. Such adoption did not result in any material changes to its financial position, results of operations or cash flows.

Any new accounting standards, not disclosed above, that have been issued or proposed by FASB that do not require adoption until a future date are not expected to have a material impact on the consolidated financial statements upon adoption.

F-20

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

**NOTE 3 - DEPOSIT, PROPERTY AND EQUIPMENT AND INTANGIBLE ASSETS**

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2020. The Company recorded change in fair value of mining payable of $0 and $66,547 during the year ended December 31, 2021 and 2020, respectively. There is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares.

On May 11, 2020, the Company signed a Contract Addendum with Compute North, to pause and suspend services under its Colocation Agreement. This will suspend all production of Bitcoin using our S-9 miners.

On May 11, 2020, the Company purchased 700 new generation M305+ASIC Miners from MicroBT for approximately $1.3 million. The 700 miners produce 80/Th and will generate 56 PH/s (petahash) of hashing power, compared to the Company's current S-9 production of 46 PH/s. These next generation MicroBT ASIC miners were markedly more energy efficient than the Bitmain S-9 models. These miners were delivered to the Company's Hosting Facility in June 2020 and are producing Bitcoins.

The Company purchased 660 latest generation Bitmain S19 Pro Miners on May 12, 2020, 500 units on May 18, 2020 and an additional 500 units on June 11, 2020. These miners produce 110 TH/s and will generate 73 PH/s (petahash) of hashing power, compared to the Company's S-9 production of 46 PH/s. The Company made the payments of approximately $4.2 million in the second quarter of 2020 and received 660 of the 1,660 units at its Hosting Facility in August of 2020, and its hosting partner, Compute North, had installed them upon their arrival. Of the 1,000 remaining S-19 Pro Miners due to arrive in the 4th quarter of 2020, 500 were received in November of 2020 and installed in the Company's Hosting Facility in Montana, while another 60 miners were received and placed into service in January 2021. The remaining 440 miners that were anticipated to arrive in the 4th quarter of 2020 were cancelled and the Company received a refund of the original purchase price of $1.1 million in January 2021.

On July 29, 2020, the Company announced the purchase of 700 next generation M31S+ASIC Miners from MicroBT. The miners arrived mid-August of 2020. On August 13, 2020, the Company entered into a Long Term Purchase Contract with Bitmaintech PTE., LTD ("Bitmain") for the purchase of 10,500 next generation Antminer S-19 Pro ASIC Miners.

The purchase price per unit is $2,362 ($2,206 with a 6.62% discount) for a total purchase price of $24,801,000 (with a 6.62% discount for a discounted price of $23,159,174). The parties confirm that the total hashrate of the Antminers under this agreement shall not be less than 1,155,000 TH/s.

Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a total net discount of 8.63% to the purchase price adjusting the amount due to $22,660,673.

Subject to the timely payment of the purchase price, Bitmain shall deliver products according to the following schedule: 1,500 Units on or before

January 31, 2021; and 1,800 units on or before each of February 28, 2021; March 31, 2021; April 30, 2021, May 31, 2021 and June 30, 2021. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and has received 10,500 units from Bitmain.

On October 23, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19 Pro ASIC Miners. The 2021 delivery schedule was for 2,500 units to be delivered in January, 4,500 units to be delivered in February and the final 3,000 units to be delivered in March 2021.The gross purchase price was $23,620,000 with 30% due upon the execution of the contract and the balance paid over the next 4 months. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,581,594. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and has received 10,000 units from Bitmain.

On December 8, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19j Pro ASIC Miners, with 6,000 units to be delivered in August 2021, and the remaining 4,000 units to be delivered in September 2021. The gross purchase price is $23,770,000 with 10% of the purchase price due within 48 hours of execution of the contract, 30% due on January 14, 2021, 10% due on February 15, 2021, 30% due on June 15, 2021 and 20% due on July 15, 2021. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,718,649. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and has received 10,000 units from Bitmain.

F-21

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On December 23, 2020, the Company executed a contract with Bitmain to purchase an additional 70,000 next generation Antminer S-19 ASIC Miners, with 7,000 units to be delivered by August 2021, 2,100 units to be delivered by September 2021, 6,500 units to be delivered by October 31, 2021, 14,700 units to be delivered by November 30, 2021, 24,500 units to be delivered by December 31, 2021 and 15,200 units to be delivered by January 31, 2022. The purchase price is $167,763,451. The purchase price for the miners shall be paid as follows: 20% within 48 hours of signing of contract; 30% on or before March 1, 2021; 4.75% on June 15, 2021; 1.76% on July 15, 2021; 4.58% on August 15, 2021; 10.19% on September 15, 2021; 17.63% on October 15, 2021 and 11.55% on November 15, 2021. As of December 31, 2021, the Company has paid the entire purchase price under this agreement and has received 40,000 units from Bitmain.

On February 1, 2021, Marathon announced that Bitmain had shipped approximately 4,000 S-19 Pro ASIC miners to the Company's mining facility in Hardin, MT, all of which were delivered as scheduled.

In addition to the initial 4,000 miners delivered to the Hardin facility in February, Bitmain has shipped another 26,050 miners to Hardin. Marathon has received over 30,050 miners as of December 31, 2021 and subsequent to year end increased its active mining fleet to approximately 32,710 miners generating approximately 3.6 EH/s.

On December 21, 2021, the Company executed a contract with Bitmain to purchase an additional 78,000 next generation Antminer S-19 XP Miners, with 13,000 units being delivered in each of July 2022, August 2022, September 2022, October 2022, November 2022 and December 2022. The purchase price is $879,060,000. The purchase price for the miners shall be paid as follows: 35% of the total amount within two days of execution of the purchase contract, 35% of each single shipment price at least six months prior to each such shipment, and the remaining 30% of each single shipment price at least one month prior to each such shipment. As of December 31, 2021, the Company has paid $307,671,000 of the purchase price. As of December 31, 2021, approximately $466.3 million cash paid for miners was recorded as a deposit on the balance sheet.

The components of property, equipment and intangible assets as of December 31, 2021 and 2020 are:

| | Useful life (Years) | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Website | 7 | $ 121,787 | $ 121,787 |
| Mining equipment | 5 | 163,868,283 | 12,989,318 |
| Construction in Progress | N/A | 133,565,908 | 10,593,575 |
| Mining patent | 17 | 1,210,000 | 1,210,000 |
| Gross property, equipment and intangible assets | | 298,765,978 | 24,914,680 |
| Less: Accumulated depreciation and amortization | | (21,591,958) | (6,687,957) |
| **Property, equipment and intangible assets, net** | | $ 277,174,020 | $ 18,226,723 |

As of December 31, 2021, intangible assets amortization are as follows:

| | |
|---|---|
| 2022 | 71,176 |
| 2023 | 71,176 |
| 2024 | 71,176 |
| 2025 | 71,176 |
| 2026 | 71,176 |
| Thereafter | 575,346 |
| Total | $ 931,226 |

As of December 31, 2020, intangible assets amortization are as follows:

| | |
|---|---|
| 2021 | 71,176 |
| 2022 | 71,176 |
| 2023 | 71,176 |
| 2024 | 71,176 |
| 2025 | 71,176 |
| Thereafter | 646,522 |
| Total | $ 1,002,402 |

F-22

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 4 - STOCKHOLDERS' EQUITY**

We are authorized to issue 200,000,000 shares of common stock and 50,000,000 shares of preferred stock, at $.0001 par value per share. As of December 31, 2021, we have 102,733,273 shares of our common stock and no shares of our preferred stock issued and outstanding.

**Common Stock**

*At The Market Offering Agreement*

On July 19, 2019, we entered into an At The Market Offering Agreement (the "Agreement") with H.C. Wainwright & Co., LLC ("H.C. Wainwright") which establishes an at-the-market equity program pursuant to which we may offer and sell shares of our common stock, par value $0.0001 per share ("Common Stock"), from time to time as set forth in the Agreement. The Agreement provides for the sale of shares of our Common Stock

41

("Shares") having an aggregate offering price of up to $7,472,417.

Subject to the terms and conditions set forth in the Agreement, H.C. Wainwright will use its commercially reasonable efforts consistent with its normal trading and sales practices to sell the Shares from time to time, based upon our instructions. We have provided H.C. Wainwright with customary indemnification rights, and H.C. Wainwright will be entitled to a commission at a fixed rate equal to three percent (3.0%) of the gross proceeds per Share sold. In addition, we have agreed to pay certain expenses incurred by H.C. Wainwright in connection with the Agreement, including up to $25,000 of the fees and disbursements of their counsel. The Agreement will terminate upon the earlier of sale of all of the Shares under the Agreement or July 19, 2022 unless terminated earlier by either party as permitted under the Agreement.

Sales of the Shares, if any, under the Agreement shall be made in transactions that are deemed to be "at the market offerings" as defined in Rule 415 under the Securities Act of 1933, as amended (the "Securities Act"), including sales made by means of ordinary brokers' transactions, including on the Nasdaq Capital Market, at market prices or as otherwise agreed with H.C. Wainwright. We have no obligation to sell any of the Shares, and, at any time, we may suspend offers under the Agreement or terminate the Agreement.

*Follow On Offering*

On July 23, 2020, the Company entered into an underwriting agreement with H.C. Wainwright. The Company agreed to sell H.C. Wainwright 7,666,666 shares of its common stock, including the exercise in full by H.C. Wainwright of the option to purchase an additional 999,999 shares of common stock, at a public offering price of $0.90 per share. The gross proceeds of this offering, which closed on July 28, 2020, were approximately $6.9 million, and proceeds, net of underwriting discount and expenses of $0.6 million, were $6.3 million. Additionally, representative's warrant to purchase 536,667 shares of our common stock with a five year term and an exercise price of $1.125 per share were issued.

*Shelf Registration Statements on Form S-3 and At The Market Offering Agreements*

On August 13, 2020, the Company's Shelf Registration Statement on Form S-3, filed on August 6, 2020, was declared effective by the SEC, along with the Company's At The Market Offering Agreement, entered into by the Company and H.C. Wainwright & Co., LLC, as Exhibit 1.1 to the Form S-3 (the "2020 At The Market Agreement"). This 2020 At the Market Agreement establishes an at-the-market equity program pursuant to which the Company may offer and sell shares of its common stock, par value $0.0001 per share, with an aggregate offering price of up to $100 million, from time to time as set forth in the agreement.

On December 22, 2020, the Company's Shelf Registration Statement on Form S-3, filed on December 11, 2020, was declared effective by the SEC, along with the Company's At The Market Offering Agreement, entered into by the Company and H.C. Wainwright & Co., LLC, as Exhibit 1.1 to the Form S-3 (the "2020 At The Market Agreement"). This 2020 At the Market Agreement establishes an at-the-market equity program pursuant to which the Company may offer and sell shares of its common stock, par value $0.0001 per share, with an aggregate offering price of up to $200 million, from time to time as set forth in the agreement.

On January 12, 2020, the Company, entered into a Securities Purchase Agreement (the "Purchase Agreement") with certain purchasers named therein (the "Purchasers"), pursuant to which the Company agreed to issue and sell, in a registered direct offering (the "Offering"), 12,500,000 shares of its common stock (the "Securities") at an offering price of $20.00 per share. The Purchase Agreement contains customary representations and warranties and agreements of the Company and the Purchasers and customary indemnification rights and obligations of the parties. The closing of the Offering occurred on January 15, 2021. The Company received gross proceeds of $250,000,000 in connection with the Offering, before deducting placement agent fees and related offering expenses.

Pursuant to a letter agreement, dated August 2020 (the "Engagement Letter"), the Company engaged H.C. Wainwright & Co., LLC (the "Placement Agent") as placement agent in connection with the Offering. The Placement Agent agreed to use its reasonable best efforts to arrange for the sale of the Securities. The Company agreed to pay to the Placement Agent a cash fee of 5.0% of the aggregate gross proceeds raised in the Offering. The Company also issued to designees of the Placement Agent warrants to purchase up to 3.0% of the aggregate number of shares of Common Stock sold in the transactions, or warrants to purchase up to 375,000 shares of Common Stock (the "Placement Agent Warrants"). The Placement Agent Warrants have an exercise price equal to 125% of the offering price per share (or $25.00 per share). The Company also agreed to pay the Placement Agent $50,000 for accountable expenses, to reimburse an investor's legal fees in an amount up to $7,500 and to pay $12,900 for the Placement Agent's clearing fees. Pursuant to the terms of the Engagement Letter, the Placement Agent has the right, for a period of twelve months following the closing of the Offerings, to act (i) as financial advisor in connection with any merger, consolidation or similar business combination by the Company and (ii) as sole book-running manager, sole underwriter or sole placement agent in connection with certain debt and equity financing transactions by the Company. As of December 31, 2021, warrants to purchase up to 324,375 shares of Common Stock related to the Securities Purchase Agreement remain outstanding.

During the year ended December 31, 2020, 54,301,698 shares of common stock were issued under the Company's 2020 At The Market Agreements for total proceeds of approximately $307.1 million, net of offering costs, of $9.4 million, and the Company has sold all shares possible under the Agreements.

During the year ended December 31, 2019, 172,126 of common stock were issued under the Company's 2019 At The Market Agreements for total proceeds of approximately $0.3 million, net of offering costs, of $0.01 million, and the Company has sold all shares possible under the Agreements.

F-23

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

*Other 2020 Common Stock Activity*

During 2020, the Company issued 54,301,698 shares of common stock under the At The Market Offering for the total proceeds of $307,064,401, net of offering cost of $9,405,129.

On March 30, 2020, the Company issued 350,250 shares of common stock in exchange for S9 miners with a fair market value of $612,938.

On June 1, 2020, the Company issued 2,023,739 shares of common stock in exchange for the conversion and extinguishment of the note payable outstanding in an amount of $999,106.

On October 6, 2020, the Company issued 6,000,000 shares of common stock in exchange for five years of services pursuant to the Power Purchase Agreement and Data Facility Services Agreement for the total proceeds of $0, net of offering cost of $0 valued at the time of execution at $1.87 per share or $11,220,000 in aggregate.

F-24

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

*2019 Common Stock Activity*

During 2019, the Company issued 172,126 shares of common stock under the At The Market Offering for the total proceeds of $255,893, net of offering cost of $10,442.

On October 1, 2019, the Company issued 150,000 shares of its common stock to a consultant. The fair value of the common stock was $259,500.

**Common Stock Warrants**

A summary of the status of the Company's outstanding stock warrants and changes during year ended is as follows:

| | Number of Warrants | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|---|
| Outstanding as of December 31, 2019 | 182,191 | $ | 25.04 | 2.8 |
| Issued | 536,667 | $ | 1.13 | 4.6 |
| Expired | (17,969) | | 59.14 | - |
| Exercised | (413,233) | | 1.13 | - |
| Outstanding as of December 31, 2020 | 287,656 | $ | 12.64 | 2.7 |
| Issued | 375,000 | | 25.00 | 4.3 |
| Expired | (19,792) | | 27.20 | - |
| Exercised | (316,085) | | 14.42 | - |
| Outstanding as of December 31, 2021 | 326,779 | $ | 25.54 | 3.5 |
| Warrants exercisable as of December 31, 2021 | 326,779 | $ | 25.54 | 3.5 |

The aggregate intrinsic value of options outstanding and exercisable at December 31, 2021 was $2,549,588.

On July 23, 2020, the Company entered into an underwriting agreement with H.C. Wainwright. The Company agreed to sell H.C. Wainwright 7,666,666 shares of its common stock, including the exercise in full by H.C. Wainwright of the option to purchase an additional 999,999 shares of common stock, at a public offering price of $0.90 per share. The gross proceeds of this offering, which closed on July 28, 2020, were approximately $6.9 million, and proceeds, net of underwriting discount and expenses of $0.6 million, were $6.3 million. Additionally, representative's warrant to purchase 536,667 shares of our common stock with a five year term and an exercise price of $1.125 per share were issued.

Pursuant to a letter agreement, dated August 2020 (the "Engagement Letter"), the Company engaged H.C. Wainwright & Co., LLC (the "Placement Agent") as placement agent in connection with the Offering. The Placement Agent agreed to use its reasonable best efforts to arrange for the sale of the Securities. The Company agreed to pay to the Placement Agent a cash fee of 5.0% of the aggregate gross proceeds raised in the Offering. The Company also issued to designees of the Placement Agent warrants to purchase up to 3.0% of the aggregate number of shares of Common Stock sold in the transactions, or warrants to purchase up to 375,000 shares of Common Stock (the "Placement Agent Warrants"). The Placement Agent Warrants have an exercise price equal to 125% of the offering price per share (or $25.00 per share). The Company also agreed to pay the Placement Agent $50,000 for accountable expenses, to reimburse an investor's legal fees in an amount up to $7,500 and to pay $12,900 for the Placement Agent's clearing fees. Pursuant to the terms of the Engagement Letter, the Placement Agent has the right, for a period of twelve months following the closing of the Offerings, to act (i) as financial advisor in connection with any merger, consolidation or similar business combination by the Company and (ii) as sole book-running manager, sole underwriter or sole placement agent in connection with certain debt and equity financing transactions by the Company. As of December 31, 2021, warrants to purchase up to 324,375 shares of Common Stock related to the Securities Purchase Agreement remain outstanding.

**Common Stock Options**

On July 22, 2019, the Company's board has approved to issue 275,000 shares of option to purchase the Company's common stock to 8 employees and consultants for the service they provided. The options have a five-year term with an exercise price of $2.04, vesting 50% on the date of grant and 25% on each 6 months anniversary of the date of grant. The options were valued based on the Black-Scholes model, using the strike of $2.04 per share, an average expected term of 2.69 years, volatility of 39.46% based on the average volatility of comparable companies over the comparable prior period.

On May 5, 2020, the Compensation Committee of the Board of Directors held a meeting and approved bonuses and stock option grants for Directors and Officers for their contributions to the growth of Marathon Patent Group, Inc., for the year ended December 31, 2020. Total awards to be granted amounted to 1,158,138 restricted stock units at a price of $0.43 per unit with a term of one year, vesting quarterly in equal amounts, and (ii) cash award of $105,000 to Merrick Okamoto and $54,000 to David Lieberman. In addition, the Compensation Committee agreed to cancel 1,587,500 existing stock options for Directors, Officers and outside legal counsel, and replace them with 1,587,500 restricted stock units at a price of $0.43 per unit with a term of one year, vesting quarterly in equal amounts.

Due to the conversion of stock options to restricted stock options during 2020, the grant date fair value of stock options granted to employees during the years ended December 31, 2021 and 2020 were $0 and $0, respectively. Estimated future stock-based compensation expense relating to unvested stock options is approximately $0 as of December 31, 2021.

F-25

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

A summary of the stock options as of December 31, 2021 and changes during the year ended is as follows:

| | Number of Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|---|
| Outstanding as of December 31, 2020 | 106,120 | $ | 44.32 | 4.28 |
| Exercised | (25,000) | | 2.04 | - |
| Expired | (81,120) | | - | - |
| Outstanding as of December 31, 2021 | - | $ | - | - |
| Options vested and expected to vest as of December 31, 2021 | - | $ | - | - |
| Options vested and exercisable as of December 31, 2021 | - | $ | - | - |

The aggregate intrinsic value of options outstanding and exercisable at December 31, 2021 was $0.

A summary of the RSUs as of December 31, 2021 and 2020, respectively and changes during the period are presented below:

| | Number of Units | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested at December 31, 2020 | 566,279 | $ | 0.43 |
| Granted | 8,313,410 | $ | 20.89 |
| Vested | (8,237,595) | $ | 18.31 |
| Nonvested at December 31, 2021 | 642,094 | $ | 35.93 |

**NOTE 5 - DEBT, COMMITMENTS AND CONTINGENCIES**

43

Debt consists of the following:

| | Maturity Date | Interest Rate | | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|---|---|
| Convertible Note | 11/15/2026 | 1% | $ | 747,500,000 | $ | - |
| Less: debt discount | | | | 19,094,078 | | - |
| Total convertible notes, net of discount | | | $ | 728,405,922 | $ | - |
| Total | | | $ | 728,405,922 | $ | - |
| Less: current portion | | | | - | | - |
| Long term portion | | | $ | 728,405,922 | $ | - |

F-26

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

During the year ended December 31, 2021 and 2020, there was amortization of debt discount of $0.3 million and $0, respectively. Interest expenses were $1.6 million and $22,815 for the years ended December 31, 2021 and 2020, respectively.

**Convertible Note**

On November 18, 2021, the Company issued $650,000,000 principal amount of its 1.00% Convertible Senior Notes due 2026 (the "Notes"). The Notes were issued pursuant to, and are governed by, an indenture (the "Indenture"), dated as of November 18, 2021, between the Company and U.S. Bank National Association, as trustee (the "Trustee"). Pursuant to the purchase agreement between the Company and the initial purchasers of the Notes, the Company also granted the initial purchasers an option, for settlement within a period of 13 days from, and including, November 18, 2021 to purchase up to an additional $97,500,000 principal amount of Notes, which additional Notes were purchased on November 23, 2021, for an aggregate principal amount of Notes purchased of $747,500,000. All references in this disclosure to "Notes" includes the Notes issued on both November 18, 2021 and November 23, 2021..

The Notes will be the Company's senior, unsecured obligations and will be (i) equal in right of payment with the Company's existing and future senior, unsecured indebtedness; (ii) senior in right of payment to the Company's existing and future indebtedness that is expressly subordinated to the Notes; (iii) effectively subordinated to the Company's existing and future secured indebtedness, to the extent of the value of the collateral securing that indebtedness; and (iv) structurally subordinated to all existing and future indebtedness and other liabilities, including trade payables, and (to the extent the Company is not a holder thereof) preferred equity, if any, of the Company's subsidiaries.

The Notes will accrue interest at a rate of 1.00% per annum, payable semi-annually in arrears on June 1 and December 1 of each year, beginning on June 1, 2022. The Notes will mature on December 1, 2026, unless earlier repurchased, redeemed or converted. Before the close of business on the business day immediately before June 1, 2026, noteholders will have the right to convert their Notes only upon the occurrence of certain events. From and after June 1, 2026, noteholders may convert their Notes at any time at their election until the close of business on the second scheduled trading day immediately before the maturity date. The Company will settle conversions by paying or delivering, as applicable, cash, shares of its common stock or a combination of cash and shares of its common stock, at the Company's election. The initial conversion rate is 13.1277 shares of common stock per $1,000 principal amount of Notes, which represents an initial conversion price of approximately $76.17 per share of common stock. The conversion rate and conversion price will be subject to customary adjustments upon the occurrence of certain events. In addition, if certain corporate events that constitute a "Make-Whole Fundamental Change" (as defined in the Indenture) occur, then the conversion rate will, in certain circumstances, be increased for a specified period of time.

The Notes will be redeemable, in whole or in part (subject to certain limitations described below), at the Company's option at any time, and from time to time, on or after December 6, 2024 and on or before the 21st scheduled trading day immediately before the maturity date, at a cash redemption price equal to the principal amount of the Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date, but only if the last reported sale price per share of the Company's common stock exceeds 130% of the conversion price on (1) each of at least 20 trading days, whether or not consecutive, during the 30 consecutive trading days ending on, and including, the trading day immediately before the date the Company sends the related redemption notice; and (2) the trading day immediately before the date the Company sends such notice. However, the Company may not redeem less than all of the outstanding Notes unless at least $100.0 million aggregate principal amount of Notes are outstanding and not called for redemption as of the time the Company sends the related redemption notice. In addition, calling any Note for redemption will constitute a Make-Whole Fundamental Change with respect to that Note, in which case the conversion rate applicable to the conversion of that Note will be increased in certain circumstances if it is converted during the related redemption conversion period.

If certain corporate events that constitute a "Fundamental Change" (as defined in the Indenture) occur, then, subject to a limited exception for certain cash mergers, noteholders may require the Company to repurchase their Notes at a cash repurchase price equal to the principal amount of the Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. The definition of Fundamental Change includes certain business combination transactions involving the Company and certain de-listing events with respect to the Company's common stock.

The Notes will have customary provisions relating to the occurrence of "Events of Default" (as defined in the Indenture), which include the following: (i) certain payment defaults on the Notes (which, in the case of a default in the payment of interest on the Notes, will be subject to a 30-day cure period); (ii) the Company's failure to send certain notices under the Indenture within specified periods of time; (iii) the Company's failure to comply with certain covenants in the Indenture relating to the Company's ability to consolidate with or merge with or into, or sell, lease or otherwise transfer, in one transaction or a series of transactions, all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, to another person; (iv) a default by the Company in its other obligations or agreements under the Indenture or the Notes if such default is not cured or waived within 60 days after notice is given in accordance with the Indenture; (v) certain defaults by the Company or any of its subsidiaries with respect to indebtedness for borrowed money of at least $50,000,000; and (vi) certain events of bankruptcy, insolvency and reorganization involving the Company or any of its significant subsidiaries.

If an Event of Default involving bankruptcy, insolvency or reorganization events with respect to the Company (and not solely with respect to a significant subsidiary of the Company) occurs, then the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding will immediately become due and payable without any further action or notice by any person. If any other Event of Default occurs and is continuing, then, the Trustee, by notice to the Company, or noteholders of at least 25% of the aggregate principal amount of Notes then outstanding, by notice to the Company and the Trustee, may declare the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding to become due and payable immediately. However, notwithstanding the foregoing, the Company may elect, at its option, that the sole remedy for an Event of Default relating to certain failures by the Company to comply with certain reporting covenants in the Indenture consists exclusively of the right of the noteholders to receive special interest on the Notes for up to 270 days at a specified rate per annum not exceeding 0.50% on the principal amount of the Notes.

**Revolving Credit Line**

On October 1, 2021, Marathon Digital Holdings, Inc. (the "Company") entered into a Revolving Credit and Security Agreement (the "Agreement") with Silvergate Bank (the "Bank") pursuant to which Silvergate has agreed to loan the Company up to $100,000,000 on a revolving basis pursuant

to the terms of the Agreement and the $100,000,000 principal amount revolving credit note issued by the Company in favor of the Bank under the Agreement ("Note"). The terms of the facility ("RLOC") set forth in the Agreement and Note are as follows:

| | |
|---|---|
| **Initial Term:** | One (1) Year |
| **Availability:** | The RLOC shall be made available from time to time to the Company for periodic draws (provided no event of default then exists) from its closing date up to and including the one- year anniversary of the loan date. |
| **Origination Fee:** | 0.25% of the Loan Commitment to the Bank (or $250,000); due at RLOC closing. |
| **Unused Commitment Fee:** | 0.25% per annum of the portion of the unused Loan Commitment, payable monthly in arrears. |
| **Renewal:** | The RLOC may be renewed annually by agreement between the Bank and the Company, subject to (without limitation): (i) Company makes a request for renewal, in writing, no less than sixty (60) days prior to the then current maturity date, (ii) no event of default then exists, (iii) Company provides all necessary documentation to extend the RLOC, (iv) Company has paid all applicable fees related to the loan renewal, and (v) the Bank has approved such extension request according to its internal credit policies as determined by the Bank in its sole and absolute discretion. |
| | If the Bank approves a request by Company to renew the RLOC upon any maturity, then a Renewal Fee of 0.25% of the Loan Commitment (or $250,000) shall be due and payable upon extension of the Loan Commitment. |
| **Payments:** | Interest only to be paid monthly, with principal all due at maturity. |
| **Collateral:** | The RLOC will be secured by a pledge of a sufficient amount of Company's right, title and interest in and to bitcoin and/or U.S. Dollar ("USD") stored in a custody account for the benefit of the Bank (the "Collateral Account"). the Bank will establish a Collateral Account with a regulated custodial entity (the "Custodian") that has been approved by the Bank. the Bank and Custodian will have a custodial agreement to perfect the security interest in the pledged Collateral Account which, among other things, allows for 1) the Bank to monitor the balance of the Collateral Account and 2) allows the Bank to have exclusive control over the Collateral Account including liquidation of the collateral in the event of Company's default under the terms of the RLOC. the Bank may also file a UCC financing statement on the pledged collateral. |
| **Minimum Advance Rate:** | At origination, the Company must ensure the Collateral Account balance has sufficient bitcoin (and/or US$) to cause a Loan to Value (the "LTV") ratio of 65% (or less) ("Minimum Advance Rate") on the unpaid principal balance of the RLOC. |
| **Covenants:** | The Company must maintain a minimum debt to equity ratio of 0.5:1. The Company must maintain a minimum liquidity of $25,000,000. |

On November 9, 2021, the Company received a waiver letter from Silvergate Bank whereas Silvergate Bank has waived its default rights with respect to noncompliance of Section VII. Negative Covenants 7.3 Indebtedness and Section VI. Affirmative Covenants 6.5. Financial Covenants. Silvergate Bank accepts and acknowledges convertible notes in the aggregate principal amount up to $650,000,000, plus an option to purchase an additional $97,500,000 principal amount of Convertible Notes shall not constitute "Indebtedness" for purpose of Section 7.3 of the Revolving Credit and Security Agreement. Further the maximum debt-to-equity ratio in Section 6.5 shall be revised to be 1.50:1.00.

**Note Payable**

On May 6, 2020, the Company entered into a Paycheck Protection Program Promissory Note agreement with a bank which is providing $62,500 to the Company. The note accrues interest at a rate of 1% per annum and matures on May 6, 2022. The Company applied and received 100% loan forgiveness in 2021.

**Leases**

Effective June 1, 2018, the Company rented its corporate office at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada 89144, on a month to month basis. The monthly rent is $1,997. A security deposit of $3,815 has been paid.

The Company also assumed a lease in connection with the mining operations in Quebec, Canada. Operating leases are included in operating lease right-of-use assets, operating lease liabilities, and noncurrent operating lease liabilities on the balance sheets. The Company entered into a termination agreement with the Lessor to agree to terminate the lease as of March 7, 2021. As of that date, the Company was fully released and discharged from any and all obligations under the Lease Agreement.

Operation lease costs are recorded on a straight-line basis within operating expenses. The Company's total lease expense is comprised of the following:

| | For the Year Ended | |
|---|---|---|
| | December 31, 2021 | December 31, 2020 |
| **Operating leases** | | |
| Operating lease cost | $ - | $ 106,727 |
| Operating lease expense | - | 106,727 |
| Short-term lease rent expense | 31,104 | 26,363 |
| Total rent expense | $ 31,104 | $ 133,090 |

Additional information regarding the Company's leasing activities as a lessee is as follow:

| | For the Year Ended | |
|---|---|---|
| | December 31, 2021 | December 31, 2020 |
| Operating cash flows from operating leases | $ - | $ 96,908 |
| Weighted-average remaining lease term - operating leases | - | 0.3 |
| Weighted-average discount rate - operating leases | 0.0% | 6.5% |
| 2021 | - | 126,783 |
| 2022 | - | - |
| Total | - | 126,783 |
| Less present value discount | - | (5,187) |
| Less current portion of operating lease liabilities | - | (121,596) |
| Non-current operating lease liabilities | $ - | $ - |

F-27

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

**Legal Proceedings**

*Feinberg Litigation*

On March 27, 2018, Jeffrey Feinberg, purportedly joined by the Jeffrey L. Feinberg Personal Trust and the Jeffrey L. Feinberg Family Trust, filed a complaint against the Company and certain of its former officers and directors. The complaint was filed in the Supreme Court of the State of New York, County of New York. The plaintiffs purported to state claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933 and common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation, seeking unspecified money damages (including punitive damages), as well as costs and attorneys' fees, and equitable or injunctive relief. On June 15, 2018, the defendants filed a motion to dismiss all claims asserted in the complaint and, on July 27, 2018, the plaintiffs filed an opposition to that motion. The court heard argument on the motion and, on January 15, 2019, the court granted the motion to dismiss, allowing 30 days for the filing of an amended complaint. On February 15, 2019, Jeffrey Feinberg, individually and as trustee of the Jeffrey L. Feinberg Personal Trust, and Terrence K. Ankner, as trustee of the Jeffrey L. Feinberg Family Trust, filed an amended complaint that purports to state the same claims and seeks the same relief sought in the original complaint. On March 7 and 22, 2019, defendants filed motions to dismiss the amended complaint and on April 5, 2019, plaintiffs filed an opposition to those motions. The court heard oral argument on the motions to dismiss on July 9, 2019, and at the conclusion of the argument the court took the motions under submission. On March 13, 2020, the court issued its Decision in which it granted the motions to dismiss in full and ordered that the case be dismissed with prejudice. On or about May 4, 2020, the plaintiffs filed a notice of appeal. Plaintiffs filed their opening appellate brief on January 4, 2021, and defendants filed their responsive appellate briefs on February 3, 2021. Oral argument on the appeal was conducted on April 1, 2021. On April 22, 2021, the court's Appellate Division issued its Decision and Order affirming the dismissal of the case.

*Ho Matter*

On January 14, 2021, Plaintiff Michael Ho ("Plaintiff" or "Ho") filed a Civil Complaint for Damages and Restitution ("Complaint") against Marathon Patent Group, Inc., now known as Marathon Digital Holdings, Inc. (the "Company") in the Superior Court of the State of California for the County of Riverside. The Complaint alleges six causes of action against the Company, (1) Breach of Written Contract; (2) Breach of Implied Contract; (3) Quasi-Contract; (4) Services Rendered; (5) Intentional Interference with Prospective Economic Relations; and (6) Negligent Interference with Prospective Economic Relations. The Complaint seeks damages, restitution, punitive damages, and costs of suit. The claims arise from the same set of facts. Ho alleges that the Company profited from commercially-sensitive information he shared with the Company, purportedly under a mutual non-disclosure agreement, and that the Company failed to compensate him for his role in securing the acquisition of a supplier of energy for the Company. On February 22, 2021, the Company responded to Mr. Ho's Complaint with a general denial and the assertion of applicable affirmative defenses. Then, on February 25, 2021, the Company removed the action to the United States District Court in the Central District of California, where the action remains pending. Marathon filed a motion for summary judgment/adjudication of all causes of action. On February 11, 2022, the Court granted the motion and dismissed Ho's 2nd, 5th and 6th causes of action. Discovery is closed. The Court held a pre-trial conference on February 24, 2022, where it vacated the March 3, 2022 trial date and ordered the parties to meet and confer on a new trial date, which will likely be after June 2022, given the Court's current backlog as a result of Covid. The Court discussed the various theories of damages maintained by the parties. In its ruling on the summary judgment motion and at the pre-trial conference on February 24, 2022, the Court noted that a jury is more likely to accept $150,000 as an appropriate damages amount if liability is found, as opposed to the various theories espoused by Ho that result in multi-million dollar recoveries. Due to outstanding issues of fact and law, it is impossible to predict the outcome at this time; however, after consulting legal counsel, the Company is confident that it will prevail in this litigation, since it did not have a contract with Mr. Ho and he did not disclose any commercially-sensitive information under any mutual nondisclosure agreement that was used to structure any joint venture with energy providers. Trial is set to begin on May 26, 2022.

*Information Subpoena*

On October 6, 2020, the Company entered into a series of agreements with multiple parties to design and build a data center for up to 100-megawatts in Hardin, MT. In conjunction therewith, the Company filed a Current Report on Form 8-K on October 13, 2020. The 8-K discloses that, pursuant to a Data Facility Services Agreement, the Company issued 6,000,000 shares of restricted Common Stock, in transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933, as amended. During the quarter ended September 30, 2021, the Company and certain of its executives received a subpoena to produce documents and communications concerning the Hardin, Montana data center facility described in our Form 8-K dated October 13, 2020. We understand that the SEC may be investigating whether or not there may have been any violations of the federal securities law. We are cooperating with the SEC.

F-28

---

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 6 - INCOME TAXES**

The Company accounts for income taxes under ASC Topic 740: Income Taxes, which requires the recognition of deferred tax assets and liabilities for both the expected impact of differences between the financial statements and the tax basis of assets and liabilities, and for the expected future tax benefit to be derived from tax losses and tax credit carry-forwards. ASC Topic 740 additionally requires the establishment of a valuation allowance to reflect the likelihood of realization of deferred tax assets.

Income tax expense attributable to income from continuing operations was $23,020,721 and $2,400 for the years ended December 31, 2021 and 2020, respectively, and differed from the amounts computed by applying the U.S. federal income tax rate of 21% to pretax income from continuing operations as a result of the following:

| | 2021 | | 2020 | |
|---|---|---|---|---|
| Federal income tax expense (benefit) at the statutory rate | (21.0)% | $ (2,762,295) | (21.0)% | $ (2,229,606) |
| State income taxes, net of federal tax expense | 57.7% | 7,593,773 | (7.0)% | (745,190) |
| Executive Compensation Deduction Limitation | 229.7% | 30,213,175 | 4.2% | 444,031 |
| Excess Tax Benefit Related to Share-Based Compensation | (14.5)% | (1,909,197) | 0.0% | |
| Nondeductible Other Expenses | 1.7% | 225,278 | 0.0% | |
| Change in Valuation Allowance | (110.1)% | (14,477,083) | 23.9% | 2,533,165 |
| Change in Expected Utilization of Tax Attributes | 32.5% | 4,281,445 | 0.0% | |
| Other, net | (1.1)% | (144,375) | 0.0% | |
| Income tax expense (benefit) from continuing operations | 174.9% | $ 23,020,721 | 0.1% | $ 2,400 |

The components of the provision for income taxes are as follows:

| | 2021 | 2020 |
|---|---|---|
| **Current income tax expense (benefit)** | | |
| Federal | - | |
| State | $ 1,600 | $ 2,400 |

46

| | | |
|---|---:|---:|
| Total Current Income Tax Expense | 1,600 | 2,400 |
| **Deferred expense** | | |
| Federal | 29,904,031 | - |
| State | 7,592,173 | - |
| Total Deferred Tax Expense | 37,496,204 | 9,079,841 |
| Change in Valuation Allowance | (14,477,083) | (9,079,841) |
| Net Deferred Tax Expense after Valuation Allowance | 23,019,121 | (0) |
| **Income Tax Provision** | $ 23,020,721 | $ 2,400 |

F-29

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities at December 31, 2021 and 2020 are presented below.

| | 12/31/2021 | 12/31/2020 |
|---|---:|---:|
| Deferred tax assets: | | |
| Tax Credit carryforwards | $ 163,211 | $ 31,961 |
| Net Operating Loss carryforwards | 25,422,829 | 11,467,248 |
| Capital Loss carryforwards | - | 758,731 |
| Intangible assets | 1,055,099 | 2,995,317 |
| Stock Compensation | 447,487 | 246,975 |
| Accruals, reserves and other | 269,096 | 143,079 |
| Digital Currencies | 7,255,674 | - |
| Other | - | 144,358 |
| Total gross deferred tax assets | 34,613,396 | 15,787,669 |
| Less Valuation Allowance | - | (14,477,083) |
| Net deferred tax assets | 34,613,396 | 1,310,586 |
| Deferred tax liabilities: | | |
| | - | - |
| Unrealized Gains | (18,294,723) | - |
| Prepaid service contracts | (4,395,095) | |
| Property and equipment | (34,942,699) | (1,310,586) |
| Total gross deferred liabilities | (57,632,517) | (1,310,586) |
| Net deferred tax liability | $ (23,019,121) | $ - |

The valuation allowance for deferred tax assets as of December 31, 2021 and 2020 was $0 and $14,477,083, respectively. The net change in the total valuation allowance was a decrease of $14,477,083 in 2021.

At year ended December 31, 2021, the Company concluded, based upon all available evidence, it was more likely than not that it would have sufficient future taxable income to realize the Company's federal and state deferred tax assets. As a result, the Company released $14.5 million of valuation allowance associated with deferred tax assets and recognized a corresponding benefit from income taxes in the consolidated statement of operations for the year ended December 31, 2021. The Company's conclusion regarding the realizability of such deferred tax assets was based on the scheduled reversal of existing deferred tax liabilities.

At December 31, 2021, the Company has net operating loss carryforwards for federal income tax purposes of $109,130,270, which are available to offset future taxable income. The Company has net operating loss carryforwards for state income tax purposes of $54,106,348 which are available to offset future state taxable income.

| | Gross Amount | Expiring |
|---|---:|---|
| Federal Net Operating Loss Carryforwards | 3,314,298 | 2034-2035 |
| Federal Net Operating Loss Carryforwards - Indefinite Life | 105,815,972 | Indefinite |
| State Net Operating Loss carryforwards | 54,106,348 | 2035-2041 |

Section 382 and Section 383 of the Internal Revenue Code limit the utilization of U.S. tax attribute carryforwards following a change of control. Based on the Company's analysis under Section 382, approximately $76.2 million of tax attributes is limited by Section 382/383 as of December 31, 2021. The Section 382/383 limitation in conjunction with the twenty-year carryforward limitation caused $37.8 million of attributes to be deemed worthless, which resulted in a write-off of the deferred asset.

In addition, the Company has the following attributes and credit carryforwards as follows:

| | | |
|---|---:|---|
| Federal R&D Tax Credit Carryforwards | 131,250 | 2040-2041 |
| State alternative minimum tax credit carryforwards | 40,457 | |

A reconciliation of the beginning and ending amount of total unrecognized tax benefits for the tax years ended December 31, 2021, and 2020 is as follows:

| | 2021 | 2020 |
|---|---:|---:|
| Balance, beginning of year | $ - | $ - |
| Increase related to prior year tax positions | 25,000 | - |
| Decrease related to prior year tax positions | - | - |
| Increase related to current year tax positions | 18,750 | - |
| Settlements | - | - |
| Lapse of statute of limitation | - | - |
| Change in tax rate | - | - |
| Balance, end of year | $ 43,750 | $ - |

Unrecognized tax benefits that reduce a net operating loss, similar tax loss or tax credits carryforward are presented as a reduction to deferred income taxes.

The company has established a reserve against its federal R&D tax credits generated in 2021.

As of December 31, 2021, the total amount of unrecognized tax benefits was $43,750, all of which was offset against deferred tax assets. If the unrecognized tax benefits were recognized as of December 31, 2021, there would be a $43,750 favorable impact that would affect the effective rate on

income from continuing operations. The Company also accrues for interest and penalties on its uncertain tax positions and includes such charges in its income tax provision in the Consolidated Statement of Operations. Interest and penalty expense amounted to nil and nil, respectively, in 2021. Total accrued interest and penalties were nil and nil, respectively, in 2021. The Company does not currently expect any of its remaining unrecognized tax benefits to be recognized in the next twelve months.

The Company files federal and state income tax returns. The 2018-2020 tax years generally remain subject to examination by the IRS and various state taxing authorities, although the Company is not currently under examination in any jurisdiction.

F-30

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

In 2018, the company dissolved those subsidiaries that were required to file tax returns that had no tax due for 2018. Marathon Digital Holdings, Inc. moved its headquarters to Las Vegas, Nevada on June 1, 2018 so it is required to file a final tax return with the state of California for 2018. The company believes there will be no tax due in the state of California other than the $800 Minimum Franchise fee that all companies are required to pay.

Management does not believe there are any material tax liabilities owed with respect to its operations in Canada, since Management believes there is a loss from the Canadian operations. Such operations have been outsourced. (See NOTE 1 - ORGANIZATION AND DESCRIPTION OF BUSINESS, for details)

The Coronavirus Aid, Relief, and Economic Security (CARES) Act, was enacted March 27, 2020. Among the business provisions, the CARES Act provided for various payroll tax incentives, changes to net operating loss carryback and carryforward rules, business interest expense limitation increases, and bonus depreciation on qualified improvement property. Additionally, the Consolidated Appropriations Act of 2021 was signed on December 27, 2020 which provided additional COVID relief provisions for businesses. The Company has evaluated the impact of both the Acts and has determined that any impact is not material to its financial statements.

**NOTE 7 - Subsequent Events**

On February 11, 2022, we entered into an At The Market Offering Agreement, or sales agreement, with H.C. Wainwright & Co., LLC, or Wainwright, relating to shares of our common stock offered by this prospectus supplement. In accordance with the terms of the sales agreement, we may offer and sell shares of our common stock having an aggregate offering price of up to $750,000,000 from time to time through Wainwright acting as our sales agent.

As of December 31, 2021, the market price of bitcoin was approximately $46,306 per Yahoo Finance. Subsequent to year end, the price of bitcoin decreased to approximately $35,030 on January 22, 2022. Pursuant to ASC 350, the Company anticipates recording an impairment charge on its mined bitcoin of approximately $21 million for the decrease in the market price of bitcoin during January 2022.

The Company has evaluated subsequent events through the date of the consolidated financial statements were available to be issued and has concluded that no such events or transactions took place that would require disclosure herein except as stated directly above.

F-31

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Management's Conclusions Regarding Effectiveness of Disclosure Controls and Procedures**

We conducted an evaluation of the effectiveness of our "disclosure controls and procedures" ("Disclosure Controls"), as defined by Rules 13a-15(e) and 15d-15(e) of the Exchange Act, as of December 31, 2021, the end of the period covered by this Annual Report on Form 10-K. The Disclosure Controls evaluation was done under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, with the goal being that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding disclosure. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, our disclosure controls and procedures were ineffective as of December 31, 2021.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this evaluation, management identified a weakness in internal control over financial reporting related to Information Technology General Controls (ITGC). Specifically, the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

The material weakness described above did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

The effectiveness of our internal control over financial reporting as of December 31, 2021, has been audited by our independent registered public

accounting firm, Marcum, LLP, as stated in their report on management's internal control over financial reporting, which is also included in Item 8, "Financial Statements and Supplementary Data," of this 2021 Form 10-K.

**Remediation**

As noted above, during the initial audit over the internal controls over financial reporting ("ICFR") a material weakness was identified related to certain ITGCs over user access, segregation of duties and change management controls.

As management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, we understand the importance of developing a resolution plan aligned with management and overseen by the Audit Committee of our Board of Directors. Our plan includes the following:

- Enhance our remediation team by continuing to increase our headcount in 2022 in key financial reporting and information technology roles (i.e. as we have increased from three full time employees as of December 31, 2020 to ten full time employees as of December 31, 2021).
- Continue to utilize an external third-party internal audit and SOX 404 implementation firm to work to improve the Company's controls related to our material weaknesses, specifically relating to user access and change management surrounding the Company's IT systems and applications.
- Continue to implement new processes and controls and engage external resources when required in connection with remediating this material weakness, such that these controls are designed, implemented, and operating effectively.
- Continue to formalize our policies and processes over including those over outside service providers with a specific focus on enhancing design and documentation related to (i) developing and communicating additional policies and procedures to govern the areas of IT change management and user access processes and related control activities and (ii) develop robust processes to validate data received from third-parties and relied upon to generate financial statements is complete and accurate.

We recognize that the material weaknesses in our internal control over financial reporting will not be considered remediated until the remediate controls operate for a sufficient period of time and can be tested and concluded by management to be designed and operating effectively. Because our remediation efforts involve our outsource service providers, we cannot provide any assurance that these remediation efforts will be successful or that our internal control over financial reporting will be effective as a result of these efforts.

We continue to evaluate and work to improve our internal control over financial reporting related to the identified material weaknesses and management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above. In addition, we report the progress and status of the above remediation efforts to the Audit Committee on a periodic basis.

**Change in Internal Control Over Financial Reporting**

Other than what is disclosed above there were no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2021.

50

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
**ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

To the Stockholders and Board of Directors of
Marathon Digital Holdings, Inc.

**Adverse Opinion on Internal Control over Financial Reporting**

We have audited Marathon Digital Holdings, Inc.'s (the "Company") internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, because of the effect of the material weakness described in the following paragraph on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness have been identified and included in "Management's Annual Report on Internal Control Over Financial Reporting":

The Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the fiscal December 31, 2021 consolidated financial statements, and this report does not affect our report dated March 9, 2022 on those financial statements.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheet of the Company as of December 31, 2021 and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended and our report dated March 9, 2022 expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Management Annual Report on Internal Control Over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are

recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that degree of compliance with the policies or procedures may deteriorate.

/s/ Marcum LLP

Marcum LLP

Costa Mesa, California

March 9, 2022

**ITEM 9B. OTHER INFORMATION**

None.

51

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this Item is incorporated herein by reference to the information provided under the headings "Executive Officers of the Company," "Election of Directors - Nominees," and "Corporate Governance and the Board of Directors and its Committees" in our definitive proxy statement to be filed with the SEC not later than 120 days after the fiscal year ended December 31, 2021 (the "2022 Proxy Statement").

**ITEM 11. EXECUTIVE COMPENSATION**

The information required by this Item is incorporated herein by reference to the information provided under the headings "Executive Officers of the Company," "Election of Directors - Nominees," and "Corporate Governance and the Board of Directors and its Committees" in our definitive proxy statement to be filed with the SEC not later than 120 days after the fiscal year ended December 31, 2021 (the "2022 Proxy Statement").

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this Item is incorporated herein by reference to the information provided under the headings "Executive Officers of the Company," "Election of Directors - Nominees," and "Corporate Governance and the Board of Directors and its Committees" in our definitive proxy statement to be filed with the SEC not later than 120 days after the fiscal year ended December 31, 2021 (the "2022 Proxy Statement").

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this Item is incorporated herein by reference to the information provided under the headings "Executive Officers of the Company," "Election of Directors - Nominees," and "Corporate Governance and the Board of Directors and its Committees" in our definitive proxy statement to be filed with the SEC not later than 120 days after the fiscal year ended December 31, 2021 (the "2022 Proxy Statement").

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this Item is incorporated herein by reference to the information provided under the headings "Executive Officers of the Company," "Election of Directors - Nominees," and "Corporate Governance and the Board of Directors and its Committees" in our definitive proxy statement to be filed with the SEC not later than 120 days after the fiscal year ended December 31, 2021 (the "2022 Proxy Statement").

52

**PART IV**

**ITEM 15. EXHIBITS [to be updated]**

The following exhibits are filed as part of this Annual Report on Form 10-K.

| Exhibit No. | Description |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of the Company dated November 25, 2011. (1) |
| 3.2 | Certificate of Amendment to Articles of Incorporation dated February 15, 2013. (2) |
| 3.3 | Certificate of Amendment to Amended and Restated Articles of Incorporation dated July 18, 2013 (3) |
| 3.4 | Certificate of Amendment to Articles of Incorporation dated October 25, 2017. (4) |
| 3.5 | Amended and Restated Bylaws of the Company dated November 25, 2011. (5) |
| 3.6 | Certificate of Amendment to Articles of Incorporation dated April 8, 2019 (48) |
| 4.1 | Certificate of Designation of Preferences, Rights and Limitations of Series B Convertible Preferred Stock. (6) |
| 4.2 | Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series E Convertible Preferred Stock. (7) |
| 4.3 | Certificate of Correction to Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series E Convertible Preferred Stock. (8) |
| 4.4 | Form of proposed Certificate of Designation of Preferences, Rights and Limitations of 0% Series E-1 Convertible Preferred Stock. (9) |
| 4.5 | Form of Underwriter's Warrant (51) |
| 4.6 | Indenture, dated as of November 18, 2021, between Marathon Digital Holdings, Inc. and U.S. Bank National Association, as trustee and Form of Certificate with Respect Thereto(66) |
| 4.7 | Form of At The Market Offering Agreement (70) |
| 10.1 | Form of Unit Purchase Agreement dated as of August 14, 2017. (10) |
| 10.2 | Form of Registration Rights Agreement dated as of August 14, 2017. (11) |
| 10.3 | Form of 5% Convertible Promissory Note dated August 14, 2017. (12) |
| 10.4 | Form of Common Stock Purchase Warrant dated August 14, 2017. (13) |
| 10.5 | Form of Exchange Agreement dated as of July 16, 2017. (14) |
| 10.6 | Form of Exchange Agreement dated as of August 7, 2017. (15) |
| 10.7 | Form of Exchange Agreement dated as of November 28, 2017. (16) |
| 10.8 | Amended and Restated Croxall Retention Agreement dated August 30, 2017. (17) |
| 10.9 | Retention Agreement with Francis Knuettel II dated August 31, 2017. (18) |
| 10.10 | Employment Agreement with James Crawford dated August 31, 2017. (19) |

53

| | |
|---|---|
| 10.11 | Consulting Termination and Release Agreement with Erich Spangenberg dated August 31, 2017. (20) |
| 10.12 | Consulting Agreement dated August 31, 2017 with Page Innovations, LLC. (21) |
| 10.13 | Form of Lock-up Agreement with Doug Croxall dated September 7, 2017. (22) |
| 10.14 | Letter agreement with Revere Investments L.P., dated October 31, 2017. (23) |
| 10.15 | Agreement and Plan of Merger dated as of November 1, 2017. (24) |
| 10.16 | Amendment to Croxall Retention Agreement dated November 1, 2017. (25) |

| 10.17 | Voting and Standstill Agreement with Doug Croxall dated November 1, 2017. (26) |
| 10.18 | CF Marathon LLC Limited Liability Company Agreement dated as of October 20, 2017. (27) |
| 10.19 | First Amendment to Amended and Restated Revenue Sharing and Securities Purchase Agreement and Restructuring Agreement dated as of August 3, 2017. (28) |
| 10.20 | M&A Advisory Agreement with Palladium Capital Advisors, LLC, dated November 13, 2017. (29) |
| 10.21 | CIARA Technologies Agreement. (Confidential Treatment Requested) (30) |
| 10.22 | Master Services Agreement with Hypertec Systems Inc. dated December 15, 2017. (Confidential Treatment Requested) (31) |
| 10.23 | Engagement Letter with Roth Capital Partners, LLC dated December 7, 2017. (32) |
| 10.24 | Fairness Opinion dated December 13, 2017. (33) |
| 10.25 | Form of Securities Purchase Agreement. (34) |
| 10.26 | Form of Securities Purchase Agreement. (35) |
| 10.27 | Patent Rights Purchase and Assignment Agreement with XpresSpa Group, Inc. dated January 11, 2018. (36) |
| 10.28 | Amendment No. 1 to Agreement and Plan of Merger dated January 23, 2018. (37) |
| 10.29 | Lease Agreement, by and between 9349-0001 Quebec Inc. and Cryptoespace Inc., dated November 11, 2017. (38) |
| 10.30 | Assignment and Assumption Agreement, by and between Blocespace Inc. and Marathon Crypto Mining, Inc., dated February 12, 2018 (39) |
| 10.31 | Settlement Agreement and Release of Claims, dated March 8, 2018. (40) |
| 10.32 | Amendment No. 2 to Agreement and Plan of Merger, dated March 19, 2018. (41) |
| 10.33 | Amended and Restated Agreement and Plan of Merger, dated April 3, 2018. (42) |
| 10.34 | Executive Employment Agreement (46) |
| 10.35 | Executive Employment Agreement (47) |
| 10.36 | At the Market Offering Agreement with HC Wainwright & Co., dated July 2019 (49) |
| 10.37 | Asset Purchase Agreement with SelectGreen, Ltd., dated August 2019 (50) |
| 10.38 | Form of Lockup Agreement (51) |
| 10.39 | Form of At the Market Agreement (52) |
| 10.40 | Sales and Purchase Agreement between the Company and Bitmain (53) |
| 10.41 | Executive Employment Agreement between the Company and Simeon Salzman (54) |
| 10.42 | Sales and Purchase Agreement between the Company and Bitmain (55) |
| 10.43 | Sales and Purchase Agreement between the Company and Bitmain (56) |
| 10.44 | Form of At the Market Agreement (57) |
| 10.45 | Sales and Purchase Agreement between the Company and Bitmain (58) |
| 10.46 | Employment Agreement with Fred Thiel (60) |
| 10.47 | Intentionally omitted |
| 10.48 | Binding Letter of Intent with Compute North, LLC (62) |
| 10.49 | Purchase Agreement dated July 30, 2021 (63) |
| 10.50 | Master Securities Loan Agreement between the Company and NYDIG Funding, LLC, dated August 27, 202 (64). |
| 10.51 | Compute North Agreements (65) |
| 10.52 | Line of Credit with Silvergate Bank (65) |
| 10.53 | Amended Hosting Agreement between the Company and Compute North dated as of November 30, 2021 (67) |
| 10.54 | Operating Agreement, dated November 30, 2021 of Marathon Compute North 1 LLC(67) |
| 10.55 | Hosting Agreement between the Company and the LLC dated as of November 30, 2021 (67) |
| 10.56 | Bitmain Agreement (68) |
| 10.57 | Employment Agreement (69) |
| 14.1 | Code of Business Conduct and Ethics (43) |
| 16.1 | SingerLewak LLP letter to the Securities and Exchange Commission. (44) |
| 16.2 | Letter from BDO USA, LLP dated November 30, 2017. (45) |
| 23.1 | Consent of Marcum, LLP |
| 23.2 | Consent of RBSM, LLP |
| 31.1 | Certification of Chief Executive Officer pursuant to Section302 of the Sarbanes-Oxley Act 2002* |
| 31.2 | Certification of Chief Financial Officer pursuant to Section302 of the Sarbanes-Oxley Act 2002* |
| 32.1 | Section 1350 Certification of the Chief Executive Officer and Chief Financial Officer* |

54

| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Calculation Linkbase Document |
| 101.LAB | XBRL Taxonomy Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Presentation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Document |

* Filed herein.

(1) Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed December 9, 2011 and incorporated herein by reference.

(2) Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed February 20, 2013 and incorporated herein by reference.

(3) Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed July 19, 2013 and incorporated herein by reference.

(4) Previously filed as Exhibit 3.4 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(5) Previously filed as Exhibit 3.2 to Current Report on Form 8-K filed December 9, 2011 and incorporated herein by reference

(6) Previously filed as Exhibit 3.2 to Current Report on Form 8-K filed May 7, 2014 and incorporated herein by reference.

(7) Previously filed as Exhibit 4.1 to Current Report on Form 8-K filed December 1, 2017 and incorporated herein by reference.

(8) Previously filed as Exhibit 4.1 to Current Report on Form 8-K filed December 22, 2017 and incorporated herein by reference.

(9) Previously filed as Exhibit 4.4 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(10) Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(11) Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(12) Previously filed as Exhibit 4.1 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(13) Previously filed as Exhibit 4.2 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(14) Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed July 18, 2017 and incorporated herein by reference.

(15)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed August 9, 2017 and incorporated herein by reference.
(16)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed December 1, 2017 and incorporated herein by reference.
(17)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.
(18)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.
(19)  Previously filed as Exhibit 10.3 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.
(20)  Previously filed as Exhibit 10.4 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.
(21)  Previously filed as Exhibit 10.5 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.
(22)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed September 12, 2017 and incorporated herein by reference.
(23)  Previously filed as Exhibit 10.14 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(24)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed November 2, 2017 and incorporated herein by reference.
(25)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed November 2, 2017 and incorporated herein by reference.
(26)  Previously filed as Exhibit 10.3 to Current Report on Form 8-K filed November 2, 2017 and incorporated herein by reference.

55

(27)  Previously filed as Exhibit 10.18 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(28)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed August 9, 2017 and incorporated herein by reference.
(29)  Previously filed as Exhibit 10.20 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(30)  Previously filed as Exhibit 10.21 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(31)  Previously filed as Exhibit 10.22 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(32)  Previously filed as Exhibit 10.23 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(33)  Previously filed as Exhibit 10.24 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(34)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed December 12, 2017 and incorporated herein by reference
(35)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed December 19. 2017 and incorporated herein by reference
(36)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed January 18, 2018 and incorporated herein by reference.
(37)  Previously filed as Exhibit 10.28 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.
(38)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed February 15, 2018 and incorporated herein by reference.
(39)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed February 15, 2018 and incorporated herein by reference.
(40)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed July 31, 2018 and incorporated herein by reference.
(41)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed March 20, 2018 and incorporated herein by reference.
(42)  Previously filed as Exhibit 10.4 to Current Report on Form 8-K filed April 4, 2018 and incorporated herein by reference.
(43)  Previously filed as Exhibit 14.1 to Annual Report on 10- K filed March 31, 2014 and incorporated herein by reference.
(44)  Previously filed as Exhibit 16.1 to Current Report on Form 8-K filed January 17, 2017 and incorporated herein by reference.
(45)  Previously filed as Exhibit 16.1 to Current Report on Form 8-K filed December 1, 2017 and incorporated herein by reference.
(46)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed October 16, 2018 and incorporated herein by reference.
(47)  Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed on October 16, 2018 and incorporated herein by reference.
(48)  Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed on April 8, 2019 and incorporated herein by reference.
(49)  Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed on July 19, 2019 and incorporated herein by reference.
(50)  Previously filed as Exhibit 10.1 to Current report on Form 8-K filed on August 29, 2019 and incorporated herein by reference.
(51)  Previously filed as Exhibit 4.1 to S-1/A filed on July 23, 2020
(52)  Previously filed as Exhibit 10.1 to S-3 filed on August 6, 2020
(53)  Previously filed as Exhibit 10.1 to 8-K filed on August 18, 2020
(54)  Previously filed as Exhibit 10.1 to 8-K filed on October 24, 2020
(55)  Previously filed as Exhibit 10.1 to 8-K filed October 29, 2020
(56)  Previously filed as Exhibit 10.1 to 8-K filed on December 11, 2020
(57)  Previously filed as Exhibit 10.1 to S-3 filed on December 11, 2020
(58)  Previously filed as Exhibit 10.1 to 8-K filed on December 28, 2020
(59)  Previously filed as Exhibit 4.1 to 8-K filed on January 15, 2021
(60)  Previously filed as Exhibit 99.1 to 8-K filed on April 30, 2021
(61)  Intentionally omitted
(62)  Previously filed as Exhibit 10.1 to 8-K filed on May 27, 2021
(63)  Previously filed as Exhibit 10.1 to 8-K dated August 4, 2021
(64)  Previously filed as Exhibit 10.1 to 8-K dated September 2, 2021
(65)  Previously filed as Exhibits 10.1 and 10.2 to 10-Q dated November 15, 2021
(66)  Previously filed as Exhibits 4.1 and 4.2, respectively, to 8-K dated November 18, 2021 and 8-K dated November 24, 2021
(67)  Previously filed as Exhibits 10.1, 10.2 and 10.3, respectively, to 8-K dated December 6, 2021
(68)  Previously filed as Exhibit 10.1 to 8-K dated December 28, 2021
(69)  Previously filed as Exhibit 10.1 to Form 8-K dated January 3, 2022
(70)  Previously filed as Exhibit 4.12 to Registration Statement filed on Form S-3ASR dated February 11, 2022

**ITEM 16. FORM 10-K SUMMARY**
None.

56

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: March 9, 2022

|  |  |
|---|---|
| | **MARATHON DIGITAL HOLDINGS, INC.** |
| By: | */s/ Fred Thiel* |
| Name: | Fred Thiel |
| Title: | Chief Executive Officer and Executive Chairman (Principal Executive Officer) |
| By: | */s/ Simeon Salzman* |
| Name: | Simeon Salzman |
| Title: | Chief Financial Officer |

(Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Fred Thiel | Chief Executive Officer and Chairman | March 9, 2022 |
| Fred Thiel | (Principal Executive Officer) | |
| /s/ Simeon Salzman | Chief Financial Officer | March 9, 2022 |
| Simeon Salzman | (Principal Financial and Accounting Officer) | |
| /s/ Said Ouissal | Director | March 9, 2022 |
| Said Ouissal | | |
| /s/ Jay Leupp | Director | March 9, 2022 |
| Jay Leupp | | |
| /s/ Georges Antoun | Director | March 9, 2022 |
| Georges Antoun | | |
| /s/ Kevin DeNuccio | Director | March 9, 2022 |
| Kevin DeNuccio | | |
| /s/ Sarita James | Director | March 9, 2022 |
| Sarita James | | |