# EXHIBIT E

# Mar. 16, 2021 Marathon Form 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
# FORM 10-K

(Mark One)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2020

or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the transition period from _____ to_____

# MARATHON DIGITAL HOLDINGS, INC.

(Exact Name of Registrant as Specified in Charter)

| Nevada | 001-36555 | 01-0949984 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1180 North Town Center Drive, Suite 100, Las Vegas, NV     89144

(Address of principal executive offices)     (Zip Code)

Registrant's telephone number, including area code: 702-945-2773

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | MARA | The Nasdaq Capital Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. [X]

| | | | |
|---|---|---|---|
| Large Accelerated Filer | [ ] | Accelerated Filer | [ ] |
| Non-accelerated Filer | [X] | Smaller Reporting Company | [X] |
| Emerging growth company | [ ] | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes [ ] No [X]

The aggregate market value of the common stock, no par value, held by non-affiliates of the registrant, based on the closing sale price of registrant's common stock as quoted on the Nasdaq Capital Market on June 30, 2020 (the last business day of the registrant's most recently completed second fiscal quarter), was approximately $19.8 million. Accordingly, the registrant qualifies under the SEC's revised rules as a "smaller reporting company."

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date. 98,804,636 shares of common stock are issued and outstanding as of March 16, 2021.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **PART I.** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 29 |
| Item 2. | Properties | 30 |
| Item 3. | Legal Proceedings | 30 |
| Item 4. | Mine Safety Disclosures | 31 |
| **PART II.** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 32 |
| Item 6. | Selected Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 40 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 41 |
| Item 9A. | Controls and Procedures | 41 |
| Item 9B. | Other Information | 41 |
| **PART III.** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 42 |
| Item 11. | Executive Compensation | 46 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 49 |
| Item 13. | Certain Relationships and Related Transactions, Director Independence | 49 |
| Item 14. | Principal Accounting Fees and Services | 50 |

**PART IV.**

| Item 15. | Exhibits, Financial Statement Schedules | 50 |
| Item 16. | Form 10-K Summary | 53 |

2

## MARATHON DIGITAL HOLDINGS, INC.

### FORWARD LOOKING STATEMENTS

This Annual Report on Form 10-K and other written and oral statements made from time to time by us may contain so-called "forward-looking statements," all of which are subject to risks and uncertainties. Forward-looking statements can be identified by the use of words such as "expects," "plans," "will," "forecasts," "projects," "intends," "estimates," and other words of similar meaning. One can identify them by the fact that they do not relate strictly to historical or current facts. These statements are likely to address our growth strategy, financial results and product and development programs. One must carefully consider any such statement and should understand that many factors could cause actual results to differ from our forward-looking statements. These factors may include inaccurate assumptions and a broad variety of other risks and uncertainties, including some that are known and some that are not. No forward-looking statement can be guaranteed, and actual future results may vary materially.

These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks in the section entitled "Risk Factors" and the risks set out below, any of which may cause our or our industry's actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. These risks include, by way of example and not in limitation:

- The uncertainty of profitability;
- Risks related to failure to obtain adequate financing on a timely basis and on acceptable terms; and
- The potential economic fallout resulting from the COVID-19 outbreak and related circumstances.
- Other risks and uncertainties related to our business plan and business strategy.

This list is not an exhaustive list of the factors that may affect any of our forward-looking statements. These and other factors should be considered carefully, and readers should not place undue reliance on our forward-looking statements. Forward looking statements are made based on management's beliefs, estimates and opinions on the date the statements are made, and we undertake no obligation to update forward-looking statements if these beliefs, estimates and opinions or other circumstances should change. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable law, including the securities laws of the United States we do not intend to update any of the forward-looking statements to conform these statements to actual results.

Information regarding market and industry statistics contained in this Annual Report on Form 10-K is included based on information available to us that we believe is accurate. It is generally based on industry and other publications that are not produced for purposes of securities offerings or economic analysis. We have not reviewed or included data from all sources. Forecasts and other forward-looking information obtained from these sources are subject to the same qualifications and the additional uncertainties accompanying any estimates of future market size, revenue and market acceptance of products and services. As a result, investors should not place undue reliance on these forward-looking statements.

As used in this annual report, the terms "we", "us", "our", the "Company", "Marathon Digital Holdings, Inc.", "Marathon") and "MARA" mean Marathon Digital Holdings, Inc. and its subsidiaries, unless otherwise indicated.

3

## PART I

### ITEM 1. BUSINESS

Marathon is a digital asset technology company that mines cryptocurrencies with a focus on the blockchain ecosystem and the generation of digital assets. On February 1, 2021, Marathon announced that its main supplier of bitcoin miners, Bitmain, had shipped approximately 4,000 S-19 Pro ASIC miners to the Company's mining facility in Hardin, MT, all of which were delivered as scheduled. In addition to the initial 4,000 miners delivered to the Hardin facility in February, Bitmain recently shipped another 6,300 miners to Hardin. A portion of this new shipment has already been received and installations are progressing. Marathon expects all 10,300 miners to be installed by the end of March, at which point the Company's mining fleet will consist of 12,920 miners generating approximately 1.4 EH/s. With BTC at $56,600 (the price on March 12, 2021), generation of 1.4 EH/s translates into gross revenues of $5.5 million per month. With delivery of all 100,500 miners currently on order (which delivery and installation is expected to be complete by January 31, 2022, Marathon expects to generate approximately 11.8 EH/s. At the current price of BTC of $56,600, the Company would expect to generate approximately $46.3 million per month.

Marathon also acquires bitcoin when our cash, cash equivalents and short-term investments exceed current working capital requirements, and we may from time to time, subject to favorable market conditions, issue debt or equity securities to raise capital to use the proceeds to purchase bitcoin. To Marathon, the strategy is to hold bitcoin as a long term investment rather than engaging in regular trading of bitcoin or to hedge or otherwise enter into derivative contracts with respect to our bitcoin holdings, though we may sell bitcoin in future periods as needed to generate cash for treasury management and other general corporate purposes. Holding bitcoin is a strategy to act as a store of value, supported by a robust and public open source architecture, that is not linked to any country's monetary policy and can therefore serve as a hedge against inflation. We are of the firm belief that bitcoin offers additional opportunity for appreciation in value with increasing adoption due to its limited supply. We may also explore opportunities to become involved in businesses ancillary to our bitcoin mining business as favorable market conditions and opportunities arise.

We were incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc. On December 7, 2011, we changed our name to American Strategic Minerals Corporation and were engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, we discontinued our minerals business and began to invest in real estate properties in Southern California. In October 2012, we discontinued our real estate business when our former CEO joined the firm and we commenced our IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc. On November 1, 2017, we entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), which is focused on mining digital assets. We purchased cryptocurrency mining machines and established a data center in Canada to mine digital assets. We are expanding our activities in the mining of new digital assets, while at the same time harvesting the value of our remaining IP assets.

On June 28, 2018, our Board has determined that it is in the best interests of the Company and our shareholders to allow the Amended Merger Agreement with GBV to expire on its current termination date of June 28, 2018 without further negotiation or extension. The Board approved to issue 3,000,000 shares of our common stock to GBV as a termination fee for us canceling the proposed merger between the two companies.

All share and per share values for all periods presented in the accompanying consolidated financial statements have been retroactively adjusted to reflect the 1:4 Reverse Split which occurred on April 8, 2019.

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd. (the "Seller"), a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock

168

at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share on December 27, 2019. On March 30, 2020, the Seller has agreed to amend the total of number of shares to be issued was reduced to 2,101,500 shares and the rest of 350,250 shares was issued at $0.49 per share. There was no mining payable outstanding as of September 30, 2020.

4

On May 11, 2020, the Company announced the purchase of 700 M30S+ (80 TH) miners. On May 12, 2020, the Company announced the purchase 660 Bitmain S19 Pro Miners. On June 11, 2020, the Company announced the purchase of an additional 500 of the latest generation Bitmain S19 Pro Miners, bringing the Company's total Hashrate to approximately 240 PH/s when fully deployed.

On May 20, 2020, the Company amended its note, originally dated August 31, 2017, with Bi-Coastal Consulting Defined Benefit Plan to reduce the conversion price to $0.60 per share. The current principal balance of the Note was $999,105.60 and accrued the interest was $215,411.30. The Company agreed to the reduction in the conversion price from $0.80 to $0.60 to incentivize the Note holder to convert the Note to common stock. As the Note has been fully converted to common stock, the Company has no Long-Term debt.

On July 28, 2020, we closed a public offering of 7,666,666 shares of common stock, including the exercise in full by the underwriter of the option to purchase an additional 999,999 shares of common stock, at a public offering price of $0.90 per share. The gross proceeds of this offering, before deducting underwriting discounts and commissions and other offering expenses payable by Marathon, were approximately $6.9 million.

On July 29, 2020, the Company announced the purchase of 700 next generation M31S+ ASIC Miners from MicroBT. Additionally, Bitmain has notified the Company that 660 of the 1,660 Bitmain S-19 Pro Miners previously purchased will be delivered in mid-August.

On August 13, 2020, the Company entered into a Long Term Purchase Contract with Bitmaintech PTE., LTD ("Bitmain") for the purchase of 10,500 next generation Antminer S-19 Pro ASIC Miners. The purchase price per unit is $2,362 ($2,206 with a 6.62% discount) for a total gross purchase price of $24,801,000. The parties confirm that the total hashrate of the Antminers under this agreement shall not be less than 1,155,000 TH/s. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a total net discount of 8.63% to the purchase price adjusting the amount due to $22,660,673.70.

The Company shall pay for the Antminers as follows:

(1) Twenty percent (20%) of the total purchase price shall be paid as a nonrefundable down payment within forty-eight (48) hours of execution of the agreement.

(2) The Company shall pay the twenty percent (20%) of the total purchase price prior to September 20, 2020.

(3) The Company shall pay the ten percent (10%) of the total purchase price prior to October 10, 2020.

(4) The Company shall pay the remaining fifty percent (50%) of the total purchase price in equal monthly installments due not less than fifty-five (55) days prior to the scheduled delivery of the Product(s) as follows:

    a) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the first installment of products to be shipped to the Company in January 2021.

    b) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the second installment of the products to be shipped to the Company in February 2021.

    c) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the third installment of the products to be shipped to the Company in March 2021.

    d) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the fourth installment of the products to be shipped to the Company in April 2021.

    e) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the fifth installment of the products to be shipped to the Company in May 2021.

    f) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the sixth installment of the products to be shipped to the Company in June 2021.

5

Subject to the timely payment of the purchase price, Bitmain shall deliver products according to the following schedule: 1,500 Units on or before January 31, 2021; and 1,800 units on or before each of February 28, 2021; March 31, 2021; April 30, 2021, May 31, 2021 and June 30, 2021. As of December 31, 2020, the Company has paid $15,052,648.08 of the total balance of $22,660,673.70.

On October 23, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19 Pro ASIC Miners. The 2021 delivery schedule will be 2,500 Units in January, 4,500 Units in February and the final 3,000 Units in March 2021.The gross purchase price is $23,620,000.00 with 30% due upon the execution of the contract and the balance paid over the next 4 months. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,581,594.00. As of December 31, 2020, the Company has paid $13,634,645.00 of the total balance of $21,581,594.00.

On December 8, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19j Pro ASIC Miners, with 6,000 units to be delivered in August 2021, and the remaining 4,000 units to be delivered in September 2021. The gross purchase price is $$23,770,000 with 10% of the purchase price due within 48 hours of execution of the contract, 30% due on January 14, 2021, 10% due on February 15, 2021, 30% due on June 15, 2021 and 20% due on July 15, 2021. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,718,649.00. As of December 31, 2020, the Company has paid $2,192,307.10 of the total balance of $21,718,649.00.

On December 23, 2020, the Company executed a contract with Bitmain to purchase an additional 70,000 next generation Antminer S-19 ASIC Miners, with 7,000 units to be delivered in July 2021, and the remaining 63,000 units to be delivered in December 2021. The purchase price is $167,763,451.93. The purchase price for the miners shall be paid as follows: 20% within 48 hours of signing of contract; 30% on or before March 1, 2021; 4.75% on June 15, 2021; 1.76% on July 15, 2021; 4.58% on August 15, 2021; 10.19% on September 15, 2021; 17.63% on October 15, 2021 and 11.55% on November 15, 2021. As of December 31, 2020, the Company has paid $33,552,690.39 of the total balance of $167,763,451.93.

Effective December 31, 2020, The Board of Directors of Marathon Digital Holdings, Inc. (the "Company") ratified the following arrangements approved by its Compensation Committee:

Merrick Okamoto, CEO was awarded a cash bonus of $2,000,000 which was paid before year end 2020. He was also awarded a special bonus of 1,000,000 RSUs with immediate vesting. He was given a new three-year employment agreement effective January 1, 2021 with the same salary and bonus as the prior agreement. He was also granted the following: award of 1,000,000 RSUs when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $500,000,000; award of 1,000,000 RSUs priced when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $750,000,000; award of 2,000,000 RSUs priced at lowest

169

closing stock price in past 30 trading days when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $1,000,000,000; and award of 2,000,000 RSUs when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $2,000,000,000.

6

Sim Salzman, CFO, was granted a bonus payment of $40,000 in cash; and a bonus of 91,324 RSUs with immediate vesting. James Crawford, COO, was granted a bonus payment of $127,308 in cash and a stock bonus of 57,990 RSUs with immediate vesting. Furthermore, per his employment agreement, his base salary for the 2021 will be increased by 3%.

Compensation for directors of the board for 2021 as follows: (i) cash compensation of $60,000 per year for each director, plus an additional $15,000 per year for each committee chair, paid 25% at the end of each calendar quarter; (ii) for existing directors, the equivalent of 54,795 RSUs; and (iii) for newly elected directors, a one-time grant of 91,324 RSUs, vesting 25% each calendar quarter during 2021. For clarification, new directors will also receive the same annual compensation as existing directors in addition to their one time grant.

On January 4, 2021, the Company received a letter from Nasdaq that because the Company had delayed its annual meeting until January 15, 2021 (in order to enable further shareholders to vote their shares in order to meet the 50.1% quorum requirement), that it was not in compliance with Nasdaq Rules 5620(a) which requires that an annual meeting be held within one year of each fiscal year. As the Company has indicated to Nasdaq in late December, it has received reports from its proxy solicitor that the quorum requirements have been met, and all matters have received requisite approvals to pass at the Annual Meeting on January 15, 2021. Once the Annual Meeting is held and the results publicly reported, Nasdaq has indicated that the Company will be deemed back in compliance with this requirement.

On January 12, 2021, the Company also announced that it had successfully completed its previously announced $200 million shelf offering by utilizing its at-the-market (ATM) facility. As a result, the Company ended the 2020 fiscal year with $217.6 million in cash and 74,656,549 shares outstanding.

On January 15, 2021, Marathon Digital Holdings, Inc., a Nevada corporation (the "Company"), held an annual meeting of stockholders (the "Meeting"). As of the record date for the Meeting, 51,403,280 shares of common stock were issued and outstanding. A total of 33,981,556 shares of common stock, constituting a quorum, were present and accounted for at the Meeting. At the Meeting, the Company's stockholders approved the following proposals:

**VOTES CAST**

| Common shares | PROPOSAL #1 Increase in Shares under 2018 Incentive Plan by 5 million | PROPOSAL #2a Election of Merrick Okamoto | PROPOSAL #2b Election of Peter Benz | PROPOSAL #3 Ratification of Auditor | PROPOSAL #4 Nonbinding Advisory Vote on Executive Compensation |
|---|---|---|---|---|---|
| Yes | 10,112,531 | 12,184,952 | 12,216,945 | 32,948,526 | 11,146,174 |
| No | 2,278,676 | | | 464,134 | 1,093,170 |
| Abstain | 163,325 | 369,187 | 337,194 | 567,470 | 315,663 |
| Broker Non-Vote | 21,427,024 | 21,427,417 | 21,427,417 | 1,426 | 21,426,549 |

On January 12, 2020, Marathon Digital Holdings, Inc., a Nevada corporation (the "Company"), entered into a Securities Purchase Agreement (the "Purchase Agreement") with certain purchasers named therein (the "Purchasers"), pursuant to which the Company agreed to issue and sell, in a registered direct offering (the "Offering"), 12,500,000 shares of its common stock (the "Securities") at an offering price of $20.00 per share.

The Purchase Agreement contains customary representations and warranties and agreements of the Company and the Purchasers and customary indemnification rights and obligations of the parties. The closing of the Offering occurred on January 15, 2021. The Company received gross proceeds of $250,000,000 in connection with the Offering, before deducting placement agent fees and related offering expenses.

7

Pursuant to a letter agreement, dated August 2020 (the "Engagement Letter"), the Company engaged H.C. Wainwright & Co., LLC (the "Placement Agent") as placement agent in connection with the Offering. The Placement Agent agreed to use its reasonable best efforts to arrange for the sale of the Securities. The Company agreed to pay to the Placement Agent a cash fee of 5.0% of the aggregate gross proceeds raised in the Offering. The Company also issued to designees of the Placement Agent warrants to purchase up to 3.0% of the aggregate number of shares of Common Stock sold in the transactions, or warrants to purchase up to 375,000 shares of Common Stock (the "Placement Agent Warrants"). The Placement Agent Warrants have an exercise price equal to 125% of the offering price per share (or $25.00 per share). The Company also agreed to pay the Placement Agent $50,000 for accountable expenses, to reimburse an investor's legal fees in an amount up to $7,500 and to pay $12,900 for the Placement Agent's clearing fees. Pursuant to the terms of the Engagement Letter, the Placement Agent has the right, for a period of twelve months following the closing of the Offerings, to act (i) as financial advisor in connection with any merger, consolidation or similar business combination by the Company and (ii) as sole book-running manager, sole underwriter or sole placement agent in connection with certain debt and equity financing transactions by the Company.

Effective January 19, 2021, David Lieberman resigned as a director of Marathon Digital Holdings, Inc. (the "Company"). On the same date, the Company's Board appointed Kevin DeNuccio as a director to fill the vacancy created by Mr. Lieberman's resignation.

Mr. DeNuccio is the Founder and General Partner of Wild West Capital LLC since 2012 where he focused on angel investments, primarily in SAAS software start-ups.

He brings to Marathon more than 25 years of experience as a chief executive, global sales leader, public and private board member, and more than a dozen angel investments, managing and growing leading technology businesses. He served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories and Unisys Corporation.

On January 25, 2021, the Company announced that it has purchased 4,812.66 BTC in an aggregate purchase price of $150 million.

Effective March 1, 2021, the Company changed its name to Marathon Digital Holdings, Inc.

*Blockchain and Cryptocurrencies Generally*

Bitcoin is a digital asset that is issued by and transmitted through an open source protocol collectively maintained by a peer-to-peer network of decentralized user nodes. This network hosts a public transaction ledger, known as the bitcoin blockchain, on which bitcoin holdings and transactions in bitcoin are recorded. Balances of bitcoin are stored in individual "wallet" functions, which associate network public addresses with a "private key" that controls the transfer of bitcoin. The bitcoin blockchain can be updated without any single entity owning or operating the network. New bitcoin is created and allocated by the protocol that governs bitcoin through a "mining" process that rewards users that verify transactions in the bitcoin blockchain. The bitcoin protocol limits the total issuance of bitcoin over time to 21 million.

Bitcoin can be used to pay for goods and services, or it can be converted to fiat currencies, such as the U.S. dollar, at rates of exchange determined by market forces on bitcoin trading platforms, which operate 24-hours-a-day, 7-days-a-week and are not regulated in as comprehensive a manner as traditional securities exchanges. As a result, trading on these markets is likely more subject to manipulation than on securities markets regulated by the SEC, and pricing on these markets is likely affected by such manipulative activity. In addition to these platforms, over-the-counter markets and

derivatives markets for bitcoin also exist; however, these markets are still maturing and many are unregulated.

Bitcoin exists entirely in electronic form, as virtually irreversible public transaction ledger entries on the blockchain, and transactions in bitcoin are recorded and authenticated not by a central repository, but by a decentralized peer-to-peer network. This decentralization avoids certain threats common to centralized computer networks, such as denial of service attacks, and reduces the dependency of the bitcoin network on any single system. While the bitcoin network as a whole is decentralized, the private keys used to access bitcoin balances are not widely distributed and are held on hardware (which can be physically controlled by the holder or by a third party such as a custodian) or via software programs on third-party servers and loss of such private keys results in an inability to access, and effective loss of, the corresponding bitcoin. Consequently, bitcoin holdings are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure, and user error, among others. These risks, in turn, make bitcoin subject to theft, destruction, or loss of value from hackers, corruption, or technology-specific factors such as viruses that do not affect conventional fiat currency. In addition, the bitcoin network relies on open source developers to maintain and improve the bitcoin protocol. Accordingly, bitcoin may be subject to protocol design changes, governance disputes such as "forked" protocols, competing protocols, and other open source-specific risks that do not affect conventional proprietary software.

8

Distributed blockchain technology is a decentralized and encrypted ledger that is designed to offer a secure, efficient, verifiable, and permanent way of storing records and other information without the need for intermediaries. Cryptocurrencies serve multiple purposes. They can serve as a medium of exchange, store of value or unit of account. Examples of cryptocurrencies include: bitcoin, bitcoin cash, and litecoin. Blockchain technologies are being evaluated for a multitude of industries due to the belief in their ability to have a significant impact in many areas of business, finance, information management, and governance.

Cryptocurrencies are decentralized currencies that enable near instantaneous transfers. Transactions occur via an open source, cryptographic protocol platform which uses peer-to-peer technology to operate with no central authority. The online network hosts the public transaction ledger, known as the blockchain, and each cryptocurrency is associated with a source code that comprises the basis for the cryptographic and algorithmic protocols governing the blockchain. In a cryptocurrency network, every peer has its own copy of the blockchain, which contains records of every historical transaction - effectively containing records of all account balances. Each account is identified solely by its unique public key (making it effectively anonymous) and is secured with its associated private key (kept secret, like a password). The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.

No single entity owns or operates the network. The infrastructure is collectively maintained by a decentralized public user base. As the network is decentralized, it does not rely on either governmental authorities or financial institutions to create, transmit or determine the value of the currency units. Rather, the value is determined by market factors, supply and demand for the units, the prices being set in transfers by mutual agreement or barter among transacting parties, as well as the number of merchants that may accept the cryptocurrency. Since transfers do not require involvement of intermediaries or third parties, there are currently little to no transaction costs in direct peer-to-peer transactions. Units of cryptocurrency can be converted to fiat currencies, such as the US dollar, at rates determined on various exchanges, such as Cumberland, Coinsquare (in Canada), Coinbase, Bitsquare, Bitstamp, and others. Cryptocurrency prices are quoted on various exchanges and fluctuate with extreme volatility.

We believe cryptocurrencies offer many advantages over traditional, fiat currencies, although many of these factors also present potential disadvantages and may introduce additional risks, including:

- acting as a fraud deterrent, as cryptocurrencies are digital and cannot be counterfeited or reversed arbitrarily by a sender;
- immediate settlement;
- elimination of counterparty risk;
- no trusted intermediary required;
- lower fees;
- identity theft prevention;
- accessible by everyone;
- transactions are verified and protected through a confirmation process, which prevents the problem of double spending;
- decentralized – no central authority (government or financial institution); and
- recognized universally and not bound by government imposed or market exchange rates.

9

However, cryptocurrencies may not provide all of the benefits they purport to offer at all or at any time.

Bitcoin was first introduced in 2008 and was first introduced as a means of exchange in 2009. Bitcoin is a consensus network that enables a new payment system and a completely new form of digital money. It is the first decentralized peer-to-peer payment network that is powered by its users with no central authority or middlemen. From a user perspective, we believe bitcoin can be viewed as cash for the Internet. The bitcoin network shares a public ledger called the "blockchain." This ledger contains every transaction ever processed, allowing a user's computer to verify the validity of each transaction. The authenticity of each transaction is protected by digital signatures corresponding to the sending addresses, allowing all users to have full control over sending bitcoins currency rewards from their own bitcoin addresses. In addition, anyone can process transactions using the computing power of specialized hardware and earn a reward in bitcoins for this service. This process is often called "mining."

As with many new and emerging technologies, there are potentially significant risks. Businesses (including the Company) which are seeking to develop, promote, adopt, transact or rely upon blockchain technologies and cryptocurrencies have a limited track record and operate within an untested new environment. These risks are not only related to the businesses the Company pursues, but the sector and industry as a whole, as well as the entirety of the concept behind blockchain and cryptocurrency as value. Factors such as access to computer processing capacity, interconnectivity, electricity cost, environmental factors (such as cooling capacity) and location play an important role in "mining," which is the term for using the specialized computers in connection with the blockchain for the creation of new units of cryptocurrency.

**Mathematically Controlled Supply**

The method for creating new bitcoins is mathematically controlled in a manner so that the supply of bitcoins grows at a limited rate pursuant to a pre-set schedule. The number of bitcoins awarded for solving a new block is automatically halved every 210,000 blocks. Thus, the current fixed reward for solving a new block is 12.5 bitcoins per block and the reward decreased by half to become 6.25 bitcoins around May 10, 2020, which is the current reward (based on estimates of the rate of block solution calculated by BitcoinClock.com). This deliberately controlled rate of bitcoin creation means that the number of bitcoins in existence will never exceed 21 million and that bitcoins cannot be devalued through excessive production unless the Bitcoin Network's source code (and the underlying protocol for bitcoin issuance) is altered. The Company monitors the Blockchain network and, as of December 9, 2020, based on the information we collected from our network access, more than 18.45 million bitcoins have been mined.

**Digital Asset Mining**

171

We intend to power and secure blockchains by verifying blockchain transactions using custom hardware and software. We are currently using our hardware to mine bitcoin ("BTC") and expect to mine BTC, and potentially other cryptocurrencies. Bitcoin relies on different technologies based on the blockchain. Wherein bitcoin is a digital currency, we will be compensated in BTC based on the mining transactions we perform, which is how we will earn revenue.

Blockchains are decentralized digital ledgers that record and enable secure peer-to-peer transactions without third party intermediaries. Blockchains enable the existence of digital assets by allowing participants to confirm transactions without the need for a central certifying authority. When a participant requests a transaction, a peer-to-peer network consisting of computers, known as nodes, validate the transaction and the user's status using known algorithms. After the transaction is verified, it is combined with other transactions to create a new block of data for the ledger. The new block is added to the existing blockchain in a way that is permanent and unalterable, and the transaction is complete.

Digital assets (also known as cryptocurrency) are a medium of exchange that uses encryption techniques to control the creation of monetary units and to verify the transfer of funds. Many consumers use digital assets because it offers cheaper and faster peer-to-peer payment options without the need to provide personal details. Every single transaction and the ownership of every single digital asset in circulation is recorded in the blockchain. Miners use powerful computers that tally the transactions to run the blockchain. These miners update each time a transaction is made and ensure the authenticity of information. The miners receive a transaction fee for their service in the form of a portion of the new digital "coins" that are issued.

10

*Performance Metrics – Hashing*

We operate mining hardware which performs computational operations in support of the blockchain measured in "hash rate" or "hashes per second." A "hash" is the computation run by mining hardware in support of the blockchain; therefore, a miner's "hash rate" refers to the rate at which it is capable of solving such computations. The original equipment used for mining bitcoin utilized the Central Processing Unit (CPU) of a computer to mine various forms of cryptocurrency. Due to performance limitations, CPU mining was rapidly replaced by the Graphics Processing Unit (GPU), which offers significant performance advantages over CPUs. General purpose chipsets like CPUs and GPUs have since been replaced in the mining industry by Application Specific Integrated Circuits (ASIC) chips. These ASIC chips are designed specifically to maximize the rate of hashing operations.

We measure our mining performance and competitive position based on overall hash rate being produced in our mining sites. The latest equipment utilized in our mining operation performs in the range of approximately 86 – 110 terahash per second (TH/s) per unit. This mining hardware is on the cutting edge of available mining equipment and we believe our acquisition of our units places us among leaders of publicly-traded cryptocurrency miners; however, advances and improvements to the technology are ongoing and may be available in quantities to the market in the near future which may affect our perceived position. We believe that our current inventory of miners establishes us among the top public companies in the United States mining cryptocurrency.

## Government Regulation

Government regulation of blockchain and cryptocurrency is being actively considered by the United States federal government via a number of agencies and regulatory bodies, as well as similar entities in other countries. State government regulations also may apply to our activities and other activities in which we participate or may participate in the future. Other regulatory bodies are governmental or semi-governmental and have shown an interest in regulating or investigating companies engaged in the blockchain or cryptocurrency business.

Businesses that are engaged in the transmission and custody of bitcoin and other digital assets, including brokers and custodians, can be subject to U.S. Treasury Department regulations as money services businesses as well as state money transmitter licensing requirements. Bitcoin and other digital assets are subject to anti-fraud regulations under federal and state commodity laws, and digital asset derivative instruments are substantively regulated by the U.S. Commodity Futures Trading Commission. Certain jurisdictions, including, among others, New York and a number of countries outside the United States, have developed regulatory requirements specifically for digital assets and companies that transact in them.

Regulations may substantially change in the future and it is presently not possible to know how regulations will apply to our businesses, or when they will be effective. As the regulatory and legal environment evolves, we may become subject to new laws, further regulation by the SEC and other agencies, which may affect our mining and other activities. For instance, various bills have also been proposed in Congress related to our business, which may be adopted and have an impact on us. For additional discussion regarding our belief about the potential risks existing and future regulation pose to our business, see the Section entitled "Risk Factors" herein.

In addition, since transactions in bitcoin provide a reasonable degree of pseudo anonymity, they are susceptible to misuse for criminal activities, such as money laundering. This misuse, or the perception of such misuse (even if untrue), could lead to greater regulatory oversight of bitcoin platforms, and there is the possibility that law enforcement agencies could close bitcoin platforms or other bitcoin-related infrastructure with little or no notice and prevent users from accessing or retrieving bitcoin held via such platforms or infrastructure. For example, in her January 2021 nomination hearing before the Senate Finance Committee, Treasury Secretary Janet Yellen noted that cryptocurrencies have the potential to improve the efficiency of the financial system but that they can be used to finance terrorism, facilitate money laundering, and support malign activities that threaten U.S. national security interests and the integrity of the U.S. and international financial systems. Accordingly, Secretary Yellen expressed her view that federal regulators needed to look closely at how to encourage the use of cryptocurrencies for legitimate activities while curtailing their use for malign and illegal activities. Furthermore, in December 2020, the Financial Crimes Enforcement Network ("FinCEN"), a unit of the Treasury Department focused on money laundering, proposed a new set of rules for cryptocurrency-based exchanges aimed at reducing the use of cryptocurrencies for money laundering. These proposed rules would require filing reports with FinCEN regarding cryptocurrency transactions in excess of $10,000 and also impose record-keeping requirements for cryptocurrency transactions in excess of $3,000 involving users who manage their own private keys. In January 2021, the Biden Administration issued a memorandum freezing federal rulemaking, including these proposed FinCEN rules, to provide additional time for the Biden Administration to review the rulemaking that had been proposed by the Trump Administration. As a result, it remains unclear whether these proposed rules will take effect.

11

## Intellectual Property

We actively use specific hardware and software for our cryptocurrency mining operation. In certain cases, source code and other software assets may be subject to an open source license, as much technology development underway in this sector is open source. For these works, we intend to adhere to the terms of any license agreements that may be in place.

We do not currently own, and do not have any current plans to seek, any patents in connection with our existing and planned blockchain and cryptocurrency related operations. We do expect to rely upon trade secrets, trademarks, service marks, trade names, copyrights and other intellectual property rights and expect to license the use of intellectual property rights owned and controlled by others. In addition, we have developed and may further develop certain proprietary software applications for purposes of our cryptocurrency mining operation.

## Competition

In cryptocurrency mining, companies, individuals and groups generate units of cryptocurrency through mining. Miners can range from individual

enthusiasts to professional mining operations with dedicated data centers. Miners may organize themselves in mining pools. The Company competes or may in the future compete with other companies that focus all or a portion of their activities on owning or operating cryptocurrency exchanges, developing programming for the blockchain, and mining activities. At present, the information concerning the activities of these enterprises is not readily available as the vast majority of the participants in this sector do not publish information publicly or the information may be unreliable. Published sources of information include "bitcoin.org" and "blockchain.info"; however, the reliability of that information and its continued availability cannot be assured.

Several public companies (traded in the U.S. and Internationally), such as the following, may be considered to compete with us, although we believe there is no company, including the following, which engages in the same scope of activities as we do.

- Overstock.com Inc.
- Bitcoin Investment Trust
- Blockchain Industries, Inc. (formerly Omni Global Technologies, Inc.)
- Bitfarms Technologies Ltd. (formerly Blockchain Mining Ltd)
- DMG Blockchain Solutions Inc.
- Digihost International, Inc.
- Hive Blockchain Technologies Inc.

12

- Hut 8 Mining Corp.
- HashChain Technology, Inc.
- MGT Capital Investments, Inc.
- DPW Holdings, Inc.
- Layer1 Technologies, LLC
- Northern Data AG
- Riot Blockchain

While there is limited available information regarding our non-public competitors, we believe that our recent acquisition and deployment of miners (as discussed further above) positions us well among the publicly traded companies involved in the cryptocurrency mining industry. The cryptocurrency industry is a highly competitive and evolving industry and new competitors and/or emerging technologies could enter the market and affect our competitiveness in the future.

### Employees

As of March 12, 2021, we had 3 full-time employees. We believe our employee relations to be good.

### *Accounting for Digital Currencies*

The lack of U.S. Generally Accepted Accounting Principles (U.S. GAAP) instruction regarding the proper accounting treatment of digital currency assets has created uncertainty regarding the reporting and proper asset classification of digital currency holdings. Management intends to exercise its business judgment in determining appropriate accounting treatment for the recognition of revenue from mining of digital currencies. Management, in conjunction with its outside public accountants and its auditors, has examined various factors surrounding the substance of the Company's operations and the available guidance published for public company accounting practices in Accounting Standards Codification.

The Company intends to account for its digital currency assets as indefinite life intangible assets. An intangible asset with an indefinite useful life is not amortized, but rather is assessed for impairment annually, or more frequently, when events or changes in circumstances occur which indicate that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company will have the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted. Realized gain or loss on the sale of digital currencies is included in other income or expenses in the Company's statements of operations.

### ITEM 1A. RISK FACTORS

*The combined organization will be faced with a market environment that cannot be predicted and that involves significant risks, many of which will be beyond its control. In addition to the other information contained in this Annual Report on Form 10-K, you should carefully consider the material risks described below before investing in our securities. If any of the following risks actually occur, our business, results of operations and financial condition would likely suffer. In these circumstances, the market price of our common stock could decline, and you may lose all or part of your investment.*

13

### *We may be classified as an inadvertent investment company*.

We are not engaged in the business of investing, reinvesting, or trading in securities, and we do not hold ourselves out as being engaged in those activities. Under the Investment Company Act of 1940, as amended (the "1940 Act"), however, a company may be deemed an investment company under Section 3(a)(1)(C) of the 1940 Act if the value of its investment securities is more than 40% of its total assets (exclusive of government securities and cash items) on a consolidated basis.

We have commenced digital asset mining, the outputs of which are cryptocurrencies, which may be deemed a security. In the event that the digital assets held by us exceed 40% of our total assets, exclusive of cash, we inadvertently become an investment company. An inadvertent investment company can avoid being classified as an investment company if it can rely on one of the exclusions under the 1940 Act. One such exclusion, Rule 3a-2 under the 1940 Act, allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which an issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis and (b) the date on which an issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of government securities and cash items) on an unconsolidated basis. We are putting in place policies that we expect will work to keep the investment securities held by us at less than 40% of our total assets, which may include acquiring assets with our cash, liquidating our investment securities or seeking a no-action letter from the SEC if we are unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner.

As Rule 3a-2 is available to a company no more than once every three years, and assuming no other exclusion were available to us, we would have to keep within the 40% limit for at least three years after we cease being an inadvertent investment company. This may limit our ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on our earnings. In any event, we do not intend to become an investment company engaged in the business of investing and trading securities.

Classification as an investment company under the 1940 Act requires registration with the SEC. If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable. Registration is time consuming and restrictive and would require a restructuring of our operations, and we would be very constrained in the kind of business we could do as a registered investment company.

173

Further, we would become subject to substantial regulation concerning management, operations, transactions with affiliated persons and portfolio composition, and would need to file reports under the 1940 Act regime. The cost of such compliance would result in the Company incurring substantial additional expenses, and the failure to register if required would have a materially adverse impact to conduct our operations.

***Failure to effectively manage our growth could place strains on our managerial, operational and financial resources and could adversely affect our business and operating results.***

Our growth has placed, and is expected to continue to place, a strain on our limited managerial, operational and financial resources and systems. Further, as our subsidiary companies' businesses grow, we will be required to continue to manage multiple relationships. Any further growth by us or our subsidiary companies, or an increase in the number of our strategic relationships, may place additional strain on our managerial, operational and financial resources and systems. Although we may not grow as we expect, if we fail to manage our growth effectively or to develop and expand our managerial, operational and financial resources and systems, our business and financial results would be materially harmed.

***Digital Assets such as bitcoin are likely to be regulated as securities or investment securities.***

Bitcoin is the oldest and most well-known form of digital asset. Bitcoin and other forms of digital assets/cryptocurrencies have been the source of much regulatory consternation, resulting in differing definitional outcomes without a single unifying statement. When the interests of investor protection are paramount, for example in the offer or sale of Initial Coin Offering ("ICO") tokens, the SEC has no difficulty determining that the token offerings are securities under the "Howey" test as stated by the United States Supreme Court, a conclusion with which Marathon agrees. As such, ICO offerings would require registration under the Securities Act or an available exemption therefrom for offers or sales in the United States to be lawful. Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Although we do not believe our mining activities require registration for us to conduct such activities and accumulate digital assets the SEC, CFTC, Nasdaq or other governmental or quasi-governmental agency or organization may conclude that our activities involve the offer or sale of "securities", or ownership of "investment securities", and we may face regulation under the Securities Act or the 1940 Act. Such regulation or the inability to meet the requirements to continue operations, would have a material adverse effect on our business and operations.

14

***The further development and acceptance of digital asset networks and other digital assets, which represent a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of digital asset systems may adversely affect an investment in us.***

Digital assets such as bitcoins, that may be used, among other things, to buy and sell goods and services are a new and rapidly evolving industry of which the digital asset networks are prominent, but not unique, parts. The growth of the digital asset industry in general, and the digital asset networks of bitcoin in particular, are subject to a high degree of uncertainty. The factors affecting the further development of the digital asset industry, as well as the digital asset networks, include:

- continued worldwide growth in the adoption and use of bitcoins and other digital assets;
- government and quasi-government regulation of bitcoins and other digital assets and their use, or restrictions on or regulation of access to and operation of the digital asset network or similar digital assets systems;
- the maintenance and development of the open-source software protocol of the bitcoin network;
- changes in consumer demographics and public tastes and preferences;
- the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;
- general economic conditions and the regulatory environment relating to digital assets; and
- the impact of regulators focusing on digital assets and digital securities and the costs associated with such regulatory oversight.
- A decline in the popularity or acceptance of the digital asset networks of bitcoin, or similar digital asset systems, could adversely affect an investment in us.

***If we acquire digital securities, even unintentionally, we may violate the Investment Company Act of 1940 and incur potential third-party liabilities.***

The Company intends to comply with the 1940 Act in all respects. To that end, if holdings of cryptocurrencies are determined to constitute investment securities of a kind that subject the Company to registration and reporting under the 1940 Act, the Company will limit its holdings to less than 40% of its assets. Section 3(a)(1)(C) of the 1940 Act defines "investment company" to mean any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. Section 3(a)(2) of the 1940 Act defines "investment securities" to include all securities except (A) Government securities, (B) securities issued by employees' securities companies, and (C) securities issued by majority-owned subsidiaries which (i) are not investment companies and (ii) are not relying on the exception from the definition of investment company in section 3(c)(1) or 3(c)(7) of the 1940 Act. As noted above, the SEC has not stated whether bitcoin and cryptocurrency is an investment security, as defined in the 1940 Act.

15

***COVID-19 or any pandemic, epidemic or outbreak of an infectious disease in the United States or elsewhere may adversely affect our business.***

The COVID-19 virus has had unpredictable and unprecedented impacts in the United States and around the world. The World Health Organization has declared the outbreak of COVID-19 as a "pandemic," or a worldwide spread of a new disease. Many countries around the world have imposed quarantines and restrictions on travel and mass gatherings to slow the spread of the virus. In the United States, federal, state and local governments have enacted restrictions on travel, gatherings, and workplaces, with exceptions made for essential workers and businesses. As of the date of this prospectus, we have not been declared an essential business. As a result, we may be required to substantially reduce or cease operations in response to governmental action or decree as a result of COVID-19. We are still assessing the effect on our business from COVID-19 and any actions implemented by the federal, state and local governments. We have implemented safety protocols to protect our staff, but we cannot offer any assurance that COVID-19 or any other pandemic, epidemic or outbreak of an infectious disease in the United States or elsewhere, will not materially and adversely affect our business.

***Significant contributors to all or any digital asset network could propose amendments to the respective network's protocols and software that, if accepted and authorized by such network, could adversely affect an investment in us.***

For example, with respect to bitcoins network, a small group of individuals contribute to the Bitcoin Core project on GitHub.com. This group of contributors is currently headed by Wladimir J. van der Laan, the current lead maintainer. These individuals can propose refinements or improvements to the bitcoin network's source code through one or more software upgrades that alter the protocols and software that govern the bitcoin network and the properties of bitcoin, including the irreversibility of transactions and limitations on the mining of new bitcoin. Proposals for upgrades and discussions relating thereto take place on online forums. For example, there is an ongoing debate regarding altering the blockchain by increasing the size of blocks to accommodate a larger volume of transactions. Although some proponents support an increase, other market

participants oppose an increase to the block size as it may deter miners from confirming transactions and concentrate power into a smaller group of miners. To the extent that a significant majority of the users and miners on the bitcoin network install such software upgrade(s), the bitcoin network would be subject to new protocols and software that may adversely affect an investment in the Shares. In the event a developer or group of developers proposes a modification to the bitcoin network that is not accepted by a majority of miners and users, but that is nonetheless accepted by a substantial plurality of miners and users, two or more competing and incompatible blockchain implementations could result. This is known as a "hard fork." In such a case, the "hard fork" in the blockchain could materially and adversely affect the perceived value of digital assets as reflected on one or both incompatible blockchains, which may adversely affect an investment in us.

***The open-source structure of the bitcoin network protocol means that the contributors to the protocol are generally not directly compensated for their contributions in maintaining and developing the protocol. A failure to properly monitor and upgrade the protocol could damage the bitcoin network and an investment in us.***

The bitcoin network for example operates based on an open-source protocol maintained by contributors, largely on the Bitcoin Core project on GitHub. As an open source project, bitcoin is not represented by an official organization or authority. As the bitcoin network protocol is not sold and its use does not generate revenues for contributors, contributors are generally not compensated for maintaining and updating the bitcoin network protocol. Although the MIT Media Lab's Digital Currency Initiative funds the current maintainer Wladimir J. van der Laan, among others, this type of financial incentive is not typical. The lack of guaranteed financial incentive for contributors to maintain or develop the bitcoin network and the lack of guaranteed resources to adequately address emerging issues with the bitcoin network may reduce incentives to address the issues adequately or in a timely manner. Changes to a digital asset network which we are mining on may adversely affect an investment in us.

16

***If a malicious actor or botnet obtains control in excess of 50% of the processing power active on any digital asset network, including the bitcoin network, it is possible that such actor or botnet could manipulate the blockchain in a manner that adversely affects an investment in us.***

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on any digital asset network, including the bitcoin network, it may be able to alter the blockchain by constructing alternate blocks if it is able to solve for such blocks faster than the remainder of the miners on the blockchain can add valid blocks. In such alternate blocks, the malicious actor or botnet could control, exclude or modify the ordering of transactions, though it could not generate new digital assets or transactions using such control. Using alternate blocks, the malicious actor could "double-spend" its own digital assets (i.e., spend the same digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintains control. To the extent that such malicious actor or botnet does not yield its majority control of the processing power or the digital asset community does not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible. Such changes could adversely affect an investment in us.

The approach towards and possible crossing of the 50% threshold indicate a greater risk that a single mining pool could exert authority over the validation of digital asset transactions. To the extent that the digital assets ecosystems do not act to ensure greater decentralization of digital asset mining processing power, the feasibility of a malicious actor obtaining in excess of 50% of the processing power on any digital asset network (e.g., through control of a large mining pool or through hacking such a mining pool) will increase, which may adversely impact an investment in us.

***If the award of digital assets for solving blocks and transaction fees for recording transactions are not sufficiently high to incentivize miners, miners may cease expending hashrate to solve blocks and confirmations of transactions on the blockchain could be slowed temporarily. A reduction in the hashrate expended by miners on any digital asset network could increase the likelihood of a malicious actor obtaining control in excess of fifty percent (50%) of the aggregate hashrate active on such network or the blockchain, potentially permitting such actor to manipulate the blockchain in a manner that adversely affects an investment in us.***

Bitcoin miners record transactions when they solve for and add blocks of information to the blockchain. When a miner solves for a block, it creates that block, which includes data relating to (i) the solution to the block, (ii) a reference to the prior block in the blockchain to which the new block is being added and (iii) all transactions that have occurred but have not yet been added to the blockchain. The miner becomes aware of outstanding, unrecorded transactions through the data packet transmission and propagation discussed above. Typically, bitcoin transactions will be recorded in the next chronological block if the spending party has an internet connection and at least one minute has passed between the transaction's data packet transmission and the solution of the next block. If a transaction is not recorded in the next chronological block, it is usually recorded in the next block thereafter.

As the award of new digital assets for solving blocks declines, and if transaction fees are not sufficiently high, miners may not have an adequate incentive to continue mining and may cease their mining operations. For example, the current fixed reward on the bitcoin network for solving a new block is twelve and a half (12.5) bitcoins per block; the reward decreased from twenty-five (25) bitcoin in July 2016. It is estimated that it will halve again in about four (4) years. This reduction may result in a reduction in the aggregate hashrate of the bitcoin network as the incentive for miners will decrease. Moreover, miners ceasing operations would reduce the aggregate hashrate on the bitcoin network, which would adversely affect the confirmation process for transactions (i.e., temporarily decreasing the speed at which blocks are added to the blockchain until the next scheduled adjustment in difficulty for block solutions) and make the bitcoin network more vulnerable to a malicious actor obtaining control in excess of fifty percent (50%) of the aggregate hashrate on the bitcoin network. Periodically, the bitcoin network has adjusted the difficulty for block solutions so that solution speeds remain in the vicinity of the expected ten (10) minute confirmation time targeted by the bitcoin network protocol.

Marathon believes that from time to time there will be further considerations and adjustments to the bitcoin network, and others regarding the difficulty for block solutions. More significant reductions in aggregate hashrate on digital asset networks could result in material, though temporary, delays in block solution confirmation time. Any reduction in confidence in the confirmation process or aggregate hashrate of any digital asset network may negatively impact the value of digital assets, which will adversely impact an investment in us.

17

***To the extent that the profit margins of digital asset mining operations are not high, operators of digital asset mining operations are more likely to immediately sell their digital assets earned by mining in the digital asset exchange market, resulting in a reduction in the price of digital assets that could adversely impact an investment in us.***

Over the past two years, digital asset mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation servers. Currently, new processing power brought onto the digital asset networks is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated machines. They require the investment of significant capital for the acquisition of this hardware, the leasing of operating space (often in data centers or warehousing facilities), incurring of electricity costs and the employment of technicians to operate the mining farms. As a result, professionalized mining operations are of a greater scale than prior miners and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to more immediately sell digital assets earned from mining operations on the digital asset exchange market, whereas it is believed that individual miners in past years were more likely to hold newly mined digital assets for more extended periods. The immediate selling of newly mined digital assets greatly increases the supply of digital assets on the digital asset exchange market, creating downward pressure on the price of each digital asset.

175

The extent to which the value of digital assets mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined digital assets rapidly if it is operating at a low profit margin—and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold into the digital asset exchange market more rapidly, thereby potentially reducing digital asset prices. Lower digital asset prices could result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a network effect that may further reduce the price of digital assets until mining operations with higher operating costs become unprofitable and remove mining power from the respective digital asset network. The network effect of reduced profit margins resulting in greater sales of newly mined digital assets could result in a reduction in the price of digital assets that could adversely impact an investment in us.

***To the extent that any miners cease to record transactions in solved blocks, transactions that do not include the payment of a transaction fee will not be recorded on the blockchain until a block is solved by a miner who does not require the payment of transaction fees. Any widespread delays in the recording of transactions could result in a loss of confidence in that digital asset network, which could adversely impact an investment in us.***

To the extent that any miners cease to record transaction in solved blocks, such transactions will not be recorded on the blockchain. Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (e.g., a collective movement among miners or one or more mining pools forcing bitcoin users to pay transaction fees as a substitute for or in addition to the award of new bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the blockchain. Any systemic delays in the recording and confirmation of transactions on the blockchain could result in greater exposure to double-spending transactions and a loss of confidence in certain or all digital asset networks, which could adversely impact an investment in us.

18

***The acceptance of digital asset network software patches or upgrades by a significant, but not overwhelming, percentage of the users and miners in any digital asset network could result in a "fork" in the respective blockchain, resulting in the operation of two separate networks until such time as the forked blockchains are merged. The temporary or permanent existence of forked blockchains could adversely impact an investment in us.***

Digital asset networks are open source projects and, although there is an influential group of leaders in, for example, the bitcoin network community known as the "Core Developers," there is no official developer or group of developers that formally controls the bitcoin network. Any individual can download the bitcoin network software and make any desired modifications, which are proposed to users and miners on the bitcoin network through software downloads and upgrades, typically posted to the bitcoin development forum on GitHub.com. A substantial majority of miners and bitcoin users must consent to those software modifications by downloading the altered software or upgrade that implements the changes; otherwise, the changes do not become a part of the bitcoin network. Since the bitcoin network's inception, changes to the bitcoin network have been accepted by the vast majority of users and miners, ensuring that the bitcoin network remains a coherent economic system; however, a developer or group of developers could potentially propose a modification to the bitcoin network that is not accepted by a vast majority of miners and users, but that is nonetheless accepted by a substantial population of participants in the bitcoin network. In such a case, and if the modification is material and/or not backwards compatible with the prior version of bitcoin network software, a fork in the blockchain could develop and two separate bitcoin networks could result, one running the pre-modification software program and the other running the modified version (i.e., a second "bitcoin" network). Such a fork in the blockchain typically would be addressed by community-led efforts to merge the forked blockchains, and several prior forks have been so merged. This kind of split in the bitcoin network could materially and adversely impact an investment in us and, in the worst-case scenario, harm the sustainability of the bitcoin network's economy.

***Intellectual property rights claims may adversely affect the operation of some or all digital asset networks.***

Third parties may assert intellectual property claims relating to the holding and transfer of digital assets and their source code. Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in some or all digital asset networks' long-term viability or the ability of end-users to hold and transfer digital assets may adversely affect an investment in us. Additionally, a meritorious intellectual property claim could prevent us and other end-users from accessing some or all digital asset networks or holding or transferring their digital assets. As a result, an intellectual property claim against us or other large digital asset network participants could adversely affect an investment in us.

***The digital asset exchanges on which digital assets trade are relatively new and, in most cases, largely unregulated and may therefore be more exposed to fraud and failure than established, regulated exchanges for other products. To the extent that the digital asset exchanges representing a substantial portion of the volume in digital asset trading are involved in fraud or experience security failures or other operational issues, such digital asset exchanges' failures may result in a reduction in the price of some or all digital assets and can adversely affect an investment in us.***

The digital asset exchanges on which the digital assets trade are new and, in most cases, largely unregulated. Furthermore, many digital asset exchanges (including several of the most prominent USD denominated digital asset exchanges) do not provide the public with significant information regarding their ownership structure, management teams, corporate practices or regulatory compliance. As a result, the marketplace may lose confidence in, or may experience problems relating to, digital asset exchanges, including prominent exchanges handling a significant portion of the volume of digital asset trading.

A lack of stability in the digital asset exchange market and the closure or temporary shutdown of digital asset exchanges due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in the digital asset networks and result in greater volatility in digital asset values. These potential consequences of a digital asset exchange's failure could adversely affect an investment in us.

***Political or economic crises may motivate large-scale sales of digital assets, which could result in a reduction in some or all digital assets' values and adversely affect an investment in us.***

As an alternative to fiat currencies that are backed by central governments, digital assets such as bitcoins, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of digital assets either globally or locally. Large-scale sales of digital assets would result in a reduction in their value and could adversely affect an investment in us.

19

***Our ability to adopt technology in response to changing security needs or trends poses a challenge to the safekeeping of our digital assets.***

The history of digital asset exchanges has shown that exchanges and large holders of digital assets must adapt to technological change in order to secure and safeguard their digital assets. We rely on Bitgo Inc.'s multi-signature enterprise storage solution to safeguard our digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. Our digital assets will also be moved to various exchanges in

order to exchange them for fiat currency during which time we will be relying on the security of such exchanges to safeguard our digital assets. We believe that it may become a more appealing target of security threats as the size of our bitcoin holdings grow. To the extent that either Bitgo Inc. or we are unable to identify and mitigate or stop new security threats, our digital assets may be subject to theft, loss, destruction or other attack, which could adversely affect an investment in us.

***Security threats to us could result in, a loss of our digital assets, or damage to the reputation and our brand, each of which could adversely affect an investment in us.***

Security breaches, computer malware and computer hacking attacks have been a prevalent concern in the digital asset exchange markets, for example since the launch of the bitcoin network. Any security breach caused by hacking, which involves efforts to gain unauthorized access to information or systems, or to cause intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, and the inadvertent transmission of computer viruses, could harm our business operations or result in loss of our digital assets. Any breach of our infrastructure could result in damage to our reputation which could adversely affect an investment in us. Furthermore, we believe that, as our assets grow, it may become a more appealing target for security threats such as hackers and malware.

We primarily rely on Bitgo Inc.'s (https://www.bitgo.com/) multi-signature enterprise storage solution to safeguard its digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. Nevertheless, Bitgo Inc.'s security system may not be impenetrable and may not be free from defect or immune to acts of God, and any loss due to a security breach, software defect or act of God will be borne by the Company. The Company's digital assets will also be stored with exchanges such as Bitgo, Kraken, Bitfinex, Itbit and Coinbase and others prior to selling them.

The security system and operational infrastructure may be breached due to the actions of outside parties, error or malfeasance of an employee of ours, or otherwise, and, as a result, an unauthorized party may obtain access to our, private keys, data or bitcoins. Additionally, outside parties may attempt to fraudulently induce employees of ours to disclose sensitive information in order to gain access to our infrastructure. As the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently, or may be designed to remain dormant until a predetermined event and often are not recognized until launched against a target, we may be unable to anticipate these techniques or implement adequate preventative measures. If an actual or perceived breach of our security system occurs, the market perception of the effectiveness of our security system could be harmed, which could adversely affect an investment in us.

In the event of a security breach, we may be forced to cease operations, or suffer a reduction in assets, the occurrence of each of which could adversely affect an investment in us.

***A loss of confidence in our security system, or a breach of our security system, may adversely affect us and the value of an investment in us.***

We will take measures to protect us and our digital assets from unauthorized access, damage or theft; however, it is possible that the security system may not prevent the improper access to, or damage or theft of our digital assets. A security breach could harm our reputation or result in the loss of some or all of our digital assets. A resulting perception that our measures do not adequately protect our digital assets could result in a loss of current or potential shareholders, reducing demand for our Common Stock and causing our shares to decrease in value.

20

***Digital Asset transactions are irrevocable and stolen or incorrectly transferred digital assets may be irretrievable. As a result, any incorrectly executed digital asset transactions could adversely affect an investment in us.***

Digital asset transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction or, in theory, control or consent of a majority of the processing power on the respective digital asset network. Once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer of digital assets or a theft of digital assets generally will not be reversible, and we may not be capable of seeking compensation for any such transfer or theft. Although our transfers of digital assets will regularly be made to or from vendors, consultants, services providers, etc. it is possible that, through computer or human error, or through theft or criminal action, our digital assets could be transferred from us in incorrect amounts or to unauthorized third parties. To the extent that we are unable to seek a corrective transaction with such third party or are incapable of identifying the third party which has received our digital assets through error or theft, we will be unable to revert or otherwise recover incorrectly transferred Company digital assets. To the extent that we are unable to seek redress for such error or theft, such loss could adversely affect an investment in us.

[5] https://www.bitgo.com/

***The limited rights of legal recourse against us, and our lack of insurance protection expose us and our shareholders to the risk of loss of our digital assets for which no person is liable.***

The digital assets held by us are not insured. Therefore, a loss may be suffered with respect to our digital assets which is not covered by insurance and for which no person is liable in damages which could adversely affect our operations and, consequently, an investment in us.

***Digital assets held by us are not subject to FDIC or SIPC protections.***

We do not hold our digital assets with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC") and, therefore, our digital assets are not subject to the protections enjoyed by depositors with FDIC or SIPC member institutions.

***We may not have adequate sources of recovery if our digital assets are lost, stolen or destroyed.***

If our digital assets are lost, stolen or destroyed under circumstances rendering a party liable to us, the responsible party may not have the financial resources sufficient to satisfy our claim. For example, as to a particular event of loss, the only source of recovery for us might be limited, to the extent identifiable, other responsible third parties (e.g., a thief or terrorist), any of which may not have the financial resources (including liability insurance coverage) to satisfy a valid claim of ours.

***The sale of our digital assets to pay expenses at a time of low digital asset prices could adversely affect an investment in us.***

We may sell our digital assets to pay expenses on an as-needed basis, irrespective of then-current prices. Consequently, our digital assets may be sold at a time when the prices on the respective digital asset exchange market are low, which could adversely affect an investment in us.

21

***Regulatory changes or actions may restrict the use of bitcoins or the operation of the bitcoin network in a manner that adversely affects an investment in us.***

Until recently, little or no regulatory attention has been directed toward bitcoin and the bitcoin network by U.S. federal and state governments, foreign governments and self-regulatory agencies. As bitcoin has grown in popularity and in market size, the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., the CFTC, the Commission, FinCEN and the Federal Bureau of Investigation) have begun to examine the operations of the bitcoin network, bitcoin users and the bitcoin exchange market.

Digital assets currently face an uncertain regulatory landscape in not only the United States but also in many foreign jurisdictions such as the European Union, China and Russia. While certain governments such as Germany, where the Ministry of Finance has declared bitcoin to be "*Rechnungseinheiten*" (a form of private money that is recognized as a unit of account, but not recognized in the same manner as fiat currency), have issued guidance as to how to treat bitcoin, most regulatory bodies have not yet issued official statements regarding intention to regulate or

determinations on regulation of bitcoin, the bitcoin network and bitcoin users.

The effect of any future regulatory change on us, bitcoins, or other digital assets is impossible to predict, but such change could be substantial and adverse to us and could adversely affect an investment in us.

***It may be illegal now, or in the future, to acquire, own, hold, sell or use digital assets in one or more countries, and ownership of, holding or trading in our securities may also be considered illegal and subject to sanction.***

Although currently digital assets are not regulated or are lightly regulated in most countries, including the United States, one or more countries such as China and Russia may take regulatory actions in the future that severely restricts the right to acquire, own, hold, sell or use digital assets or to exchange digital assets for fiat currency. Such an action may also result in the restriction of ownership, holding or trading in our securities. Such restrictions may adversely affect an investment in us.

***If regulatory changes or interpretations of our activities require our registration as a money services business ("MSB") under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, we may be required to register and comply with such regulations. If regulatory changes or interpretations of our activities require the licensing or other registration of us as a money transmitter (or equivalent designation) under state law in any state in which we operate, we may be required to seek licensure or otherwise register and comply with such state law. In the event of any such requirement, to the extent Marathon decides to continue, the required registrations, licensure and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease Marathon's operations. Any termination of certain Company operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.***

To the extent that the activities of Marathon cause it to be deemed an MSB under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, Marathon may be required to comply with FinCEN regulations, including those that would mandate Marathon to implement anti-money laundering programs, make certain reports to FinCEN and maintain certain records.

To the extent that the activities of Marathon cause it to be deemed a "money transmitter" ("MT") or equivalent designation, under state law in any state in which Marathon operates, Marathon may be required to seek a license or otherwise register with a state regulator and comply with state regulations that may include the implementation of anti-money laundering programs, maintenance of certain records and other operational requirements. Currently, the NYSDFS has finalized its "BitLicense" framework for businesses that conduct "virtual currency business activity," the Conference of State Bank Supervisors has proposed a model form of state level "virtual currency" regulation and additional state regulators including those from California, Idaho, Virginia, Kansas, Texas, South Dakota and Washington have made public statements indicating that virtual currency businesses may be required to seek licenses as money transmitters. In July 2016, North Carolina updated the law to define "virtual currency" and the activities that trigger licensure in a business-friendly approach that encourages companies to use virtual currency and blockchain technology. Specifically, the North Carolina law does not require miners or software providers to obtain a license for multi-signature software, smart contract platforms, smart property, colored coins and non-hosted, non-custodial wallets. Starting January 1, 2016, New Hampshire requires anyone who exchanges a digital currency for another currency must become a licensed and bonded money transmitter. In numerous other states, including Connecticut and New Jersey, legislation is being proposed or has been introduced regarding the treatment of bitcoin and other digital assets. Marathon will continue to monitor for developments in such legislation, guidance or regulations.

22

Such additional federal or state regulatory obligations may cause Marathon to incur extraordinary expenses, possibly affecting an investment in the Shares in a material and adverse manner. Furthermore, Marathon and its service providers may not be capable of complying with certain federal or state regulatory obligations applicable to MSBs and MTs. If Marathon is deemed to be subject to and determines not to comply with such additional regulatory and registration requirements, we may act to dissolve and liquidate Marathon. Any such action may adversely affect an investment in us.

***Current interpretations require the regulation of bitcoins under the CEA by the CFTC, we may be required to register and comply with such regulations. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.***

Current and future legislation, CFTC and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins are treated for classification and clearing purposes. In particular, bitcoin derivatives are not excluded from the definition of "commodity future" by the CFTC. We cannot be certain as to how future regulatory developments will impact the treatment of bitcoins under the law.

Bitcoins have been deemed to fall within the definition of a commodity and, we may be required to register and comply with additional regulation under the CEA, including additional periodic report and disclosure standards and requirements. Moreover, we may be required to register as a commodity pool operator and to register us as a commodity pool with the CFTC through the National Futures Association. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in us. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain of our operations. Any such action may adversely affect an investment in us. No CFTC orders or rulings are applicable to our business.

***If regulatory changes or interpretations require the regulation of bitcoins under the Securities Act and Investment Company Act by the Commission, we may be required to register and comply with such regulations. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors. This would likely have a material adverse effect on us and investors may lose their investment.***

Current and future legislation and the Commission rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins are treated for classification and clearing purposes. The Commission's July 25, 2017 Report expressed its view that digital assets may be securities depending on the facts and circumstances. As of the date of this prospectus, we are not aware of any rules that have been proposed to regulate bitcoins as securities. We cannot be certain as to how future regulatory developments will impact the treatment of bitcoins under the law. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in us. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain of our operations. Any such action may adversely affect an investment in us.

To the extent that digital assets including bitcoins and other digital assets we may own are deemed by the Commission to fall within the definition of a security, we may be required to register and comply with additional regulation under the 1940 Act, including additional periodic reporting and disclosure standards and requirements and the registration of our Company as an investment company. Additionally, one or more states may conclude bitcoins and other digital assets we may own are a security under state securities laws which would require registration under state laws including merit review laws which would adversely impact us since we would likely not comply. As stated earlier in this prospectus, some states including California define the term "investment contract" more strictly than the Commission. Such additional registrations may result in extraordinary, non-recurring expenses of our Company, thereby materially and adversely impacting an investment in our Company. If we determine

not to comply with such additional regulatory and registration requirements, we may seek to cease all or certain parts of our operations. Any such action would likely adversely affect an investment in us and investors may suffer a complete loss of their investment.

23

***If federal or state legislatures or agencies initiate or release tax determinations that change the classification of bitcoins as property for tax purposes (in the context of when such bitcoins are held as an investment), such determination could have a negative tax consequence on our Company or our shareholders.***

Current IRS guidance indicates that digital assets such as bitcoin should be treated and taxed as property, and that transactions involving the payment of bitcoin for goods and services should be treated as barter transactions. While this treatment creates a potential tax reporting requirement for any circumstance where the ownership of a bitcoin passes from one person to another, usually by means of bitcoin transactions (including off-blockchain transactions), it preserves the right to apply capital gains treatment to those transactions which may adversely affect an investment in our Company.

***The loss or destruction of a private key required to access a digital asset may be irreversible. Our loss of access to our private keys or our experience of a data loss relating to our Company's digital assets could adversely affect an investment in our Company.***

Digital assets are controllable only by the possessor of both the unique public key and private key relating to the local or online digital wallet in which the digital assets are held. We are required by the operation of digital asset networks to publish the public key relating to a digital wallet in use by us when it first verifies a spending transaction from that digital wallet and disseminates such information into the respective network. We safeguard and keep private the private keys relating to our digital assets by primarily utilizing Bitgo Inc.'s enterprise multi-signature storage solution; to the extent a private key is lost, destroyed or otherwise compromised and no backup of the private key is accessible, we will be unable to access the digital assets held by it and the private key will not be capable of being restored by the respective digital asset network. Any loss of private keys relating to digital wallets used to store our digital assets could adversely affect an investment in us.

***Because many of our digital assets are held by digital asset exchanges, we face heightened risks from cybersecurity attacks and financial stability of digital asset exchanges.***

Marathon may transfer their digital asset from its wallet to digital asset exchanges prior to selling them. Digital assets not held in Marathon's wallet are subject to the risks encountered by digital asset exchanges including a DDoS Attack or other malicious hacking, a sale of the digital asset exchange, loss of the digital assets by the digital asset exchange and other risks similar to those described herein. Marathon does not maintain a custodian agreement with any of the digital asset exchanges that hold the Marathon's digital assets. These digital asset exchanges do not provide insurance and may lack the resources to protect against hacking and theft. If this were to occur, Marathon may be materially and adversely affected.

***If the award of digital assets for solving blocks and transaction fees for recording transactions are not sufficiently high to cover expenses related to running data center operations, it may have adverse effects on an investment in us.***

If the award of new digital assets for solving blocks declines and transaction fees are not sufficiently high, we may not have an adequate incentive to continue our mining operations, which may adversely impact an investment in us.

24

***As the number of digital assets awarded for solving a block in the blockchain decreases, the incentive for miners to continue to contribute processing power to the respective digital asset network will transition from a set reward to transaction fees. Either the requirement from miners of higher transaction fees in exchange for recording transactions in the blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for digital assets and prevent the expansion of the digital asset networks to retail merchants and commercial businesses, resulting in a reduction in the price of digital assets that could adversely impact an investment in us.***

In order to incentivize miners to continue to contribute processing power to any digital asset network, such network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. This transition could be accomplished either by miners independently electing to record in the blocks they solve only those transactions that include payment of a transaction fee or by the digital asset network adopting software upgrades that require the payment of a minimum transaction fee for all transactions. If transaction fees paid for digital asset transactions become too high, the marketplace may be reluctant to accept digital assets as a means of payment and existing users may be motivated to switch from one digital asset to another digital asset or back to fiat currency. Decreased use and demand for bitcoins that we have accumulated may adversely affect their value and may adversely impact an investment in us.

***Fluctuations in the price of bitcoin may significantly influence the market price of our class A common stock***

To the extent investors view the value of our class A common stock as linked to the value or change in the value of our bitcoin, fluctuations in the price of bitcoin may significantly influence the market price of our class A common stock.

***Our bitcoin holdings could subject us to regulatory scrutiny***

As noted above, several bitcoin investment vehicles have attempted to list their shares on a U.S. national securities exchange to permit them to function in the manner of an ETF with continuous share creation and redemption at NAV. To date the SEC has declined to approve any such listing, citing concerns over the surveillance of trading in markets for the underlying bitcoin as well as concerns about fraud and manipulation in bitcoin trading markets. Even though we do not function in the manner of an ETF and do not offer continuous share creation and redemption at NAV, it is possible that we nevertheless could face regulatory scrutiny from the SEC, as a company with securities traded on The Nasdaq Global Select Market.

In addition, as digital assets, including bitcoin, have grown in popularity and market size, there has been increasing focus on the extent to which digital assets can be used to launder the proceeds of illegal activities or fund criminal or terrorist activities, or entities subject to sanctions regimes. While we have implemented and maintain policies and procedures reasonably designed to promote compliance with applicable anti-money laundering and sanctions laws and regulations and take care to only acquire our bitcoin through entities subject to anti money laundering regulation and related compliance rules in the United States, if we are found to have purchased any of our bitcoin from bad actors that have used bitcoin to launder money or persons subject to sanctions, we may be subject to regulatory proceedings and further transactions or dealings in bitcoin may be restricted or prohibited.

***Due to the unregulated nature and lack of transparency surrounding the operations of many bitcoin trading venues, they may experience fraud, security failures or operational problems, which may adversely affect the value of our bitcoin***

Bitcoin trading venues are relatively new and, in some cases, unregulated. Furthermore, there are many bitcoin trading venues which do not provide the public with significant information regarding their ownership structure, management teams, corporate practices and regulatory compliance. As a result, the marketplace may lose confidence in bitcoin trading venues, including prominent exchanges that handle a significant volume of bitcoin trading.

Negative perception, a lack of stability in the broader bitcoin markets and the closure or temporary shutdown of bitcoin trading venues due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in bitcoin and result in greater volatility in the prices of bitcoin. To the extent investors view our class A common stock as linked to the value of our bitcoin holdings, these potential consequences of a bitcoin trading venue's failure could have a material adverse effect on the market value of our class A common stock.

179

25

*The price of bitcoin may be influenced by regulatory, commercial, and technical factors that are highly uncertain*

Bitcoin and other digital assets are relatively novel and are subject to various risks and uncertainties that may adversely impact their price. For example, the application of securities laws and other regulations to such assets is unclear in certain respects, and it is possible that regulators in the United States or foreign countries may create new regulations or interpret laws in a manner that adversely affects the price of bitcoin. The growth of the digital assets industry in general, and the use and acceptance of bitcoin in particular, may also impact the price of bitcoin and is subject to a high degree of uncertainty. The pace of worldwide growth in the adoption and use of bitcoin may depend, for instance, on public familiarity with digital assets, ease of buying and accessing bitcoin, institutional demand for bitcoin as an investment asset, consumer demand for bitcoin as a means of payment, and the availability and popularity of alternatives to bitcoin. Even if growth in bitcoin adoption occurs in the near or medium-term, there is no assurance that bitcoin usage will continue to grow over the long-term. Because bitcoin has no physical existence beyond the record of transactions on the Bitcoin blockchain, a variety of technical factors related to the Bitcoin blockchain could also impact the price of bitcoin. For example, malicious attacks by "miners" who validate bitcoin transactions, inadequate mining fees to incentivize validating of bitcoin transactions, hard "forks" of the Bitcoin blockchain into multiple blockchains, and advances in quantum computing could undercut the integrity of the Bitcoin blockchain and negatively affect the price of bitcoin. The liquidity of bitcoin may also be reduced and damage to the public perception of bitcoin may occur, if financial institutions were to deny banking services to businesses that hold bitcoin, provide bitcoin-related services or accept bitcoin as payment, which could also decrease the price of bitcoin.

*If we or our third-party service providers experience a security breach or cyberattack and unauthorized parties obtain access to our bitcoin, we may lose some or all of our bitcoin and our financial condition and results of operations could be materially adversely affected*

Security breaches and cyberattacks are of particular concern with respect to our bitcoin. Bitcoin and other blockchain-based cryptocurrencies have been, and may in the future be, subject to security breaches, cyberattacks, or other malicious activities. A successful security breach or cyberattack could result in a partial or total loss of our bitcoin in a manner that may not be covered by insurance or indemnity provisions of the custody agreement with a custodian who holds our bitcoin. Such a loss could have a material adverse effect on our financial condition and results of operations.

*Regulatory change reclassifying bitcoin as a security could lead to our classification as an "investment company" under the Investment Company Act of 1940 and could adversely affect the market price of bitcoin and the market price of our class A common stock.*

While senior SEC officials have stated their view that bitcoin is not a "security" for purposes of the federal securities laws, the SEC has so far refused to permit the listing of any bitcoin-based exchange traded funds, citing, among other things, concerns regarding bitcoin market integrity and custodial protections. It is possible that the SEC could take a contrary position to the one taken by its senior officials or a federal court could conclude that bitcoin is a security. Such a determination could lead to our classification as an "investment company" under the Investment Company Act of 1940, which would subject us to significant additional regulatory controls that could have a material adverse effect on our business and operations and also may require us to substantially change the manner in which we conduct our business.

In addition, if bitcoin is determined to constitute a security for purposes of the federal securities laws, the additional regulatory restrictions imposed by those laws could adversely affect the market price of bitcoin and in turn adversely affect the market price of our class A common stock.

*Variability in intellectual property laws may adversely affect our intellectual property position.*

Intellectual property laws, and patent laws and regulations in particular, have been subject to significant variability either through administrative or legislative changes to such laws or regulations or changes or differences in judicial interpretation, and it is expected that such variability will continue to occur. Additionally, intellectual property laws and regulations differ among states, and countries. Variations in the patent laws and regulations or in interpretations of patent laws and regulations in the United States and other countries may diminish the value of our intellectual property and may change the impact of third-party intellectual property on us. Accordingly, we cannot predict the scope of patents that may be granted to us, the extent to which we will be able to enforce our patents against third parties, or the extent to which third parties may be able to enforce their patents against us.

26

*We may seek to internally develop additional new inventions and intellectual property, which would take time and be costly. Moreover, the failure to obtain or maintain intellectual property rights for such inventions would lead to the loss of our investments in such activities.*

We may in the future seek to engage in commercial business ventures or seek internal development of new inventions or intellectual property. These activities would require significant amounts of financial, managerial and other resources and would take time to achieve. Such activities could also distract our management team from its present business initiatives, which could have a material and adverse effect on our business. There is also the risk that such initiatives may not yield any viable new business or revenue, inventions or technology, which would lead to a loss of our investment in such activities.

In addition, even if we are able to internally develop new inventions, in order for those inventions to be viable and to compete effectively, we would need to develop and maintain, and we would be heavily reliant upon, a proprietary position with respect to such inventions and intellectual property. However, there are significant risks associated with any such intellectual property we may develop principally including the following:

- patent applications we may file may not result in issued patents or may take longer than we expect to result in issued patents;
- we may be subject to interference proceedings;
- we may be subject to opposition proceedings in the U.S. or foreign countries;
- any patents that are issued to us may not provide meaningful protection;
- we may not be able to develop additional proprietary technologies that are patentable;
- other companies may challenge patents issued to us;
- other companies may have independently developed and/or patented (or may in the future independently develop and patent) similar or alternative technologies, or duplicate our technologies;
- other companies may design around technologies we have developed; and
- enforcement of our patents would be complex, uncertain and very expensive.

We cannot be certain that patents will be issued as a result of any future patent applications, or that any of our patents, once issued, will provide us with adequate protection from competing products. For example, issued patents may be circumvented or challenged, declared invalid or unenforceable or narrowed in scope. In addition, since publication of discoveries in scientific or patent literature often lags behind actual discoveries, we cannot be certain that we will be the first to make our additional new inventions or to file patent applications covering those inventions. It is also possible that others may have or may obtain issued patents that could prevent us from commercializing our products or require us to obtain licenses requiring the payment of significant fees or royalties in order to enable us to conduct our business. As to those patents that we may acquire, our continued rights will depend on meeting any obligations to the seller and we may be unable to do so. Our failure to obtain or maintain intellectual property rights for our inventions would lead to the loss of our investments in such activities, which would have a material adverse effect on us.

Moreover, patent application delays could cause delays in recognizing revenue from our internally generated patents and could cause us to miss

opportunities to license patents before other competing technologies are developed or introduced into the market. We are not actively pursuing any commercialization opportunities or internally generated patents.

27

***Our future success depends on our ability to expand our organization to match the growth of our activities.***

As our operations grow, the administrative demands upon us will grow, and our success will depend upon our ability to meet those demands. We are organized as a holding company, with numerous subsidiaries. Both the parent company and each of our subsidiaries require certain financial, managerial and other resources, which could create challenges to our ability to successfully manage our subsidiaries and operations and impact our ability to assure compliance with our policies, practices and procedures. These demands include, but are not limited to, increased executive, accounting, management, legal services, staff support and general office services. We may need to hire additional qualified personnel to meet these demands, the cost and quality of which is dependent in part upon market factors outside of our control. Further, we will need to effectively manage the training and growth of our staff to maintain an efficient and effective workforce, and our failure to do so could adversely affect our business and operating results. Currently, we have limited personnel in our organization to meet our organizational and administrative demands.

### Risks Relating to Marathon's Stock

***Exercise or conversion of warrants and other convertible securities will dilute shareholder's percentage of ownership.***

We have issued convertible securities, options and warrants to purchase shares of our Common Stock to our officers, directors, consultants and certain shareholders. In the future, we may grant additional options, warrants and convertible securities. The exercise, conversion or exchange of options, warrants or convertible securities, including for other securities, will dilute the percentage ownership of our shareholders. The dilutive effect of the exercise or conversion of these securities may adversely affect our ability to obtain additional capital. The holders of these securities may be expected to exercise or convert such options, warrants and convertible securities at a time when we would be able to obtain additional equity capital on terms more favorable than such securities or when our Common Stock is trading at a price higher than the exercise or conversion price of the securities. The exercise or conversion of outstanding warrants, options and convertible securities will have a dilutive effect on the securities held by our shareholders. We have in the past, and may in the future, exchange outstanding securities for other securities on terms that are dilutive to the securities held by other shareholders not participating in such exchange.

***Our Common Stock may be delisted from The Nasdaq Capital Market ("Nasdaq") if we fail to comply with continued listing standards.***

Our Common Stock is currently traded on Nasdaq under the symbol "MARA". If we fail to meet any of the continued listing standards of Nasdaq, our Common Stock could be delisted from Nasdaq. The continued listing standards include specifically enumerated criteria, such as:

- a $1.00 minimum closing bid price;
- stockholders' equity of $2.5 million;
- 500,000 shares of publicly-held Common Stock with a market value of at least $1 million;
- 300 round-lot stockholders; and
- compliance with Nasdaq's corporate governance requirements, as well as additional or more stringent criteria that may be applied in the exercise of Nasdaq's discretionary authority.

28

***Our stock price may be volatile.***

The market price of our Common Stock is likely to be highly volatile and could fluctuate widely in price in response to various factors, many of which are beyond our control, including the following:

- changes in our industry including changes which adversely affect bitcoin and other digital assets;
- competitive pricing pressures;
- our ability to obtain working capital financing;
- additions or departures of key personnel;
- sales of our Common Stock;
- our ability to execute our business plan;
- operating results that fall below expectations;
- loss of any strategic relationship;
- regulatory developments; and
- economic and other external factors.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are unrelated to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of our Common Stock.

***We have never paid nor do we expect in the near future to pay cash dividends.***

We have never paid cash dividends on our capital stock and do not anticipate paying any cash dividends on our Common Stock for the foreseeable future. While it is possible that we may declare a dividend after a large settlement, investors should not rely on such a possibility, nor should they rely on an investment in us if they require income generated from dividends paid on our capital stock. Any income derived from our Common Stock would only come from rise in the market price of our Common Stock, which is uncertain and unpredictable.

***Offers or availability for sale of a substantial number of shares of our Common Stock may cause the price of our Common Stock to decline.***

If our stockholders sell substantial amounts of our Common Stock in the public market upon the expiration of any statutory holding period or lockup agreements, under Rule 144, or issued upon the exercise of outstanding warrants or other convertible securities, it could create a circumstance commonly referred to as an "overhang" and in anticipation of which the market price of our Common Stock could fall. The existence of an overhang, whether or not sales have occurred or are occurring, also could make more difficult our ability to raise additional financing through the sale of equity or equity-related securities in the future at a time and price that we deem reasonable or appropriate. The shares of our restricted Common Stock will be freely tradable upon the earlier of: (i) effectiveness of a registration statement covering such shares and (ii) the date on which such shares may be sold without registration pursuant to Rule 144 (or other applicable exemption) under the Securities Act of 1933, as amended ("Securities Act").

### ITEM 1B. UNRESOLVED STAFF COMMENTS

Not Applicable

29

### ITEM 2. PROPERTIES

We lease an executive office space on a month to month basis at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada 89144.

On February 12, 2018, in connection with the intended mining operations of Marathon Crypto Mining, Inc. ("MCM"), the Company assumed a lease contract dated November 11, 2017 (the "Lease Agreement") by and between 9349-0001 Quebec Inc. (the "Lessor") and Blocespace Inc., formerly known as Cryptoespace Inc. (the "Lessee"). Pursuant to the Lease Agreement, among other things, the Lessee leases a building of 26,700 square feet (the "Property") in Quebec, Canada, for an initial term of five (5) years (the "Term"), commencing on December 1, 2017 and terminating

on November 30, 2022. The Lessee shall pay a monthly rent of $10,013 Canadian Dollars ("CAD") plus tax, or an annual rent of $120,150 CAD plus tax ("Yearly Rent"). Subsequent to December 31, 2020, the Company entered into a termination agreement with the Lessor to agree to terminate the lease as of March 7, 2021. As of that date, the Company was fully released and discharged from any and all obligations under the Lease Agreement.

## ITEM 3. LEGAL PROCEEDINGS

*Feinberg Litigation*

*Jeffrey Feinberg v. Marathon Patent Group, Inc., Doug Croxall, and Francis Knuettel II,* Superior Court of the State of California, County of Los Angeles, Case Number BC673128; Date Filed: August 21, 2017

On August 21, 2017, plaintiff Jeffrey Feinberg filed his Complaint against the Company and its Chief Executive Officer and Chief Financial Officer, purporting to state claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933, and to state common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation. Feinberg sought unspecified money damages, as well as costs and attorneys' fees, and equitable or injunctive relief, all based on allegations that he purchased Company securities and was induced to continue holding shares of the Company's common stock through his reliance on a series of purported misstatements and omissions concerning the Company's financial performance and future prospects.

On October 10, 2017, all defendants filed a motion to dismiss or to stay the action, contending that Feinberg's claims were encompassed by various written contracts in which he had agreed that any disputes he had with the Company should be litigated exclusively in the courts in New York City. While that motion was pending, on November 14, 2017, Feinberg voluntarily dismissed his complaint, in its entirety, without prejudice.

On March 27, 2018, Feinberg, purportedly joined by the Jeffrey L. Feinberg Personal Trust and the Jeffrey L. Feinberg Family Trust, refiled the alleged claims described above in a lawsuit filed in the Supreme Court of the State of New York, County of New York. The new lawsuit is entitled *Jeffrey Feinberg, Jeffrey L. Feinberg Personal Trust, and Jeffrey L. Feinberg Family Trust v. Marathon Patent Group, Inc., Doug Croxall, and Francis Knuettel II*, Index No. 651463/2018 (the "NY Action"). The plaintiffs purported to state claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933, and to state common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation. The plaintiffs sought unspecified money damages (including punitive damages), as well as costs and attorneys' fees, and equitable or injunctive relief, all based on allegations that over a period extending from approximately May 2015 through May 2017 they purchased Company securities and were induced to continue holding shares of the Company's stock through their reliance on a series of purported misstatements and omissions concerning the Company's financial performance and future prospects.

On June 15, 2018, all defendants filed a motion to dismiss the complaint in the NY Action asserting, among other arguments, that the Jeffrey L. Feinberg Personal Trust and the Jeffrey L. Feinberg Family Trust lack capacity to sue, that the purported state law "holder" claims are barred as a matter of law, and that plaintiffs otherwise failed to state facts sufficient to state a claim. Plaintiffs opposed the motion. After the motion was fully briefed, the court conducted an oral argument on January 16, 2019. At the conclusion of the argument, the court granted the motion to dismiss, allowing plaintiff Feinberg 30 days' time to replead.

In addition, concurrent with filing their motion to dismiss, the defendants filed a motion to stay discovery pursuant to the mandatory stay provisions of the Private Securities Litigation Reform Act of 1995 and local state rules. The plaintiffs filed a statement of non-opposition to the motion to stay discovery, and on January 9, 2019, the court granted that motion.

On February 15, 2019, Feinberg, in his individual capacity and purportedly as trustee of the Jeffrey L. Feinberg Personal Trust, and Terrence K. Ankner, purportedly as trustee of the Jeffrey L. Feinberg Family Trust, filed what they styled as an "Amended Complaint." These plaintiffs purport to state claims against the Company, Doug Croxall and Francis Knuettel II under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933, and to state common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation. In the Amended Complaint, the plaintiffs seek unspecified money damages (including punitive damages), as well as costs and attorneys' fees, and equitable or injunctive relief, all based on allegations that over a period extending from approximately May 2015 through May 2017 they purchased Company securities and were induced to continue holding shares of the Company's stock through their reliance on a series of purported misstatements and omissions concerning the Company's financial performance and future prospects.

On March 7, 2019, defendants Marathon Patent Group, Inc. and Doug Croxall filed a motion to dismiss the Amended Complaint, and on March 22, 2019, defendant Francis Knuettel II filed a motion to dismiss the Amended Complaint. On April 5, 2019, plaintiffs filed an opposition to defendants' motions to dismiss, and on April 17, 2019 defendants filed reply papers in support of the motions to dismiss. On July 9, 2019, the court heard the parties' oral arguments and, at the conclusion of those arguments, took the motions to dismiss under submission. On March 13, 2020, the court issued its Decision in which it granted the motions to dismiss in full and ordered that the case be dismissed with prejudice. On or about May 4, 2020, the plaintiffs filed a notice of appeal. Plaintiffs filed their opening appellate brief on January 4, 2021, and defendants filed their responsive appellate briefs on February 3, 2021. The parties are now awaiting oral argument on the appeal.

*Ramirez Litigation*

On July 20, 2018, Tony Ramirez filed a complaint against the Company and certain of its former directors. The complaint was filed in the United States District Court for the Central District of California. Mr. Ramirez alleged that he was a shareholder of the Company and purported to assert a single claim under Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9 promulgated thereunder. The parties entered into a "Settlement Agreement and Mutual Release" and the case was voluntarily dismissed with prejudice on December 17, 2018.

*Amazon Litigation*

As part of the cancellation of certain indebtedness owed to Fortress Investment Group, LLC, we transferred ownership of various patents, including U.S. Patent No. 7,177,798, commonly referred to as "Patent 798." Fortress created a new Special Purpose Entity, CF Dynamic Advances LLC, in which we own a 30% interest. In May 2018, Rensselaer Polytechnic Institute and CF Dynamic Advances LLC filed a complaint against Amazon.com, Inc. in the United States District Court for the Northern District of New York, which alleges, among other things, that "Alexa Voice Software and Alexa enabled devices" infringe U.S. Patent No. 7,177,798, entitled "Natural Language Interface Using Constrained Intermediate Dictionary of Results." The complaint seeks an injunction, monetary damages, an ongoing royalty, pre- and post-judgment interest, attorneys' fees, and costs. If plaintiffs are successful, and if the recoveries or settlement proceeds are sufficient following litigation expenses and recovery of amounts due in connection with the cancelled loan, the special purpose entity could be entitled to a portion of the net proceeds. There can be no assurance that the plaintiff will be successful or that any recoveries will exceed amounts due under the debt settlement arrangements or that our 30% interest in the special purpose entity will have any value even if the plaintiffs are successful in their case against Amazon.

Michael Ho, an individual v. Marathon Patent Group, Inc., a Nevada Corporation, Case No. 5:21-cv-00339-PSG-SPx (C.D. Cal.) On January 14, 2021, Plaintiff Michael Ho ("Plaintiff" or "Ho") filed a Civil Complaint for Damages and Restitution ("Complaint") against the Company and 10 Doe Defendants. The Complaint alleges six causes of action against the Company, (1) Breach of Written Contract; (2) Brach of Implied Contract; (3) Quasi-Contract; (4) Services Rendered; (5) Intentional Interference with Prospective Economic Relations; and (6) Negligent Interference with Prospective Economic Relations, which interestingly is the one plead against "all Defendants" and is most likely to involve later named defendants. The claims arise from the same set of facts, Ho alleges that the Company profited from commercially sensitive information he shared with the Company and then it refused to compensate him for his role in securing the acquisition of Beowulf. In connection with his Complaint, Plaintiff alleges that in early 2020, he obtained information that an electricity producer, Beowulf Energy, had available, unused capacity and that he obtained

pricing information and approached Mr. Okamoto "concerning a proposed transaction that would be favorable to MARA." Plaintiff specifically alleges to have been damaged in an amount in excess of $30,000,000 (and pleads such damages for each cause of action) and costs of suit. In addition, if successful, Plaintiff would be able to claim attorney's fees as a prevailing party. Defendant denies liability. The Company denies breaching the NDA with Mr. Ho and further alleges that the agreement reached with Beowulf Energy was a result of an independent commercial relationship. b) the progress of the case to date. On February 22, 2021, the Company responded to Mr. Ho's Complaint with a general denial and the assertion of applicable affirmative defenses. Then, on February 25, 2021, the Company removed the matter to federal court. The court has not set an initial scheduling conference yet so there are no significant litigation deadlines at this point in time. The Company is in the process of early facts investigation and discussions with Mr. Ho's legal counsel about case scheduling, including a discovery plan.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

31

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information**

Our common stock is currently quoted on The NASDAQ Capital Market under the symbol "MARA".

**Holders**

As of March 12, 2021, there were 230 holders of record of 98,804,636 shares of the Company's Common Stock.

**Securities Authorized for Issuance under Equity Compensation Plans**

**2012, 2014, 2017 and 2018 Equity Incentive Plans**

The following table gives information about the Company's common stock that may be issued upon the exercise of options granted to employees, directors and consultants under its 2012, 2014, 2017 and 2018 Equity Incentive Plans as of December 31, 2021. On August 1, 2012, our board of directors and stockholders adopted the 2012 Equity Incentive Plan, pursuant to which 96,154 shares of our common stock are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On September 16, 2014, our board of directors adopted the 2014 Equity Incentive Plan, subsequently approved by the shareholders on July 31, 2015, pursuant to which up to 125,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On September 6, 2017, our board of directors adopted the 2017 Equity Incentive Plan, subsequently approved by the shareholders on September 29, 2017, pursuant to which up to 625,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On January 1, 2018, our board of directors adopted the 2018 Equity Incentive Plan, subsequently approved by the shareholders on March 7, 2018, pursuant to which up to 2,500,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On January 15, 2021, the Company's shareholders approved an increase in the number of shares authorized for issuance under the 2018 Equity Incentive Plan by 5,000,000 shares, which increase took effect automatically. As of March 12, 2021, the 2012, 2014, 2017 and 2018 Equity Incentive Plans had outstanding grants and remaining unissued shares, taking into account issuance of restricted stock to officers and directors, as follows:

**Equity Compensation Plan Information**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 393,777 | $ | 21.18 | 880,804 |
| Equity compensation plans not approved by security holders | — | $ | — | — |
| Total | 393,777 | $ | 21.18 | 880,804 |

**Recent issuances of unregistered securities**

On January 3, 2018, the Company issued 150,000 shares of the Company's Common Stock pursuant to the conversion of $480,000 in principal amount invested in the Convertible Note.

On January 4, 2018, the Company issued 150,000 shares of the Company's Common Stock pursuant to the conversion of $480,000 in principal amount invested in the Convertible Note.

On January 6, 2018, the Company issued 150,000 shares of the Company's Common Stock pursuant to the conversion of $480,000 in principal amount invested in the Convertible Note.

On January 11, 2018, the Company entered into a Patent Rights Purchase and Assignment Agreement with XpresSpa Group, Inc., a Delaware Corporation and Crypto Currency Patent Holdings Company LLC, a Delaware limited liability company and wholly owned subsidiary of the Company ("CCPHC"). The Company issued 62,500 shares of common stock of the Company, par value $0.0001 per share, subject to the terms and conditions of a lock-up agreement.

32

On January 11, 2018, the Company agreed to issue 6,250 shares of the Company's common stock to Andrew Kennedy Lang, one of the named inventors of the patents, in exchange for consulting services, and 12,500 shares of the Company's common stock to another individual in exchange for consulting services, in connection with the acquisition of the Assigned IP.

On February 5, 2018, the Company issued 7,763 shares of the Company's Common Stock pursuant to the conversion of $24,842 in principal amount invested in the Convertible Note.

On February 27, 2018, the Company issued 175,000 shares of the Company's Common Stock pursuant to the conversion of $560,000 in principal amount invested in the Convertible Note.

On February 28, 2018, the Company issued 4,601 shares of the Company's Common Stock to board members as compensation earned as members of the board.

On March 6, 2018, the Company issued 4,433 shares of the Company's Common Stock pursuant to the exercise of 4,433 shares of warrants.

On March 8, 2018, the Company issued 12,500 shares of the Company's Common Stock pursuant to the conversion of $40,000 in principal amount invested in the Convertible Note.

On March 14, 2018, the Company issued 105,636 shares pursuant to the conversion of 106 shares of the Company's Series E Convertible Preferred

Stock.

On March 15, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 16, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 19, 2018, the Company issued 74,250 shares pursuant to the conversion of 74 shares of the Company's Series E Convertible Preferred Stock.

On March 20, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 21, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 22, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 23, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 26, 2018, the Company issued 89,250 shares pursuant to the conversion of 89 shares of the Company's Series E Convertible Preferred Stock.

On March 26, 2018, the Company issued 9,608 shares of the Company's Common Stock pursuant to the conversion of $30,746 in principal amount invested in the Convertible Note.

On March 27, 2018, the Company issued 87,750 shares pursuant to the conversion of 88 shares of the Company's Series E Convertible Preferred Stock.

33

On April 17, 2018, the Company issued 12,500 shares to Mr. Knuettel pursuant to his termination agreement. In connection with this issuance, the Company valued the shares at the quoted market price on the date of grant at $6.88 per share or $86,000. The transaction did not involve any underwriters, underwriting discounts or commissions, or any public offering. The issuance of these securities was deemed to be exempt from the registration requirements of the Securities Act by virtue of Section 4(a)(2) thereof, as a transaction by an issuer not involving a public offering.

On April 27, 2018, the Company issued 300,000 shares of the Company's Common Stock pursuant to the conversion of $960,000 in principal amount invested in the Convertible Note.

On June 28, 2018, the board has determined that it is in the best interests of the Company and its shareholders to allow the Amended Merger Agreement to expire on its current termination date of June 28, 2018 without further negotiation or extension. The Board approved to issue 750,000 shares of our common stock to Global Bit Ventures, Inc as a termination fee for canceling the proposed merger between the two companies. The fair value of the common stocks was $2,850,000.

On August 2, 2018, the Company issued 121,250 shares pursuant to the conversion of 121 shares of the Company's Series E Convertible Preferred Stock.

On August 10, 2018, the Company issued 121,250 shares pursuant to the conversion of 121 shares of the Company's Series E Convertible Preferred Stock.

On August 21, 2018, the Company issued 121,250 shares pursuant to the conversion of 121 shares of the Company's Series E Convertible Preferred Stock.

On August 29, 2018, the Company issued 121,250 shares pursuant to the conversion of 121 shares of the Company's Series E Convertible Preferred Stock.

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued and additional 474,808 at $0.90 per share. On March 30, 2020, the Company has issued an additional 350,250 shares at $1.75 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2019. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2020 and 2019, respectively.. As of December 31, 2020, there is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020.

On June 1, 2020, the Company issued 2,023,739 shares at $0.60 per share pursuant to the conversion of $999,106 of principal and $215,137 of interest related to the extinguishment of the Convertible Note.

On October 6, 2020, the Company issued 6,000,000 shares at $1.87 per share pursuant to the Long Term Prepaid Service Contract with Liefern LLC and Lucky Liefern LLC each receiving 3,000,000 shares for the operation and servicing of the Hardin, Montana facility through September 2025.

**Recent Repurchases of Securities**

None.

34

## ITEM 6. SELECTED FINANCIAL DATA

We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act") and are not required to provide the information under this item.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis is intended as a review of significant factors affecting our financial condition and results of operations for the periods indicated. The discussion should be read in conjunction with our consolidated financial statements and the notes presented herein. In addition to historical information, the following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that involve risks and uncertainties. Our actual results could differ significantly from those expressed, implied or anticipated in these forward-looking statements as a result of certain factors discussed herein and any other periodic reports filed and to be filed with the Securities and Exchange Commission.*

***Cautionary Note Regarding Forward-Looking Statements***

*This report and other documents that we file with the Securities and Exchange Commission contain forward-looking statements that are based on current expectations, estimates, forecasts and projections about our future performance, our business, our beliefs and our management's assumptions. Statements that are not historical facts are forward-looking statements. Words such as "expect," "outlook," "forecast," "would," "could," "should," "project," "intend," "plan," "continue," "sustain", "on track", "believe," "seek," "estimate," "anticipate," "may," "assume," and variations of such words and similar expressions are often used to identify such forward-looking statements, which are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward- looking statements are not guarantees of future performance and involve risks, assumptions and uncertainties, including, but not limited to, those described in our reports that we file or furnish with the Securities and Exchange Commission. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statements after the date they are made, whether as a result of new information, future events, changes in assumptions or otherwise.*

## Business of the Company

We were incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc. As of the date of this filing, our name has been changed to Marathon Digital Holdings, Inc. On December 7, 2011, we changed our name to American Strategic Minerals Corporation and were engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, we discontinued our minerals business and began to invest in real estate properties in Southern California. In October 2012, we discontinued our real estate business when our former CEO joined the firm and we commenced our IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc. On November 1, 2017, we entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), which is focused on mining digital assets. We have since purchased our cryptocurrency mining machines and established a data center in Canada to mine digital assets. Following the merger, we intended to add GBV's existing technical capabilities and digital asset miners and expand our activities in the mining of new digital assets, while at the same time harvesting the value of our remaining IP assets. On June 28, 2018, the board has determined that it is in the best interests of the Company and its shareholders to allow the Amended Merger Agreement to expire on its current termination date of June 28, 2018 without further negotiation or extension. The Board approved to issue 750,000 shares of our common stock to GBV as a termination fee for canceling the proposed merger between the two companies. The fair value of the common stocks was $2,850,000.

35

## Recent Developments
### Purchase of Digital Asset Mining Servers

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued and additional 474,808 at $0.90 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2019. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2020 and 2019, respectively.. There is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020.

### Critical Accounting Policies and Estimates

We believe that the following accounting policies are the most critical to aid you in fully understanding and evaluating this management discussion and analysis:

### Digital Currencies

Digital currencies are included in current assets in the consolidated balance sheets as intangible assets with indefinite useful lives. Digital currencies are recorded at cost less impairment.

An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

At December 31, 2020, we carried $2.272 million of digital assets on our balance sheet, consisting of the approximately 126 bitcoins, and held $141.3 million in cash and cash equivalents, compared to $0.001 million of digital assets and $0.7 million in cash and cash equivalents at December 31, 2019, reflecting the shift in our liquid assets. As of March 4, 2021, we held approximately 5,035 bitcoins, of which, 4,813 bitcoins were acquired at an aggregate purchase price of $150 million at an average purchase price of approximately $31,137 per bitcoin, inclusive of fees and expenses. We expect to purchase additional bitcoin in future periods, though we may also sell bitcoin in future periods as needed to generate Cash Assets for treasury management purposes.

### Impairment of Long-lived Assets

Management reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to undiscounted future cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020. During the year ended December 31, 2019 we moved certain of our bitcoin miners to a new location in the United States and recorded an impairment of $447,776 in our leasehold improvements in Canada.

36

### Recent Issued Accounting Standards

See Note 2 to our consolidated financial statements for a discussion of recent accounting standards and pronouncements.

**Results of Operations for the Years Ended December 31, 2020 and December 31, 2019**

We generated revenues of $4.4 million during the year ended December 31, 2020 as compared to $1.2 million during the year ended December 31, 2019. For the year ended December 31, 2020, this represented an increase of $3.2 million or 268%. Revenue for the years ended December 31, 2020 and 2019 were derived primarily from cryptocurrency mining.

Direct cost of revenues during the year ended December 31, 2020 and 2019 amounted to approximately $7.0 million and $2.5 million, respectively. For the year ended December 31, 2020, this represented an increase of $4.5 million or 182%. Direct costs of revenue include depreciation and amortization expenses of the cryptocurrency mining machines and patents, contingent payments to patent enforcement legal costs, patent enforcement advisors and inventors as well as various non-contingent costs associated with enforcing the Company's patent rights and otherwise in developing and entering into settlement and licensing agreements that generate the Company's revenue.

We incurred other operating expenses of $7.2 million for the year ended December 31, 2020 and $2.9 million for the year ended December 31, 2019. For the year ended December 31, 2020, this represented an increase of $4.3 million or 144%. These expenses primarily consisted of the impairment of mining equipment, compensation to our officers, directors and employees, professional fees and consulting incurred in connection with the day-to-day operation of our business and break-up fee to GBV.

The operating expenses consisted of the following:

| | Total Other Operating Expenses | |
| --- | --- | --- |
| | For the Years Ended | |
| | December 31, 2020 | December 31, 2019 |
| Compensation and related taxes (1) | $ 4,730,143 | $ 1,475,450 |
| Consulting fees (2) | 302,561 | 130,813 |
| Professional fees (3) | 733,741 | 422,335 |
| Other general and administrative (4) | 551,671 | 465,783 |
| Impairment of mining equipment (5) | 871,302 | - |
| Impairment of leasehold improvements (6) | - | 477,776 |
| Total | $ 7,189,418 | $ 2,942,157 |

(1) Compensation expense and related taxes: Compensation expense includes cash compensation and related payroll taxes and benefits, and non-cash equity compensation expenses. For the year ended December 31, 2020 and 2019, compensation expense and related payroll taxes were $4.7 million and $1.5 million, an increase of $3.3 million or 221%. During the years ended December 31, 2020 and 2019, we recognized non-cash employee and board equity-based compensation of $1,258,735 and $674,182, respectively.

(2) Consulting fees: For the year ended December 31, 2020 and 2019, we incurred consulting fees of $0.3 million and $0.1 million, respectively, an increase of $0.2 million or 131%. Consulting fees include consulting fees primarily for investor relations and public relations services as well as other consulting services. The increase in consulting fees for the year ended December 31, 2020 compared to the same period in the prior year was primarily due to the write-off of prepaid consulting fees from a prior period.

(3) Professional fees: For the year ended December 31, 2020 and 2019, professional fees were $0.7 million and $0.4 million, respectively, an increase of $0.3 million or 74%. Professional fees primarily reflect the costs of professional outside accounting fees, legal fees and audit fees. The increase in professional fees was mainly the result of legal fees related to the ATM financing offerings.

(4) Other general and administrative expenses: For the year ended December 31, 2020 and 2019, other general and administrative expenses were $0.6 million and $0.5 million, respectively, an increase of $0.1 million or 18%. General and administrative expenses reflect the other non-categorized operating costs of the Company and include expenses related to being a public company, rent, insurance, technology and other expenses incurred to support the operations of the Company.

(5) Impairment of mining equipment: For the years ended December 31, 2020, the Company recorded a loss on the impairment of mining equipment in the amounts of $0.9 million.

(6) Impairment of leasehold improvements: For the years ended December 31, 2019, the Company recorded a loss on the impairment of leasehold improvements in the amounts of $0.4 million.

**Operating Loss**

We reported operating loss from continuing operations of $9.8 million and $4.2 million for the years ended December 31, 2020 and 2019, respectively.

**Other Expenses**

Total other expenses were $0.6 million for the year ended December 31, 2020 compared to total other income of $0.7 million for the year ended December 31, 2019. The changes are de minimis.

**Net Loss Available to Common Shareholders**

We reported net loss of $10.4 million and $3.5 million for the year ended December 31, 2020 and 2019, respectively.

*Liquidity and Capital Resources*

The Company's consolidated financial statements have been prepared assuming that it will continue as a going concern, which contemplates continuity of operations, realization of assets, and liquidation of liabilities in the normal course of business.

As reflected in the consolidated financial statements, the Company had and accumulated deficit of approximately $116.1 million and $105.6 million at December 31, 2020 and December 31, 2019, respectively, a net loss of approximately $10.4 million and $3.5 million, respectively, and approximately $7.8 million and $3.3 million net cash used in operating activities for the year ended December 31, 2020 and December 31, 2019, respectively.

Liquidity is the ability of a company to generate funds to support its current and future operations, satisfy its obligations, and otherwise operate on an ongoing basis. At December 31, 2020, the Company's cash and cash equivalents balances totaled $141.3 million compared to $0.7 million at December 31, 2019. The increase in liquidity is due to the issuance of common stock during 2020 as it relates to the various At The Market Offerings.

Net working capital increased by $285.3 million, to working capital of $285.0 million at December 31, 2020 from working capital deficit of $0.4 million at December 31, 2019.

Cash used in operating activities was $7.8 million during the year ended December 31, 2020 compared to $3.3 million during the year ended December 31, 2019.

Cash used in investing activities was $81.3 million during the year ended December 31, 2020 compared to cash provided of $1.2 million for the year ended December 31, 2019.

Cash provided by financing activities was $229.7 million during the year ended December 31, 2020 compared to $0.2 million for the year ended December 31, 2019.

During the month of August 2019, the Company issued 16,081 shares of common stock under the At The Market Offering for the total proceeds of $35,764, net of offering cost of $1,371.

During the month of September 2019, the Company issued 25,533 shares of common stock under the At The Market Offering for the total proceeds of $47,689, net of offering cost of $2,257.

During the month of October 2019, the Company issued 15,510 shares of common stock under the At The Market Offering for the total proceeds of $24,756, net of offering cost of $1,289.

During the month of November 2019, the Company issued 92,037 shares of common stock under the At The Market Offering for the total proceeds of $122,039, net of offering cost of $4,437.

During the month of December 2019, the Company issued 22,965 shares of common stock under the At The Market Offering for the total proceeds of $25,645, net of offering cost of $1,088.

During the month of January 2020, the Company issued 118,524 shares of common stock under the At The Market Offering for the total proceeds of $131,215, net of offering cost of $5,045.

During the month of February 2020, the Company issued 186,211 shares of common stock under the At The Market Offering for the total proceeds of $220,802, net of offering cost of $8,687.

During the month of March 2020, the Company issued 98,340 shares of common stock under the At The Market Offering for the total proceeds of $49,874, net of offering cost of $3,042.

On March 30, 2020, the Company issued 350,250 shares of common stock in exchange for S9 miners with a fair market value of $612,938.

During the month of April 2020, the Company issued 3,016,385 shares of common stock under the At The Market Offering for the total proceeds of $1,514,969, net of offering cost of $58,532.

During the month of May 2020, the Company issued 5,987,723 shares of common stock under the At The Market Offering for the total proceeds of $3,607,398, net of offering cost of $127,765.

During the month of June 2020, the Company issued 1,540,710 shares of common stock under the At The Market Offering for the total proceeds of $1,537,346, net of offering cost of $51,526.

On June 1, 2020, the Company issued 2,023,739 shares of common stock in exchange for the conversion and extinguishment of the note payable outstanding in an amount of $999,106.

During the month of August 2020, the Company issued 5,820,761 shares of common stock under the At The Market Offering for the total proceeds of $20,178,935, net of offering cost of $630,283.

During the month of September 2020, the Company issued 943,981 shares of common stock under the At The Market Offering for the total proceeds of $2,516,199, net of offering cost of $78,874.

During the month of October 2020, the Company issued 7,813,218 shares of common stock under the At The Market Offering for the total proceeds of $21,320,409, net of offering cost of $665,773.

On October 6, 2020, the Company issued 6,000,000 shares of common stock in exchange for five years of services pursuant to the Power Purchase Agreement and Data Facility Services Agreement for the total proceeds of $0, net of offering cost of $0 valued at the time of execution at $1.87 per share or $11,220,000 in aggregate.

During the month of November 2020, the Company issued 5,851,295 shares of common stock under the At The Market Offering for the total proceeds of $16,685,649, net of offering cost of $519,992.

During the month of December 2020, the Company issued 22,924,550 shares of common stock under the At The Market Offering for the total proceeds of $239,301,605, net of offering cost of $7,255,610.

39

We believe that existing cash and cash equivalents held by us and cash and cash equivalents anticipated to be generated by us are sufficient to meet working capital requirements, anticipated capital expenditures, and contractual obligations for at least the next 12 months. As of December 31, 2020, we held approximately 125 bitcoins. Subsequent to year end, in January 2021, we purchased over 4,800 bitcoin for approximately $150 million. We do not believe we will need to sell any of our bitcoins within the next twelve months to meet our working capital requirements, although we may from time to time sell bitcoins as part of treasury management operations, including to increase our cash balances. The Bitcoin market historically has been characterized by significant volatility in its price, limited liquidity and trading volumes compared to sovereign currencies markets, relative anonymity, a developing regulatory landscape, susceptibility to market abuse and manipulation, and various other risks inherent in its entirely electronic, virtual form and decentralized network. During times of instability in the Bitcoin market, we may not be able to sell our bitcoins at reasonable prices or at all. As a result, our bitcoins are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. In addition, upon sale of our bitcoin, we may incur additional taxes related to any realized gains or we may incur capital losses as to which the tax deduction may be limited.

**Off-Balance Sheet Arrangements**

None.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information under this item.

40

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**MARATHON DIGITAL HOLDINGS, INC.**

**CONSOLIDATED FINANCIAL STATEMENTS**

**DECEMBER 31, 2020**

**Index to Consolidated Financial Statements**

| | |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | F-2 |
| CONSOLIDATED BALANCE SHEETS | F-3 |
| CONSOLIDATED STATEMENTS OF OPERATIONS | F-4 |
| CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY | F-5 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS | F-6 |
| NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS | F-7 to F-22 |

F-1



**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
Marathon Digital Holdings, Inc. & Subsidiaries
(formerly known as Marathon Patent Group, Inc)

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Marathon Digital Holdings, Inc. & Subsidiaries (the Company) as of December 31, 2020 and 2019, and the related consolidated statements of operations, stockholders' equity, and cash flows for the two years ended December 31, 2020, and the related notes (collectively referred to as the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial positions of the Company as of December 31, 2020, and the consolidated results of its operations and its cash flows for the year ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters:**

Critical audit matters are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements, and (2) involved our especially challenging, subjective, or complex judgments.

We determined that there are no critical audit matters.

*RBSM LLP*

RBSM LLP
We have served as the Company's auditor since 2017.
Henderson, NV
March 16, 2021

F-2

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 141,322,776 | $ | 692,963 |
| Digital currencies | | 2,271,656 | | 1,141 |
| Other receivable | | 74,767,226 | | - |
| Deposit | | 65,647,592 | | - |
| Prepaid expenses and other current assets | | 2,399,965 | | 800,024 |
| Total current assets | | 286,409,215 | | 1,494,128 |
| Non-current assets: | | | | |
| Property and equipment, net of accumulated depreciation of $6,480,359 and $3,487,323 for December 31, 2020 and 2019, respectively | | 17,224,321 | | 3,754,969 |
| Prepaid service contract | | 8,415,000 | | - |
| Right-of-use assets | | 200,301 | | 297,287 |
| Intangible assets, net of accumulated amortization of $207,598 and $136,422 for December 31, 2020 and 2019, respectively | | 1,002,402 | | 1,073,578 |
| Total non-current assets | | 26,842,024 | | 5,125,834 |
| **TOTAL ASSETS** | $ | **313,251,239** | $ | **6,619,962** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 999,742 | $ | 1,238,197 |
| Mining servers payable | | - | | 513,700 |
| Current portion of operating lease liability | | 121,596 | | 87,959 |
| Warrant liability | | 322,437 | | 12,849 |
| Total current liabilities | | 1,443,775 | | 1,852,705 |
| Long-term liabilities | | | | |
| Convertible notes payable | | - | | 999,106 |
| SBA PPP loan payable | | 62,500 | | - |
| Operating lease liability | | - | | 120,479 |
| Total long-term liabilities | | 62,500 | | 1,119,585 |
| Total liabilities | | 1,506,275 | | 2,972,290 |

**Commitments and Contingencies**

Stockholders' Equity:

| | 2020 | 2019 |
|---|---|---|
| Preferred stock, 0.0001 par value, 50,000,000 shares authorized, no shares issued and outstanding at December 31, 2020 and 2019, respectively | - | - |
| Common stock, 0.0001 par value; 200,000,000 shares authorized; 81,974,619 and 8,458,781 issued and outstanding at December 31, 2020 and 2019, respectively | 8,197 | 846 |
| Additional paid-in capital | 428,242,763 | 109,705,051 |
| Accumulated other comprehensive loss | (450,719) | (450,719) |
| Accumulated deficit | (116,055,277) | (105,607,506) |
| Total stockholders' equity | 311,744,964 | 3,647,672 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 313,251,239 | $ 6,619,962 |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-3

### MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS

| | For the Years Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| **Revenues** | | |
| Cryptocurrency mining revenue | $ 4,357,443 | $ 1,185,227 |
| **Total revenues** | 4,357,443 | 1,185,227 |
| **Operating costs and expenses** | | |
| Cost of revenue | 7,001,128 | 2,482,181 |
| Impairment of mining equipment | 871,302 | - |
| Impairment of leasehold improvements | - | 447,776 |
| Compensation and related taxes | 4,730,143 | 1,475,450 |
| Consulting fees | 302,561 | 130,813 |
| Professional fees | 733,741 | 422,335 |
| General and administrative | 551,672 | 465,783 |
| Total operating expenses | 14,190,547 | 5,424,338 |
| **Operating loss** | (9,833,104) | (4,239,111) |
| **Other income (expenses)** | | |
| Gain from extinguishment of debt | - | 181,995 |
| Other income (expenses) | 113,476 | - |
| Foreign exchange loss | - | (11,873) |
| Loss on conversion of note | (364,833) | - |
| Realized gain on sale of digital currencies | 15,466 | 36,092 |
| Change in fair value of warrant liability | (309,588) | 26,234 |
| Change in fair value of mining payable | (66,547) | 507,862 |
| Interest income | 18,343 | 33,651 |
| Interest expense | (20,984) | (51,915) |
| Total other (expenses) income | (614,667) | 722,046 |
| **Loss before income taxes** | $ (10,447,771) | $ (3,517,065) |
| Income tax expense | - | - |
| **Net loss** | $ (10,447,771) | $ (3,517,065) |
| **Net loss per share, basic and diluted:** | $ (0.13) | $ (0.53) |
| **Weighted average shares outstanding, basic and diluted:** | 81,408,340 | 6,664,238 |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-4

### MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS EQUITY

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | | | | |
| **Balance as of December 31, 2018** | - | $ - | 6,379,992 | $ 638 | $105,461,396 | $(102,090,441) | $ (450,719) | $ 2,920,874 |
| Stock based compensation | - | - | 150,000 | 15 | 933,667 | - | - | 933,682 |
| Par value adjustment and additional shares issued due to reverse split | - | - | 5,413 | 1 | (1) | - | - | - |
| Issuance of common stock, net of offering costs/At-the-market offering | - | - | 172,126 | 17 | 245,477 | - | - | 245,494 |
| Common stock issued for purchase of mining servers | - | - | 1,751,250 | 175 | 3,064,512 | - | - | 3,064,687 |
| Net loss | - | - | - | - | - | (3,517,065) | - | (3,517,065) |
| **Balance as of December 31, 2019** | - | $ - | 8,458,781 | $ 846 | $109,705,051 | $(105,607,506) | $ (450,719) | $ 3,647,672 |
| Stock based compensation | - | - | 2,745,639 | 275 | 1,178,334 | - | - | 1,178,609 |
| Issuance of common stock, net of offering costs/At-the-market offering | - | - | 54,301,698 | 5,430 | 297,653,840 | - | - | 297,659,270 |

189

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Common stock issued for purchase of mining servers | - | - | 350,250 | 35 | 171,587 | - | - | 171,622 |
| Common stock issued for note conversion | - | - | 2,023,739 | 202 | 1,578,873 | - | - | 1,579,075 |
| Common stock issued for long term service contract | - | - | 6,000,000 | 600 | 11,219,400 | - | - | 11,220,000 |
| Issue common stock and warrant for cash | - | - | 7,666,666 | 767 | 6,270,833 | - | - | 6,271,600 |
| Warrant exercised for cash | - | - | 413,233 | 41 | 464,846 | - | - | 464,887 |
| Options exercised for cash | - | - | 14,613 | 1 | (1) | - | - | - |
| Net loss | - | - | - | - | - | (10,447,771) | - | (10,447,771) |
| **Balance as of December 31, 2020** | - | $ - | **81,974,619** | $ **8,197** | **$428,242,763** | **$ (116,055,277)** | $ **(450,719)** | **$ 311,744,964** |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-5

---

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (10,447,771) | $ (3,517,065) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 2,993,036 | 923,304 |
| Amortization of patents and website | 71,176 | 71,177 |
| Loss on conversion of debt | 364,833 | - |
| Realized gain on sale of digital currencies | (15,466) | (36,092) |
| Change in fair value of warrant liability | 309,588 | (26,234) |
| Change in fair value of mining payable | 66,547 | (507,862) |
| Impairment of mining equipment | 871,302 | - |
| Impairment of leasehold improvements | - | 447,776 |
| Stock based compensation | 1,178,609 | 933,682 |
| Amortization of right-of-use assets | 96,986 | 82,840 |
| Change in prepaid service contract | 561,000 | - |
| Changes in operating assets and liabilities: | | |
| | - | - |
| Digital currencies | (4,357,443) | (1,185,227) |
| Operating lease liability | (86,842) | (72,548) |
| Prepaid expenses and other assets | 644,059 | (435,159) |
| Accounts payable and accrued expenses | (23,318) | 2,753 |
| Net cash used in operating activities | (7,773,704) | (3,318,655) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Sale of digital currencies | 2,102,394 | 1,220,178 |
| Purchase of property and equipment | (17,742,315) | (5,225) |
| Deposits for the purchase of mining servers | (65,647,592) | - |
| Net cash (used in) provided by investing activities | (81,287,513) | 1,214,953 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds received on SBA PPP notes payable | 62,500 | - |
| Proceeds from issuance of common stock/At-the-market offering | 229,961,998 | 255,893 |
| Offering costs for the issuance of common stock/At-the-market offering | (7,069,955) | (10,399) |
| Proceeds from issuance of common stock and warrant, net | 6,271,600 | - |
| Proceeds received on exercise of warrants | 464,887 | - |
| Net cash provided by financing activities | 229,691,030 | 245,494 |
| Net increase (decrease) in cash and cash equivalents | 140,629,813 | (1,858,208) |
| Cash and cash equivalents — beginning of year | 692,963 | 2,551,171 |
| Cash and cash equivalents — end of year | $ 141,322,776 | $ 692,963 |
| **Supplemental schedule of non-cash investing and financing activities:** | | |
| Par value adjustment due to reverse split | $ - | $ 1 |
| Receivable due to share issuance | $ 74,767,226 | $ - |
| Common stock issued for long-term service contract | $ 11,220,000 | $ - |
| Common stock issued for purchase of mining servers | $ 171,622 | $ 3,064,687 |
| Reduction of share commitment for purchase of mining servers | $ 408,625 | $ 1,021,562 |
| Common stock issued for note conversion | $ 1,579,075 | $ - |
| Restricted stock issuance | $ - | $ 15 |

The accompanying notes are an integral part to these audited consolidated financial statements.

F-6

---

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 1 - ORGANIZATION AND DESCRIPTION OF BUSINESS**

**Organization**

Marathon Digital Holdings, Inc. (the "Company") was incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc.

190

On December 7, 2011, the Company changed its name to American Strategic Minerals Corporation and were engaged in exploration and potential development of uranium and vanadium minerals business. In June 2012, the Company discontinued the minerals business and began to invest in real estate properties in Southern California. In October 2012, the Company discontinued its real estate business when the former CEO joined the firm and the Company commenced IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc. On November 1, 2017, the Company entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), which is focused on mining digital assets. The Company purchased cryptocurrency mining machines and established a data center in Canada to mine digital assets. The Company expanded its activities in the mining of new digital assets, while at the same time harvesting the value of its remaining IP assets. As of October 2020, the financial operations were brought in house and are completed by the Company's accounting team that consists of a Chief Financial Officer, Chief Operating Officer and bookkeeper. Subsequent to December 31, 2020, the Company hired a full-time Controller. We have also moved all of our data mining operations to our new facility in Hardin Montana.

The Company's Board of Directors adopted the reverse stock split approved by its shareholders at its December 2018 Board Meeting. Upon the effectiveness of the reverse stock split, every four shares of issued and outstanding common stock before the open of business on April 8, 2019 was combined into one issued and outstanding share of common stock, with no change in par value per share. All share and per share values for all periods presented in the accompanying consolidated financial statements have been retroactively adjusted to reflect the 1:4 Reverse Split.

On January 1, 2018, our Board adopted the 2018 Equity Incentive Plan, subsequently approved by the stockholders on March 7, 2018, pursuant to which up to 625,000 shares of common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers.

On May 21, 2019, the Company received notice from the Nasdaq Capital Market (the "Capital Market") that the Company has failed to maintain a minimum of $2,500,000 in stockholders' equity for continued listing as required under Listing Rule 5550(b)(1) as its Form 10-Q for the period ended March 31, 2019 reported stockholders' equity of $2,158,192. On July 23, 2019, we announced Nasdaq approved the Company's plan to regain compliance, and the Company was required to file its Form 10-Q for the period ending September 30, 2019 with the SEC on or before November 13, 2019, which it did, evidencing compliance with the stockholders' equity requirement.

F-7

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2019. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2020 and 2019, respectively.. There is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020.

The Company believes that bitcoin is attractive because it can serve as a store of value, supported by a robust and public open source architecture, that is untethered to sovereign monetary policy and can therefore serve as a hedge against inflation. Bitcoin exists entirely in electronic form, as virtually irreversible public transaction ledger entries on the blockchain, and transactions in bitcoin are recorded and authenticated not by a central repository, but by a decentralized peer-to-peer network. This decentralization avoids certain threats common to centralized computer networks, such as denial of service attacks, and reduces the dependency of the bitcoin network on any single system. While the bitcoin network as a whole is decentralized, the private keys used to access bitcoin balances are not widely distributed and are held on hardware (which can be physically controlled by the holder or by a third party such as a custodian) or via software programs on third-party servers and loss of such private keys results in an inability to access, and effective loss of, the corresponding bitcoin. Consequently, bitcoin holdings are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure, and user error, among others. These risks, in turn, make bitcoin subject to theft, destruction, or loss of value from hackers, corruption, or technology-specific factors such as viruses that do not affect conventional fiat currency. In addition, the bitcoin network relies on open source developers to maintain and improve the bitcoin protocol. Accordingly, bitcoin may be subject to protocol design changes, governance disputes such as "forked" protocols, competing protocols, and other open source-specific risks that do not affect conventional proprietary software.

The Company believes that in the context of the economic and public health crisis precipitated by COVID-19 and the unprecedented government financial stimulus measures adopted around the world, decreasing interest rates, as well as the breakdown of trust in and between political institutions and political parties in the United States and globally, bitcoin represents a more attractive store of value than fiat currency, and further that opportunity for appreciation in the value of bitcoin exists in the event that such factors lead to even more widespread adoption of bitcoin as a treasury reserve alternative.

On May 11, 2020, the Company purchased 700 new generation M305+ASIC Miners from MicroBT for approximately $1.3 million. The 700 miners produce 80/Th and will generate 56 PH/s (petahash) of hashing power, compared to the Company's current S-9 production of 46 PH/s. These next generation MicroBT ASIC miners are markedly more energy efficient than our existing Bitmain models. These miners were delivered to the Company's Hosting Facility in June and are producing Bitcoins.

The Company purchased 660 latest generation Bitmain S19 Pro Miners on May 12, 2020, 500 units on May 18, 2020 and an additional 500 units on June 11, 2020. These miners produce 110 TH/s and will generate 73 PH/s (petahash) of hashing power, compared to the Company's S-9 production of 46 PH/s. The Company made the payments of approximately $4.2 million in the second quarter of 2020 and received 660 of the 1,660 units at its Hosting Facility in August, and its hosting partner, Compute North, had installed them upon their arrival. Of the 1,000 remaining S-19 Pro Miners due to arrive in the 4th quarter, 500 were received in November and installed in the Company's Hosting Facility in Montana, while 500 were received and installed during the remainder of the 4th quarter. These miners will produce an additional 110 PH/s increasing the Company to an aggregate Hashpower of 294 PH/s.

On July 29, 2020, the Company announced the purchase of 700 next generation M31S+ASIC Miners from MicroBT. The miners arrived mid-August.

On August 13, 2020, the Company entered into a Long Term Purchase Contract with Bitmaintech PTE., LTD ("Bitmain") for the purchase of 10,500 next generation Antminer S-19 Pro ASIC Miners. The purchase price per unit is $2,362 ($2,206 with a 6.62% discount) for a total gross purchase price of $24,801,000. The parties confirm that the total hashrate of the Antminers under this agreement shall not be less than 1,155,000 TH/s. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a total net discount of 8.63% to the purchase

price adjusting the amount due to $22,660,673.

F-8

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The Company shall pay for the Antminers as follows:

(1) Twenty percent (20%) of the total purchase price shall be paid as a nonrefundable down payment within forty-eight (48) hours of execution of the agreement.

(2) The Company shall pay the twenty percent (20%) of the total purchase price prior to September 20, 2020.

(3) The Company shall pay the ten percent (10%) of the total purchase price prior to October 10, 2020.

(4) The Company shall pay the remaining fifty percent (50%) of the total purchase price in equal monthly installments due not less than fifty-five (55) days prior to the scheduled delivery of the Product(s) as follows:

   a) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the first installment of products to be shipped to the Company in January 2021.

   b) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the second installment of the products to be shipped to the Company in February 2021.

   c) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the third installment of the products to be shipped to the Company in March 2021.

   d) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the fourth installment of the products to be shipped to the Company in April 2021.

   e) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the fifth installment of the products to be shipped to the Company in May 2021.

   f) eight-point thirty-three percent (8.33%) no later than 55 days prior to each scheduled delivery period as to the sixth installment of the products to be shipped to the Company in June 2021.

As of December 31, 2020, the Company has paid $15,052,648 of the total balance of $22,660,679.

Subject to the timely payment of the purchase price, Bitmain shall deliver products according to the following schedule: 1,500 Units on or before January 31, 2021; and 1,800 units on or before each of February 28, 2021; March 31, 2021; April 30, 2021, May 31, 2021 and June 30, 2021.

On October 6, 2020, the Company entered into a series of agreements with affiliates of Beowulf Energy LLC, a Delaware limited liability company (collectively and as applicable, "Beowulf") and Two Point One, LLC, a Delaware limited liability company ("2Pl"; Marathon, Beowulf and 2Pl each a "Party" and, collectively, the "Parties"). Beowulf and 2Pl have been designing and developing a data center facility of up to 100-megawatts (the "Facility") that will be located next to, and supplied energy directly from, Beowulf's power generating station in Hardin, MT (the "Hardin Station"). The Facility is being developed in two phases to reach its 100 MW capacity, and the Hardin Station will supply the Facility exclusively with energy to operate Bitcoin mining servers.

The projected build out cost for Phase I is approximately $23 million, which is front loaded as the infrastructure is being built for the full 100 MW project. Phase I accounts for 70 MW of the 100 MW project. It entails high voltage equipment to break down the full 100 MW load from the generating station, and thereafter, the infrastructure cost per MW is a matter of distributing power at a container level. Assuming market conditions similar to current, the build out cost for Phase II works out to approximately $200,000 - $250,000 per MW. These are all in costs covering all equipment and labor needed starting from the power coming off the Generating Station distributed down to running the actual miners: including breakers, transformers, switches, containers, PDUs, fans, network cables, and the like.

F-9

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

Marathon and Beowulf entered into an exclusive Power Purchase Agreement for the initial supply of 30 MW (Phase I), and up to 100 MW in the aggregate (Phase II), of energy load to the Facility at a cost of $0.028/kWh. The initial term of the Power Purchase Agreement is five years, with up to five additional three-year extensions, as mutually agreed, assuming 75% energy utilization of the initial 30 MW of energy supplied to the Facility. Marathon purchased certain mining infrastructure and equipment for the Facility from Beowulf for a purchase price of $750,000, and Marathon has the right, at no additional cost, to construct and access the Facility on land adjacent to the Hardin Station pursuant to a lease agreement with Beowulf. After the execution of the contract, the Company entered into additional miner purchase agreements. Due to the increased size of the Company's fleet of miners, Phase I was increased from the initial 30 MW to 70 MW, while Phase II will encompass the completion of the remaining 30 MW for the project.

Beowulf and 2P1 will provide operation and maintenance services for the Facility pursuant to a Data Facility Services Agreement, in exchange for an initial issuance of 3,000,000 shares of Marathon's common stock to each of Beowulf and 2Pl valued at the time of execution at $1.87 per share or $11,220,000 in aggregate. Upon completion of Phase I, Marathon will issue to Beowulf an additional 150,000 shares of its common stock. During Phase II, Marathon will issue to Beowulf an additional 350,000 shares of its common stock – 150,000 shares upon reaching 60 MW of Facility load and 200,000 at completion of the full 100 MW of Facility load. The cost to maintain and run the Facility will be $0.006/kWh. All shares issued under the Data Facility Services Agreement are issued pursuant to transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933.

Effective October 19, 2020, David Lieberman retired as the Company's Chief Financial Officer, and Simeon Salzman was appointed Chief Financial Officer.

On October 23, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19 Pro ASIC Miners. The 2021 delivery schedule will be 2,500 Units in January, 4,500 Units in February and the final 3,000 Units in March 2021.The gross purchase price is $23,620,000 with 30% due upon the execution of the contract and the balance paid over the next 4 months. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,581,594. As of December 31, 2020, the Company has paid $13,634,645 of the total balance of $21,581,594.

As of the November 12, 2020, the Company sold all shares of our common stock available thereunder for an aggregate purchase price of $100,000,000 under our 2020 At the Market Offering pursuant to our registration statement on Form S-3 declared effective by the SEC on August 6, 2020, which was the total amount available for sale thereunder.

On December 8, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19j Pro ASIC Miners, with 6,000 units to be delivered in August 2021, and the remaining 4,000 units to be delivered in September 2021. The gross purchase price is $$23,770,000 with 10% of the purchase price due within 48 hours of execution of the contract, 30% due on January 14, 2021, 10% due on February 15, 2021, 30% due on June 15, 2021 and 20% due on July 15, 2021. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,718,649. As of December 31, 2020, the Company has paid $2,192,307 of the total balance of $21,718,649.

On December 11, 2020, the Company entered into an At The Market Agreement with HC Wainwright for up to $200,000,000. On January 12, 2021, the Company also announced that it had successfully completed its previously announced $200 million shelf offering by utilizing its at-the-market (ATM) facility. As a result, the Company ended the 2020 fiscal year with $141.3 million in cash and 81,974,619 shares outstanding.

On December 23, 2020, the Company executed a contract with Bitmain to purchase an additional 70,000 next generation Antminer S-19 ASIC Miners, with 7,000 units to be delivered in July 2021, and the remaining 63,000 units to be delivered in December 2021. The purchase price is $167,763,451. The purchase price for the miners shall be paid as follows: 20% within 48 hours of signing of contract; 30% on or before March 1, 2021; 4.75% on June 15, 2021; 1.76% on July 15, 2021; 4.58% on August 15, 2021; 10.19% on September 15, 2021; 17.63% on October 15, 2021 and 11.55% on November 15, 2021. As of December 31, 2020, the Company has paid $33,552,690 of the total balance of $167,763,452.

F-10

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On December 31, 2020, the Company sold 6,632,712 shares of common stock pursuant to the At The Market offering. Proceeds of $77.1 million net of offering costs of $2.3 million were received on January 4, 2021. Due to the timing of the proceeds received, an other current receivable was recorded in an amount of $74.8 million.

Effective December 31, 2020, the Board of Directors of the Company ratified the following arrangements approved by its Compensation Committee: Merrick Okamoto, CEO was awarded a cash bonus of $2,000,000 which was paid before year end 2020. He was also awarded a special bonus of 1,000,000 RSUs with immediate vesting. He was given a new three-year employment agreement effective January 1, 2021 with the same salary and bonus as the prior agreement. He was also granted the following: award of 1,000,000 RSUs when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $500,000,000; award of 1,000,000 RSUs priced when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $750,000,000; award of 2,000,000 RSUs priced at lowest closing stock price in past 30 trading days when the company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $1,000,000,000; and award of 2,000,000 RSUs when the Company's market capitalization reaches and sustains a market capitalization for 30 consecutive days above $2,000,000,000. As of March 12, 2021, Mr. Okamoto had earned all bonuses set forth, and as a result of the maximum shares available under the Company's 2018 Equity Incentive Plan having been issued, he is owed an additional 2,547,392 RSUs, for which the Company will, within 15 business days of the date of this report, file a proxy statement on Schedule 14A to hold an annual or special meeting of shareholders to gain shareholder approval to increase the number of shares available under the Plan in a sufficient number to cover issuance of these 2,547,392 RSUs.

Sim Salzman, CFO, was granted a bonus payment of $40,000 in cash; and a bonus of 91,324 RSUs with immediate vesting. James Crawford, COO, was granted a bonus payment of $127,308 in cash and a stock bonus of 57,990 RSUs with immediate vesting. Furthermore, per his employment agreement, his base salary for the 2021 will be increased by 3%.

Compensation for directors of the board for 2021 as follows: (i) cash compensation of $60,000 per year for each director, plus an additional $15,000 per year for each committee chair, paid 25% at the end of each calendar quarter; (ii) for existing directors, the equivalent of 54,795 RSUs; and (iii) for newly elected directors, a one-time grant of 91,324 RSUs, vesting 25% each calendar quarter during 2021. For clarification, new directors will also receive the same annual compensation as existing directors in addition to their one time grant.

F-11

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Presentation and Principles of Consolidation**

The accompanying consolidated financial statements include the accounts of the Company's subsidiaries, Marathon Crypto Mining, Inc., Crypto Currency Patent Holding Company and Soems Acquisition Corp, all of which are dormant as of December 31, 2020. For consolidated entities where the Company owns less than 100% of the subsidiary, the Company records net loss attributable to non-controlling interests in its consolidated statements of operations equal to the percentage of the economic or ownership interest retained in such entities by the respective non-controlling parties.

The Company's consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

**Use of Estimates and Assumptions**

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant estimates made by management include, but are not limited to, estimating the useful lives of patent assets and fixed assets, the assumptions used to calculate fair value of warrants and options granted, realization of long-lived assets, deferred income taxes, unrealized tax positions and the realization of digital currencies.

**Cash and Cash Equivalents**

The Company considers all highly liquid debt instruments and other short-term investments with maturity of three months or less, when purchased, to be cash equivalents. The Company maintains cash and cash equivalent balances at one financial institution that is insured by the Federal Deposit Insurance Corporation. The Company's accounts at this institution are insured, up to $250,000, by the Federal Deposit Insurance Corporation ("FDIC"). For the years ended December 31, 2020 and 2019, the Company's bank balances exceeded the FDIC insurance limit in an amount of $140.3 million and $0.2 million, respectively. To reduce its risk associated with the failure of such financial institution, the Company evaluates at least annually the rating of the financial institution in which it holds deposits. As of December 31, 2020 and 2019, the Company did not have any cash equivalents.

**Segment Reporting**

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision–making group in deciding how to allocate resources and in assessing performance. Our chief operating decision–making group ("CODM") is composed of the chief executive officer and chief financial officer. The Company currently operates in the Digital Currency Blockchain segment. The Company's Crypto-currency Machines are located in the United States, and the Company has employees only in the United States and views its operations as one operating segment as the CODM reviews financial information on a consolidated basis in making decisions regarding resource allocations and assessing performance.

**Digital Currencies**

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

F-12

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

- An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted. The reward for a bitcoin miner changes roughly every four years, or after every 210,000 blocks are mined and gets reduced by half each time, this whole process is called bitcoin halving. The last halving occurred on May 11, 2020 and reduced the reward per block to 6.25 BTC.

The following table presents the activities of the digital currencies for the years ended December 31, 2020 and 2019:

| | |
|---|---:|
| **Digital currencies at December 31, 2018** | $ - |
| Additions of digital currencies | 1,185,227 |
| Realized gain on sale of digital currencies | 36,092 |
| Sale of digital currencies | (1,220,178) |
| **Digital currencies at December 31, 2019** | $ 1,141 |
| Additions of digital currencies | 4,357,443 |
| Realized gain on sale of digital currencies | 15,466 |
| Sale of digital currencies | (2,102,394) |
| **Digital currencies at December 31, 2020** | $ 2,271,656 |

**Crypto-currency Machines**

Management has assessed the basis of depreciation of the Company's Crypto-currency Machines used to verify digital currency transactions and generate digital currencies and believes they should be depreciated over a 2 year period. The rate at which the Company generates digital assets and, therefore, consumes the economic benefits of its transaction verification servers are influenced by a number of factors including the following:

- the complexity of the transaction verification process which is driven by the algorithms contained within the bitcoin open source software;
- the general availability of appropriate computer processing capacity on a global basis (commonly referred to in the industry as hashing capacity which is measured in Petahash units); and
- technological obsolescence reflecting rapid development in the transaction verification server industry such that more recently developed hardware is more economically efficient to run in terms of digital assets generated as a function of operating costs, primarily power costs i.e. the speed of hardware evolution in the industry is such that later hardware models generally have faster processing capacity combined with lower operating costs and a lower cost of purchase.

The Company operates in an emerging industry for which limited data is available to make estimates of the useful economic lives of specialized equipment. Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Subsequent to December 31, 2020, management has determined that the expected useful life of transaction verification servers would be five years. Prior to December 31, 2020, management depreciated these servers over two years. This assessment takes into consideration the availability of historical data and management's expectations regarding the direction of the industry including potential changes in technology. Management will review this estimate annually and will revise such estimates as and when data comes available.

To the extent that any of the assumptions underlying management's estimate of useful life of its transaction verification servers are subject to revision in a future reporting period either as a result of changes in circumstances or through the availability of greater quantities of data then the estimated useful life could change and have a prospective impact on depreciation expense and the carrying amounts of these assets.

**Intangible Assets**

Intangible assets include the Crypto Currency Patent with original estimated useful life of 17 years. The Company amortize the cost of the intangible assets over their estimated useful lives on a straight-line basis. Costs incurred to acquire patents, including legal costs, are also capitalized as long-lived assets and amortized on a straight-line basis with the associated patent.

F-13

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The Company monitors the carrying value of long-lived assets for potential impairment and tests the recoverability of such assets whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If a change in circumstance occurs, the Company will perform a test of recoverability by comparing the carrying value of the asset or asset group to its undiscounted expected future cash flows. If cash flows cannot be separately and independently identified for a single asset, the Company will determine whether impairment has occurred for the group of assets for which we can identify the projected cash flows. If the carrying values are in excess of undiscounted expected future cash flows, the Company will measure any impairment by comparing the fair value of the asset or asset group to its carrying value. During the year ended December 31, 2020 and 2019, there was no impairment to the intangible assets.

**Revenue Recognition**

The Company recognizes revenue under ASC 606, Revenue from Contracts with Customers. The core principle of the new revenue standard is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The following five steps are applied to achieve that core principle:

- Step 1: Identify the contract with the customer
- Step 2: Identify the performance obligations in the contract
- Step 3: Determine the transaction price
- Step 4: Allocate the transaction price to the performance obligations in the contract
- Step 5: Recognize revenue when the Company satisfies a performance obligation

In order to identify the performance obligations in a contract with a customer, a company must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met: The customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct), and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

If a good or service is not distinct, the good or service is combined with other promised goods or services until a bundle of goods or services is

identified that is distinct.

The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both. When determining the transaction price, an entity must consider the effects of all of the following:

- Variable consideration
- Constraining estimates of variable consideration
- The existence of a significant financing component in the contract
- Noncash consideration
- Consideration payable to a customer

Variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

The transaction price is allocated to each performance obligation on a relative standalone selling price basis.

F-14

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The transaction price allocated to each performance obligation is recognized when that performance obligation is satisfied, at a point in time or over time as appropriate.

Providing computing power in crypto asset transaction verification services is an output of the Company's ordinary activities. The provision of computing power is the only performance obligation in the Company's contracts with third party pool operators. The transaction consideration the Company receives, if any, is noncash consideration, which the Company measures at fair value on the date received, which is not materially different than the fair value at contract inception. The consideration is all variable. Because it is not probable that a significant reversal of cumulative revenue will not occur, the consideration is constrained until the Company successfully places a block (by being the first to solve an algorithm) and the Company receives confirmation of the consideration it will receive, at which time revenue is recognized. There is no significant financing component in these transactions.

Fair value of the digital asset award received is determined using the average U.S. dollar spot rate of the related digital currency at the time of receipt.

Expenses associated with running the digital currency mining business, such as rent and electricity cost are also recorded as cost of revenues. Depreciation on digital currency mining equipment is recorded as a component of cost of revenues.

**Related Party Transactions**

Parties are considered related to the Company if the parties, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with the Company. Related parties also include principal owners of the Company, its management, members of the immediate families of principal owners of the Company and its management and other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests. The Company discloses all related party transactions.

On October 11, 2018, the Company entered into a 2-year Employment Agreement, subject to successive 1 year extension, with Merrick Okamoto, pursuant to which Mr. Okamoto will serve as the Executive Chairman and Chief Executive Officer of the Company. Pursuant to the terms of the Agreement, Mr. Okamoto shall receive a base salary at an annual base salary of $350,000 (subject to annual 3% cost of living increase) and an annual bonus up to 100% of base salary as determined by the Compensation Committee or the Board. As further consideration for Mr. Okamoto's services, the Company agreed to issue Mr. Okamoto 10-year stock options to purchase 1,250,000 shares of Common Stock, with a strike price of $2.32 per share, vesting 50% on the date of grant and 25% on each 6 months anniversary of the date of grant. As of December 31, 2020 and 2019, no bonus has been accrued.

On July 22, 2019, the Company granted David Lieberman, James Crawford and other three board directors 5-year stock options to purchase total of 200,000 shares of common stock, with an exercise price of $2.04 per share, vesting 50% on the date of grant and 25% on each 6 months anniversary of the date of grant. On October 19, 2020, David Lieberman retired and at that time, his shares of common stock fully vested.

See Note 1 for a description of bonuses and restricted stock unit awards to related parties ratified by the Board of Directors as of December 31, 2020.

**Fair Value of Financial Instruments**

The Company measures at fair value certain of its financial and non-financial assets and liabilities by using a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, essentially an exit price, based on the highest and best use of the asset or liability. The levels of the fair value hierarchy are:

Level 1: Observable inputs such as quoted market prices in active markets for identical assets or liabilities

Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data

Level 3: Unobservable inputs for which there is little or no market data, which require the use of the reporting entity's own assumptions.

F-15

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The carrying amounts reported in the consolidated balance sheet for cash, accounts receivable, accounts payable, and accrued expenses, approximate their estimated fair market value based on the short-term maturity of these instruments. The carrying value of notes payable and other long-term liabilities approximate fair value as the related interest rates approximate rates currently available to the Company.

Financial assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level of input that is significant to their fair value measurement. The Company measures the fair value of its marketable securities by taking into consideration valuations obtained from third-party pricing sources. The pricing services utilize industry standard valuation models, including both income and market-based approaches, for which all significant inputs are observable, either directly or indirectly, to estimate fair value. These inputs included reported trades of and broker-dealer quotes on the same or similar securities, issuer credit spreads, benchmark securities and other observable inputs.

The following tables present information about the Company's assets and liabilities measured at fair value on a recurring basis and the Company's estimated level within the fair value hierarchy of those assets and liabilities as of December 31, 2020 and 2019, respectively:

| | Fair value measured at December 31, 2020 | | |
|---|---|---|---|
| | Total carrying value at December 31, | Quoted prices in active markets | Significant other observable inputs | Significant unobservable inputs |

195

| | 2020 | (Level 1) | (Level 2) | (Level 3) |
|---|---|---|---|---|
| **Liabilities** | | | | |
| Warrant liability | $ 322,437 | $ - | $ - | $ 322,437 |

| | Fair value measured at December 31, 2019 | | | |
|---|---|---|---|---|
| | **Total carrying value at December 31, 2019** | **Quoted prices in active markets (Level 1)** | **Significant other observable inputs (Level 2)** | **Significant unobservable inputs (Level 3)** |
| **Liabilities** | | | | |
| Warrant liability | $ 12,849 | $ - | $ - | $ 12,849 |

There were no transfers between Level 1, 2 or 3 during the years ended December 31, 2020 and 2019.

At December 31, 2020, the Company had an outstanding warrant liability in the amount of $322,437 associated with warrants that were issued in January 2017 and warrants issued related to the Convertible Notes issued in August and September of 2017. The following table rolls forward the fair value of the Company's warrant liability, the fair value of which is determined by Level 3 inputs for the year ended December 31, 2020.

**FV of warrant liabilities**

| | Fair value |
|---|---|
| Outstanding as of December 31, 2018 | $ 39,083 |
| Change in fair value of warrants | (26,234) |
| Outstanding as of December 31, 2019 | $ 12,849 |
| Change in fair value of warrants | 309,588 |
| Outstanding as of December 31, 2020 | $ 322,437 |

The fair value of the warrant liabilities are marked-to-market each reporting period and changes in fair value are recorded as a non-operating gain or loss in our statement of operations, until they are completely exercised. The fair value is determined each reporting period using the Black-Scholes option pricing model and is affected by changes in inputs to that model including our stock price, expected stock price volatility, dividends, interest rates and expected term. The assumptions used in valuing the warrant liability as of the year ended December 31, 2020 were exercise price of $4.80 per share; implied stock price of $10.44; expected volatility of 44.47%; expected dividend rate of 0%; risk free interest rate of 1.70%; and expiration date of 2.17 years.

**Income Taxes**

The Company accounts for income taxes pursuant to the provision of Accounting Standards Codification ("ASC") 740-10, "Accounting for Income Taxes" which requires, among other things, an asset and liability approach to calculating deferred income taxes. The asset and liability approach requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the carrying amounts and the tax bases of assets and liabilities. A valuation allowance is provided to offset any net deferred tax assets for which management believes it is more likely than not that the net deferred asset will not be realized.

F-16

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The Company follows the provision of the ASC 740-10 related to Accounting for Uncertain Income Tax Position. When tax returns are filed, it is more likely than not that some positions taken would be sustained upon examination by the taxing authorities, while others are subject to uncertainty about the merits of the position taken or the amount of the position that would be ultimately sustained. In accordance with the guidance of ASC 740-10, the benefit of a tax position is recognized in the financial statements in the period during which, based on all available evidence, management believes it is most likely that not that the position will be sustained upon examination, including the resolution of appeals or litigation processes, if any. Tax positions taken are not offset or aggregated with other positions.

Tax positions that meet the more-likely-than-not recognition threshold are measured as the largest amount of tax benefit that is more than 50% likely of being realized upon settlement with the applicable taxing authority. The portion of the benefits associated with tax positions taken that exceeds the amount measured as described above should be reflected as a liability for uncertain tax benefits in the accompanying balance sheet along with any associated interest and penalties that would be payable to the taxing authorities upon examination. The Company believes its tax positions will more likely than not be upheld upon examination. As such, the Company has not recorded a liability for uncertain tax benefits.

**Basic and Diluted Net Loss per Share**

Net loss per common share is calculated in accordance with ASC Topic 260: Earnings Per Share ("ASC 260"). Basic loss per share is computed by dividing net loss by the weighted average number of shares of common stock outstanding during the period. The computation of diluted net loss per share does not include dilutive common stock equivalents in the weighted average shares outstanding, as they would be anti-dilutive.

Securities that could potentially dilute loss per share in the future that were not included in the computation of diluted loss per share at December 31, 2020 and 2019 are as follows:

| | As of December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Warrants to purchase common stock | 287,656 | 182,191 |
| Options to purchase common stock | 106,120 | 1,731,745 |
| Convertible notes to exchange common stock | - | 312,221 |
| **Total** | **393,776** | **2,226,157** |

The following table sets forth the computation of basic and diluted loss per share:

| | For the Years Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Net loss attributable to common shareholders | $ (10,447,771) | $ (3,517,065) |
| Denominator: | | |
| Weighted average common shares - basic and diluted | 81,408,340 | 6,664,238 |
| Loss per common share - basic and diluted | $ (0.13) | $ (0.53) |

**Impairment of Long-lived Assets**

Management reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to undiscounted future cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be

recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Subsequent to year end, on January 14, 2021, the Company sold its inventory of approximately 5,900 S9, 13.5 TH/s miners for $616,236. As of December 31, 2020, these assets had a net book value of $1,487,538. As such, management determined that those crypto-currency machines were impaired by a total of $871,302 based upon an assessment as of December 31, 2020. During the year ended December 31, 2020 and 2019, the Company's leasehold improvements were impaired by $0 and $447,776, respectively.

**Stock-Based Compensation**

The Company expenses stock-based compensation to employees and non-employees over the requisite service period based on the estimated grant-date fair value of the awards and forfeiture rates. The Company estimates the fair value of stock option grants using the Black-Scholes option pricing model and the assumptions used in calculating the fair value of stock-based awards represent management's best estimates and involve inherent uncertainties and the application of management's judgment. These assumptions are the expected stock volatility, the risk–free interest rate, the expected life of the option, the dividend yield on the underlying stock and the expected forfeiture rate. Expected volatility is calculated based on the historical volatility of the Company's common stock over the expected term of the option. Risk–free interest rates are calculated based on continuously compounded risk–free rates for the appropriate term.

F-17

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

**Leases**

Effective January 1, 2019, the Company accounts for its leases under ASC 842, Leases. Under this guidance, arrangements meeting the definition of a lease are classified as operating or financing leases and are recorded on the consolidated balance sheet as both a right of use asset and lease liability, calculated by discounting fixed lease payments over the lease term at the rate implicit in the lease or the Company's incremental borrowing rate. Lease liabilities are increased by interest and reduced by payments each period, and the right of use asset is amortized over the lease term. For operating leases, interest on the lease liability and the amortization of the right of use asset result in straight-line rent expense over the lease term. Variable lease expenses, if any, are recorded when incurred.

In calculating the right of use asset and lease liability, the Company elected to combine lease and non-lease components. The Company excluded short-term leases having initial terms of 12 months or less from the new guidance as an accounting policy election and recognizes rent expense on a straight-line basis over the lease term.

The Company continues to account for leases in the prior period financial statements under ASC Topic 840.

**Recent Accounting Pronouncements**

In December 2019, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2019-12, "*Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes ("ASU 2019-12")*", which is intended to simplify various aspects related to accounting for income taxes. ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. This guidance is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, with early adoption permitted. The Company is currently evaluating the impact of this standard on its consolidated financial statements and related disclosures.

F-18

## MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

In November 2019, the FASB issued ASU 2019-10, *Financial Instruments—Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates*, which, among other items, allows public business entities that qualify as smaller reporting companies for SEC reporting purposes additional time to implement the guidance related to FASB ASC 326. Under ASU 2019-10, the effective date for such entities is deferred to fiscal years, and interim periods within those fiscal years, beginning after December 15, 2022. Earlier application is still allowed for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company is currently evaluating the impact of this standard on its consolidated financial statements and related disclosures.

In June 2018, the FASB issued ASU 2018-07, "*Improvements to Nonemployee Share-Based Payment Accounting*", which simplifies the accounting for share-based payments granted to nonemployees for goods and services. Under the ASU, most of the guidance on such payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. The changes take effect for public companies for fiscal years starting after December 15, 2018, including interim periods within that fiscal year. For all other entities, the amendments are effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted, but no earlier than an entity's adoption date of Topic 606. On January 1, 2019, the Company adopted this ASU and the adoption did not have a material impact on the Company's consolidated financial statements.

In July 2017, the FASB issued ASU 2017-11, "*Earnings Per Share (Topic 260) Distinguishing Liabilities from Equity (Topic 480) Derivatives and Hedging (Topic 815)*," which addresses the complexity of accounting for certain financial instruments with down round features. Down round features are features of certain equity-linked instruments (or embedded features) that result in the strike price being reduced on the basis of the pricing of future equity offerings. Current accounting guidance creates cost and complexity for entities that issue financial instruments (such as warrants and convertible instruments) with down round features that require fair value measurement of the entire instrument or conversion option. For public business entities, the amendments in Part I of this Update are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018 with early adoption permitted. On January 1, 2019, the Company adopted this ASU and the adoption did not have a material impact on the Company's consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842) in order to increase transparency and comparability among organizations by, among other provisions, recognizing lease assets and lease liabilities on the balance sheet for those leases classified as operating leases under previous GAAP. For public companies, ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 (including interim periods within those periods) using a modified retrospective approach and early adoption is permitted. In transition, entities may also elect a package of practical expedients that must be applied in its entirety to all leases commencing before the adoption date, unless the lease is modified, and permits entities to not reassess (a) the existence of a lease, (b) lease classification or (c) determination of initial direct costs, as of the adoption date, which effectively allows entities to carryforward accounting conclusions under previous U.S. GAAP. In July 2018, the FASB issued ASU 2018-11, Leases (Topic 842): Targeted Improvements, which provides entities an optional transition method to apply the guidance under Topic 842 as of the adoption date, rather than as of the earliest period presented. The Company adopted Topic 842 on January 1, 2019, using the optional transition method to apply the new guidance as of January 1, 2019, rather than as of the earliest period presented, and elected the package of practical expedients described above. Based on the analysis, on January 1, 2019, the Company recorded right of use assets of approximately $388,425, lease liability of approximately $289,283 and eliminated deferred rent of approximately $99,141.

Any new accounting standards, not disclosed above, that have been issued or proposed by FASB that do not require adoption until a future date are not expected to have a material impact on the consolidated financial statements upon adoption.

197

F-19

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 3 – PROPERTY AND EQUIPMENT AND INTANGIBLE ASSETS**

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2019. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2020 and 2019, respectively. There is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares.

On May 11, 2020, the Company signed a Contract Addendum with Compute North, to pause and suspend services under its Colocation Agreement. This will suspend all production of Bitcoin using our S-9 miners.

On May 11, 2020, the Company purchased 700 new generation M305+ASIC Miners from MicroBT for approximately $1.3 million. The 700 miners produce 80/Th and will generate 56 PH/s (petahash) of hashing power, compared to the Company's current S-9 production of 46 PH/s. These next generation MicroBT ASIC miners are markedly more energy efficient than our existing Bitmain models. These miners were delivered to the Company's Hosting Facility in June 2020 and are producing Bitcoins.

The Company purchased 660 latest generation Bitmain S19 Pro Miners on May 12, 2020, 500 units on May 18, 2020 and an additional 500 units on June 11, 2020. These miners produce 110 TH/s and will generate 73 PH/s (petahash) of hashing power, compared to the Company's S-9 production of 46 PH/s. The Company made the payments of approximately $4.2 million in the second quarter of 2020 and received 660 of the 1,660 units at its Hosting Facility in August, and its hosting partner, Compute North, had installed them upon their arrival. Of the 1,000 remaining S-19 Pro Miners due to arrive in the 4th quarter, 500 were received in November and installed in the Company's Hosting Facility in Montana, while 500 are anticipated to be received and installed during the remainder of the 4th quarter. These miners will produce an additional 110 PH/s increasing the Company to an aggregate Hashpower of 294 PH/s.

On July 29, 2020, the Company announced the purchase of 700 next generation M31S+ASIC Miners from MicroBT. The miners arrived mid-August. On August 13, 2020, the Company entered into a Long Term Purchase Contract with Bitmaintech PTE., LTD ("Bitmain") for the purchase of 10,500 next generation Antminer S-19 Pro ASIC Miners.

The purchase price per unit is $2,362 ($2,206 with a 6.62% discount) for a total purchase price of $24,801,000 (with a 6.62% discount for a discounted price of $23,159,174). The parties confirm that the total hashrate of the Antminers under this agreement shall be not less than 1,155,000 TH/s.

Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a total net discount of 8.63% to the purchase price adjusting the amount due to $22,660,673.

Subject to the timely payment of the purchase price, Bitmain shall deliver products according to the following schedule: 1,500 Units on or before January 31, 2021; and 1,800 units on or before each of February 28, 2021; March 31, 2021; April 30, 2021, May 31, 2021 and June 30, 2021. As of December 31, 2020, the Company has paid $15,052,648 of the total balance of $22,660,673.

On October 23, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19 Pro ASIC Miners. The 2021 delivery schedule will be 2,500 Units in January, 4,500 Units in February and the final 3,000 Units in March 2021. The gross purchase price is $23,620,000 with 30% due upon the execution of the contract and the balance paid over the next 4 months. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,581,594. As of December 31, 2020, the Company has paid $13,634,645 of the total balance of $21,581,594.

On December 8, 2020, the Company executed a contract with Bitmain to purchase an additional 10,000 next generation Antminer S-19j Pro ASIC Miners, with 6,000 units to be delivered in August 2021, and the remaining 4,000 units to be delivered in September 2021. The gross purchase price is $23,770,000 with 10% of the purchase price due within 48 hours of execution of the contract, 30% due on January 14, 2021, 10% due on February 15, 2021, 30% due on June 15, 2021 and 20% due on July 15, 2021. Subsequent to executing this agreement, due to the additional executed contracts, Bitmain applied a discount of 8.63% to the purchase price adjusting the amount due to $21,718,649. As of December 31, 2020, the Company has paid $2,192,307 of the total balance of $21,718,649.

On December 23, 2020, the Company executed a contract with Bitmain to purchase an additional 70,000 next generation Antminer S-19 ASIC Miners, with 7,000 units to be delivered in July 2021, and the remaining 63,000 units to be delivered in December 2021. The purchase price is $167,763,451. The purchase price for the miners shall be paid as follows: 20% within 48 hours of signing of contract; 30% on or before March 1, 2021; 4.75% on June 15, 2021; 1.76% on July 15, 2021; 4.58% on August 15, 2021; 10.19% on September 15, 2021; 17.63% on October 15, 2021 and 11.55% on November 15, 2021. As of December 31, 2020, the Company has paid $33,552,690 of the total balance of $167,763,451.

On February 1, 2021, Marathon announced that Bitmain had shipped approximately 4,000 S-19 Pro ASIC miners to the Company's mining facility in Hardin, MT, all of which were delivered as scheduled.

In addition to the initial 4,000 miners delivered to the Hardin facility in February, Bitmain recently shipped another 6,300 miners to Hardin. A portion of this new shipment has already been received and installations are progressing. Marathon expects all 10,300 miners to be installed by the end of March, at which point the Company's mining fleet will consist of 12,920 miners generating approximately 1.4 EH/s.

The components of property, equipment and intangible assets as of December 31, 2020 and 2019 are:

| | Useful life (Years) | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Website | 7 | $ 121,787 | $ 121,787 |
| Mining equipment | 5 | 12,989,318 | 7,120,505 |
| Construction in Progress | N/A | 10,593,575 | - |
| Right to mining patent | 17 | 1,210,000 | 1,210,000 |
| Gross property, equipment and intangible assets | | 24,914,680 | 8,452,292 |
| Less: Accumulated depreciation and amortization | | (6,687,957) | (3,623,745) |
| **Property, equipment and intangible assets, net** | | $ 18,226,723 | $ 4,828,547 |

As of December 31, 2020, intangible assets amortization are as follows:

| | | |
|---|---|---|
| 2021 | $ | 71,176 |
| 2022 | | 71,176 |

198

| | |
|---|---|
| 2023 | 71,176 |
| 2024 | 71,176 |
| 2025 | 71,176 |
| Thereafter | 646,522 |
| Total | $ 1,002,402 |

F-20

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 4 - STOCKHOLDERS' EQUITY**

We are authorized to issue 200,000,000 shares of common stock and 50,000,000 shares of preferred stock, at $.0001 par value per share. As of December 31, 2020, we have 81,974,619 shares of our common stock and no shares of our preferred stock issued and outstanding.

**Common Stock**

*At The Market Offering Agreement*

On July 19, 2019, we entered into an At The Market Offering Agreement (the "Agreement") with H.C. Wainwright & Co., LLC ("H.C. Wainwright") which establishes an at-the-market equity program pursuant to which we may offer and sell shares of our common stock, par value $0.0001 per share ("Common Stock"), from time to time as set forth in the Agreement. The Agreement provides for the sale of shares of our Common Stock ("Shares") having an aggregate offering price of up to $7,472,417.

Subject to the terms and conditions set forth in the Agreement, H.C. Wainwright will use its commercially reasonable efforts consistent with its normal trading and sales practices to sell the Shares from time to time, based upon our instructions. We have provided H.C. Wainwright with customary indemnification rights, and H.C. Wainwright will be entitled to a commission at a fixed rate equal to three percent (3.0%) of the gross proceeds per Share sold. In addition, we have agreed to pay certain expenses incurred by H.C. Wainwright in connection with the Agreement, including up to $25,000 of the fees and disbursements of their counsel. The Agreement will terminate upon the earlier of sale of all of the Shares under the Agreement or July 19, 2022 unless terminated earlier by either party as permitted under the Agreement.

Sales of the Shares, if any, under the Agreement shall be made in transactions that are deemed to be "at the market offerings" as defined in Rule 415 under the Securities Act of 1933, as amended (the "Securities Act"), including sales made by means of ordinary brokers' transactions, including on the Nasdaq Capital Market, at market prices or as otherwise agreed with H.C. Wainwright. We have no obligation to sell any of the Shares, and, at any time, we may suspend offers under the Agreement or terminate the Agreement.

*Follow On Offering*

On July 23, 2020, the Company entered into an underwriting agreement with H.C. Wainwright. The Company agreed to sell H.C. Wainwright 7,666,666 shares of its common stock, including the exercise in full by H.C. Wainwright of the option to purchase an additional 999,999 shares of common stock, at a public offering price of $0.90 per share. The gross proceeds of this offering, which closed on July 28, 2020, were approximately $6.9 million, and proceeds, net of underwriting discount and expenses of $0.6 million, were $6.3 million. Additionally, representative's warrant to purchase 536,667 shares of our common stock with a five year term and an exercise price of $1.125 per share were issued.

*Shelf Registration Statements on Form S-3 and At The Market Offering Agreements*

On August 13, 2020, the Company's Shelf Registration Statement on Form S-3, filed on August 6, 2020, was declared effective by the SEC, along with the Company's At The Market Offering Agreement, entered into by the Company and H.C. Wainwright & Co., LLC, as Exhibit 1.1 to the Form S-3 (the "2020 At The Market Agreement"). This 2020 At the Market Agreement establishes an at-the-market equity program pursuant to which the Company may offer and sell shares of its common stock, par value $0.0001 per share, with an aggregate offering price of up to $100 million, from time to time as set forth in the agreement.

On December 22, 2020, the Company's Shelf Registration Statement on Form S-3, filed on December 11, 2020, was declared effective by the SEC, along with the Company's At The Market Offering Agreement, entered into by the Company and H.C. Wainwright & Co., LLC, as Exhibit 1.1 to the Form S-3 (the "2020 At The Market Agreement"). This 2020 At the Market Agreement establishes an at-the-market equity program pursuant to which the Company may offer and sell shares of its common stock, par value $0.0001 per share, with an aggregate offering price of up to $200 million, from time to time as set forth in the agreement.

During the year ended December 31, 2020, 54,301,698 shares of common stock were issued under the Company's 2020 At The Market Agreements for total proceeds of approximately $307.1 million, net of offering costs, of $9.4 million, and the Company has sold all shares possible under the Agreements.

During the year ended December 31, 2019, 172,126 of common stock were issued under the Company's 2019 At The Market Agreements for total proceeds of approximately $0.3 million, net of offering costs, of $0.01 million, and the Company has sold all shares possible under the Agreements.

F-21

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

*Asset Purchase Agreement*

On September 30, 2019, the Company consummated the purchase of 6000 S-9 Bitmain 13.5 TH/s Bitcoin Antminers ("Miners") from SelectGreen Blockchain Ltd., a British Columbia corporation, for which the purchase price was $4,086,250 or 2,335,000 shares of its common stock at a price of $1.75 per share. As a result of an exchange cap requirement imposed in conjunction with the Company's Listing of Additional Shares application filed with Nasdaq to the transaction, the Company issued 1,276,442 shares of its common stock which represented $2,233,773 of the $4,086,250 (constituting 19.9% of the issued and outstanding shares on the date of the Asset Purchase Agreement) and upon the receipt of shareholder approval, at the Annual Shareholders Meeting to be held on November 15, 2019, the Company can issue the balance of the 1,058,558 unregistered common stock shares. The shareholders did approve the issuance of the additional shares at the Annual Shareholders Meeting. The Company has issued an additional 474,808 at $0.90 per share. The $513,700 set forth on the balance sheet for mining servers payable reflects the fair value of 583,750 shares to be issued at $0.88 per share to conclude the purchase of the Miners at December 31, 2019. The Company recorded change in fair value of mining payable of $66,547 and $507,862 during the year ended December 31, 2020 and 2019, respectively.. There is no requirement for the Company to make a payment in cash in lieu of issuing the remaining shares.

*Agreements with Beowulf Energy*

On October 6, 2020, the Company entered into a series of agreements with affiliates of Beowulf Energy LLC, a Delaware limited liability company (collectively and as applicable, "Beowulf") and Two Point One, LLC, a Delaware limited liability company ("2Pl"; Marathon, Beowulf and 2Pl each a "Party" and, collectively, the "Parties"). Beowulf and 2Pl have been designing and developing a data center facility of up to 100-megawatts (the "Facility") that will be located next to, and supplied energy directly from, Beowulf's power generating station in Hardin, MT (the "Hardin Station"). The Facility is being developed in two phases to reach its 100 MW capacity, and the Hardin Station will supply the Facility exclusively with energy to operate Bitcoin mining servers.

The projected build out cost for Phase I is approximately $14 million, which is front loaded as the infrastructure is being built for the full 100 MW

project. It entails high voltage equipment to break down the full 100 MW load from the generating station, and thereafter, the infrastructure cost per MW is a matter of distributing power at a container level. Assuming market conditions similar to current, the build out cost for Phase II works out to approximately $200,000 - $250,000 per MW. These are all in costs covering all equipment and labor needed starting from the power coming off the Generating Station distributed down to running the actual miners: including breakers, transformers, switches, containers, PDUs, fans, network cables, and the like.

Marathon and Beowulf entered into an exclusive Power Purchase Agreement for the initial supply of 30 MW (Phase I), and up to 100 MW in the aggregate (Phase II), of energy load to the Facility at a cost of $0.028/kWh. The initial term of the Power Purchase Agreement is five years, with up to five additional three-year extensions, as mutually agreed, assuming 75% energy utilization of the initial 30 MW of energy supplied to the Facility. Marathon purchased certain mining infrastructure and equipment for the Facility from Beowulf for a purchase price of $750,000, and Marathon has the right, at no additional cost, to construct and access the Facility on land adjacent to the Hardin Station pursuant to a lease agreement with Beowulf.

Beowulf and 2P1 will provide operation and maintenance services for the Facility pursuant to a Data Facility Services Agreement, in exchange for an initial issuance of 3,000,000 shares of Marathon's common stock to each of Beowulf and 2Pl valued at the time of execution or $1.87 per share. Upon completion of Phase I, Marathon will issue to Beowulf an additional 150,000 shares of its common stock. During Phase II, Marathon will issue to Beowulf an additional 350,000 shares of its common stock – 150,000 shares upon reaching 60 MW of Facility load and 200,000 at completion of the full 100 MW of Facility load. The cost to maintain and run the Facility will be $0.006/kWh. All shares issued under the Data Facility Services Agreement are issued pursuant to transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933.

F-22

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

*Other 2020 Common Stock Activity*

During the month of January 2020, the Company issued 118,524 shares of common stock under the At The Market Offering for the total proceeds of $131,215, net of offering cost of $5,045.

During the month of February 2020, the Company issued 186,211 shares of common stock under the At The Market Offering for the total proceeds of $220,802, net of offering cost of $8,687.

During the month of March 2020, the Company issued 98,340 shares of common stock under the At The Market Offering for the total proceeds of $49,874, net of offering cost of $3,042.

On March 30, 2020, the Company issued 350,250 shares of common stock in exchange for S9 miners with a fair market value of $612,938.

During the month of April 2020, the Company issued 3,016,385 shares of common stock under the At The Market Offering for the total proceeds of $1,514,969, net of offering cost of $58,532.

During the month of May 2020, the Company issued 5,987,723 shares of common stock under the At The Market Offering for the total proceeds of $3,607,398, net of offering cost of $127,765.

During the month of June 2020, the Company issued 1,540,710 shares of common stock under the At The Market Offering for the total proceeds of $1,537,346, net of offering cost of $51,526.

On June 1, 2020, the Company issued 2,023,739 shares of common stock in exchange for the conversion and extinguishment of the note payable outstanding in an amount of $999,106.

During the month of August 2020, the Company issued 5,820,761 shares of common stock under the At The Market Offering for the total proceeds of $20,178,935, net of offering cost of $630,283.

During the month of September 2020, the Company issued 943,981 shares of common stock under the At The Market Offering for the total proceeds of $2,516,199, net of offering cost of $78,874.

During the month of October 2020, the Company issued 7,813,218 shares of common stock under the At The Market Offering for the total proceeds of $21,320,409, net of offering cost of $665,773.

On October 6, 2020, the Company issued 6,000,000 shares of common stock in exchange for five years of services pursuant to the Power Purchase Agreement and Data Facility Services Agreement for the total proceeds of $0, net of offering cost of $0 valued at the time of execution at $1.87 per share or $11,220,000 in aggregate.

During the month of November 2020, the Company issued 5,851,295 shares of common stock under the At The Market Offering for the total proceeds of $16,685,649, net of offering cost of $519,992.

During the month of December 2020, the Company issued 22,924,550 shares of common stock under the At The Market Offering for the total proceeds of $239,301,605, net of offering cost of $7,255,610.

F-23

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

*2019 Common Stock Activity*

On October 1, 2019, the Company issued 150,000 shares of its common stock to a consultant. The fair value of the common stock was $259,500.

**Common Stock Warrants**

A summary of the status of the Company's outstanding stock warrants and changes during year ended is as follows:

| | Number of Warrants | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|---|
| Outstanding as of December 31, 2018 | 182,191 | $ | 25.04 | 2.8 |
| Expired | - | | - | - |
| Exercised | - | | - | - |
| Outstanding as of December 31, 2019 | 182,191 | $ | 25.04 | 2.8 |
| Issued | 536,667 | | 1.13 | 4.6 |
| Expired | (17,969) | | 59.14 | - |
| Exercised | (413,233) | | 1.13 | - |
| Outstanding as of December 31, 2020 | 287,656 | $ | 12.64 | 2.7 |
| Warrants exercisable as of December 31, 2020 | 287,656 | $ | 12.64 | 2.7 |

The aggregate intrinsic value of options outstanding and exercisable at December 31, 2020 was $1,395,921.

On July 23, 2020, the Company entered into an underwriting agreement with H.C. Wainwright. The Company agreed to sell H.C. Wainwright

7,666,666 shares of its common stock, including the exercise in full by H.C. Wainwright of the option to purchase an additional 999,999 shares of common stock, at a public offering price of $0.90 per share. The gross proceeds of this offering, which closed on July 28, 2020, were approximately $6.9 million, and proceeds, net of underwriting discount and expenses of $0.6 million, were $6.3 million. Additionally, representative's warrant to purchase 536,667 shares of our common stock with a five year term and an exercise price of $1.125 per share were issued.

**Common Stock Options**

On July 22, 2019, the Company's board has approved to issue 275,000 shares of option to purchase the Company's common stock to 8 employees and consultants for the service they provided. The options have a five-year term with an exercise price of $2.04, vesting 50% on the date of grant and 25% on each 6 months anniversary of the date of grant. The options were valued based on the Black-Scholes model, using the strike of $2.04 per share, an average expected term of 2.69 years, volatility of 39.46% based on the average volatility of comparable companies over the comparable prior period.

On May 5, 2020, the Compensation Committee of the Board of Directors held a meeting and approved bonuses and stock option grants for Directors and Officers for their contributions to the growth of Marathon Patent Group, Inc., for the year ended December 31, 2019. Total awards to be granted amounted to 1,158,138 restricted stock units at a price of $0.43 per unit with a term of one year, vesting quarterly in equal amounts, and (ii) cash award of $105,000 to Merrick Okamoto and $54,000 to David Lieberman. In addition, the Compensation Committee agreed to cancel 1,587,500 existing stock options for Directors, Officers and outside legal counsel, and replace them with 1,587,500 restricted stock units at a price of $0.43 per unit with a term of one year, vesting quarterly in equal amounts.

Due to the conversion of stock options to restricted stock options during 2020, the grant date fair value of stock options granted to employees during the years ended December 31, 2020 and 2019 were $0 and $163,165, respectively. Estimated future stock-based compensation expense relating to unvested stock options is approximately $0 as of December 31, 2020.

F-24

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

A summary of the stock options as of December 31, 2020 and changes during the year ended is as follows:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|
| Outstanding as of December 31, 2019 | 1,731,745 | $ 5.50 | 7.92 |
| Cancelled | (1,587,500) | 2.28 | - |
| Exercised | (25,000) | 2.04 | - |
| Expired | (13,125) | 83.62 | - |
| Outstanding as of December 31, 2020 | 106,120 | $ 44.32 | 4.28 |
| Options vested and expected to vest as of December 31, 2020 | 106,120 | $ 44.32 | 4.28 |
| Options vested and exercisable as of December 31, 2020 | 106,120 | $ 44.32 | 4.28 |

The aggregate intrinsic value of options outstanding and exercisable at December 31, 2020 was $210,000.

A summary of the stock options as of December 31, 2019 and changes during the year ended is as follows:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|
| Outstanding as of December 31, 2018 | 1,466,520 | $ 6.66 | 9.49 |
| Granted | 275,000 | 2.04 | 4.81 |
| Expired | (9,775) | 82.05 | - |
| Outstanding as of December 31, 2019 | 1,731,745 | $ 5.50 | 7.92 |
| Options vested and expected to vest as of December 31, 2019 | 1,731,745 | $ 5.50 | 7.92 |
| Options vested and exercisable as of December 31, 2019 | 1,594,245 | $ 5.80 | 8.21 |

F-25

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

A summary of the RSUs as of December 31, 2020 and 2019, respectively and changes during the period are presented below:

| | Number of Units | Weighted Average Grant Date Fair Value |
|---|---|---|
| Nonvested at December 31, 2018 | 43,750 | $ 6.88 |
| Granted | 150,000 | $ 1.73 |
| Vested | (175,000) | $ 2.47 |
| Nonvested at December 31, 2019 | 18,750 | $ 6.88 |
| Granted | 2,745,639 | $ 0.43 |
| Vested | (2,198,110) | $ 0.49 |
| Nonvested at December 31, 2020 | 566,279 | $ 0.43 |

| | Number of Units | Weighted Average Grant Date Fair Value |
|---|---|---|
| Nonvested at December 31, 2019 | 18,750 | $ 6.88 |
| Granted | 2,745,639 | $ 0.43 |
| Vested | (2,198,110) | $ 0.48 |
| Nonvested at December 31, 2020 | 566,279 | $ 0.45 |

| Number of Units | Weighted Average Grant Date Fair Value |
|---|---|

| | | | | December 31, | December 31, |
| | | | | - $ | - |
| Anticipated Vesting | | | | - $ | - |
| March 31, 2021 | | | | 566,279 $ | 0.43 |

**NOTE 5 - DEBT, COMMITMENTS AND CONTINGENCIES**

Included in the Accounts payable and accrued expenses amount of approximately $1.0 million, $0.4 million relates to trade accounts payable incurred in the ordinary course of business while $0.6 million relates to accrued expenses.

Debt consists of the following:

| | Maturity Date | Interest Rate | December 31, 2020 | December 31, 2019 |
|---|---|---|---|---|
| Convertible Note | 9/1/2021 | 5% | $ - | $ 999,106 |
| Less: debt discount | | | - | - |
| Total convertible notes, net of discount | | | $ - | $ 999,106 |
| Total | | | $ - | $ 999,106 |
| Less: current portion | | | - | - |
| Long term portion | | | $ - | $ 999,106 |

F-26

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On August 14, 2017, the Company entered into a unit purchase agreement (the "Unit Purchase Agreement") with certain accredited investors providing for the sale of up to $5,500,000 of 5% secured convertible promissory notes (the "Convertible Notes"), which are convertible into shares of the Corporation's common stock, and the issuance of warrants to purchase 1,718,750 shares of the Company's Common Stock (the "Warrants"). The Convertible Notes are convertible into shares of the Company's Common Stock at the lesser of (i) $0.80 per share or (ii) the closing bid price of the Company's common stock on the day prior to conversion of the Convertible Note; provided that such conversion price may not be less than $0.40 per share. The Warrants have an exercise price of $4.80 per share. In two closings of the Unit Purchase Agreement, the Company issued $5,500,000 in Convertible Notes to the investors. The remaining balance of the Convertible Notes were due to mature on May 31, 2018. On February 10, 2020, the investor agreed to extend the maturity date to September 1, 2021, and the conversion price will be changed to the lower of, the closing price on the previous days close prior to the conversion request or a maximum conversion price of $1.00 and a floor of $0.80. The note bears interest at the rate of 5% per annum and accrues but is not paid in cash.

During the year ended December 31, 2020, $999,106 remaining balance of the Convertible Notes and $215,136 of accrued and unpaid interest were converted into 2,023,739 shares of the Company's Common Stock, and the Company recorded $364,833 of expenses pursuant to the inducement of the conversion terms.

Issuers of convertible debt that has fallen "out of the money" (the conversion price is more than the applicable stock price) sometimes want to encourage conversion of the debt into its equity securities anyhow. To do that, they can provide an incentive, lasting for a brief period, for holders of the debt to exercise their conversion privilege. Frequently, this inducement will take the form of a temporary lessening of the conversion price (and consequent increase in the "conversion ratio," which determines how many shares can be converted from each bond). Less often, the issuer may transfer cash or other property to those holders who can be persuaded to exercise the conversion privilege. Statement of Financial Accounting Standards No. 84, *Induced Conversions of Convertible Debt,* addresses the financial-accounting ramifications of such arrangements. The statement applies only to conversions that comply with two conditions. They must conform to changed conversion privileges that are exercisable for only a limited period. Further, they must include the issuance of all stock that can be issued in accordance with conversion privileges included in the terms of the debt at issuance.

During the year ended December 31, 2020 and 2019, there was no amortization of debt discount. Interest expenses were $20,984 and $49,954 for the years ended December 31, 2020 and 2019, respectively.

**Note Payable**

On May 6, 2020, the Company entered into a Paycheck Protection Program Promissory Note agreement with a bank which is providing $62,500 to the Company. The note accrues interest at a rate of 1% per annum and matures on May 6, 2022. The Company will apply for 100% forgiveness when the forgiveness portal is opened for submission by the bank.

**Leases**

Effective June 1, 2018, the Company rented its corporate office at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada 89144, on a month to month basis. The monthly rent is $1,997. A security deposit of $3,815 has been paid.

The Company also assumed a lease in connection with the mining operations in Quebec, Canada. Operating leases are included in operating lease right-of-use assets, operating lease liabilities, and noncurrent operating lease liabilities on the balance sheets. Subsequent to December 31, 2020, the Company entered into a termination agreement with the Lessor to agree to terminate the lease as of March 7, 2021. As of that date, the Company was fully released and discharged from any and all obligations under the Lease Agreement.

F-27

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

Operation lease costs are recorded on a straight-line basis within operating expenses. The Company's total lease expense is comprised of the following:

| | For the Year Ended December 31, 2020 |
|---|---|
| Operating leases | |
| Operating lease cost | $ 106,727 |
| Operating lease expense | 106,727 |
| Short-term lease rent expense | 26,363 |
| Total rent expense | $ 133,090 |

Additional information regarding the Company's leasing activities as a lessee is as follow:

| | For the Year Ended December 31, 2020 |
|---|---|

202

| | | |
|---|---|---|
| Operating cash flows from operating leases | $ | 96,908 |
| Weighted-average remaining lease term – operating leases | | 0.3 |
| Weighted-average discount rate – operating leases | | 6.5% |
| 2021 | | 126,783 |
| Total | | 126,783 |
| Less present value discount | | (5,187) |
| Less current portion of operating lease liabilities | | (121,596) |
| Non-current operating lease liabilities | $ | - |

**Legal Proceedings**

*Feinberg Litigation*

*Jeffrey Feinberg v. Marathon Patent Group, Inc., Doug Croxall, and Francis Knuettel II,* Superior Court of the State of California, County of Los Angeles, Case Number BC673128; Date Filed: August 21, 2017

On August 21, 2017, plaintiff Jeffrey Feinberg filed his Complaint against the Company and its Chief Executive Officer and Chief Financial Officer, purporting to state claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933, and to state common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation. Feinberg sought unspecified money damages, as well as costs and attorneys' fees, and equitable or injunctive relief, all based on allegations that he purchased Company securities and was induced to continue holding shares of the Company's common stock through his reliance on a series of purported misstatements and omissions concerning the Company's financial performance and future prospects.

On October 10, 2017, all defendants filed a motion to dismiss or to stay the action, contending that Feinberg's claims were encompassed by various written contracts in which he had agreed that any disputes he had with the Company should be litigated exclusively in the courts in New York City. While that motion was pending, on November 14, 2017, Feinberg voluntarily dismissed his complaint, in its entirety, without prejudice.

On March 27, 2018, Feinberg, purportedly joined by the Jeffrey L. Feinberg Personal Trust and the Jeffrey L. Feinberg Family Trust, refiled the alleged claims described above in a lawsuit filed in the Supreme Court of the State of New York, County of New York. The new lawsuit is entitled *Jeffrey Feinberg, Jeffrey L. Feinberg Personal Trust, and Jeffrey L. Feinberg Family Trust v. Marathon Patent Group, Inc., Doug Croxall, and Francis Knuettel II*, Index No. 651463/2018 (the "NY Action"). The plaintiffs purported to state claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933, and to state common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation. The plaintiffs sought unspecified money damages (including punitive damages), as well as costs and attorneys' fees, and equitable or injunctive relief, all based on allegations that over a period extending from approximately May 2015 through May 2017 they purchased Company securities and were induced to continue holding shares of the Company's stock through their reliance on a series of purported misstatements and omissions concerning the Company's financial performance and future prospects.

On June 15, 2018, all defendants filed a motion to dismiss the complaint in the NY Action asserting, among other arguments, that the Jeffrey L. Feinberg Personal Trust and the Jeffrey L. Feinberg Family Trust lack capacity to sue, that the purported state law "holder" claims are barred as a matter of law, and that plaintiffs otherwise failed to state facts sufficient to state a claim. Plaintiffs opposed the motion. After the motion was fully briefed, the court conducted an oral argument on January 16, 2019. At the conclusion of the argument, the court granted the motion to dismiss, allowing plaintiff Feinberg 30 days' time to replead.

In addition, concurrent with filing their motion to dismiss, the defendants filed a motion to stay discovery pursuant to the mandatory stay provisions of the Private Securities Litigation Reform Act of 1995 and local state rules. The plaintiffs filed a statement of non-opposition to the motion to stay discovery, and on January 9, 2019, the court granted that motion.

On February 15, 2019, Feinberg, in his individual capacity and purportedly as trustee of the Jeffrey L. Feinberg Personal Trust, and Terrence K. Ankner, purportedly as trustee of the Jeffrey L. Feinberg Family Trust, filed what they styled as an "Amended Complaint." These plaintiffs purport to state claims against the Company, Doug Croxall and Francis Knuettel II under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933, and to state common law claims for "actual fraud and fraudulent concealment," constructive fraud, and negligent misrepresentation. In the Amended Complaint, the plaintiffs seek unspecified money damages (including punitive damages), as well as costs and attorneys' fees, and equitable or injunctive relief, all based on allegations that over a period extending from approximately May 2015 through May 2017 they purchased Company securities and were induced to continue holding shares of the Company's stock through their reliance on a series of purported misstatements and omissions concerning the Company's financial performance and future prospects.

F-28

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

On March 7, 2019, defendants Marathon Patent Group, Inc. and Doug Croxall filed a motion to dismiss the Amended Complaint, and on March 22, 2019, defendant Francis Knuettel II filed a motion to dismiss the Amended Complaint. On April 5, 2019, plaintiffs filed an opposition to defendants' motions to dismiss, and on April 17, 2019 defendants filed reply papers in support of the motions to dismiss. On July 9, 2019, the court heard the parties' oral arguments and, at the conclusion of those arguments, took the motions to dismiss under submission. On March 13, 2020, the court issued its Decision in which it granted the motions to dismiss in full and ordered that the case be dismissed with prejudice. On or about May 4, 2020, the plaintiffs filed a notice of appeal. Plaintiffs filed their opening appellate brief on January 4, 2021, and defendants filed their responsive appellate briefs on February 3, 2021. The parties are now awaiting oral argument on the appeal.

*Amazon Litigation*

As part of the cancellation of certain indebtedness owed to Fortress Investment Group, LLC, we transferred ownership of various patents, including U.S. Patent No. 7,177,798, commonly referred to as "Patent 798." Fortress created a new Special Purpose Entity, CF Dynamic Advances LLC, in which we own a 30% interest. In May 2018, Rensselaer Polytechnic Institute and CF Dynamic Advances LLC filed a complaint against Amazon.com, Inc. in the United States District Court for the Northern District of New York, which alleges, among other things, that "Alexa Voice Software and Alexa enabled devices" infringe U.S. Patent No. 7,177,798, entitled "Natural Language Interface Using Constrained Intermediate Dictionary of Results." The complaint seeks an injunction, monetary damages, an ongoing royalty, pre- and post-judgment interest, attorneys' fees, and costs. If plaintiffs are successful, and if the recoveries or settlement proceeds are sufficient following litigation expenses and recovery of amounts due in connection with the cancelled loan, the special purpose entity could be entitled to a portion of the net proceeds. There can be no assurance that the plaintiff will be successful or that any recoveries will exceed amounts due under the debt settlement arrangements or that our 30% interest in the special purpose entity will have any value even if the plaintiffs are successful in their case against Amazon.

**NOTE 6 - INCOME TAXES**

The Company accounts for income taxes under ASC Topic 740: Income Taxes, which requires the recognition of deferred tax assets and liabilities for both the expected impact of differences between the financial statements and the tax basis of assets and liabilities, and for the expected future tax benefit to be derived from tax losses and tax credit carry-forwards. ASC Topic 740 additionally requires the establishment of a valuation allowance to reflect the likelihood of realization of deferred tax assets.

The table below summarizes the differences between the Companies' effective tax rate and the statutory federal rate as follows for the years ended December 31, 2020 and 2019:

| | 2020 | 2019 |
|---|---|---|
| U.S. federal statutory income tax rate | 21.00% | 21.00% |
| State and local income taxes, net of federal benefit | 7.0% | - |
| Non-Deductible Expenses | (4.2)% | - |
| Change in valuation allowance | (23.9)% | (21.00)% |
| Effective tax rate | -% | -% |

The components of the provision for income taxes are as follows:

| | | 2020 |
|---|---|---|
| Current: | | |
| Federal | $ | - |
| State | | 2,400 |
| | $ | 2,400 |
| Deferred: | | |
| Federal | $ | - |
| State | | - |
| | $ | - |
| Income Tax Provision | | |
| | $ | 2,400 |

The Company has a deferred tax asset, which is summarized as follows at December 31:

| | 2020 | | 2019 |
|---|---|---|---|
| Deferred tax assets: | | | |
| Total deferred tax assets | $ 15,787,669 | $ | 23,556,924 |
| Total deferred tax liabilities | (1,310,586) | | - |
| Less: valuation allowance | (14,477,083) | | (23,556,924) |
| Net deferred tax asset | $ - | $ | - |

The Company does not have any taxable income in carryback years in which net operating losses ("NOLs") can be carried back to. At December 31, 2020, the Company did not have any taxable temporary differences that will reverse and generate taxable income and was still in a cumulative loss position. Based on all the available information, including tax planning strategies and future forecast, the Company does not believe that it is more likely than not that the net deferred tax assets will be realized; therefore, a full valuation allowance has been recorded against its net deferred tax assets.

As of December 31, 2020 and 2019, the Company had NOL carry-forwards for federal and state purposes of approximately $45.6 million and $27.2 million, respectively, which will begin to expire in 2034 (Estimated). The utilization of NOL and credit carry-forwards may be limited under the provisions of the Internal Revenue Code ("IRC") Section 382, as amended, and similar state provisions. IRC Section 382 generally imposes an annual limitation on the amount of NOL carry-forwards that may be used to offset taxable income where a corporation has undergone significant changes in stock ownership.

F-29

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

As of December 31, 2020 and 2019, the Company has not recorded liability for unrecognized tax benefit. As of December 31, 2020 and 2019 the Company did not increase or decrease penalties or interest in connection with liability for unrecognized tax benefit. The Company does not expect its unrecognized tax benefits to change significantly over the next 12 months. The Company files U.S. and state income tax returns with varying statutes of limitations. The 2016 through 2020 tax years generally remain subject to examination by federal and state tax authorities.

In 2018, the company dissolved those subsidiaries that were required to file tax returns that had no tax due for 2018. Marathon Digital Holdings, Inc. moved its headquarters to Las Vegas, Nevada on June 1, 2018 so it is required to file a final tax return with the state of California for 2018. The company believes there will be no tax due the state of California other than the $800 Minimum Franchise fee all companies are required to pay.

Management does not believe there are any material tax liabilities owed with respect to its operations in Canada, since Management believes there is a loss from the Canadian operations. Such operations have been outsourced. (See NOTE 1 - ORGANIZATION AND DESCRIPTION OF BUSINESS, for details)

The Company believes that bitcoin is attractive because it can serve as a store of value, supported by a robust and public open source architecture, that is untethered to sovereign monetary policy and can therefore serve as a hedge against inflation. Bitcoin exists entirely in electronic form, as virtually irreversible public transaction ledger entries on the blockchain, and transactions in bitcoin are recorded and authenticated not by a central repository, but by a decentralized peer-to-peer network. This decentralization avoids certain threats common to centralized computer networks, such as denial of service attacks, and reduces the dependency of the bitcoin network on any single system. While the bitcoin network as a whole is decentralized, the private keys used to access bitcoin balances are not widely distributed and are held on hardware (which can be physically controlled by the holder or by a third party such as a custodian) or via software programs on third-party servers and loss of such private keys results in an inability to access, and effective loss of, the corresponding bitcoin. Consequently, bitcoin holdings are susceptible to all of the risks inherent in holding any electronic data, such as power failure, data corruption, security breach, communication failure, and user error, among others. These risks, in turn, make bitcoin subject to theft, destruction, or loss of value from hackers, corruption, or technology-specific factors such as viruses that do not affect conventional fiat currency. In addition, the bitcoin network relies on open source developers to maintain and improve the bitcoin protocol. Accordingly, bitcoin may be subject to protocol design changes, governance disputes such as "forked" protocols, competing protocols, and other open source-specific risks that do not affect conventional proprietary software.

The Company believes that in the context of the economic and public health crisis precipitated by COVID-19 and the unprecedented government financial stimulus measures adopted around the world, decreasing interest rates, as well as the breakdown of trust in and between political institutions and political parties in the United States and globally, bitcoin represents a more attractive store of value than fiat currency, and further that opportunity for appreciation in the value of bitcoin exists in the event that such factors lead to even more widespread adoption of bitcoin as a treasury reserve alternative.

F-30

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 7 – Subsequent Events**

On January 6, 2021, the Company issued 566,279 shares pursuant to the 2018 Equity Incentive Plan for shares that vested as of December 31, 2020. Subsequent to year end, the Company issued 170,904 and 23,500 shares of common stock pursuant to warrant and option exercises, respectively.

On January 12, 2021, the Company also announced that it had successfully completed its previously announced $200 million shelf offering by utilizing its at-the-market (ATM) facility. Pursuant to the terms of the offering 12,500,000 shares of common stock were issued at a value of $20 per share. As a result, the Company ended the 2020 fiscal year with $141.3 million in cash and 81,974,619 shares outstanding.

On January 15, 2021, the Company, held an annual meeting of stockholders (the "Meeting"). As of the record date for the Meeting, 51,403,280 shares of common stock were issued and outstanding. A total of 33,981,556 shares of common stock, constituting a quorum, were present and accounted for at the Meeting. At the Meeting, the Company's stockholders approved the following proposals:

VOTES CAST

| Common shares | PROPOSAL #1 Increase in Shares under 2018 Incentive Plan by 5 million | PROPOSAL #2a Election of Merrick Okamoto | PROPOSAL #2b Election of Peter Benz | PROPOSAL #3 Ratification of Auditor | PROPOSAL #4 Nonbinding Advisory Vote on Executive Compensation |
|---|---|---|---|---|---|
| Yes | 10,112,531 | 12,184,952 | 12,216,945 | 32,948,526 | 11,146,174 |
| No | 2,278,676 | | | 464,134 | 1,093,170 |
| Abstain | 163,325 | 369,187 | 337,194 | 567,470 | 315,663 |
| Broker Non-Vote | 21,427,024 | 21,427,417 | 21,427,417 | 1,426 | 21,426,549 |

On January 12, 2021, the Company, entered into a Securities Purchase Agreement (the "Purchase Agreement") with certain purchasers named therein (the "Purchasers"), pursuant to which the Company agreed to issue and sell, in a registered direct offering (the "Offering"), 12,500,000 shares of its common stock (the "Securities") at an offering price of $20.00 per share.

The Purchase Agreement contains customary representations and warranties and agreements of the Company and the Purchasers and customary indemnification rights and obligations of the parties. The closing of the Offering occurred on January 15, 2021. The Company received gross proceeds of $250,000,000 in connection with the Offering, before deducting placement agent fees and related offering expenses.

Pursuant to a letter agreement, dated August 2020 (the "Engagement Letter"), the Company engaged H.C. Wainwright & Co., LLC (the "Placement Agent") as placement agent in connection with the Offering. The Placement Agent agreed to use its reasonable best efforts to arrange for the sale of the Securities. The Company agreed to pay to the Placement Agent a cash fee of 5.0% of the aggregate gross proceeds raised in the Offering. The Company also issued to designees of the Placement Agent warrants to purchase up to 3.0% of the aggregate number of shares of Common Stock sold in the transactions, or warrants to purchase up to 375,000 shares of Common Stock (the "Placement Agent Warrants"). The Placement Agent Warrants have an exercise price equal to 125% of the offering price per share (or $25.00 per share). The Company also agreed to pay the Placement Agent $50,000 for accountable expenses, to reimburse an investor's legal fees in an amount up to $7,500 and to pay $12,900 for the Placement Agent's clearing fees. Pursuant to the terms of the Engagement Letter, the Placement Agent has the right, for a period of twelve months following the closing of the Offerings, to act (i) as financial advisor in connection with any merger, consolidation or similar business combination by the Company and (ii) as sole book-running manager, sole underwriter or sole placement agent in connection with certain debt and equity financing transactions by the Company.

Effective January 19, 2021, David Lieberman resigned as a director of the Company. On the same date, the Company's Board appointed Kevin DeNuccio as a director to fill the vacancy created by Mr. Lieberman's resignation.

Mr. DeNuccio is the Founder and General Partner of Wild West Capital LLC since 2012 where he focused on angel investments, primarily in SAAS software start-ups.

He brings to Marathon more than 25 years of experience as a chief executive, global sales leader, public and private board member, and more than a dozen angel investments, managing and growing leading technology businesses. He served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories and Unisys Corporation.

On January 25, 2021, the Company announced that it has purchased 4,812.66 BTC in an aggregate purchase price of $150 million.

On February 11, 2021, the Company issued 4,701,442 shares of common stock pursuant to the 2018 Equity Incentive Plan.

Effective March 1, 2021, the Company changed its name to Marathon Digital Holdings, Inc.

On March 7, 2021, the Company entered into a termination agreement with the 9349-0001 Quebec Inc., to agree to terminate the outstanding lease. As of that date, the Company was fully released and discharged from any and all obligations under the Lease Agreement. In November 2017, the Company assumed a lease in connection with the mining operations in Quebec, Canada.

The Company has evaluated subsequent events through the date of the consolidated financial statements were available to be issued and has concluded that no such events or transactions took place that would require disclosure herein except as stated directly above.

F-31

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Management's Conclusions Regarding Effectiveness of Disclosure Controls and Procedures**

We conducted an evaluation of the effectiveness of our "disclosure controls and procedures" ("Disclosure Controls"), as defined by Rules 13a-15(e) and 15d-15(e) of the Exchange Act, as of December 31, 2020, the end of the period covered by this Annual Report on Form 10-K. The Disclosure Controls evaluation was done under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, with the goal being that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding disclosure. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, our disclosure controls and procedures were effective as of December 31, 2020.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a

process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2020. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework. During our assessment of the effectiveness of internal control over financial reporting as of December 31, 2020, management identified no material weaknesses with respect to the financial reporting and close process, resulting from a lack of segregation of duties within accounting functions and evidence of control review. Accordingly, management concluded that our internal controls over financial reporting were effective as of December 31, 2020.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

This Annual Report on Form 10-K does not include an attestation report of the Company's independent registered public accounting firm regarding internal control over financial reporting since the Company is a smaller reporting company under the rules of the SEC.

**ITEM 9B. OTHER INFORMATION**

None.

## PART III
## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The following table presents information with respect to our officers, directors and significant employees as of the date of this Report:

| Name and Address | Age | Date First Elected or Appointed | Position(s) |
|---|---|---|---|
| Merrick Okamoto | 59 | August 13, 2017 | Chief Executive Officer |
| Simeon Salzman | 40 | October 19, 2020 | Chief Financial Officer |
| James Crawford | 45 | March 1, 2013 | Chief Operating Officer |
| Fred Thiel | 59 | April 24, 2018 | Director |
| Michael Berg | 70 | August 17, 2018 | Director |
| Peter Benz | 60 | December 17, 2020 | Director |
| Keven DeNuccio | 61 | January 19, 2021 | Director |

**Background of officers and directors**

The following is a brief account of the education and business experience during at least the past five years of our officers and directors, indicating each person's principal occupation during that period, and the name and principal business of the organization in which such occupation and employment were carried out.

*Merrick D. Okamoto - Chief Executive Officer*

Mr. Merrick D. Okamoto, age 59, serves as the President at Viking Asset Management which he co-founded in 2002. Mr. Okamoto is responsible for research, due diligence, and structuring potential investment opportunities. He has been instrumental in providing capital to over 200 private and public companies. He is also responsible for the firm's trading operations. Prior to Viking, Mr. Okamoto co-founded TradePortal.com, Inc. in 1999 and served as its President until 2001. He was instrumental in developing the proprietary Trade Matrix software platform offered by TradePortal Securities. Mr. Okamoto's negotiations were key in selling a minority stake in TradePortal.com Inc. to Thomson Financial. Prior to that, he held Vice President positions with Shearson Lehman Brothers, Prudential Securities, and Paine Webber.

*Simeon Salzman - Chief Financial Officer*

Mr. Simeon Salzman, age 40, has served as the Chief Financial Officer and Senior Vice President of the Las Vegas Monorail Company, a private non-profit 501c(4) entity, since July 2018. The Las Vegas Monorail Company operates a driverless monorail transit system that carries approximately 4,600,000 passengers annually over a 3.9 mile elevated track. There Mr. Salzman was responsible for overseeing all financial functions including audit, treasury and corporate finance. In addition, he was responsible for internal control compliance and management strategy.

Prior to the Las Vegas Monorail Company and from May 2015 to July 2018, Mr. Salzman served as the Chief Financial Officer for Wendoh Media and Corner Bar Management for over three years. Wendoh Media operated a weekly publication, a video editing entity, and a digital advertising entity. Corner Bar Management operates four different bars and restaurants in Downtown Las Vegas. Using his previous experience as the Corporate Controller for various managed nightlife, lounges and restaurants at the most prestigious Resort & Casinos on the Las Vegas Strip, Mr. Salzman was able to parlay his skill set revitalizing the various food and beverage establishments operated by Corner Bar Management in Downtown Las Vegas. Through enhanced analytical reviews, budgeting, internal control implementation and reducing overhead, Mr. Salzman was able to save over $1.4 million in aggregate costs and generate EBITDA of over 25% for eight consecutive quarters.

Mr. Salzman previously served as the Vice President of Programs and Secretary on the Board of Director's for Financial Executives International (FEI). Financial Executives International connects senior-level financial executives by defining the profession, exchanging ideas about best practices, educating members and others while working with the government to improve the general economy. He also currently serves as the Treasurer on the Board of Directors of his local neighborhood HOA. Mr. Salzman holds a Bachelor of Science in Accounting and a Bachelor of Arts in Criminal Justice & Criminology from the University of Maryland, College Park. He is a Certified Public Accountant.

*James Crawford - Chief Operating Officer*

Mr. Crawford, age 45, was a founding member of Kino Interactive, LLC, and of AudioEye, Inc. Mr. Crawford's experience as an entrepreneur spans the entire life cycle of companies from start-up capital to compliance officer and director of reporting public companies. Prior to his involvement as Chief Operating Officer of the Company, Mr. Crawford served as a director and officer of Augme Technologies, Inc. beginning March 2006, and assisted the company in maneuvering through the initial challenges of acquisitions executed by the company through 2011 that established the company as a leading mobile marketing company in the United States. Mr. Crawford is experienced in public company finance and compliance functions. He has extensive experience in the area of intellectual property creation, management and licensing. Mr. Crawford also served on the board of directors Modavox and Augme Technologies, and as founder and managing member of Kino Digital, Kino Communications, and Kino Interactive.

*Fred Thiel - Director*

Mr. Thiel, age 59, has been the Chairman of SPROCKET, INC. since June 2017, a Blockchain/Cryptocurrency technology and financial services company whose mission is to reduce the risk and friction of cryptocurrency trading across marketplaces, regions and exchanges by establishing a

federation of exchanges that together create a single aggregated global trading market place with large scale liquidity, rapid execution, minimal counter-party risk, and price transparency. From January 2013 until November 2015, Mr. Thiel served as a director of Local Corporation, which was a NASDAQ listed entity which was a leader in on-line local search and digital media, mobile search monetization and programmatic retargeting markets. He served as Chairman of the Board of LOCAL from January 2014 to November 2015 and as its Chief Executive Officer from May 2014 to November 2015. Mr. Thiel has been the principal of Thiel Advisors Inc. since 2013. Thiel Advisors is a boutique advisory firm providing PE and VC firms, as well as public and private company boards of director, with deep technology industry operating expertise and strategic advisory services.

## Peter Benz - Director

Peter Benz, 60, is currently the Chief Executive Officer of Viking Asset Management, LLC, an asset and investment management company which he founded in 2001. From March 2015 until January 2019, Mr. Benz served as a director of Fluent, Inc, a leading performance marketing company. Since March 26, 2018, Mr. Benz has served as a director of Red Violet, a data analytics company. From June 2016 to May 2018, Mr. Benz served as a director of Lilis Energy Inc., an onshore oil and natural gas exploration and production company. From January 2012 until its merger with Lilis Energy Inc. in June 2016, Mr. Benz served as a director of Brushy Resources, Inc. (formerly known as Starboard Resources, Inc.), an onshore oil and natural gas exploration and production company, and became its Chairman on November 24, 2015. From October 2014 to January 2018, Mr. Benz served as a director of Usell.com, a technology based online market place, and Mr. Benz served as a director and Chairman of the Board of Optex Systems, Inc., a manufacturer of optical systems for the defense industry from November 2014 to August 2018. Mr. Benz earned a Bachelor of Business Administration from the University of Notre Dame. The Board of Directors believes Peter Benz is suited to be a director due to his longstanding experience with public companies.

## Michael Berg - Director

Mr. Berg, age 70, has been a practicing Certified Public Accountant for over 30 years and currently serves as an advisor to several small public companies. From September of 1977 until June of 1985, he was an audit manager for Coopers & Lybrand (now PWC) in San Francisco and in January 2008, co-founded and served as the West Coast PIC of PMB Helin Donovan, a 100+ person CPA firm. From September 1988 until December 2000, Mr. Berg served as the Chief Financial Officer of a public real estate company and a high tech manufacturer and a research and development company. He has established several independent companies including EXIS in January 1992, which sold and installed a proprietary software product which he helped develop for distributed general ledgers systems. Most recently, in January 2014, he formed the Registry of Accredited Investors that provides services to investors and companies in Reg D offerings. His industry experience ranges from finance and distribution to high tech, pharma, real estate and construction. Mr. Berg has worked extensively with public companies and has participated in many public offerings in national markets. From January 1989 until October 1996, he was the President of the Board of Directors of the Names Project and formed a not-for-profit called the Permanent Display aimed at creating a San Francisco landmark for the AIDs Quilt. In March 2005, Mr. Berg also helped found Welcome, a 501C (3) that provides homeless outreach in the Upper Polk Street area of San Francisco. Mr. Berg attended San Francisco State University, where he received his B.A. in Accounting, and is a licensed CFF and CPA in the States of California.

## Kevin DeNuccio – Director

Mr. DeNuccio, age 61 is the Founder and General Partner of Wild West Capital LLC since 2012 where he focused on angel investments, primarily in SAAS software start-ups.

He brings to Marathon more than 25 years of experience as a chief executive, global sales leader, public and private board member, and more than a dozen angel investments, managing and growing leading technology businesses. He served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories and Unisys Corporation.

## Code of Business Conduct and Ethics

We have adopted a Code of Business Conduct and Ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions and also to other employees. Our Code of Business Conduct and Ethics can be found on the Company's website at www.marathonpg.com.

## Family Relationships

There are no family relationships between any of our directors, executive officers or directors.

43

## Involvement in Certain Legal Proceedings

During the past ten years, none of our officers, directors, promoters or control persons have been involved in any legal proceedings as described in Item 401(f) of Regulation S-K.

## Term of Office

Our Board of Directors is comprised of five directors, of which all five seats are currently occupied, and is divided among three classes, Class I, Class II and Class III. Class I directors will serve until the 2021 annual meeting of stockholders and until their respective successors have been duly elected and qualified, or until such director's earlier resignation, removal or death. Class III directors will serve until the 2023 annual meeting of stockholders and until their respective successors have been duly elected and qualified, or until such director's earlier resignation, removal or death. Class II directors, elected at the Company's annual shareholder meeting held on September 28, 2016, will serve until the 2022 annual meeting of stockholders and until their respective successors have been duly elected and qualified, or until such director's earlier resignation, removal or death. All officers serve at the pleasure of the Board.

## Director Independence

Mr. Fred Thiel, Mr. Michael Berg, Mr. Peter Benz and Mr. Kevin DeNuccio are "independent" directors based on the definition of independence in the listing standards of the NASDAQ Stock Market LLC ("NASDAQ").

## Committees of the Board of Directors

Our Board has established three standing committees: an audit committee, a nominating and corporate governance committee and a compensation committee, which are described below. Members of these committees are elected annually at the regular board meeting held in conjunction with the annual stockholders' meeting. The charter of each committee is available on our website at www.marathonpg.com.

## Audit Committee

The Audit Committee members are currently Mr. Fred Thiel, Mr. Michael Berg and Mr. Peter Benz, with Mr. Michael Berg as Chairman. The Audit Committee has authority to review our financial records, deal with our independent auditors, recommend to the Board policies with respect to financial reporting, and investigate all aspects of our business. All of the members of the Audit Committee currently satisfy the independence requirements and other established criteria of NASDAQ.

The Audit Committee Charter is available on the Company's website at http://www.marathonpg.com/. The Audit Committee has sole authority for the appointment, compensation and oversight of the work of our independent registered public accounting firm, and responsibility for reviewing and discussing with management and our independent registered public accounting firm our audited consolidated financial statements included in our Annual Report on Form 10-K, our interim financial statements and our earnings press releases. The Audit Committee also reviews the independence and quality control procedures of our independent registered public accounting firm, reviews management's assessment of the effectiveness of internal controls, discusses with management the Company's policies with respect to risk assessment and risk management and will review the adequacy of the Audit Committee charter on an annual basis.

*Nominating and Governance Committee*

The Nominating and Corporate Governance Committee members are currently Mr. Kevin DeNuccio, Mr. Michael Berg and Mr. Peter Benz, with Mr. DeNuccio as Chairman. The Nominating and Corporate Governance Committee has the following responsibilities: (a) setting qualification standards for director nominees; (b) identifying, considering and nominating candidates for membership on the Board; (c) developing, recommending and evaluating corporate governance standards and a code of business conduct and ethics applicable to the Company; (d) implementing and overseeing a process for evaluating the Board, Board committees (including the Committee) and overseeing the Board's evaluation of the Chairman and Chief Executive Officer of the Company; (e) making recommendations regarding the structure and composition of the Board and Board committees; (f) advising the Board on corporate governance matters and any related matters required by the federal securities laws; and (g) assisting the Board in identifying individuals qualified to become Board members; recommending to the Board the director nominees for the next annual meeting of shareholders; and recommending to the Board director nominees to fill vacancies on the Board.

The Nominating and Governance Committee Charter is available on the Company's website at http://www.marathonpg.com/. The Nominating and Governance Committee determines the qualifications, qualities, skills, and other expertise required to be a director and to develop, and recommend to the Board for its approval, criteria to be considered in selecting nominees for director (the "Director Criteria"); identifies and screens individuals qualified to become members of the Board, consistent with the Director Criteria. The Nominating and Governance Committee considers any director candidates recommended by the Company's shareholders pursuant to the procedures described in the Company's proxy statement, and any nominations of director candidates validly made by shareholders in accordance with applicable laws, rules and regulations and the provisions of the Company's charter documents. The Nominating and Governance Committee makes recommendations to the Board regarding the selection and approval of the nominees for director to be submitted to a shareholder vote at the Annual Meeting of shareholders, subject to approval by the Board.

44

*Compensation Committee*

The Compensation Committee oversees our executive compensation and recommends various incentives for key employees to encourage and reward increased corporate financial performance, productivity and innovation. Its members are currently Mr. Fred Thiel, Mr. Peter Benz and Mr. Kevin DeNuccio with Mr. Fred Thiel as Chairman. All of the members of the Compensation Committee currently satisfy the independence requirements and other established criteria of NASDAQ.

The Compensation Committee Charter is available on the Company's website at http://www.marathonpg.com/. The Compensation Committee is responsible for: (a) assisting our Board in fulfilling its fiduciary duties with respect to the oversight of the Company's compensation plans, policies and programs, including assessing our overall compensation structure, reviewing all executive compensation programs, incentive compensation plans and equity-based plans, and determining executive compensation; and (b) reviewing the adequacy of the Compensation Committee charter on an annual basis. The Compensation Committee, among other things, reviews and approves the Company's goals and objectives relevant to the compensation of the Chief Executive Officer, evaluate the Chief Executive Officer's performance with respect to such goals, and set the Chief Executive Officer's compensation level based on such evaluation. The Compensation Committee also considers the Chief Executive Officer's recommendations with respect to other executive officers and evaluates the Company's performance both in terms of current achievements and significant initiatives with long-term implications. It assesses the contributions of individual executives and recommend to the Board levels of salary and incentive compensation payable to executive officers of the Company; compares compensation levels with those of other leading companies in similar or related industries; reviews financial, human resources and succession planning within the Company; recommend to the Board the establishment and administration of incentive compensation plans and programs and employee benefit plans and programs; recommends to the Board the payment of additional year-end contributions by the Company under certain of its retirement plans; grants stock incentives to key employees of the Company and administer the Company's stock incentive plans; and reviews and recommends for Board approval compensation packages for new corporate officers and termination packages for corporate officers as requested by management.

**Changes in Nominating Procedures**

None.

**Board Leadership Structure and Role in Risk Oversight**

Although we have not adopted a formal policy on whether the Chairman and Chief Executive Officer positions should be separate or combined, we have traditionally determined that it is in the best interests of the Company and its shareholders to partially combine these roles. Due to the small size of the Company, we believe it is currently most effective to have the Chairman and Chief Executive Officer positions partially combined.

Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

**Compliance with Section 16(a) of the Exchange Act**

Section 16(a) of Exchange Act requires our executive officers and directors and persons who beneficially own more than 10% of a registered class of our equity securities to file with the Commission initial statements of beneficial ownership, statements of changes in beneficial ownership and annual statement of changes in beneficial ownership with respect to their ownership of the Company's securities, on Form 3, 4 and 5 respectively. Executive officers, directors and greater than 10% shareholders are required by the Securities and Exchange Commission regulations to furnish our Company with copies of all Section 16(a) reports they file.

The Company does not report on compliance with Section 16(a).

45

**ITEM 11. EXECUTIVE COMPENSATION**

The following summary compensation table sets forth information concerning compensation for services rendered in all capacities during 2020 and 2019 awarded to, earned by or paid to our executive officers or most highly paid individuals. The value attributable to any option awards and stock awards reflects the grant date fair values of stock awards calculated in accordance with FASB Accounting Standards Codification Topic 718. As described further in "Note 5 — Stockholders' Equity - Common Stock Options" in our Notes to Consolidated Financial Statements, the assumptions made in the valuation of these option awards and stock awards is set forth therein.

| Name and Principal Position | Year | Salary | Bonus Awards | Stock Awards | Option Awards | Non-Equity Plan Compensation | Nonqualified Deferred Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | ($) | ($) | ($) | ($) | ($) | ($) | ($) | ($) |
| Merrick Okamoto (1) | 2020 | 368,715 | 2,000,000 | - | 391,706 | - | - | - | 2,760,421 |
| CEO | 2019 | 352,406 | - | - | - | - | - | - | 352,406 |

208

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| David Lieberman (2) | 2020 | 170,414 | 54,000 | 220,500 | | - | - | - | 444,914 |
| Former CFO & Director | 2019 | 181,238 | - | - | 29,666 | - | - | - | 210,904 |
| James Crawford (3) | 2020 | 127,441 | 160,788 | 52,811 | | - | - | - | 341,040 |
| COO | 2019 | 120,900 | - | - | 14,833 | - | - | - | 135,733 |
| Simeon Salzman (6) | 2020 | 200,000 | 40,000 | - | - | - | - | - | 240,000 |
| CFO | 2019 | - | - | - | - | - | - | - | - |

Merrick Okamoto entered into a new employment agreement on January 1, 2021 which replaced his prior employment agreement.

David Lieberman retired on October 19, 2020 terminating his employment with the Company.

James Crawford entered into a new employment agreement on January 1, 2021 which replaced his prior employment agreement.

Simeon Salzman entered into an employment agreement on October 19, 2020 as the Chief Financial Officer.

**Employment Agreements**

On October 11, 2018, we entered into a 2-year Employment Agreement, subject to successive one year extensions, with Merrick Okamoto, pursuant to which Mr. Okamoto will serve as the Executive Chairman and Chief Executive Officer of the Company. Pursuant to the terms of the Agreement, Mr. Okamoto shall receive a base salary at an annual base salary of $350,000 (subject to annual 3% cost of living increase) and an annual bonus up to 100% of base salary as determined by the Compensation Committee or the Board. As further consideration for Mr. Okamoto's services, we agreed to issue Mr. Okamoto 10-year stock options to purchase 1,250,000 shares of Common Stock, with a strike price of $2.32 per share, vesting 50 % on the date of grant and 25% on each 6 months anniversary of the date of grant.

On October 19, 2020, the Company entered into an Executive Employment Agreement with Mr. Salzman (the "Agreement"). The Agreement has a term of two years and automatically renews for successive one year terms unless either party provides notice of nonrenewal at least 90 days prior to the end of the initial term or any renewal term. Mr. Salzman's annual base salary is $200,000 with bonuses at the discretion of the Company's Board of Directors. Mr. Salzman may also receive a grant of restricted stock units, and any such grant shall vest in four equal amounts on the date of grant and the three successive three month anniversaries thereof. In the event of a change in control, all RSUs vest immediately. Mr. Salzman received a signing bonus of $25,000 in lieu of a base pay increase during the second year of the Agreement. Mr. Salzman is entitled to 30 paid vacation days per year and is entitled to participate in all Company benefit plans per standard Company policy.

46

Upon any termination of the Agreement, Mr. Salzman is entitled to compensation and reimbursement of expenses through the date of termination as well as payment for any accrued and unpaid vacation days. If the termination is other than for cause, Mr. Salzman's outstanding RSUs shall immediately vest. Upon a termination not for cause by the Company or by Mr. Salzman with good reason or within 180 days of a change in control, he shall receive the greater of his remaining base salary for the remaining term of the Agreement and 12 months base salary plus benefits. The Agreement contains customary and usual definitions of termination for cause and good reason.

The Annual Bonus, and any and all stock based compensation (such as options and equity awards) (collectively, the "Clawback Benefits") shall be subject to "Clawback Rights" as follows: during the period that the Executive is employed by the Company and upon the termination of the Executive's employment and for a period of three (3) years thereafter, if there is a restatement of any financial results from which any metrics were determined to be achieved which were the basis of the granting and calculation of such Clawback Benefits to the Executive, the Executive agrees to repay any amounts which were determined by reference to any Company financial results which were later restated (as defined below), to the extent the Clawback Benefits amounts paid exceed the Clawback Benefits amounts that would have been paid, based on the restatement of the Company's financial information.

**Directors' Compensation**

The following summary compensation table sets forth information concerning compensation for services rendered in all capacities during 2020 and 2019 awarded to, earned by or paid to our directors. The value attributable to any warrant awards reflects the grant date fair values of stock awards calculated in accordance with FASB Accounting Standards Codification Topic 718. As described further in "Note 5 — Stockholders' Equity (Deficit) — Common Stock Warrants" in our Consolidated Financial Statements, a discussion of the assumptions made in the valuation of these warrant awards.

| Name | Year | Fees Earned or paid in cash | Stock awards | Option awards | Non-equity incentive plan compensation | Non-qualified deferred compensation earnings | All other compensation | Total |
|---|---|---|---|---|---|---|---|---|
| | | ($) | ($) | ($) | ($) | ($) | ($) | ($) |
| David Lieberman | | | | | | | | |
| | 2020 | 1,667 | - | - | - | - | - | 1,667 |
| | 2019 | - | - | - | - | - | - | - |
| Michael Rudolph (1) | | | | | | | | |
| | 2020 | 20,000 | - | - | - | - | - | 20,000 |
| | 2019 | 20,000 | - | - | - | - | - | 20,000 |
| Michael Berg | | | | | | | | |
| | 2020 | 20,000 | - | - | - | - | - | 20,000 |
| | 2019 | 20,000 | - | - | - | - | - | 20,000 |
| Fred Thiel | | | | | | | | |
| | 2020 | 20,000 | - | - | - | - | - | 20,000 |
| | 2019 | 20,250 | - | - | - | - | - | 20,250 |

(1)    Michael Rudolph resigned from all positions with the Company as a board member on December 13, 2020.

47

**Employee Grants of Plan Based Awards and Outstanding Equity Awards at Fiscal Year-End**

On August 1, 2012, our Board and stockholders adopted the 2012 Equity Incentive Plan, pursuant to which 96,154 shares of our common stock are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers, after giving effect to the Reverse Split.

On September 16, 2014, our Board adopted the 2014 Equity Incentive Plan (the "2014 Plan"), and only July 31, 2015, the shareholders approved the 2014 Plan at the Company's annual meeting. The 2014 Plan authorizes the Company to grant stock options, restricted stock, preferred stock, other stock-based awards, and performance awards to purchase up to 125,000 shares of common stock. Awards may be granted to the Company's directors, officers, consultants, advisors and employees. Unless earlier terminated by the Board, the 2014 Plan will terminate, and no further awards may be granted, after September 16, 2024.

On September 6, 2017, our Board adopted the 2017 Equity Incentive Plan, subsequently approved by the shareholders on September 29, 2017, pursuant to which up to 625,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards

are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers.

On January 1, 2018, our Board adopted the 2018 Equity Incentive Plan, subsequently approved by the shareholders on March 7, 2018, pursuant to which up to 2,500,000 shares of our common stock, stock options, restricted stock, preferred stock, stock-based awards and other awards are reserved for issuance as awards to employees, directors, consultants, advisors and other service providers. On January 15, 2021, the number of shares available under the Plan was increased by 5,000,000.

As of December 31, 2020, and within sixty (60) days thereafter, the following sets forth the option and stock awards to officers of the Company:

| | Option Awards | | | | | Stock awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of securities underlying unexercised options (1) | Number of securities underlying unexercised options | Equity incentive plan awards: Number of securities underlying unexercised unearned options | Option exercise price | Option expiration date | Number of shares of units of stock that have not vested | Market value of shares of units of stock that have not vested | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested |
| | (#) exercisable | (#) unexercisable | (#) unexercisable | ($) | | (#) | ($) | (#) | ($) |
| Merrick Okamoto | - | - | - | $ - | - | 454,942 | 4,749,594 | 7,000,000 | 73,080,000 |
| James Crawford | - | - | - | $ - | - | 61,337 | 640,358 | 57,990 | 605,416 |
| Simeon Salzman | - | - | - | $ - | - | - | - | 91,324 | 953,423 |

**Compensation Committee Interlocks and Insider Participation**

None of our executive officers serves as a member of the Board or Compensation Committee of any other entity that has one or more of its executive officers serving as a member of our Board.

48

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table sets forth certain information regarding beneficial ownership of our Common Stock as of March __, 2021: (i) by each of our directors, (ii) by each of the named executive officers, (iii) by all of our executive officers and directors as a group, and (iv) by each person or entity known by us to beneficially own more than five percent (5%) of any class of our outstanding shares. As of March -, 2021, there were 98,803,068 shares of our common stock outstanding.

**Amount and Nature of Beneficial Ownership as of March __, 2021**

| Name of Beneficial Owner | Common Stock | RSUs | Warrants | Total | Percentage of Common Stock (%) |
|---|---|---|---|---|---|
| **Officers and Directors** | | | | | |
| Merrick Okamoto (1) | 3,824,659 | 454,941 | - | 4,279,600 | 4.33% |
| Simeon Salzman | 89,366 | - | - | 89,366 | 0.09% |
| James Crawford (Chief Operating Officer) | 180,991 | 61,338 | - | 242,329 | 0.25% |
| Fred Thiel | 55,140 | 75,471 | - | 130,611 | 0.13% |
| Michael Berg) | 35,027 | 62,971 | - | 97,998 | 0.1% |
| Peter Benz) | 6,530 | 109,589 | - | 116,119 | 0.12% |
| Kevin DeNuccio | 16,417 | 50,526 | | 66,943 | 0.07% |
| **All Directors and Executive Officers (seven persons)** | 4,208,130 | 814,836 | - | 5,022,966 | 5.08% |

(1) Represents RSUs that have vested pursuant to Mr. Okamoto's compensation agreement.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

Other than disclosed herein, there were no transactions during the year ended December 31, 2020 and 2019 or any currently proposed transactions, in which the Company was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest.

49

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

For the years ended December 31, 2020 and 2019, we engaged RBSM LLP, as our independent auditor. For the years ended December 31, 2020 and 2019, we incurred fees for our current auditor, RBSM as set forth below:

| | Fiscal Year Ended | |
|---|---|---|
| | December 31, 2020 | December 31, 2019 |
| Audit fees | $ 172,964 | $ 187,500 |
| Tax fees | - | 13,000 |
| All other fees | 112,500 | - |

Audit fees consist of fees related to professional services rendered in connection with the annual audit of our annual financial statements, review of our quarterly financial statements and review of the Company's registration statements and other filings.

Tax fees consist of fees billed for professional services related to the preparation of our U.S. federal and state income tax returns and tax advice.

All other fees consist of fees for other miscellaneous items, including fees related to registrations statements.

All services provided by the Company's independent auditor were approved by the Company's Audit Commitee.

Our policy is to pre-approve all audit and permissible non-audit services performed by the independent accountants. These services may include audit services, audit-related services, tax services and other services. Under our Audit Committee's policy, pre-approval is generally provided for particular services or categories of services, including planned services, project-based services and routine consultations. In addition, the Audit Committee may also pre-approve particular services on a case-by-case basis. Our Audit Committee approved all services that our independent

210

accountants provided to us in the past two fiscal years.

**PART IV**

**ITEM 15. EXHIBITS [to be updated]**

The following exhibits are filed as part of this Annual Report on Form 10-K.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Amended and Restated Articles of Incorporation of the Company dated November 25, 2011. (1) |
| 3.2 | Certificate of Amendment to Articles of Incorporation dated February 15, 2013. (2) |
| 3.3 | Certificate of Amendment to Amended and Restated Articles of Incorporation dated July 18, 2013 (3) |
| 3.4 | Certificate of Amendment to Articles of Incorporation dated October 25, 2017. (4) |
| 3.5 | Amended and Restated Bylaws of the Company dated November 25, 2011. (5) |
| 3.6 | Certificate of Amendment to Articles of Incorporation dated April 8, 2019. (48) |
| 4.1 | Certificate of Designation of Preferences, Rights and Limitations of Series B Convertible Preferred Stock. (6) |
| 4.2 | Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series E Convertible Preferred Stock. (7) |
| 4.3 | Certificate of Correction to Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series E Convertible Preferred Stock. (8) |
| 4.4 | Form of proposed Certificate of Designation of Preferences, Rights and Limitations of 0% Series E-1 Convertible Preferred Stock. (9) |
| 4.5 | Form of Underwriter's Warrant (51) |
| 4.6 | Form of Underwriter's Warrant (59) |
| 10.1 | Form of Unit Purchase Agreement dated as of August 14, 2017. (10) |
| 10.2 | Form of Registration Rights Agreement dated as of August 14, 2017. (11) |
| 10.3 | Form of 5% Convertible Promissory Note dated August 14, 2017. (12) |
| 10.4 | Form of Common Stock Purchase Warrant dated August 14, 2017. (13) |
| 10.5 | Form of Exchange Agreement dated as of July 16, 2017. (14) |
| 10.6 | Form of Exchange Agreement dated as of August 7, 2017. (15) |
| 10.7 | Form of Exchange Agreement dated as of November 28, 2017. (16) |
| 10.8 | Amended and Restated Croxall Retention Agreement dated August 30, 2017. (17) |
| 10.9 | Retention Agreement with Francis Knuettel II dated August 31, 2017. (18) |
| 10.10 | Employment Agreement with James Crawford dated August 31, 2017. (19) |

50

| Exhibit No. | Description |
| --- | --- |
| 10.11 | Consulting Termination and Release Agreement with Erich Spangenberg dated August 31, 2017. (20) |
| 10.12 | Consulting Agreement dated August 31, 2017 with Page Innovations, LLC. (21) |
| 10.13 | Form of Lock-up Agreement with Doug Croxall dated September 7, 2017. (22) |
| 10.14 | Letter agreement with Revere Investments L.P., dated October 31, 2017. (23) |
| 10.15 | Agreement and Plan of Merger dated as of November 1, 2017. (24) |
| 10.16 | Amendment to Croxall Retention Agreement dated November 1, 2017. (25) |
| 10.17 | Voting and Standstill Agreement with Doug Croxall dated November 1, 2017. (26) |
| 10.18 | CF Marathon LLC Limited Liability Company Agreement dated as of October 20, 2017. (27) |
| 10.19 | First Amendment to Amended and Restated Revenue Sharing and Securities Purchase Agreement and Restructuring Agreement dated as of August 3, 2017. (28) |
| 10.20 | M&A Advisory Agreement with Palladium Capital Advisors, LLC, dated November 13, 2017. (29) |
| 10.21 | CIARA Technologies Agreement. (Confidential Treatment Requested) (30) |
| 10.22 | Master Services Agreement with Hypertec Systems Inc. dated December 15, 2017. (Confidential Treatment Requested) (31) |
| 10.23 | Engagement Letter with Roth Capital Partners, LLC dated December 7, 2017. (32) |
| 10.24 | Fairness Opinion dated December 13, 2017. (33) |
| 10.25 | Form of Securities Purchase Agreement. (34) |
| 10.26 | Form of Securities Purchase Agreement. (35) |
| 10.27 | Patent Rights Purchase and Assignment Agreement with XpresSpa Group, Inc. dated January 11, 2018. (36) |
| 10.28 | Amendment No. 1 to Agreement and Plan of Merger dated January 23, 2018. (37) |
| 10.29 | Lease Agreement, by and between 9349-0001 Quebec Inc. and Cryptoespace Inc., dated November 11, 2017. (38) |
| 10.30 | Assignment and Assumption Agreement, by and between Blocespace Inc. and Marathon Crypto Mining, Inc., dated February 12, 2018 (39) |
| 10.31 | Settlement Agreement and Release of Claims, dated March 8, 2018. (40) |
| 10.32 | Amendment No. 2 to Agreement and Plan of Merger, dated March 19, 2018. (41) |
| 10.33 | Amended and Restated Agreement and Plan of Merger, dated April 3, 2018. (42) |
| 10.34 | Executive Employment Agreement (46) |
| 10.35 | Executive Employment Agreement (47) |
| 10.36 | At the Market Offering Agreement with HC Wainwright & Co., dated July 2019 (49) |
| 10.37 | Asset Purchase Agreement with SelectGreen, Ltd., dated August 2019 (50) |
| 10.38 | Form of Lockup Agreement (51) |
| 10.39 | Form of At the Market Agreement (52) |
| 10.40 | Sales and Purchase Agreement between the Company and Bitmain (53) |
| 10.41 | Executive Employment Agreement between the Company and Simeon Salzman (54) |
| 10.42 | Sales and Purchase Agreement between the Company and Bitmain (55) |
| 10.43 | Sales and Purchase Agreement between the Company and Bitmain (56) |
| 10.44 | Form of At the Market Agreement (57) |
| 10.45 | Sales and Purchase Agreement between the Company and Bitmain (58) |
| 14.1 | Code of Business Conduct and Ethics (43) |
| 16.1 | SingerLewak LLP letter to the Securities and Exchange Commission. (44) |
| 16.2 | Letter from BDO USA, LLP dated November 30, 2017. (45) |
| 23.1 | Auditor consents |
| 31.1 | Certification of Chief Executive Officer pursuant to Section302 of the Sarbanes-Oxley Act 2002* |
| 31.2 | Certification of Chief Financial Officer pursuant to Section302 of the Sarbanes-Oxley Act 2002* |
| 32.1 | Section 1350 Certification of the Chief Executive Officer and Chief Financial Officer* |

51

| | |
|---|---|
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Calculation Linkbase Document |
| 101.LAB | XBRL Taxonomy Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Presentation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Document |

\* Filed herein.

(1)   Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed December 9, 2011 and incorporated herein by reference.

(2)   Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed February 20, 2013 and incorporated herein by reference.

(3)   Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed July 19, 2013 and incorporated herein by reference.

(4)   Previously filed as Exhibit 3.4 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(5)   Previously filed as Exhibit 3.2 to Current Report on Form 8-K filed December 9, 2011 and incorporated herein by reference

(6)   Previously filed as Exhibit 3.2 to Current Report on Form 8-K filed May 7, 2014 and incorporated herein by reference.

(7)   Previously filed as Exhibit 4.1 to Current Report on Form 8-K filed December 1, 2017 and incorporated herein by reference.

(8)   Previously filed as Exhibit 4.1 to Current Report on Form 8-K filed December 22, 2017 and incorporated herein by reference.

(9)   Previously filed as Exhibit 4.4 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(10)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(11)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(12)   Previously filed as Exhibit 4.1 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(13)   Previously filed as Exhibit 4.2 to Current Report on Form 8-K filed August 15, 2017 and incorporated herein by reference.

(14)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed July 18, 2017 and incorporated herein by reference.

(15)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed August 9, 2017 and incorporated herein by reference.

(16)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed December 1, 2017 and incorporated herein by reference.

(17)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.

(18)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.

(19)   Previously filed as Exhibit 10.3 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.

(20)   Previously filed as Exhibit 10.4 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.

(21)   Previously filed as Exhibit 10.5 to Current Report on Form 8-K filed September 5, 2017 and incorporated herein by reference.

(22)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed September 12, 2017 and incorporated herein by reference.

(23)   Previously filed as Exhibit 10.14 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(24)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed November 2, 2017 and incorporated herein by reference.

(25)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed November 2, 2017 and incorporated herein by reference.

(26)   Previously filed as Exhibit 10.3 to Current Report on Form 8-K filed November 2, 2017 and incorporated herein by reference.

52

(27)   Previously filed as Exhibit 10.18 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(28)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed August 9, 2017 and incorporated herein by reference.

(29)   Previously filed as Exhibit 10.20 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(30)   Previously filed as Exhibit 10.21 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(31)   Previously filed as Exhibit 10.22 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(32)   Previously filed as Exhibit 10.23 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(33)   Previously filed as Exhibit 10.24 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(34)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed December 12, 2017 and incorporated herein by reference

(35)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed December 19. 2017 and incorporated herein by reference

(36)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed January 18, 2018 and incorporated herein by reference.

(37)   Previously filed as Exhibit 10.28 to Registration Statement on Form S-4 filed January 24, 2018 and incorporated herein by reference.

(38)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed February 15, 2018 and incorporated herein by reference.

(39)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed February 15, 2018 and incorporated herein by reference.

(40)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed July 31, 2018 and incorporated herein by reference.

(41)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed March 20, 2018 and incorporated herein by reference.

(42)   Previously filed as Exhibit 10.4 to Current Report on Form 8-K filed April 4, 2018 and incorporated herein by reference.

(43)   Previously filed as Exhibit 14.1 to Annual Report on 10- K filed March 31, 2014 and incorporated herein by reference.

(44)   Previously filed as Exhibit 16.1 to Current Report on Form 8-K filed January 17, 2017 and incorporated herein by reference.

(45)   Previously filed as Exhibit 16.1 to Current Report on Form 8-K filed December 1, 2017 and incorporated herein by reference.

(46)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed October 16, 2018 and incorporated herein by reference.

(47)   Previously filed as Exhibit 10.2 to Current Report on Form 8-K filed on October 16, 2018 and incorporated herein by reference.

(48)   Previously filed as Exhibit 3.1 to Current Report on Form 8-K filed on April 8, 2019 and incorporated herein by reference.

(49)   Previously filed as Exhibit 10.1 to Current Report on Form 8-K filed on July 19, 2019 and incorporated herein by reference.

(50)   Previously filed as Exhibit 10.1 to Current report on Form 8-K filed on August 29, 2019 and incorporated herein by reference.

(51)   Previously filed as Exhibit 4.1 to S-1/A filed on July 23, 2020

(52)   Previously filed as Exhibit 10.1 to S-3 filed on August 6, 2020

(53)   Previously filed as Exhibit 10.1 to 8-K filed on August 18, 2020

(54)   Previously filed as Exhibit 10.1 to 8-K filed on October 24, 2020

(55)   Previously filed as Exhibit 10.1 to 8-K filed October 29, 2020

(56)   Previously filed as Exhibit 10.1 to 8-K filed on December 11, 2020

(57)   Previously filed as Exhibit 10.1 to S-3 filed on December 11, 2020

(58)   Previously filed as Exhibit 10.1 to 8-K filed on December 28, 2020

(59)   Previously filed as Exhibit 4.1 to 8-K filed on January 15, 2021

**ITEM 16. FORM 10-K SUMMARY**

None.

53

**SIGNATURES**

212

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: March 16, 2021

|  |  |
|---|---|
| | **MARATHON DIGITAL HOLDINGS, INC.** |
| | By: */s/ Merrick Okamoto* |
| | Name: Merrick Okamoto |
| | Title: Chief Executive Officer and Executive Chairman |
| | (Principal Executive Officer) |
| | By: */s/ Simeon Salzman* |
| | Name: Simeon Salzman |
| | Title: Chief Financial Officer |
| | (Principal Financial and Accounting Officer) |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Merrick Okamoto*<br>Merrick Okamoto | Chief Executive Officer and Executive Chairman (Principal Executive Officer) | March 16, 2021 |
| */s/ Simeon Salzman*<br>Simeon Salzman | Chief Financial Officer (Principal Financial and Accounting Officer) | March 16, 2021 |
| */s/ Fred Thiel*<br>Fred Thiel | Director | March 16, 2021 |
| */s/ Peter Benz*<br>Peter Benz | Director | March 16, 2021 |
| */s/ Michael Berg*<br>Michael Berg | Director | March 16, 2021 |
| */s/ Kevin DeNuccio*<br>Kevin DeNuccio | Director | March 16, 2021 |