# EXHIBIT F

**June 30, 2022 Association of International Certified Professional Accountants,** *Accounting for an auditing of digital assets,* **excerpted (cover and pages iii–v, 15, and 18)**

Practice aid



Together as the Association of International
Certified Professional Accountants®

# Accounting for and auditing of digital assets

as of June 30, 2022

# Contents (continued)

## Accounting subgroup

### Questions [Published October 2020]

**Meeting the definition of an investment company when engaging in digital asset activities** ......................... 10

11  Would participation in digital asset activities (for example, mining activities) disqualify an entity from classification as an investment company within the scope of FASB ASC 946, *Financial Services—Investment Companies?*

**Accounting by an investment company for digital assets it holds as an investment** ...................................... 12

12  How should an entity that qualifies as an investment company under FASB ASC 946, *Financial Services— Investment Companies*, account for investments in digital assets?

**Recognition, measurement, and presentation of digital assets specific to broker-dealers** ............................ 13

> **NOTE:** Q&As 13–15 do not address how an entity determines whether it is within the scope of FASB ASC 940 and the Broker-Dealer guide. See NOTE before Q&A 13 for additional information about considerations for an entity that reaches a conclusion that it is within the scope of FASB ASC 940.

13  How should an entity that is a broker-dealer in the scope of FASB ASC 940, *Financial Services—Brokers and Dealers*, present digital assets held or received on behalf of customers on its statement of financial condition?

14  How should a broker-dealer in the scope of FASB ASC 940 recognize revenue for purchases or sales transactions in digital assets on behalf of its customers?

15  How should the digital assets owned by a broker-dealer in the scope of FASB ASC 940 as part of its proprietary trading portfolio be measured?

**Considerations for crypto assets[2]  that require fair value measurement.** ...................................................... 15

> **NOTE:** The scope of Q&As 16–21 is specific to crypto assets. In addition, the Q&As interrelate and therefore are intended to be read in conjunction with one another.

16  When determining the fair value for crypto assets, what is the principal market?

17  What are some items an entity should consider about the markets in which crypto assets trade when determining the fair value of a crypto asset holding?

18  Assume the principal (or most advantageous) market for a given crypto asset is an active market with quoted prices for identical assets. Given the characteristics of the principal market, an entity concludes the fair value would be classified as Level 1. How is the fair value of the crypto asset determined in this circumstance?

19  Is it appropriate for a reporting entity to adjust the fair value measurement of a crypto asset to reflect the size of the entity's holding of the crypto asset?

20  Crypto asset markets often operate continuously, without a traditional market close. How should entities determine the fair value of the crypto asset in such circumstances?

21  If the principal (or most advantageous) market is not active or does not have orderly transactions (that is, not Level 1), how does management weigh inputs from different sources in the determination of the fair value of a crypto asset?

---

[2] Refer to the definition of a *crypto asset* in Q&A 1 of this practice aid.

# Contents (continued)

**Accounting for stablecoin holdings**.............................................................................................. **20**

22  How should investors that do not apply specialized industry guidance account for a holding of a stablecoin?

23  Entity A owns 100 units of a stablecoin, a digital asset that has a stated value of one U.S. dollar and is collateralized on a one-for-one basis by dollars held in a segregated bank account by the issuing entity. The holders of the units only have the right to redeem each unit for one U.S. dollar. How should Entity A account for its stablecoin?

Assume Entity A does not apply any specialized industry guidance (for example, FASB ASC 946 or FASB ASC 940).

## Questions [Published January 2022]

**Contracts involving derivatives and embedded derivatives**............................................................. **22**

24  How should Entity A evaluate whether the asset representing the right to receive a fixed quantity of crypto assets contains an embedded derivative?

**Crypto asset lending**..................................................................................................................... **24**

25  Assume a lender lends 100 units of a crypto asset (Crypto Asset ABC) for a term of six months to a borrower. How should the lender account for the loan?

26  Assume a lender lends 100 units of a crypto asset (Crypto Asset ABC) for a term of six months to a borrower. How should the borrower account for the loan?

**Mining**........................................................................................................................................ **26**

27  If an entity operates as a crypto asset miner, how should the entity recognize and measure transaction fees and block rewards earned in connection with its mining efforts?

28  Entity A shares its computing infrastructure as part of a mining pool run by operator O. How does Entity A account for the arrangement?

# Contents (continued)

## Auditing subgroup

### Client acceptance and continuance [Published July 2020]

1 Overview ........................................................................................................................................... 31

2 Auditor skill sets and competencies ................................................................................................ 32

3 Management skill sets and competencies ........................................................................................ 37

4 Management integrity and overall business strategy ...................................................................... 39

5 Processes and controls, including information technology ............................................................. 44

### Risk assessment and processes and controls [Published May 2021]

1 Introduction ..................................................................................................................................... 50

2 Understanding the entity and its environment ............................................................................... 51

3 Understanding and evaluating the entity's risk assessment process ............................................. 54

4 Understanding the entity's processes and controls ....................................................................... 56

### Laws and regulations and related parties [Published May 2021]

1 Introduction ..................................................................................................................................... 72

2 Laws and regulations ....................................................................................................................... 72

3 Related parties ................................................................................................................................. 74

### Appendix A

Blockchain universal glossary ........................................................................................................... 77

### Appendix B

Staff Accounting Bulletin No. 121 Questions and Answers ............................................................. 78

## Considerations for crypto assets that require fair value measurement

### Question 16:

When determining the fair value for crypto assets,[18] what is the principal market?

### Response 16:

In accordance with FASB ASC 820-10-35-3, a fair value measurement assumes that the asset or liability is exchanged in an orderly transaction between market participants to sell the asset or transfer the liability at the measurement date under current market conditions. Furthermore, FASB ASC 820-10-35-5 states that a fair value measurement assumes that the transaction to sell the asset or transfer the liability takes place either (*a*) in the principal market for the asset or liability or (*b*) in the absence of a principal market, in the most advantageous market for the asset or liability. Therefore, a fair value measurement contemplates an orderly transaction to sell the asset or transfer the liability in its principal market (or in the absence of a principal market, the most advantageous market).

There are various markets in which crypto assets trade. The reliability and sufficiency of the information produced could vary market by market. It is important for entities to consider whether these markets provide reliable volume and level of activity information in their determination of the principal market (or in the absence of a principal market, the most advantageous market).

Under FASB ASC 820, *Fair Value Measurement*, a *principal market* is the market with the greatest volume and level of activity for the asset or liability. The determination of the principal market should be based on the market with the greatest volume and level of activity that the reporting entity can access and not on the entity's own level of activity in a particular market. In that regard, it is important for an entity to assess whether there are any regulatory or other restrictions that prevent it from accessing a particular market.

When identifying the principal market — or in the absence of a principal market, the most advantageous market — an entity is not required to undertake an exhaustive search of all possible markets for the asset, but it should consider all information that is reasonably available. In accordance with FASB ASC 820-10-35-5A, the market in which an entity normally transacts for the crypto asset is presumed to be the principal market, unless contrary evidence exists.

To overcome the presumption, an entity must obtain evidence that the market it normally transacts in is not the market with the greatest volume and level of activity for the crypto asset. For example, if an entity normally buys and sells crypto assets through an intermediary or a broker, it would generally identify that market as the principal market, unless it has obtained evidence (considering all information that is reasonably available) that another market (for example, an exchange) has a greater volume and level of activity. For this purpose, a comparison would be made between the other market and the market the entity normally transacts in. Although numerous market participants may transact in crypto assets through intermediaries or brokers, each individual intermediary or broker is not a market. Generally, there is a lack of information regarding volume and pricing of crypto asset transactions in non-exchange markets. Therefore, it may be difficult for an entity to make a comparison between markets in order to conclude that another market (for example, an exchange) has a greater volume and level of activity than the market in which it normally transacts through an intermediary or broker. In this situation, it would be difficult to overcome the presumption that the market it normally transacts in is the principal market.

---

[18] Refer to the definition of a *crypto asset* in Q&A 1 of this practice aid.

size as a characteristic of the reporting entity's holding (specifically, a blockage factor that adjusts the quoted price of an asset or a liability because the market's normal daily trading volume is not sufficient to absorb the quantity held by the entity, as described in FASB ASC 820-10-35-44), rather than as a characteristic of the asset or liability (for example a control premium when measuring the fair value of a controlling interest) are not permitted in a fair value measurement.

The response to Q&A 7 indicates that entities will generally reach a determination that the unit of account for a crypto asset is the individual unit (or divisible fraction of a unit.) Further, the response to Q&A 1 explains that a crypto asset is not a financial instrument, financial asset, or a nonfinancial item accounted for as a derivative in accordance with FASB ASC 815, *Derivatives and Hedging*. As a result, the portfolio exception at FASB ASC 820-10-35-18D is not applicable to a crypto asset and, therefore, it would be inappropriate to adjust the fair value measurement of a crypto asset to reflect the size of an entity's holding of a crypto asset.

> **NOTE:** The scope of Q&As 16–21 is specific to crypto assets. In addition, the Q&As interrelate and therefore are intended to be read in conjunction with one another.

## Question 20:

Crypto asset[22]  markets often operate continuously, without a traditional market close. How should entities determine the fair value of the crypto asset in such circumstances?

## Response 20:

In such circumstances, an accounting convention may establish a cut-off time for determining the fair value of the crypto asset. For example, it may be reasonable for an entity to establish an accounting convention based on prices at

- the close of the business day of the entity.

- a fixed Coordinated Universal Time (UTC).

- other timing as deemed reasonable, such as traditional close time based on local market jurisdictions.

Entities should consider transactions that take place after the cut-off time but before the end of the reporting period, similar to the guidance in FASB ASC 820-10-35-41C.

Any convention used should be reasonable and consistently applied, and changes should be made only if facts and circumstances support a change.

> **NOTE:** The scope of Q&As 16–21 is specific to crypto assets. In addition, the Q&As interrelate and therefore are intended to be read in conjunction with one another.

---

[22] Refer to the definition of a *crypto asset* in Q&A 1 of this practice aid.



The Association of International Certified Professional Accountants, powering leaders in accounting and finance around the globe.

© 2022 Association of International Certified Professional Accountants. All rights reserved. AICPA and CIMA are trademarks of the American Institute of CPAs and The Chartered Institute of Management Accountants, respectively, and are registered in the US, the EU, the UK and other countries. The Globe Design is a trademark of the Association of International Certified Professional Accountants.

For information about the procedure for requesting permission to make copies of any part of this work, please email copyright-permissions@aicpa-cima.com with your request. Otherwise, requests should be written and mailed to Permissions Department, 220 Leigh Farm Road, Durham, NC 27707-8110 USA. 2206-465060