# EXHIBIT G

# Sept. 30, 2022 Financial Accounting Standards Board, Staff Paper



# Staff paper

IASB Agenda reference 12A

FASB Agenda reference 12A

**FASB | IASB Joint Education Meeting**

Date          **30 September 2022**
Project       **Accounting for and Disclosure of Crypto Assets**
Topic         **Project Update**
Contacts      **Nick Cappiello** (ntcappiello@fasb.org), **Tiffany Wyszkowski** (twyszkowski@fasb.org), **Sally Bishop** (sbishop@fasb.org), **Gary Sardo** (gsardo@fasb.org), **Cassie Mongold** (cmongold@fasb.org), **Alicia Manders** (aamanders@fasb.org)

This paper has been prepared for discussion at a public educational meeting of the US Financial Accounting Standards Board (FASB) and the International Accounting Standards Board (IASB). It is not intended to represent the views of the boards or any individual member of either board or the staff. Comments on the application of IFRS® Accounting Standards or US GAAP do not purport to set out acceptable or unacceptable application of IFRS Accounting Standards or US GAAP. Tentative technical decisions are made in public and reported in FASB Action Alert or in IASB Update. Official positions of the FASB or the IASB are determined after extensive due process and deliberations.

## Purpose of this paper

1.  This paper summarizes the results of the FASB's research and outreach related to digital assets. Specifically, the paper summarizes the information the staff gathered during its pre-agenda research for purposes of evaluating whether the FASB's standard-setting agenda criteria were met, which led the Board to add a project to its technical agenda in May 2022 to address the Accounting for and Disclosure of Digital Assets (renamed to the Accounting for and Disclosure of Crypto Assets on August 31, 2022). The paper also summarizes the scope criteria considered by the Board at its recent decision-making meeting on August 31, 2022, and the related stakeholder feedback on those criteria.

2.  This paper is organized as follows:

    (a)   Background

    (b)   Information and Research Gathered

    (c)   Agenda Decision

    (d)   Scope.



## Background

3.   The Background section provides an overview of the current financial reporting guidance and practice for digital assets.

4.   For the purposes of this paper, the term *digital assets* is used unless those providing feedback or the sources for the research performed used a different term.

5.   This paper does not include discussion and analysis related to the staff's concurrent research on exchange-traded commodities because the Board decided on May 11, 2022, not to add a technical project on the accounting for commodities at that time. The chair directed the staff to continue exploring the accounting for and disclosure of exchange-traded commodities, as part of its research agenda.

**Accounting for Digital Assets**

6.   Assuming that an entity does not apply specialized industry accounting guidance or hold digital assets that are within the scope of other accounting guidance (as described further below), holders of digital assets generally account for them as indefinite-lived intangible assets. In December 2019, the AICPA's Digital Assets Working Group released a Practice Aid, *Accounting for and Auditing of Digital Assets* (Digital Asset Practice Aid).[1] The Digital Asset Practice Aid serves as nonauthoritative guidance on how to account for and audit digital assets under generally accepted accounting principles (GAAP) and generally accepted auditing standards, respectively. The Digital Asset Practice Aid states that crypto assets (a subset of digital assets) generally would be accounted for under Topic 350, Intangibles—Goodwill and Other*,* and that cryptocurrencies do not meet the Master Glossary definitions of *cash* and *cash equivalents, financial instruments, financial assets,* and *inventory.* In the guide, the Working Group lays out its reasoning for its conclusions, as follows:

   (a)   Crypto assets will not meet the definition of *cash* or *cash equivalents* (as defined in the Master Glossary) if they are not considered legal tender and are not backed by sovereign governments. In addition, these crypto assets typically do not have a maturity date and have traditionally experienced significant price volatility.

   (b)   Crypto assets will not meet the definition of *financial instruments* or *financial assets* (as defined in the Master Glossary) if they are not cash (see previous discussion) or an ownership interest in an entity and if they do not represent a contractual right to receive cash or another financial instrument.

   (c)   Although these crypto assets may be held for sale in the ordinary course of business, they are not tangible assets and, therefore, may not meet the definition of *inventory* (as defined in the Master Glossary).

---

[1] The Digital Assets Practice Aid was updated in June 2022.



7.  As intangible assets, digital assets are initially measured at cost. They are treated as indefinite-lived intangible assets in accordance with paragraph 350-30-35-4, which states that if no legal, regulatory, contractual, competitive, economic, or other factors limit the useful life of an intangible asset to the reporting entity, the useful life of the asset should be considered indefinite. As a result, the indefinite-lived intangible asset should not be amortized and should be tested for impairment annually or more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired. In practice, this impairment testing has been interpreted to mean that digital assets should be impaired to the lowest fair value observable within a period. Impairment losses are presented in net income and not reversed.

8.  Investment companies apply industry-specific guidance in Topic 946, Financial Services—Investment Companies. That guidance applies to entities that are regulated under the Investment Company Act of 1940, as well as an entity that meets the characteristics described in paragraphs 946-10-15-6 through 15-9. Entities within the scope of that guidance account for all assets, including digital assets, at fair value.

9.  Broker-dealers apply industry-specific guidance in Topic 940, Financial Services—Brokers and Dealers, and the interpretive guidance in the AICPA Accounting and Auditing Guide for Broker Dealers (Broker-Dealer Guide). While there is no specific guidance for those entities to carry digital assets at fair value, industry practice has been to measure "inventory," including digital assets, at fair value, based on the interpretation of paragraph 5.02 in the Broker-Dealer Guide, which states that "A broker-dealer accounts for *inventory* and derivative positions (such as futures, forwards, swaps, and options) at fair value" (emphasis added).

10. The Securities and Exchange Commission (SEC) issued a Spotlight on Initial Coin Offerings[2] (ICOs), which are digital assets used to raise capital or allow entities to participate in investment opportunities. The SEC has stated that some digital assets may be securities under the Securities Exchange Act of 1934. Securities must be registered with the Commission or must qualify for an exemption from registration requirements. Items, including digital assets, that the SEC deems to be a security have established GAAP depending on the nature of those items.

11. On March 31, 2022, the SEC issued Staff Accounting Bulletin No. 121 (SAB 121), which states that in the fact pattern described in that SAB, a crypto platform should present a liability on its balance sheet measured at an amount equal to the fair value of the "crypto-assets" that a registrant is responsible for holding on its platform. That liability represents the platform's "obligation to safeguard the crypto-assets held for its platform users." The liability is offset by an asset measured at the same amount. SAB 121 also details disclosures that a registrant should make.

---

[2] https://www.sec.gov/ICO



## Information and Research Gathered

12. The Board first considered adding a project to its technical agenda on the accounting for digital assets in 2020. At its October 21, 2020 Board meeting, because of limited evidence of a sufficiently pervasive need to improve the guidance in this area, the Board decided not to add a project at that time. However, the Board directed the staff to continue monitoring developments and the pervasiveness of the need to improve GAAP.

13. Following the Board's consideration of agenda requests related to digital assets in October 2020, the staff has monitored and gathered information from a variety of sources. Additionally, stakeholders requested that the Board consider standard setting in this area in recent agenda requests and through the feedback received in response to the 2021 FASB Invitation to Comment, *Agenda Prioritization* (2021 ITC).

**Agenda Requests Since the Previous Agenda Prioritization Meeting on Digital Assets**

14. Since October 2020, the Board has received three agenda requests on digital assets, all of which encourage the Board to address the financial reporting for digital assets. Those agenda requests are summarized as follows:

    (a) On May 21, 2021, the Board received an agenda request from seven members of Congress to add a project to address the accounting for digital assets. Those members noted that the "growth of digital assets has been staggering and will likely continue." The letter further notes that that "U.S. financial regulators are also recognizing the enormous potential of digital assets." It highlights that the Office of the Comptroller and Currency issued statements on allowing national banks to provide custody services for digital assets. Those members noted that a "lack of thoughtful and carefully developed authoritative guidance from the FASB threatens the ability to create accurate and consistent financial reporting of a large and fast-growing financial asset class." The letter also states that because "companies hold digital currencies for varying purposes, we believe the FASB should take into consideration how a company intends to use its bitcoin holdings when determining the appropriate accounting method."

    (b) On June 7, 2021, the Board received an agenda request from the International Swaps and Derivatives Association (ISDA) to add a project to address the accounting for cryptocurrencies. The request highlighted the increase in pervasiveness since the October 2020 Board meeting. The ISDA stated that the current accounting for digital assets as intangible assets under Topic 350 does not reflect the economics and is misleading and not a faithful representation of the assets for users of financial statements. The request states that "a framework should be developed that will allow all entities, and not just investment companies and broker dealers, to account for crypto assets at fair value."



(c)    On September 2, 2021, the Board received an agenda request from Mark Zashin, a member of the CFA Society of NY. In his agenda request, Mr. Zashin stated that fair market value of certain digital assets should be communicated, with cost and fair market value explained in detail.

**Feedback Received on the 2021 ITC**

15.    In June 2021 the Board issued an ITC to solicit broad stakeholder feedback about the future the Board's standard-setting agenda. Chapter 2 of the ITC contains three questions on digital assets:

(a)    Investors: How significant are holdings in digital assets, such as crypto assets, in the companies you analyze? What type of financial reporting information about holdings in digital assets do you use in your analysis of a company? How does that information influence your decisions and behaviors? If there is other financial reporting information about digital assets that would be decision useful, what is that information and why would it be decision useful?

(b)    Preparers and practitioners: Does your company (or companies that you are involved with) hold significant digital assets, such as crypto assets? What is the purpose of those holdings?

(c)    If the Board were to pursue a project on digital assets, which improvements are most important, what types of digital assets should be included within the scope, and should this guidance apply to other nonfinancial assets?

16.    Overall, the Board received 522 responses from a variety of stakeholders. Of the 522 ITC responses, 492 respondents commented on digital assets and 445 responses were solely related to digital assets, making it the most frequently identified top priority among all respondents. Of those 445 responses, 308 respondents (the majority of which self-identified as an individual retail investor, sole proprietor, or small business owner) expressed specific support for one preparer's recommendation to account for digital assets at fair value. The digital assets topic was not the most frequently identified top priority for respondents that are other users of financial statements, for example, institutional investors.

17.    The response to the ITC broadly favored the Board exploring a project on accounting for digital assets (and particularly bitcoin) at fair value. Nearly all respondents, across all stakeholder types, agreed that adding a project that would permit or require entities to account for certain digital assets at fair value should be the Board's top priority going forward. Many respondents stated that the current accounting for digital assets as intangible assets, carried at cost and evaluated for impairment each period, does not reflect the economic reality of those assets or provide users with decision-useful information, and that fair value would provide a more relevant measure.

18.    Furthermore, many respondents, including users, noted that because of the continued growth and change in the digital asset space and the rate of adoption of digital assets by more and more entities, the trajectory of the pervasiveness of digital assets should be weighed along with the current state.



**Additional Discussions with Stakeholders**

*Investor and Other User Outreach*

19.   The staff spoke with 13 users from 6 companies that included a rating agency and entities that specialize in investment management and investment banking. Those investors/users supported the Board undertaking a project. Those users generally favored improvements to the recognition and measurement (with accompanying presentation and disclosure requirements) of digital assets with one user specifically favoring a disclosure-only project and noted that if entities were required to provide units held or fair value information on their top five digital asset holdings, that information would be adequate for their analyses.

20.   Although there was limited user outreach concerning a fair value option, two users noted that they did not favor an option.

21.   Members from the FASB's Investor Advisory Committee also provided their individual views about potential improvements and prioritization. One Committee member noted that current impairment accounting does not make sense given the volatility of the digital asset markets. Some Committee members also noted that it would be useful in the notes to have detailed information on the type of holdings, units held, and the cost and fair value of those holdings. Some Committee members would prefer disclosure because fair value measurement of digital assets would introduce volatility to the income statement. However, generally, improving the accounting for digital assets was not noted as a major area of concern by those members.[3]

*Preparer, Practitioner, and Other: Outreach Discussions*

22.   Since October 2020, as part of the pre-agenda monitoring activities, the staff has had more than 40 different interactions with preparers, accounting firms, regulators, other standard setters, and others. Recurring themes throughout the outreach performed are as follows:

(a)   Accounting for digital assets at cost less impairment does not reflect the economics of digital assets.

(b)   The impairment model is costly for preparers because entities are required to identify the lowest price and estimate fair value for their digital asset holdings throughout the entire reporting period. This process requires an entity to consider prices across multiple exchanges and to seek information that often is not readily available.

---

[3] Comments were provided by individual IAC members as part of an internal Agenda Consultation meeting on February 28, 2022.



(c)     Prior concerns regarding the ability to audit holdings in this space have decreased because many audit firms have developed new processes and additional expertise in verification of the existence and valuation of digital assets.

(d)     Either a requirement or an option to account for digital assets at fair value would improve the existing financial reporting.

(e)     Entities are becoming more interested in decentralized finance activities that create potential for mismatches between the measurement of an entity's digital assets holdings and related liabilities associated with those activities.

(f)     Digital assets are becoming more prevalent.

23.     On March 9, 2022, members from the FASB's Financial Accounting Standards Advisory Council provided their views about potential improvements and prioritization. Council members noted that they were not seeing a lot of entities investing in digital assets at the time. Nonetheless, they indicated that the current accounting treatment as an intangible asset does not make sense and should be improved. One council member noted that an entity that has material digital asset holdings accounted for as intangible assets was having to include extensive non-GAAP disclosures to the financial statements to convey an entity's value to its investors. Some members suggested that the accounting should be based on how the entity intends to use the digital assets, that is, either as an investment or as inventory. Council members noted that even if the Board does not address recognition or measurement, digital assets should be presented separately on the balance sheet with disclosures on the quantity held and cost basis.

24.     The staff solicited feedback from the Not-for-Profit Advisory Committee (NAC) members through a survey and at the March 31, 2022 NAC meeting. Feedback from the survey and NAC meeting indicated that some not-for-profits (NFPs) have received donations of digital assets. Many indicated that NFPs were liquidating those donations upon receipt, similar to what they would do when equity securities are gifted. Some NFPs that have yet to receive a gift of digital assets are reviewing their gift acceptance policies and establishing relationships with third parties to assist with liquidation of digital assets received. One NAC member also noted that its organization is reviewing its policies to determine when using digital assets might be acceptable, for example, in the event of a ransomware attack. NAC members were unaware of NFPs currently investing in or intentionally holding digital assets. One NAC member stated that it would support accounting for exchange traded digital assets at fair value.

## Agenda Decision

25.     In order to assist the Board in deciding whether to add a project to its technical agenda, the staff considered a potential project to improve the financial reporting for holders of digital assets against the Board's agenda decision criteria. The Board's agenda decision criteria are as follows:

(a)     Identifiable and sufficiently pervasive need to improve GAAP



(b)    Identifiable scope

(c)    Technically feasible solutions and the perceived benefits of those solutions are likely to justify the expected costs of change.

26.    The pre-agenda research focused on the primary issue raised by many stakeholders as a top priority—the accounting for and disclosure of certain digital asset holdings. It did not focus on the underlying technology (blockchain technology), issuers of digital assets (for example, ICOs) or those traditional assets that may come in digitized form (for example, securities), or digital assets that are accounted for within the scope of industry-specific guidance (for example, digital assets held by investment companies).

27.    Board members agreed there is a pervasive need to improve the accounting for and disclosure of digital assets that are held by an entity because the current accounting does not reflect the economics of certain digital assets, the increase in overall market capitalization and the increased number of entities holding and transacting with digital assets. Stakeholder feedback generally indicates that the current accounting is costly for preparers to apply and does not provide users with decision-useful information because users are requesting entities to provide supplemental information for their analyses. Board members concluded that there are feasible solutions that justify the costs, that defining a scope for the project is achievable and agreed with the feedback received from the ITC that a project on the accounting for and disclosure of digital assets should be a priority.

28.    For the reasons stated above, the Board added a project for the accounting for and disclosure of digital assets to its technical agenda on May 11, 2022. During that meeting, Board members shared views about certain aspects of the project, including the types of digital assets that they believe should be within the scope of the project.

## Scope

29.    This section of the paper summarizes the criteria that the Board considered in establishing the scope of the project. Those criteria were considered in the context of three broad categories, as follows:

(a)    Intangible Assets, Securities and Financial Assets, and Contracts: Within this category, the paper summarizes existing GAAP definitions that could be used in developing a portion of the criteria for the scope of this project.

(b)    Other Key Characteristics: Within this category, the paper summarizes various characteristics of digital assets that differentiate them from other assets. They are criteria that could be used in developing a portion of the scope of this project.  Among the characteristics discussed are the following:

(i)    Medium of exchange

(ii)    Store of value

(iii)    Secured through cryptography



  (iv) Reside or created on a distributed ledger or "blockchain."

 (c) Fungibility and Marketability: Within this category, the paper summarizes criteria that relate to the fungibility and marketability of digital assets because those factors may increase the cost and complexity associated with requiring information about digital assets or decrease the relevance of that information. They also are criteria that could be used in developing a portion of the scope of this project. Among the possible criteria discussed are the following:

  (i) Fungibility

  (ii) Active markets/reliable market price in established markets

  (iii) Readily convertible to cash

  (iv) Observable transactions for fiat.

**General Stakeholder Feedback**

30. Respondents to the 2021 ITC provided detailed feedback on which assets should be considered if the Board were to pursue a project on accounting for digital assets. A majority of respondents favored a narrow scope, while a few respondents noted that the Board should broadly consider all digital assets. Additionally, some respondents recommended a phased approach to establishing a project scope.

31. The most frequently cited suggestion was to model the scope after the definition of *crypto assets* included in the AICPA Digital Assets Practice Aid[4] that provides nonauthoritative guidance on the application of existing GAAP to digital assets created by the AICPA's Digital Assets Working Group. The Digital Assets Practice Aid broadly defines *digital assets* as "digital records that are made using cryptography for verification and security purposes, on a distributed ledger (referred to as a blockchain)."

32. The Digital Asset Practice Aid goes on to differentiate crypto assets from digital assets. It does so by stating that crypto assets are a subset of digital assets that:

 (a) Function as a medium of exchange

 (b) Have all the following characteristics:

  (i) They are not issued by a jurisdictional authority (for example, a sovereign government).

  (ii) They do not give rise to a contract between the holder and another party.

  (iii) They are not considered a security under the Securities Act of 1933 or the Securities Exchange Act of 1934.

---

[4] https://www.aicpa.org/resources/download/accounting-for-and-auditing-of-digital-assets-practice-aid-pdf

33. The Digital Asset Practice Aid explains that those characteristics are not all-inclusive and other facts and circumstances may need to be considered. It also lists examples of crypto assets that meet those characteristics, including bitcoin, bitcoin cash, and Ether.

34. Other narrow-scope suggestions included digital assets that are traded in active markets or those with a readily determinable fair value that do not otherwise qualify as a financial asset.

35. Separately, some respondents recommended that the Board pursue a two-phase approach to a digital asset project, which would start with a narrow scope to provide more immediate guidance for certain digital assets and then consider a broader scope.

36. Other respondents recommended that the Board set a broad scope to address all digital asset holdings. Overall, most respondents who favored a broad scope supported a project to address all types of digital assets such as, but not limited to, crypto assets, stablecoins, non-fungible tokens, and central bank digital currencies.

37. Many stakeholders acknowledged the evolution in the digital asset space and how that evolution may necessitate starting with a narrow scope that can be expanded in targeted ways after the initial project is completed.

**Criteria Considered for the Scope of the Project**

*Intangible Assets, Securities and Financial Assets, and Contracts*

38. The staff explored how intangible assets, securities and financial assets, and contracts are defined and accounted for and how the current guidance may relate to the project scope.

39. The Master Glossary defines *intangible assets* as follows:

> Assets (not including financial assets) that lack physical substance. (The term *intangible assets* is used to refer to intangible assets other than goodwill.)

40. The staff analyzed the definition of *intangible assets* as part of potentially including that definition as a criterion for the scope of this project.

41. Given that the definition of *intangible assets* specifically excludes financial assets as defined in GAAP, the staff has included the Master Glossary of *financial assets* below.

42. The Master Glossary defines *financial assets* as follows:

> Cash, evidence of an ownership interest in an entity, or a contract that conveys to one entity a right to do either of the following:
>
> (a)    Receive cash or another financial instrument from a second entity
> (b)    Exchange other financial instruments on potentially favorable terms with the second entity.

43. One aspect of the project scope that was raised by Board members and stakeholders is the need to exclude securities because guidance already exists in GAAP for how to account for those assets.

44.    The Master Glossary has two definitions for *security*. They are as follows:

(a)    Definition 1 (See Topic 260, Earnings Per Share, and Topic 505, Equity): The evidence of debt or ownership or a related right. It includes options and warrants as well as debt and stock.

(b)    Definition 2 (See Topic 320, Investments—Debt Securities, Topic 321, Investments—Equity Securities, Topic 470, Debt, Topic 815, Derivatives and Hedging, Topic 860, Transfers and Servicing, Topic 952, Franchisors, and Topic 958, Not-for-Profit Entities): A share, participation, or other interest in property or in an entity of the issuer or an obligation of the issuer that has all the following characteristics:

(i)    It is either represented by an instrument issued in bearer or registered form or, if not represented by an instrument, is registered in books maintained to record transfers by or on behalf of the issuer.

(ii)    It is of a type commonly dealt on securities exchanges or markets or, when represented by an instrument, is commonly recognized in any area in which it is issued or dealt in as a medium for investment.

(iii)    It either is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations.

45.    Others have used the definition of *security* under the Securities Act of 1933 or the Securities Exchange Act of 1934 in defining digital assets. Those definitions (not necessarily GAAP definitions) and other factors are used when determining whether something is a security for regulatory or legal purposes.

46.    The Master Glossary defines *contract* as "An agreement between two or more parties that creates enforceable rights and obligations."

47.    The description of crypto assets in the AICPA Digital Assets Practice Aid excludes those types of digital assets that give rise to a contract between the holder and another party. Additionally, during outreach, stakeholders supported a scope criterion that would exclude from the scope of the project those digital assets that represent a contract, that have underlying contractual features or that convey other underlying rights to the asset holder. For example, a non-fungible token that provides the asset holder with a right to access a database of music maintained by the sponsor may be a contract. Stakeholders generally noted that, whether a contract is in paper or digital form, its underlying substance should determine the appropriate accounting. Additionally, they noted that the majority of the crypto assets for which there is a pressing need for accounting improvements would not meet the Master Glossary definition of *contract*.

48.    The staff considered whether financial assets, securities, and contracts should be excluded from the scope of the project. For example, if an asset met the definition of a financial instrument, the Board could consider excluding those assets from the scope of the project.

*Other Key Characteristics*

49. In order to further narrow the scope of this project, the staff considered the characteristics of the underlying phenomena to distinguish certain digital assets from other assets.

50. The staff identified that the differentiating characteristics of the digital assets commonly referred to as *cryptocurrencies* or *crypto assets* are that they are created or reside on blockchains and are secured through cryptography. Providing those characteristics as scope criteria would avoid other digital intangible assets (for example software or data) from being within the scope of this project. Appropriately including the technological form (that is, distribution through the blockchain and secured through cryptography) also is important because, while impossible to predict the future of these assets, it allows for flexibility as the technology continues to evolve.

51. Some of the descriptions or definitions of digital assets used by other organizations include phrases like *store of value* or *medium of exchange*. On the basis of the staff's analysis, those other characteristics may be less helpful in defining the scope of this project for the following reasons:

    (a)    Other assets share those characteristics (real estate may be viewed as a store of value and money is a medium of exchange).

    (b)    A medium of exchange may depend on the perspective of the holder.

    (c)    A digital asset may not be considered a medium of exchange by some in practice because of limitations of networks.

    (d)    Evaluating whether an asset is a medium of exchange or store of value is subjective. For example, relative volatility may lead some stakeholders to conclude that a digital asset is a poor store of value.

*Fungibility and Marketability*

52. In addition to the key characteristics, the staff explored the fungibility of the assets and characteristics of their marketability (or market activity) as it relates to the project's scope.

*Fungibility*

53. For something to be fungible, it must be interchangeable. Merriam-Webster Dictionary defines *fungible* as "being something (such as money or a commodity) of such a nature that one part or quantity may be replaced by another equal part or quantity in paying a debt or settling an account."

*Active Markets/ Reliable Market Price in Established Markets*

54.    Another criterion raised by some stakeholders that the Board could consider adding to the scope of the project is requiring that the digital asset be traded in an active market or an established market with reliable market prices.

55. *Active market* is defined in the Master Glossary as "A market in which transactions for the asset or liability take place with sufficient frequency and volume to provide pricing information on an ongoing basis."

*Readily Convertible to Cash*

56. Another criterion considered by the Board in establishing the scope of this project is whether the digital assets are readily convertible to cash. Assets that are readily convertible to cash have both of the following:

   (a)   Interchangeable (fungible) units

   (b)   Quoted prices available in an active market that can rapidly absorb the quantity held by an entity without significantly affecting the price.

*Observable Transactions for Fiat*

57. The staff also considered whether the project's scope should include a criterion that the digital asset can be traded for a fiat currency (such as the U.S. dollar), given the difference in the process on how the value of those assets are derived. Some digital assets can be traded only for other digital assets (which then can be traded for a fiat currency), rather than a direct trade for a fiat currency. The staff observed that if an entity exchanges one digital asset for another, then there is existing accounting for that exchange in GAAP, including the requirements for nonmonetary exchanges, revenue recognition, and gains and losses from the derecognition of nonfinancial assets.

**Entity-Type Considerations**

58. The request to account for certain digital assets at fair value (rather than at cost less impairment) generally has been consistent across different entity types that do not currently apply industry-specific guidance that results in digital assets being accounted for at fair value. Similarly, users and practitioners have not identified a reason, broadly speaking, that there should be differences in the accounting for digital assets because of the entity type.

59. That said, certain industries have specialized accounting practices, including accounting for substantially all investments at fair value, with changes in value recognized in earnings (income) or in the change in net assets. Examples of those entities include the following:

   (a)   Brokers and dealers in securities (Topic 940)

   (b)   Defined benefit pension, other postretirement, and health and welfare plans (Topics 960, 962, and 965)

   (c)   Investment companies (Topic 946).

60. It is possible that certain measurement decisions in this project could conflict with the guidance for those entities. Therefore, as the staff brings individual groups of issues to the Board (for example,

measurement, presentation, and disclosure), the staff will ensure that the effects those issues could have on those entities (who currently are required to measure all investments at fair value) are assessed and the applicability of those individual areas be considered.

61. The concerns raised by stakeholders about the measurement of digital assets and the complexity related to the current accounting are the same across public, private, and NFP entities. In fact, the staff's understanding is that most of the companies that hold digital assets are nonpublic business entities, some of which anticipate accessing the public debt or equities markets in the future. Therefore, the effect of the guidance that results from this project may be more pervasive for private companies than for others. Also, the staff will evaluate future issues throughout the deliberations in this project under the Private Company Decision Making Framework to assess the applicability of proposed guidance to private companies.

**Board Decision—Scope and Next Steps**

62. At the August 31, 2022 Board meeting, the Board decided that crypto assets that are held by an entity must meet the following criteria to be within the project's scope:

   (a)   Meet the definition of *intangible asset* as defined in the Codification Master Glossary

   (b)   Do not provide the asset holder with enforceable rights to, or claims on, underlying goods, services, or other assets

   (c)   Are created or reside on a distributed ledger or "blockchain"

   (d)   Are secured through cryptography

   (e)   Are fungible.

63. The Board discussed the different entity types that would be within the scope of the guidance. The Board decided that all entities would be within the scope of the project and that throughout the remaining deliberations, the Board will consider the applicability of its decisions to those entities.

64. The Board will consider potential measurement alternatives for crypto assets at a future Board meeting, as well as presentation and disclosure.

**Question**

| Question |
| --- |
| Do FASB or IASB members have any questions or comments on Agenda Paper 12A? |