**MUEHLBAUER LAW OFFICE, LTD.**
ANDREW R. MUEHLBAUER
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email:   andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
Jonathan D. Park (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email:   jalieberman@pomlaw.com
         ahood@pomlaw.com
         jpark@pomlaw.com

*Attorneys for Co-Lead Plaintiffs Todd Langer,*
*Mary Barida, and Jacks Way LLC*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| TODD LANGER, MARY BARIDA, AND JACKS WAY LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>MARATHON DIGITAL HOLDINGS, INC., MERRICK OKAMOTO, FREDERICK G. THIEL, SIMEON SALZMAN, and HUGH J. GALLAGHER,<br><br>                              Defendants. | Case No. 2:23-cv-00470-RFB-DJA<br><br>**OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**ORAL ARGUMENT REQUESTED** |

OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

    A.    The Defendants ........................................................................................ 2

    B.    Bitcoin Mining and Trading ..................................................................... 3

    C.    Management is Responsible for Compliance with Accounting Standards .................................................................................................. 4

    D.    Accounting Standards for Impairment of Bitcoin Assets. ....................... 4

    E.    Marathon's Valuation of Its Bitcoin Assets. ............................................ 5

    F.    The Company's Bitcoin Mining Pool: MaraPool .................................... 7

    G.    The Company Reveals That It Received an SEC Comment Letter Concerning the Company's Accounting Policies, That It Could Not Timely File its 10-K, and Cancels Its Scheduled Earnings Call ........................... 8

    H.    The Company Issues the Restatement .................................................. 9

III.  LEGAL STANDARD ......................................................................................... 11

IV.   ARGUMENT ...................................................................................................... 11

    A.    Defendants' Request for Judicial Notice is Improper ........................... 11

    B.    Viewed Holistically, Plaintiffs Have Plead Scienter. ........................... 12

        1.    Legal Standard. ......................................................................... 12

        2.    There is a Strong Inference of Scienter ..................................... 13

    C.    Defendants Made Material Misstatements ............................................ 18

        1.    Defendants Made False and Misleading Statements. ............... 18

        2.    Those False and Misleading Statements were Material. ........... 19

    D.    Plaintiffs Have Adequately Pleaded Loss Causation ............................ 20

    E.    Plaintiffs' Section 20(a) Claim Is Adequately Pleaded. ....................... 23

    F.    Dismissal with Prejudice is Improper. .................................................. 23

V.    CONCLUSION ................................................................................................... 23

OPPOSITION TO MOTION TO DISMISS

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................19

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .......................................................................18, 20

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019).................................................................21

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ..............................................................................18

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
    824 F.3d 1156 (9th Cir. 2016) ............................................................................11

*Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
    709 F. Supp. 3d 1217 (D. Nev. 2024).............................................................21, 22

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................20

*E. Öhman J:or Fonder AB v. NVIDIA Corp. (NVIDIA)*,
    81 F.4th 918 (9th Cir. 2023), *cert. granted*, 144 S. Ct. 2655 (2024)................18

*Eng v. Edison Int'l*,
    2017 WL 1857243 (S.D. Cal. May 5, 2017).......................................................22

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ............................................................................13

*Ezzes v. Vintage Wine Estates, Inc.*,
    2024 WL 895018 (D. Nev. Mar. 1, 2024) ..........................................................16

*Ferris v. Wynn Resorts Ltd.*,
    462 F. Supp. 3d 1101 (D. Nev. 2020)..................................................................23

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)...........................................................................19, 20

*Gibson v. United States*,
    781 F.2d 1334 (9th Cir. 1986) ............................................................................11

- ii -

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ..................................................................................14, 19

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985)..................................................................................20

*Hutchison v. Deutsche Bank Sec. Inc.*,
   647 F.3d 479 (2d Cir. 2011)....................................................................................20

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) .....................................................................................19

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................13

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ................................................................................20

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ..................................................................................22

*In re Daou Systems, Inc.*,
   411 F.3d 1006 (9th Cir. 2005), *abrogated in part on other grounds as
   recognized by Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th
   747 (9th Cir. 2023)..................................................................................................14

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023), *cert. granted on other grounds sub nom.
   Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024)........................11

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ...........................................................................22, 23

*In re Medicis Pharm. Corp. Sec. Litig.*,
   2010 WL 3154863 (D. Ariz. Aug. 9, 2010)............................................................16

*In re Northpoint Comm'ns Grp., Inc. Sec. Litig.*,
   184 F. Supp. 2d 991 (N.D. Cal. 2001) ...................................................................14

*In re VEON Ltd. Sec. Litig.*,
   2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)........................................................16

*In re Watchguard Securites Litig.*,
   2006 WL 2038656 (W.D. Wash. Apr. 21, 2006).................................................14, 16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...............................................................11, 12, 13, 17

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................................................21

- iii -

OPPOSITION TO MOTION TO DISMISS

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .................................................................................21

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .................................................................................21

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) .................................................................................18

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .............................................................................13, 21

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................................21

*No. 84 Employer–Teamster Joint Council Pension Tr. Fund v. Am W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .................................................................................22

*Ramos v. Comerica Inc.*,
2024 WL 2104398 (C.D. Cal. Apr. 12, 2024) .........................................................21, 22

*S.E.C. v. Phan*,
500 F.3d 895 (9th Cir. 2007) .................................................................................20

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) .............................................................................12, 19

*South Ferry LP v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .................................................................................14

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, ltd.*,
551 U.S. 308 (2007).............................................................................................2, 13

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) .................................................................................12

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .................................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .................................................................................17

**Statutes**

15 U.S.C. § 78u4(b)(2) .................................................................................12

- iv -

OPPOSITION TO MOTION TO DISMISS

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................11, 23

Federal Rule of Evidence 201 ...............................................................................................12

**Other Authorities**

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. (Aug. 12, 1999) ...................................20

OPPOSITION TO MOTION TO DISMISS

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Court-appointed Co-Lead Plaintiffs Todd Langer, Mary Barida, and Jacks Way LLC ("Plaintiffs") respectfully submit this opposition to Defendants' Motion to Dismiss (ECF No. 43) ("Motion" or "Mot.").

## I.   INTRODUCTION

The opening paragraph of Defendants' Motion betrays its mischaracterization of this case. Defendants attempt to dismiss their false and misleading statements, ***which required the restatement of multiple years' worth of financial reporting*** that Defendants had sworn were truthful, accurate, and complied with accounting standards, as "two discrete technical accounting issues." Mot. at 1. Further, Defendants seek to bypass the standards on a motion to dismiss, introducing hundreds of pages of extrinsic exhibits and raising fact-intensive inquiries inappropriate for resolution at the pleading stage.

Plaintiffs' Amended Complaint sets forth how Defendants (i) falsely and misleadingly represented how Marathon, a Bitcoin mining company, was valuing its bitcoin portfolio, its single biggest asset, (ii) improperly accounted for Marathon's operation of a Bitcoin mining pool known as MaraPool, and (iii) did so at least recklessly. Defendants explicitly represented that Marathon valued its bitcoin using the price "on the active exchange at any time since [] acquisition" of the bitcoin. This was false. After the SEC found that the Company's disclosures were materially incorrect, the Company restated years' worth of financial reporting, with double-digit percentage changes to the Company's financial metrics. When the truth was disclosed, Marathon's stock price dropped over 8%, damaging investors. These facts detail precisely the type of conduct and harm that the securities laws are intended to address.

The Motion primarily attacks two elements of Plaintiffs' securities fraud claims: scienter and loss causation. Both elements are adequately alleged. Plaintiffs have alleged detailed facts showing Defendants' knowledge of the proper accounting method to assess Bitcoin holdings for impairment (or at least recklessly disregarded the risk of violating the standard), yet misled the public as to how they were valuing the asset, and failed to disclose any risk of improper valuation. The Amended Complaint also details the materially false statements that Defendants

-1-

OPPOSITION TO MOTION TO DISMISS

made with respect to accounting for the Company's "MaraPool" Bitcoin mining pool.

Defendants' own public filings and statements make clear that the Individual Defendants were virtually the only employees during the Class Period and were so intimately involved with the core operations of the Company, which included valuing its single asset, that it would be absurd to suggest they lacked scienter. Under well-settled authority, these allegations establish a strong inference of scienter.

As for loss causation, the Amended Complaint alleges that Marathon's stock price fell over 8% the day after the Company cancelled its earnings call, postponed its earnings release, and revealed that it had received a comment letter from the SEC ("Comment Letter") and was restating two years' worth of financial statements. Defendants' contention that this simply reflected "volatility" in Marathon's stock price raises a fact-intensive inquiry inappropriate for a motion to dismiss. Further, the 8.31% stock drop the trading day after the disclosure, while a relevant stock index rose, is more than sufficient to allege loss causation.

Finally, while Plaintiffs respectfully submit that the Amended Complaint adequately states claims and that the Motion should be denied outright, to the extent that the Court believes that additional factual allegations are necessary, Plaintiffs request leave to amend and detail below some of the additional factual allegations that would be included in an amended pleading.

## II.    STATEMENT OF FACTS[1]

### A.    The Defendants

Defendant Marathon is a digital asset technology company that is engaged in producing or "mining" digital assets, particularly Bitcoin. ¶23. The Individual Defendants are Merrick Okamoto, the former CEO; Frederick Thiel, who replaced Okamoto as CEO in April 2021; Simeon Salzman, the CFO from October 2020 until March 2022, when he became the Chief

---

[1] This is a condensed version of the well-pleaded facts set forth in the Amended Class Action Complaint ("Amended Complaint") (ECF No. 42), the entirety of which must be considered and accepted as true for purposes of this Motion. *Tellabs, Inc. v. Makor Issues & Rights, ltd.*, 551 U.S. 308, 322-23 (2007). "¶__" references are to paragraphs of the Amended Complaint. Unless otherwise indicated, capitalized terms have the meanings set forth in the Amended Complaint, emphases are added, and citations and internal quotations are omitted.

OPPOSITION TO MOTION TO DISMISS

Accounting Officer ("CAO"), and Hugh Gallagher, who became CFO in March 2022 but announced his departure only a year later, in March 2023. ¶¶16-19, 126.

Prior to the Class Period (May 10, 2021 and February 28, 2023), the Company was in the minerals business, then real estate, and then IP licensing. *Id.* In November 2017—after Defendant Okamoto joined the Company's Board—the Company pivoted again, entering into a merger agreement with a digital asset mining company. ¶24. The Company called off that merger, but began purchasing its own cryptocurrency mining machines and has, since then, focused on mining and holding cryptocurrency, specifically Bitcoin. *Id.*

### B.    Bitcoin Mining and Trading

Bitcoin is a cryptocurrency that was introduced in 2009 and is designed to act as money and a form of payment outside the control of any one person, group, or entity. ¶25. Unlike fiat currency, bitcoin is created, distributed, traded, and stored using a decentralized ledger system known as a blockchain. *Id.* A distributed ledger is a shared database, stored on many computers rather than on a centralized server, that is chained together via cryptographic techniques. *Id.*

Bitcoin mining is the process by which transactions are officially entered on the blockchain, and how new bitcoins are launched into circulation. ¶26. Bitcoin mining is the computational work that network nodes undertake to validate the information contained in blocks. *Id.* The goal is to solve a mathematical problem; the first to do so receives bitcoin as a reward, and the process begins again. ¶¶26-27.

Bitcoin trades on Bitcoin exchanges, which are digital marketplaces that serve as intermediaries between buyers and sellers of bitcoin, similar to stock exchanges. ¶33. Some exchanges are decentralized, meaning they are operated without a central authority. *Id.* These exchanges allow peer-to-peer trading of bitcoin without an exchange authority to facilitate the transactions. *Id.* Unlike a stock exchange, Bitcoin trading is not limited to market hours; it trades twenty-four hours a day, every day. ¶34. As a result, the trading price of bitcoin can change constantly, not just during specified hours; there is no "closing" price or "opening" price. *Id.*

OPPOSITION TO MOTION TO DISMISS

## C.     Management is Responsible for Compliance with Accounting Standards.

As a publicly traded U.S. company, Marathon must comply with United States generally accepted accounting principles ("GAAP"). ¶35. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. ¶35. The SEC has designated the Financial Accounting Standards Board ("FASB") as the organization responsible for promulgating GAAP rules. ¶36. In 2009, FASB issued the Accounting Standards Codification ("ASC"), which is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." *Id*.

Under GAAP and SEC rules, senior management is responsible for a company's financial reporting. ¶¶38-39. SEC regulations state that financial statements which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. ¶37.

## D.     Accounting Standards for Impairment of Bitcoin Assets.

The ASC Master Glossary defines intangible assets as assets (not including financial assets) that lack physical substance. ¶40. Cryptocurrency assets such as Bitcoin meet the definition of intangible assets and are accounted for under FASB ASC 350, *Intangibles — Goodwill and Other*. *Id*. Under ASC 350-30-35-4, cryptocurrency assets are, more specifically, indefinite-lived intangible assets.

ASC 350-30 requires reporting companies to assess indefinite-lived intangible assets for impairment at least annually, and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired. ¶43. An impairment is recorded when the carrying value of an intangible asset exceeds its fair value and the impairment loss is equal to the excess amount. *Id*. As a result, GAAP requires that if the trading price of bitcoin *at any time* declines below the price at which a company bought it, that indicates that the bitcoin asset is impaired and the Company is required to record an impairment reflecting the difference between the bitcoin's preexisting carrying value and the lowest trading price since acquisition. ¶46. Impairments, once taken, are never reversed, even if the fair value of the asset recovers during the same period. ¶47.

- 4 -

OPPOSITION TO MOTION TO DISMISS

Other reporting companies acknowledged this rule. For instance, Tesla—a large purchaser of bitcoin—stated the following in its 2020 Annual Report (¶48):

> We will account for digital assets as indefinite-lived intangible assets in accordance with ASC 350, Intangibles–Goodwill and Other. The digital assets are initially recorded at cost and are subsequently remeasured on the consolidated balance sheet at cost, net of any impairment losses incurred since acquisition. We will perform an analysis each quarter to identify impairment. *If the carrying value of the digital asset exceeds the fair value* **based on the lowest price quoted in the active exchanges during the period**, *we will recognize an impairment loss equal to the difference in the consolidated statement of operations*.

MicroStrategy, a major Bitcoin development company, also acknowledged the proper GAAP requirements for valuing its Bitcoin assets, similarly stated, in relevant part (¶49):

> The Company determines the fair value of its bitcoin on a nonrecurring basis in accordance with ASC 820, Fair Value Measurement[.] . . . *In determining if an impairment has occurred, the Company considers the* **lowest price of one bitcoin quoted on the active exchange at any time** *since acquiring the specific bitcoin held by the Company*. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.

### E.    Marathon's Valuation of Its Bitcoin Assets.

Prior to and during the Class Period, Marathon stated that it accounted for its digital assets as indefinite-lived intangible assets. In the Q2 2021 10-Q, the Company stated that (¶50):

> *Digital currencies are recorded at cost less impairment.*
>
> *An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently,* **when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired.** . . .

This misled investors because the Company did not, as required by ASC 350, assess its bitcoin holdings for impairment "when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired" and did not record impairment reflecting the different between the carrying value and the fair value as revealed by those "events or changes in circumstances." ¶51. Specifically, even if the trading price of bitcoin declined below the carrying value of the Company's bitcoin holdings, it did *not* record impairment unless the trading price of bitcoin was lower **at a specified cut-off time** that the

- 5 -

Company selected. *Id*. Further, when the Company did record impairment, it did not use the lowest trading price of bitcoin during the reporting period. Rather, it used the trading price at that arbitrary cut-off time. *Id*.

Indeed, Defendants assured investors that the Company had robust internal controls and that its financial statements were prepared in compliance with GAAP. ¶52. The Company's 2021 10-K bitcoin stated that the Company's bitcoin "subject to impairment losses if the fair value of our bitcoin decrease[d] below their carrying value *at any time* since their acquisition" and that "the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange *at any time* since its acquisition." ¶53.

This was false. When the Company restated its financial statements in 2023, it restated the values for impairment of its bitcoin holdings for all four quarters of 2021 and the first three quarters of 2022 to "correct[] its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day." ¶54.  Thus, the Company did not, as it stated in the 2021 10-K, use the lowest prices of bitcoin "at any time" to determine whether and to what extent the Company's bitcoin holdings were impaired, in violation of GAAP. *Id*.

Investors did not know until the end of the Class Period that the Company's impairment analysis for its bitcoin holdings improperly used trading prices at an arbitrary cut-off time in violation of ASC 350 and thus of GAAP. ¶55. Investors were thus misled by the Company's Class Period Reports that reported impairment of the Company's bitcoin holdings in violation of GAAP. *Id*.

Further, Defendants did not inform shareholders or the public that there was a material chance that they were improperly valuing the Company's bitcoin assets. Defendants now contend that their decision was a reasonable exercise of business judgment, but they never disclosed the issue to the public, much less that they were making a large company bet on their "judgment" being correct and adopted by regulators, and the potential downsides of them being wrong.

OPPOSITION TO MOTION TO DISMISS

**F.      The Company's Bitcoin Mining Pool: MaraPool**

On March 25, 2021, Marathon entered into a licensing agreement for technology to use in the Company's Bitcoin mining pool called "MaraPool." ¶56. A Bitcoin mining pool involves multiple miners aggregating their computing power to mine bitcoin, which is then shared by the miners proportionally to their contribution of computing power. ¶58.

MaraPool is now a self-operated *private* pool. ¶57. However, from September 2021 until May 2022 the Company permitted third parties to participate. *Id.* Those third-party participants paid a fee to Marathon for its services as the pool operator; in turn, Marathon provided access to the pool's software license, tracked the hash rate contribution of each pool participant, and algorithmically delegated mining work to the participants. *Id.* MaraPool was associated with its own bitcoin wallet, which received Bitcoin mined by the pool. *Id.* Marathon owned this bitcoin wallet. *Id.*

Under GAAP, whether a company is an agent or principal with respect to a specified good or service is key. Under ASC 606-10-55-37, an entity is a principal if it controls the specified good or service before it is transferred to a customer. ¶59. Under ASC 606-10-55-37B, a principal follows the "gross" approach and recognizes revenue when (or as) it satisfies its performance obligation in the amount equal to the price paid by the end consumer for the good or service ("gross" revenue). ¶60. The amounts remitted to the other party are presented as an expense. Conversely, under ASC 606- 10-55-38, an agent, follows the "net" approach and recognizes revenue when (or as) it satisfies its performance obligation equal to the net amount retained *after* remitting amounts to the other parties for providing the good or service ("net" revenue). *Id.*

During the Class Period, despite the Company's control over the pool, as operator, the Company accounted for MaraPool as if it was an agent, and not a principal. ¶61. This permitted the Company to follow the "net" approach, meaning that the costs of MaraPool revenue were netted out rather than reported in their full amounts.

OPPOSITION TO MOTION TO DISMISS

**G.     The Company Reveals That It Received an SEC Comment Letter Concerning the Company's Accounting Policies, That It Could Not Timely File its 10-K, and Cancels Its Scheduled Earnings Call**

On February 28, 2023, the Company issues a series of announcements that sent its stock price into a decline. ¶67. The Company issued a press release at 12:21 pm Eastern time "announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for *today*, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results." ¶68.

The Company also filed a Form 8-K with the SEC stating that it had "received a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below." ¶69. The Company disclosed that "after consultation with Marcum LLP, the Company's independent auditor," the Board had concluded that:

> due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements.

*Id.*

The Company stated that "[a]s a result of receiving the SEC comments on February 22, 2023 and the Audit Committee's determination to restate the Impacted Financial Statements," the Company was unable its Form 10-K for 2022 by the filing deadline of March 1, 2023. ¶70.

The Company disclosed that "[a]mong the restatement issues" were impairment of digital assets, and operation of a bitcoin mining pool that included third party participants. The Company acknowledged that:

> its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance with the ASC 350-30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value, which effectively calls for the intraday low price to be utilized in calculating impairment whenever events or changes in

- 8 -

OPPOSITION TO MOTION TO DISMISS

circumstances indicate it is more likely than not that the asset is impaired." ¶71.

The Company also disclosed that its revenue recognition with respect to MaraPool included the determination that "in its capacity as the operator of a mining pool that included third parties, it acted as an agent. As a result, the Company recorded revenues on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool." ¶72. However, this "assessment that it acted as an Agent in operating the third-party mining pool was incorrect and . . . it should have concluded that it was acting as a principal in its capacity as the pool operator." *Id.* The Company acknowledged that it "should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants," and estimated that "its revenues and its cost of revenues for the year ended December 31, 2021 were understated due to the 'net' vs. 'gross' presentation of revenues in its financial statements." *Id.*

As the market digested this news, the Company's stock price fell 0.14% on February 28, 2023, while the Nasdaq Blockchain Economy Index *rose*, generating a negative abnormal company-specific return. ¶73. The following trading day, March 1, 2023, as the market continued to digest the Company's announcements, the Company's stock price fell 8.31% to close at $6.51, even as the Nasdaq Blockchain Economy Index rose again. *Id.*

### H.   The Company Issues the Restatement

On March 16, 2023, the Company finally filed its 2022 10-K, disclosing that "[t]he Company received SEC comments *during 2022* which are *material* and *still under review* as set forth below," and that "[w]e *additionally* have described below certain comments *more recently received* which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved." ¶74.

The 2022 10-K further disclosed that, at some point either in 2022 or on February 22, 2023 (or both), the SEC "objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin." ¶75. The Company

- 9 -

acknowledged that its prior practice of using a daily "closing" price for bitcoin did not comply with GAAP, and restated its bitcoin impairment by the following material amounts:

| Period | Amount of Understatement in Original Report |
|---|---|
| Q1 2021 | $204,000, or 30.8% |
| Q2 2021 | $1,944,000, or 17.6% |
| Full year 2021 | $2.448 million, or 8.3% |
| Q1 2022 | $3,756,000, or 19.2% |
| Q2 2022 | $6,797,000, or 5.3% |

¶120.

The 2022 10-K also revealed that the SEC had, at an unspecified time, "commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool." ¶76. The Company disclosed that in its restated financial results provided in the 2022 10-K, it had "revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue." *Id.*

The Company acknowledged that its accounting for MaraPool violated ASC Topic 606 and thus GAAP. ¶77. In the 2022 10-K, Defendants conceded that Marathon, as operator of MaraPool, was a principal and not an agent, and thus should have recorded revenue from the pool on a gross rather than net basis. *Id.* Correcting this improper accounting led to material changes in the Company's cost of revenues. For instance, the Company originally reported that cost of revenues for 2021 of $33.7 million. The Restatement revealed that this was understated by $8.7 million, or *25.8%*. ¶120.

Given these well-pled facts, there should be little doubt that Plaintiffs have stated a claim. Marathon admitted that its financial reporting and SEC filings were materially inaccurate and restated them. The stock price took an immediate hit, directly causing harm to Plaintiffs and the Company's shareholders. And the Individual Defendants, all senior executives in a company

with less than ten employees and actively involved in managing and valuing the Company's largest asset, were all intimately familiar with and involved in these decisions. Simply stated, all of the necessary elements have been alleged. Defendants' Motion should be denied.

## III.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible if the facts permit the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In making this assessment, the Court must accept all well-pled facts as true and construe them in a light most favorable to plaintiffs. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023), *cert. granted on other grounds sub nom. Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024) (No. 23-980). A complaint may only be dismissed if it fails to articulate a cognizable legal theory or to plead sufficient facts to support such a theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). The plaintiff is not required "to plead his evidence" or to state "specific factual details not ascertainable in advance of discovery." *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986).

"If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). The plausibility standard is not a basis to consider the factual merit of a claim at the pleading stage. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## IV.   ARGUMENT

### A.   Defendants' Request for Judicial Notice is Improper

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja*, 899 F.3d at 998. Consideration of matters outside the pleading converts a 12(b)(6) motion into a motion for summary judgment unless the external matters are considered

- 11 -

OPPOSITION TO MOTION TO DISMISS

under the incorporation-by-reference doctrine or judicial notice under Federal Rule of Evidence 201. *Id*. The Ninth Circuit has "note[d] a concerning pattern in securities cases like this one: exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Id*. Accordingly, the consideration of documents pursuant to judicial notice must be carefully limited to avoid "premature dismissals of plausible claims that may turn out to be valid after discovery." *Id*.

Here, Defendants have submitted hundreds of pages of extrinsic documents as exhibits to an attorney declaration. ECF No. 46 (these exhibits are referred to as "Defs Exs." herein). These include filings by other, unrelated companies (Defs. Exs. D, H, I, J, P, S) and a self-serving filing by Individual Defendant Okamoto (Defs. Ex. V). Defendants have included a footnoted request that the Court take judicial notice of these documents. Mot. at 4 n.2.[2] Impermissibly, Defendants seek to use these documents for their purported truth. Under Ninth Circuit law, the Court may not consider the contents of Defendants' exhibits as true, as "[i]t is improper to judicially notice a [document] when the substance of the [document] is subject to varying interpretations, and there is a reasonable dispute as to what [it] establishes." *Khoja*, 899 F.3d at 1000. "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, ***not whether the contents of those articles were in fact true***.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). Defendants' request for judicial notice should be denied.

### B.      Viewed Holistically, Plaintiffs Have Pleaded Scienter.

#### 1.      Legal Standard.

Scienter is a mental state embracing "intent to deceive, manipulate, or defraud" as well as "deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs must plead facts giving rise to a "strong inference" of scienter, 15 U.S.C. § 78u4(b)(2), meaning that the inference of scienter must be "cogent and at least as compelling as any opposing inference"

---

[2] Defendants do not invoke, and thus waive, the incorporation-by-reference doctrine.

OPPOSITION TO MOTION TO DISMISS

drawn from the allegations. *Tellabs*, 551 U.S. at 324. The test is whether "all of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. Importantly, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* Plaintiffs "need not prove [their] case at the outset," but only allege "facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). A "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). Plaintiffs' allegations, individually and collectively, raise such an inference.

### 2.     There is a Strong Inference of Scienter.

Defendants ignore and mischaracterize Plaintiffs' specific factual allegations establishing a strong inference of scienter. Instead, they introduce a large collection of extrinsic documents, succumbing—against the Ninth Circuit's admonition—to the "temptation to pile on numerous documents to their motion[] to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage." *Khoja*, 899 F.3d at 998. But Defendants' own documents **support** a strong inference of scienter. Here, the Individual Defendants were practically the Company's only employees during the Class Period, and they approved materially false and misleading statements about the Company's single largest asset—its Bitcoin holdings—even while they and their auditor acknowledged that testing whether those Bitcoin holdings were impaired required using the lowest price "at any time" during each reporting period.

*First*, Marathon had an extraordinarily small number of personnel. "As of March 12, 2021," two months before the Class Period, "we had 3 full-time employees." ECF No. 45-5 (Defs. Ex. E) at 173; *see also* ECF No. 45-1 (Defs. Ex. A) at 14 ("As of February 28, 2022, we had ten full time employees."). In a recent trial in the U.S. District Court for the Central District of California, Defendant Thiel testified that when he joined Marathon as CEO in April 2021, "we were a very small company." Indeed, he testified, "I was employee No. 4. Actually, technically No. 5." Park Decl., Ex. A at 35. Thus, Defendants Thiel and Salzman were virtually Marathon's only employees when they signed and certified the accuracy of the Q1 2021 10-Q at the

- 13 -

beginning of the Class Period.

*Second*, it is undisputed that during the Class Period, Marathon's primary business was Bitcoin: mining it, holding it as its primary asset, and—for a portion of the Class Period—operating MaraPool. These facts render the "core operations" doctrine—under which it can inferred that key corporate officers have knowledge of facts central to a business' core operations—exceptionally applicable to this case. *See In re Northpoint Comm'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001); *South Ferry LP v. Killinger*, 542 F.3d 776, 782-83 (9th Cir. 2008). "[A]llegations regarding management's role in a company . . . may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *South Ferry*, 542 F.3d at 785-86. Further, "such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *See id.* at 786.

Here, it would be "absurd" to suggest that the Individual Defendants were unaware of how the Company assessed its bitcoin holdings for impairment and accounted for MaraPool revenues and costs. Thiel himself testified that "***every decision we made about anything we did, I had to be informed of it myself with direct personal involvement.***" Park Decl., Ex. A at 35. This is exactly the sort of "specific admission[] from [a] top executive[] that they are involved in every detail of the company and that they monitored portions of the company's database" that supports a strong inference of scienter. *In re Daou Systems, Inc.*, 411 F.3d 1006, 1022–23 (9th Cir. 2005), *abrogated in part on other grounds as recognized by Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Further, *In re Watchguard Securities Litig.*, cited by Defendants, *supports* Plaintiffs' core operations argument. 2006 WL 2038656, at *4 (W.D. Wash. Apr. 21, 2006) ("The court acknowledges that one may infer that certain critical corporate information is known to high-ranking officers.")

Indeed, and *third*, Defendants explicitly acknowledged the proper bitcoin impairment standard, while failing to apply it. The 2021 10-K, signed by Okamoto and Salzman, stated that

OPPOSITION TO MOTION TO DISMISS

the Company's bitcoin holdings were "subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition" and that "the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition." ¶53. The Company's auditor likewise acknowledged that "[t]he existing impairment requirement" required bitcoin "to be recorded at its *lowest ever* post-purchase value." ¶130. Defendants concede, as alleged in the Amended Complaint, that other auditors and other prominent Bitcoin companies (including Tesla and MicroStrategy) publicly acknowledged the proper way to assess impairment. ¶¶130-132.

*Fourth*, the Amended Complaint includes detailed factual allegations about the MaraPool mining pool and how the Company's disclosures around it were false and misleading. Here again, Defendants disregarded clear accounting rules, all while assuring the investing public that Marathon was complying with GAAP and had robust controls in place to ensure that its financial reporting was accurate and legally-compliant. The Amended Complaint alleges that both of those statements were materially false and misleading, as confirmed by the SEC letters and the Restatement. Defendants have not, and cannot, point to any new information or facts that changed this analysis.

These facts, on their own, show that Plaintiffs do not "allege fraud based solely on the fact of the Restatement." Mot at 12. In addition, Marathon's departure from its normal practice of disclosing SEC comment letters further contributes to scienter. Although it had publicly filed 33 prior SEC comment letters, Defendants withheld the Comment Letter from shareholders. Given that the Company was forced to admit that its prior statements were false and that its calculations were not GAAP compliant just days later, the failure of the Company to follow its own practice of disclosing SEC letters is strong evidence of scienter. Further, after obliquely describing the Comment Letter on February 28, 2023, without disclosing it, the later 2022 10-K stated that the Company "received [SEC] Staff comments during 2022 which are material and still under review," *as well as* "certain comments more recently received which relate to certain restatement items in this Form 10-K." These evasive descriptions of what the SEC said, and

- 15 -

OPPOSITION TO MOTION TO DISMISS

when, strongly indicate scienter. *See In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at \*10 (S.D.N.Y. Sept. 19, 2017) ("steps to obscure" facts indicated scienter).

Defendants' reliance on *Watchguard* and *Ezzes v. Vintage Wine Estates, Inc.*, 2024 WL 895018 (D. Nev. Mar. 1, 2024), is entirely misplaced, as Plaintiffs are not relying solely on the fact of the Restatement as a basis for scienter. In stark contrast to the allegations here, in *Watchguard* the plaintiffs made no attempt to explain how or why the defendants mischaracterized their expenses. Instead, the plaintiff contended that "no one would have made such a blatant error unless he was at least deliberately reckless." *Watchguard*, 2006 WL 2038656 at \*4. Here, Plaintiffs have alleged, in detail, not only how Defendants improperly valued the Bitcoin, but also that Defendants were aware of the issue, failed to disclose the risk, and then falsely described what they were doing. That is a far cry from what was found insufficient in *Watchguard*. Similarly, in *Ezzas*, the plaintiffs cited to a GAAP principle, "but do not plead facts demonstrating that Defendants knew of [the] principle or knew it was being incorrectly applied." 2024 WL 895018, at \*11. That is precisely the detailed allegations that Plaintiffs have set forth in the Amended Complaint here.

Likewise, Defendants' reliance on *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863 (D. Ariz. Aug. 9, 2010), is unavailing. That court held, unremarkably, that GAAP violations, alone, are generally insufficient to show scienter. *Id*. at \*4. But, the court acknowledged, violations of GAAP along with allegations regarding the reasonableness of the violation, the omission of material facts about the GAAP violation, and/or other statements or conduct indicating that the defendant intentionally or recklessly applied GAAP are sufficient. *Id*. Those are precisely the facts that have been alleged here. Defendants knew of the applicable rule, intentionally misrepresented how the Company was trying to comply, ignored the risks of improperly calculating the impairment, and hid the SEC letters from the investors. Each of these facts, taken together with the GAAP violations and restatements, are sufficient to establish a strong inference of scienter.

Further, the allegations establish that the resignation of Defendant Gallagher "was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was

OPPOSITION TO MOTION TO DISMISS

accompanied by suspicious circumstances." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009). Not only did Gallagher abruptly leave just two weeks after the Restatement, but he had been on the job only a year when he announced he was leaving, and the Company had no successor lined up, even as it consummated a $14 million private placement offering. ¶¶126, 139. That Gallagher surrendered 100,000 restricted stock units ("RSUs") worth hundreds of thousands of dollars strongly suggests that his resignation was unplanned and suspicious. Defendants' reasoning that "it would not make sense for him to retire before he realized this financial gain" (Mot. at 17) ignores that when Gallagher left, the truth about the Company's accounting and internal controls had already been revealed. That Gallagher failed to realize this gain does not undermine the fact that his departure was "accompanied by suspicious circumstances." *Zucco Partners*, 552 F.3d at 1002.

Finally, Defendant Okamoto's insider sale of *$3 million* in Company stock *and* receipt from the Company of *$24 million* related to RSUs during the Class Period shows a strong motive to defraud investors and inflate the Company's stock price. Defendant Okamoto's self-serving claim that he sold $3 million in stock for "tax purposes" (Mot. at 19) is untested and cannot be taken as true. *Khoja*, 899 F.3d at 999 (judicial notice only proper for "sources whose accuracy cannot reasonably be questioned"). Further, it is consistent with Plaintiffs' theory of fraud, as an inflated stock price would yield greater proceeds to satisfy tax obligations. Notably, Okamoto does *not* claim that he sold those shares pursuant to a predetermined 10b5-1 trading plan.

Plaintiffs' allegations establish that Defendants were aware of the proper accounting standards, but violated them while certifying that the Company's financial statements were correct and that its internal controls were robust. When the SEC told them to apply the accounting standard they had already acknowledged, they hid the letter, and Defendant Gallagher left the Company in short order. That is more than enough to support a strong inference that Defendants were at least reckless as to the risk of misleading investors.

OPPOSITION TO MOTION TO DISMISS

### C.      Defendants Made Material Misstatements.

#### 1.      Defendants Made False and Misleading Statements.

A statement is false if it is "contradict[ed]" by existing facts. *E. Öhman J:or Fonder AB v. NVIDIA Corp. (NVIDIA)*, 81 F.4th 918, 928 (9th Cir. 2023), *cert. granted*, 144 S. Ct. 2655 (2024) (No. 23-970). "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Even "literally true" statements may be materially misleading. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

Defendants contend that Plaintiffs rely entirely on "[t]he mere fact of a post-Class Period Restatement" which "does not show Defendant's contemporaneous knowledge that their disclosures were false and misleading." Mot. at 21. But of course, in the Restatement, Defendants admitted that Marathon's Class Period reports violated GAAP, "should no longer be relied upon," and required correction. ¶¶69, 115. The Company then significantly restated its financials for two years, including revealing that its cost of revenues for 2021 was 25.8% higher than originally reported, and that the Company's bitcoin holdings were 30.8% more impaired than originally reported, with material repercussions for operating income, net income, and earnings (loss) per share. ¶¶120, 123-24.

Moreover, Plaintiffs do not rely solely on the fact of this Restatement. They also allege that Defendants acknowledged the proper accounting method for assessing the Company's bitcoin holdings for impairment, under which Marathon was required to "*reflect[] the lowest price of one bitcoin quoted on the active exchange **at any time** since its acquisition*." ¶97. The Amended Complaint also makes clear that there were no factual developments with respect to the Company's bitcoin holdings or the Company's operation of MaraPool to justify the Restatement. Rather, Marathon's accounting was materially wrong when it was reported to investors during the Class Period. Nevertheless, Defendants represented that the Company had no internal control issues related to this improper accounting.

In determining whether a statement is misleading, the court applies the objective standard

- 18 -

OPPOSITION TO MOTION TO DISMISS

of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 705–06; *Glazer*, 63 F.4th at 764. Defendants materially understated the impairment of the Company's bitcoin holdings and the cost of the Company's MaraPool revenues, without disclosing any "adverse information that cut[] against the positive information." *Schueneman*, 840 F.3d at 705–06. As such, Plaintiffs have met their burden.

### 2.     Those False and Misleading Statements were Material.

At the pleading stage, a plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32.

Defendants argue that their misstatements were not material as a matter of law because (i) the "impairment restatement . . . represented only 2.57%" of Marathon's digital assets, (ii) the understatement of cost of revenues was accompanied by improperly reported revenues as well, and (iii) they assert, in conclusory fashion, that Restatement had "no impact whatsoever" on Marathon's financial results.

However, determinations of materiality cannot be made on the basis of a single numerical or percentage benchmark. *Id*. at 236 & n.14 ("Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("Following *Basic*, we have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."). SAB No. 99—which Defendants cite—itself states that a bright line percentage "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg.

at 45, 151 (Aug. 12, 1999); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011).

Moreover, the Restatement revealed changes much greater than 2.57%. For example, the Company understated the impairment of its bitcoin holdings by *30.8%* for Q1 2021, and understated its cost of revenues by *25.8%* for full year 2021. ¶¶120, 123.

As to the Restatement's corrections concerning MaraPool, the fact that Defendants misstated *multiple* financial metrics does not insulate them from liability. "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985. Defendants' Class Period reports of Marathon's revenues and cost of revenues were materially false and misleading, as they created an impression that differed from reality.

Further, materiality is properly left to the trier of fact. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989); *S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007). Because materiality is a mixed question of law and fact, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162*; Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Defendants cannot meet that burden.

### D.   Plaintiffs Have Adequately Pleaded Loss Causation

Marathon also argues that Plaintiffs have not pleaded loss causation. To demonstrate loss causation, a plaintiff must simply allege "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "This inquiry requires no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

In other words, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Loss causation does not require proof that the fraudulent misrepresentation was the *sole* cause of a security's loss in

value, but that the fraudulent statement was a "substantial" or "significant" cause of the decline in price. *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013). "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 134 (2014)).

Plaintiffs have pled such here, alleging that Marathon's stock price fell on February 28 and March 1, dropping 8.31% from one close to the next, during which time the Nasdaq Blockchain Economy index rose. ¶¶73, 114-17. While Defendants suggest that a price decline of more than 8% is not "significant," there is no legal or economic basis for this proposition. Even their own authorities concede that "[t]here is no hard cutoff for what percentage drop constitutes a 'significant' drop for a stock price." *Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1237 (D. Nev. 2024); *see also See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (sustaining loss causation allegations concerning "three stock drops, ranging from 2% to 8.59%").

Relying on an outlier district court case, *Ramos v. Comerica Inc.*, 2024 WL 2104398 (C.D. Cal. Apr. 12, 2024), Defendants ask the Court to conclude that Marathon's stock price dropped solely because it was "highly volatile" and "fluctuat[ed] widely in price in response to various factors." Mot. at 9. But attributing the stock drop to unspecified "various factors" introduces a fact-intensive inquiry that cannot be resolved at this stage. *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) ("If, as Miller argues, there are alternative causes for the losses of which Plaintiff complains, that is an issue for resolution in the later stages of this case."). This is especially true given that Plaintiffs need not establish that Defendants' misrepresentations were the "*sole* reason" for the stock drop. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (emphasis in original).

Further, the *Comerica* Court did not address allegations, as Plaintiffs have made here (¶73), that a relevant stock index rose while the issuer's stock price fell, and Defendants do not address how that index fared during the "available trading days between February 1, 2023, and

OPPOSITION TO MOTION TO DISMISS

March 31, 2023." Mot. at 23.[3] The *Comerica* Court also relied on its finding that the alleged stock drop "followed three straight days of price drops, so they d[id] not reflect a sudden change in trajectory." 2024 WL 2104398, at *4. Defendants can make no such argument here. *See* ECF No. 46-7 (Defs.' Ex. O).[4]

Defendants' argument that "Marathon's stock price also quickly rebounded following the March 1, 2023 drop," Mot. at 24, is simply false. Marathon's stock price did not close above the March 1 closing price until March 13, 2023. Thus, *Wochos v. Tesla, Inc.*, where the stock "immediately rebounded" the very next trading day, 985 F.3d 1180, 1198 (9th Cir. 2021), does not apply. The question of what inferences can be drawn from Marathon's stock price nearly two weeks after the alleged corrective disclosure is a factual inquiry that cannot be resolved at this stage.

Finally, Defendants contend that Marathon's stock price did not fall until the trading day immediately after the corrective disclosure, but there is no bright-line rule requiring an immediate market reaction. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057–58 (9th Cir. 2008); *No. 84 Employer–Teamster Joint Council Pension Tr. Fund v. Am W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (drop in stock price over one and a half months after market learned of misrepresentations).

Whether a drop in stock price was "significant" enough or closely tied enough to a corrective statement is a fact question that must be left for the jury to resolve. *Gilead*, 536 F.3d at 1057 (loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss") (quoting *Emergent Cap. Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir.2003)). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the

---

[3] The fact that Marathon's stock fell while the index rose distinguishes this case from *Daniels Fam.*, where the court found that "the peer stocks and industry index appear to move in tandem" with the issuer's stock. 709 F. Supp. 3d at 1239.

[4] Defendants also cannot rely on *Eng v. Edison Int'l*, which found that price declines of 0.79% to 2.71% were not "statistically significant," 2017 WL 1857243, at *4 (S.D. Cal. May 5, 2017), addressing a mathematical concept that is distinct from the significance of a stock price decline, and one that Defendants do not and cannot invoke here.

OPPOSITION TO MOTION TO DISMISS

plaintiff's case can be rejected on evidentiary grounds." *Id*. "There is no exception to this rule for the element of loss causation." *Id*. "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *Id*.

### E.   Plaintiffs' Section 20(a) Claim Is Adequately Pleaded.

Defendants offer no independent reason to dismiss Plaintiffs' "control person" claim under Section 20(a) of the Exchange Act. That claim, like the 10(b) claim, is adequately pleaded.

### F.   Dismissal with Prejudice is Improper.

If the Court is inclined to grant the Motion, Plaintiffs respectfully request leave to amend. Leave to amend must be granted unless "the pleading could not possibly be cured by the allegation of other facts." *See Ferris v. Wynn Resorts Ltd.*, 462 F. Supp. 3d 1101, 1129 (D. Nev. 2020). Here, should the Court dismiss with leave to amend, Plaintiffs can make additional factual allegations relating to, among other things, scienter and loss causation. For example, based on sworn testimony by the Individual Defendants, Plaintiffs can allege additional facts regarding the Individual Defendants' scienter.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: October 25, 2024                    Respectfully submitted,

                                           **MUEHLBAUER LAW OFFICE, LTD.**

                                           */s/ Andrew R. Muehlbauer*
                                           Andrew R. Muehlbauer
                                           Nevada Bar No. 10161
                                           7915 West Sahara Avenue, Suite 104
                                           Las Vegas, Nevada 89117
                                           Telephone: (702) 330-4505
                                           Facsimile: (702) 825-0141
                                           Email: andrew@mlolegal.com

                                           *Counsel for Co-Lead Plaintiffs and Liaison Counsel for the Class*

                                           **POMERANTZ LLP**
                                           Jeremy A. Lieberman (*pro hac vice*)
                                           J. Alexander Hood II (*pro hac vice*)
                                           Jonathan D. Park (*pro hac vice*)
                                           600 Third Avenue, 20th Floor

New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
        ahood@pomlaw.com
        jpark@pomlaw.com

**THE SCHALL FIRM**
Brian Schall (*pro hac vice* application forthcoming)
Brian England (*pro hac vice* application forthcoming)
Rina Restaino (*pro hac vice* application forthcoming)
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Email: brian@schallfirm.com
        briane@schallfirm.com
        rina@schallfirm.com

*Counsel for Co-Lead Plaintiffs and Co-Lead Counsel for the Class*

- 24 -