021

# EXHIBIT B

Practice aid



Together as the Association of International
Certified Professional Accountants®

# Accounting for and auditing of digital assets

as of June 30, 2022

## Digital Assets Working Group

### Accounting Subgroup

| | | |
|---|---|---|
| Matthew Schell, *Chair*<br>Crowe LLP | Kevin Jackson<br>PwC | Mark Murray<br>RSM US LLP |
| Michael Bingham<br>US Government Accountability Office | Jin Koo<br>BDO USA LLP | Amy Park<br>Deloitte & Touche LLP |
| Brian Fields<br>KPMG LLP | Corey McLaughlin<br>Cohen & Company | Beth Paul<br>PwC |
| Rahul Gupta<br>Grant Thornton LLP | Lan Ming<br>Ernst & Young LLP | Aleks Zabreyko<br>Connor Group |

### Auditing Subgroup

| | | |
|---|---|---|
| Amy Steele, *Chair*<br>Deloitte & Touche LLP | Angie Hipsher-Williams<br>Crowe LLP | Shelby Murphy<br>Deloitte & Touche LLP |
| Michael Bingham<br>US Government Accountability Office | Michael Kornstein<br>Ernst & Young LLP | Christian Randall<br>Cohen & Company |
| Jay Brodish<br>PwC | Sara Krople<br>Crowe LLP | Jay Schulman<br>RSM US LLP |
| Damon Busse<br>Baker Tilly Virchow Krause, LLP | Bryan Martin<br>BDO USA LLP | Robert Sledge<br>KPMG LLP |
| Mary Grace Davenport<br>PwC | Dylan McDermott<br>Coinbase | Jagruti Solanki<br>BitPay |
| Jeremy Goss<br>BKD | | |

## AICPA Senior Committees

### Financial Reporting Executive Committee

| | | |
|---|---|---|
| Angela Newell, *Chair* | Mark Northan | Lynne Triplett |
| Paul Balynsky | Alexander Sannella | Jake Vossen |
| Lee Campbell | Bill Schneider | Mike Winterscheidt |
| Mark Crowley | Rachel Simons | Aleks Zabreyko |
| Melinda Henbest | Ryan Siurek | |
| Sean Lager | Dusty Stallings | |

### Assurance Services Executive Committee

| | | |
|---|---|---|
| Jim Burton, *Chair* | Chris Halterman | Catherine Schweigel |
| Damon Busse | Elaine Howle | Amy Steele |
| Daniel Balla | Bryan Martin | Kimberly Ellison-Taylor |
| Mary Grace Davenport | Dyan Rohol | Miklos Vasarhelyi |

### Auditing Standards Board

Tracy Harding, *Chair*

## AICPA staff

| | | |
|---|---|---|
| Diana Krupica, *Lead Manager*<br>Assurance & Advisory Innovation,<br>AICPA | Jennifer Burns, *Chief Auditor*<br>Audit & Attest Standards<br>AICPA | Daniel Noll, *Senior Director*<br>Accounting Standards<br>AICPA |
| Ami Beers, *Senior Director*<br>Assurance & Advisory Innovation,<br>AICPA | Ahava Goldman, *Associate Director*<br>Audit & Attest Standards<br>AICPA | Amy Pawlicki, *Vice President*<br>Assurance & Advisory Innovation<br>AICPA |

In addition, the working group gratefully acknowledges the contributions of Matthew Sickmiller of the Center for Audit Quality; Sean Prince, Mark Shannon, and Christopher Moore of Crowe LLP; Anna Gosine and Michael Gonzales of Ernst & Young LLP; Mike Santay and Dan Voogt of Grant Thornton; Ian Wildenborg of KPMG LLP; Rick Day of RSM US LLP; and the following industry reviewers: Jeremy Dillard of Singer Lewak; Monica Blocker and Grant Casteel of Houlihan Capital; Timothy Singh of Circle; Matt Perona of Polychain Capital; Teddy Fusaro of Bitwise Investments; Nadine Taylor of Ripple; Joey Ryan of Gilded; Mary Kauffman of Meta; Rob Loban of BlockFi; Aaron Jacob of TaxBit; Donna Brinton of Anchorage; Lynne Weber, Ph.D., of Kroll, LLC; and Muhammad Qasim Farooq of Abra.

**023**

# Notice to readers

The objective of this practice aid is to develop nonauthoritative guidance on how to account for and audit digital assets under U.S. generally accepted accounting principles (GAAP) for nongovernmental entities and generally accepted auditing standards (GAAS), respectively. This guidance is intended for financial statement preparers and auditors with a fundamental knowledge of blockchain technology. For the purposes of this practice aid, *digital assets* are defined broadly as digital records that are made using cryptography for verification and security purposes, on a distributed ledger (referred to as a *blockchain*). The distributed ledger keeps a record of all transactions on a blockchain network. Digital assets, as defined herein, may be characterized by their ability to be used for a variety of purposes, including as a medium of exchange, as a representation to provide or access goods or services, or as a financing vehicle, such as a security, among other uses. The rights and obligations associated with digital assets vary significantly, as do the terms used to describe them. It is important to note that the accounting treatment for a digital asset will ultimately be driven by the specific terms, form, underlying rights, and obligations of the digital asset.

Digital assets and the associated underlying technology are an evolving area, and the expectations and experiences of stakeholders such as preparers, auditors, and regulators may change accordingly. Therefore, questions, examples, challenges, risks, considerations, and potential procedures listed in this practice aid should not be considered exhaustive. Preparers, auditors, and those charged with governance need to stay abreast of developments and consider the implications of those developments.

The guidance in this practice aid is based on existing professional literature and the experience of members  of the Digital Assets Working Group. This nonauthoritative guidance represents the views of the Digital Assets Working Group and AICPA staff. This publication is not approved, disapproved, or otherwise acted on by the Auditing Standards Board, the membership, or the governing body of the AICPA, and is not an official pronouncement of the AICPA.

## Accounting content

The Financial Reporting Executive Committee (FinREC) is the designated senior committee of the AICPA authorized to speak for the AICPA in the areas of financial accounting and reporting. The accounting guidance in this practice aid has been reviewed by FinREC, who did not object to ts issuance.

*Accounting standards and regulatory updates issued but not yet effective*

This practice aid has been updated to reflect standards that have been issued and are effective as of the date of publishing.

The SEC issued Staff Accounting Bulletin No. 121 which is effective for periods after June 15, 2022.

The preceding SAB is not reflected in this practice aid.  As this update becomes effective, this practice aid will be updated.

## Auditing content

This information represents the views of AICPA staff based on the input of the Digital Assets Working Group and has not been approved by any senior committee of the AICPA. The auditing portion of this practice aid is an other auditing publication as defined in AU-C section 200, *Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance With Generally Accepted Auditing Standards,*[1] and is intended to provide nonauthoritative guidance to auditors. Other auditing publications may help the auditor understand and apply GAAS but have no authoritative status. In applying the auditing guidance included in an other auditing publication, the auditor should exercise professional judgment and assess the relevance and appropriateness of such guidance to the circumstances of the audit.

*Auditing standards issued but not yet effective*

This practice aid has been updated to reflect standards that have been issued and are effective as of the date of publishing.

The Auditing Standards Board (ASB) has issued the following Statement on Auditing Standards (SASs), which is effective for audits of financial statements for periods ending on or after Dec. 15, 2022:

- SAS No.142, *Audit Evidence*

  In addition, the ASB has issued the following Statements on Auditing Standards (SASs), which are effective for audits of financial statements for periods ending on or after Dec. 15, 2023:

- SAS No.143, *Auditing Accounting Estimates and Related Disclosures*

- SAS No.144, *Amendments to AU-C Sections* 501, 540, and 620 *Related to the Use of Specialists and the Use of Pricing Information Obtained From External Information Sources*

- SAS No.145, *Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement*

The preceding SASs are not reflected in this practice aid as they are issued but not yet effective as of the date this practice aid has been published. As these standards become effective, this practice aid will be updated.

---

[1]  All AU-C sections can be found in AICPA Professional Standards.

# Contents

## Accounting subgroup

### Questions [Published December 2019]

**Classification and measurement when an entity purchases crypto assets**...................................................... 3

1    How should an entity that does not apply specialized industry guidance (for example, it is not applying FASB *Accounting Standards Codification* (ASC) 946, *Financial Services — Investment Companies*) account for purchases of crypto assets for cash?

**Recognition and initial measurement when an entity receives digital assets that are classified as indefinite-lived intangible assets**.................................................................................................................. 4

2    Entity A enters into a contract with a customer to deliver a good or service that is an output of its ordinary activities in a concurrent exchange for a fixed number of a digital asset that will be held in its own account and not through a custodian. At contract inception, Entity A transfers control of the good or service to the customer and concurrently receives the digital asset in return. The digital asset received is accounted for as an indefinite-lived intangible asset and the contract is within the scope of FASB ASC 606, *Revenue from Contracts with Customers*.

How should Entity A account for the receipt of the digital asset as consideration under a revenue contract with a customer?

3    If the facts in question and answer (Q&A) 2 changed and Entity A were to receive the digital asset in the future rather than concurrently with the exchange of the good or service, what additional considerations, outside of FASB ASC 606, might be necessary for Entity A?

**Subsequent accounting for digital assets classified as indefinite-lived intangible assets**................................ 5

4    How should an entity account for digital assets that are classified as indefinite-lived intangible assets subsequent to their acquisition?

5    If a digital asset is classified by an entity as an indefinite-lived intangible asset and identical digital assets are reportedly bought and sold on a market at a price below its current carrying value, is this activity an impairment indicator, and if so, should an impairment charge be recorded?

6    If the fair value of a digital asset that is classified as an indefinite-lived intangible asset has declined below the carrying value in the middle of a reporting period (that is, an impairment has occurred), does impairment need to be recorded if the fair value has recovered by the end of the same period?

7    How should an entity determine the unit of account when assessing impairment of digital asset holdings accounted for as an indefinite-lived intangible asset?

**Measurement of cost basis of digital assets that are classified as indefinite-lived intangible assets when derecognized**.................................................................................................................................. 8

8    When selling a portion of an entity's digital asset holdings that are accounted for as indefinite-lived intangible assets, how should an entity determine the cost basis of the units sold?

**Derecognition of digital asset holdings that are classified as indefinite-lived intangible assets** ...................... 8

9    How should an entity account for the sale of digital asset holdings that are accounted for as indefinite-lived intangible assets?

**Recognition of digital assets when an entity uses a third-party hosted wallet service** .................................... 9

10    When an entity (the depositor) holds its digital asset in a third-party hosted wallet service (the custodian), should the digital asset be recognized on the financial statements of the depositor or the custodian?

**025**

# Contents (continued)

## Accounting subgroup

### Questions [Published October 2020]

**Meeting the definition of an investment company when engaging in digital asset activities** ......................... 10

11  Would participation in digital asset activities (for example, mining activities) disqualify an entity from classification as an investment company within the scope of FASB ASC 946, *Financial Services—Investment Companies?*

**Accounting by an investment company for digital assets it holds as an investment** ..................................... 12

12  How should an entity that qualifies as an investment company under FASB ASC 946, *Financial Services—Investment Companies*, account for investments in digital assets?

**Recognition, measurement, and presentation of digital assets specific to broker-dealers** ........................... 13

> **NOTE:** Q&As 13–15 do not address how an entity determines whether it is within the scope of FASB ASC 940 and the Broker-Dealer guide. See NOTE before Q&A 13 for additional information about considerations for an entity that reaches a conclusion that it is within the scope of FASB ASC 940.

13  How should an entity that is a broker-dealer in the scope of FASB ASC 940, *Financial Services—Brokers and Dealers*, present digital assets held or received on behalf of customers on its statement of financial condition?

14  How should a broker-dealer in the scope of FASB ASC 940 recognize revenue for purchases or sales transactions in digital assets on behalf of its customers?

15  How should the digital assets owned by a broker-dealer in the scope of FASB ASC 940 as part of its proprietary trading portfolio be measured?

**Considerations for crypto assets[2]  that require fair value measurement.** ..................................................... 15

> **NOTE:** The scope of Q&As 16–21 is specific to crypto assets. In addition, the Q&As interrelate and therefore are intended to be read in conjunction with one another.

16  When determining the fair value for crypto assets, what is the principal market?

17  What are some items an entity should consider about the markets in which crypto assets trade when determining the fair value of a crypto asset holding?

18  Assume the principal (or most advantageous) market for a given crypto asset is an active market with quoted prices for identical assets. Given the characteristics of the principal market, an entity concludes the fair value would be classified as Level 1. How is the fair value of the crypto asset determined in this circumstance?

19  Is it appropriate for a reporting entity to adjust the fair value measurement of a crypto asset to reflect the size of the entity's holding of the crypto asset?

20  Crypto asset markets often operate continuously, without a traditional market close. How should entities determine the fair value of the crypto asset in such circumstances?

21  If the principal (or most advantageous) market is not active or does not have orderly transactions (that is, not Level 1), how does management weigh inputs from different sources in the determination of the fair value of a crypto asset?

---

[2] Refer to the definition of a *crypto asset* in Q&A 1 of this practice aid.

**026**

# Contents (continued)

**Accounting for stablecoin holdings** ........................................................................................... **20**

22  How should investors that do not apply specialized industry guidance account for a holding of a stablecoin?

23  Entity A owns 100 units of a stablecoin, a digital asset that has a stated value of one U.S. dollar and is collateralized on a one-for-one basis by dollars held in a segregated bank account by the issuing entity. The holders of the units only have the right to redeem each unit for one U.S. dollar. How should Entity A account for its stablecoin?

Assume Entity A does not apply any specialized industry guidance (for example, FASB ASC 946 or FASB ASC 940).

## Questions [Published January 2022]

**Contracts involving derivatives and embedded derivatives** ........................................................ **22**

24  How should Entity A evaluate whether the asset representing the right to receive a fixed quantity of crypto assets contains an embedded derivative?

**Crypto asset lending** ................................................................................................................. **24**

25  Assume a lender lends 100 units of a crypto asset (Crypto Asset ABC) for a term of six months to a borrower. How should the lender account for the loan?

26  Assume a lender lends 100 units of a crypto asset (Crypto Asset ABC) for a term of six months to a borrower. How should the borrower account for the loan?

**Mining** ..................................................................................................................................... **26**

27  If an entity operates as a crypto asset miner, how should the entity recognize and measure transaction fees and block rewards earned in connection with its mining efforts?

28  Entity A shares its computing infrastructure as part of a mining pool run by operator O. How does Entity A account for the arrangement?

# Contents (continued)

## Auditing subgroup

### Client acceptance and continuance [Published July 2020]

1 Overview ........................................................................................................................................... 31

2 Auditor skill sets and competencies ............................................................................................ 32

3 Management skill sets and competencies .................................................................................... 37

4 Management integrity and overall business strategy ................................................................ 39

5 Processes and controls, including information technology ....................................................... 44

### Risk assessment and processes and controls [Published May 2021]

1 Introduction ..................................................................................................................................... 50

2 Understanding the entity and its environment ............................................................................ 51

3 Understanding and evaluating the entity's risk assessment process ..................................... 54

4 Understanding the entity's processes and controls .................................................................. 56

### Laws and regulations and related parties [Published May 2021]

1 Introduction ..................................................................................................................................... 72

2 Laws and regulations .................................................................................................................... 72

3 Related parties ............................................................................................................................... 74

### Appendix A

Blockchain universal glossary ....................................................................................................... 77

### Appendix B

Staff Accounting Bulletin No. 121 Questions and Answers ...................................................... 78

**028**

# Introduction

The AICPA formed the Digital Assets Working Group (the working group), a joint working group under the Financial Reporting Executive Committee (FinREC) and the Assurance Services Executive Committee (ASEC), with the objective of developing nonauthoritative guidance for financial statement preparers and auditors on how to account for and audit digital assets under U.S. generally accepted accounting principles (GAAP) for nongovernmental entities and generally accepted auditing standards (GAAS), respectively. The working group is split into two subgroups, one focusing on accounting topics and one focusing on auditing topics.

Each subgroup created a list of topics and prioritized those that it believes are the most relevant or critical for practitioners and accountants. As additional topics are completed, they will be added to this practice aid and posted to aicpa.org. The format of each of the accounting and auditing topics will vary based on the necessary context. For example, some topics will be addressed in question and answer (Q&A) format, whereas others requiring more context will be presented in a narrative format.

> **Help desk:** For additional information on what blockchain technology is and how it is affecting the profession, see the white paper "Blockchain Technology and Its Potential Impact on the Audit and Assurance Profession", as well as AICPA-developed CPE courses related to blockchain.
>
> In addition, see the blockchain podcast series at aicpa-cima.com/disruption.

## Accounting subgroup

The accounting subgroup focused on developing nonauthoritative guidance on accounting for digital assets and related transactions under GAAP. The scope of each question is defined within the question (for example, all digital assets versus digital assets that are classified as indefinite-lived intangible assets). The accounting Q&As do not address other factors such as compliance with laws and regulations.

Although many terms and colloquialisms that describe similar assets may be used to describe digital assets and related transactions, it is critical to consider that the accounting treatment for a digital asset and related transactions will ultimately be driven by the specific terms, form, underlying rights, and obligations of a digital asset. Therefore, the conclusions in any given topic may not be applicable to other types of digital assets that are outside the scope of such topic.

**029**

# Auditing subgroup

The focus of the auditing portion of this practice aid is to provide nonauthoritative guidance on auditing digital assets under GAAS. Audits of issuers, audits performed in accordance with the PCAOB standards, and non-audit attest engagements are not currently contemplated.

Although auditor independence and ethical requirements should be considered prior to the performance of acceptance or continuance procedures for all engagements, such considerations are not within the scope of this practice aid.

> **Help desk:** For information regarding independence and ethics, see the AICPA Code of Professional Conduct at pub.aicpa.org/codeofconduct/Ethics.aspx.

The digital asset ecosystem is an evolving business environment, presenting practitioners with unique risks and more complex audit challenges ranging from obtaining sufficient appropriate evidence to understanding the complex IT environment of entities within the ecosystem. The guidance herein is not intended to be an exhaustive list of challenges or recommended procedures and does not address certain emerging enterprise use cases for blockchain technology such as supply chain use cases, but rather focuses on the present, most widely adopted use cases.

Although many blockchain applications share some fundamental principles of trust and security through cryptography and decentralization, the design of different blockchains may differ significantly. Some are entirely public and permissionless, while others are private and serve a very narrow purpose. Consequently, it is not practical to address every blockchain. The term blockchain, as used throughout this practice aid, does not refer to any particular application of blockchain technology and instead refers to the broad concept of a decentralized ledger that uses the principles of cryptography to transmit or store value securely. That value is generally in the form of one or more digital assets.

Throughout this practice aid, the term *digital asset ecosystem* is used, which is defined as all entities participating or involved with digital assets. This may include entities engaged in various elements of the ecosystem, including development; maintenance; use (for example, the purchase, sale, investment, trading, or exchange); custody or security (for example, hot or cold wallet providers, qualified custodians, or other custodial services); or validating.

**030**

## Considerations for crypto assets that require fair value measurement

### Question 16:

When determining the fair value for crypto assets,[18] what is the principal market?

### Response 16:

In accordance with FASB ASC 820-10-35-3, a fair value measurement assumes that the asset or liability is exchanged in an orderly transaction between market participants to sell the asset or transfer the liability at the measurement date under current market conditions. Furthermore, FASB ASC 820-10-35-5 states that a fair value measurement assumes that the transaction to sell the asset or transfer the liability takes place either (*a*) in the principal market for the asset or liability or (*b*) in the absence of a principal market, in the most advantageous market for the asset or liability. Therefore, a fair value measurement contemplates an orderly transaction to sell the asset or transfer the liability in its principal market (or in the absence of a principal market, the most advantageous market).

There are various markets in which crypto assets trade. The reliability and sufficiency of the information produced could vary market by market. It is important for entities to consider whether these markets provide reliable volume and level of activity information in their determination of the principal market (or in the absence of a principal market, the most advantageous market).

Under FASB ASC 820, *Fair Value Measurement*, a *principal market* is the market with the greatest volume and level of activity for the asset or liability. The determination of the principal market should be based on the market with the greatest volume and level of activity that the reporting entity can access and not on the entity's own level of activity in a particular market. In that regard, it is important for an entity to assess whether there are any regulatory or other restrictions that prevent it from accessing a particular market.

When identifying the principal market — or in the absence of a principal market, the most advantageous market — an entity is not required to undertake an exhaustive search of all possible markets for the asset, but it should consider all information that is reasonably available. In accordance with FASB ASC 820-10-35-5A, the market in which an entity normally transacts for the crypto asset is presumed to be the principal market, unless contrary evidence exists.

To overcome the presumption, an entity must obtain evidence that the market it normally transacts in is not the market with the greatest volume and level of activity for the crypto asset. For example, if an entity normally buys and sells crypto assets through an intermediary or a broker, it would generally identify that market as the principal market, unless it has obtained evidence (considering all information that is reasonably available) that another market (for example, an exchange) has a greater volume and level of activity. For this purpose, a comparison would be made between the other market and the market the entity normally transacts in. Although numerous market participants may transact in crypto assets through intermediaries or brokers, each individual intermediary or broker is not a market. Generally, there is a lack of information regarding volume and pricing of crypto asset transactions in non-exchange markets. Therefore, it may be difficult for an entity to make a comparison between markets in order to conclude that another market (for example, an exchange) has a greater volume and level of activity than the market in which it normally transacts through an intermediary or broker. In this situation, it would be difficult to overcome the presumption that the market it normally transacts in is the principal market.

---

[18] Refer to the definition of a *crypto asset* in Q&A 1 of this practice aid.

size as a characteristic of the reporting entity's holding (specifically, a blockage factor that adjusts the quoted price of an asset or a liability because the market's normal daily trading volume is not sufficient to absorb the quantity held by the entity, as described in FASB ASC 820-10-35-44), rather than as a characteristic of the asset or liability (for example a control premium when measuring the fair value of a controlling interest) are not permitted in a fair value measurement.

The response to Q&A 7 indicates that entities will generally reach a determination that the unit of account for a crypto asset is the individual unit (or divisible fraction of a unit.) Further, the response to Q&A 1 explains that a crypto asset is not a financial instrument, financial asset, or a nonfinancial item accounted for as a derivative in accordance with FASB ASC 815, *Derivatives and Hedging*. As a result, the portfolio exception at FASB ASC 820-10-35-18D is not applicable to a crypto asset and, therefore, it would be inappropriate to adjust the fair value measurement of a crypto asset to reflect the size of an entity's holding of a crypto asset.

> **NOTE:** The scope of Q&As 16–21 is specific to crypto assets. In addition, the Q&As interrelate and therefore are intended to be read in conjunction with one another.

## Question 20:

Crypto asset[22] markets often operate continuously, without a traditional market close. How should entities determine the fair value of the crypto asset in such circumstances?

## Response 20:

In such circumstances, an accounting convention may establish a cut-off time for determining the fair value of the crypto asset. For example, it may be reasonable for an entity to establish an accounting convention based on prices at

- the close of the business day of the entity.
- a fixed Coordinated Universal Time (UTC).
- other timing as deemed reasonable, such as traditional close time based on local market jurisdictions.

Entities should consider transactions that take place after the cut-off time but before the end of the reporting period, similar to the guidance in FASB ASC 820-10-35-41C.

Any convention used should be reasonable and consistently applied, and changes should be made only if facts and circumstances support a change.

> **NOTE:** The scope of Q&As 16–21 is specific to crypto assets. In addition, the Q&As interrelate and therefore are intended to be read in conjunction with one another.

---

[22] Refer to the definition of a *crypto asset* in Q&A 1 of this practice aid.

## Question 28:

Entity A shares its computing infrastructure as part of a mining pool run by Operator O. The computing infrastructure from participants (including Entity A) is used for the mining activities of the pool. Each participant operates their own computing infrastructure. The block rewards received from the network upon successfully mining a block are collected by Operator O and then transferred to the mining pool participants in accordance with an agreed-upon formula.

How does Entity A account for the arrangement?

## Response 28:



**033**

Entity A should apply the following steps to determine the appropriate accounting for its arrangement with Operator O.

- **Step 1: Does the arrangement between Entity A and Operator O include a lease within the scope of FASB ASC 842?**

The guidance in FASB ASC 842 applies to contracts that convey the right to control the use of identified property, plant, and equipment for a period of time in exchange for consideration. For a lease to exist under FASB ASC 842, a customer should have both the right to obtain substantially all the economic benefits from using an identified asset and the right to direct its use. This determination should be based on all the facts and circumstances, including the terms and conditions of the contract. If Operator O can dictate when Entity A makes use of its computing infrastructure assets, this may indicate that Entity A is leasing those assets to Operator O.

If the arrangement between Entity A and Operator O includes a lease, Entity A should apply the lessor accounting guidance in FASB ASC 842. Entity A should also consider whether it is providing a non-lease component service to Operator O of operating and maintaining the computing infrastructure assets.

If Operator O is leasing Entity A's computing infrastructure, Entity A's customer for that lease and any operations and maintenance services will generally be Operator O. This means that, in general, Operator O is the principal to the mining activities undertaken using Entity A's computing infrastructure.

- **Step 2: If the arrangement does not include a lease, the next step is for Entity A to assess for which party it is providing computing services. Depending on the facts and circumstances, Entity A may be providing those services either for Operator O or the blockchain participants.**

To make this determination, it would typically be appropriate for Entity A to consider whether it or Operator O is the principal for the mining activities performed on the blockchain, using the principal versus agent guidance in FASB ASC 606. If Entity A is the principal for providing mining services to the blockchain participants, Operator O is an agent arranging for Entity A to provide those services. If, instead, Operator O is the principal performing the mining activities on the blockchain, Entity A is providing computing services to Operator O, assisting Operator O with its provision of mining services to the blockchain participants.

Determining the principal for performing the mining service may involve judgment. An entity should consider all the relevant guidance in FASB ASC 606 on principal versus agent considerations when making this determination. Some questions that may be relevant to applying that guidance in the context of mining pool arrangements include the following:

- Does Operator O direct (that is, assign) to the mining pool participants (including Entity A) the mining activities they undertake as part of the pool?
- Is Entity A or Operator O primarily responsible for selecting the transactions to be mined, the activities to be performed, placing the mined block on the blockchain, and collecting the block reward?
- Does Entity A bear the risks and rewards associated with the mining activities? For example, is Entity A compensated on a fixed basis per unit of computing power delivered or, instead, allocated a percentage only of the actual rewards earned based on the results of the mining activities?

If Entity A concludes that it is engaging in mining activities directly on the blockchain, rather than providing computing services to Operator O, the mining pool arrangement may represent a sharing of transaction fees and block reward between pool participants that is some form of joint arrangement under FASB ASC 808, *Collaborative Arrangements*. In that case, Entity A should apply Q&A 27 to account for its share of the transaction fees and block reward.

**034**

- **Step 3: Once Entity A determines to which party it is providing computing services, it should consider if those services are being provided pursuant to a contract with a customer under FASB ASC 606.**

  Refer to Q&A 27 if Entity A concludes it is providing computing services to the blockchain participants, that is, engaging in mining activities directly on the blockchain.

  If Entity A concludes it is providing computing services to Operator O, Entity A should evaluate whether its mining pool arrangement with Operator O is a contract with a customer. This evaluation should consider the definitions of both *contract* and *customer* in FASB ASC 606 as well as the following questions:

  – Do the terms and conditions of the mining pool arrangement create enforceable rights and obligations for Operator O and Entity A as described in FASB ASC 606-10-25-2?

  – Does the arrangement meet all the criteria in FASB ASC 606-10-25-1?

  – Is providing computing services of this nature an output of Entity A's ordinary activities pursuant to FASB ASC 606-10-15-3?

  If Entity A's computing services to Operator O are provided pursuant to a contract with a customer, Entity A should apply the guidance in FASB ASC 606 to recognize revenue from that contract.

  If Entity A determines that its computing services are not being provided pursuant to a contract with a customer, they are outside the scope of FASB ASC 606. Entity A should determine the appropriate accounting and presentation model to apply, including whether it is appropriate to apply FASB ASC 606 by analogy.

**035**