# EXHIBIT C

# Deloitte.

**Heads Up | Volume 30, Issue 24**
December 15, 2023



## In This Issue

- Overview
- Background
- Main Provisions
- Effective Date and Transition
- Contacts

# FASB Issues Final Standard on Crypto Assets

### Overview

On December 13, 2023, the FASB issued ASU 2023-08,[1] which addresses the accounting and disclosure requirements for certain crypto assets. The new guidance requires entities to subsequently measure certain crypto assets at fair value, with changes in fair value recorded in net income in each reporting period. In addition, entities are required to provide additional disclosures about the holdings of certain crypto assets.

For all entities, the ASU's amendments are effective for fiscal years beginning after December 15, 2024, including interim periods within those years. Early adoption is permitted. If an entity adopts the amendments in an interim period, it must adopt them as of the beginning of the fiscal year that includes that interim period. See the Effective Date and Transition section below for more information.

### Background

Before ASU 2023-08, entities (other than those within the scope of the investment-company guidance in ASC 946[2] or certain types of broker-dealers) accounted for crypto assets as indefinite-lived intangible assets in accordance with ASC 350 (i.e., the assets were measured at historical cost less impairment). Stakeholders had raised concerns that, among other factors, this intangible asset model (1) did not faithfully represent the economics of crypto assets and (2) made the recognition of impairments needlessly complex by requiring entities to use a crypto asset's lowest observable fair value within a reporting period. The FASB anticipates that the guidance in the ASU will better reflect the economics of certain crypto assets held by entities as well as reduce the complexity and cost of complying with a historical-cost-less-impairment model under the existing requirements in ASC 350.

---

[1] FASB Accounting Standards Update (ASU) No. 2023-08, *Accounting for and Disclosure of Crypto Assets*.
[2] For titles of *FASB Accounting Standards Codification* (ASC) references, see Deloitte's "Titles of Topics and Subtopics in the *FASB Accounting Standards Codification*."

## Main Provisions

### Scope

The ASU applies to all entities that hold certain crypto assets, including private companies and not-for-profit entities. In this *Heads Up*, the term "crypto assets" refers to assets that meet the scope criteria in the new guidance. As outlined in ASC 350-60-15-1 (added by the ASU), these scope criteria are as follows:

- The crypto asset meets the U.S. GAAP definition of an intangible asset.

- The holder does not have "enforceable rights to or claims on underlying goods, services, or other assets."

- The asset is created or resides on "a distributed ledger based on blockchain or similar technology."

- The asset is secured by cryptography.

- The asset is fungible.

- The asset is "not created or issued by the reporting entity or its related parties."[3]



### Connecting the Dots

While the new guidance applies to assets that meet the scope criteria in ASC 350-60, not all digital assets will meet these criteria. Because the guidance only applies to "fungible" digital assets that meet the definition of an intangible asset, questions will remain about how entities should account for and disclose other types of digital assets, such as nonfungible tokens (NFTs). Financial statement preparers accounting for NFTs will need to fully understand the rights associated with these tokens and what is being transferred through them. For more information about accounting considerations related to NFTs, see Deloitte's June 21, 2022, *Accounting Spotlight*.

In addition, wrapped tokens[4] are generally outside the scope of the guidance since, as the FASB observed, such tokens may provide their holders with a right or a claim on another asset (i.e., the underlying wrapped crypto asset). Because crypto assets can be wrapped in different ways, the Board was concerned that expanding the scope to include wrapped tokens could have unforeseen consequences. As a result, an entity may need to use the traditional intangible asset model or another accounting model to account for the wrapped token (depending on its nature) even if the underlying crypto asset is within the scope of the amendments. An entity will need to use judgment in accounting for wrapped tokens.

The ASU's amendments do not apply to assets that the reporting entity (or its related party) has issued or created, even if those entities have obtained the assets from an unrelated third party. The entity therefore would be required to apply the traditional intangible asset model to such assets, as appropriate, even if they are otherwise within the scope of the amendments. Paragraph BC15 of the ASU's Background Information and Basis for Conclusions explains that the Board decided to exclude assets created or issued by the reporting entity or its related party from this amendment because "stakeholders did not ask that the Board address the issuer's accounting" and "issuers and others did not support measuring crypto assets created or issued by a reporting entity or its related parties at fair value."

---

[3] A reporting entity that performs mining or validating services, and that receives newly created crypto assets as consideration for those services, would not be deemed the creator of those crypto assets as long as the services constitute the entity's only involvement with the creation of the asset.

[4] Wrapped tokens are tokenized representations of another crypto asset that have additional features not contained in the original version, such as the ability to transact on a different blockchain (i.e., wrapped bitcoin that can be transacted on the Ethereum blockchain).

038

## Measurement

The amendments require entities to subsequently measure crypto assets at fair value, with changes in fair value included in net income for each reporting period. The FASB notes that entities should look to the existing guidance in ASC 820. Specifically, in the ASU's Background Information and Basis for Conclusions, the Board indicates that there is already guidance on determining the principal (or most advantageous market), determining the levels of inputs in the fair value hierarchy, measuring fair value when the volume of transactions has decreased, and determining fair value in transactions affected by related parties. As it does when assessing other assets measured at fair value, an entity should use judgment when evaluating the factors related to determining the fair value of crypto assets.

> For more information about the accounting and disclosure guidance in ASC 820, see Deloitte's Roadmap *Fair Value Measurements and Disclosures (Including the Fair Value Option)*.
>
> During the 2023 AICPA & CIMA Conference on Current SEC and PCAOB Developments, the SEC staff highlighted crypto assets when discussing fair value measurements under ASC 820. For instance, SEC Senior Associate Chief Accountant Gaurav Hiranandani indicated that, given the rapid evolution of crypto asset markets, an entity is required to use judgment when determining the principal or most advantageous market for crypto assets. For more information about crypto asset fair value considerations discussed at the conference, see Deloitte's December 10, 2023, *Heads Up*.

The amendments do not provide guidance on how to recognize or present transaction costs incurred to acquire crypto assets, such as commissions and other related transaction fees. The FASB notes that, regardless of whether an entity capitalizes or expenses transaction costs, the effect on comprehensive income does not change, since the crypto assets are subsequently remeasured at fair value.



**Connecting the Dots**

The ASU addresses subsequent, but not initial, measurement of crypto assets. Entities are expected to continue to apply the guidance in ASC 350-30 when initially measuring intangibles other than goodwill, including crypto assets within the scope of ASC 350-60. Accordingly, there may be situations in which an entity acquires and initially measures a crypto asset at an amount that differs from the asset's fair value at the time of initial recognition. Because the entity is required to subsequently measure the crypto asset at fair value, it may have to recognize a change in the asset's measurement from its initial measurement even though the asset's fair value has not changed.

## Presentation

ASU 2023-08 requires entities with crypto asset holdings to:

- Present on the balance sheet the aggregate amount of "crypto assets measured at fair value separately from other intangible assets" that are not measured at fair value.
- Include in net income changes in the fair value of crypto assets separately from changes in the carrying amount (e.g., impairments and amortization) of other intangible assets, including other digital assets that are not measured at fair value.

**039**

- Classify as cash flows from operating activities those cash receipts from the nearly immediate[5] sale of crypto assets that were "received as noncash consideration in the ordinary course of business (for example, in exchange for goods and services transferred to a customer)."



**Connecting the Dots**

The Board acknowledged that some stakeholders were concerned about the net income volatility that could result from presenting fair value changes in net income. However, the Board believes that the benefits derived from holding a crypto asset are similar to those derived from holding equity securities that have a readily determinable fair value (i.e., holding and selling crypto assets at an appreciated value). As a result, the amendments require that fair value changes in crypto assets be presented within net income. Although the ASU does not stipulate whether fair value changes should be presented as operating or nonoperating income, the Board stated in the ASU's Background Information and Basis for Conclusions that the correct presentation would be based on facts and circumstances. If an entity presents operating income, the determination of whether fair value changes should be presented as operating or nonoperating income should be based on (1) how the entity is using the crypto asset (e.g., trading vs. holding for investment purposes) and (2) whether crypto assets are a core part of the entity's business.

## Disclosures

Like other assets measured at fair value, crypto assets are subject to the disclosure requirements in ASC 820. Further, the ASU's amendments require entities to provide certain additional disclosures about crypto asset holdings for annual and interim periods. Specifically, entities should disclose:

- For annual and interim periods, the "name, cost basis, fair value, and number of units for each significant crypto asset holding." Entities must also disclose the aggregate cost basis and fair value of crypto assets determined not to be individually significant.

- For annual periods, the method the entity used to determine the cost basis of the crypto assets disposed of when calculating gains and losses, and the income statement line item in which gains and losses are included (if they are not presented separately).

- An annual reconciliation of aggregate crypto asset holdings, from the opening to the closing balance, that addresses (1) additions (and discusses the nature of the activities resulting in those additions), (2) dispositions (including the total amount of cumulative realized gains and losses from dispositions during the period), and (3) gains and losses included in net income for that respective period. Assets with net gains or net losses within the period should be presented in the applicable line of the reconciliation (e.g., a crypto asset with transactions resulting in both gains and losses during the period, but that results in a net gain overall, should be presented within net gains in that period).

- For crypto assets subject to contractual sale restrictions as of the balance sheet date, entities are required to disclose the (1) fair value of those assets, (2) nature and remaining duration of the restrictions, and (3) circumstances in which the restrictions could lapse.

---

[5]  The ASU states that the phrase "nearly immediately" means "a short period of time that is expected to be within hours or a few days, rather than weeks."

**040**



**Connecting the Dots**

The disclosure requirements also apply to companies subject to other industry-specific guidance since the Board believes that investors would benefit from the enhanced disclosures. The ASU's Background Information and Basis for Conclusions indicates that if the disclosure requirements in industry-specific guidance differ from those in the ASU, companies subject to that guidance should continue to follow it as well.

## Effective Date and Transition

### Effective Date

The amendments are effective for all entities for fiscal years beginning after December 15, 2024, including interim periods within those years. Early adoption is permitted. An entity that early adopts the amendments would be required to apply the entire ASU, including the presentation and disclosure provisions, not just the measurement guidance. An entity that adopts the amendments in an interim period must adopt them as of the beginning of the fiscal year that includes that interim period.

### Transition

When adopting the final standard, entities are required to record a cumulative-effect adjustment to retained earnings (or other appropriate components of equity or net assets) as of the beginning of the annual period of adoption. Retrospective restatement would not be required or allowed for prior periods.



**Connecting the Dots**

Entities adopting the new ASU should consider the potential effects (if any) of the 15 percent corporate alternative minimum tax (CAMT) on an applicable corporation's adjusted financial statement income (AFSI).[6] Although the IRS and U.S. Treasury Department are expected to issue proposed regulations in late 2023 or early 2024, the current CAMT rules allow for no adjustment to financial statement income for unrealized mark-to-market gains or losses in the determination of ASFI (i.e., unrealized gains and losses from changes in the fair value of crypto assets within a taxpayer's financial statement income after adoption of ASU 2023-08 are included in AFSI). There are also specific rules for cumulative adjustments to retained earnings for a change in financial accounting principle, including the adoption of a new accounting standard, to prevent duplications or omissions of items. Accordingly, any cumulative adjustment to retained earnings recorded as a result of adopting ASU 2023-08 would generally be included in AFSI over a four-year period (if the adjustment results in an increase in AFSI) or in the year of adoption (if the adjustment results in a decrease in AFSI). For more information, see Deloitte's September 30, 2023, *Tax Alert*.

---

[6]  The CAMT was introduced by the Inflation Reduction Act of 2022 and is effective for taxable years beginning after December 31, 2022. A corporation is subject to the CAMT for a taxable year if it meets the average annual AFSI test for one or more taxable years that are before that taxable year and end after December 31, 2021 (i.e., the $1 billion three-year average annual AFSI test).

**041**

## Contacts



**Stephen McKinney**
Audit & Assurance
Managing Director
Deloitte & Touche LLP
+1 203 761 3579
smckinney@deloitte.com



**Bob Bell**
Audit & Assurance
Senior Manager
Deloitte & Touche LLP
+1 312 486 0031
robbell@deloitte.com

For information about Deloitte's service offerings related to the matters discussed in this publication, please contact:



**PJ Theisen**
Audit & Assurance
Partner
Deloitte & Touche LLP
+1 202 220 2824
ptheisen@deloitte.com

042

## Dbriefs for Financial Executives

We invite you to participate in Dbriefs, Deloitte's live webcasts that give you valuable insights into important developments affecting your business. Topics covered in the Dbriefs for Financial Executives series include financial reporting, tax accounting, business strategy, governance, and risk. Dbriefs also provide a convenient and flexible way to earn CPE credit — right at your desk.

## Subscriptions

To subscribe to Dbriefs, or to receive accounting publications issued by Deloitte's Accounting and Reporting Services Department, please register at My.Deloitte.com.

## The Deloitte Accounting Research Tool

Put a wealth of information at your fingertips. The Deloitte Accounting Research Tool (DART) is a comprehensive online library of accounting and financial disclosure literature. It contains material from the FASB, EITF, AICPA, PCAOB, and SEC, in addition to Deloitte's own accounting manuals and other interpretive guidance and publications.

Updated every business day, DART has an intuitive design and navigation system that, together with its powerful search and personalization features, enable users to quickly locate information anytime, from any device and any browser. While much of the content on DART is available at no cost, subscribers have access to premium content, such as Deloitte's *FASB Accounting Standards Codification Manual*. DART subscribers and others can also subscribe to *Weekly Accounting Roundup*, which provides links to recent news articles, publications, and other additions to DART. For more information, or to sign up for a free 30-day trial of premium DART content, visit dart.deloitte.com.

*Heads Up* is prepared by members of Deloitte's National Office as developments warrant. This publication contains general information only and Deloitte is not, by means of this publication, rendering accounting, business, financial, investment, legal, tax, or other professional advice or services. This publication is not a substitute for such professional advice or services, nor should it be used as a basis for any decision or action that may affect your business. Before making any decision or taking any action that may affect your business, you should consult a qualified professional advisor. Deloitte shall not be responsible for any loss sustained by any person who relies on this publication.

The services described herein are illustrative in nature and are intended to demonstrate our experience and capabilities in these areas; however, due to independence restrictions that may apply to audit clients (including affiliates) of Deloitte & Touche LLP, we may be unable to provide certain services based on individual facts and circumstances.

**About Deloitte**
Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"), its network of member firms, and their related entities. DTTL and each of its member firms are legally separate and independent entities. DTTL (also referred to as "Deloitte Global") does not provide services to clients. In the United States, Deloitte refers to one or more of the US member firms of DTTL, their related entities that operate using the "Deloitte" name in the United States and their respective affiliates. Certain services may not be available to attest clients under the rules and regulations of public accounting. Please see www.deloitte.com/us/about to learn more about our global network of member firms.

Copyright © 2023 Deloitte Development LLC. All rights reserved.

Follow us @DeloitteAcctg