053

# EXHIBIT E

**AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON AUGUST 6, 2020**

REGISTRATION NO. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM S-3

**REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**

# MARATHON PATENT GROUP, INC.

(Exact name of registrant as specified in its charter)

Nevada

(State or other jurisdiction of incorporation or organization)

01-0949984

I.R.S. Employer Identification Number

1180 North Town Center Drive, Suite 100
Las Vegas, NV 89144
702-945-2773

(Address, including zip code, and telephone number, including area code of registrant's principal executive offices)

Copies to:

Jolie Kahn, Esq.
12 E. 49th Street, 11th floor
New York , NY 10017
Phone: (516) 217-6379
Fax: (866) 705-3071

Approximate date of commencement of proposed sale to the public: From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box: [ ]

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plants, check the following box: [X]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box. [ ]

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer [ ]    Accelerated filer [ ]    Non-accelerated filer [X]    Smaller reporting company [X]    Emerging growth company [ ]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

**CALCULATION OF REGISTRATION FEE**

| Title of each class of Securities to be registered | Amount to be registered[1] | Proposed maximum offering price per unit[2] | Proposed maximum aggregate offering price[2] | Amount of registration fee[3] |
|---|---|---|---|---|
| Common stock, no par value per share | — | — | — | — |
| Preferred stock, no par value per share | — | — | — | — |
| Warrants[4] | — | — | — | — |
| Units | — | — | — | — |
| Total[5] | | | $ 100,000,000 | $ 12,980 |

**054**

**RISK FACTORS**

Investing in our securities involves a high degree of risk. Before making an investment decision, you should consider carefully the risks, uncertainties and all risk factors set forth in the applicable prospectus supplement and the documents incorporated by reference in this prospectus, including the risk factors discussed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K for the year ended December 31, 2019, as amended, and each subsequent filed quarterly report on Form 10-Q and current reports on Form 8-K, which may be amended, supplemented or superseded from time to time by the other reports we file with the SEC in the future.

In addition to those risk factors incorporated by reference herein, the Company has identified the following uncertainties and risk factors which may affect our business:

***We may be classified as an inadvertent investment company.***

We are not engaged in the business of investing, reinvesting, or trading in securities, and we do not hold ourselves out as being engaged in those activities. Under the Investment Company Act of 1940, as amended (the "1940 Act"), however, a company may be deemed an investment company under Section 3(a)(1)(C) of the 1940 Act if the value of its investment securities is more than 40% of its total assets (exclusive of government securities and cash items) on a consolidated basis.

We have commenced digital asset mining, the outputs of which are cryptocurrencies, which may be deemed a security. In the event that the digital assets held by us exceed 40% of our total assets, exclusive of cash, we inadvertently become an investment company. An inadvertent investment company can avoid being classified as an investment company if it can rely on one of the exclusions under the 1940 Act. One such exclusion, Rule 3a-2 under the 1940 Act, allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which an issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis and (b) the date on which an issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of government securities and cash items) on an unconsolidated basis. We are putting in place policies that we expect will work to keep the investment securities held by us at less than 40% of our total assets, which may include acquiring assets with our cash, liquidating our investment securities or seeking a no-action letter from the SEC if we are unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner.

As Rule 3a-2 is available to a company no more than once every three years, and assuming no other exclusion were available to us, we would have to keep within the 40% limit for at least three years after we cease being an inadvertent investment company. This may limit our ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on our earnings. In any event, we do not intend to become an investment company engaged in the business of investing and trading securities.

Classification as an investment company under the 1940 Act requires registration with the SEC. If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable. Registration is time consuming and restrictive and would require a restructuring of our operations, and we would be very constrained in the kind of business we could do as a registered investment company. Further, we would become subject to substantial regulation concerning management, operations, transactions with affiliated persons and portfolio composition, and would need to file reports under the 1940 Act regime. The cost of such compliance would result in the Company incurring substantial additional expenses, and the failure to register if required would have a materially adverse impact to conduct our operations.

*Failure to effectively manage our growth could place strains on our managerial, operational and financial resources and could adversely affect our business and operating results.*

Our growth has placed, and is expected to continue to place, a strain on our limited managerial, operational and financial resources and systems. Further, as our subsidiary companies' businesses grow, we will be required to continue to manage multiple relationships. Any further growth by us or our subsidiary companies, or an increase in the number of our strategic relationships, may place additional strain on our managerial, operational and financial resources and systems. Although we may not grow as we expect, if we fail to manage our growth effectively or to develop and expand our managerial, operational and financial resources and systems, our business and financial results would be materially harmed.

*Marathon has an evolving business model.*

As digital assets and blockchain technologies become more widely available, we expect the services and products associated with them to evolve. Very recently, the Securities and Exchange Commission (the "Commission" or the "SEC") issued a Report that promoters that use initial coin offerings or token sales to raise capital may be engaged in the offer and sale of securities in violation of the Securities Act and the Exchange Act of 1934 (the "Exchange Act"). This may cause us to potentially change our future business in order to comply fully with the federal securities laws as well as applicable state securities laws. As a result, to stay current with the industry, our business model may need to evolve as well. From time to time we may modify aspects of our business model. We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to the business. We may not be able to manage growth effectively, which could damage our reputation, limit our growth and negatively affect our operating results.

*Digital Assets such as bitcoin are likely to be regulated as securities or investment securities.*

Bitcoin is the oldest and most well-known form of digital asset. Bitcoin and other forms of digital assets/cryptocurrencies have been the source of much regulatory consternation, resulting in differing definitional outcomes without a single unifying statement. When the interests of investor protection are paramount, for example in the offer or sale of Initial Coin Offering ("ICO") tokens, the SEC has no difficulty determining that the token offerings are securities under the "Howey" test as stated by the United States Supreme Court, a conclusion with which Marathon agrees. As such, ICO offerings would require registration under the Securities Act or an available exemption therefrom for offers or sales in the United States to be lawful. Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Although we do not believe our mining activities require registration for us to conduct such activities and accumulate digital assets the SEC, CFTC, Nasdaq or other governmental or quasi-governmental agency or organization may conclude that our activities involve the offer or sale of "securities", or ownership of "investment securities", and we may face regulation under the Securities Act or the 1940 Act. Such regulation or the inability to meet the requirements to continue operations, would have a material adverse effect on our business and operations.

12

Bitcoin and other digital assets are viewed differently by different regulatory and standards setting organizations. For example, the Financial Action Task Force ("FATF") and the Internal Revenue Service ("IRS") consider a cryptocurrency as currency or an asset or property.

Bitcoin is described as a virtual currency by the Financial Action Task Force, as follows:

> a digital representation of value that can be digitally traded and functions as: (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. It is not issued or guaranteed by any jurisdiction, and it fulfils the above functions only by agreement within the community of users of the virtual currency. Virtual currency is distinguished from fiat currency (a.k.a. "real currency," "real money," or "national currency"), which is the coin and paper money of a country that is designated as its legal tender; circulates; and is customarily used and accepted as a medium of exchange in the issuing country. It is distinct from e-money, which is a digital representation of fiat currency used to electronically transfer value denominated in fiat currency.[1]

Further, the IRS views bitcoin as property and applies general tax principles that apply to property transactions to transactions involving virtual currency, as follows:[2]

> IR-2014-36, March. 25, 2014

> WASHINGTON — The Internal Revenue Service today issued a notice providing answers to frequently asked questions (FAQs) on virtual currency, such as bitcoin. These FAQs provide basic information on the U.S. federal tax implications of transactions in, or transactions that use, virtual currency.

> In some environments, virtual currency operates like "real" currency — i.e., the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance — but it does not have legal tender status in any jurisdiction.

> The notice provides that virtual currency is treated as property for U.S. federal tax purposes. General tax principles that apply to property transactions apply to transactions using virtual currency. Among other things, this means that:

> Wages paid to employees using virtual currency are taxable to the employee, must be reported by an employer on a Form W-2, and are subject to federal income tax withholding and payroll taxes.

> Payments using virtual currency made to independent contractors and other service providers are taxable and self-employment tax rules generally apply. Normally, payers must issue Form 1099.

> The character of gain or loss from the sale or exchange of virtual currency depends on whether the virtual currency is a capital asset in the hands of the taxpayer.

> A payment made using virtual currency is subject to information reporting to the same extent as any other payment made in property.

[1] FATF Report, Virtual Currencies, Key Definitions and Potential AML/CFT Risks, FINANCIAL ACTION TASK FORCE (June 2014), http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potentialaml-cft-risks.pdf. The Financial Action Task Force ("FATF") is an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction. The FATF Recommendations are recognized as the global anti-money laundering ("AML") and counter-terrorist financing ("CFT") standard.

[2] IR-2014-36 (Marth 25, 2014). https://www.irs.gov/newsroom/irs-virtual-currency-guidance

In June 2016, the AICPA commented on IRS Notice 2014-21 urging the IRS to provide additional guidance about existing tax principles whether virtual currency is property, currency or commodity.[3]

Furthermore, in the several applications to establish an Exchange Traded Fund ("ETF") of cryptocurrency, and in the questions raised by the Staff under the 1940 Act, no clear principles emerge from the regulators as to how they view these issues and how to regulate cryptocurrency under the applicable securities acts. It has been widely reported that the SEC has recently issued letters and requested various ETF applications be withdrawn because of concerns over liquidity and valuation and unanswered questions about absence of reporting and compliance procedures capable of being implemented under the current state of the markets for exchange traded funds.[4]

13

Accordingly, there is no one unifying principle governing the regulatory status of cryptocurrency nor whether cryptocurrency is a security in each context in which it is viewed. Cryptocurrency may be a security and its offer or sale may require compliance with Section 5 of the Securities Act, in certain instances. However, since the Company does not intend to be engaged in the offer or sale of securities in the form of ICO offerings its internal mining activities that are not related to ICO offerings do not require registration under the Securities Act. We may face similar issues with various state securities regulators who may interpret our actions as requiring registration under state securities laws, banking laws, or money transmitter and similar laws, which are also an unsettled area or regulation that exposes us to risks.

***Since there has been limited precedent set for financial accounting or taxation of digital assets other than digital securities, it is unclear how we will be required to account for digital asset transactions and the taxation of our businesses.***

There is currently no authoritative literature under accounting principles generally accepted in the United States which specifically addresses the accounting for digital assets, including digital currencies. Therefore, by analogy, we intend to record digital assets similar to financial instruments under ASC 825, Financial Instruments, because the economic nature of these digital assets is most closely related to a financial instrument such as an investment in a foreign currency.

We believe that Marathon will recognize revenue when it is realized or realizable and earned. Our material revenue stream is expected to be related to the mining of digital currencies. Marathon will derive revenue by providing transaction verification services within the digital currency networks of crypto-currencies, such as bitcoin commonly termed "crypto-currency mining." In consideration for these services, Marathon expects to receive digital currency (also known as "Coins"). Coins are generally recorded as revenue, using the average spot price on the date of receipt. The coins are recorded on the balance sheet at their fair value. Gains or losses on sale of Coins are recorded in the statement of operations. Expenses associated with running the crypto-currency mining business, such as equipment deprecation, rent and electricity cost are recorded as cost of revenues.

In 2014, the IRS issued guidance in Notice 2014-21 that classified cryptocurrency as property, not currency, for federal income tax purposes. But according to the requirements of FATCA, which requires foreign financial institutions to provide the IRS with information about accounts held by U.S. taxpayers or foreign entities controlled by U.S. taxpayers, cryptocurrency exchanges, in the ordinary course of doing business, are considered financial institutions.

On November 30, 2016, a federal judge in the Northern District of California granted an IRS application to serve a "John Doe" summons on Coinbase Inc., which operates a cryptocurrency wallet and exchange business. The summons asked Coinbase to identify all U.S. customers who transferred convertible cryptocurrency from 2013 to 2015. The IRS is trying to get cryptocurrency owners to report the value of their wallets to the federal government and the IRS is treating cryptocurrency as both property and currency.

The American Institute of Certified Public Accountants recommended in a June 2016 letter to the IRS that cryptocurrency accounts be reported in the summary information section of Form 8938, Statement of Specified Foreign Financial Assets, which breaks with the IRS's 2014 guidance that cryptocurrency be treated as property.

14

Property is divided into certain sections within the Internal Revenue Code ("IRC") that determine everything from how the property is treated at sale, to how the property is depreciated, to the nature and character of the gain on sale of the asset. For instance, IRC §1231 property (real or depreciable business property held for more than one year) is treated as capital in nature when sold for a profit, but it is treated as ordinary when the property is sold for a loss. IRC §1245 property, on the other hand, is treated as ordinary in nature. IRC §1245 property encompasses most types of property. IRC §1250 property covers everything else. IRC §1250 states that a gain from selling real property that has been depreciated should be taxed as ordinary income, to the extent that the accumulated depreciation exceeds the depreciation calculated using the straight-line method, which is the most basic depreciation method used on an income statement. IRC §1250 bases the amount of tax due on the type of property, such as residential or nonresidential property, and on how many months the property was owned.

IRS guidance is silent on which section of the tax code cryptocurrency falls into. For instance, IRC §1031 allows for the like-kind exchange of certain property. IRC §1031 exchanges typically are done with real estate or business assets. However, with the classification of cryptocurrency as property by the IRS, many tax professionals will argue that cryptocurrency can be exchanged using IRC §1031.

[3] https://www.aicpa.org/advocacy/cpaadvocate/2016/virtual-currency-guidance-needed.html
[4] https://seekingalpha.com/article/4137093-sec-saying-no-bitcoin-etfs-one-may-still-get-approved

We believe that all of our digital asset mining activities will be accounted for on the same basis regardless of the form of digital asset. A change in regulatory or financial accounting standards or interpretation by the IRS or accounting standards or the SEC could result in changes in our accounting treatment, taxation and the necessity to restate our financial statements. Such a restatement could negatively impact our business, prospects, financial condition and results of operation.

***The further development and acceptance of digital asset networks and other digital assets, which represent a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of digital asset systems may adversely affect an investment in us.***

Digital assets such as bitcoins, that may be used, among other things, to buy and sell goods and services are a new and rapidly evolving industry of which the digital asset networks are prominent, but not unique, parts. The growth of the digital asset industry in general, and the digital asset networks of bitcoin in particular, are subject to a high degree of uncertainty. The factors affecting the further development of the digital asset industry, as well as the digital asset networks, include:

- continued worldwide growth in the adoption and use of bitcoins and other digital assets;

- government and quasi-government regulation of bitcoins and other digital assets and their use, or restrictions on or regulation of access to and operation of the digital asset network or similar digital assets systems;

- the maintenance and development of the open-source software protocol of the bitcoin network;

- changes in consumer demographics and public tastes and preferences;

- the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;

- general economic conditions and the regulatory environment relating to digital assets; and

- the impact of regulators focusing on digital assets and digital securities and the costs associated with such regulatory oversight.

A decline in the popularity or acceptance of the digital asset networks of bitcoin, or similar digital asset systems, could adversely affect an investment in us.

***If we acquire digital securities, even unintentionally, we may violate the Investment Company Act of 1940 and incur potential third-party liabilities.***

The Company intends to comply with the 1940 Act in all respects. To that end, if holdings of cryptocurrencies are determined to constitute investment securities of a kind that subject the Company to registration and reporting under the 1940 Act, the Company will limit its holdings to less than 40% of its assets. Section 3(a)(1)(C) of the 1940 Act defines "investment company" to mean any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. Section 3(a)(2) of the 1940 Act defines "investment securities" to include all securities except (A) Government securities, (B) securities issued by employees' securities companies, and (C) securities issued by majority-owned subsidiaries which (i) are not investment companies and (ii) are not relying on the exception from the definition of investment company in section 3(c)(1) or 3(c)(7) of the 1940 Act. As noted above, the SEC has not stated whether bitcoin and cryptocurrency is an investment security, as defined in the 1940 Act.

**059**