# EXHIBIT F

**060**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2022

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the transition period from _____to_____

# MARATHON DIGITAL HOLDINGS, INC.
(Exact Name of Registrant as Specified in Charter)

| Nevada | 001-36555 | 01-0949984 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 1180 North Town Center Drive, Suite 100 Las Vegas, NV | 89144 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: 702-945-2773

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | MARA | The Nasdaq Capital Market |

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date, 116,810,405 shares of common stock are issued and outstanding as of August 9, 2022.

**061**

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

Providing computing power in bitcoin transaction verification services to the network is the only performance obligation under our arrangements with the network. The transaction consideration the Company receives, if any, is noncash consideration, which the Company measures at fair value on the date received, which is not materially different than the fair value at the time of contract inception. The consideration is all variable. Because it is not probable that a significant reversal of cumulative revenue will not occur, the consideration is constrained until the Company successfully places a block (by being the first to solve an algorithm) and the Company receives confirmation of the consideration it will receive, at which time revenue is recognized. There is no significant financing component in these transactions.

Fair value of the digital asset award received is determined using the daily closing U.S. dollar spot rate of the related digital currency on the date of receipt.

Expenses associated with running the digital currency mining business, such as rent and electricity cost are also recorded as cost of revenues. Depreciation on digital currency mining equipment is recorded as a component of cost of revenues.

**Block rewards**

Block rewards earned by a bitcoin miner are recognized as revenue, but the evaluation is required to determine if the block rewards earned should be recognized as revenue from contracts with customers under FASB ASC 606 or as other revenue.

The Company evaluated whether its mining activities represent a contract with a customer to provide services and, determined it should recognize block rewards it receives from the network as revenue from a customer under FASB ASC 606. All relevant facts and circumstances, including the network's protocols, were considered in determining (1) whether the Company has a contract with a customer under FASB ASC 606-10-25-2 and (2) whether its mining activities on the network meet all the criteria in FASB ASC 606-10-25-1.

The inflow of bitcoin as a result of the block reward would meet the definition of revenue because it gives rise to economic benefits to the miner from rendering services or carrying out activities.

Therefore, the Company may account for the block reward as revenue.

Block rewards are the Company's most significant source of revenue. Block rewards included in revenues on the statements of operations were approximately $24.5 million and $26.6 million, respectively for the three months ended June 30, 2022 and June 30, 2021. Block rewards included in revenues on the statements of operations were approximately and $75.6 and $34.8 million for the six months ended June 30, 2022 and June 30, 2021.

**Transaction Fees**

Transaction fees earned by the Company are recognized as revenue from customers in accordance with FASB ASC 606 and pursuant to AICPA Practice Guide "Accounting for and Auditing Digital Assets". The transaction fees are specified in each transaction request and paid by the requester to the Company, acting as the successful miner, in exchange for the successful processing of the transaction.

The requester meets the definition of a customer in FASB ASC 606 because it has contracted with the miner to obtain a service (successful mining) that is an output of the miner's ordinary activities in exchange for consideration. A contract with a customer exists at the point when the miner successfully validates a requesting customer's transaction to the distributed ledger. At this point, the performance obligation has been satisfied in accordance with FASB ASC 606-10-25-30. Because of this, the additional criteria in FASB ASC 606-10-25-1 would be met as follows:

- Both the requester (a customer) and the miner have approved the contract and are committed to the transaction at the point of successfully validating and adding the transaction to the distributed ledger.
- Each party's rights, the consideration to be transferred, and the payment terms are clear.
- The transaction has commercial substance (that is, the risk, timing, or amount of the miner's future cash flows is expected to change as a result of the contract).
- Collection of the fees is probable because it is completed as part of closing a successful block.

By successfully mining a block, the miner satisfies its performance obligation to the requester and, thus, should recognize revenue at that point in time.

The payment of transaction fees in bitcoin constitutes non-cash consideration under FASB ASC 606-10-32-21. This non-cash consideration is measured at its estimated fair value at contract inception - that is, the date that the criteria in FASB ASC 606-10-25-1 are met. If fair value cannot be reasonably estimated in accordance with FASB ASC 606-10-32-22, the consideration should be measured indirectly by reference to the stand-alone selling price of the miner's services.

Transaction fees were approximately $1.0 million and $0.3 million for the six and three months ended June 30, 2022, respectively and $3.6 million and $2.7 million for the six and three months ended June 30, 2021, respectively.

11

**062**

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

**Pool Fees**

The Company is a pool operator and acts as an agent, and not as a principal. The Company did not have control over any third party contributing hashrate to its pool. It merely facilitated the contribution of hash rate by third party pool participants who could choose to join or leave a pool as they wish. As the pool operator, the Company recognized 100% of all pool fees generated by such pool as fee revenue and not mining revenue. The Company therefore concluded that in its capacity as the pool operator it was an agent, and not a principal.

From May 2021 until April 30, 2022, the Company operated a mining pool that included certain third parties. Pool fees included in revenues on the statements of operations were approximately $76 thousand and $89 thousand, respectively for the three months ended June 30, 2022 and June 30, 2021. Pool fees included in revenues on the statements of operations were approximately $331 thousand and $89 thousand, respectively for the six months ended June 30, 2022 and June 30, 2021. As of April 30, 2022, third party miners were no longer participating in the Company's mining pool. As such, the Company will no longer recognize pool fees.

**NOTE 4 – ADVANCES TO VENDORS AND DEPOSITS**

The Company contracts with bitcoin mining server manufacturers in procuring equipment necessary for the operation of its bitcoin mining operations. A typical agreement calls for a certain percentage of the total order to be paid in advance at specific intervals, usually (1) within several days of execution of a specific contract (2) approximately six months before each shipment date and (3) approximately one month before each shipment date. We account for these payments as Advances to vendor on the balance sheet.

As of June 30, 2022 and December 31, 2021, such advances totalled approximately $800.2 million and $466.3 million, respectively. At June 30, 2022, the company had a payable of $46.6 million related to the accrual of an advance to a vendor that was subsequently approved for payment and paid in early July.

In addition, the Company contracts with other service providers for hosting of its equipment and operational support in data centers where the company's equipment is deployed. These arrangements also call for advance payments to be made to vendors in conjunction with the contractual obligations associated with these services. We classify these payments as deposits on the balance sheet.

**NOTE 5 – PROPERTY AND EQUIPMENT**

The components of property and equipment as of June 30, 2022 and December 31, 2021 are:

| | Useful life (Years) | June 30, 2022 | December 31, 2021 |
|---|---|---|---|
| Website | 7 | 273,122 | 121,787 |
| Mining equipment | 5 | 186,608,915 | 163,868,283 |
| Construction in Progress | N/A | 182,765,654 | 133,565,908 |
| Mining patent | 17 | - | 1,210,000 |
| Gross property, equipment and intangible assets | | 369,647,691 | 298,765,978 |
| Less: Accumulated depreciation and amortization | | (55,390,407) | (21,591,958) |
| **Property, equipment and intangible assets, net** | | $ 314,257,284 | $ 277,174,020 |

The Company's depreciation expense related to property and equipment for the three and six months ended June 30, 2022 and June 30, 2021 was $24,701,111 and $38,565,242, and $2,937,666 and $3,675,603, respectively. Amortization expense for the three and six months ended June 30, 2022 and June 30, 2021 was $8,686 and $21,238, and $17,794 and $35,588, respectively.

**NOTE 6 – ASSETS HELD FOR SALE**

On December 2, 2021, we entered into an agreement with DCRBN Ventures Development and Acquisition LLC ("DCRBN") in which the Company agreed to sell certain equipment to DCRBN starting in April 2022, in conjunction with the development of commercial activities at the King Mountain wind farm in McCamey, TX. During the three months ended June 30, 2022, the Company sold equipment for cash proceeds totalling $87.2 million and realized a pre-tax gain on the sale of such assets of $58.2 million. There were no such sales in the prior-year period. As of June 30, 2022, the third and final batch of equipment was to be sold subsequent to quarter end and as such, classified as assets held for sale on the balance sheet.

**NOTE 7 - STOCKHOLDERS' EQUITY**

**Common Stock**

*Shelf Registration Statements on Form S-3 and At The Market Offering Agreements*

On February 11, 2022, we entered into an At The Market Offering Agreement, or sales agreement, with H.C. Wainwright & Co., LLC relating to shares of our common stock. In accordance with the terms of the sales agreement, we may offer and sell shares of our common stock having an aggregate offering price of up to $750,000,000 from time to time through Wainwright acting as our sales agent. As of June 30, 2022, the Company had sold 10,556,232 shares of common stock for an aggregate purchase price of $161.0 million net of offering costs pursuant to this At The Market Offering Agreement.

**063**