064

# EXHIBIT G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2022

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the transition period from _____ to _____

# MARATHON DIGITAL HOLDINGS, INC.
(Exact Name of Registrant as Specified in Charter)

| Nevada | 001-36555 | 01-0949984 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 1180 North Town Center Drive, Suite 100 Las Vegas, NV | 89144 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: 702-945-2773

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | MARA | The Nasdaq Capital Market |

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date, 116,842,289 shares of common stock are issued and outstanding as of November 14, 2022.

**065**

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

If a good or service is not distinct, the good or service is combined with other promised goods or services until a bundle of goods or services is identified that is distinct.

The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both. When determining the transaction price, an entity must consider the effects of all of the following:

- Variable consideration
- Constraining estimates of variable consideration
- The existence of a significant financing component in the contract
- Noncash consideration
- Consideration payable to a customer

Variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved. The transaction price is allocated to each performance obligation on a relative standalone selling price basis. The transaction price allocated to each performance obligation is recognized when that performance obligation is satisfied, at a point in time or over time as appropriate.

The Company's ongoing major or central operations is to use computing power to solve cryptographic algorithms to record and publish Bitcoin ("BTC") transactions to blockchain ledgers or provide BTC transaction verification services to the BTC network (such activity, collectively, "mining"). In return for verifying transactions to be added as a new block to the network (i.e., successfully 'solving' a block), the Company is entitled to receive transaction fees and block rewards in the form of BTCs. Transaction fees are specified in each block of transactions request and are paid by the requester. The Bitcoin blockchain protocol itself currently issues a block reward for each solved block at a current rate of 6.25 BTC per block. Such reward is expected to be reduced to half of that in 2024. The Company also mines in a self-operated private pool, which was open to third-party pool participants from September 2021 until May 2022. The third-party pool participants employed the Company's services as a pool operator in exchange for a pool fee paid to the Company. As a private pool operator, the Company facilitated the contribution of hash rate by third-party pool participants who choose to join or leave the pool at will.

**Block rewards** - The inflow of bitcoin as a result of receiving a block reward meets the definition of revenue because it gives the miner economic benefits from rendering services or carrying out its mining activities. Therefore, the Company may account for the block reward as revenue.

The Company determined it should recognize block rewards it receives from successfully solving a block as revenue from a contract with a customer (i.e. BTC network or pool operators) under FASB ASC 606. The customers under each type of revenue (Participant vs. Private pool participants) are further noted below. All relevant facts and circumstances, including the network's protocols, were considered in determining (1) whether the Company has a contract with a customer under FASB ASC 606-10-25-2 and (2) whether its mining activities on the network meet all the criteria in FASB ASC 606-10-25-1.

Block rewards are the Company's most significant source of revenue. Block rewards included in revenues on the statements of operations were approximately $12.5 million and $50.8 million, respectively for the three months ended September 30, 2022, and September 30, 2021. Block rewards included in revenues on the statements of operations were approximately $88.1 and $85.6 million for the nine months ended September 30, 2022 and September 30, 2021.

**Transaction Fees** - The transaction fees are specified in each transaction request and paid by the requester to the miner in exchange for the successful processing of the transaction. The requester meets the definition of a customer in FASB ASC 606 and pursuant to AICPA Practice Guide "Accounting for and Auditing Digital Assets" because it has contracted with the miner to obtain a service (successful mining) that is an output of the miner's ordinary activities in exchange for consideration.

Transaction fees included in revenues on the statements of operations were approximately $0.2 million and $0.9 million, for the three months ended September 30, 2022 and September 30, 2021, respectively. Transaction fees included in revenues on the statements of operations were approximately $1.2 million and $4.6 million for the nine months ended September 30, 2022 and September 30, 2021, respectively.

**Pool Fees** - Pool fees earned by the Company as an operator of a private pool are recognized as revenue from contracts with customers in accordance with FASB ASC 606.

Pool fees included in revenues on the statements of operations were approximately zero and $0.05 million, respectively for the three months ended September 30, 2022 and September 30, 2021. Pool fees included in revenues on the statements of operations were approximately $0.3 million and $0.05 million, respectively for the nine months ended September 30, 2022 and September 30, 2021. As of May 2022, third party miners were no longer participating in the Company's mining pool. As such, the Company ceased recognizing pool fees.

**066**

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

The Company earns revenues as:

- a participant in a third-party operated mining pool ("Participant")
- a participant in a privately operated mining pool ("Private pool participant")
- the operator of a private pool ("Operator")

*Participant*

The Company has entered into contracts with third-party mining pool operators, whom the Company considers its customer under FASB ASC 606. The Company provides a service of computing power (i.e., generated hash rate) that is an output of the Company's ordinary activities in exchange for consideration. These contracts are terminable at any time by either party and the Company's enforceable right to compensation only begins when the Company provides computing power to the mining pool operator. In exchange for providing computing power, the Company is entitled to consideration equal to a fractional share of the BTC reward (non-cash consideration, less any pool fees paid to the mining pool operator which are recorded as contra-revenues), for successfully adding a block to the blockchain. The Company's fractional share of the block reward is based on the proportion of the Company's contributed hash rate to the total computing power contributed by all mining pool participants in solving the current algorithm as calculated and determined by the pool operator, net of any pool fees.

The provision of computing power is the only performance obligation under our arrangements with the third-party mining pool operators. The transaction consideration the Company receives, is non-cash and variable in that the amount that it receives is dependent on the success of the mining pool regardless of whether any hash rate is contributed by the Company (the pool being the first to solve an algorithm). The non-cash consideration is measured at the estimated fair value of the contract inception. However, because it is not probable that a significant reversal of revenue will not occur, as the Company does not have visibility to exactly when a block is won and the pro rata share to which it is entitled (as it does when the Company is a participant in a privately operated pool where the Company is also the pool operator) all consideration is constrained until the Company receives confirmation of the consideration it earned, usually via the settlement of the block reward in the Company's digital wallet, at which time revenue is recognized. The Company measures the non-cash consideration at the fair value on the date the block reward is received in the Company's digital wallet when the contingency constraint on the transaction consideration is resolved, which is not materially different than the fair value at contract inception or the time the Company has earned the awards from the third-party mining pools. There is no significant financing component in these transactions.

Fair value of the digital asset award received is determined using the daily closing U.S. dollar spot rate of the related digital currency on the date received, which is not materially different than the fair value at contract inception.

Expenses associated with running the digital currency mining business, such as rent and electricity cost are recorded as cost of revenues. Depreciation on digital currency mining equipment is also recorded as a component of cost of revenues.

*Private pool participant*

The Company operates as a participant in its privately operated pool ("Marapool"). From September 2021 until May 2022, the Company operated as a participant in Marapool alongside third-party pool participants. The Company views the transaction requestor and the blockchain network as its customers under FASB ASC 606. The Company provides a service (successful mining) that is an output of the Company's ordinary activities in exchange for consideration from the requester and the blockchain network (transaction fee and block reward, respectively). A contract with a customer exists at the point when the miner successfully validates a requesting customer's transaction to the distributed ledger. At this point, the performance obligation has been satisfied (i.e., earned) in accordance with FASB ASC 606-10-25-30. Specifically, the inception of the contract and the point in time at which the consideration in that same contract is earned occurs simultaneously. Because of this, the additional criteria in FASB ASC 606-10-25-1 would be met as follows:

- Both the requester (a customer) and the miner have approved the contract and are committed to the transaction at the point of successfully validating and adding the transaction to the distributed ledger.
- Each party's rights, the consideration to be transferred, and the payment terms are clear.
- The transaction has commercial substance (that is, the risk, timing, or amount of the miner's future cash flows is expected to change as a result of the contract).
- Collection occurs in conjunction with the inception of the contract and the fulfillment of the performance obligation (i.e. successfully solving a block) and therefore, there is no risk of collectability.

By successfully mining a block, the miner satisfies its performance obligation to the requester and network, thus, should recognize revenue at that point in time, which is the same point in time as contract inception. The transaction consideration the Company receives, is non-cash consideration paid in BTC, and is comprised of transaction fees and block rewards. The transaction consideration is variable in that the amount of block reward earned is based on the pro rata share of the computing power the Company contributes in relation to the total computing power contributed by the pool. The non-cash consideration is measured at its estimated fair value at contract inception - that is, the date that the criteria in FASB ASC 606-10-25-1 are met. The Company is able to apply an estimate to the variable transaction consideration without risk of significant revenue reversal as the Company has visibility to the computing power it provides for a given transaction, and the exact timing of when its privately operated pool successfully solves for a block (as compared to when the Company is a participant in a third-party operated pool as discussed above). As the Company can estimate its pro rata share of block rewards and transaction fees prior to the receipt of the rewards in their digital wallet, the Company measures the non-cash consideration at the fair value when block reward and transaction fee are earned, which is the same point in time as contract inception.

13

**067**

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**

Fair value of the digital asset award received is determined using the daily closing U.S. dollar spot rate of the related digital currency on the date the block reward and transaction fees are earned, which is not materially different than the fair value at contract inception, or the time the Company has earned the award from the requester and network. There is no significant financing component in these transactions.

Expenses associated with running the digital currency mining business, such as rent and electricity cost are recorded as cost of revenues. Depreciation on digital currency mining equipment is also recorded as a component of cost of revenues.

*Operator*

From September 2021 until May 2022, the Company entered into pool service contracts with third-party mining pool participants, whom the Company considered to be a customer under FASB ASC 606. In these contracts, the Company provided a facilitator service to connect miners to the blockchain network and to track hash rate generated by each pool participant in exchange for non-cash consideration equal to a percentage of the block reward and transaction fee earned by the individual pool participants as pool fees. These contracts were terminable at any time by either party and the Company's enforceable right to compensation only began when the Company provided the facilitator services and access to the pool's software licenses to the pool participants.

The Company's performance obligations under the arrangement with third-party pool participants were to provide access to the pool's software license and track the hash rate generated by each pool participant to enable calculation of the pro rata block reward and transaction fee payment to each pool participant. The transaction consideration the Company received is non-cash and variable in that the pool fees earned is based on the block reward and transaction fees earned by pool participants. The non-cash consideration is measured at the estimated fair value of the contract inception, which occurs simultaneously to when the Company has earned the pool fees (i.e., upon successful mining of a block). The Company is able to estimate variable consideration at the point in time it has earned the fees without risk of significant revenue reversal as the Company has visibility to the exact timing of when the pool successfully solves for a block as pool operator (as compared to when the Company is a participant in a third-party operated pool) and the block rewards and transaction fees each pool participant is entitled to base on contributed hash rate. As the Company can estimate the amount of pool fees prior to the receipt of the fees in the pool's digital wallet, the Company measures the non-cash consideration at the fair value on the date the pool fees are earned (using the stated convention below), which occurs simultaneously to contract inception.

Fair value of the digital asset award received is determined using the daily closing U.S. dollar spot rate of the related digital currency on the date the pool fees are earned, which is not materially different than the fair value at contract inception which occurs simultaneously to the time the pool participants have earned the award from the requester and network. There is no significant financing component in these transactions.

Fees associated with the licensed software used in the operation of the private pool are recorded as cost of revenues.

**NOTE 4 – ADVANCES TO VENDORS AND DEPOSITS**

The Company contracts with bitcoin mining equipment manufacturers in procuring equipment necessary for the operation of its bitcoin mining operations. A typical agreement calls for a certain percentage of the total order to be paid in advance at specific intervals, usually within several days of execution of a specific contract and periodically thereafter with final payments due prior to each shipment date. We account for these payments as Advances to vendors on the balance sheet.

As of September 30, 2022 and December 31, 2021, such advances totaled approximately $687.8 million and $466.3 million, respectively.

In addition, the Company contracts with other service providers for hosting of its equipment and operational support in data centers where the company's equipment is deployed. These arrangements also call for advance payments to be made to vendors in conjunction with the contractual obligations associated with these services. We classify these payments as Deposits on the balance sheet.

068