# EXHIBIT M

**MUEHLBAUER LAW OFFICE, LTD.**
ANDREW R. MUEHLBAUER
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104 Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141 Email:  andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
 Jonathan D. Park (*pro hac vice* application forthcoming)  600
Third Avenue, 20th Floor
New York, New York 10016 Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com ahood@pomlaw.com
        jpark@pomlaw.com

*Attorneys for Co-Lead Plaintiffs Todd Langer,*
*Mary Barida, and Jacks Way LLC*

[additional counsel on signature page]

### UNITED STATES DISTRICT COURT DISTRICT OF NEVADA

| | |
|---|---|
| TODD LANGER, MARY BARIDA, AND JACKS WAY LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MARATHON DIGITAL HOLDINGS, INC., MERRICK OKAMOTO, FREDERICK G. THIEL, SIMEON SALZMAN, and HUGH J. GALLAGHER, <br><br> Defendants. | Case No. 2:23-cv-00470-RFB-DJA <br><br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br><br> **JURY TRIAL DEMANDED** |

**100**

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ...........................................................................1

II.     ~~JURISDICTION AND VENUE~~                    ~~4~~**JURISDICTION AND VENUE6**

III.    ~~PARTIES~~                                    ~~4~~**PARTIES6**

        A.      ~~Plaintiffs~~                                  ~~4~~**Plaintiffs6**

        B.      ~~Defendants~~                                  ~~5~~**Defendants7**

IV.     ~~SUBSTANTIVE ALLEGATIONS~~              ~~7~~**SUBSTANTIVE ALLEGATIONS9**

        A.      ~~Background of Marathon~~                  ~~7~~**Background of Marathon9**

        B.      ~~Bitcoin and Bitcoin Mining~~              ~~8~~**Bitcoin and Bitcoin Mining10**

        C.      ~~Bitcoin Trading~~                          ~~10~~**Bitcoin Trading12**

        D.      ~~Management is Responsible for Compliance with Accounting Standards.10~~**Management is Responsible for Compliance with Accounting Standards.**                 **12**

        E.      ~~Accounting Standards for Reporting Impairment of Bitcoin Assets.12~~**Standards for Restatements of Financial Statements**                **14**

        F.      ~~Marathon's Valuation of Its Bitcoin Assets.14~~**Accounting Standards for Reporting Impairment of Bitcoin Assets**                **15**

        G.      ~~The Company's Bitcoin Mining Pool: MaraPool16~~**Marathon's Valuation of Its Bitcoin Assets.  18**

        H.      ~~The Company Reveals Certain Material Weaknesses In Its Financial Reporting While Concealing Others 19~~**The Company's Bitcoin Mining Pool: Marapool**                **22**

        **I.      The Company Reveals One Material Weakness in Its Financial Reporting, While Concealing Others                 25**

        **J.      The SEC Warns Defendants on Multiple Occasions That They Were Violating GAAP.                 26**

                **i.      Impairment of Bitcoin Holdings                 26**

                **ii.      Accounting for Marapool                 30**

        ~~I~~**K**.      The Company Reveals That It Received ~~an~~ SEC ~~Comment Letter~~**Comments** Concerning ~~the Company's~~**its** Accounting Policies, **Announces** That ~~It Could Not Timely File~~ its **Form** 10-K **Will Be Late**, and Cancels Its Scheduled Earnings Call ...........................~~20~~**34**

        ~~J~~**L**.      ~~The Company Issues the Restatement22~~**The Company Restates Nearly Two Years of Financial Statements 36**

        **M.      Defendants Gallagher and Salzman Leave the Company in Short Order      41**

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...............................................~~24~~**42**

        A.      ~~Materially False and Misleading Assurances Regarding the Company's Internal Controls over Financial Reporting      24~~**Materially False and Misleading Statements Regarding the Company's Disclosure Controls and Internal Controls over Financial Reporting      42**

**101**

B.      Materially False and Misleading ~~Reports~~**Statements** Regarding Impairment of Bitcoin Assets Accounted for in Violation of GAAP. .......................... ~~26~~**47**

C.      Materially False and Misleading ~~Reports of Cost of~~**Statements of Costs of Revenue and** Revenues Accounted for in Violation of GAAP ...................... ~~34~~**57**

**VI.**    ~~LOSS CAUSATION~~ ....................... ~~34~~**LOSS CAUSATION 58**

**VII.**   ~~THE RESTATEMENT~~ ....................... ~~37~~**ADDITIONAL ALLEGATIONS CONCERNING SCIENTER 61**

**VIII.** ~~DEFENDANT GALLAGHER ABRUPTLY LEAVES THE COMPANY~~ ....................... ~~39~~

      ~~IX~~**A**.  ~~ADDITIONAL ALLEGATIONS CONCERNING SCIENTER~~ ....................... ~~40~~**Defendants Did Not Do What They Explicitly Told Investors. 61**

      ~~A~~**B**.  The ~~2021 10-K Explicitly Acknowledged A Requirement that~~**SEC Criticized the Company's Accounting Methods, and** Defendants ~~Violated.~~**Acknowledged during the Class Period That the Company's Methods Were Improper** ....................... ~~40~~**62**

      B.  ~~Defendants Violated Clear and Long-Standing Accounting Rules.~~ ....................... ~~40~~

      C.  ~~Defendants Have Never Fully Disclosed the Comment Letter or Previously Hidden SEC Comments Received During 2022.~~ ~~42~~**Defendants Thiel, Salzman, and Gallagher Signed and Certified the Company's SEC Filings 63**

      D.  ~~Defendant Gallagher's Abrupt Departure.~~ ~~43~~**During the Class Period, the Company's Auditor Explicitly Acknowledged the Proper Method to Determine the Impairment of Bitcoin 64**

      E.  ~~Insider Stock Sales.~~ ~~44~~**Defendants Violated Clear and Long-Standing Accounting Rules. 65**

      **F.**  **Defendants' GAAP Violations Concerned the Company's Core Operations, Which Were Handled By A Remarkably Small Number of People. 69**

      **G.**  **Defendants Did Not Disclose the Company's Extensive Correspondence with the SEC Until Over a Year After the Class Period Ended. 71**

      **H.**  **Impairment of the Company's Bitcoin Holdings Was Specifically Addressed During Earnings Calls 72**

      ~~XI~~**I**.  ~~CLASS ACTION ALLEGATIONS~~ ....................... ~~44~~**Defendant Okamoto 74**

      ~~XII~~**J**.  ~~PRESUMPTION OF RELIANCE~~ ....................... ~~46~~**Defendant Thiel 76**

      **K.**  **Defendant Salzman** ....................... **78**

      **L.**  **Defendant Gallagher** ....................... **79**

**VIII.** **CLASS ACTION ALLEGATIONS** ....................... **83**

**IX.**   **PRESUMPTION OF RELIANCE** ....................... **85**

~~XII~~**X**.  INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................... ~~47~~**86**

~~XIII~~**XI**. ....................... ~~COUNTS~~ ~~48~~**COUNTS 86**

**102**

COUNT I .................................................................................................................. 48COUNT I    86

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the 10(b) Defendants) .................................................. 48(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the 10(b) Defendants)    86

COUNT II .................................................................................................................. 51COUNT II90

(Violations of Section 20(a) of the Exchange Act Against the 20(a) Defendants)51(Violations of Section 20(a) of the Exchange Act Against the 20(a) Defendants) .................................................. 90

PRAYER FOR RELIEF .................................................................................... 52PRAYER FOR RELIEF92

DEMAND FOR TRIAL BY JURY .................................... 53DEMAND FOR TRIAL BY JURY92

Court-appointed Co-Lead Plaintiffs Todd Langer, Mary Barida, and Jacks Way LLC ("Plaintiffs"),[1] individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, alleges**allege** the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.**US**") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marathon Digital Holdings, Inc. ("Marathon" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet, as well as the investigation directed by Plaintiffs' counsel. Plaintiffs **obtainable on the Internet. Plaintiffs** believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[2]

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants**Defendants**[3] that purchased or otherwise acquired Marathon's publicly traded common stock between May 10, 2021 and February 28, 2023, both dates inclusive (the "Class Period"), seeking**. This action seeks** to recover damages caused by Defendants' violations of the federal**Sections 10(b) and** securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its current and former executive officers.

**103**

[1] Mary Barida pursues these claims both on her own behalf (and on behalf of the Class) as well as on behalf of her husband, Peter J. Wuebbolt, from whom she has received a valid assignment of claims. *See* ECF No. 16-2.

[2] **Unless otherwise noted, all emphases are added.**

[3] **Defendants are: Marathon; Merrick Okamoto, the Company's former Chief Executive Officer ("CEO") and Executive Chairman; Frederick G. Thiel, who succeeded Okamoto as CEO; Simeon Salzman, the Company's former Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO"); and Hugh J. Gallagher, who succeeded Salzman as CFO. On August 29, 2024, after the Class Period and the filing of this action, Marathon changed its name to "MARA Holdings, Inc."**

**20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, by the Company and certain of its current and former executive officers.**

2.	Marathon is a digital asset technology company that is principally engaged in producing or "mining" digital assets with a focus on the Bitcoin ecosystem. Bitcoin (or "BTC") **is** ~~is~~ a cryptocurrency that was introduced in 2009 and is designed to act as money and a form of payment outside the control of any one person, group, or entity. Unlike fiat currency, bitcoin is created, distributed, traded, and stored using a decentralized ledger system known as a blockchain.~~2~~ "Mining" bitcoin involves devoting significant computing power to "solving" the next block in the Bitcoin blockchain and thus obtaining the resulting new bitcoin. ~~The Company also operated~~

3.	**During the Class Period, the Company's business consisted of mining and holding bitcoin as a long-term investment, as well as operating a bitcoin mining pool that, for a portion of** ~~a~~**the Class Period, was open to third parties. In this** mining pool ~~where~~**, called "Marapool",** the Company's computing power and that of unrelated third parties were combined in ~~this~~**an** effort **to mine bitcoin**, with any ~~mined bitcoins~~**resulting bitcoin** allocated to participating miners according to their contribution of mining power.

3.	~~During the Class Period, the Company's strategic initiatives primarily focused on mining and holding bitcoin as a long-term investment. Each quarter, the Company reported its~~
4.	**Each quarter, the Company reported the book value of its** bitcoin holdings as well as ~~its~~**revenue and cost of** revenue from ~~its~~**that** bitcoin mining pool, while assuring investors that **it had** ~~it had~~appropriate internal controls over financial reporting. ~~Nevertheless~~**In doing so**, the Company ~~repeatedly~~**violated mandatory accounting rules. Further, unbeknownst to investors, the SEC sent numerous letters to Defendant Hugh Gallagher, the Company's CFO during the latter part of the Class Period,**

**104**

**criticizing the Company's accounting methods. this correspondence, which was not made public until over a year after the Class Period, the SEC made clear that the Company as improperly reporting the book value of its bitcoin holdings, and the Company concluded that it was improperly accounting for revenue and cost of revenue from Marapool. However, Defendants did not change the Company's accounting methods in its Class Period financial statements, and did not alert investors until February 28, 2023 that its accounting methods were improper. Defendants chose not to make the Company's correspondence with the SEC public until July 16, 2024—over fifteen months after the end of the Class Period.**

**5. Long after this undisclosed correspondence began, Defendants revealed to investors, beginning on February 28, 2023, that the Company had repeatedly** violated accounting rules concerning **(1) impairment of** its bitcoin assets and **(2)** its Bitcoin mining pool, leading it to restate nearly *two years* of financial results ~~after receiving an unspecified number of comment~~.

**6. During the Class Period, applicable accounting rules provided that if the trading price of any bitcoin acquired by the Company declined below the carrying value of that bitcoin, the Company had to mark down the value of the bitcoin and record as an impairment the difference between the carrying value of each bitcoin and its fair value, which was required to reflect the lowest price *at any time* since then. Defendants explicitly told investors that they followed this** ~~letters, including one on February 22, 2013, from the SEC.  The SEC raised questions about a~~ **rule, stating that the Company**

> **determines the fair value of its bitcoin based on quoted (unadjusted) prices on the active exchange that Marathon has determined is its principal market for bitcoin. *Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.***

**7. This was false: the Company did *not* account for its bitcoin in this manner. Rather, the Company chose an arbitrary daily cut-off time and used the trading price of bitcoin at *that* time to determine whether and in what amount its bitcoin was impaired. Defendants did not begin to disclose to investors that they violated accounting rules by using a "cutoff time" until February 28, 2023.**

**8. Moreover, Defendants did not disclose to investors until over a year after the Class Period ended that the SEC, beginning April 8, 2022, criticized the Company's use of a daily "cutoff time" to determine the impairment of its bitcoin holdings. Neither did they disclose that on June**

**105**

**24, 2022, the SEC explicitly stated that "*[y]our policy of utilizing a standardized time on a daily basis to assess for impairment does not appear to comply with ASC 350-30-35-18* that indicates intangible assets should be tested for impairment at any time events or changes in circumstances indicate that it is more likely than not that the asset is impaired. *Please revise your accounting to comply with ASC 350.*"**

**9.     The Company also improperly accounted for Marapool, the Bitcoin mining pool that the Company accounted operated and which was open to third-party participants during the Class Period. Even though the Company (1) controlled the pool, (2) controlled access to the pool's software license, (3) delegated work to participants, (4) controlled the transaction verification services, and (5) owned and controlled the digital wallet for the pool, Defendants treated the Company as an "agent" rather than the "principal" with respect to the pool. On this basis, the Company materially understated, among other things, its cost of revenues. For instance, the Company understated its cost of revenue by *25.8%* for fiscal year 2021.**

**10.     During the Class Period, Defendants did not disclose that the SEC, beginning on April 8, 2022, raised questions about the Company's accounting for Marapool. Nor did they disclose that, in response to the SEC's inquiries, the Company stated on June 13, 2022, that it "has concluded that it is a *principal* under ASC 606," rather than an agent, contrary to Defendants'** ~~number of~~**representations to investors and to** the Company's accounting practices~~, including one rule that the Company's own~~ **during the Class Period.**

~~auditor publicly acknowledged required a different method several months before the Company conceded that it had violated accounting rules.~~

---

~~² In this Amended Complaint, "Bitcoin" — with a capitalized first letter — is used to refer to the protocol, software, and community, and "bitcoin" — with a lower-case first letter — is used to refer to units of the currency.~~

~~4~~**11**.     On February 28, 2023, Marathon cancelled its webcast and earnings call concerning its fiscal year 2022 results with only four hours**'** notice. That same day, the Company disclosed receipt of ~~a~~**one comment** letter from the SEC relating to accounting errors in the Company's ~~previously issued~~ **previously issued financial statements, as well as an unspecified number of prior comment letters** ~~financial statements, as well as~~ ~~prior comments~~ from the SEC relating to the Company's **accounting practices.**

**106**

**Departing from its usual practice,**

accounting practices.  The**the** Company did not publicly file *any* of those comments**comment letters** from the SEC **until years later**.

The Company**Defendants** told investors that the "statements contained in the Company's Annual Report on **Form** Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited **condensed** condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 . . . *should no longer be relied upon*" and would be restated.[3][4]

5**12**.    On this news, Marathon's stock price fell $0.59 per share, or *8.31%*, to close at $6.51 per share on March 1, 2023**, and continued falling over the next several trading days**.

6**13**.    Two weeks later, the Company issued a restatement, revealing that its financial condition—and internal controls—were materially different than it had told investors during the Class Period, including with respect to the value of its bitcoin holdings and the cost of its revenues**,** **and conceding that the financial statements issued during the Class Period contained errors and material misstatements**.

7**14**.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities**common stock**, Plaintiffs and other Class members have suffered significant losses and damages.

---

[3][4]  The Company referred to these periodic reports as the "Impacted Financial Statements," and that term is used herein at times.

**107**

## II.    JURISDICTION AND VENUE

815.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

916.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

1017.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act .C. § 78aa) and 28 U.S.C. § 1391(b). Marathon is incorporated in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

1118.    In connection with the acts alleged in this complaint**Complaint**, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

1219.    Co-Lead Plaintiff Todd Langer, as set forth in the previously-filed Certification (ECF No. 16-5), acquired Marathon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

1320.    Co-Lead Plaintiff Mary Barida and her assignee, as set forth in the previously-filed Certification (ECF No. 16-5), acquired Marathon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

1421.    Co-Lead Plaintiff Jacks Way LLC, as set forth in the previously-filed Certification (ECF No. 16-5), acquired Marathon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B.    Defendants

1522.    Defendant Marathon is a Nevada corporation with principal executive offices located at 101 NE Third Avenue, Suite 1200, Fort Lauderdale, Florida 33301. The Company's headquarters were formerly located at 1180 North Town Center Drive, Suite 100, Las Vegas,

**108**

Nevada 89144. The Company has stated that it moved its headquarters to Fort Lauderdale in 2022.

During the Class Period, Marathon's common stock and redeemable warrants traded on The Nasdaq Capital Market ("Nasdaq") under the ticker symbol "MARA".

~~16~~**23**.   Defendant Merrick Okamoto ("Okamoto") served as the Company's ~~Chief~~**CEO and** ~~Executive Officer ("CEO") and Executive Chairman of the Board from prior to the start of the~~ **Executive Chairman of the Board from prior to the start of the** Class Period until April 2021. Defendant Okamoto joined the Company's Board in April 2017, was appointed the interim CEO effective January 1, 2018, and was hired as the Company's permanent CEO and Executive Chairman in October 2018. After stepping down as CEO in April 2021, Defendant Okamoto remained as Executive Chairman until the end of 2021.

~~17~~**24**.   Defendant Frederick G. Thiel ("Thiel") has served as the Company's CEO since April 2021 and as its Executive Chairman since January 2022, replacing Defendant Okamoto in both roles. Prior to joining the Company, from June 2017 through 2020, Defendant Thiel was the Chairman of SPROCKET, INC., a Blockchain/Cryptocurrency technology and financial services company.

~~18~~**25**.   Defendant Simeon Salzman ("Salzman") served as the Company's ~~Chief Financial~~**CFO from** ~~Officer ("CFO") from October 2020 until March 2022, when he became the Company's Chief~~ **October 2020 until March 31, 2022, and then as the Company's CAO until November 21, 2022. Salzman served as Vice President – Finance from that date until leaving the Company on April 1,** ~~Accounting Officer ("CAO"). Defendant Salzman served as CAO until~~**2023.** Defendant Salzman is a Certified Public Accountant and served as the CFO of several other companies prior to joining Marathon.

~~19~~**26**.   Defendant Hugh J. Gallagher ("Gallagher") ~~has~~served as the Company's CFO ~~since~~ **beginning on** March 31, 2022, when he replaced Defendant Salzman in that position. **On March 27, 2023, he gave notice to the Company that he would depart in May 2023, and he subsequently did so.** Prior to joining the Company, Defendant Gallagher had over thirty years of experience in treasury, accounting, financial reporting, and financial planning roles, including serving as vice

**109**

president **of** finance and
CFO of AmeriGas Propane from 2013 to 2018, treasurer (2011-2014) and

director of investor
relations and treasury (2007-2011) at UGI Corporation; and director of

financial planning (~~2000~~ **2000-2004**~~2004~~) at AmeriGas Propane. Defendant Gallagher is a Certified Public

Accountant.

~~20~~**27**.  Defendants Marathon, Thiel, Salzman, and Gallagher are sometimes referred to

herein as the "10(b) Defendants." Defendants Okamoto, Thiel, Salzman, and Gallagher are sometimes referred to herein as the

"20(a) Defendants."

~~21~~**28**.  The 20(a) Defendants possessed the power and authority to control the contents of Marathon's SEC filings,

press releases, and other market communications. The 20(a) Defendants were provided with copies of Marathon's SEC

filings and press releases alleged herein to be

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

their issuance or to cause them to be corrected. Because of their positions with Marathon, and their access to material

information available to them but not to the public, the 20(a) Defendants **knew**

~~knew~~ that the adverse facts specified herein had not been disclosed to and were being concealed **from**
~~from~~ the public, and that the positive representations being made were then materially false and

misleading. The 20(a) Defendants are liable for the false statements and omissions pleaded herein.

~~22~~**29**.  The 10(b) Defendants and the 20(a) Defendants are collectively referred to herein

as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background of Marathon

~~23~~**30**.  Marathon is a digital asset technology company that is principally engaged in

producing or "mining" digital assets with a focus on the Bitcoin ecosystem. Marathon was

first incorporated in the State of Nevada in 2010 under the name Verve Ventures, Inc. The

following year, it changed its name to American Strategic Minerals Corporation. At that time, the

Company was engaged in exploration and potential development of uranium and vanadium

**110**

minerals ~~business~~. In June 2012, the Company discontinued its minerals business and began to invest in real estate properties in Southern California. Only four months later, in October 2012, the Company discontinued its real estate business and began focusing on IP licensing operations, at which time the Company's name was changed to Marathon Patent Group, Inc.

~~24~~**31**. Then, on November 1, 2017—after Defendant Okamoto joined the Company's Board—the Company entered into a merger agreement with Global Bit Ventures, Inc. ("GBV"), a company that was focused on mining digital assets. The Company later began purchasing its own cryptocurrency mining machines and established a data center in Canada to mine digital assets. The Company told investors that it intended to add GBV's existing technical capabilities and digital asset miners and expand its activities in the mining of new digital assets, while at the same time harvesting the value of its remaining IP assets. In June 2018, however, the Company disclosed that its board of directors ("Board") had decided not to pursue the merger agreement with GBV. The Company paid GBV a termination fee of 750,000 shares of common stock valued at $2.85 million. ~~Since~~**Nevertheless, since** that time, the Company has focused on mining and holding cryptocurrency, in particular Bitcoin.

### B.    Bitcoin and Bitcoin Mining

~~25~~**32**. Bitcoin is a cryptocurrency that was introduced in 2009 and is designed to act as money and a form of payment outside the control of any one person, group, or entity. Unlike fiat currency, bitcoin is created, distributed, traded, and stored using a decentralized ledger system known as a blockchain. A distributed ledger is a shared database of information, stored on many computers rather than on a centralized server, that is chained together via cryptographic techniques.

~~26~~**33**. Bitcoin mining is the process by which transactions are officially entered on the blockchain. It is also the way new bitcoins are launched into circulation. Bitcoin mining is the computational work that network nodes undertake to validate the information contained in blocks. Mining is conducted by miners using hardware and software to generate a cryptographic number that is equal to or less than a number set by the Bitcoin network's difficulty algorithm.

**111**

2734.   The first miner to find the solution to the problem receives bitcoins as a reward, and the process begins again. This reward is an incentive that motivates miners to assist in the primary purpose of mining: to earn the right to record transactions on the blockchain for the network to verify and confirm. In essence, Bitcoin miners are paid for their work as auditors: they conduct the first verification of Bitcoin transactions.

2835.   The rewards for mining bitcoin are cut in half every four years. When first mined in 2009, one block would earn you 50 BTC. In 2012, this was halved to 25 BTC. By 2016, this was halved again to 12.5 BTC. On May 11, 2020, the reward was halved again to 6.25 BTC. The reward was halved again in April 2024 to 3.125 BTC.

**36.     Bitcoin prices have, since introduced, risen exponentially, due in part to the halving**
29.    Due to the halving process and increasing (if volatile) prices of Bitcoin, miners want to receive as many bitcoins as possible because the supply of new coins is slowly dwindling. Sometime around 2140, there will be no more new bitcoins created.
**process and because the supply of new coins is finite. It has been estimated the supply of bitcoins will run out sometime around 2140. Thus, miners want to receive as many bitcoins as possible, as quickly as possible.**

3037.   When the Bitcoin blockchain was first released, it was possible to mine it competitively on a personal computer. However, as it became more popular, more miners joined the network, which lowered the chances of being the one to solve the hash.[45] As a cryptocurrency like Bitcoin becomes more popular, the number of computers participating in this peer-to-peer validation network increases. With more participants and more computing power, the so **so-called** called "hashpower" of the entire network increases accordingly. This is also referred to as the mining difficulty or difficulty.

3138.   Mining difficulty in the Bitcoin network is adjusted automatically after 2,016 blocks have been mined in the network. An adjustment of difficulty upwards or downwards depends on the number of participants in the mining network and their combined hashpower. **Thus,** Thus, over time, greater processing (or "hashing") power has become necessary for one to have a reasonable chance of receiving a reward for mining.

32.    For that reason, Bitcoin mining has moved on from using personal computers and is now done largely on specialized application-specific integrated circuits ("ASICs") that are usually optimized for a specific digital currency, such as Bitcoin or another cryptocurrency. The

**112**

~~majority of the Bitcoin network mining capacity is now owned by large mining firms, such as~~

---

~~4~~ **5**   In computer science, a hash is a function that converts one value to another.  Hashes are used to secure information. In the case of cryptocurrency, they are used to ensure data contained in the blocks on a blockchain are not altered. The information encrypted by a hashing function is validated by network participants when they attempt to generate a hash less than the network target. Once the target hash is reached, the network closes the block— consensus is reached after the block closes because the network continues to validate transactions and block information after the hash solution is found.

**39.    For that reason, Bitcoin mining has moved on from using personal computers and is now done largely on specialized application-specific integrated circuits ("ASICs") that are usually optimized for a specific digital currency, such as Bitcoin or another cryptocurrency. The majority of the Bitcoin network mining capacity is now owned by large mining firms, such as** Marathon, as well as mining pools, where miners combine their hashing power in order to secure new Bitcoin. For instance, Marathon reported at the beginning of the Class Period that its "active mining fleet" comprised approximately 12,084 miners, all of which were ASIC machines. At that time, Marathon reported that this mining fleet generated approximately 1.29 EH/s, or exahashes per second. (One exahash is equal to one quintillion hashes.)

### C.    Bitcoin Trading

~~33~~**40**.    Bitcoin is generally traded on a ~~Bitcoin~~**bitcoin** exchange, which is a digital marketplace that serves as an intermediary between buyers and sellers of bitcoin, similar to a stock exchange. Some Bitcoin exchanges are decentralized, meaning they are operated without a central authority. These exchanges allow peer-to-peer trading of bitcoin without an exchange authority to facilitate the transactions.

~~34~~**41**.    Unlike a stock exchange, ~~Bitcoin~~**bitcoin** trading is not limited to market hours. Bitcoin trades twenty-four hours a day. As a result, the value of bitcoin can change constantly, not just during regular stock exchange hours. There is no "closing" price or "opening" price.

### D.    Management is Responsible for Compliance with Accounting Standards.

~~35~~**42**.    As a publicly traded ~~U.S.~~ company, Marathon must comply with ~~U.S.~~**US** Generally **Accepted** ~~Accepted~~ Accounting Principles ("GAAP" or "US GAAP"). GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures ~~necessary to~~**defining accepted accounting**

**113**

~~define accepted accounting~~ practice at a particular time. ~~GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional~~

**43.    The SEC has the statutory authority for the promulgation of GAAP for public** ~~association, through three successor groups that it established, the Committee on Accounting~~ **companies. Since 1973, the SEC has entrusted the maintenance of GAAP to the Financial**

~~Procedure, the~~ Accounting ~~Principles~~**Standards** Board (~~the~~ "~~APB~~**FASB**"), ~~and the Financial Accounting Standards~~**which periodically updates or revises GAAP in light of** ~~Board (the "FASB").~~ **new accounting and legal developments. The SEC Rules and interpretive releases and the FASB**

~~36.    In 2009, FASB issued the FASB~~ Accounting Standards Codification ("ASC") ~~which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards~~**represent sources of authoritative GAAP for SEC**

**registrants**.

**44.**    ASC is a systematic framework used in the United States to organize and present ~~accounting standards and principles, and the SEC has designated FASB as the organization responsible for setting accounting standards for public companies~~ in the United States. ASC is "the source of

accounting standards and principles. ASC is "the source of authoritative [GAAP] recognized by

the FASB to be applied by nongovernmental entities." (ASC,
Topic 105, Sub-topic 10, § 5, ¶ 1.)

~~37~~**45**.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements

filed with the SEC which are not prepared in compliance with GAAP are presumed to be
 misleading and inaccurate**, despite footnote or other disclosures, unless the SEC has otherwise provided**. Regulation S-X requires that interim financial statements must also
 comply with GAAP, with the exception that interim financial statements need not include disclosures that would be

duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

~~38.    Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by AICPA states in pertinent part:~~
~~The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.~~

~~1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).~~
~~39~~**46**.    Section 13 of the Exchange Act confirms management's responsibilities for an

entity's internal controls:

Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is

**114**

required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . .

(15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

**Additionally, SEC regulations (17 C.F.R. § 229.601(b)(31)) obligate CEOs and CFOs of public reporting companies like Marathon to certify in annual reports on Form 10-K, and quarterly reports on Form 10-Q, that they (i) have reviewed the applicable annual or quarterly report, and it does not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," (ii) "are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," and (iii) have . . . [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendant Thiel certified all of the Class Period Reports (defined below in footnote 8) in this manner, and Defendants Salzman and Gallagher each certified the Class Period Reports that were issued when they served as CFO.**

**E.      Standards for Restatements of Financial Statements**

**47.      GAAP requires any error in the financial statements of a prior period discovered after the financial statements are issued to be reported as an error correction by restating the prior-period financial statements and providing a description of the nature of the error and its effect on the financial statements. ASC 250-10-45-23 and ASC 250-10-50-7.**

**48.      ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is *not* generally accepted to one that *is* generally accepted *is a correction of an error*." ASC 250-10-20 – Glossary.**

**49.      The SEC Staff Accounting Bulletins No. 99, Materiality, and No. 108, Quantifying Financial Statement Misstatements, ("SAB 99" and "SAB 108") are the primary source of guidance in assessing materiality of financial statement misstatements.**

**115**

**50.      Because GAAP does not apply to immaterial items (ASC 105-10-05-6), a restatement is required *only* for items deemed to be material.**

**E F.     Accounting Standards for Reporting Impairment of Bitcoin Assets.**

40**51**.    The FASB ASC Master Glossary defines intangible assets as assets (not including financial assets) that lack physical substance. Accordingly, cryptocurrency assets such as Bitcoin meet the definition of intangible assets and are accounted for under FASB ASC 350, *Intangibles — Goodwill and Other*.

41**52**.    ASC 350-30-35-4 states that if no legal, regulatory, contractual, competitive, economic, or other factors limit the useful life of an intangible asset to the reporting entity, the useful life of the asset should be considered indefinite. Because there is no inherent limit imposed on the useful life of the crypto asset to the entity, then the crypto**cryptocurrency** asset would be classified as an **as an** indefinite-lived intangible asset.

**53.      During the Class Period, cryptocurrency assets such as bitcoin were subject to the accounting rules for indefinite-lived intangible assets in general. Approximately ten months after the Class Period ended, the FASB issued a new accounting rule specific to cryptocurrency assets. This Complaint addresses the rules that existed during the Class Period.**

42.    Therefore**54.    During the Class Period**, accounting and reporting that applies**applied** to crypto assets is**was** much more closely aligned to that of a brand or trademark than to that of cash (including foreign currency), a **currency), a** cash equivalent or a financial asset or instrument. This is because**,** without the endorsement of a government, crypto currencies do not qualify as legal tender. Through comment letters, in 2018, the SEC made its position clear that bitcoin (or ether) should not be treated as cash equivalents or equity, which companies account for based on fair market value.[5][6]

---

[5] *See, e.g.*, July 23, 2018 SEC comment letter to Blockchain Industries, Inc. (https://www.sec.gov/Archives/edgar/data/1084370/000000000018022481/filename1.pdf); August 21, 2018 SEC comment letter to BTCS Inc. (https://www.sec.gov/Archives/edgar/data/1436229/000000000018026066/filename1.pdf).

43**55**.    ASC 350-30 requires that indefinite-lived intangible assets not be amortized but assessed for impairment at least annually, and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired. An impairment is recorded when the carrying value of an intangible asset exceeds its fair value and the impairment

**116**

loss is equal to the excess amount. **Per ASC 350-30-35-20, impairments, once taken, are never reversed, even if the fair value of the crypto asset recovers during the same reporting period.**

~~44~~**56**.   ASC 820 addresses measurement of fair value. Under ASC 810-10-20, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

~~45~~**57**.   Under ASC 820-10-35-6, if there is a principal market for the asset or liability, the fair value measurement shall represent the price in that market (whether that price is directly observable or estimated using another valuation technique), even if the price in a different market is potentially more advantageous at the measurement date.  Per ASC 820-10-35-41, a quoted price in an active market provides the most reliable evidence of fair value and shall be used without adjustment to measure fair value whenever available. Because bitcoins are fungible, the trading price of bitcoin provides the most reliable evidence of fair value.

~~46~~**58**.   As a result, GAAP requires that if the trading price of bitcoin ~~*at any time* declines~~**held by a public** ~~below the price at which a company bought it, that is a circumstance indicating that the bitcoin~~ ~~asset is impaired and the Company is required to record an impairment reflecting the difference~~ **company *at any time* declines below the carrying value of that bitcoin (for instance, for newly-**

---

[6]   *See, e.g.*, **July 23, 2018 SEC comment letter to Blockchain Industries, Inc. (https://www.sec.gov/Archives/edgar/data/1084370/000000000018022481/filename1.pdf); August 21, 2018 SEC comment letter to BTCS Inc. (https://www.sec.gov/Archives/edgar/data/1436229/000000000018026066/filename1.pdf).**

**acquired bitcoin, its purchase price), that constitutes a circumstance indicating that the bitcoin asset is impaired. In that circumstance, the entity is required to record an impairment reflecting the difference** between the bitcoin's preexisting carrying value and the lowest trading price since acquisition.

~~47.     Per ASC 350-30-35-20, impairments, once taken, are never reversed, even if the~~ ~~fair value of the crypto asset recovers during the same reporting period.~~

**59.     This rule was widely recognized during and prior to the Class Period. For instance, Ernst & Young wrote in a guidance document published on June 30, 2022, that "if a crypto asset**

**117**

**is traded on an exchange where there are observable prices in an active market, a decline in the quoted price below an entity's cost is generally viewed as an impairment indicator."[7]**

4860.   Other reporting companies acknowledged this rule. For instance, Tesla—publicly

known as a large purchaser of bitcoin—stated the following in its annual report on Form 10-K for its fiscal year ended

December 31, 2020, filed on February 2, 2021:

> We will account for digital assets as indefinite-lived intangible assets in accordance with ASC 350, Intangibles–Goodwill and Other. The digital assets are initially recorded at cost and are subsequently remeasured on the consolidated balance sheet at cost, net of any impairment losses incurred since acquisition. We will perform an analysis each quarter to identify impairment. *If the carrying value of the digital asset exceeds the fair value **based on the lowest price quoted in the active exchanges during the period**, we will recognize an impairment loss equal to the difference in the consolidated statement of operations.*[6]

4961.   MicroStrategy, a major Bitcoin development company, also acknowledged the

proper GAAP requirements for valuing its Bitcoin assets. MicroStrategy's annual report on Form

10-K for its fiscal year ended December 31, 2020, filed on February 12, 2021, stated:

> The Company determines the fair value of its bitcoin on a nonrecurring basis in accordance with ASC 820, Fair Value Measurement, based on quoted (unadjusted) prices on the active exchange that the Company has determined is its principal market for bitcoin (Level 1 inputs). The Company performs an analysis each quarter to identify whether events or changes in circumstances, principally decreases in the quoted (unadjusted) prices on the active exchange, indicate that it is more likely

---

[7]   *See* **https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-tl16494-221us-06-30-2022.pdf.**

> than not that any of the assets are impaired. *In determining if an impairment has occurred, the Company considers the **lowest price of one bitcoin quoted on the active exchange at any time** since acquiring the specific bitcoin held by the Company. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.*

### F**G**.   **Marathon's Valuation of Its Bitcoin Assets.**

5062.   Prior to and during the Class Period, Marathon stated that it accounted for its digital

assets as indefinite-lived intangible assets. In the Q2**The Company's Q1** 2021 10-Q, the Company stated that: **filed on May 10, 2021**

**(the first day of the Class Period), stated that:**

> Digital currencies are included in current assets in the consolidated balance sheets.
> *Digital currencies are recorded at cost less impairment.*

---

[6] Unless otherwise noted, all emphases are added.

**118**

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently,* **when events or changes in circumstances occur indicating that it is more likely than not that the** ~~*indefinite-lived*~~*indefinite- lived* **asset is impaired. Impairment exists when the carrying amount exceeds its fair value.** In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

**63.      That same day, the Company issued a press release regarding its Q1 2021 results,**

**which stated that**

**Marathon accounts for its digital assets as indefinite-lived intangible assets, which are initially recorded at cost. Subsequently, they are measured at cost, net of any impairment losses incurred since acquisition. Marathon determines the fair value of its bitcoin based on quoted (unadjusted) prices on the active exchange that Marathon has determined is its principal market for bitcoin.** *Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.*

~~51.      This~~**64.      These statements** misled investors because the Company did *not*, as required by

ASC 350, assess
its bitcoin holdings for impairment "when events or changes in circumstances

occur indicating that
it is more likely than not that the indefinite-lived asset is impaired" and did

not record impairment
reflecting the different between the carrying value and the fair value as

revealed by those "events **or changes in circumstances." More specifically, the Company did** *not*

**record impairment of its bitcoin "in the amount equal to the difference between its carrying value"**

**and "the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin."**

~~or changes in circumstances." Specifically~~**65.      Instead**, even if the trading price of bitcoin declined below the carrying value of the

Company's bitcoin holdings, it did *not* record impairment unless the trading price of bitcoin was

lower at a specified cut-off time that the Company selected~~. The Company~~**, and any impairment consisted of the**

**difference between the preexisting carrying value and the trading price at that specified time. The**

**Company** made this choice even though Bitcoin trading is not restricted to "market hours." ~~Further, when the Company did record impairment, it did not use the lowest trading price of bitcoin during the reporting period, as required by ASC 820. Rather, it used the trading price at the Company's selected cut-off time.~~
~~52.      Indeed, Defendants assured investors that the Company had robust internal controls~~

~~and that its financial statements were prepared in compliance with GAAP.~~

**119**

5366. The Company's annual report on Form 10-K for the fiscal year ended December 31, 2022 (the "2021 10-K"), filed on March 10, 2022, further misled investors. The 2021 10-K reported that the Company "account[ed] for [its] bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value *at any time* since their acquisition" and that "*the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time* since its acquisition."

5467. This was false. When the Company restated its financial statements in 2023, it restated the values for impairment of its bitcoin holdings for all four quarters of 2021 and the first three quarters of 2022 to "correct[] its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day." Thus, the Company did not, as it stated in the 2021 10-K, use the lowest prices of bitcoin "at any time" to determine whether and to what extent the Company's bitcoin holdings were impaired, in violation of GAAP.

**68.     Thus, Defendants' statements regarding impairment of the Company's bitcoin holdings were false and misleading for two, independent reasons: (i) Marathon's method of determining such impairment violated GAAP; and (ii) the method was not what Defendants told investors the Company did.**

**69.     Defendants bolstered the false and misleading impression given to investors by stating that the Company applied a different method to determine the fair value of bitcoin held by a fund with which it entered into a limited partnership agreement. The Company's Q2 2022 10-Q, filed on August 9, 2022, stated that the fair value of the bitcoin owned by that fund, NYDIG Digital Assets Fund III, LP (the "NYDIG Fund"), was "determined at the end of each reporting period based on pricing obtained from CoinDesk Bitcoin Price Index at approximately 4pm New York time," rather than using, as Defendants stated with respect to the Company's directly owned bitcoin holdings, "*the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition.*" By the time the Company, on August 9, 2022, disclosed this method for**

**120**

determining the fair value of bitcoin held by the NYDIG Fund, it had already (specifically, on June 10, 2022) transferred such bitcoin from NYDIG Fund to its own account.

70.    Further misleading investors, Defendants made other vague statements about impairment of digital currencies. For instance, the 2021 10-K stated that:

> Digital currencies are included in current assets in the consolidated balance sheets as an indefinite lived intangible asset. Digital currencies are recorded at cost less impairment. In performing the quantitative impairment test of the mined BTC balances as well as recordation of daily revenues, as described in ASC 350-30-35-19, the Company utilizes the pricing of BTC on a nightly basis from Coindesk.com (https://www.coindesk.com/price/bitcoin/). The CoinDesk Bitcoin Price Index (XBX) is the world's leading reference for the price of bitcoin, used by the largest institutions active in crypto assets. It is the crypto market standard, benchmarking billions of dollars in registered financial products and pricing hundreds of millions in daily over-the-counter transactions. Built for replicability and reliability, in continuous operation since 2014, the "XBX" is relied upon by asset allocators, asset managers, market participants and exchanges Bitcoin, ether and gold prices are taken at approximately 4pm New York time.

71.    Notably, these statements did not inform investors that, when determining the amount of impairment of the Company's bitcoin, the Company used the price of bitcoin as of 4 pm New York time.

72.    First, the third sentence of the quoted paragraph addresses only "mined BTC balances" and not bitcoin that the Company acquired in any other manner, such as purchases.

73.    Second, it is not clear whether "mined BTC balances" includes the Company's receipt of fractional shares of block rewards (i.e., bitcoin) based on its pro rata contribution to computing power in Marapool.

74.    Third, the quoted paragraph did not state that the Company did not determine the impairment of its bitcoin holdings by using the lowest trading price since acquisition of such bitcoin.

75.    Rather, the third sentence of the quoted paragraph says that the Company "utilize[d] the pricing of BTC on a nightly basis from Coindesk.com," without making clear that a nightly price was used or whether the Company merely reviewed the trading price history provided by CoinDesk on a nightly basis.

76.    Indeed, the final sentence of the quoted paragraph, which refers to "approximately 4pm New York time," is ungrammatical and nonsensical as written. To drive this point home, the

**121**

sentence is reproduced here:

> Built for replicability and reliability, in continuous operation since 2014, the "XBX" is relied upon by asset allocators, asset managers, market participants and exchanges Bitcoin, ether and gold prices are taken at approximately 4pm New York time.

77.    This sentence, quite simply, does not make sense. It does not inform investors that, as the Company revealed after the Class Period, the Company used the trading price of bitcoin on XBX at 4pm New York time as the "fair value" of bitcoin when determining the impairment of its bitcoin holdings. By contrast, Defendants explicitly, clearly, and with proper grammar told investors that "*[i]f the carrying value of a bitcoin exceeds [its lowest price since acquisition], an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.*"

55.    Investors did not know**78.    Thus, a reasonable investor would not have known** until the end of**after** the Class Period that the Company's

**the Company's** impairment analysis for its bitcoin holdings improperly used trading prices at an arbitrary cut-off **arbitrary cut-off** time in violation of ASC 350 and thus of GAAP**, and contrary to Defendants' explicit representations**. Investors were thus misled by the Company's Class Period Reports (defined herein) that reported impairment of the Company's bitcoin holdings

 in violation of GAAP.

### ~~G~~**H**.    The Company's Bitcoin Mining Pool: ~~MaraPool~~**Marapool**

~~56~~**79**.    On March 25, 2021, Marathon entered into an agreement to obtain an exclusive and irrevocable license to use another company's proprietary Bitcoin mining pool technology for use in the Company's new Bitcoin mining pool called "~~MaraPool~~**Marapool**." Marathon claimed that ~~MaraPool~~**Marapool** "functions as a strategic differentiator for Marathon, as it provides us with improved insight into the performance of our mining operations, the potential to further optimize our performance, and the ability to vote on proposed upgrades and changes to the Bitcoin network."

~~57~~**80**.    ~~MaraPool~~**Marapool** is now a self-operated *private* pool. However, it was open to third-party pool participants from September 2021 until May 2022. During that time, the third-party pool participants paid a pool fee to Marathon for its services as the pool operator pursuant to pool service contracts. As the private pool operator, the Company facilitated the contribution of hash rate by third-party pool participants by providing access to the pool's software license and tracking

**122**

23

the hash rate generated by each pool participant to enable calculation of the pro rata block reward and transaction fee payment to each pool participant. As the operator of ~~MaraPool~~**Marapool**, the Company delegated mining work to the pool participants utilizing software that algorithmically assigned work to each individual miner. By virtue of its selection and operation of the software, the Company as operator controlled delegation of work to the pool participants, and thus directed the mining pool participants to contribute their hash rate to solve in areas that the Company designates.

**Marapool** ~~MaraPool~~ was associated with its own bitcoin wallet (owned by the Company as Operator), which was recorded on the distributed Bitcoin ledger as the winner of proof of work block rewards and assignee of all validations and, therefore, the transaction verifier of record. Therefore, the Company determined that it controlled the service of providing transaction verification services to the network and requester. Fees associated with the licensed software used in the operation of the private pool were originally recorded by Marathon as cost of revenues.

~~58~~**81**.   The Company also acted as a participant in the pool: it contributed mining power and thus was entitled to consideration equal to a fractional share of the Bitcoin reward (non-cash consideration, less any pool fees paid to the mining pool operator which are recorded as contra-revenues), for successfully adding a block to the blockchain. The Company's fractional share of the block reward was based on the proportion of the Company's contributed hash rate to the total computing power contributed by all mining pool participants in solving the then-current algorithm as calculated and determined by the pool operator (that is, the Company itself), net of any pool fees.

~~59~~**82**.   Under ASC 606-10-55-37, generally, an entity is a principal if it controls the specified good or service before that good or service is transferred to a customer. Here, Marathon exercised control over the operations of the mining pool.

~~60~~**83**.   Under ASC 606-10-55-37B, the entity that is determined to be a principal follows the "gross" approach and recognizes revenue when (or as) it satisfies its performance obligation in the amount equal to the price paid by the end consumer for the good or service ("gross" revenue). The amounts remitted to the other party are presented as an expense. Conversely, under ASC 606-10-55-38, a reporting entity that is determined to be an agent, follows the "net" approach and

**123**

recognizes revenue when (or as) it satisfies its performance obligation equal to the net amount

retained after remitting amounts to the other parties for providing the good or service ("net"

revenue).

61**84**.    The Company's ~~annual reports on Form 10-K for 2020 and 2021~~**2021 10-K, filed on March 10, 2022,** did not disclose **whether**

~~whether~~ Marathon accounted for revenues derived from ~~MaraPool~~**Marapool** on a gross basis (as principal) **or on a** ~~or on a~~ net basis (as an agent). ~~The~~**However, the** Company's quarterly report for the second quarter of 2022,

filed on August 9, 2022, disclosed that:

> The Company is a pool operator and acts as an agent, and not as a principal. The Company did not have control over any third party contributing hashrate to its pool. It merely facilitated the contribution of hash rate by third party pool participants who could choose to join or leave a pool as they wish. As the pool operator, the Company recognized 100% of all pool fees generated by such pool as fee revenue and not mining revenue. The Company therefore concluded that in its capacity as the pool operator it was an agent, and not a principal.

62**85**.    That report assured investors that the Company complied with GAAP and had

robust internal controls over its financial reporting. **This was false, as the Company's conclusion**

**that it acted as an agent, and not a principal, was an error that violated GAAP, and directly**

**contradicted the Company's statement to the SEC on June 13, 2022 (discussed further below,**

**¶109).**

### ~~H~~**I**.    The Company Reveals ~~Certain~~**One** Material ~~Weaknesses  In~~ **Weakness in** Its Financial **Reporting,** ~~Reporting~~ While Concealing Others

63**86**.    During the Class Period, Defendants made a series of statements to investors about pany's internal controls over financial reporting. Beginning on May 10, 2021—the first day of the Class Period—Defendants reassuringly reported that the Company had a robust system of internal controls

and disclosure controls to assure that the Company's financial statements were accurate.

64**87**.    On March 10, 2022, the Company disclosed one discrete "material weakness" in

its internal controls over financial reporting. On that day, the Company filed the 2021 10-K, which

Defendants Thiel and Gallagher signed. The 2021 10-K disclosed that "management identified a

weakness in internal control over financial reporting related to Information Technology General

Controls" as of December 31, 2022. Specifically, Defendants disclosed that:

> the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting

**124**

records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

65 88. Defendants nevertheless assured investors that there were no other material weaknesses in the Company's internal controls over financial reporting, and that this particular material weakness "did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K."

66 89. The Q1 2022 10-Q, Q2 2022 10-Q, and Q3 2022 10-Q similarly represented that there were no other material weaknesses in the Company's internal controls over financial reporting.

**J.      The SEC Warns Defendants on Multiple Occasions That They Were Violating GAAP**

**90.      Beginning on April 8, 2022, if not earlier, the Company and the SEC exchanged extensive correspondence concerning the Company's accounting methods and disclosures. This correspondence was not made public during the Class Period. On information and belief, all such correspondence was made public at Defendants' election on or about July 16, 2024—over fifteen months after the end of the Class Period, and after Defendants Salzman and Gallagher left the Company. This correspondence is first discussed below with respect to the Company's methods to determine impairment of its bitcoin holdings, and then with respect to the Company's methods to account for Marapool.**

*i.   Impairment of Bitcoin Holdings*

**91.      On April 8, 2022, the SEC sent a letter to Defendant Gallagher (the "April 8, 2022 SEC Letter"), which is attached as Exhibit A to this Complaint. The April 8, 2022 Letter directed the Company to:**

> *Please tell why you believe pricing of BTC on a nightly basis is the proper time to use in the quantitative impairment test of the mined BTC balances as well as for the recordation of daily revenues.* Cite the literature that supports your accounting. Refer to ASC 350- 30-35-20.

**92.      The Company responded to the April 8, 2022 Letter on April 22, 2022, in a letter**

**125**

signed by Defendant Gallagher (the "April 22, 2022 Marathon Letter"), which is attached as

Exhibit B to this Complaint. The April 22, 2022 Marathon Letter stated, in part:

> The Company aggregates all BTC rewarded in any given day and records revenue in USD at the prevailing market price at the end of the day. Management utilizes various pricing sources, including those readily available to the general public (including Messari.io, Yahoo Finance and Blockchain.com) to ensure the reasonableness of its position. Management has examined various factors surrounding the substance of the Company's operations and the available guidance published for public company accounting practices in Accounting Standards Codification in arriving at its accounting treatment. Pursuant to ASC 350, the Company accounts for the BTC received from its mining operations as indefinite-lived intangible assets on its balance sheet. An intangible asset with an indefinite useful life is not amortized, but rather is assessed for impairment annually, or more frequently, when events or changes in circumstances occur which indicate that it is more likely than not that the indefinite lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value.
>
> In performing the quantitative impairment test of the mined BTC balances, the Company utilizes the daily price of BTC from the same indices utilized for daily revenue recognition. Management believes that this method, which is consistently applied on a daily basis over applicable reporting periods, complies with ASC 350 in that would not result in a material difference from valuations used earlier in the day. The company also believes that this method provides a fundamental consistency in applying GAAP to this continuous process.

93.     Thus, the Company's response made clear that, in determining the impairment of

its "mined BTC balances," it used "the same indices utilized for daily revenue recognition," i.e.,

"various pricing sources, including those readily available to the general public (including

Messari.io, Yahoo Finance and Blockchain.com)." Remarkably, these are *different* than the source

(Coindesk.com) that the Company obliquely referred to in the 2021 10-K, which was filed on March 10, 2022, just

six weeks earlier.

94.     The SEC responded on May 27, 2022, in a letter addressed to Defendant Gallagher

(the "May 27, 2022 SEC Letter"). The May 27, 2022 SEC Letter directed the Company to

> Further explain how your policy of testing for impairment on a nightly basis complies with ASC 350. In this regard, consistent with ASC 350-30-35-19, you indicate that impairment exists when fair value is below carrying value, and ASC 350-30-35-18 indicates intangible assets should be tested for impairment at any time events or changes in circumstances indicate that it is more likely than not that the asset is impaired.

95.     The Company responded to the May 27, 2022 SEC Letter on June 13, 2022, in a

letter signed by Defendant Gallagher (the "June 13, 2022 Marathon Letter"), which is attached as

Exhibit C to this Complaint. The June 13, 2022 Marathon Letter stated, in part, that:

> Bitcoin is highly volatile and continuously traded 24 hours a day, 7 days a week with no specific closing price on any day. Since there is no recognizable cut off and bitcoin is constantly traded, the Company has concluded utilizing a standardized time on a daily basis to determine the closing price provides for consistency in evaluating impairment and eliminates any subjectivity as to when the impairment has

**126**

occurred.

96.    The SEC responded on June 24, 2022, in a letter to Defendant Gallagher (the "June 24, 2022 SEC Letter"), which is attached as Exhibit D to this Complaint. The June 24, 2022 SEC Letter stated that:

> Your policy of utilizing a standardized time on a daily basis to assess for impairment *does not appear to comply with ASC 350-30-35-18* that indicates intangible assets should be tested for impairment at any time events or changes in circumstances indicate that it is more likely than not that the asset is impaired. *Please revise your accounting to comply with ASC 350.*

97.    After requesting two extensions, the Company responded to the substance of the June 24, 2022 SEC Letter on August 1, 2022, in a letter signed by Defendant Gallagher (the "August 1, 2022 Marathon Letter"). The August 1, 2022 Marathon Letter stated, in part, that:

> Given the continuous nature of BTC pricing *there are numerous points during any day that could be an indication that it is more likely than not that an asset is impaired*, including declines in value measured using daily lows, daily averages, or daily closing prices. *However, it is impossible to make a determination of impairment in real time since the markets are always moving. Given these circumstances, the company reviews its BTC for impairment daily, looking back on these indicators and recording an impairment based on the daily closing price*

**127**

*of BTC as defined by Yahoo Finance (https://finance.yahoo.com/quote/BTC- USD) and published daily at 23:59 GMT.*

98.    The Company did not explain why the purported "impossibility" of "mak[ing] a determination of impairment in real time" would affect the Company's financial statements, given that they are issued quarterly and retrospectively (i.e., after the end of the relevant quarter), rather than in "real time." Further, the Company's response to the SEC, which discussed using "the daily closing price of BTC as defined by Yahoo Finance" and published at "23:59 GMT," was again inconsistent with its oblique and confusing references to Coindesk and "approximately 4pm New York time" (which is 7:59 pm EDT or 6:59 pm EST, rather than "4pm").

99.    The SEC responded on October 11, 2022, in a letter to Defendant Gallagher (the "October 11, 2022 SEC Letter"), which pressed the Company to explain its impairment policy, stating:

> Please reconcile for us your discussion in response to prior comment 4 indicating that a decline in fair value below carrying value "could be an indication" of impairment with your stated policy that an impairment exists when carrying value exceeds fair value and with ASC 350-30-35-19.

100.    The Company, after requesting two extensions, responded to the October 11, 2022 SEC Letter on December 2, 2022, in a letter signed by Defendant Gallagher (the "December 2, 2022 Marathon Letter"). The December 2, 2022 Marathon Letter state, in part:

> [T]he Company monitors on a daily basis, whether there is a point in time during each day where BTC is bought or sold at a price lower than the BTC carrying value on the Company's financial statements. The Company views this event (i.e., BTC bought or sold at a price lower than the BTC carrying value on the Company's financial statements) as an indicator that impairment is more likely than not, and proceeds to the quantitative impairment test outlined in ASC 350-30-35-19 which compares the fair value of the asset (BTC) with its carrying amount to determine the amount of impairment.
>
> . . . The Company has considered that given there is no traditional close for the crypto market, determination of the fair value of BTC on the date an impairment indicator exists should be based on the fair value of BTC at 23:59 GMT on that respective measurement date. Any difference between such fair value of BTC at 23:59 GMT and BTC carrying value on the day an indicator of impairment exists is recorded as an impairment charge to the income statement by the amount by which the carrying value exceeds the fair value of BTC.

101.    The Company did not explain why the lowest intraday price, which would be the *strongest* "indicator that impairment is more likely than not," should not be used to determine the *amount* of that impairment.

102.    On February 22, 2023, the SEC responded in a letter to Defendant Gallagher (the "February 22, 2023 SEC Letter"), which is attached as Exhibit G to this Complaint. Repeating the

**128**

SEC's admonition in the June 24, 2022 SEC Letter, the February 22, 2023 SEC Letter again directed the Company to revise its accounting to comply with ASC 350, stating:

> We note your response to prior comment 4. *We note that impairment exists whenever carrying value exceeds fair value.* Given the significant intraday volatility that has occurred in historical periods, *it does not appear that your accounting convention complies with the ASC 350-30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value. Please revise.*

103.    On February 28, 2023, at the end of the Class Period, Defendants disclosed receipt of this letter and announced that nearly two years of the Company's financial statements would be restated. However, Defendants did not make any of this correspondence public until July 2024.

> *i.    Accounting for Marapool*

104.    In addition to addressing the Company's method for determining impairment of its bitcoin holdings, the April 8, 2022 Letter also addressed the Company's accounting for Marapool, stating:

> Please clarify whether some or all of your mining activity is conducted with other third party pool participants and collectively provides transaction verification services to the blockchain network through a pool operator. If so, clearly disclose the reward sharing mechanism you select when participating in mining pools. *Explain how you are accounting for any fees retained by the pool operator.* In addition, tell us and disclose the amount of rewards earned from mining separately from fees earned for transaction verification.

105.    The April 8, 2022 Letter also stated:

> We note from disclosures elsewhere in your filing that you operate your own bitcoin mining pools. *Explain to us and disclose how you recognize revenue as a pool operator.* Ensure your disclosure addresses the nature, amount, timing, and uncertainty of revenue and cash flows arising from these arrangements.

106.    The Company responded in the April 22, 2022 Marathon Letter, which stated, in part:

> In addition to mining within the pool, the Company, as pool operator, recognizes approximately 0.5% of any block reward as pool fee revenue. This fee is subtracted from BTC rewarded prior to the allocation of the BTC reward among the pool participants based on contributed hashrate.
>
> . . .
>
> As a result, mining revenues are recorded net of any pool fee, not gross, with an offsetting cost of revenue.

107.    As previously discussed, recording mining revenues on a net basis, rather than on a gross basis, meant that the Company was treating itself as an agent, and not the principal, with respect to Marapool, in violation of GAAP.

108.    The SEC responded in the May 27, 2022 SEC Letter, which, among other things,

**129**

directed the Company to "provide us with your comprehensive principal versus agent accounting analysis. Refer to ASC 606-10-55-36 through 55-40."

109.    The Company responded in the June 13, 2022 Marathon Letter, which included an analysis of whether the Company acted as a principal or an agent with respect to Marapool and stated that "*[t]he Company has concluded that it is a principal under ASC 606.*" This conclusion complied with GAAP, but was directly contradicted by the Company's actual practices and statements to investors.

110.    The SEC responded in the June 24, 2022 SEC Letter, which directed the Company to "[e]xplain why the pool fee revenue you earn as the pool operator would be a reduction to revenue. *In this regard, we note your conclusion that, as the pool operator, you are the principal and you have full control of the bitcoin rewards to be transferred to the pool participant.*" The June 24, 2022 SEC Letter also informed the Company that "*[y]our revenue recognition accounting policy should be revised.*"

111.    The Company did not provide a substantive response to these comments until August 26, 2022. According to an August 5, 2022 letter to the SEC from Defendant Gallagher, on behalf of the Company (the "August 5, 2022 Marathon Letter", which is attached as Exhibit E to this Complaint), the Company's need for a significant amount of time to respond to the SEC was due, in part, to "the fact that I am expecting to be out of the office for at least two weeks following a medical procedure." The Company's August 26, 2022 letter (the "August 26, 2022 Marathon Letter"), which is attached as Exhibit F to this Complaint, stated that the Company was reversing course, stating that the Company

> has concluded that in its capacity as a pool operator (i.e. when it ran a pool that included Third-party miners) it acted as an agent, *and not a principal (as was previously indicated)* and that the miners in the pool (including the Company in its capacity as a miner) are the principal given they are the primary responsible party for providing computing power to the customer.

112.    Thus, the Company disavowed its June 13, 2022 concession to the SEC that the Company was the principal with respect to Marapool.

113.    The SEC, unsurprisingly, was not satisfied with this about-face. In the October 11, 2022 SEC Letter, the SEC probed the Company's conclusion that it was an agent, and not a

principal, directing the Company as follows, in part, to:

> [c]larify what you considered to be the specified service provided to the customer in the arrangements with the pool participant and with the blockchain network[;] and
>
> . . .
>
> provide us with a revised analysis of whether you, in your capacity as the pool operator, controlled the transaction verification services before being provided to the blockchain network.

114.    The October 11, 2022 SEC Letter pointed out that, given that Marathon, as operator of Marapool, had the ability to control the transaction verification services performed by the pool, "it is unclear why you believe not having control over any third party contributing hashrate to your pool is relevant to who controls the transaction verification services before being transferred to the blockchain."

115.    The Company responded in the December 2, 2022 Marathon Letter, which stated that "the Company believes that it does not control the transaction verification services as pool operator," even though it "acknowledge[d] that Marapool wallet (i.e., Operator wallet) was the miner of record recognized by the blockchain network with no further record of the pool participants' involvement in fulfilling transaction verification services."

116.    The SEC responded in its February 22, 2023 SEC letter, which posed a series of questions probing the Company's position that it was merely an agent with respect to Marapool. Among other things, the SEC directed the Company to "clarify how an individual mine pool participant could exercise control over the transaction verification service on behalf of the pool."

117.    As discussed further below (Section IV.L), Defendants announced on February 28, 2023 that nearly *two years* of financial results could not be relied upon. However, Defendants did not make any of this correspondence available to investors until July 2024.

**131**

**~~I~~K.    The Company Reveals That It Received ~~an~~ SEC ~~Comment Letter~~Comments Concerning _its_ ~~the Company's~~ Accounting Policies, Announces That ~~It Could Not Timely File~~ its Form 10-K Will Be Late, and Cancels Its Scheduled Earnings Call**

~~67~~118. On February 28, 2023, during the trading day, the Company issues a series of announcements that sent its stock price into a decline.

~~68~~119. The Company issued a press release at 12:21 pm Eastern time "announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for _today_, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

~~69~~120. The Company also filed a Form 8-K with the SEC stating that it had "received a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below." The Company disclosed that "after consultation with Marcum LLP, the Company's independent auditor," the Board had concluded that:

> _due to certain accounting errors_, as described below, the previously issued audited consolidated financial statements contained in _the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and_ the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in _the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon_. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. _The Company intends to correct the errors and will be restating the Impacted Financial Statements_.

~~70~~121. The Company stated that "[a]s a result of receiving the SEC comments on February 22, 2023 and the Audit Committee's determination to restate the Impacted Financial Statements," the Company was unable its Form 10-K for 2022 by the filing deadline of March 1, 2023.

~~71~~122. The Company disclosed that "[a]mong the restatement issues" were impairment of digital assets, and operation of a bitcoin mining pool that included third party participants. The Company acknowledged that:

> _its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance with the ASC 350-30-35-19_ requirement to recognize impairment whenever carrying value exceeds fair value, which effectively calls for the intraday low price to be utilized in calculating impairment whenever events or changes in circumstances indicate it is more likely than not that the asset is impaired.

~~72~~123. The Company also disclosed that its revenue recognition with respect to ~~MaraPool~~**Marapool**

**132**

included the determination that "in its capacity as the operator of a mining pool that included third parties, it acted as an agent. As a result, the Company recorded revenues on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool." However, ***this "assessment that it acted as an Agent in operating the third-party mining*** ~~pool~~

~~was incorrect and . . . it should have concluded that it was acting as a principal in its capacity as~~
***pool was incorrect and . . . it should have concluded that it was acting as a principal in its capacity as*** the pool operator."*** The Company acknowledged that it "should have recorded revenue ~~from the~~ **from the** pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants," and estimated that "its ***revenues and its cost of revenues for the year*** ~~ended December~~ ***ended December 31, 2021 were understated*** due to the 'net' vs. 'gross' presentation of revenues in its financial

 statements."

~~73~~**124**. As the market digested this news, the Company's stock price fell 0.14% on February 28, 2023, while the Nasdaq Blockchain Economy Index *rose*, generating a negative abnormal company-specific return. The following trading day, March 1, 2023, as the market continued to digest the Company's announcements, the Company's stock price fell 8.31% to close at $6.51, even as the Nasdaq Blockchain Economy Index rose again.

**133**

~~J~~**L.**    **The Company** ~~Issues the Restatement~~**Restates Nearly Two Years of Financial Statements**

~~74~~**125**. Two weeks later, on March 16, 2023, the Company finally filed its **late** annual ~~report~~

**report** on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K")**, correcting the accounting violations discussed above and restating its financial results for the periods covered by the Impacted Financial Statements (the "Restatement")**. The 2022 10-K~~,~~

~~which~~ was signed and certified by Defendants Thiel and Gallagher~~, disclosed~~ that "[t]he Company**.**

~~received Staff comments *during 2022* which are *material* and *still under review* as set forth below."~~
~~The report continued: "[w]e *additionally* have described below certain comments *more recently*~~
~~*received* which relate to certain restatement items in this Form 10-K in order to provide complete~~
~~disclosure and not imply that the restated items set forth below have been fully resolved."~~

~~75~~**126**. The 2022 10-K disclosed that, at some point either in 2022 or on February 22, 2023

(or both), the SEC "objected to the Company's calculation of impairment of bitcoin using a daily

closing price. The Company has, in the restated financial results, revised its calculation to calculate

impairment of bitcoin using the intraday low price of bitcoin." The Company ~~acknowledged~~**conceded** that **its**

~~its~~ prior practice of using a daily "closing" price for bitcoin ~~did not comply with GAAP~~**violated ASC 350**.

~~76~~**127**. The 2022 10-K also revealed that the SEC had, at an unspecified time, "commented

on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity

as a pool participant, with specific attention on the Company's previous net recognition of revenue

as an operator of a pool." The Company disclosed that in its restated financial results provided in

the 2022 10-K, it had "revised its revenue to include gross revenue earned as pool operator with

any amounts remitted to third party pool participants as cost of revenue."

**128.    Specifically, the 2022 10-K stated:**

*The Company received Staff comments during 2022 which are material and still under review as set forth below**. We additionally have described below certain comments more recently received** which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved.*

*i.* **Revenue recognition. The Staff commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool. The Company has, in the restated financial results, revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. . . .**

*ii.* **Impairment of bitcoin. The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.**

~~77~~**129**. The Company ~~acknowledged~~**conceded** that its ~~previous~~**Class Period** accounting ~~practice violated~~

**134**

~~ASC~~**practices with respect to**

**Marapool violated ASC** Topic 606, "Revenue from Contracts with Customers," and thus violated ~~Generally Accepted Accounting Principles that it is required to follow~~**GAAP**. In the 2022 10-K, Defendants conceded that Marathon's

assessment that it acted as an Agent in operating the third-party mining pool was incorrect and that it should have concluded that it was acting as a principal in its capacity as the pool operator. The effect of this change from Agent to Principal is that the Company should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants.

~~78~~**130**. The Company further ~~acknowledged~~**conceded** that it "concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls **the** ~~the~~ transaction verification services as an Operator," and thus that it acted a principal rather than **an** ~~an~~ agent. The Company did not identify any new facts that led it to correct its prior violation of **ASC** ~~ASC~~ 606.

**131.    The 2022 10-K disclosed:**

**The Company corrected its previous conclusion that as the operator of Marapool ("Operator"), third-party mining pool participants ("pool participants") are its customer. The Company previously viewed such pool participants as principal to the delivery of transaction verification services to the network and requester and therefore recognized revenue net of amount remitted to pool participants' pro rata entitlement to block rewards and transaction fees.** *The Company has since corrected its revenue recognition policy and concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls the transaction verification services as an Operator. This results in recognition of all transaction fees and block rewards earned from transaction verification services performed by the Company in its role as an Operator of MaraPool as revenue from contracts with customers under Topic 606, with the portion of the transaction fees and block rewards remitted to MaraPool participants as cost of revenues*.

~~79~~**132**. The proper application of ASC 606 to the Company's ~~MaraPool~~**Marapool** operations led to material changes in the Company's cost of revenues **for 2021 and reported cost of revenues for 2022**. For instance, the Company originally reported that its cost of revenues for 2021 was $33.7 million. As a result of the Company's **violation of ASC 606 with respect to Marapool, this was** ~~violation of ASC 606 with respect to MaraPool, this was~~ understated by approximately $8.7 **million, or** *25.8%*. **The Restatement revealed that the Company's prior reports of cost of revenue were understated by the following amounts as a result of the Company's improper accounting with respect to Marapool:**

| Period | Amount of Understatement in Original Report |
|---|---|
| Q3 2021 | $624,000, or 6% |

**135**

| | |
|---|---|
| **Full year 2021** | **$8.699 million, or 25.8%** |
| **Q1 2022** | **$5,000, or 0.19%** |
| **Q2 2022** | **$1,000, or 0.02%** |

**133.    The 2022 10-K further disclosed:**

**Impairment of bitcoin.** *The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.*

**134.    The 2022 10-K further explained:**

*The Company corrected its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day. The Company's correction of this calculation results in it recognizing impairment in an amount by which the carrying value exceeds the fair value of the digital assets at any point in time during the day.*

**135.    The 2022 10-K reported restated amounts of impairment for the Company's bitcoin holdings. The Restatement showed that the Company had materially understated the impairment of its bitcoin holdings, as follows:**

| *Period* | *Amount of Understatement in Original Report* |
|---|---|
| **Q1 2021** | **$204,000, or 30.8%** |
| **Q2 2021** | **$1,944,000, or 17.6%** |
| **Full year 2021** | **$2.448 million, or 8.3%** |
| **Q1 2022** | **$3,756,000, or 19.2%** |
| **Q2 2022** | **$6,797,000, or 5.3%** |

**136.    The table below further illustrates the impact of the Restatement, with respect to the Company's improper impairment of its bitcoin assets, on the Company's financial statements:**

| | Impairment of Digital Assets | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ($000s, except per share amts.) | Q1 2021 3/31/2021 | Q2 2021 6/30/2021 | Q3 2021 9/30/2021 | Q4 2021 12/31/2021 | 2021 12/31/2021 | Q1 2022 3/31/2022 | Q2 2022 6/30/2022 | Q3 2022 9/30/2022 |
| | | | | (Over)/understated by | | | | |
| Total Revenues | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Cost of revenues | — | — | — | — | — | — | — | — |
| Operating income (loss) | (204) | (1,944) | 551 | (851) | (2,448) | (3,756) | (6,797) | 4,529 |
| Income (loss) before income taxes | (204) | (1,944) | 551 | (851) | (2,448) | (3,756) | (6,797) | 4,529 |

**136**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net income (loss)** | $ | **(204)** | $ | **(1,944)** | $ | **551** | $ | **(265)** | $ | **(1,748)** | $ | **(3,756)** | $ | **(7,155)** | $ **4,739** |
| **Earnings (loss) per share - diluted** | $ | **(0.01)** | $ | **(0.02)** | $ | **:** | $ | **:** | $ | **(0.02)** | $ | **(0.04)** | $ | **(0.06)** | $ **0.04** |

**137.** As the above table shows, the Company's GAAP violations resulted in it reporting operating income/loss, income/loss before income taxes, net income/loss, and earnings per share (diluted) that were materially more positive than they, in reality, were for the first two quarters of 2021, the fiscal year of 2021, and the first two quarters of 2022.

**138.** A chart showing the impact of the Restatement on impairment of the Company's bitcoin holdings, and cost of revenue and revenue regarding Marapool, is attached as Appendix A ~~million, or 25.8%~~hereto.

**139.** In the Restatement, Defendants acknowledged that the Company's Class Period Reports violated GAAP and contained material misstatements. The Restatement stated:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework.
>
> *Based on this evaluation, management identified a weakness in internal control over financial reporting related to the application and interpretation of generally accepted accounting principles ("GAAP")* primarily in the areas of consolidation, *impairment of digital assets*, disposal of property and equipment *and principal versus agent considerations in revenue recognition.* In addition, the Company has not designed or implemented user access controls to ensure appropriate segregation of duties, or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's
> (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. The Company has also not effectively designed a key manual control to detect material misstatements in revenue.
>
> *The material weakness related to the application and interpretation of GAAP, as described above, resulted in a material misstatement to the Company's previously issued consolidated financial statements.* The material weakness associated with the manual control over revenue recognition did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

**140.** As noted above (¶48), ASC 250 distinguishes errors from accounting changes. In the Restatement, Defendants conceded that the Class Period Reports reflected errors, rather than accounting changes, related to impairment of the Company's bitcoin holdings and the accounting treatment of Marapool. The Restatement stated that:

**137**

*The Company and its Audit Committee formally concluded on March 15, 2023 that the restatement of financial statements and amendment of certain information of prior periods presented in this Annual Report on Form 10-K was necessary to correct* for the following: *(i) Revenue Recognition – Principal versus Agent, (ii) Impairment of Digital Assets,* (iii) NYDIG Digital Assets Fund III, LP – Consolidation Gross versus Net Presentation, (iv) NYDIG Digital Assets Fund III, LP – Financial Statement Reclassification (v) Disposal of Assets (vi) Other Adjustments, and (vii) the income tax adjustments due to the forementioned *errors.*

141.     With respect to impairment of the Company's bitcoin holdings, the Restatement specified that Defendants had made an error that required correction, stating:

The Company *corrected* its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day. The Company's *correction* of this calculation results in it recognizing impairment in an amount by which the carrying value exceeds the fair value of the digital assets at any point in time during the day.

142.     The Restatement also specified that Defendants had made an error regarding accounting for Marapool, which required correction, stating that "[t]he Company corrected its previous conclusion that as the operator of Marapool ('Operator'), third-party mining pool participants ("pool participants") are its customer," and that "[t]he Company has since corrected its revenue recognition policy and concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls the transaction verification services as an Operator."

M.     **Defendants Gallagher and Salzman Leave the Company in Short Order**

143.     The Restatement was the last SEC filing that Defendant Gallagher signed on behalf of the Company. On March 31, 2023—only *two weeks* after the Restatement—the Company announced that Defendant Gallagher, who had become the Company's CFO just one year earlier, would leave his job effective May 12, 2023. According to the Company, Defendant Gallagher was leaving for unspecified "personal reasons." The Company did not announce Gallagher's successor at that time. In fact, the CFO position was not filled until June 14, 2023, meaning the Company had no CFO for an entire month, even as it consummated a private placement offering of over $14 million of its Series A redeemable convertible preferred stock, which is a transaction in which a CFO would normally be centrally involved.

144.     In addition, Defendant Salzman left the Company on April 1, 2023—one day after

**138**

**the Company disclosed that Gallagher was stepping down. Defendant Salzman's departure was announced on November 28, 2022, in the midst of the Company's exchange of correspondence with the SEC regarding its improper accounting methods.**

**V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING**

**THE CLASS PERIOD**

**A.    Materially False and Misleading ~~Assurances~~Statements Regarding the Company's Disclosure Controls and Internal Controls over Financial Reporting**

~~80~~**145**. Each of the Company's periodic reports on Form 10-K or Form 10-Q filed during

the Class Period assured investors concerning the Company's **disclosure controls and procedures, and** internal controls over

financial reporting.[7] ~~Specifically, each of the Company's Class Period Reports~~[8] **The Q1 2021 10-Q** stated ~~that~~:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with

---

[8] **These are the quarterly reports on Form 10-Q filed on May 10, 2021 (the "Q1 2021 10-Q"), August 13, 2021 (the "Q2 2021 10-Q"), November 15, 2021 (the "Q3 2021 10-Q"), May 6, 2022 (the "Q1 2022 10-Q"), August 9, 2022 (the "Q2 2022 10-Q"), and November 14, 2022 (the "Q3 2022 10-Q"), as well as the 2021 10-K filed on March 10, 2022. These are referred to collectively herein as the "Class Period Reports." Defendants Thiel and Salzman signed the Q1 2021 10-Q, the Q2 2021 10-Q, the Q3 2021 10-Q, and the 2021 10-K. Defendants Thiel and Gallagher signed the Q1 2022 10-Q, the Q2 2022 10-Q, and the Q3 2022 10-Q.**

> Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. ***Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2021***. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

~~81.    With respect to each Class Period Report that they signed, each such Defendant certified that, inter alia: (a) based on their knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,~~

**146.    The Q2 2021 10-Q and Q3 2021 10-Q each contained an equivalent statement regarding management's assessment of the effectiveness of the Company's internal control over financial reporting, and disclosure controls and procedures, as of the end of June 30, 2021, and September 30, 2021,**

**139**

respectively.

147.    The 2021 10-K identified one material weakness, but did not disclose any material weaknesses regarding the Company's use of daily cut-off times to determine impairment of its bitcoin holdings or the Company's conclusion that it was an agent, and not the principal, with respect to Marapool, both of which violated GAAP. The 2021 10-K stated that:

As described under Item 9A. "Controls and Procedures" below, management has concluded that *a material weakness* in our internal control over financial reporting existed as of December 31, 2021. *This material weakness* is more fully described in Item 9A. Accordingly, internal control over financial reporting and our disclosure controls and procedures were not effective as of such date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

148.    Item 9A of the 2021 10-K stated, in part:

Management's Conclusions Regarding Effectiveness of Disclosure Controls and Procedures

We conducted an evaluation of the effectiveness of our "disclosure controls and procedures" ("Disclosure Controls"), as defined by Rules 13a-15(e) and 15d-15(e) of the Exchange Act, as of December 31, 2021, the end of the period covered by

this Annual Report on Form 10-K. The Disclosure Controls evaluation was done under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, with the goal being that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding disclosure. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, our disclosure controls and procedures were ineffective as of December 31, 2021.

149.    The 2021 10-K further stated:

Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of

**140**

the company's financial reporting.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this evaluation, *management identified a weakness in internal control over financial reporting related to Information Technology General Controls (ITGC). Specifically, the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective* as a result *of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.*

The material weakness described above did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

The effectiveness of our internal control over financial reporting as of December 31, 2021, has been audited by our independent registered public accounting firm, Marcum, LLP, as stated in their report on management's internal control over financial reporting, which is also included in Item 8, "Financial Statements and Supplementary Data," of this 2021 Form 10-K.

150.    The 2021 10-K further stated: "Other than what is disclosed above there were no changes in the Company's internal control over financial reporting during the quarter ended ~~⁷  These are the quarterly reports on Form 10-Q filed on May 10, 2021 (the "Q1 2021 10-Q"), August 13, 2021 (the "Q2 2021 10-Q"), November 15, 2021 (the "Q3 2021 10-Q"), May 6, 2022~~ December 31, 2021.

151.    The Q1 2022 10-Q acknowledged the material weakness identified in the 2021 10-K and represented that it was the only reason the Company's disclosure controls and procedures were not effective, stating:

Disclosure Controls and Procedures .

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal ~~(the "Q1 2022 10-Q"), August 9, 2022 (the "Q2 2022 10-Q"), and November 14, 2022 (the "Q3 2022 10-Q"), as well as the 2021 10-K filed on March 10, 2022. These are referred to collectively herein as the "Class Period Reports." Defendants Thiel and Salzman signed the Q1 2021 10-Q, the Q2 2021 10-Q, the Q3 2021 10-Q, and~~

**141**

the 2021 10-K. Defendants Thiel and Gallagher signed the Q1 2022 10-Q, the control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of March 31, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

152. The Q2 2022 10-Q and Q3 2022 10-Q each contained the equivalent statement

concerning the Company's disclosure controls and procedures as of June 30, 2022, and September

30, 2022, respectively.

153. The Q1 2022 10-Q stated: "There have been changes in our internal control over

financial reporting during the quarter ended March 31, 2022 that have materially affected, or are reasonably likely to

materially affect, our internal controls over financial reporting."

154. The Q2 2022 10-Q, and the Q3 2022 10-Q. each contained the equivalent statement

concerning the Company's internal control over financial reporting as of June 30, 2022, and

September 30, 2022, respectively

155. With respect to each Class Period Report that they signed, Defendants certified:

(1) that they had reviewed the report;
that, based on their knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect

to the period covered by the report;

(b3) that, based on their knowledge, the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations and cash flows of the registrantCompany as of, and for, the periods presented in the report;

that they, with the other signatory, (a) designed and maintained disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d 15(e)) and internal controls over financial 15(e)) and (b) internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company, and (c) evaluated

the effectiveness of the disclosure those controls and procedures, and disclosedpresented their conclusions about the effectiveness of thethose controls and procedures as of the end of the period covered by the report, and (d) disclosed any change in the Company's internal control over financial reporting during the most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

re controls and procedures; and (d5) that they disclosed (a) all significant deficiencies and material sses in the design or operation of the Company's internal controlcontrols over financial reporting which were reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial

**142**

**information, and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.** ~~report financial information.~~

~~82~~**156**. The statements ~~referenced in the two above paragraphs above~~**quoted above in this subsection** were materially false **and**

~~and~~ misleading because (i) the Company misrepresented the robustness of its disclosure controls **and**

~~and~~ procedures and internal control over financial reporting; (ii) the Company was violating GAAP

with respect to its ~~MaraPool~~**Marapool** revenues and cost of revenues and assessing impairment of its bitcoin

**holdings; (iii) the Company violated GAAP and its own representations because it did not measure the impairment of its**

**bitcoin holdings by using the lowest trading price of bitcoin *at any time***

~~holdings~~**during the period**; (~~iii~~**iv**) as a result, the Company's **revenue and** cost of revenue ~~were~~**was** materially

misstated during the Class Period; **and** (~~iv~~**v**) also as a result, the value of the Company's bitcoin

holdings was materially misstated during the Class Period~~, and (v) the foregoing, once revealed, was reasonably likely to have a material negative impact on the Company's financial condition~~.

    **B.**    **Materially False and Misleading ~~Reports~~Statements Regarding Impairment of Bitcoin**

        **Assets Accounted for in Violation of GAAP.**

~~83~~**157**. Each of the Class Period Reports reported impairment of the Company's bitcoin

holdings that, unbeknownst to investors, was calculated in violation of GAAP, and falsely and

misleadingly described the Company's method for assessing impairment of bitcoin without

disclosing the Company's GAAP violations.

~~84~~**158**. The Q1 2021 10-Q stated that:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired*. *Impairment exists when the carrying amount exceeds its fair value*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

~~85~~**159**. The Q2 2021 10-Q stated that:

Digital currencies, Digital currencies, restricted and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

**143**

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

~~86~~**160**. The Q3 2021 10-Q stated that:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired*. *Impairment exists when the carrying amount exceeds its fair value*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an

impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

~~87~~**161**. The 2021 10-K stated that:

The Company intends to account for its digital currency assets as indefinite life intangible assets. *An intangible asset with an indefinite useful life is not amortized, but rather is assessed for impairment annually, or more frequently, when events or changes in circumstances occur which indicate that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value*. In testing for impairment, the Company will have the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted. Realized gain or loss on the sale of digital currencies is included in other income or expenses in the Company's statements of operations.

~~88~~**162**. The 2021 10-K further stated that:

Digital currencies are included in current assets in the consolidated balance sheets as intangible assets with indefinite useful lives. Digital currencies are recorded at cost less impairment.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the*
*time its fair value is being measured*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

**144**

89**163**. The Q1 2022 10-Q stated that:

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

90**164**. The Q2 2022 10-Q stated that:

Digital currencies, Digital currencies, restricted and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value*. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

91**165**. The Q3 2022 10-Q further stated that:

Digital currencies are included in current and other assets in the consolidated balance sheets as intangible assets with indefinite useful life and are recorded at cost less impairment. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, *or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured*. In testing for impairment, the Company has the option to first perform a qualitative assessment

to determine whether it is more likely than not that an impairment exists. *If it is determined that the price of Bitcoin declines to lower than the carrying value, the Company has determined that it is more likely than not that an impairment exists. The Company determines the amount of impairment to record based on the fair value of bitcoin following the fair value measurement framework in ASC 820 – Fair Value Measurement. If the fair value of bitcoin is lower than the carrying amount the Company will record an impairment* and subsequent reversal of impairment losses is not permitted.

92**166**. The Q3 2022 10-Q stated that:

Digital currencies, and Digital currencies loaned are included in current assets in the consolidated balance sheets. Digital currencies are recorded as indefinite lived intangibles at cost less impairment in accordance with FASB ASC 350 – Intangibles-Goodwill and Other. Digital currencies, restricted represent collateral for long-term loans and as such are classified as a non-current asset.

*An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or*

**145**

*more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite- lived asset is impaired. When the exchange-traded price of digital currencies declines below its carrying value, the Company has determined that it is more likely than not that an impairment exists*. When this occurs, the amount of impairment to record is determined based on the fair value of digital currencies in accordance with the fair value measurement framework in FASB ASC 820 – Fair Value Measurement "(ASC 820)". *If the fair value of digital currency is lower than its carrying amount, the Company will record an impairment in an amount by which the carrying value exceeds the fair value of the digital currency*. Subsequent reversal of impairment losses is not permitted.

93**167**. The statements ~~in the eleven~~**quoted** above ~~paragraphs~~**in this subsection** were materially false and ~~misleading~~

**misleading** because (i) the Company did not recognize impairment losses on its bitcoin holdings ~~when events~~

**when events** or changes in circumstances occurred indicating that it is more likely than not that the ~~indefinite-lived~~**indefinite-lived** asset is impaired, (ii) nor did it record impairment of its bitcoin holdings in the  amount by

which the carrying value exceeded the fair value of bitcoin, as required by ASC 350

and 820.
 These accounting rules required that the Company assess whether and to what extent its ~~bitcoin~~

**bitcoin** holdings were impaired by reference to the lowest trading price of bitcoin *at any time*

during the period, which the Company did not do. Instead, the Company used the ~~U.S.~~**US** Dollar bitcoin ~~spot~~
**spot** rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest

trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time,

leading the Company to understate impairment and overstate the value of its bitcoin holdings.

94**168**. The Q2 2021 10-Q also stated that:

*The Company accounts for its digital currencies as indefinite-lived intangible assets  in  accordance  with  Accounting  Standards  Codification  ("ASC")  350,  Intangibles – Goodwill and Other*. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, *net of any impairment losses incurred since receipt*. *Pursuant to guidance from ASC 820, Fair Value Measurement, the Company is required to determine the non-recurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value falls below the carrying value of the digital currencies*. The digital currencies can only be marked down when impaired and not marked up when their value increases. *The resulting carrying value represents the fair value of the asset*.

95**169**. Similarly, the Q3 2021 10-Q stated that:

*The Company accounts for its digital currencies as indefinite-lived intangible assets  in  accordance  with  Accounting  Standards  Codification  ("ASC")  350, Intangibles – Goodwill and Other*. The Company's digital currencies are initially recorded at fair value upon receipt (or "carrying value"). On a quarterly basis, they are measured at carrying value, *net of any impairment losses incurred since receipt*. *Pursuant to guidance from ASC 820, Fair Value Measurement, the Company is required to determine the non-recurring fair value measurement used to determine impairment of the digital currencies held on the balance sheet. The Company will record impairment losses as the fair value falls below the carrying value of the digital currencies*. The digital currencies can only be marked down when impaired and not marked up when their value increases. *The resulting carrying value represents the fair value of the asset*.

**146**

96**170**. The statements in the two above paragraphs were materially false and misleading because (i) the Company did not account for its bitcoin holdings in accordance with ASC 350 or ASC 820, (ii) did not measure the carrying value of its bitcoin holdings net of any impairment losses incurred since receipt, and (iii) did not record impairment losses as the fair value of bitcoin fell below the Company's carrying value of its bitcoin holdings. These accounting rules required that the Company assess whether and to what extent its bitcoin holdings were impaired by reference to the lowest trading price of bitcoin *at any time* during the period, which the Company did not do. Instead, the Company used the ~~U.S.~~**US** Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was **lower** ~~lower~~ than the lowest price at the Company's selected cut-off time, leading the Company to **understate** ~~understate~~ impairment and overstate the value of its bitcoin holdings.

97**171**. The 2021 10-K further stated that:

> ***Market Price Risk of Bitcoin.*** We have invested a significant portion of our cash in bitcoin and, as of December 31, 2021, we held approximately 8,115 bitcoins. The carrying value of our bitcoins as of December 31, 2021 was $42,667, which reflects cumulative impairments of $29.6 million, on our Consolidated Balance Sheet. As discussed in Note 2, Summary of Significant Accounting Policies, to the Consolidated Financial Statements, ***we account for our bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition***. Impairment losses cannot be recovered for any subsequent increase in fair value. For example, the market price of one bitcoin in our principal market ranged from
> $46,178 - $67,634 during the three months ended December 31, 2021, ***but the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition***. Therefore, negative swings in the market price of bitcoin could have a material impact on our earnings and on the carrying value of our digital assets. Positive swings in the market price of bitcoin are not reflected in the carrying value of our digital assets and impact earnings only when the bitcoin is sold at a gain. For the year ended December 31, 2021, we incurred impairment losses of $29.6 million on our bitcoin. As of March 9, 2022, at 4:00 p.m. EST, the market price of one bitcoin in our principal market was $38,900.

98**172**. The statements in the above paragraph were materially false and misleading because the Company did not report the carrying value of each bitcoin it held at the end of the reporting period in a manner that reflected the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition. Instead, the Company used the ~~U.S.~~**US** Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings.

**147**

99173. In addition, the Company's Class Period Reports contained materially false and misleading reports of impairment of the Company's bitcoin holdings that violated GAAP.

100174. The Q1 2021 10-Q reported that the Company's bitcoin holdings were impaired by $662,119 in that quarter and, as a result, the Company's total operating expenses were $56,208,229.

101175. The Q2 2021 10-Q reported that the Company's mined bitcoin holdings were impaired by $11,078,660 in that quarter and that, as a result, the Company's total operating. expenses were $24,700,251.

102176. The Q3 2021 10-Q reported that the Company's bitcoin holdings were impaired by $6,731,890 in that quarter and that, as a result, the Company's total operating expenses were $115,991,238.

103177. The 2021 10-K reported that the Company's bitcoin holdings were impaired by $29,552,991 in that year and that, as a result, the Company's total operating expenses were $201,855,397.

104178. The Q1 2022 10-Q reported that the Company's bitcoin holdings were impaired by $19,551,254 in that quarter and that, as a result, the Company's total operating and administrative. expenses were $34,450,350.

105179. The Q2 2022 10-Q reported that the Company's bitcoin holdings were impaired by $127,590,231 in that quarter.

106180. The Q3 2022 10-Q reported that the Company's bitcoin holdings were impaired by $5,903,891 in that quarter.

107181. These reports of impairment of the Company's bitcoin holdings in the seven above**were materially** paragraphs were materially false and misleading by virtue of the Company's violation of ASC 350 **false and misleading because they violated ASC 350 as well as of Defendants' own statements that** as well as of the Company's own statements in the 2021 10-K that the**book** value of the Company's

bitcoin holdings reflected the lowest price of one bitcoin quoted

at any time since its acquisition. ASC 350 and 820 required that the Company assess whether and

to what extent its bitcoin holdings were impaired by reference to the lowest trading price of bitcoin *at any time* during the period, which the Company did not do despite explicitly stating it did so in

the 2021 10-K. Instead, the Company used the U.S.**US** Dollar bitcoin spot rate at a cutoff time selected

by the Company. During

**148**

the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings. The Company's violations of GAAP were revealed on February 28, 2023, and the true impairment of the Company's bitcoin holdings, and its effect on the Company's financial condition, was revealed by the Restatement as set forth in Section VII, set forth in Section IV.L. and Appendix A. below.

182. In addition to these materially false and misleading statements regarding impairment of the Company's bitcoin holdings, Defendants issued press releases that also contained materially false and misleading statements regarding that subject.

183. On May 10, 2021, Defendants issued a press release on the Investor Relations section of the Company's website. This press release quoted Defendants Thiel and Salzman, and stated:

> For the first quarter ended March 31, 2021, the carrying value of Marathon's digital assets (comprised solely of bitcoin) was $292.6 million, which reflects cumulative impairment charges of $662k since acquisition. Marathon accounts for its digital assets as indefinite-lived intangible assets, which are initially recorded at cost. Subsequently, they are measured at cost, net of any impairment losses incurred since acquisition. Marathon determines the fair value of its bitcoin based on quoted (unadjusted) prices on the active exchange that Marathon has determined is its principal market for bitcoin. Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price. Impairment losses are recognized as "Impairment of cryptocurrencies" in Marathon's Consolidated Condensed Statements of Operations.

184. On August 13, 2021, Defendants issued a press release on the Investor Relations section of the Company's website. This press release quoted Defendants Thiel and Salzman; Salzman's statement regarding the Company's Q2 2021 results noted that "impairments on our mined bitcoin holdings" were one of the "non-cash items that impact[ed] our financial results." The press release also stated:

> For the second quarter ended June 30, 2021, the carrying value of Marathon's mined digital assets (comprised solely of bitcoin) was $29.0 million, which reflects cumulative impairment charges of $11.7 million year-to-date. Marathon accounts for its digital assets as indefinite-lived intangible assets, which are initially recorded at cost. Subsequently, they are measured at cost, net of any impairment losses incurred since acquisition. Marathon determines the fair value of its bitcoin based on quoted (unadjusted) prices on the active exchange that Marathon has determined is its principal market for bitcoin. Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.

**149**

**Impairment losses are recognized as "impairment of mined cryptocurrency" in Marathon's Consolidated Condensed Statement of Operations.**

**185.   On November 10, 2021, Defendants issued a press release on the Investor Relations section of the Company's website. This press release quoted Defendants Thiel and Salzman, and stated:**

*For the third quarter ended September 30, 2021, the carrying value of Marathon's mined digital assets (comprised solely of bitcoin) was $73.9 million, which reflects cumulative impairment charges of $18.5 million year-to-date.* **Marathon accounts for its digital assets as indefinite-lived intangible assets, which are initially recorded at cost. Subsequently, they are measured at cost, net of any impairment losses incurred since acquisition. Marathon determines the fair value of its bitcoin based on quoted (unadjusted) prices on the active exchange that Marathon has determined is its principal market for bitcoin.** *Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.* **Impairment losses are recognized as "impairment of mined cryptocurrency" in Marathon's Consolidated Condensed Statement of Operations.**

**186.   Finally, on March 1, 2022, Defendants issued a press release on the Investor Relations section of the Company's website. This press release quoted Defendants Thiel and Salzman, and stated:**

*As of December 31, 2021, the carrying value of Marathon's mined digital assets (comprised solely of bitcoin) was $123.2 million, which reflects cumulative impairment charges of $29.6 million year-to-date.* **Marathon accounts for its digital assets as indefinite-lived intangible assets, which are initially recorded at cost. Subsequently, they are measured at cost, net of any impairment losses incurred since acquisition.** *Marathon determines the fair value of its bitcoin based on quoted (unadjusted) prices on the active exchange that Marathon has determined is its principal market for bitcoin. Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin. If the carrying value of a bitcoin exceeds that lowest price, an impairment loss has occurred with respect to that bitcoin in the amount equal to the difference between its carrying value and such lowest price.* **Impairment losses are recognized as "impairment of mined cryptocurrency" in Marathon's Consolidated Condensed Statement of Operations.**

**187.   The statements in those four press releases were materially false and misleading because the Company did not report the carrying value of each bitcoin it held at the end of the reporting period in a manner that reflected the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition. Instead, the Company used the US Dollar bitcoin spot rate at a cutoff time selected by the Company. During the reporting periods at issue, the lowest trading price of bitcoin was lower than the lowest price at the Company's selected cut-off time, leading the Company to understate impairment and overstate the value of its bitcoin holdings.**

C.   **Materially False and Misleading** ~~Reports of~~**Statements Regarding** **Cost of Revenues** ~~Accounted for~~**and Revenues Accounted for** **in Violation of GAAP**

~~108~~**188**.   The Company's periodic reports for the third quarter of 2021 through the second

**150**

quarter of 2022 were false and misleading by reporting cost of revenues **and revenues** that were ~~accounted for~~

**accounted for** in violation of GAAP as a result of the Company's improper accounting with respect

to ~~MaraPool~~**Marapool**, as revealed by the Restatement.

~~109~~**189**.        The Q3 2021 10-Q reported that cost of revenue for the third quarter of 2021 was

$10,263,009**, and that revenue for that quarter was $51,707,483**.

~~110~~**190**.        The 2021 10-K reported that cost of revenue for the **fourth quarter of 2021 was**

**$14,033,000, and that revenue for that quarter was $60,282,000. The 2021 10-K also reported that**

**cost of revenue for the** fiscal year ended December
31, 2021 was $33,696,103~~.~~**, and that revenue**

**for that year was $150,463,770.**

~~111~~**191**.        The Q1 2022 10-Q reported that cost of revenue for the first quarter of 2022 was

$26,393,636**, and that revenue for that quarter was $51,717,718**.

~~112~~**192**.        The Q2 2022 10-Q reported that cost of revenue for second ~~first~~ quarter of 2022 **was**

~~was~~ $41,394,556**, and that revenue for that quarter was $24,921,816**.

~~113~~**193**.        These reports of the Company's ~~cost~~**costs** of revenue were materially false and

**misleading because they were understated as a result of the Company's improper accounting with**

**respect to Marapool. Further, these reports of the Company's revenues <span style="color:green">were materially false and</span>**

misleading because they were understated as a result of the Company's improper accounting with

respect to ~~MaraPool~~**Marapool**. The Company's violations of GAAP were revealed on February 28, 2023,

and the Company's true cost of revenue **and revenue** for these reporting periods was revealed by ~~the Restatement as set forth in Section VII, below.~~

<span style="color:green">**the Restatement as set forth in Section IV.L and Appendix A.**</span>

## VI.    LOSS CAUSATION

~~114~~**194**.        On February 28, 2023, during the trading day, Marathon issued a press release

"announc[ing] . . . that it has cancelled its webcast and conference call for the fourth quarter and

fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication

of its corresponding financial results."

~~115~~**195**.        That same day, also during the trading day, in a Form 8-K filed with the SEC, Marathon disclosed

**151**

receipt of a letter from the SEC relating to accounting errors in the Company's previously issued financial statements.

Specifically, the Company disclosed:

On February 22, 2023, Marathon Digital Holdings, Inc. [] received a comment letter from the Corporation Finance Staff of the Securities and Exchange Commission relating to, among other things, certain accounting matters as described further below.

On February 27, 2023, the Company's Audit Committee of the Board of Directors, after consultation with Marcum LLP, the Company's independent auditor, concluded that due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021
and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements.

Management and the Audit Committee have discussed these matters with Marcum LLP.

As a result of receiving the SEC comments on February 22, 2023 and the Audit Committee's determination to restate the Impacted Financial Statements, the Company is unable to complete and file its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 ("2022 Form 10-K") and to make the required corrections to its financials and accompanying disclosures for the Impacted Financial Statements by the filing deadline for the Company's 2022 Form 10-K of March 1, 2023. The Company expects to file a Form 12b-25 with the SEC indicating that the Company intends to file its 2022 Form 10-K on or before the fifteenth calendar day following the prescribed due date.

Among the restatement issues are:

**Impairment of digital assets:** The Company's digital assets (bitcoin) are indefinite lived intangible assets within the scope of FASB ASC 350 – *Intangible Assets*
 *Goodwill and Other* ("ASC 350") and as such, are subject to impairment testing on an annual basis or more frequently if events or changes in circumstances indicate it is more likely than not that the asset is impaired in accordance with ASC 350-30- 35-18.

The Company recently determined that its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance with the ASC 350- 30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value, which effectively calls for the intraday low price to be utilized in calculating impairment whenever events or changes in circumstances indicate it is more likely than not that the asset is impaired.

**Operation of a bitcoin mining pool that included third party participants**: In late 2021 and early 2022, the Company operated a bitcoin mining pool that included a small number of unrelated third-party participants. The Company accounts for revenues based on ASC Topic 606, *Revenue from Contracts with Customers* (ASC "606") and had determined that in its capacity as the operator of a mining pool that included third parties, it acted as an agent. As a result, the Company recorded revenues on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool.

The Company recently determined that its assessment that it acted as an Agent in operating the third-party mining pool was incorrect and that it should have concluded that it was acting as a principal in its capacity as the pool operator. The effect of this change from Agent to Principal is that the Company should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third

**152**

party participants.

The Company estimates that both its revenues and its cost of revenues for the year ended December 31, 2021 were understated due to the "net" vs. "gross" presentation of revenues in its financial statements. As a result, both revenues and cost of revenues, energy, hosting and other are expected to increase upon completion of this restatement for 2021. There will also be minor increases to revenues and cost of revenues, energy, hosting and other in previously issued interim financial statements in both 2021 and 2022. The restatement of the Impacted Financial Statements is not expected to have any impact on total margin, operating income or net income in 2021 or in any of the interim periods in 2021 or 2022. The Company no longer operates a pool that includes third parties.

116196.      As the market digested this news, which revealed that Defendants' prior statements

were materially false and misleading, and constituted the materialization of risks concealed by

**those statements, the Company's stock price fell 0.14% on February 28, 2023, while the Nasdaq**

**Blockchain Economy Index *rose*, generating a negative abnormal company-specific return. The**

**Company's stock price, which was $7.10 at the close of trading on February 28, 2023, fell further in afterhours trading**

**to at least as low as $6.82. The following trading day, March 1, 2023, as the**
**market continued to digest the Company's announcements, the Company's stock price fell 8.31%**

**to close at $6.51, even as the Nasdaq Blockchain Economy Index rose again. Marathon's stock**

those statements, Marathon's stock price fell $0.60 from its closing price on February 27, 2023 to
close at $6.51 on March 1, 2023, a

decline of *8.31%*.

117197.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline
in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and

damages.

**VII.   THE RESTATEMENT**
118.   On March 16, 2023, the Company filed its late annual report on Form 10-K for the fiscal year ended December 31, 2022, correcting the accounting violations discussed above and restating its financial results for the periods covered by the Impacted Financial Statements (the "Restatement"). The 2022 10-K disclosed, inter alia, that:

*The Company received Staff comments **during 2022** which **are material and still under review** as set forth below. We **additionally** have described below **certain comments more recently received** which relate to certain restatement items in this Form 10-K in order to provide complete disclosure and not imply that the restated items set forth below have been fully resolved.*

● Revenue recognition. The Staff commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool. The Company has, in the restated financial results, revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. . . .

● Impairment of bitcoin. The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.

**153**

119. The 2022 10-K disclosed:

The Company corrected its previous conclusion that as the operator of Marapool ("Operator"), third-party mining pool participants ("pool participants") are its customer. The Company previously viewed such pool participants as principal to the delivery of transaction verification services to the network and requester and therefore recognized revenue net of amount remitted to pool participants' pro rata entitlement to block rewards and transaction fees. *The Company has since corrected its revenue recognition policy and concluded that the Company's customers are the transaction requestor and the blockchain network, and that the Company controls the transaction verification services as an Operator. This results in recognition of all transaction fees and block rewards earned from transaction verification services performed by the Company in its role as an Operator of*

*MaraPool as revenue from contracts with customers under Topic 606, with the portion of the transaction fees and block rewards remitted to MaraPool participants as cost of revenues.*

120. The Company disclosed restated cost of revenues for 2021 and reported cost of revenues for 2022 that corrected the improper accounting for cost of revenues related to MaraPool originally reported for the first two quarters of 2022. The Restatement revealed that the Company's prior reports of cost of revenue were understated by the following amounts as a result of the Company's improper accounting with respect to MaraPool:

| *Period* | *Amount of Understatement In Original Report* |
|---|---|
| Q3 2021 | $624,000, or 6% |
| Full year 2021 | $8.699 million, or 25.8% |
| Q1 2022 | $5,000, or 0.19% |
| Q2 2022 | $1,000, or 0.02% |

121. The 2022 10-K further disclosed:

Impairment of bitcoin. *The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.*

122. The 2022 10-K further explained:

*The Company corrected its calculation of impairment on digital assets that used the U.S. Dollar bitcoin spot rate at a standard cutoff time instead of the lowest U.S. Dollar bitcoin spot rate at any point in time during the day.* The Company's correction of this calculation results in it recognizing impairment in an amount by which the carrying value exceeds the fair value of the digital assets at any point in time during the day.

123. The 2022 10-K reported restated amounts of impairment for the Company's bitcoin holdings. The Restatement showed that the Company had materially understated the impairment of its bitcoin holdings, as follows:

| *Period* | *Amount of Understatement In Original Report* |
|---|---|
| Q1 2021 | $204,000, or 30.8% |
| Q2 2021 | $1,944,000, or 17.6% |
| Full year 2021 | $2.448 million, or 8.3% |
| Q1 2022 | $3,756,000, or 19.2% |

**154**

| Q2 2022 | $6,797,000, or 5.3% |
|---------|---------------------|

124. The table below further illustrates the impact of the Restatement, with respect to the Company's improper impairment of its bitcoin assets, on the Company's financial statements:

| ($000s, except per share amts.) | Q1 2021 3/31/2021 | Q2 2021 6/30/2021 | Q3 2021 9/30/2021 | Q4 2021 12/31/2021 | 2021 12/31/2021 | Q1 2022 3/31/2022 | Q2 2022 6/30/2022 | Q3 2022 9/30/2022 |
|---|---|---|---|---|---|---|---|---|
| | | | | (Over)/understated by | | | | |
| Total Revenues | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cost of revenues | - | - | - | - | - | - | - | - |
| Operating income (loss) | (204) | (1,944) | 551 | (851) | (2,448) | (3,756) | (6,797) | 4,529 |
| Income (loss) before income taxes | (204) | (1,944) | 551 | (851) | (2,448) | (3,756) | (6,797) | 4,529 |
| Net income (loss) | $ (204) | $ (1,944) | $ 551 | $ (265) | $ (1,748) | $ (3,756) | $ (7,155) | $ 4,739 |
| Earnings (loss) per share - diluted | $ (0.01) | $ (0.02) | $ - | $ - | $ (0.02) | $ (0.04) | $ (0.06) | $ 0.04 |

125. As the above table shows, the Company's GAAP violations resulted in it reporting operating income/loss, income/loss before income taxes, net income/loss, and earnings per share (diluted) that were materially more positive than they, in reality, were for the first two quarters of 2021, the fiscal year of 2021, and the first two quarters of 2022.

VIII. DEFENDANT GALLAGHER ABRUPTLY LEAVES THE COMPANY

126. The Restatement was the last SEC filing that Defendant Gallagher signed on behalf of the Company. On March 31, 2023 – only *two weeks* after the Restatement – the Company announced that Defendant Gallagher, who had become the Company's CFO just one year earlier, would leave his job effective May 12, 2023. According to the Company, Defendant Gallagher was leaving for unspecified "personal reasons." The Company did not announce Gallagher's successor at that time. In fact, the CFO position was not filled until June 14, 2023, meaning the Company had no CFO for an entire month, even as it consummated a private placement offering of over $14 million of its Series A redeemable convertible preferred stock, which is a transaction in which a CFO would normally be centrally involved.

IXVII. ADDITIONAL ALLEGATIONS CONCERNING SCIENTER

127198. In addition to the allegations above, a strong inference of Defendants' scienter is further established by the following allegations. Allegations that pertain to more than one Defendant are set forth first. Following those allegations are subsections concerning each Defendant that explain how those allegations pertain to each Defendant and set forth any additional scienter allegations specific to that Defendant.

**155**

56

**A.** ~~The 2021 10-K~~Defendants Did Not Do What They **Explicitly** ~~Acknowledged A Requirement That Defendants~~Told Investors.

~~Violated.~~

**199.    Defendants told investors that the Company "account[ed] for [its] bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our**

~~128.    In the 2021 10-K, Defendants provided greater specificity concerning its assessment of impairment of its bitcoin holdings under GAAP. The 2021 10-K specifically~~**bitcoin decreases below their carrying value *at any time* since their acquisition." Defendants further** stated that "the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest **price of one bitcoin quoted on the active exchange *at any time* since its acquisition," as stated in the 2021 10-K, which Defendants Thiel and Gallagher signed and certified.**

**200.    Defendants did not do what they said. Instead, they calculated any impairment of the Company's bitcoin holdings by using the price of bitcoin at an arbitrary cut-off time selected by Defendants.**

**201.    These facts contribute to a strong inference of scienter for two reasons. First, Defendants made an explicit, affirmatively false statement, including in the exact same SEC filing (the 2021 10-K) that directly contradicted that statement. Second, by stating that they were applying the correct accounting method (of using the lowest** price of ~~one~~bitcoin ~~quoted on the active exchange~~at any time since its ~~acquisition." Thus,~~

**acquisition),** Defendants ~~explicitly~~acknowledged ~~that GAAP~~ ~~required the Company to~~ ~~assess the impairment~~**the existence and correctness of that method. These facts**

**thus contribute to a strong inference that Defendants were at least reckless when telling investors**

**that the Company calculated the impairment** of its bitcoin holdings **by** using the lowest ~~bitcoin trading~~price ***at any time*** ~~since the Company~~**of**

~~acquired the bitcoin. Though Defendants' statement that the Company complied with this rule was false, it contributes to the~~

~~strong inference of their scienter.~~

**bitcoin at any time since acquisition.**

**B.** ~~Defendants Violated Clear and Long-Standing~~The SEC Criticized the Company's **Accounting** ~~Rules.~~Methods, and Defendants

Acknowledged during the Class Period That the Company's Methods Were

Improper

~~129.    A strong inference of Defendants' scienter is further established by the fact that~~

**156**

202.    Beginning on April 8, 2022, the SEC posed extensive questions to the Company,

~~they violated clear and long-standing accounting rules under GAAP.The Company did not~~ revealing the SEC's criticism of the Company's accounting practices. These criticisms clearly

~~identify any new facts or circumstances previously unknown to it that led it to correct its prior~~ indicated that the Company's accounting practices were improper. Indeed, on June 24, 2022, the

SEC explicitly directed the Company to "revise your accounting to comply with ASC 350," referring to the

Company's determination of impairment of its bitcoin holdings Further, the

Company itself conceded on June 13, 2022, that, with respect to Marapool, "it is a principal under

ASC 606," and not an agent as it told investors, before attempting to reverse course on August 26,

2022 (despite the issuance of the Q2 2022 10-Q during the interim, on August 9, 2022).

203.    Defendant Gallagher, the CFO, was the recipient of the SEC's letters and the sender ~~improper accounting.~~ of the Company's letters. Thus, his knowledge of the correspondence cannot be disputed. Further,

given the significance of the issues raised by the SEC, the extensive nature of the correspondence,

the small size of the Company, and the fact that the letters involved the C-suite, it is not plausible

that Defendants Thiel and Salzman (then the CEO and CAO, respectively) were not aware of the

details of the correspondence. Further, as the most senior officers at the time, it is not plausible

that Defendants Thiel, Gallagher, and Salzman were not responsible for the decision to keep the correspondence secret

until after the Class Period.

C.    Defendants Thiel, Salzman, and Gallagher Signed and Certified the Company's SEC Filings

204.    During the Class Period, Defendants Thiel, Salzman, and Gallagher signed the

Company's SEC filings and certified that they did not contain any material misstatements, that

they had assessed the Company's disclosure controls and internal controls over financial reporting

and that those controls did not have any weaknesses concerning the Company's accounting for impairment of its

bitcoin holdings or for Marapool.

205.    These Defendants did this despite the Company's violation of GAAP and the SEC's criticisms of the

Company's accounting practices. Indeed, even though the SEC explicitly told the Company on June 24, 2022, that

"[y]our policy of utilizing a standardized time on a daily basis to

assess for impairment does not appear to comply with ASC 350-30-35-18" and directed the

**157**

**Company to "revise [its] accounting to comply with ASC 350," Defendants Thiel and Gallagher subsequently signed and certified the Q1 2022 10-Q, the Q2 2022 10-Q, and the Q3 2022 10-Q.**

**Further, after the Company conceded to the SEC on June 13, 2022, that "[t]he Company has concluded that it is a principal under ASC 606" with respect to Marapool, Defendants Thiel and Gallagher signed and certified the Q1 2022 10-Q, the Q2 2022 10-Q, and the Q3 2022 10-Q.**

**Though the Company attempted to reverse its position on August 26, 2022, claiming that it was in fact an agent with respect to Marapool, Defendants Thiel and Gallagher signed and certified the Q2 2022 10-Q, which was issued on August 9, 2022, before that reversal.**

> **D.    During the Class Period, the Company's Auditor Explicitly Acknowledged the Proper Method to Determine the Impairment of Bitcoin**

~~130.~~    ~~Indeed~~**206.    During the Class Period**, the Company's ~~own~~ auditor, Marcum, explicitly acknowledged ~~*during the Class Period*~~ ~~that GAAP's impairment requirement requires companies to record the value of~~

**that GAAP required companies to record the impairment of** Bitcoin ~~at~~**by using** its lowest value ~~*not*~~ ~~its lowest value at an~~ ~~arbitrary "closing" time. The article was~~ **since** ~~attributed to Robert Graham's Marcum's National Leader – Digital Assets & Blockchain.~~ ~~Published on Marcum's website on October 20, 2022~~ ~~*months before the Company issued the*~~

**acquisition, rather than using an arbitrary "closing" time. On October 20, 2022,** *four months before the Company issued the Restatement,* **and before the Company filed the Q3 2022 10-Q, Marcum**

~~*Restatement*~~ ~~the~~**published an** article ~~addressed~~**regarding** the FASB's tentative recommendation to modify accounting **rules** ~~rules~~ for reporting cryptocurrency assets~~, stating that~~**. The article stated**:

> This recommendation may prove a boon to the cryptocurrency industry as advocates for the change have long suggested that adopting the fair-value accounting method will enable crypto holdings to be accurately valued on corporate balance sheets. The existing impairment requirement will be phased out so an asset won't have to be recorded at its *lowest ever post-purchase value*.~~89~~

**207.    Thus, Marcum explicitly acknowledged that the "existing impairment requirement" called for "an asset . . . to be recorded at its lowest ever post-purchase value," rather than at an arbitrary time. The was attributed to Robert Graham, Marcum's National Leader – Digital Assets & Blockchain.**

**208.    Further, Marcum sought to position itself as a leader in the field of digital assets, i.e., cryptocurrencies such as Bitcoin. Indeed, the article mentioned above was published as part**

**158**

**9**    *See* https://www.marcumllp.com/insights/fasb-recommends-new-cryptocurrency-accounting-method-with-significant-impact-on-corporate-reporting.

of a strategy to attract clients with significant digital assets. Thus, Marcum had a motive not to compel Defendants to acknowledge that the Company's method to determine the impairment of its bitcoin holdings (1) was contradicted by Defendants' explicit statements, and (2) violated GAAP, as that could prompt Defendants to fire Marcum. Indeed, on March 10, 2025, after the Class Period, the Company announced that it was dismissing Marcum as its independent auditor and hiring PricewaterhouseCoopers LLP ("PwC") in its stead.

### E.    Defendants Violated Clear and Long-Standing Accounting Rules.

**209.**    A strong inference of Defendants' scienter is further established by the fact that they violated clear and long-standing accounting rules under GAAP. The Company did not identify any new facts or circumstances previously unknown to it that led it to correct its prior improper accounting.

~~131~~**210**.    The prominent accounting firm Deloitte also recognized that GAAP, during the Class Period, "require[d] entities to use a crypto asset's *lowest observable fair value* within a reporting period."~~9~~**10**

~~132~~**211**.    Furthermore, other major companies including Tesla and MicroStrategy, as discussed above, acknowledged that GAAP required them to use the lowest recorded price of bitcoin when assessing whether and to what extent their bitcoin holdings were impaired. This is particularly significant given the prominence of Tesla's announcement in February 2021 that it was buying $1.5 *billion* in bitcoin, which was credited for pushing the price of bitcoin up by 20%. Furthermore, Defendant Okamoto specifically acknowledged MicroStrategy in his January 25, 2021 announcement that the Company had purchased $150 million in bitcoin, stating:

> By purchasing $150 million worth of Bitcoin, we have accelerated the process of

**8**    ~~https://www.marcumllp.com/insights/fasb-recommends-new-cryptocurrency-accounting-method-with-significant-impact-on-corporate-reporting~~

**9**    **10**    *See* https://dart.deloitte.com/USDART/home/publications/deloitte/heads-up/2023/~~fasb-issues-asu-crypto-assets~~**fasb- issues-asu-crypto-assets.**

> building Marathon into what we believe to be the de facto investment choice for individuals and institutions who are seeking exposure to this new asset class. We also believe that holding part of our Treasury reserves in Bitcoin will be a better long-term strategy than holding US Dollars, similar to other *forward-thinking companies like MicroStrategy.*

**159**

**212.    Many other companies acknowledged this requirement as well. For example, like** ~~133.    Thus, Defendants' decision to violate this rule when reporting its Bitcoin assets to investors was *at least* reckless.~~ **Tesla and MicroStrategy, as noted above, Phunware, Inc. stated in its annual report on Form 10-K**

**for the year ended December 31, 2021, filed with the SEC on April 7, 2022, that:**

> **We determine the fair value of our digital assets on a nonrecurring basis in accordance with ASC 820, Fair Value Measurement, based on quoted prices on the active exchange(s) that we have determined is the principal market for bitcoin and ethereum (Level 1 inputs). We perform an analysis each quarter to identify whether events or changes in circumstances, principally decreases in the quoted prices on active exchanges, indicate that it is more likely than not that our digital assets are impaired. *In determining if an impairment has occurred, we consider the lowest market price quoted on an active exchange since acquiring the respective digital asset.* If the then current carrying value of a digital asset exceeds the fair value, an impairment loss has occurred with respect to those digital assets in the amount equal to the difference between their carrying values and the fair value.**

**213.    Similarly, Cipher Mining, Inc., stated in its annual report on Form 10-K for the year**

**ended December 31, 2021, filed with the SEC on March 4, 2022, that:**

> **In determining if an impairment has occurred, we will consider the lowest price of one Bitcoin quoted on the active exchange at any time since acquiring the specific Bitcoin held. *If the carrying value of a Bitcoin exceeds that lowest price at any time during the quarter, an impairment loss is deemed to have occurred with respect to that Bitcoin in the amount equal to the difference between its carrying value and such lowest price, and subsequent increases in the price of Bitcoin will not affect the carrying value of our Bitcoin.***

**214.    For one more example, a prospectus filed with the SEC on April 1, 2022, by**

**TradeUP Global Corporation (now known as SAI.TECH Global Corporation) stated that that**

**company,**

> **In determining if an impairment has occurred, we will consider the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin held. *If the carrying value of a bitcoin exceeds that lowest price at any time during the quarter, an impairment loss is deemed to have occurred with respect to that bitcoin in the amount equal to the difference between its carrying***

**160**

*value and such lowest price, and subsequent increases in the price of bitcoin will not affect the carrying value of our bitcoin.*

215. The fact that these companies employed the correct method to determine the impairment of their digital currency holdings is not their only similarity. Phunware, Cipher Mining, and TradeUP were all audited by *Marcum*.[11]

216. Further, when the FASB, on March 23, 2023, issued a proposed accounting standards update ("ASU") seeking comment as to whether it should modify accounting rules for crypto assets, such that they would no longer be accounted for like other indefinite-lived intangible assets, many commenters noted that the then-existing rule required the use of the lowest price ever since acquisition of the digital assets, including:

   a. A May 23, 2023 letter complaining, "How can FASB allow banks to keep bonds on their balance sheet at their nominal value (and not mark to market) yet *demand that bitcoin must be valued at the lowest market price that occurred in a period*?;"

   b. A June 5, 2023 letter from Foundry Digital, a financing and advisory company focused on digital asset mining and staking, noted that "there are already multiple public companies that are not allowed to measure their digital assets at fair value *and therefore continuously write down the asset to its lowest reported price in each reporting period*;"

   c. A June 5, 2023 letter from Digital Currency Group, which made the same observation as the Foundry Digital letter;

---

[11] Phunware and Cipher Mining were audited at the time by Marcum LLP. TradeUP Global was audited by Marcum Bernstein & Pinchuk LLP, a joint venture with Marcum LLP, which later changed its name to "Marcum Asia CPAs LLP."

   d. A June 5, 2023 from Grayscale Investments LLC, making the same observation as the Digital Currency Group and Foundry Digital letters; and

   e. A June 6, 2023 letter from Robert Traficanti, the Global Head of Accounting Policy at Citigroup, which stated that "We believe changing from an impairment model to

**161**

a fair value model would be less costly for Citi to implement in the future and for the vast majority of entities, given *the impairment model is costly requiring preparers to identify the lowest price during the reporting period*."

217.    In December 2023, after receiving comments, FASB issued the final rule addressing the accounting and disclosure requirements for digital currency assets, known as ASU 2023-08. Deloitte, one of the "big four" accounting firms, noted that:

Before ASU 2023-08, entities (other than those within the scope of the investment- company guidance in ASC 9462 or certain types of broker-dealers) accounted for crypto assets as indefinite-lived intangible assets in accordance with ASC 350 (i.e., the assets were measured at historical cost less impairment). *Stakeholders had raised concerns that, among other factors, this intangible asset model* (1) did not faithfully represent the economics of crypto assets and (2) *made the recognition of impairments needlessly complex by requiring entities to use a crypto asset's lowest observable fair value within a reporting period*.

218.    The accumulation of evidence establishing that it was widely understood (including by other companies audited by Marcum, the Company's auditor) that GAAP, during the Class Period, required use of the lowest price ever since acquisition of digital currency to determine its impairment, further bolsters the strong inference that Defendants were at least reckless when they told investors that they followed that same method but, in fact, followed a different one.

~~134~~**219**.    Further, the Company's violation of ASC Topic 606 and the resulting understatement of cost of revenues arising from the Company's operation of ~~MaraPool~~**Marapool** involved clear and long-standing accounting rules. The Company's recognition that ASC Topic 606 required it to record its cost of revenues on a gross basis did not result from any new facts that were not available to Defendants at the time of their misleading statements. Thus, Defendants misstatements concerning revenues from ~~MaraPool~~**Marapool** were made at least with recklessness.

~~135~~**220**.    The fact that the Company committed multiple accounting violations regarding the core of its business is strong evidence that Defendants acted at least recklessly in reporting the Company's Bitcoin assets and cost of revenues, and in assuring investors about the Company's internal controls over financial reporting.

**F.    Defendants' GAAP Violations Concerned the Company's Core Operations, Which Were Handled by A Remarkably Small Number of People.**

221.    Defendants' GAAP violations concerned the core operations of the Company:

**162**

Bitcoin mining, including through Marapool. In addition, the Company had a remarkably small number of employees during the Class Period, and the Company's financial operations were conducted in house by a team that included Defendant Salzman and then Defendant Gallagher.

222. Specifically, as of October 2020—when Defendant Salzman was hired--the Company brought its financial operations in house. After that date, the Company's financial operations were completed by the Company's accounting team that consisted of the Chief Financial Officer (Salzman, and then Gallagher), the Chief Operating Officer, and a bookkeeper. In early 2021, the Company also added a controller to this team.

223. As of March 12, 2021, two months before the Class Period, the Company had only three full-time employees. At that time, Defendant Okamoto was the CEO, Defendant Salzman was the CFO, and Mr. James Crawford was the Chief Operating Officer. On information and belief, Defendants Okamoto and Salzman were two of the three full-time employees at that time.

224. As of February 28, 2022, the Company had only ten full-time employees. At that time, Defendant Thiel was the CEO and Defendant Salzman was the CFO. On information and belief, they were two of the Company's ten employees at that time.

225. As of February 20, 2023, the Company had only had 30 full-time employees. At that time, Defendant Thiel was the CEO and Defendant Salzman was the CFO. On information and belief, they were two of the Company's ten employees at that time.

226. Further, Defendant Thiel confirmed his involvement in and knowledge of all Company operations. Thiel testified under oath on July 15, 2024, that "when I joined Marathon as CEO in April of 2021, I was Employee No. 4. Actually, technically Number 5. So we were a very small company." Thiel further testified that "I had a CFO and a head of operations, *but* every decision about hiring, every order we made for machines, *every decision we made about anything we did, I had to be informed of it myself with direct personal involvement*," and that "because I was there from the very beginning essentially when we began to scale, *I've been involved in every decision we've made*." The fact that Thiel specifically noted that he was involved in "every decision" despite the fact that the Company "had a CFO" makes clear that Thiel was involved in

**163**

financial and accounting decisions, not just operational decisions.

227.    In addition, the fact that the Company had a *de minimis* number of employees before Thiel succeeded Defendant Okamoto as CEO indicates that Okamoto had similar plenary involvement in all Company decisions, including financial and accounting decisions, and was thus aware of how the Company accounted for its bitcoin holdings after he transitioned to the role of Executive Chairman.

**164**

~~C~~G.        Defendants ~~Have Never Fully Disclosed the Comment Letter or Previously Hidden SEC Comments Received During 2022.~~**Did Not Disclose the Company's Extensive Correspondence with the SEC Until Over a Year After the Class Period Ended.**

~~136~~**228**.        The strong inference of Defendants' scienter is further bolstered by the fact that

**they withheld the extensive correspondence between the SEC and the Company until more than a**

~~they withheld the   Comment Letter~~**year after the Class Period ended,** rather than filing it publicly for investors to read, as is common.

Indeed, the Company has itself previously filed *thirty-three* letters it received from the SEC.

~~Nevertheless, the Company did not file the Comment Letter it received on February 22, 2023.~~

**229.    However, Defendants chose not to reveal any of the five letters it received from**

~~137.    Rather,~~**during the Class Period, or** the Company's ~~first disclosure of the Comment Letter, on~~**six substantive letters in response, until** February 28,

**2023, when Defendants obliquely described the February 22, 2023 SEC Letter as "relating to,**

~~2023, obliquely described the letter~~ ~~as "relating to,~~among other things, certain accounting matters
as described further below.**"** The February 28, 2023

announcement did not clearly disclose the
 contents of ~~the Comment~~**February 22, 2023 SEC** Letter, stating ~~instead that as a result of the Comment Letter *and* the~~

**instead that as a result of the Comment Letter *and* the** determination of the Company's Audit
Committee, the Company would restate the Impacted
 Financial Statements, and that "among the restatement issues" were impairment of bitcoin in

 compliance with the ASC 350-30-35-19 and

accounting for ~~MaraPool~~**Marapool** revenues under ASC Topic **606. Nor did it disclose the existence or**

~~606.~~
**contents of any of the other letters exchanged by the SEC and the Company during the Class Period.**

~~138~~**230**.        Then, in the late-filed 2022 10-K, the Company disclosed that it "received [SEC]

Staff comments during *2022* which are material and still under review," *as well as* "certain

comments more recently received which relate to certain restatement items in this Form 10-K."

All of these comments were listed under the heading "Unresolved Staff Comments." The **Company**

~~Company~~ did not file the ~~Comment Letter received in~~ February **22,** 2023 ~~or the comments it received~~**SEC Letter or any of the other Class Period correspondence**

**between the SEC and the Company until July 14, 2024, over a year after the Class Period. Notably,**
~~during 2022, leaving investors to guess exactly what the SEC said and when~~**this was after Defendants Salzman and Gallagher left the Company**. Defendants' decision **to keep**

**165**

to keep investors in the dark about the details of the SEC's correspondence contributes to a strong inference of Defendants'

scienter.

### H. Impairment of the Company's Bitcoin Holdings Was Specifically Addressed During Earnings Calls

231. A strong inference of the scienter of Defendants Gallagher, Thiel, and Salzman is further supported by the fact that impairment of bitcoin holdings was specifically addressed in Marathon earnings calls during the Class Period. During the Company's earnings calls regarding Q1 2022 (on May 8, 2022), Q2 2022 (on August 8, 2022), and Q3 2022 (on November 8, 2022), Defendants Thiel and Gallagher spoke to investors. At the time of these calls, Defendant Salzman was serving as the Company's Chief Accounting Officer.

232. On May 8, 2022, during the Company's earnings call regarding Q1 2022, Defendant Gallagher noted in his prepared remarks that:

> At March 31 we held 4,579 self-mined bitcoin with a book value of $155.6 million. We also held bitcoin in an investment fund with a book value of $218.2 million that investment fund is carried at fair value. The market value of all of our bitcoin holdings at March 31 was $427.7 million.

233. Defendant Gallagher thus contrasted the "market value" of the Company's bitcoin holdings, as well as the "book value" of bitcoin in the NYDIG Fund (which is carried at "fair value"), with the "book value" of the Company's "self-mined bitcoin," which reflects impairment of those holdings.

234. During the Q2 2022 earnings call on August 8, 2022, Defendant Gallagher's prepared remarks addressed impairment of the Company's bitcoin holdings at greater length. Gallagher informed analysts that the Company's results reflected "$81.5 million of an unfavorable earnings variance quarter-over-quarter" due to "a combined impairment expense/fair value decline of $207.3 million during the current period quarter, compared with $125.8 million in the prior year period." Indeed, Gallagher pointedly noted that "the largest single driver of the steeper loss in the quarter was the significant decline in the carrying value of our digital currencies, driven by the lower bitcoin prices during the quarter," referring to the impairment of those holdings to reflect lower trading prices of bitcoin during the quarter.

**166**

235.    During the same call, Defendant Gallagher also noted in his prepared remarks that "[a]s previously reported on June 13, we withdrew 4,769 bitcoin from [the NYDIG Fund" and transferred into direct company ownership," and that "[a]s a result, we no longer will receive mark-to-market accounting for the bitcoin formerly held in the investment fund and the 4,769 bitcoin are now classified on our balance sheet as digital currencies." This statement drew a distinction between the "mark-to-market accounting" for bitcoin held in NYDIG Fund (which Defendant Gallagher noted on May 8, 2022 was "carried at fair value"), and the treatment of bitcoin holdings as "digital currencies" on the balance sheet, which reflects impairment.

236.    Finally, on November 8, 2022, during the call regarding Q3 2022 earnings, Defendant Gallagher's prepared remarks further addressed this distinction, stating the following:

Turning to the value of our digital currencies. We experienced a $5.9 million *impairment in the carrying value of digital currencies* during the quarter compared with an impairment of $6.7 million in the prior year period. However, in last year's quarter, we also experienced an increase in the *fair value* of digital assets we *held in our investment fund* of $42.1 million. You'll recall that *we eliminated the investment fund during the second quarter of this year and we now hold all of our bitcoin as intangible assets subject to impairment. So overall, the negative period- over-period impact was $41.3 million*.

~~D~~237. Defendant Gallagher's ~~Abrupt Departure.~~statements directly addressing the impairment of the Company's bitcoin holdings, and noting that the impairment of those holdings distinguished them, from the "mark-to-market accounting" the Company employed for bitcoin held in NYDIG Fund,

~~139.~~    ~~The announcement~~provide further evidence of Defendant Gallagher's ~~abrupt departure from the Company~~familiarity with the determination of such impairment, and thus of his scienter. The fact that Defendant Gallagher made these statements, including the statement that "the largest single driver of the steeper loss in [Q2 2022] was the ~~a mere two weeks after the Restatement provides strong additional support for scienter. Not only did his departure come virtually immediately on the heels of the Restatement, Gallagher had served as the Company's CFO for just one year when his resignation was announced, though he had been hired on a three-year contract subject to automatic renewal. Further, by leaving at that time, Defendant Gallagher surrendered 100,000 restricted stock units (RSUs) that would have vested over the next two years at a schedule of 12,500 RSUs every three months. Had Gallagher remained in the CFO position for one more year—which would still be an unusually short tenure of merely two years as CFO—another 50,000 RSUs, worth over $400,000 at the time his departure was~~ significant decline in the carrying value of our digital currencies, driven by the lower bitcoin prices

**167**

during the quarter," during calls where Defendant Thiel also presented to investors, also supports an inference of Defendant Thiel's scienter. Finally, because Defendant Salzman was the Chief Accounting Officer at the time of these earnings calls, and thus necessarily was involved in announced, would vest.preparing the financial statements and drafting and/or confirming Defendant Gallagher's prepared remarks regarding the book value and impairment of the Company's bitcoin holdings, these statements also contribute to an inference of Salzman's scienter.

EI. Insider Stock Sales.Defendant Okamoto

238. A strong inference that Defendant Okamoto was at least reckless as to the possibility of misleading investors is established by numerous facts.

239. First, the Company did not account for its bitcoin in the manner that Defendants explicitly told investors, strongly indicating that Defendant Okamoto was at least reckless in approving those misstatements as well as that he was aware that the method that Defendants claimed the Company used was the correct one.

240. Second, the Company's auditor explicitly acknowledged that accounting for bitcoin in the manner that Defendants told investors the Company used, strongly indicating that Defendant Okamoto was aware that the method that Defendants claimed the Company used was the correct one.

241. Third, evidence establishing that it was widely understood that GAAP, at the time, required the Company to use the lowest price ever since acquisition of each bitcoin to determine the impairment of that bitcoin strongly indicates that Defendant Okamoto was aware of that understanding.

242. Fourth, the fact that Defendant Okamoto served as the Company's CEO when there were only three full-time employees strongly indicates that he was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

243. Fifth, the fact that the accounting methods at issue concerned the core of the Company's operations strongly indicates that Defendant Okamoto was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

**168**

**244.    Sixth, the fact that Defendants did not make the Company's correspondence with the SEC available to investors until over a year after the Class Period contributes to a strong inference of Defendant Okamoto's scienter.**

~~140.    During~~**245.    Seventh, during** the Class Period, before Defendants' fraud was revealed, ~~Defendant~~ **Defendant** Okamoto sold millions of dollars**'** worth of Company stock. Specifically, on December 28, 2021,

Defendant Okamoto sold 83,333 shares of Marathon stock at an average price of $37.02

per share,

reaping proceeds of over *$3 million*. **On information and belief, these insider sales were not made pursuant to a predetermined 10b5-1 trading plan.**

~~141~~**246**.    Furthermore, during the Class Period, the Company entered into an unusual

agreement concerning equity compensation for Defendants Okamoto and Thiel. Specifically, in

connection with a dispute concerning the settlement of certain restricted stock unit awards
previously granted to Defendant Okamoto, on October 12, 2022, the Company entered into a

settlement agreement with Okamoto, pursuant to which it agreed to pay him *$24 million*. The Company entered into related

settlement agreements with respect to certain restricted stock unit

awards previously granted to five other individuals, including Defendant Thiel, which totaled approximately $1 million in

the aggregate.

**J.    Defendant Thiel**
~~142.    These facts establish that Defendants had a motive to defraud investors.~~
**247.    A strong inference that Defendant Thiel was at least reckless as to the possibility of misleading investors is established by numerous facts.**

**248.    First, the Company did not account for its bitcoin in the manner that Defendants explicitly told investors, strongly indicating that Defendant Thiel was at least reckless in approving those misstatements as well as that he was aware that the method that Defendants claimed the Company used was the correct one.**

**249.    Second, the Company's extensive correspondence with the SEC, and Defendants' decision not to keep investors in the dark about that correspondence, supports a strong inference that Defendant Thiel was at least reckless as to the possibility that Defendants' statements were false or misleading.**

**250.    Third, Defendant Thiel signed and certified the Company's Class Period Reports**

**169**

despite the fact that they violated GAAP, even after the SEC criticized the Company's accounting practices and directed the Company to change those practices, and even after the Company conceded that it had improperly concluded that it was an agent with respect to Marapool.

251.	Fourth, the Company's auditor explicitly acknowledged that accounting for bitcoin in the manner that Defendants told investors the Company used, strongly indicating that Defendant Thiel was aware that the method that Defendants claimed the Company used was the correct one.

252.	Fifth, evidence establishing that it was widely understood that GAAP, at the time, required the Company to use the lowest price ever since acquisition of each bitcoin to determine the impairment of that bitcoin strongly indicates that Defendant Thiel was aware of that understanding.

253.	Sixth, the fact that Defendant Thiel served as the Company's CEO when there were only three full-time employees, which grew to only thirty during the Class Period, strongly indicates that he was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

254.	Seventh, Defendant Thiel explicitly admitted that "when I joined Marathon as CEO in April of 2021, I was Employee No. 4. Actually, technically Number 5. So we were a very small company." Thiel further testified that "I had a CFO and a head of operations, *but* every decision about hiring, every order we made for machines, *every decision we made about anything we did, I had to be informed of it myself with direct personal involvement*," and that "because I was there from the very beginning essentially when we began to scale, *I've been involved in every decision we've made*." The fact that Thiel specifically noted that he was involved in "every decision" despite the fact that the Company "had a CFO" makes clear that Thiel was involved in financial and accounting decisions, not just operational decisions.

255.	Eighth, the fact that the accounting methods at issue concerned the core of the Company's operations strongly indicates that Defendant Thiel was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

256.	Ninth, the fact that Defendants did not make the Company's correspondence with

**170**

the SEC available to investors until over a year after the Class Period contributes to a strong inference of Defendant Thiel's scienter.

**171**

### K.  Defendant Salzman

257.  A strong inference that Defendant Salzman was at least reckless as to the possibility of misleading investors is established by numerous facts.

258.  First, the Company did not account for its bitcoin in the manner that Defendants explicitly told investors, strongly indicating that Defendant Salzman was at least reckless in approving those misstatements as well as that he was aware that the method that Defendants claimed the Company used was the correct one.

259.  Second, the Company's extensive correspondence with the SEC, and Defendants' decision not to keep investors in the dark about that correspondence, supports a strong inference that Defendant Salzman was at least reckless as to the possibility that Defendants' statements were false or misleading.

260.  Third, Defendant Salzman signed and certified the Company's Class Period Reports despite the fact that they violated GAAP.

261.  Third, the Company's auditor explicitly acknowledged that accounting for bitcoin in the manner that Defendants told investors the Company used, strongly indicating that Defendant Salzman was aware that the method that Defendants claimed the Company used was the correct one.

262.  Fourth, evidence establishing that it was widely understood that GAAP, at the time, required the Company to use the lowest price ever since acquisition of each bitcoin to determine the impairment of that bitcoin strongly indicates that Defendant Salzman was aware of that understanding.

263.  Fifth, the fact that Defendant Salzman served as the Company's CFO when there were only three full-time employees strongly indicates that he was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

264.  Sixth, the fact that Defendant Salzman, as CFO, was a member of the small team that was responsible for the Company's financial operations, which were brought in house simultaneously with Salzman's hiring as CFO, strongly indicates that he was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

265.  Seventh, the fact that the accounting methods at issue concerned the core of the

**172**

Company's operations strongly indicates that Defendant Salzman was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.

266.    Eighth, the fact that Defendants did not make the Company's correspondence with the SEC available to investors until over a year after the Class Period contributes to a strong inference of Defendant Salzman's scienter.

267.    Ninth, the fact that Defendant Salzman's departure was announced on November 28, 2023, in the midst of the Company's extensive correspondence with the SEC regarding the Company's improper accounting, further contributes to a strong inference of Defendant Salzman's scienter.

### L.    Defendant Gallagher

268.    A strong inference that Defendant Gallagher was at least reckless as to the possibility of misleading investors is established by numerous facts.

269.    First, the Company did not account for its bitcoin in the manner that Defendants explicitly told investors, strongly indicating that Defendant Gallagher was at least reckless in approving those misstatements as well as that he was aware that the method that Defendants claimed the Company used was the correct one.

270.    Second, the Company's extensive correspondence with the SEC, and Defendants' decision not to keep investors in the dark about that correspondence, supports a strong inference that Defendant Gallagher was at least reckless as to the possibility that Defendants' statements were false or misleading. This is particularly true given that Gallagher was the recipient of the SEC's letters and the sender of the Company's letters.

271.    Third, Defendant Gallagher signed and certified the Company's Class Period Reports despite the fact that they violated GAAP. This includes the Q2 2022 10-Q and the Q3  2022 10-Q, which were issued after the SEC criticized the Company's accounting practices and directed the Company to change those practices and, with respect to the Q3 2022 10-Q, even after the Company conceded that it had improperly concluded that it was an agent with respect to Marapool.

**173**

272. **Third, the Company's auditor explicitly acknowledged that accounting for bitcoin in the manner that Defendants told investors the Company used, strongly indicating that Defendant Gallagher was aware that the method that Defendants claimed the Company used was the correct one.**

273. **Fourth, evidence establishing that it was widely understood that GAAP, at the time, required the Company to use the lowest price ever since acquisition of each bitcoin to determine the impairment of that bitcoin strongly indicates that Defendant Gallagher was aware of that understanding.**

274. **Fifth, the fact that Defendant Gallagher served as the Company's CFO when there were only ten full-time employees, which grew to only thirty during the Class Period, strongly indicates that he was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations. Indeed, Defendant Gallagher stated in the August 5, 2022 Marathon Letter that the Company required more time to respond to the SEC's comments because, among other reasons, he was having a medical procedure, shows that he was centrally involved in addressing the SEC's extensive criticisms of the Company's accounting methods.**

275. **Sixth, the fact that Defendant Gallagher, as CFO, was a member of the small team that was responsible for the Company's financial operations, which were brought in house simultaneously with Salzman's hiring as CFO, strongly indicates that he was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.**

276. **Seventh, the fact that the accounting methods at issue concerned the core of the Company's operations strongly indicates that Defendant Gallagher was involved in and aware of how the Company accounted for its bitcoin holdings and for its Marapool operations.**

277. **Eighth, the fact that Defendants did not make the Company's correspondence with the SEC available to investors until over a year after the Class Period contributes to a strong inference of Defendant Gallagher's scienter.**

278. **Ninth, the announcement of Defendant Gallagher's abrupt departure provides strong additional support for scienter. First, his departure was accompanied by suspicious**

**174**

circumstances. Gallagher gave notice to the Company on March 27, 2023, only eleven days after the Restatement, indicating that Gallagher was asked to resign as a result of the Company's accounting violations alleged herein. The abrupt nature of the announcement is underscored by the fact that the Company had no successor in place. Indeed, the CFO position was not filled until June 14, 2023, meaning the Company had no CFO for an entire month, during which time it consummated a private placement offering of over $14 million of its Series A redeemable convertible preferred stock, which is the sort of transaction in which a CFO would normally be centrally involved. Moreover, Gallagher had served as the Company's CFO for just one year when his resignation was announced, though he had been hired on a three-year contract subject to automatic renewal. By leaving at that time, Defendant Gallagher surrendered 100,000 restricted stock units (RSUs) that, per his three-year contract, would have vested over the next two years at a schedule of 12,500 RSUs every three months. Had Gallagher remained in the CFO position for one more year—which would still be an unusually short tenure of merely two years as CFO— another 50,000 RSUs, worth over $400,000 at the time his departure was announced, would vest.

279.   Defendant Gallagher's departure was also uncharacteristic when compared to the Company's typical hiring and termination practices. After the Company pivoted to Bitcoin mining in 2017, Defendant Okamoto became CEO effective January 1, 2018, and remained in that position until Defendant Thiel replaced him effective April 26, 2021 – over three years later. Theil is still the Company's CEO, more than four years after assuming that role. As to the CFO role, Mr. Francis Knuettel resigned on April 22, 2018, when the Company was transitioning to the cryptocurrency space. Mr. David Lieberman, already a Board member, was then appointed CFO on an interim basis; he then entered into a two-year contract with the Company on October 15, 2018. Mr. Lieberman completed that contract, three and a half years after assuming the CFO role, in October 2020, when he was replaced by Defendant Salzman. Salzman served as CFO for a year and half months before becoming CAO and then Vice President of Finance; his tenure with the Company lasted two years and one month. By contrast, Defendant Gallagher provided notice of his departure only one year after joining the Company on a three-year contract that automatically

**175**

renewed. Thus, the circumstances of Defendant Gallagher's departure contribute to a strong inference of scienter.

**176**

## XVIII.        CLASS ACTION ALLEGATIONS

280.        Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

> All persons and entities that purchased or otherwise acquired the Marathon's publicly traded common stock during the Class Period and were damaged thereby.

281.        Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of the Company and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; and (v) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories

282.        The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Marathon common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Marathon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

283.        Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

284.        Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

285.        Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the

**177**

questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Marathon;

- whether the 20(a) Defendants caused Marathon to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of Marathon common stock was artificially inflated during the Class Period because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

149**286**.        A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**178**

## ~~XII~~IX. PRESUMPTION OF RELIANCE

~~150~~**287**.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Marathon common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company's common stock traded on the Nasdaq;

- the Company was covered by multiple analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold Marathon common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

~~151~~**288**.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

~~152~~**289**.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**179**

## XIIX. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

153290. The protections applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

154291. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures the Company or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of the Company who knew that the statement was untrue or misleading when made.

## XIIIXI.     COUNTS

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the 10(b) Defendants)**

155292. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

156293. This Count is asserted against the 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

157294. During the Class Period, the 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted

**180**

to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Marathon securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Marathon common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the 10(b) Defendants, and each of them, took the actions set forth herein.

158**295**. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Marathon common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Marathon's financial condition, prospects, and internal controls.

159**296**. By virtue of their positions at Marathon, the 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

160**297**. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Marathon, the 10(b) Defendants (other than Marathon itself) had knowledge of the details of Marathon's internal affairs.

161**298**. The 10(b) Defendants are liable both directly and indirectly for the wrongs

**181**

complained of herein. Because of their positions of control and authority, the 10(b) Defendants (other than Marathon itself) were able to and did, directly or indirectly, control the content of the statements of Marathon. As officers and/or directors of a ~~publicly held~~**publicly held** company, the 10(b) Defendants (other than Marathon itself) had a duty to disseminate timely, accurate, and truthful information with respect to Marathon's business, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Marathon common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Marathon's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Marathon common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the 10(b) Defendants, and were damaged thereby.

~~162~~**299**.		During the Class Period, Marathon common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the 10(b) Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Marathon common stock at prices artificially inflated by 10(b) Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Marathon stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Marathon stock declined **sharply** ~~sharply~~ upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

~~163~~**300**.		By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

~~164~~**301**.		As a direct and proximate result of the 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective

**182**

purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**183**

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the 20(a) Defendants)**

~~165~~**302**.        Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

~~166~~**303**.        During the Class Period, the 20(a) Defendants participated in the operation and management of Marathon, and conducted and participated, directly and indirectly, in the conduct of Marathon's business affairs. Because of their senior positions, they knew the adverse ~~non~~ **non-public** ~~public~~ information about Marathon's ~~misstatement of income and expenses and false financial~~**accounting practices, disclosure controls and procedures, and** ~~statements~~**internal controls over financial reporting**.

~~167~~**304**.        As officers and/or directors of a publicly owned company, the 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Marathon's financial condition and results of operations, and to correct promptly any public statements issued by Marathon which had become materially false or misleading.

~~168.~~    ~~Because of their positions of control and authority as senior officers, the 20(a)~~
**305.    Defendant Okamoto was the Executive Chairman of the Company during the Class**

~~Defendants were able to, and did, control the contents of the various reports, press releases and~~
**Period. In that capacity, Defendant Okamoto was involved in the management of the Company**

**and its communications to investors. Defendant Okamoto repeatedly spoke to investors on behalf of the Company**

**during the Class Period, including on September 13, 2021 and December 2, 2021.**

~~public filings which Marathon disseminated in the marketplace~~**306. Defendant Thiel was the CEO of the Company** during the Class Period~~concerning~~**. In that**

~~Marathon's results of operations.  Throughout the Class Period, the 20(a) Defendants exercised~~
**capacity, Defendant Thiel was deeply involved in all aspects of the day-to-day management of the**

~~their power and authority to cause Marathon to engage in the wrongful acts complained of herein.~~
**Company and its communications to investors. Thiel spoke on behalf of the Company during**

~~The 20(a) Defendants, therefore, were "controlling persons" of Marathon~~ ~~within the meaning of~~
**earnings calls and other events, was quoted in the Company's press releases, signed periodic filings**

**on behalf of the Company, certified those filings pursuant to the Sarbanes-Oxley Act of 2002, and was responsible for**

**maintaining, assessing, and reporting to investors regarding the Company's**

**disclosure controls and procedures and internal controls over financial reporting. As a result, Thiel**

**had the power and ability** to control the actions of the Company, and acted as a controlling person

**184**

**of the Company within the meaning of** Section 20(a) of the Exchange Act. ~~In this capacity, they participated in the unlawful conduct~~ **for all statements and**

~~alleged which artificially inflated the market price of Marathon common stock.~~ **omissions of the Company alleged herein, and is liable for the Company's violations of the**

~~169.    Each of the 20(a) Defendants, therefore, acted as a controlling person of Marathon.~~ **Exchange Act related thereto.**

~~By reason of their senior management positions and/or being directors of Marathon, each of the~~ **307.    Defendant Salzman was the CFO and then CAO of the Company during the Class Period. In those capacities, Salzman was deeply involved in the day-to-day management of the** ~~20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Marathon~~

~~to engage in the unlawful acts and conduct complained of herein.  Each of the 20(a) Defendants~~

~~exercised control over the general operations of Marathon and possessed the power to control the~~

~~specific activities which comprise the primary violations about which Plaintiff and the other~~ **Company, particularly its accounting function, and the Company's communications to investors. Salzman was quoted in the Company's press releases, signed periodic filings on behalf of the Company, certified those filings pursuant to the Sarbanes-Oxley Act of 2002, and was responsible for maintaining, assessing, and reporting to investors regarding the Company's disclosure controls and procedures and internal controls over financial reporting. As a result, Salzman had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related** ~~members of the Class complain~~**thereto**.

**308.    Defendant Gallagher was the CFO of the Company during a portion of the Class Period. In that capacity, Defendant Gallagher was deeply involved in all aspects of the day-to-day management of the Company, particularly its accounting function, and the Company's communications to investors. Gallagher spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, certified those filings pursuant to the Sarbanes-Oxley Act of 2002, and was responsible for maintaining, assessing, and reporting to investors regarding the Company's disclosure controls and procedures and internal controls over financial reporting. As a result, Gallagher had the power**

**185**

**and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.**

~~170.~~    ~~By reason of the above conduct~~**309.    Thus**, the 20(a) Defendants are liable pursuant to Section **20(a) of the Exchange** ~~20(a) of~~**Act for** the Exchange Act ~~for the~~ violations committed by Marathon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class ~~representative~~**representatives**;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: ~~June 4~~**April 2**, ~~2024~~**2025**                Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**
*/s/ Andrew R. Muehlbauer_____*

Andrew R. Muehlbauer Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104 Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141 Email: andrew@mlolegal.com

*Counsel for Co-Lead Plaintiffs and Liaison Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*) Jonathan D. Park (*pro hac vice* ~~application forthcoming~~)
600 Third Avenue, 20th Floor
New York, New York 10016 Telephone: (212) 661-1100
Facsimile: (917) 463-1044

**186**

Email: jalieberman@pomlaw.com ahood@pomlaw.com jpark@pomlaw.com

**THE SCHALL FIRM**
Brian Schall (*pro hac vice* application forthcoming)
Brian England (*pro hac vice* application forthcoming)
Rina Restaino (*pro hac vice* application forthcoming)
2049 Century Park East, Ste. 2460 Los Angeles, CA 90067
 Telephone: 310-301-3335
Email: brian@schallfirm.com briane@schallfirm.com rina@schallfirm.com

*Counsel for Co-Lead Plaintiffs and Co-Lead Counsel for the Class*

**187**

## CERTIFICATE OF SERVICE

I hereby certify that on ~~June 4~~**April 2**, ~~2024~~**2025**, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the email addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Andrew R. Muehlbauer*
Andrew R. Muehlbauer

**188**