ANDREW R. MUEHLBAUER
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email:  andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
Jonathan D. Park (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
        ahood@pomlaw.com
        jpark@pomlaw.com

*Attorneys for Co-Lead Plaintiffs Todd Langer,
Mary Barida, and Jacks Way LLC*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| TODD LANGER, MARY BARIDA, AND JACKS WAY LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MARATHON DIGITAL HOLDINGS, INC., MERRICK OKAMOTO, FREDERICK G. THIEL, SIMEON SALZMAN, and HUGH J. GALLAGHER, <br><br> Defendants. | Case No. 2:23-cv-00470-RFB-DJA <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS (ECF NO. 83)** <br><br> **ORAL ARGUMENT REQUESTED** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ............................................................................... 1

      A.   The Defendants .................................................................................... 1

      B.   Bitcoin Mining and Trading................................................................. 2

      C.   Defendants Misrepresent, and the SEC Rejects, the Company's Bitcoin Impairment Accounting ....................................................................... 2

      D.   The Company Admits That its MaraPool Accounting Violates GAAP, and the SEC Agrees, Directing Defendants to Change It ......................... 6

      E.   The Company Reveals One SEC Letter and Delays its 2022 Earnings...... 8

      F.   The Company Issues the Restatement ......................................................... 9

III.  LEGAL STANDARD...................................................................................... 10

IV.   ARGUMENT................................................................................................... 10

      A.   Defendants' Reliance on Extrinsic Documents is Improper..................... 10

           1.   Nearly All of Defendants' Exhibits are Not Incorporated by Reference .................................................................................... 11

           2.   Defendants Improperly Invoke Judicial Notice ........................... 12

      B.   The SAC Adequately Pleads Falsity......................................................... 13

      C.   The SAC Adequately Pleads Scienter........................................................ 16

      D.   The SAC Adequately Pleads Loss Causation .......................................... 22

      E.   The SAC Adequately Pleads a Section 20(a) Claim................................. 24

V.    CONCLUSION................................................................................................ 24

**TABLE OF AUTHORITIES**

**Cases**                                                                                      **Page(s)**

*Applestein* v. *Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012) ........................................................................22

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .........................................................................................................24

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................................13

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) .............................................................................22

*Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*,
2016 WL 9413421 (S.D. Fla. June 29, 2016) .................................................................23

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ...........................................................................................13

*Cheever v. Huawei Device USA, Inc.*,
2019 WL 8883942 (N.D. Cal. Dec. 4, 2019) ..................................................................11

*Daniels Family 2001 Rev. Trust v. Las Vegas Sands Corp.*,
709 F. Supp. 3d 1217 (D. Nev. 2024) .............................................................................23

*Diabat v. Credit Suisse Grp. AG*,
2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024) ...............................................................18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .........................................................................................................22

*E. Öhman J:or Fonder AB v. NVIDIA Corp. (NVIDIA)*,
81 F.4th 918 (9th Cir. 2023) ...........................................................................................13

*Eng v. Edison Int'l*,
2017 WL 1857243 (S.D. Cal. May 5, 2017) ...................................................................23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .........................................................................................................10

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .........................................................................................16

*Espinoza v. Whiting*,
8 F.Supp.3d 1142 (E.D. Mo. 2014), *aff'd Podraza v. Whiting*, 790 F.3d 828
(8th Cir. 2015) ..................................................................................................................18

*Ferreira v. Funko Inc.*,
2021 WL 880400 (C.D. Cal. Feb. 25, 2021) ..................................................................13

*Ferris v. Wynn Resorts Ltd.*,
    462 F. Supp. 3d 1101 (D. Nev. 2020)................................................................................24

*Firefighters Pension & Ret. Sys.* v. *Ixia*,
    2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ...................................................................19

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023)  ............................................................................................19

*Greenberg v. Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) ............................................................................................23

*Hadian v. Fate Therapeutics, Inc.*,
    2024 WL 4246083 (S.D. Cal. Sept. 19, 2024)............................................................12, 21, 22

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)............................................................16, 17, 22

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ..........................................................................................20

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)......................................................................23

*In re CV Scis., Inc. Sec. Litig.*,
    2019 WL 6718086 (D. Nev. Dec. 10, 2019).......................................................................24

*In re Cylink Sec. Litig.*,
    178 F. Supp. 2d 1077 (N.D. Cal. 2001) .............................................................................13

*In re Daou Systems, Inc.*,
    411 F.3d 1006 (9th Cir. 2005), *abrogated in part on other grounds as
    recognized by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747
    (9th Cir. 2023)..................................................................................................................19

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ......................................................................................23, 24

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .....................................................................15

*In re New Valley Corp.*,
    89 F.3d 143 (3d Cir. 1996).................................................................................................21

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010)..............................................................................23

*In re Silver Wheaton Corp. Sec. Litig.*,
    2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)....................................................................18

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) ...............................................................................22

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)...........................................................................21

*In re Volkswagen AG Sec. Litig.*,
  661 F. Supp. 3d 494 (E.D. Va. 2023) .....................................................................................22

*In re WatchGuard Sec. Litig.*,
  2006 WL 8473541 (W.D. Wash. Apr. 21, 2006).............................................................14, 19

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)......................................................13, 20, 21

*Kang* v. *PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022) ....................................................................................22

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..............................................................................11, 12, 13

*Klaas v. Allstate Ins. Co.*,
  21 F.4th 759 (11th Cir. 2021) .................................................................................................21

*Korzen* v. *Tetra Tech Inc.*,
  2014 WL 12603209 (C.D. Cal. Jan. 17, 2014) .......................................................................19

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) ...............................................................................14, 20

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).....................................................................................................................10

*Medicis Pharm. Corp. Sec. Litig.*,
  2010 WL 3154863 (D. Ariz. Aug. 9, 2010)............................................................................19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .................................................................................................24

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ...................................................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...................................................................................................................15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .................................................................................................19

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) .................................................................................................19

*Ramos v. Comerica Inc.*,
  2024 WL 2104398 (C.D. Cal. Apr. 12, 2024) ..................................................................23, 24

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................................................................18, 19

*Rosi v. Aclaris Therapeutics, Inc.*,
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) .......................................................................15, 18

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .........................................................................................................18

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .........................................................................................................16

*Sinnathurai v. Novavax, Inc.*,
  645 F. Supp. 3d 495 (D. Md. 2022) ...............................................................................................18

*Sudunagunta v. NantKwest, Inc.*,
  2017 WL 8810760 (C.D. Cal. Sept. 20, 2017) ..............................................................................14

*Swanson v. Interface, Inc.*,
  2022 WL 2003990 (E.D.N.Y. June 6, 2022) ..................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, ltd.*,
  551 U.S. 308 (2007)...........................................................................................................1, 10, 16

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) .........................................................................................................11

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .........................................................................................................19

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .......................................................................................................24

*zCap Equity Fund LLC v. LuxUrban Hotels Inc*,
  2025 WL 2097951 (S.D.N.Y. July 25, 2025) ................................................................................14

**Statutes**

15 U.S.C. § 78t(a) ................................................................................................................................10

15 U.S.C. § 78u4(b)(2) ........................................................................................................................16

ERISA ..................................................................................................................................................21

Securities and Exchange Act of 1934 ......................................................................................10, 18, 24

**Rules**

17 C.F.R. § 240.10b-5(b)......................................................................................................................10

Fed. R. Civ. P. 15(a)(2).........................................................................................................................24

Fed. R. Evid. 201 ...................................................................................................................11, 12

## I.    INTRODUCTION

The Court dismissed Plaintiffs' Amended Complaint for failure to adequately plead the scienter element of their securities fraud claim. ECF No. 68. The Second Amended Complaint ("SAC") remedies that issue with detailed allegations of secret correspondence between Marathon Digital Holdings (or the "Company") and the SEC's Division of Corporate Finance ("CorpFin") regarding two accounting issues. *First*, Defendants falsely told investors that Marathon used "the lowest price" of bitcoin to calculate impairment of its bitcoin holdings, while telling CorpFin the truth: Marathon used the price at a "cut-off time"—i.e., *not* the lowest price. The SEC told Marathon to change its method because it violated Generally Accepted Accounting Principles ("GAAP"), but Defendants declined. *Second*, Defendants told investors that, under GAAP, Marathon was an agent, and not a principal, with respect to its bitcoin mining pool ("MaraPool"). When the SEC questioned this, Defendants conceded that the Company was a principal, and the SEC told them to change this accounting method, too. Defendants did not do so. Instead, they falsely told investors that the Company's financial statements were accurate and GAAP-compliant, and hid the SEC correspondence from investors.

The SEC correspondence, on its own, establishes that Defendants (1) knew the proper accounting standards, (2) knew that Marathon violated them, and (3) misled investors. When Defendants began to reveal the truth, the Company's stock price fell, harming investors. The SAC states a claim for securities fraud. Defendants' motion to dismiss (ECF No. 83) ("Motion") should be denied so this case can proceed to discovery.

## II.    STATEMENT OF FACTS[1]

### A.    The Defendants

Marathon produces or "mines" digital assets, particularly bitcoin. ¶30. The Individual Defendants are: Merrick Okamoto, CEO from 2018 to April 2021; Frederick Thiel, CEO since April 2021; Simeon Salzman, CFO from October 2020 to March 2022, then Chief Accounting

---

[1] The facts are from the SAC (ECF No. 69), which must be accepted as true. *Tellabs, Inc. v. Makor Issues & Rights, ltd.*, 551 U.S. 308, 322-23 (2007). "¶_" references are to paragraphs of the SAC, which has one Appendix and seven exhibits (A-G). "DB" references are to Defendants' brief (ECF No. 83). Unless otherwise indicated, capitalized terms have the meanings set forth in the SAC, emphases are added, and citations and internal quotations are omitted.

Officer until November 21, 2022, then VP – Finance until leaving on April 1, 2023; and Hugh Gallagher, CFO from March 2022 to May 2023. ¶¶23-26.

### B.    Bitcoin Mining and Trading

Bitcoin is a cryptocurrency designed to act as money and a form of payment outside the control of any one person, group, or entity. ¶32. Unlike fiat currency, bitcoin is created, distributed, traded, and stored using a decentralized ledger system known as a blockchain. *Id.* Bitcoin mining is the computational work that network nodes perform to validate the information in the blocks of the blockchain and is the process by which transactions are officially entered on the blockchain as well as how new bitcoins are launched into circulation. ¶33. The first to do so receives bitcoin as a reward, and the process begins again. ¶¶33-34.

Bitcoin trades on bitcoin exchanges, which are digital marketplaces that serve as intermediaries between buyers and sellers of bitcoin, similar to stock exchanges. ¶40. Unlike a stock exchange, bitcoin trading is not limited to market hours; it trades twenty-four hours a day, so there is no "closing" price or "opening" price. ¶41.

### C.    Defendants Misrepresent, and the SEC Rejects, the Company's Bitcoin Impairment Accounting

Marathon must comply with GAAP. ¶42. The Accounting Standards Codification ("ASC") of the Financial Accounting Standards Board ("FASB") is authoritative as to GAAP. ¶43. During the Class Period, GAAP required cryptocurrency such as bitcoin to be treated as indefinite-lived intangible assets, and Defendants told investors that they did so. ¶¶53, 62. ASC 350-30 requires companies to assess indefinite-lived intangible assets for impairment when events or changes in circumstances indicate that it is more likely than not that they are impaired. ¶55. An impairment is recorded when the fair value of the asset is less than its carrying value, and the impairment loss is equal to that difference. *Id.* Thus, GAAP requires that when the trading price of bitcoin declines below the price at which a company bought it, it indicates that the bitcoin asset is impaired and the company is required to record an impairment reflecting the difference between the bitcoin's preexisting carrying value and the lowest trading price since acquisition. ¶58. Impairments are recorded as operating expenses and directly affect net income, earnings per share, and cash flows

from operating activities. ¶¶136-37; Defs. Ex. D at 90. Impairments are never reversed, even if the fair value of the asset recovers during the same period. ¶55. This measurement is especially critical for a company like Marathon, with bitcoin holdings that account for a material portion of its assets.

During the Class Period, Marathon told investors that it complied with these accounting rules. For instance, the Company's Q1 2021 10-Q, filed on May 10, 2021, the first day of the Class Period, stated that its bitcoin holdings "are recorded at cost less impairment" and are "assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired." ¶158.[2]

That same day, Marathon issued a press release stating that, when measuring impairment of its bitcoin holdings, it "considers the *lowest price* of one bitcoin quoted on the active exchange *at any time* since acquiring the specific bitcoin." ¶183; *see also* ¶¶184-86 (same). Similarly, the 2021 10-K stated that the Company's bitcoin was "subject to impairment losses if the fair value of our bitcoin decreases below their carrying value *at any time* since their acquisition" and that "the carrying value of each bitcoin we held at the end of the reporting period reflects *the lowest price* of one bitcoin quoted on the active exchange *at any time* since its acquisition." ¶171. Defendants also reported the amount of this impairment on a quarterly basis. ¶¶174-180, 183-186.

Defendants assured investors regarding the Company's compliance with GAAP. Under GAAP and SEC rules, senior management is responsible for financial reporting. ¶46. The Individual Defendants recognized this, signing reports on Forms 10-K and 10-Q that stated that "[o]ur management is responsible for establishing and maintaining adequate internal control over financial reporting" and "is also required to assess and report on the effectiveness of our internal control over financial reporting." ¶145; *see also* ¶¶146, 149, 151, 152. Each Individual Defendant, during his tenure as a C-level officer, certified that he had reviewed the Company's periodic reports and had evaluated the Company's internal controls, and that the reports were not false or misleading and fairly presented the Company's financial condition in all material respects. ¶155; *see also* ¶145 n.8. During the Class Period, Defendants disclosed only one material weakness in

---

[2] The Company's other Class Period Forms 10-Q and 10-K contained equivalent statements. ¶¶159-166.

the Company's internal controls—concerning "IT program and data changes," unrelated to the accounting violations in this case (¶87)—and told investors that there were no other material weaknesses or significant deficiencies in those controls (¶¶88-89).

Defendants' statements were false and misleading. The Company did not calculate impairment of its bitcoin "when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired" and did not use a "carrying value . . . reflect[ing] *the lowest price* of one bitcoin quoted on the active exchange *at any time* since its acquisition." ¶¶62, 63. Rather, as Defendants acknowledged at the end of the Class Period, the Company violated GAAP by "calculating impairment on a daily basis using a standard cutoff time" rather than the lowest price at any time. ¶122; *see also* ¶195. Thus, even if the trading price of bitcoin declined below the carrying value of the Company's bitcoin holdings, the Company did not record impairment unless the trading price was lower at a cut-off time chosen by the Company, and it used the price at that cut-off time to determine the amount of such impairment. ¶65.

While misleading investors regarding the Company's accounting, Defendants *also* concealed lengthy correspondence with the SEC in which the SEC told the Company to change its bitcoin impairment accounting to comply with GAAP. On April 8, 2022, the SEC sent a letter to Defendant Gallagher instructing him to "tell why you believe pricing of BTC on a nightly basis is the proper time to use in the quantitative impairment test of the mined BTC balances." ¶91; *see also* SAC Ex. A at 3. The Company's April 22, 2022 response referred only to "various [unspecified] factors" and proposed that its method provided "consistency," without explaining how it was more consistent than using the lowest price at any time during the reporting period, as GAAP required. ¶92; *see also* SAC Ex. B at 7.[3] Two weeks later, on May 6, 2022, the Company filed the Q1 2022 10-Q, repeating the misstatement that the Company assessed its bitcoin for

---

[3] The Company's April 22, 2022 response stated that it used "various pricing sources, including those readily available to the general public (including Messari.io, Yahoo Finance and Blockchain.com)" and did not mention "Coindesk," the pricing source ambiguously referenced in the 2021 10-K (¶70; *see also* Ex. D at 51). Though the SAC highlights this inconsistency (¶93), Defendants do not address it.

4

impairment "when events or changes in circumstances occur indicating that it is more likely than not that the . . . asset is impaired." ¶163.

On May 27, 2022, the SEC sent another letter to Gallagher demanding again that he "explain how your policy of testing for impairment on a nightly basis complies with ASC 350"—clearly showing frustration with the Company's April 22 letter—and noting that the Company had conceded that "impairment exists when fair value is below carrying value." ¶94. The Company's June 13, 2022 response repeated the prior illogical justification that "utilizing a standardized time on a daily basis to determine the closing price provides for consistency in evaluating impairment and eliminates any subjectivity as to when the impairment has occurred," ignoring that the objective was not "to determine the closing price," and that using the lowest price at any time would be just as consistent and even more objective. ¶95; *see also* SAC Ex. C at 3.

The SEC quickly responded, writing in a June 24, 2022 letter to Gallagher that "[y]our policy of utilizing a standardized time on a daily basis to assess for impairment does not appear to comply with ASC 350-30-35-18" and ordering the Company to "*revise your accounting to comply with ASC 350.*" ¶96; *see also* SAC Ex. D at 2. After requesting two extensions, the Company replied on August 1, 2022, claiming that because "it is impossible to make a determination of impairment in real time since the markets are always moving," the Company reviews its [bitcoin] for impairment daily, looking back on these indicators and recording an impairment based on the daily closing price of [bitcoin] as defined by Yahoo Finance (https://finance.yahoo.com/quote/BTC-USD) and published daily at 23:59 GMT." ¶97.[4] The Company did not explain the relevance of the purported impossibility of determining impairment "in real time," given that the Company's financial statements were issued retrospectively (i.e., after the end of the relevant quarter)—not in "real time." ¶98.

Eight days later, on August 9, 2022, the Company filed the Q2 2022 10-Q, which repeated the prior misrepresentations regarding bitcoin impairment accounting, reported such impairment

---

[4] The SAC emphasizes that this is not the pricing source that Defendants told investors they used. ¶¶97-98. Defendants now say that they (secretly) changed their methodology in the time "between the 2022 10-K disclosure and this letter." DB at 16 n.7. Even ignoring that Defendants presumably meant to refer to the *2021* 10-K, this bald assertion is unsupported by anything in the record.

using the method the SEC had rejected, and did not disclose the SEC's position. ¶179. The Q2 2022 10-Q represented that the only material weakness in the Company's internal controls was the unrelated IT and data issue. ¶¶87, 89. Defendants Thiel and Gallagher both certified that they had reviewed the Q2 2022 10-Q and that it did not contain any untrue statement of material fact or omit to state a fact necessary to make the statements therein not misleading. ¶¶155, 145 n.8.

On October 11, 2022, the SEC, in another clear indication of disapproval, again demanded that the Company "reconcile for us your discussion . . . indicating that a decline in fair value below carrying value 'could be an indication' of impairment with your stated policy that an impairment exists when carrying value exceeds fair value and with ASC 350-30-35-19." ¶99. The Company's December 2, 2022 response merely repeated prior positions that the SEC had found wanting. ¶100.

On February 22, 2023, the SEC sent another letter ordering the Company (again) to revise its accounting because it did "not . . . compl[y] with the ASC 350-30-35-19 requirement to recognize impairment whenever carrying value exceeds fair value." ¶102; *see also* SAC Ex. G at 2. As discussed below, the Company did not disclose any of this correspondence to investors until the end of the Class Period.

**D.    The Company Admits That its MaraPool Accounting Violates GAAP, and the SEC Agrees, Directing Defendants to Change It**

On March 25, 2021, Marathon licensed technology to use in a bitcoin mining pool called "MaraPool." ¶79. A bitcoin mining pool involves multiple miners aggregating their computing power to mine bitcoin, which is then shared by the miners proportionally to their contribution. ¶39. From September 2021 until May 2022, the Company permitted third parties to participate in MaraPool. ¶80. The third-party participants paid Marathon for its services as the pool operator; in turn, Marathon provided access to the pool's software license, tracked the participants' contributions of computing power, and delegated mining work to participants. *Id.* Marathon owned the bitcoin wallet that received all bitcoin mined by the pool. *Id.*

Under GAAP, whether a company is an agent or principal with respect to a good or service is key. Under ASC 606-10-55-37, an entity is a principal if it controls the specified good or service before it is transferred to a customer. ¶82. A principal follows the "gross" approach, recognizing

revenue when (or as) it satisfies its performance obligation in the amount equal to the price paid by the end consumer for the good or service ("gross" revenue), with amounts remitted to the other party presented as expenses. ¶83. Conversely, an agent follows the "net" approach and recognizes revenue when (or as) it satisfies its performance obligation equal to the net amount retained after remitting amounts to the other parties for providing the good or service ("net" revenue). *Id.*

During the Class Period, despite its control over MaraPool, the Company deemed itself an agent, and not a principal, with respect to MaraPool, permitting the Company to follow the "net" approach, netting out the costs of MaraPool revenue rather than reporting them in full. ¶84.

The SEC's April 8, 2022 letter discussed above *also* asked the Company whether any of its mining activity was conducted with third party pool participants and, if so, directed the Company to "[e]xplain how you are accounting for any fees retained by the pool operator." ¶104. Hinting at the oblique nature of Defendants' disclosures, the letter also "note[d] from disclosures *elsewhere* in your filing that you operate your own bitcoin mining pools" and directed the Company to "[e]xplain to us and disclose how you recognize revenue as a pool operator." ¶105. In its April 22, 2022 response, the Company stated that "mining revenues are recorded net of any pool fee, not gross, with an offsetting cost of revenue," meaning that the Company, in violation of GAAP, treated itself as an agent, and not the principal, with respect to MaraPool. ¶¶106-07.

Clearly indicating its disagreement, the SEC's May 27, 2022 response demanded "your comprehensive principal versus agent accounting analysis." ¶108. On June 13, 2022, the Company's provided a lengthy analysis "conclud[ing] that [the Company] is a *principal* under ASC 606." ¶109; *see also* SAC Ex. C at 8-10. This conclusion, which complied with GAAP, directly contradicted Defendants' disclosures to investors, including as recently as May 6, 2022, when the Company filed the Q1 2022 10-Q. On June 24, 2022, the SEC ordered the Company to "[e]xplain why the pool fee revenue you earn as the pool operator would be a reduction to revenue" and bluntly stated that "[y]our revenue recognition accounting policy *should be revised*." ¶110.

The Company did not substantively respond until August 26, 2022. ¶111. Two weeks prior to that, on August 9, 2022, Marathon filed its Q2 2022 10-Q, which reported MaraPool revenues and cost of revenues reflecting the opposite of what it told the SEC on June 24, 2022. ¶192. On

7

August 26, 2022, the Company attempted a volte-face, disavowing its conclusion that it was a principal with respect to MaraPool. ¶111. The SEC's October 11, 2022 letter demanded a revised analysis and noted contradictions in Marathon's position. ¶113-14. The Company's December 2, 2022 letter acknowledged that the MaraPool wallet (owned by Marathon) was the "miner of record" and that there was "no further record of the pool participants' involvement in fulfilling transaction verification services." ¶115. The SEC's February 22, 2023 response continued to poke holes in Marathon's position, ordering the Company to explain "how an individual mine pool participant could exercise control over the transaction verification service on behalf of the pool." ¶116. The Company disclosed six days later that it would need to restate its financials. ¶117.

> **E.      The Company Reveals One SEC Letter and Delays its 2022 Earnings**

On February 28, 2023, the Company cancelled its earnings call scheduled for that day and announced it would postpone issuing financial results for 2022. ¶194. The Company also disclosed that it had "received a comment letter from [CorpFin] relating to[] . . . certain accounting matters" and that, "after consultation with Marcum LLP, the Company's independent auditor," its Board had concluded that (¶195):

> due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") *should no longer be relied upon*. Similarly, *related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements*.

The Company stated that "[a]s a result of receiving the SEC comments on February 22, 2023 and the Audit Committee's determination to restate the Impacted Financial Statements," the Company was unable its Form 10-K for 2022 by the filing deadline of March 1, 2023. *Id*.

The Company disclosed that (*id*.):

> *its method of calculating impairment on a daily basis using a standard cutoff time was not in compliance* with the *ASC 350-30-35-19* requirement to recognize impairment whenever carrying value exceeds fair value, *which effectively calls for* the *intraday low price to be utilized in calculating impairm*ent whenever events or

changes in circumstances indicate it is more likely than not that the asset is impaired.

The Company also disclosed that its revenue recognition policy reflected the determination that "in its capacity as the operator of a mining pool that included third parties [i.e., MaraPool], it acted as an agent," but this "assessment . . . was incorrect and . . . it should have concluded that it was acting as a principal in its capacity as the pool operator." *Id.* The Company acknowledged that it "should have recorded revenue from the pool on a gross basis with an offsetting cost of revenue to reflect amounts allocated to third party participants," and estimated that "its revenues and its cost of revenues for the year ended December 31, 2021 were understated due to the 'net' vs. 'gross' presentation of revenues in its financial statements." *Id.*

In response, the Company's stock price fell 0.14% on February 28, 2023, and 8.31% the following day, even as the Nasdaq Blockchain Economy Index rose on both days. ¶73.

**F.    The Company Issues the Restatement**

On March 16, 2023, after the Class Period, the Company filed its late 2022 10-K, which disclosed that "[t]he Company received [SEC] comments during 2022 which are material and *still under review*" *and* that the Company "*more recently received*" other comments "which relate to certain restatement items in this Form 10-K." ¶74. This falsely suggested that the Company only received comments relating to the Restatement "more recently," in line with the February 28, 2023 announcement that disclosed only one SEC letter.

The 2022 10-K disclosed that the SEC "objected to the Company's calculation of impairment of bitcoin using a daily closing price" and that "[t]he Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin." ¶75. The Company acknowledged that using a daily "closing" price for bitcoin violated GAAP, and restated its bitcoin impairment by material amounts, including a 30.8% increase in impairment for Q1 2021 and a 19.2% increase for Q1 2022. ¶135; SAC Appx. A.

The 10-K also disclosed that the SEC had "commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of a pool." ¶76. The Company disclosed that in its restated results, it had "revised its revenue to include gross

revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue." *Id.* The Company acknowledged that its accounting for MaraPool violated GAAP because the Company, as operator of MaraPool, was a principal and not an agent, and thus should have recorded such revenue on a gross rather than net basis. *Id.* Correcting this violation led to material changes in the Company's cost of revenues. For instance, the Restatement revealed that cost of revenues for 2021 were understated by $8.7 million, or *25.8%*. ¶120.

The 2022 10-K also disclosed material weaknesses in internal controls "related to the application and interpretation of [GAAP] primarily in the areas of . . . impairment of digital assets . . . and principal versus agent considerations in revenue recognition." ¶139.

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). In ruling on a 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs*, 551 U.S. at 320-22 & n.4.

Under Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a 10(b) claim, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). A Section 20(a) claim requires an underlying 10(b) claim and an allegation that the defendant controlled the 10(b) violator (15 U.S.C. § 78t(a)).

## IV.    ARGUMENT

### A.    Defendants' Reliance on Extrinsic Documents is Improper

Defendants' improper request that the Court consider *twenty-six* extrinsic documents

("Exhibits") (ECF Nos. 85, 86) should be denied. *First*, it was "relegated . . . to a footnote" and thus waived. *Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at \*3 (N.D. Cal. Dec. 4, 2019)). *Further*, the Ninth Circuit has warned against "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine," and Defendants' request fits "a concerning pattern in securities cases" of defendants "exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure" without converting it to a motion for summary judgment. *Id*. The exceptions are incorporation-by-reference and judicial notice under Federal Rule of Evidence 201. *Id*.

      **1.**      **Nearly All of Defendants' Exhibits are Not Incorporated by Reference**

"[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). Only eight of Defendants' Exhibits arguably meet this standard. These are SEC filings containing alleged misstatements (Exhibits D, F, G, and L), correspondence between the SEC and Marathon addressed in the SAC (Exhibits P, Q, and R), and a February 2023 disclosure that caused Marathon's stock price to fall (Exhibit S).

Fifteen Exhibits (B, E, H, I, J, K, M, N, O, T, U, V, W, X, and Y) are not referenced at all in the SAC. Exhibits A and Z are each referenced only once, which "is not sufficiently extensive under *Ritchie*." *Khoja*, 899 F.3d at 1003 ("For 'extensively' to mean anything under *Ritchie*, it should, ordinarily at least, mean more than once."). Two references to Exhibit C are also insufficient. *Id*. at 1006. None of these Exhibits "form the basis of the complaint." *Id*. at 1002.

Further, Defendants offer dubious readings of their Exhibits "to dispute facts stated in [the] well-pleaded [SAC]." *Khoja*, 899 F.3d at 1003. For instance, Exhibit Z does not say that "five comment letters (out of 83) suggest that their authors used an intraday price method for bitcoin impairment." DB at 17. It merely states that FASB "received 83 comment letters." Ex. Z at 23.

Nor does it say that FASB "acknowledged that 'the current accounting [for] crypto assets' was 'unnecessarily complex.'" DB at 17. It says that *others* complained about complexity and cost. Ex. Z at 315. This "unscrupulous use of extrinsic documents" is improper. *Khoja*, 899 F.3d at 998.

Plaintiffs do not object to the Court's consideration of Exhibits D, F, G, L, P, Q, R, and S under the incorporation-by-reference doctrine. However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

### 2.    Defendants Improperly Invoke Judicial Notice

Rule 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute," meaning the fact is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). However, "[i]t is improper to judicially notice a [document] when the substance of the [document] is subject to varying interpretations, and there is a reasonable dispute as to what [it] establishes." *Khoja*, 899 F.3d at 1000. "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id*. at 1003.

Defendants do not precisely identify, as required, the "adjudicative fact[s]" of which they seek notice. Fed. R. Evid. 201(b); *see also Khoja*, 899 F.3d at 999 ("fact or facts" must be identified). However, they appear to seek to establish facts that are subject to "reasonable dispute." *Khoja*, 899 F.3d at 1000. For example, Defendants contend that "*[d]uring* the Class Period, Marathon warned investors" of various matters, citing to Exhibit E in a manner that suggests it is a Class Period document, but Exhibit E is dated nine months *before* the Class Period. Defendants also state that CorpFin viewed crypto accounting as "novel and complex" (DB at 6 (citing Ex. O)), but Exhibit O is a letter from Marathon *to* CorpFin and thus is not proper evidence of CorpFin's position. Defendants also submit various Forms 4 they filed (Exhibits U, V, and W), but these are not "sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), and cannot be taken for their truth. *See Hadian v. Fate Therapeutics, Inc.*, 2024 WL 4246083, at *9 (S.D. Cal. Sept. 19, 2024) (improper to consider the truth of Forms 4 submitted by defendants "to support their arguments that the Individual Defendants' stock sales were nondiscretionary, that the

Individual Defendants increased their holdings over the Class Period, and that the timing of the sales is not suspicious"); *see also Ferreira v. Funko Inc.*, 2021 WL 880400, at *8 (C.D. Cal. Feb. 25, 2021) (rejecting request to consider Forms 4 "as the Court's consideration of the sufficiency of Plaintiffs' allegations of suspicious stock sales and insider trading are limited to the allegations themselves"). Exhibit Y is *undated* and thus is not judicially noticeable. *See Khoja*, 899 F.3d at 1005 (rejecting "ostensibly inadvertent" submission of document lacking correct date).

The Court must accept the well-pleaded facts as true and cannot "engage in fact-finding in the course of deciding the sufficiency of the" pleading. *Id*. at 1006. Defendants' attempt "to present their own version of the facts at the pleading stage" should be rejected. *Id.* at 999.

## B.    The SAC Adequately Pleads Falsity.

A statement is false if it is "contradict[ed]" by existing facts. *E. Öhman J:or Fonder AB v. NVIDIA Corp. (NVIDIA)*, 81 F.4th 918, 928 (9th Cir. 2023). "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Even "literally true" statements may be materially misleading. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

The SAC pleads that Defendants: (1) misrepresented how the Company measured its bitcoin holdings for impairment and whether it complied with GAAP, and reported impairment that violated GAAP, (2) misrepresented that the Company's accounting for cost of revenues and revenues with respect to MaraPool complied with GAAP, and reported such metrics calculated in violation of GAAP, and (3) as a result, falsely represented that the Company's financial statements were not misleading and that the Company's disclosure controls and procedures, and internal controls over financial reporting, did not have any material weaknesses relating to these issues.

Defendants cannot deny that they falsely reported bitcoin impairment throughout the Class Period. By restating that item, they conceded that prior reports were false. *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *10 (M.D. Tenn. Apr. 8, 2021) ("By definition, a restatement says that the prior financial statement was false."); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("[T]he existence of restated financial results is sufficient

to support plaintiffs' belief that the statements were misstated."); *zCap Equity Fund LLC v. LuxUrban Hotels Inc*, 2025 WL 2097951, at *20 (S.D.N.Y. July 25, 2025) ("courts have often held that the fact of restatement supports finding falsity plausibly pled.") (collecting cases). Defendants' authority recognizes this. *See In re WatchGuard Sec. Litig.*, 2006 WL 8473541, at *5 (W.D. Wash. Apr. 21, 2006) ("By restating those earnings, WatchGuard admitted that certain portions of its earnings statements were false.").

The Restatement also establishes that Defendants' misstatements were material. "Under GAAP, previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued." *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at *9 (C.D. Cal. Sept. 20, 2017); *see also Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 660 (N.D. Ill. 2021) (same).

Moreover, Defendants conceded that the Company violated GAAP by "calculating impairment on a daily basis using a standard cutoff time" (¶122), rather than using the "lowest price . . . at any time" (e.g., ¶183). Defendants also acknowledged that the Company's "assessment that it acted as an Agent in operating [MaraPool] was incorrect and that it should have concluded that it was acting as a principal." ¶129.

As a result, Defendants cannot dispute that they misrepresented the accuracy of the Company's financial statements, compliance with GAAP, and the strength of the Company's internal controls and disclosure controls. *First*, as Defendants' authority acknowledges, given the Restatement, "there is *no question* (at least on the pleadings) that each certifying Defendant made a false statement when he signed a certification stating that no material fact in the attached earnings report was untrue." *WatchGuard*, 2006 WL 8473541, at *9. *Second*, there is no dispute that the Company did not have sufficient controls to prevent misstatements in its financial statements. The SEC repeatedly criticized the Company's bitcoin impairment accounting and told the Company to change it to comply with GAAP, but Defendants refused. Likewise, the Company refused to change its MaraPool accounting even after the SEC criticized that accounting, the Company acknowledged that it was a principal, and the SEC told it to change this accounting. Defendants themselves admitted that the "material weakness related to the application and interpretation of

14

[GAAP] primarily in the areas of [inter alia] *impairment of digital assets*, . . . *and principal versus agent considerations in revenue recognition*" "resulted in a material misstatement to the Company's previously issued consolidated financial statements." ¶139. Further, Defendants' omission "of the position that the [SEC] had taken and the Company's decision to proceed notwithstanding that position [] was necessary to make what was said not materially misleading." *see also Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *17 (S.D.N.Y. Mar. 29, 2021).

Treating Defendants' statements as expressions of opinion or belief does not alter this conclusion.[5] Allegations that the SEC told the Company that it violated GAAP, and that the Company admitted that GAAP compelled the opposite conclusion than it employed, are sufficient to establish a strong inference that Defendants did not subjectively believe their statements, including their certifications that the Company's financial statements were accurate and internal controls robust. These "beliefs" did not "turn[] out to be wrong"—the allegations establish Defendants' knowledge at the time. *Cf. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 186 (2015). These allegations also establish that the misstatements did not "fairly align[]" with the information revealed in the SEC correspondence, *id*. at 189, and that Defendants "omit[ted] material facts about [their] inquiry into or knowledge concerning" the Company's accounting and internal controls. *Id.* at 188; *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *16 (S.D.N.Y. Dec. 2, 2013) ("even if Hi–Crush believed in good faith that it had not breached the agreement with Baker Hughes and was correct in its belief, a new fact had come to light: *Baker Hughes disagreed.*") (emphasis in original). In addition, Defendants' false description of the Company's bitcoin impairment methodology was inherently "embedded" in the periodic reports of such impairment, and their certifications of GAAP compliance were embedded in reports of bitcoin impairment and MaraPool revenues and costs of revenue. *See Omnicare*, 575 U.S. at 176 ("opinion statements can give rise to false-statement liability under §11 if they contain embedded statements of untrue facts").

---

[5] Defendants do not and cannot argue that their false descriptions of the Company's impairment accounting method were "opinions." DB at 20-22.

Defendants' few cases regarding falsity are inapposite. Unlike *Hunt* v. *Bloom Energy Corp.*, the SAC has particularized allegations regarding Defendants' knowledge that bitcoin impairment and MaraPool "should have been accounted for differently." 2021 WL 4461171, at *5 (N.D. Cal. Sept. 29, 2021). *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Technology, Inc.* is inapposite for the same reason. 856 F.3d 605, 613 (9th Cir. 2017) (no allegations that defendants accessed data room regarding other company). The cited portion of *In re Loudeye Corp. Sec. Litig.* did not address *falsity*, but simply held that "allegations that Defendants had deficient internal controls during the class period does not create a strong inference" of *scienter* on its own. 2007 WL 2404626, at *7 (W.D. Wash. Aug. 17, 2007) (citing *WatchGuard*, 2006 WL 2927663 at *10 (also discussing scienter)).

## C.    The SAC Adequately Pleads Scienter

Scienter is a mental state embracing "intent to deceive, manipulate, or defraud" as well as "deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). Plaintiffs must plead facts giving rise to a "strong inference" of scienter, 15 U.S.C. § 78u4(b)(2), meaning that the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the allegations. *Tellabs*, 551 U.S. at 324. The test is whether "all of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 323.[6] Importantly, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id*. Plaintiffs "need not prove [their] case at the outset," but only allege "facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). A "*tie goes to the Plaintiff*." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). Plaintiffs' allegations raise such an inference.

---

[6] Defendants argue that the Court already rejected certain scienter allegations. E.g., DB at 11, 15, 17. 20. However, because scienter must be assessed "holistically," the strength of each individual scienter allegation must be reevaluated in light of the new allegations. *Tellabs*, 551 U.S. at 326.

*First*, quite simply, Defendants told investors one thing, but did another—and conceded as much to the SEC.[7] Defendants stated to investors that Marathon used "the lowest price . . . at any time" to measure bitcoin impairment. E.g., ¶199. They admitted to the SEC that they instead used the price at a selected "cutoff time." ¶195. Defendants also represented to investors that Marathon was an agent, and not a principal, with respect to MaraPool (¶84), but told the SEC the opposite (¶109).[8] Defendants contend that "the law is clear that good-faith discussions with regulators . . . are not indicia of scienter" (DB at 12) but this proposition is not supported by Defendants' authority and ignores that it is the *content* of their discussions that establishes scienter.[9]

*Second*, the SEC told Defendants that their impairment accounting violated GAAP and must be revised, Defendants admitted to the SEC that their MaraPool accounting violated GAAP, and the SEC told them to revise that as well. Defendants are correct that *Podraza v. Whiting* is "instructive" with respect to SEC correspondence (DB at 12), as that case illustrates precisely why the SAC adequately pleads scienter. In *Podraza*, the SEC did "*not* . . . notify Defendants their accounting was incorrect" and the issuer publicly "explain[ed] exactly how" it did its accounting, "disclosed it had received comments from the SEC regarding this accounting treatment and that the comments were unresolved," and promptly restated when the SEC "suggested" it do so. 790 F.3d 828, 838-39 (8th Cir. 2015). Here, Defendants refused to change Marathon's accounting after

---

[7] The direct contradiction between Defendants' repeated statements to investors and actual practices also establishes a strong of scienter for statements prior to the SEC correspondence.

[8] Defendants argue that Marathon "publicly disclosed its accounting judgments in its SEC filings." DB at 13-14 (citing ¶69, ¶84). But ¶69 concerns impairment of bitcoin that Marathon held via the NYDIG Fund, which Defendants represented was different than for Bitcoin held directly, *bolstering* the false impression given to investors. The disclosure in ¶84, for its part, is directly contradicted by Defendants' admission to the SEC. ¶109.

[9] *In re Plug Power, Inc. Sec. Litig.* held that "without *more*," SEC comment letters may be insufficient to establish scienter, and the plaintiff there "d[id] not argue in its briefing that scienter can be inferred from [SEC comment letters]." 2023 WL 5577276, at *17 (S.D.N.Y. Aug. 29, 2023). *Perrin* v. *SouthWest Water Co.* did not explain how the accounting issues the SEC asked about were connected to the restatement in that case, and it was not alleged that the SEC told the company to change its accounting or that the company's responses to the SEC contradicted its public statements. 2011 WL 10756419, at *1-3 (C.D. Cal. June 30, 2011). *In re Hansen Nat. Corp. Sec. Litig.* addressed whether the announcement of an investigation was sufficient for purposes of *loss causation*—not scienter. 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007).

17

being told that it violated GAAP,[10] publicly misrepresented the Company's accounting while admitting the truth to the SEC,[11] and "chose to keep its correspondence with the SEC a secret." *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *144 (S.D.N.Y. Sept. 19, 2024) (discussing *Espinoza v. Whiting*, 8 F.Supp.3d 1142, 1152 (E.D. Mo. 2014), *aff'd Podraza*, 790 F.3d 828 (8th Cir. 2015)). Far from taking "affirmative actions . . . to correct accounting errors" (DB at 12), Defendants refused to correct their GAAP violations for months, while misleading investors.[12] These differences compel the opposite of the conclusion reached in *Podraza*.

The SEC correspondence directly involved Defendant Gallagher, establishing his scienter. The SEC's letters were addressed to him, and he sent the responses. ¶¶91, 92-96, 102, 111; SAC Exs. A, B, C, D, E, F, G. The SAC also establishes a strong inference that the other Individual Defendants were aware of the correspondence. *Robb v. Fitbit Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017) ("Although . . . the Amended Complaint does not contain express allegations that COO Hartmann gave this information to defendants Park, Zerella, and Friedman, the Court does not find this fatal to plaintiffs' Exchange Act claims."); *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 527 (D. Md. 2022) (finding scienter "[e]ven in the absence of direct evidence that Erck, Trizzino, and the other senior Novavax officers reviewed the FDA reports"); *Rosi*, 2021 WL 1177505, at *22 (the "allegations, if true, would give rise an inference that Fair and the other Defendants had access to the FDA letters"). Bitcoin mining was the Company's entire business. *See S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 785 (9th Cir. 2008) ("importance of the corporate information"). Bitcoin impairment was a "critical accounting policy" of the Company. Decl. of

---

[10] Defendants "offered to change [this] methodology" on August 1, 2022 (DB at 13 (citing Ex. P)), but the SEC had *already* told them to (¶96; *see also* SAC Ex. D at 2).

[11] Defendants' argument that Marathon disclosed its method relies on an obtuse and nonsensical reference in its 2021 10-K (¶70) which conflicts with what it stated in multiple other SEC filings (e.g., ¶183) and in letters to the SEC (¶¶92, 97).

[12] Further, "many courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors. *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *10 (C.D. Cal. Mar. 25, 2019) (collecting cases). Further, the SAC offers a plausible reason (¶208) why Marathon's auditor would sign off on accounting it acknowledged was incorrect (¶¶206-07), and the actions and state of mind of the non-defendant auditor (which Marathon has since dismissed, ¶208) are not at issue.

Jonathan Park, Ex. A at 48 of 115;[13] *Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (scienter pleaded where filings "specifically identify the Company's reserve methodology as one of Medicis's most 'critical accounting policies.'").[14] The Individual Defendants were practically the Company's only employees. ¶222-25; ¶226 ("I was employee No. 4. Actually, technically No. 5."). Defendant Thiel admitted that "every decision we made about anything we did, I had to be informed of it myself with direct personal involvement." ¶226; *see also In re Daou Systems, Inc.*, 411 F.3d 1006, 1022–23 (9th Cir. 2005) (scienter supported by "specific admission[] from [a] top executive[] that they are involved in every detail of the company and that they monitored portions of the company's database"), *abrogated in part on other grounds as recognized by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

In light of these allegations, the core operations inference supports scienter. "There are three circumstances under which core operations allegations can support a strong inference of scienter." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021); *see also Watchguard*, 2006 WL 2038656, at *4 ("The court acknowledges that one may infer that certain critical corporate information is known to high-ranking officers.").[15] Here, the inference applies in light of the SAC's other "allegations [that] support a cogent and compelling inference of scienter" and that "suggest that the [Individual Defendants] had actual access to the disputed information" *Prodanova*, 993 F.3d at 1111.[16]

---

[13] This document is an excerpt of Marathon's 2021 10-K, which contained alleged misstatements, and other excerpts of which were submitted by Defendants (Ex. D).

[14] *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014), is inapposite, as it "involved broad allegations regarding the company's financial health that the court could not even pinpoint as false." *Fitbit*, 2017 WL 219673, at *5.

[15] *WatchGuard* found the core operations inference inapplicable because that was a "300-person company" and there were no allegations "link[ing] a particular Defendant with particular knowledge." 2006 WL 2038656, at *4. Here, Gallagher was directly linked to the SEC correspondence, and the Individual Defendants were practically the Company's only employees.

[16] The allegations that Gallagher personally sent and received SEC correspondence, and regarding the involvement of the other Individual Defendants in operations and accounting, are among the many allegations distinguishing this case from *Korzen* v. *Tetra Tech Inc.*, 2014 WL 12603209 (C.D. Cal. Jan. 17, 2014); *Webb* v. *Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018); and *Firefighters Pension & Ret. Sys.* v. *Ixia*, 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015). Further, Defendants'

Defendants argue that accounting is not a core operation, but the Individual Defendants admitted their involvement in accounting. ¶¶145, 148-49; ¶221 (financial operations brought in house in 2020). Further, Salzman and Gallagher served in accounting and finance roles. ¶¶25-26. Thus, the SAC contains "specific factual allegations plausibly implicating [Marathon's] management—namely the [I]ndividual [D]efendants—as the key personnel responsible for designing and maintaining [Marathon's] internal controls; these same individuals later acknowledged [Marathon's] internal control deficiencies." *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021). Because the fraud "directly implicates [Marathon's] internal controls and accounting practices," if "Defendants truthfully reported that they reviewed [Marathon's] internal controls, then Defendants knew or recklessly disregarded that the company was not accounting . . . in accordance with its disclosures.'" *AAC Holdings, Inc.*, 2021 WL 1316705, at *9. Conversely, "[i]f Defendants did *not* review [Marathon's] internal controls, then Defendants falsely represented in their certifications that they did undertake such a review, which could also contribute to a finding of scienter." *Id*. (emphasis in original); *see also Lowry* ("The fact that each defendant attested to the accuracy of information in quarterly and annual SEC filings yet failed to even once detect a risk of erroneous financial reporting during the class period is more than sufficient at the pleading stage to indicate recklessness.").[17]

Defendants attack Plaintiffs' allegations on the basis that "[c]ryptocurrency is a novel and evolving industry" and "GAAP did not include any authoritative principles for how to account for digital assets *specifically*." DB at 3. But the "novelty" of the cryptocurrency *industry* is irrelevant, as is the absence of GAAP provisions "specifically" about accounting for digital assets. As

reliance on *Ixia* to argue that the "relevant fact" was insufficiently prominent (DB at 18) is contradicted by the SAC's particularized allegations of scienter. Further, that is more properly a question of whether Defendants' misstatements were material, and Defendants have abandoned their arguments (previously made with respect to the first Amended Complaint) regarding materiality, which is a determination properly left to the trier of fact. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

[17] In *Zucco Partners, LLC v. Digimarc Corp.*, the Ninth Circuit merely held that certification of false SEC filings cannot establish a strong inference of scienter "without more." 552 F.3d 981, 1004 (9th Cir. 2009).

Defendants concede, this merely meant that issuers were required "to apply traditional GAAP to their digital assets." Far from novel, this case involves *traditional* accounting rules.

Defendants also argue that "at any time" meant at a specific time they selected (DB at 16), relying on an ERISA case applying the federal common law of contracts. *In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996). Contract law is irrelevant here, and "[o]utside of the Third Circuit's decision in *New Valley*, which dealt with a distinct type of benefit plan . . . , courts have interpreted this language [i.e., at any time] to *unambiguously* give the plan administrator the authority to terminate benefits." *Klaas v. Allstate Ins. Co.*, 21 F.4th 759, 771 (11th Cir. 2021). And, again, *the SEC told the Company its accounting violated GAAP*.

The inference of scienter is bolstered by Defendants' efforts to hide the truth. *See In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) ("steps to obscure" indicated scienter). Marathon deviated from its normal practice of disclosing SEC comment letters. ¶228.[18] Even at the end of the Class Period, Defendants disclosed only "a" single SEC letter (¶195) and then, two weeks later, disclosed additional letters in a manner that falsely suggested that SEC comments "relat[ing] to" the Restatement were only "recently received." ¶128.

Further, Gallagher and Salzman's resignations "w[ere] uncharacteristic when compared to the defendant's typical hiring and termination patterns [and] w[ere] accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. Gallagher left just two weeks after the Restatement, after only a year on the job, surrendering over $400,000 of equity compensation, and the Company had no CFO successor lined up, despite an impending private placement offering. ¶¶278-80. Salzman was demoted in the midst of the SEC correspondence and left soon after the Restatement. ¶25.

Finally, Defendant Okamoto's sale of $3 million in Company stock and receipt of $24 million related to RSUs contributes to scienter. Okamoto's defense that he sold stock for "tax

---

[18] The SAC alleges that Defendants did not make the correspondence public until its release on July 14, 2024, over a year after the Class Period. ¶230. Defendants argue that "it is *CorpFin* (not the company) that publicly releases comment letters and company responses," citing an SEC webpage (not SEC regulations). DB at 15 (citing Ex. X). This extrinsic document, however, does not establish that Defendants were *unable* to disclose the correspondence. Further, Defendants' argument "place[s] unwarranted reliance on a disclosure-related point while ignoring the salient point about knowledge." *AAC Holdings*, 2021 WL 1316705, at *8.

purposes" (DB at 11 n.4) cannot be taken as true. *Hadian*, 2024 WL 4246083, at *9 (improper to consider the truth of Forms 4 submitted to show purpose of insider sales). Notably, Okamoto does not contend that his sales were pursuant to a predetermined trading plan.[19] Defendants' contention that they increased their stock holdings relies on improper extrinsic documents and does not establish how those increases occurred. *Hadian*, 2024 WL 4246083, at *9.

Defendants' own Exhibits contradict their narrative of "good faith." DB at 12. The SAC establishes an inference of scienter at least as strong as any non-culpable inference.

### D.    The SAC Adequately Pleads Loss Causation

Loss causation requires "no more than the familiar test for proximate cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("To demonstrate loss causation, a plaintiff need only show a causal connection between the fraud and the loss."). Plaintiffs meet this standard by alleging that Defendants' misstatements artificially inflated Marathon's stock price and that the inflation dissipated when the stock fell 0.14% on February 28, 2023, and 8.31% the next day, in response to the news that Marathon had received an SEC comment and must restate nearly two years of financials because it violated GAAP by using a cutoff time when calculating bitcoin impairment, and by deeming itself as an agent with respect to MaraPool. These allegations provide an "indication" of the causal connection Plaintiffs "ha[ve] in mind." *Dura*, 544 U.S. at 347.

Defendants argue that the 8.31% stock price decline is not "significant," but "there is 'no hard cutoff' for 'significant.'" DB at 23 (citing *Daniels Family 2001 Rev. Trust v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1237 (D. Nev. 2024)). Courts regularly find that smaller declines establish loss causation. *See, e.g.*, *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 931-35 (N.D. Cal. 2020) (stock drops ranging from 2.5% to 9%); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) ("three stock drops, ranging from 2% to 8.59%"); *In re Amgen Inc.*

---

[19] *Plumley v. Sempra Energy* found it unlikely that a defendant sold stock because they were "tipped off" by the sister of California Governor Jerry Brown regarded an impending emergency declaration. 847 Fed. Appx. 426, 429 (9th Cir. 2021). Neither *Kang* v. *PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 901 (N.D. Cal. 2022) nor *Applestein* v. *Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012), found that increasing stock holdings was "fundamentally inconsistent" with scienter, DB at 11, and Plaintiffs do not have to establish "an intend to defraud" (*id.*).

22

*Sec. Litig.*, 2014 WL 12585809, at *6, *14, *19 (C.D. Cal. Aug. 4, 2014) (drops of 2.3%, 2.1%, and 9.1%); *see also In re Volkswagen AG Sec. Litig.*, 661 F. Supp. 3d 494, 536 (E.D. Va. 2023) (single-digit drop); *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *3 (E.D.N.Y. June 6, 2022) ("stock price fell 3.3% . . . and recovered from that loss soon after"); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *14 (S.D.N.Y. Apr. 1, 2015) (3.2%); *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421, at *6 (S.D. Fla. June 29, 2016) (4.48%).

Defendants also argue that the 8.31% stock drop is insufficient because the price fluctuated more than that on a minority (35%) of the other trading days in February and March 2023. DB at 24. But Defendants themselves suggest a reason for those fluctuations: "Marathon's share price is tied to its bitcoin holdings, which are highly volatile." DB at 24. Here, when Marathon's stock price *fell* in response to the disclosure, the Nasdaq Blockchain Economy Index *rose*. ¶196. This fatally undermines Defendants' speculation that "volatility" explains Marathon's stock drop, let alone all of it. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) ("The misrepresentation need not be the sole reason for the decline in value of the securities.").

Defendants' authorities are inapposite. Neither *Eng v. Edison Int'l*, 2017 WL 1857243 (S.D. Cal. May 5, 2017), nor *Ramos v. Comerica Inc.*, 2024 WL 2104398 (C.D. Cal. Apr. 12, 2024), addressed price drops of the magnitude present here, nor allegations that the issuer's stock price fell when the relevant index rose. *See Eng*, 2017 WL 1857243, at *4 (drops ranging from 0.79% to 2.71% over a five-month period); *Ramos*, 2024 WL 2104398, at *2 (drops of 3.59% and 3.96%).[20] Further, both of those cases relied on *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004), and *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010), each of which was decided on summary judgment on a full factual record, including expert reports regarding the statistical significance of the alleged corrective disclosures. *Id.* at 1266 (noting that "[i]n the context of a summary judgment motion," "plaintiffs often hire experts to opine on loss causation").[21] There is no requirement to *plead* statistical significance.

---

[20] *Ramos* also relied on its finding, not relevant here, that the alleged fraud-related stock drop "followed three straight days of price drops." 2024 WL 2104398, at *4.

[21] In *Las Vegas Sands*, "the peer stocks and industry index appear[ed] to move in tandem" with the issuer's stock—the opposite of this case. 709 F. Supp. 3d at 1239.

Defendants are wrong that "Marathon's stock price also quickly rebounded." (DB at 24). The stock did not close above the March 1 closing price until March 13, 2023, unlike in Defendants' cases. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (stock "immediately rebounded" the next trading day); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (stock recovered in three trading days after disclosures that could not "be reasonably read to reveal" truth); *Ramos*, 2024 WL 2104398 (rebounded in three trading days). Further, "[b]asic economic principles preclude dismissing a complaint" on grounds that the stock price recovered after falling significantly because the rebound can often be explained by external events. *In re CV Scis., Inc. Sec. Litig.*, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019).

Finally, Defendants attack loss causation because the stock drop was partially the next day. However, the Supreme Court has declined to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 n.28 (1988); s*ee also Gilead*, 536 F.3d at 1057–58 ("We rejected a bright-line rule requiring an immediate market reaction.").

Loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Gilead*, 536 F.3d at 1057. "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *Id*.

### E.    The SAC Adequately Pleads a Section 20(a) Claim

The Individual Defendants do not dispute that they controlled Marathon. Thus, Plaintiffs' claim under Section 20(a) of the Exchange Act survives alongside their 10(b) claim.

### V.    CONCLUSION

For the above reasons, the Motion should be denied. Should the Court grant the Motion in any way, Plaintiffs respectfully request leave to amend, which should be "freely" granted. Fed. R. Civ. P. 15(a)(2); *see also Ferris v. Wynn Resorts Ltd.*, 462 F. Supp. 3d 1101, 1129 (D. Nev. 2020).

24

Dated: August 1, 2025

Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**

*/s/ Andrew R. Muehlbauer*
Andrew R. Muehlbauer
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@mlolegal.com

*Counsel for Co-Lead Plaintiffs and Liaison Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
J. Alexander Hood II (*pro hac vice*)
Jonathan D. Park (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
          ahood@pomlaw.com
          jpark@pomlaw.com

**THE SCHALL FIRM**
Brian Schall (*pro hac vice*)
Brian England (*pro hac vice*)
Rina Restaino (*pro hac vice*)
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Email: brian@schallfirm.com
          briane@schallfirm.com
          rina@schallfirm.com

*Counsel for Co-Lead Plaintiffs and Co-Lead Counsel for the Class*

25