1

—2:23-cv-00470-RFB-DJA—

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

TODD LANGER, MARY BARIDA,           )
and JACKS WAY, LLC,                 )  Case No. 2:23-cv-00470-RFB-DJA
Individually and on                 )
Behalf of All Others                )  Las Vegas, Nevada
Similarly Situated,                 )  Friday, February 13, 2026
                                    )  12:31 p.m.
        Plaintiffs,                 )
                                    )  MOTION HEARING
        v.                          )
                                    )  *C E R T I F I E D   C O P Y*
MARATHON DIGITAL HOLDINGS,          )
INC.; MERRICK OKAMOTO;
FREDERICK G. THIEL; SIMEON
SALZMAN; and HUGH J.
GALLAGHER,

        Defendants.

_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES:        See next page

COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                    United States District Court
                    333 Las Vegas Boulevard South, Room 1334
                    Las Vegas, Nevada  89101

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

APPEARANCES:

For the Plaintiffs:

**ANDREW R. MUEHLBAUER, ESQ.**
MUEHLBAUER LAW OFFICE, LTD.
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
(702) 330-4505

**JONATHAN D. PARK, ESQ.**
POMERANTZ, LLP
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

**BRIAN RAY ENGLAND, ESQ.**
AFFELD ENGLAND & JOHNSON, LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
(310) 979-8700

For the Defendants:

**GUS FLANGAS, ESQ.**
FLANGAS LAW GROUP
3275 South Jones Boulevard, Suite 105
Las Vegas, Nevada 89146
(702) 307-9500

**ANDREW J. EHRLICH, ESQ.**
**DANIEL SINNREICH, ESQ.**
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

**MATTHEW STACHEL, ESQ.**
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1313 North Market Street, Suite 806
Wilmington, Delaware 19801
(302) 655-4410

3

———2:23-cv-00470-RFB-DJA———

LAS VEGAS, NEVADA; FRIDAY, FEBRUARY 13, 2026; 12:31 P.M.

--oOo--

P R O C E E D I N G S

THE COURT:  Please be seated.

COURTROOM ADMINISTRATOR:  Good afternoon.  The matter now before the Court is Moreno versus Marathon Digital Holdings, Inc., Case Number 2:23-cv-470-RFB-DJA.  Counsel, please make your appearances, beginning with plaintiffs.

MR. PARK:  Good afternoon, Your Honor.  Jonathan Park of Pomerantz, LLP for the plaintiffs.

MR. MUEHLBAUER:  Good morning -- good afternoon, Your Honor.  Andrew Muehlbauer on behalf of plaintiffs, local counsel.

MR. ENGLAND:  Good afternoon, Your Honor.  Brian England on behalf of the plaintiff.

THE COURT:  Good afternoon.

MR. EHRLICH:  Good afternoon, Your Honor.  Andrew Ehrlich from Paul Weiss still on behalf of the Marathon parties.

MR. SINNREICH:  Good afternoon, Your Honor.  Daniel Sinnreich, also from Paul Weiss, also on behalf of defendants.

MR. STACHEL:  Good afternoon, Your Honor.  Matthew Stachel, also Paul Weiss.

MR. FLANGAS:  Good afternoon, Your Honor.  Gus Flangas, also on behalf of the defendants.

THE COURT:  Okay.  Good afternoon.  So, Mr. Ehrlich,

2:23-cv-00470-RFB-DJA

why don't you come up to the podium for a moment, please.

So, Mr. Ehrlich, I want to make -- first, I want to say this.  I don't think it's appropriate for me to be considering all those documents you attached to your motion.  I mean, many of them are barely even referenced by the plaintiffs.  So I want to ask you about your arguments and how they work if I don't consider any of those documents because I'm not sure how based upon the allegations in the complaint I wouldn't necessarily allow it to go forward.

Now, these are motions for summary judgment arguments, but why am I considering 20 -- I don't know how many exhibits?  I mean, that's, first, I mean -- well, let me just say this.  It's a common problem that is really an issue that I don't like to have to deal with at a motion to dismiss.  Some of these exhibits, Mr. Ehrlich, should have never been attached to the motion to dismiss.  And while I can appreciate your position that the second amended complaint grossly misstates facts, I'm not allowed to consider that here.

So why am I considering so many exhibits on a motion to dismiss?

MR. EHRLICH:  Okay.  So, Your Honor, a couple of things.  On -- I -- what I'd like to do is two things.  First, I'd like to explain -- I hear the Court and I -- I don't sound like I'm going to persuade the Court, but I'd like to explain the relevance and the appropriateness of the exhibits.

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:23-cv-00470-RFB-DJA

THE COURT:  No, you don't need to.  Mr. Ehrlich, that doesn't matter, right.

MR. EHRLICH:  Okay.  But, yeah, either way, and I'll tell you why.

THE COURT:  It doesn't matter, right.  We are at a motion to dismiss.  They could be completely relevant --

MR. EHRLICH:  Yeah.

THE COURT:  -- and completely improper, right.  Their relevance is not the issue.

MR. EHRLICH:  Right.

THE COURT:  That's not the basis for them to be admitted --

MR. EHRLICH:  Sure.

THE COURT:  -- or to even be considered, right.

MR. EHRLICH:  Well, I think they're -- they fall in different categories, Your Honor.  So SEC filings and the stock price of Marathon, there is clear Ninth Circuit law saying that is appropriately considered on a motion to dismiss.

THE COURT:  Yes, but you don't rely mostly on that. That's some of what you reply upon.  You rely a great deal on these other communications and some of these arguments because their -- well, because their argument is based upon these other communications to try to establish knowledge as it relates to when your client may or may not have known about, sort of, these improper or allegedly improper accounting methods.

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:23-cv-00470-RFB-DJA

And so I know that there's some documents in here that potentially the Court could take judicial notice of, but there are many that are not ones that would --

MR. EHRLICH:  Sure.

THE COURT:  -- be documents I would take judicial notice of.  So focus on which ones you think -- besides the two you've identified, other categories which you think the Court can take judicial notice of at this point.

MR. EHRLICH:  So, Your Honor, if I may, I am happy to proceed on the basis that the only documents the Court takes judicial notice of are the SEC filings and the -- to the extent there's a dispute about them, right.  The disputed documents, I'm happy to proceed on the basis that the Court take judicial notice only of the SEC filings and Marathon stock price.  Both of which under either *Metzler* or *Silicon Graphics,* there's clear Ninth Circuit law that's appropriate.  And I --

THE COURT:  Well --

MR. EHRLICH:  -- believe, Your Honor, that we win regardless.

THE COURT:  -- here's the issue.  The issue is there's also context for some of the SEC -- are you talking about filings or are you talking about letters?  Because the law's slightly different as to those two things.  And you also relied upon the letters, right, and that's different than the filings.  The filings, there's no issue.  I don't even think they're

disputing that, but we have -- in addition to that, we have comment letters, right.

MR. EHRLICH:  Right.

THE COURT:  And there has to be some context for some of these, and that's where I have a concern about considering portions of them.  Because you all provide context by referencing some of these other exhibits in terms of when your clients may or may not have known about things.

MR. EHRLICH:  So, Your Honor, on the comment letters, each and every one of the comment letters is mentioned in the complaint, incorporated by reference in the complaint, and attached as exhibits to plaintiffs' opposition.  There is only one comment letter --

THE COURT:  So I want to make sure that I'm --

MR. EHRLICH:  Yep.

THE COURT:  Because I want to make sure because I thought that they all weren't incorporated by reference, but let me ask plaintiffs this right now.

Mr. Park, is that correct?

MR. PARK:  We do not -- I'm actually struggling to know -- we don't attach all of the comment letters because we wanted these -- to be somewhat efficient there.

THE COURT:  Well, it's one thing if you are attaching something in response to them attaching it versus something you're incorporating by reference.  I want to make a distinction

2:23-cv-00470-RFB-DJA

between that.

MR. PARK:  Of course, of course.

THE COURT:  So which SEC comment letters have you incorporated by reference as it relates to the amended complaint?

MR. PARK:  Your Honor, I know it is the letters dated April 8th, April 22nd, May 27th, I believe -- May 27th is correct, June 13th -- and I'm just giving the dates, Your Honor, but I could tell you who the centers are if that's helpful -- June 24th.  And I know there's additional ones including obviously the one in February of 2023 which was the last one before the restatement.

MR. EHRLICH:  And, Your Honor --

THE COURT:  Hold on.  Let me just --

MR. EHRLICH:  Oh, sorry.  Excuse me.

(Pause.)

THE COURT:  Is that it, Mr. Park?

(Plaintiffs' counsel conferring.)

MR. PARK:  Certainly October 11th is referenced in the amended complaint or second amended complaint, Your Honor.

THE COURT:  Okay.

MR. EHRLICH:  And the only additional comment letter in the whole exchange, Judge, between the SEC CorpFin division and Marathon that is not in the list we just heard is Exhibit P to our motion, which if you look at Page 12 of plaintiffs'

————————2:23-cv-00470-RFB-DJA————

opposition, it's Page 19 of 32 of ECF 87, they expressly state they do not object to.

THE COURT:  Okay.

MR. EHRLICH:  So the entirety of the comment letter exchange is undisputedly on the record in this motion and appropriately so because it's at the heart of the complaint. We're not asking the Court, to be clear, to go to the truth or the falsity of it, right.  This isn't about whether what was said was true or false, but what was said, right.  That's it. That's judicial notice.

So I think that the entirety of the comment letter record really is undisputed.

THE COURT:  Okay.  All right.  So let's proceed with just those documents as it relates to the argument here.

MR. EHRLICH:  Sure.

THE COURT:  And, again, addressing really a couple, sort of, core arguments I think that are made.  One is just about, sort of, the basically, for lack of better expression, saying one thing and doing another, which is --

MR. EHRLICH:  Right.

THE COURT:  -- one of the allegations which is about acknowledging that things were not properly, sort of, accounted for under GAAP, particularly as relates to this application of the operator definition.  But then there's a filing or filings that occur subsequent to that, and that's at least a portion of

2:23-cv-00470-RFB-DJA

their main argument about, you know, saying or acknowledging one thing and doing another.  And I would like you to address that --

MR. EHRLICH:  Certainly.

THE COURT:  -- with the documents that were referenced.

MR. EHRLICH:  Certainly, Your Honor.

May I start with the impairment issue and then go to the MaraPool issue?

THE COURT:  Yes, sure.

MR. EHRLICH:  So let's start with the impairment issue. The assertion in the complaint is that the defendants were saying one thing to the SEC --

THE COURT:  Right.

MR. EHRLICH:  -- and another thing to the investing public.

THE COURT:  Right.

MR. EHRLICH:  And zooming out, the legal standard here is a cogent inference of scienter where the fraudulent inference is more compelling than the non-fraudulent inference.  And, Your Honor, the idea that Marathon would be telling the SEC something different than the market when it's talking to the regulator of the market is kind of like going to the cops to cover up a crime.  It's a fundamentally illogical inference, and it didn't happen.  Because in Marathon's 2021 10-K it says in bold face type that the Bitcoin was valued at 4 p.m. New York time daily.

—————————2:23-cv-00470-RFB-DJA—————————

THE COURT:  Right.  So you're saying they were saying what they were doing.

MR. EHRLICH:  Correct.

THE COURT:  Right.

MR. EHRLICH:  And it's on the face of the documents, and that's what judicial notice is all about in this context. The 10-K says 4 p.m. daily bold type every day.

What they say to the SEC is we do it on a daily basis. In fact, the reason the SEC knew to ask the question is because it was in the filings.

THE COURT:  Right.

MR. EHRLICH:  Right, that very first comment letter that comes in April of 2022 is, "Explain your reason for doing it this way.  Why is that consistent with ASC 350, which says you should do it at the lowest point at any time?"

THE COURT:  Right.

MR. EHRLICH:  But of course "at any time" is a ambiguous concept, any time during the day, any time during the week, any time during the month.  So there were companies, like Marathon, at that point in time when it is undisputed that there's no authoritative accounting guidance on this point who said for administrative efficiency and lack of subjectivity, so we can't be criticized, we're going to do it at the same time every day.  And that's what they said in their filings, and that's what they said to the SEC.

2:23-cv-00470-RFB-DJA

And they say it in Exhibit P to our motion, their August 1st response, when the SEC first says, "It appears to us this is inconsistent with ASC 350.  You should please change it."  They say -- in contrast to the assertion that Marathon refused, Exhibit P is clear on its face, and I want to quote it because it's important.  It says, quote, We are certainly amenable to changing our methodology, close quote, but goes onto explain its view that what they're doing by doing it on a daily basis is, quote, aligned with industry standards as a practical expedient, close quote, and, quote, results in a materially accurate calculation, close quote.

And beyond that -- excuse me.  Just grab my water, Your Honor.

THE COURT:  Sure.  Take your time.

MR. EHRLICH:  I got a frog in my throat.  Apologies.

And in that same exhibit after saying that we believe it's materially accurate, in the prior response the SEC had said, "Show us" -- "You're saying it's immaterial.  Show us." And they do the calculation for 2021, and the difference in digital asset value is 2.8 million on total assets of the company of 1.4 billion, I mean, less than one-hundredth of 1 percent difference.  And if you want to just look at digital assets, which is 120 -- more than 120 million, it's still less than 2 percent of digital assets and they're totally transparent.  And by the way, those same numbers are in the

───────────2:23-cv-00470-RFB-DJA───────────

public filings.

And, you know, while plaintiffs say in their complaint they said something different to the SEC -- they told the cops the truth and not the market -- it's not actually what it shows. And what *Metzler* -- I think the Ninth Circuit --

THE COURT:  Let me ask you a question.  What obligation do your clients have to actually also reference the fact that there was a back-and-forth with the SEC?  That's -- another part of their argument is about disclosing the disagreement.

MR. EHRLICH:  Right.  Well, this isn't --

THE COURT:  There's no disclosure of that, right.

MR. EHRLICH:  That -- 100 percent, Your Honor.  100 percent.  There is not a disclosure, and I don't believe this is actually a disclosure case.  But --

THE COURT:  I don't think it's a disclosure case either.  They're using it --

MR. EHRLICH:  For scienter, but that's important.

THE COURT:  -- for scienter, right.

MR. EHRLICH:  That's important.  What they're saying is, "You didn't disclose it.  It shows you're trying to deceive the market."

THE COURT:  Right, you're trying to hide it.

MR. EHRLICH:  You're trying to deceive the market --

THE COURT:  Right.

MR. EHRLICH:  -- right, but there's a lot of case law

2:23-cv-00470-RFB-DJA

on this.  The Eighth Circuit addressed exactly this question in *Podraza*.  There are District Courts, including the *Plug Power* case, that say as a matter of law absent more -- and we don't have more here, Your Honor.  Your Honor dismissed the last complaint, right.  Then they added the comment letter thing.  So that's what we are looking at that is different from last time.  And what *Podraza* and what *Plug Power* and other courts to address this have said is that the comment letter process is an iterative discussion with a regulator on lots of things.

If you look at the very first letter that Marathon got in April of '22, it is a laundry list of 16 items.  And when you look at all of those exhibits, they're talking about, like, all these different technical accounting and disclosure issues, and the law is --

THE COURT:  Let me stop you for a moment, Mr. Ehrlich.

MR. EHRLICH:  Yeah.

THE COURT:  Because one of the concerns I have about this is this starts to feel like it's bleeding a little bit into a motion for summary judgment as relates to the valuation or the weighing of what the letters mean or the hiding of it.  I mean, even the idea of which is a more, sort of, reasonable or plausible, whatever, however they said it -- whatever that standard is --

MR. EHRLICH:  Yes.

THE COURT:  -- that starts to feel a little bit more

2:23-cv-00470-RFB-DJA

actually like a trial, but even more like a motion for summary judgment.  So one of the concerns I had --

MR. EHRLICH:  Right.

THE COURT:  -- has to deal with the fact that at this procedural stage should I be engaging in a weighing if I think it's a close call.  Because it seems to me one of the things you have to sort of convince me of is that it's not close enough to let the case move forward because I sort --

MR. EHRLICH:  Right.

THE COURT:  -- of feel like the way the case law reads is, "If you think it's close, District Court, you probably should let the case move forward."  And so I believe *Podraza* is saying to the Court, "As a matter of law, if you think that the factors laid out are so clearly insufficient," then I can rule at this stage.  But I don't read it to be saying that I couldn't look at the, sort of, overall circumstances of the facts and find this is close enough to let the case move forward.  So help me understand why you think this isn't close.

MR. EHRLICH:  Sure.

THE COURT:  Because to me that's how I read the standard.

MR. EHRLICH:  Sure.  It's not close, Judge, because we got to zoom out.  They have to plead fraudulent intent.

THE COURT:  Right.

MR. EHRLICH:  They need a motive.  This is a fraud

2:23-cv-00470-RFB-DJA

without a motive, Judge.  In most of the securities cases that I litigate that get past a motion to dismiss, the company's trying to juice earnings because they want to get acquired.  They're trying to withhold negative information about a product because there's a regulatory approval.  What is the motive for not disclosing to the market a back-and-forth with their regulator about two esoteric accounting issues that are tangential to their business?  Like, why would you deceive the market?  And there's no other, you know, indicia of scienter.  You have usually, Your Honor, a confidential witness.  Counsel for plaintiffs is able counsel.  I have encountered them in many cases.  They have former employees who will say they were trying to do this because they wanted to get acquired.  You would have an e-mail.  You would have a text.  You would have a short seller report.  You would have some type of something else that would say why they were doing this.  We have none of that here.

And, Judge, like, let's remember what this dialogue with the SEC, the 16 issues -- these two, are about.  One is about this MaraPool thing.

THE COURT:  Right.

MR. EHRLICH:  Paragraph 80 of the complaint makes clear it was in existence for 10 months.  This was not a major part of their business.  And look at Exhibit A to their complaint about what happened when Marathon changed the accounting treatment. Revenue went up.  Cost of revenue went up.  There was no

—————2:23-cv-00470-RFB-DJA—————

ultimate change to any, like, key performance indicator of the business, no key metric, you know.  There's no analyst who after this was revealed -- you know, often in these cases when -- when the so-called fraud is revealed, they'll say, "Oh, wow.  Now we look at the company differently because now we know that they're using a principle rather" -- nobody said that because the accounting costs went up.  Revenue went up.  It was a wash.

THE COURT:  Right.

MR. EHRLICH:  And on the -- on the Bitcoin thing, it's 2.5 percent -- 7 percent of the net assets of -- of the digital assets.  This is a company, the 2022 10-K makes clear, has $1.4 billion in assets.  This restatement is a few million dollars.  So they're going back and forth about two esoteric accounting judgments about, sort of, marginal parts of the business where there's no other allegation of intent to deceive.  You have, you know, no insider dumping stock --

THE COURT:  Right.

MR. EHRLICH:  -- which is a typical allegation here.  So I don't think the weighing of the inference is as close when, on the one hand, you have a back-and-forth with an -- ordinary back-and-forth -- and it's clear, Your Honor, you know, the *Plug Power* case --

THE COURT:  But I think their argument is this --

MR. EHRLICH:  Yeah.

THE COURT:  Mr. Ehrlich, which is when you were told --

your clients were told essentially about the problems in accounting methods, they knew when they received the letters that they were wrong and they prolonged this process. And they, by doing so, were able to file inaccurate public filings. I mean, that -- to me, the best version of their argument is to say --

MR. EHRLICH: Yeah, but to what end?

THE COURT: -- is to say, "You all knew -- from the moment you started getting these letters you knew from jump street, okay, we're doing it wrong. And you kept arguing when it was obvious that you were wrong and you eventually corrected it, but it took time to do that."

And as I understand what you're saying is that, "Okay. Even if that is true, that doesn't get you all the way here past a motion to dismiss because you'd have to show there is some motive for us to do that. Okay. Maybe we were stubborn. Maybe we thought we were right for longer than we should have, but we weren't doing it for any particular reason to benefit the company. We just thought this was the way we should be doing it at the time."

MR. EHRLICH: And where is the particularized allegation that anybody didn't believe what they were doing?

THE COURT: Right.

MR. EHRLICH: And in response -- and you know what's interesting here, Judge, in the whole chain of correspondence,

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

—————2:23-cv-00470-RFB-DJA—————

SEC raises a question.  Marathon responds.  SEC says, "It appears to us it's not consistent with ASC 350."  Marathon says, "Okay.  We'll change it if you want, but here's our material" --

THE COURT:  Here's why we think --

MR. EHRLICH:  And the SEC doesn't come back and bring the boom down.  They asked for more information and that dialogue continues.

And, by the way, when the SEC says, "We're not persuaded," six days later, which is again -- you know, if you read I think in *Podraza* and the other cases, the fact that the company upon the SEC saying, "Nope, we disagree," they promptly change the public accounting.

THE COURT:  Okay.  Let me let Mr. Park come up because I want him to address that point directly.  And I may bring you back up after that, but let me let him address these issues.

MR. EHRLICH:  Of course.  Thank you, Judge.

MR. PARK:  Yes, Your Honor.  A lot of points were made. I'm --

THE COURT:  Let me ask this question.  Why is this not a principal disagreement between a regulator and an entity trying to work out a standard for which there's not a lot of history for an industry that's relatively new, which I think I can consider in the context of inferring some scienter?  Why isn't this just, right, you know, Marathon saying, "Look, we think that we're right about how we should do this.  We want to

argue that to you.  Maybe you don't believe us.  We think that we're right"?

So why isn't that this case, Mr. Park?

MR. PARK:  Oh, I think there are several reasons why the defendants are incorrect on that.  One is that their -- their position that they're right was not -- again, not what they told investors.  They said they used the price at any time, and they said at any time since acquisition of the particular Bitcoin, not -- so the discussion about any time during a week or a month is -- is irrelevant.

Second, and --

THE COURT:  And I'm sorry.  Repeat that part again because I want to make sure I'm understanding --

MR. PARK:  Sure.

THE COURT:  -- what you're saying.  Because what you're saying is that what they told investors is not exactly what they were doing because obviously Mr. Ehrlich was saying, "Look, the reason why the SEC sent these letters is because we described our methodology and it was public and people knew about it."  And you're saying that's not true?

MR. PARK:  I believe that's not true.  Firstly, I do not --

THE COURT:  Okay.  Point --

MR. PARK:  I'm sorry, Your Honor.

THE COURT:  Point to me the part where it says that in

2:23-cv-00470-RFB-DJA

an exhibit or something because I want to make sure I'm looking at the correct language.

MR. PARK:  Sure.  Yes, Your Honor.  So I'm going to point you, if I may, to the complaint, Paragraph 63 of the complaint.  And this is --

THE COURT:  Hold on just a moment.  Let me get there.

MR. PARK:  Of course.  It's Page 18 of the complaint, Paragraph 63.

(Pause.)

THE COURT:  Okay.  Which paragraph are we looking at?

MR. PARK:  63, Your Honor.

THE COURT:  Okay.  All right.  Go ahead.

MR. PARK:  So this is a press release regarding the first quarter 2021 results.  It's issued on the first day of the class period.  And it says -- we bold it of course.  This is a discussion of measurement of an impairment of the company's Bitcoin.  And it says, "Marathon considers the lowest price of one bitcoin quoted on the active exchange at any time since acquiring the specific bitcoin."

So I'm not quite clear what counsel was talking about with at any time during the week or month.  Marathon itself said we measure it based on the lowest price at any time.

There is no dispute that they were not doing that.  There's no dispute about that.  They were telling investors one thing and doing the other.

2:23-cv-00470-RFB-DJA

Now, the SEC, it appears, understood from other ambiguous disclosures in their filings what their accounting was, but the SEC's Division of Corporation Finance is not the standard that reasonable investors are held to.

Moreover, I think on --

THE COURT: So you're saying it doesn't matter what the SEC understood. I have to look at what they were saying in their public filing.

MR. PARK: For purposes of determining what a reasonable investor understood --

THE COURT: Right.

MR. PARK: -- that's correct. I mean, this is a very clear statement about what their accounting treatment was, and it was incorrect. It was false.

THE COURT: Right.

MR. PARK: As to the point about the defendants' apparent subjective belief that they were correct, this is -- this is squarely covered by the *Omnicare* case which addresses statements of opinions or belief. Defendants say a lot of these statements are ones of opinion or belief. And *Omnicare* holds that such statements can be misleading if they omit material facts about the issuer's inquiry into the subject of the statement.

And so I'm going to -- I'm going to quote from *Omnicare* which is a 2015 Supreme Court case. The quote is, Consider an

unadorned statement of opinion about legal compliance:  "We believe our" statement -- "our conduct" -- excuse me -- "is lawful" -- some ellipses -- but if the issuer made the statement in the face of its lawyer's contrary advice or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain:  He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

So they believe they were correct, again, however rationally, that's fine.  If they wanted to plead their case with the SEC, that's fine --

THE COURT:  But they can't --

MR. PARK:  -- they didn't tell investors --

THE COURT:  You're saying that they can't be pleading to the SEC and at the same time telling investors something different in terms of what they were doing.

MR. PARK:  Correct, correct.  And, again, they -- unlike in *Podraza*, they did not restate when the SEC told them to.  The SEC said on May 27th, "Explain how this is consistent with the ASC --

(Court reporter clarification.)

MR. PARK:  -- "with the ASC, with the relevant accounting standards complication."  That was the second letter on this subject of Bitcoin impairment.

2:23-cv-00470-RFB-DJA

And then on June 24th the SEC said, "Your policy does not appear to comply with ASC.  Please revise your accounting."  Defendants did not do so.  That was in June.  They did not do so.  I understand they believe they were correct and corresponded with the SEC about it.  They didn't restate or tell any investors about this correspondence until February, when again the SEC said, "Your policy does not comply with GAAP.  Please revise your account."  And defendants have no explanation for why they didn't do that the first time the SEC said it.

So, again, we think that we have clear falsity here before the correspondence, certainly once the correspondence began, and there is -- can be no dispute that defendants knew about the correspondence because it was to and from the CFO of the company, Defendant Gallagher.

This is -- and, again, defendants point out that we don't have any confidential witnesses.  One reason, Your Honor, is that this was an unusually small company, which is why we think the core operations inference contributes to scienter along with the other factual allegations.  This is -- the Ninth Circuit holds that that inference can contribute to scienter in rare circumstances.  This is a rare circumstance.  You have three employees just before the class period.  You have 10 employees right before the SEC correspondence begins.  There's -- it's basically the defendants and a couple of other people, and you have Defendant Thiel testifying that he was

involved in every decision at the company.  So this is the rare circumstances where they would have known about this accounting issue.

I would also add, Your Honor, that the standard for scienter does not require motive, and it does not require intent to defraud.  Deliberate recklessness is enough.  The defendants can't just hide their heads in the sand and -- and claim, "Well, you know, we didn't really understand."  The SEC told them they were incorrect, and they didn't do what they said that they were doing.

So I think that answers Your Honor's questions.  I'm happy to continue to other issues.

THE COURT:  Well, those are the questions I am focussed on because I think -- I think that's the core of the dispute between the parties as it relates to particularly scienter.  That's -- as I indicated the last time that we were here --

MR. PARK:  Correct.

THE COURT:  -- that was the concern that the Court had, and you have added these additional pieces of information.  And so I don't have questions about any other aspects of what's being argued here because I'm focussed on that central dispute between the parties.

MR. PARK:  Understood, Your Honor.  I could --

THE COURT:  So let me let Mr. Ehrlich come back up here.

MR. PARK:  Sure.

THE COURT:  I expect he'll have a few comments, and then you may have a few in response.  And let's see where that leads us.

MR. PARK:  Thank you, Your Honor.

MR. EHRLICH:  So, Your Honor, a few things in response to Mr. Park.  First, Paragraph 63 of the complaint that he pointed you to was results of the first quarter of 2021.  It's a press release that articulates the standard, which is "at any time."  It's sort of -- I would -- it's true the question's how is it implemented, right.  It could be done on a daily basis. What ends --

THE COURT:  Yes, but it doesn't --

MR. EHRLICH:  -- up happening --

THE COURT:  But it doesn't say what they're doing.  So if they know what they're doing and they're not stating it here, why is that not an issue?  Again, we're at a motion to dismiss.

MR. EHRLICH:  Understood.

THE COURT:  Right.

MR. EHRLICH:  This --

THE COURT:  This does not accurately state what Marathon is doing.

MR. EHRLICH:  Well --

THE COURT:  It provides a general umbrella --

MR. EHRLICH:  Sure.

—————————2:23-cv-00470-RFB-DJA—————————

THE COURT:  -- but they had a very specific method --

MR. EHRLICH:  Right.

THE COURT:  -- which they could have -- and they knew about it at the time they issued the press release, and they don't say that.

MR. EHRLICH:  Well, Your Honor, this is a press release regarding the overall earnings results of the company, and it gives the big-picture standard.  When they give the annual reports and the annual financial statements, they do.  And by the way, this is a year and a half -- a year before the first comment letter.  In the 10-K at the end of the year they have notes in the financial statements that give the details about how it is that they implement the standard "at any time."  And --

THE COURT:  I'm sorry.  The end of the year?

MR. EHRLICH:  2021.

THE COURT:  2021.  Okay.

MR. EHRLICH:  If the Court looks at the yearend 10-K, it's at ECF 85-4.

THE COURT:  Okay.

(Pause.)

MR. EHRLICH:  And it's Page 8 of 9 of the ECF filing.  These are the complete financial statements for the year.

THE COURT:  What I'm trying to do, Mr. Ehrlich, is line up --

————————2:23-cv-00470-RFB-DJA————

MR. EHRLICH:  Yep.

THE COURT:  -- the press release with the actual public filing because, obviously, if what you're saying to me is the press release provides an overall picture, but the filings provided the detailed picture, and that's where even a reasonable investor should look --

MR. EHRLICH:  Yes.

THE COURT:  -- to figure out the details of how the accounting procedures are being implemented.

MR. EHRLICH:  And I would encourage the Court to look at Page 8 of 9 of 85-4.

THE COURT:  Okay.  Hold on.

There's a lot of small print here, Mr. Ehrlich, so you'd have to tell me where --

MR. EHRLICH:  Note 2.  And you'll see there's one, two, three, four, five paragraphs and the last one is Digital Currencies.  Are you with me?

THE COURT:  Yep.

MR. EHRLICH:  And you will see that it goes through and explains how digital currencies are included in current assets in the consolidated balance sheets as an indefinite lived tangible asset.  And then it goes on that we have -- apply ASC 350.  And if you read the paragraph the -- one, two -- third line up from the bottom that sentence begins:  "Bitcoin, ether, and gold prices are taken at," bold face, "approximately 4 p.m.

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:23-cv-00470-RFB-DJA

New York time."

THE COURT:  Right.

MR. EHRLICH:  Now, look, this is all technical accounting jargon, but if someone wanted to understand the technical accounting, it is disclosed in the annual financial statements, indeed, in bold face.

So they were not telling the SEC one thing and the market the other, and the SEC didn't have to, you know, divine from some vague unclear disclosure.  It's right there, bold print, 4 p.m. New York time daily.  And the SEC -- the whole point of this comment letter process is that the company puts this out, and the SEC reads it carefully and sends lots of detailed technical accounting questions.  And they go back and forth for months on them.  That's the whole CorpFin process, Your Honor.  And that's why it's not reckless.

I mean, first of all, you know, lack of motive -- which I think counsel's conceded at this point that there's no motive because he's now gone to reckless.  But reckless is essentially, you know, willful blindness.  It's a very high standard.  And lack of motive is very probative of the absence of scienter.

And, you know, I would encourage the Court to look at all the similarities, frankly, between *Podraza* and here because what the Court says in *Podraza* is there's nothing else.  And in this case, too, there's nothing else.

And, you know, another similarity which I didn't

————————2:23-cv-00470-RFB-DJA————

mention earlier is the company's outside auditor signed off and gave them a --

THE COURT:  Right.

MR. EHRLICH:  -- clean bill of health on their -- on their audit statement every year they were using this method, same as *Podraza*.

And *Plug Power* is another cases, Your Honor, that discusses comment letters.  And I would also recommend it to the Court because what the *Plug Power* court says and I think it's relevant here is there is no freestanding duty to disclose the back-and-forth with the Government in the comment letter process.  The only thing the regulations require, and this is in *Plug Power*, is that when you file your annual filings, if there are material unresolved comments, you've got to disclose them.

THE COURT:  So let me ask this one question --

MR. EHRLICH:  Yeah.

THE COURT:  -- which is the other question that Mr. Park raised, which is that the June letter asks --

MR. EHRLICH:  Right --

THE COURT:  -- Marathon to revise.  They don't.  They make a filing in August, right.  No discussion about being asked to revise, right.

MR. EHRLICH:  Uh-hmm.

THE COURT:  And then they're asked to revise again the following year, and then there's a revision.  So what about the

2:23-cv-00470-RFB-DJA

issue of the timing of the or the alleged, quote/unquote, delay in when they're asked to revise and the revision and that becoming public?

MR. EHRLICH:  Sure.

When they're asked to revise in the June 24th comment letter, the response is, "We of course will if you want us to, but here's the reasons why we continue to believe we're wrong [sic]."  And the SEC's response -- if the SEC responded and said, "You got to do it" -- when they did that, they did it six days later.  So the response to "please revise" to a letter that said, "It appears to us that this doesn't" -- "is inconsistent with ASC 350," was to say, "We will if you want" -- they offer to.

THE COURT:  Right.

MR. EHRLICH:  "But here's why we think it's immaterial and more accurate."  And their response wasn't go do it, it was actually, "We want to hear some more about that," several times, until, "Nope, we're not persuaded.  Do it."  And it was done six days later.

THE COURT:  Right.  So you're saying it's different from a case where the SEC says, "Okay.  We're past discussion. You need to change it," and they --

MR. EHRLICH:  And they just don't.

THE COURT:  And they just don't change it.

MR. EHRLICH:  Right.  And that's another point of

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

similarity to *Podraza* where the Court says because they acted swiftly when given a final decision there's -- this is not evidence of scienter.

THE COURT:  Okay.

MR. EHRLICH:  I do -- Your Honor, if you'll -- I know we've been here a while.  I do want to just touch briefly, if you'd let me, on loss causation.

THE COURT:  Well --

MR. EHRLICH:  Yeah.

THE COURT:  -- I don't really have questions about that, honestly.

MR. EHRLICH:  Okay.

THE COURT:  But if you want to touch briefly, I'll give you a few minutes to talk about it.

MR. EHRLICH:  Well, I just -- I want to point out that it is an independent basis.  And the Ninth Circuit decision that we submitted two days ago, the one thing that we did fail to note is that it is an affirmance actually of the *Ramos* case that we cite in various places in our brief.  Because, you know, in the Ninth Circuit, in contrast to a lot of other places, it is clear that plaintiffs have to plead loss causation with particularity, right.  They have to show a causal connection. And what the Ninth Circuit said just last week -- and I know it's -- you know, it's a memorandum disposition, but it's instructive, right, as to what three judges think anyway.  What

2:23-cv-00470-RFB-DJA

they observed there is that because Comerica's stock price decline following some article was modest, typical, and quickly reversed -- that's what they say, "modest, typical, and quickly reversed" -- plaintiff hadn't sufficiently alleged loss causation. And this is exactly on all fours here.

The stock price drop is modest in absolute terms. The *Metzler* case in the Ninth Circuit talks about a 10 percent drop as being modest. This is 8 percent over two days. And, indeed, on the day of the announcement there was effectively a .1 percent drop. It was typical. In 35 percent of the days there was more fluctuation than the days that are supposed revelation of the fraud.

And in -- and in the *Ramos case* the Ninth Circuit just affirmed was 28 percent, and it was quickly reversed. Within 11 trading days it was above the pre-disclosure point and for two years stayed above. So if this was some significant fraud that had been revealed, the logic of it -- of the cases is you would have seen some type of sustained atypical drop.

And, again, Your Honor, in cases where there's loss causation, there's more. There's analyst commentary. There's a CNBC article, "Oh, wow, there's this shocking news from Marathon." There is a Bloomberg article. There is something that says this stock price drop is connected to the market learning of these events.

The only people I'm aware of anywhere ever who have

said that this modest, typical, and short-lived stock drop is connected to the revelation of these two relatively esoteric accounting judgments, who's ever made that connection, is plaintiffs.  There's no other evidence.  There's no other facts cited.  And in the Ninth Circuit you've got to do better than that.

They take some pretty unremarkable events and try to say there's causation, and I don't think they plead it with particularity.  And I think the opinion last week makes that clear.  This isn't Rule 8.  This is Rule 9.  And, respectfully, they haven't done it.

THE COURT:  Thank you, Mr. Ehrlich.

Mr. Park, one final opportunity.

MR. PARK:  Thank you, Your Honor.  I have a few points that I'd wish to make.

First, a few minutes ago defense counsel pointed to a disclosure in the company's 2021 10-K.  But, again, in the complaint we -- we allege the contents of that 10-K on Paragraph 66 which is basically the same as the statement that we pointed the Court to earlier, which is in the 10-K issued on March 10th, 2022, it stated that the company, quote, accounted for its Bitcoin as indefinite intangible assets which are subject to impair- --

THE COURT:  I'm sorry.

MR. PARK:  I'm sorry, Your Honor.

2:23-cv-00470-RFB-DJA

THE COURT:  You're referencing --

MR. PARK:  I'm in Paragraph 66 of the second amended complaint.

THE COURT:  But you're referencing the 10-K on March 22nd?

MR. PARK:  Correct.

THE COURT:  I mean, March 10 of 2022.

MR. PARK:  Correct, for -- for the 2021 results.  And I can shorten my quoting of it, but the key point is that they say they're looking at the carrying -- if the carrying value declines at any --

(Court reporter clarification.)

MR. PARK:  If the carrying value of the Bitcoin declines from its -- excuse me -- the fair value declines below the carrying value at any time since acquisition, and they say that the --

THE COURT:  Where do they say that on the 10-K?

MR. PARK:  I don't have the actual 10-K with me.  I did not print out all 26 exhibits, Your Honor, with me, but --

THE COURT:  Hold on.

MR. PARK:  -- Paragraph 66 of the second amended complaint.  And there's no dispute that this is -- that this is a correct quoting of the 10-K.

THE COURT:  Well, what if they say both?

MR. PARK:  What if they say both?  I think, Your Honor,

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:23-cv-00470-RFB-DJA

then a reasonable investor could be quite misled because this is a very clear statement about what they were doing.

THE COURT:  Yes, but so is this other one, right. This --

MR. PARK:  I --

THE COURT:  I mean, because the section that Mr. Ehrlich cited provides very specific information.  In fact, it's bolded.  It's actually one of the few portions of the 10-K that's actually bolded, other than the headings.  Because I don't see the part that you're referencing --

MR. PARK:  I'm sorry, Your Honor.

THE COURT:  -- bolded.

MR. PARK:  I don't have the page number of the 10-K.

THE COURT:  That's okay.  I'm just trying to find it on the 10-K so I can try to compare it.

But assuming that you're both correct, if it's -- if it's in there, perhaps, there's some ambiguity.  Doesn't that militate against scienter, right?  Because then, perhaps, it could have been stated more clearly.  But if it's revealed someplace within the 10-K, even if there's some confusion, why isn't that sufficient to defeat scienter here?

MR. PARK:  Your Honor, for two reasons.  Firstly is that we've established that the statement that I've quoted is false, for one.  Secondly, the defendants knew what their actual accounting treatment was and they knew that it was not what was

2:23-cv-00470-RFB-DJA

stated in Paragraph 66.  So --

THE COURT:  Yes, but they --

MR. PARK:  -- they acknowledge the falsity.

THE COURT:  Right, no, but they put it in the 10-K elsewhere.  So if the whole argument is about a misstatement or a falsity, right, why would you put it someplace else in the document if you're trying to hide it?  There would be no reason -- and then bold it on top of that, right.  That doesn't seem to me to suggest someone's trying to hide the actual formulation because you would do the exact opposite.  You wouldn't put it in and you certainly wouldn't bold it.

So why would I find that where they've actually done that, even if they referenced this other language you talked about, why isn't that enough to defeat scienter here?

MR. PARK:  Well, Your Honor, in the complaint we actually go through exactly why the disclosure that defense counsel pointed to actually is not clear.  And in their reply they say, "Well, there was a typo, and that's why it's not clear."  But, regardless, it was not clear.

The statement only addressed the mined Bitcoin balances, not balances that were -- excuse me -- not Bitcoin that were bought, and does not clearly apply to Bitcoin that were received as fractional rewards from the Bitcoin accounting pool known as MaraPool, as we talked about earlier.

It also doesn't clearly say that they -- it says that

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

they looked at the nightly -- looked at the price on a nightly basis, but they didn't say whether they were using that price or reviewing it in order to determine the lowest price in the preceding 24 hours.

And of course as we point out in Paragraphs 76 and 77 of the second amended complaint, it's -- the final sentence which I think is the key one according to defendants is simply ungrammatical.  It does not make sense as written.  And now in litigation they are attributing it to a typo, but regardless it's not clear to investors.

THE COURT:  Okay.

MR. PARK:  And, again, we have knowledge of falsity which is why the -- the questions about recklessness or motive are a little bit beside the point because we have knowledge of falsity.

THE COURT:  The knowledge --

MR. PARK:  That is scienter.

THE COURT:  You mean the knowledge being that the SEC told them that they disagreed and they shouldn't be doing it this way, and they refused to make the change and they still filed these documents.

MR. PARK:  Yes, Your Honor, but also before the correspondence, the knowledge that when they said they were looking at the lowest price at any time since acquisition, that they were not doing that.

I do also want to make a point about defense counsel mentioned that they don't have a freestanding duty to disclose the SEC correspondence apart from material comments in a 10-K. But a duty to disclose can arise in two different ways. One is a rule requiring disclosure. The other is in order not to make a statement misleading. That is black letter law under the Securities -- under the '34 Act, and that's what we allege in the complaint. They made statements that were misleading by virtue of their failure to disclose the SEC correspondence.

I would like to touch on loss causation briefly. I know Your Honor's not --

THE COURT: Focussed on it, but go ahead.

MR. PARK: -- focussed on it, but this is not a -- this is completely unlike the cases that they cite. In the *Ramos* case, which was the one affirmed in a non-precedential opinion, it was a two-day recovery, recovered two days later. In the *Tesla* case, which they also cite, it was the next trading day after a 4 percent drop. And in *Metzler* it was three trading days. This is 11 trading days later.

And we've also pleaded in the complaint the fact that the relevant index rose as the company stock price fell, and my understanding is that if you net out market and index returns on those, the two-day drop is 10.62 percent which of course is more than the 10 percent modest threshold discussed in some of the cases.

—————————2:23-cv-00470-RFB-DJA—————

And, again, they point to the company's price movement in -- you know, in like the 30 days on each side.  There's no authority for why we should be looking at those periods exactly, and that's because this is a highly fact-intensive question that is litigated through experts in cases like this and again shows how the defendants are really treating this as a motion for summary judgment.  Your Honor should be looking at the four corners of the complaint with limited exceptions.

THE COURT:  Well, but hold on.  Let me stop you there, Mr. Park.

The comment letters are what we're talking about.  I mean, we're not talking about anything else.  So I'm not sure what you mean when you say I shouldn't be considering anything else.  All we've been talking about is what's in the filings and what's in the comment letters.  And you're not disputing that I can take judicial notice of that, correct?

MR. PARK:  The company's SEC filings, yes.  They also put in other companies' SEC filings.

THE COURT:  Well, in the comment letters you attached you're --

MR. PARK:  Correct.

THE COURT:  -- saying those are fine.

MR. PARK:  Correct.  But --

THE COURT:  Hold on.  I'm sorry.

MR. PARK:  Yes, Your Honor.

2:23-cv-00470-RFB-DJA

THE COURT:  Is there something else that you are saying that they are arguing that's based upon extrinsic documents that I have not accepted that I should be ignoring?

MR. PARK:  Well, they are making a highly fact-intensive argument about loss compensation that looks at the movement of the company's stock during a period that they've selected.

THE COURT:  So let me stop you there.  So are you saying that I can't consider the number of days for the recovery of the price?

MR. PARK:  I am saying, Your Honor, that they are making disputed interpretations of these extrinsic documents which is exactly what the Ninth Circuit warned about in *Khoja*.

THE COURT:  So what exactly -- in terms of loss causation, what exactly are you talking about?  Because there's an argument about, right, the amount of the loss and percentages of that, right, and the recovery.  There are two arguments there, one, this is a modest loss, and the other is that the price recovered anyway 11 days later.

Are you saying I can't consider those facts and you're disputing those facts?

MR. PARK:  I'm saying that they're -- they're -- the facts of this case are highly different than the facts of the cases that they rely on, but they make a third loss caution argument --

2:23-cv-00470-RFB-DJA

THE COURT:  Okay.  But let me stop you there.  I'm talking about the facts that I just --

MR. PARK:  Sure, yes.

THE COURT:  -- referenced.  Are you disputing those?  Are you saying I can't consider those?

MR. PARK:  We're arguing -- I'm arguing, Your Honor, that even if you do consider those, the loss causation is sufficiently pleaded under the Ninth Circuit -- under Ninth Circuit case law.

THE COURT:  All right.  Thanks.

MR. PARK:  And one of those cases is the *Gilead* case which clearly says that this is a matter for proof at trial.  And that -- that is what this -- this case should move to discovery so that we can determine the answers to all of these questions and resolve some of the disputed inferences that defendants are urging the Court to accept as fact.

THE COURT:  Okay.  Thank you.

MR. PARK:  Thank you.

THE COURT:  Thank you, Mr. Park.

MR. PARK:  Thank you.

THE COURT:  All right, counsel.  I am going to take this matter under advisement.  I will say this.  What may happen if I do grant the motion to dismiss in this case, Mr. Ehrlich, what I will do and I have done in some of these cases is ask the defendants to draft an order for the Court to edit as it relates

2:23-cv-00470-RFB-DJA

to the ruling.  So the important thing is if you get that -- I'd like to get that draft turned around quickly if I were to grant the motion and ask you to draft it so that we can get the case resolved one way or another.  Of course if I deny the motion, I will draft that myself.

MR. EHRLICH:  Understood, Your Honor.  And if the Court does in fact grant the motion, we will act expeditiously.

THE COURT:  All right.  Perfect.  Thank you.

Thank you all for your time.  We'll be adjourned on this case.  Thank you.

MR. STACHEL:  Thank you.

MR. EHRLICH:  Thank you, Your Honor.

MR. PARK:  Thank you, Your Honor.

(Whereupon the proceedings concluded at 1:23 p.m.)

--oOo--

COURT REPORTER'S CERTIFICATE


I, PATRICIA L. EAKER, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Date:  March 12, 2026.

/s/ **Patricia L. Eaker**

Patricia L. Eaker, RMR, CRR